UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| OCLC, INC., <br><br> PLAINTIFF, <br><br> V. <br><br> BAKER & TAYLOR, LLC, *ET AL.*, <br><br> DEFENDANTS. | CASE NO. 2:25-CV-309 <br><br> JUDGE: EDMUND A. SARGUS <br><br> MAGISTRATE: ELIZABETH PRESTON DEAVERS |

**DEFENDANT BAKER & TAYLOR, LLC'S PARTIAL MOTION TO DISMISS**

Defendant Baker & Taylor, LLC ("**Baker & Taylor**") moves this Court to dismiss Counts 1, 2 and 4 of Plaintiff OCLC, Inc.'s ("**OCLC**" or "**Plaintiff**") Complaint pursuant to Fed. R. Civ. P. 12(b)(6). The reasons for this motion are more fully set forth in the accompanying Memorandum in Support, which is attached hereto and hereby incorporated by reference.

Respectfully submitted,

| | |
|---|---|
| */s/ Derek P. Hartman* | */s/ Frank E. Noyes, II (admitted pro hac vice)* |
| Derek P. Hartman (0087869), Trial Attorney | Frank E. Noyes, II (PA Bar No. 48366) |
| Michael C. Cohan (0013542) | Nafiz Cekirge (CA Bar No. 255710) |
| CAVITCH FAMILO & DURKIN CO., L.P.A. | OFFIT KURMAN, P.A. |
| 1300 East Ninth Street, Twentieth Floor | 222 Delaware Avenue, Suite 1105 |
| Cleveland, Ohio 44114 | Wilmington, Delaware 19801 |
| Telephone: (216) 621-7860 | Telephone: 302-351-0900 |
| Facsimile: (216) 621-3415 | Facsimile: 302-351-0915 |
| Email: mcohan@cavitch.com | Email: fnoyes@offitkurman.com |
| dhartman@cavitch.com | nafiz.cekirge@offitkurman.com |
| *Attorneys for Defendant Baker & Taylor, LLC* | *Attorneys for Defendant Baker & Taylor, LLC* |

## MEMORANDUM OF LAW

*… a WorldCat customer notified OCLC that it was canceling its WorldCat subscription and stated it was switching to BTCat because it was substantially cheaper.*[1]

**I.   INTRODUCTION**

This lawsuit is a thinly veiled attempt by OCLC to suppress competition—not to vindicate any legitimate legal right. Baker & Taylor's BTCat system and database is a lower-cost alternative to OCLC's self-described "centerpiece" product, WorldCat. Both are bibliographic databases designed to help libraries build their catalogs. While WorldCat contains approximately 600 million records and BTCat only 70 million, BTCat's competitive pricing has clearly struck a nerve.

Rather than compete fairly in the marketplace, OCLC resorts to litigation, spinning an unfounded narrative that Baker & Taylor built BTCat on the "back" of WorldCat. Specifically, OCLC alleges that Baker & Taylor offered free access to BTCat as part of a separate, unrelated service agreement for collectionHQ, in exchange for catalog data from subscribers—some of whom also use WorldCat. This, OCLC contends, gave Baker & Taylor "backdoor" access to WorldCat's proprietary content, which Baker & Taylor then used to build BTCat.

Even if taken at face value, OCLC fails to allege facts sufficient to state plausible claims against Baker & Taylor for: (1) tortious interference with contractual relationships (Count One); (2) tortious interference with prospective business relationships (Count Two); and (3) unjust enrichment (Count Four).[2] As such, the Court should dismiss these claims pursuant to Fed. R. Civ. P. 12(b)(6).

---

[1] Compl. ¶ 93, ECF No. 1 at PageID 16.

[2] While Baker & Taylor does not move to dismiss OCLC's breach of contract claim (Count One) at this stage of the proceedings, Baker & Taylor does not admit the allegations, does not concede that this claim has any merit, and reserves the right to raise any and all defenses, whether in law or in equity.

## II.     THE RELEVANT ALLEGATIONS

OCLC alleges that Baker & Taylor built BTCat "misappropriat[ing] WorldCat records." (Compl. ¶¶ 81, ECF No. 1 at PageID 14.) Specifically, OCLC contends that Baker & Taylor inserted a provision in its contracts for a service unrelated to cataloging called collectionHQ that "require[d] collectionHQ subscribers to authorize Baker & Taylor to access the subscriber library's catalog and to license all catalog records to Baker & Taylor for use in BTCat, which collectionHQ customers [could] then use for free." (Compl. ¶ 83, ECF No. 1 at PageID 14–15.) The problem, according to OCLC, is that these catalogs often have records "download[ed]" from WorldCat. (Compl. ¶ 53, ECF No. 1 at PageID 10.)

For starters, OCLC's allegation is belied by the plain language of the contract incorporated into OCLC's Complaint, which makes it clear that Baker & Taylor does not require subscribers to give it access to their catalogs; rather Baker & Taylor gives them the option of doing so in exchange for free access to BTCat. (Compl. ¶ 85, ECF No. 1 at PageID 15.) OCLC's allegations also make it clear that the collectionHQ agreement does not give Baker & Taylor access to WorldCat but rather to the subscriber's catalog. (Compl. ¶ 83, ECF No. 1 at PageID 14–15.)

Even leaving aside this fatal deficiency to its allegations, OCLC maintains that this "contractual backdoor" that Baker & Taylor devised "to obtain WorldCat records" tortiously interfered with its contracts with collectionHQ subscribers as well as its prospective business relationships.

Unfortunately for OCLC, the document they primarily rely on for the interference claim is not even a contract, but rather a "policy." (Compl. ¶ 60, ECF No. 1 at Page ID 11; Compl. Ex. A., ECF No. 1-1.) Secondarily, the Complaint attaches a template of a "Framework Agreement" (Compl. ¶ 98, ECF 1, at PageID 17; Compl. Ex. E, ECF No. 1-5.), which does not incorporate the

3

Policy, and which contains a menu of schedules (not attached) that OCLC customers can apparently pick and choose from as suits their needs. OCLC does not identify or allege any contracts with WorldCat customers that prohibit them from granting Baker & Taylor access to WorldCat records through the collectionHQ agreements. Nor does OCLC identify any customers who breached a contract with OCLC. Because there is no actual contractual obligation preventing WorldCat customers from granting Baker & Taylor access to their catalogs, the Complaint presents a series of allegations amounting to a fast and loose game of connect-the-dots that mischaracterizes its own documents. The following chart is illustrative.

| **OCLC's Allegations** | **What The OCLC Exhibits Actually Say** |
|---|---|
| "All OCLC customers who subscribe to WorldCat and other OCLC services agree to the terms of OCLC's Framework Agreement and the accompanying "Schedule(s)" that apply to the products or services they receive from OCLC." (Compl. ¶ 98, ECF No. 1 at PageID 17.) | In fact, an "Institution" enters into the Framework Agreement and selects from Schedules that apply to the Institution depending on the service that the Institution selects. (Compl. Ex. E, ECF No. 1-5 at PageID 2–4.) |
| "All WorldCat customers also agree to the OCLC customer responsibilities outlined in Section 3 of Schedule 2 to the Framework Agreement." (Compl. ¶ 100, ECF No. 1 at PageID 18.) | Only Institutions that have selected the service called WorldShare Metadata/ OCLC Cataloging agree to Schedule 2 of the Framework Agreement. (Compl. Ex. E, ECF No. 1-5 at PageID 4–5.) |
| "Among other things, WorldCat customers agree that the use and transfer by the Institution of WorldCat Data is subject to the [WorldCat Policy]. The WorldCat Policy sets forth WorldCat customer's and OCLC's rights and responsibilities associated with the stewardship of the WorldCat . . . bibliographic and holdings database . . . including the use and exchange of OCLC member-contributed data comprising that database." (Compl. ¶ 101, ECF No. 1 at PageID 18.) | In fact, the WorldCat Policy applies to WorldCat members—not WorldCat customers. "WorldCat member" is a term of art specifically defined in the Framework Agreement. (Compl. Ex. E § 13.1, ECF No. 1-5 at PageID 9.) |
| "Under Section 3(B) of the WorldCat Policy, WorldCat customers are prohibited from | Again, the WorldCat Policy does not apply to WorldCat customers but rather WorldCat |

4

| | |
|---|---|
| 'engaging in mass downloading from WorldCat without OCLC's prior written consent,' 'engaging in mass distribution of data directly from WorldCat to non-members without OCLC's prior consent,' or 'engaging in other activities that diminish the value of WorldCat to the OCLC cooperative.'" (Compl. ¶ 104, ECF No. 1 at PageID 19.) | members. (Compl. Ex. A § 1, 3(B), ECF No. 1-1 at PageID 5.) Moreover, by OCLC's own admission, the WorldCat Policy applied to WorldCat Data—not WorldCat records. (Compl. § 101, ECF No. 1 at PageID 18.) In fact, the WorldCat Policy never mentions "WorldCat records," but defines "WorldCat Data." (Compl. Ex. A, ECF No. 1-1 at PageID 7.) |

In short, the provisions of the exhibits OCLC attaches contradict OCLC's allegations:

- Not all WorldCat customers agree to the WorldCat Policy via Schedule 2. Rather, "Institutions" that sign the Framework Agreement and select the service called "WorldShare Metadata/OCLC Cataloging." (Compl. Ex. E, ECF No. 1-5 at PageID 4–5.)

- The WorldCat Policy does not govern WorldCat Customers, but rather WorldCat members. (Compl. Ex. A §§ 1, 3, ECF No. 1-1 at PageID 3–5; Compl. Ex. E § 13.1, ECF No. 1-5 at PageID 9.)

- The WorldCat Policy does not govern WorldCat records, which is undefined in the WorldCat Policy. Significantly, although OCLC tries to give the impression throughout the Complaint that a WorldCat record is a proprietary thing that WorldCat customers cannot share, it concedes, as it must, that a "WorldCat record" is actually a third-party record: "WorldCat records are bibliographic data, including the title, author, publisher, and number of pages. This information is obtained from OCLC customer libraries, publishers, vendors, national libraries, etc." (Compl. ¶ 42, ECF No. 1 at PageID 8.) Moreover, while the WorldCat Policy expressly asserts "copyright rights in WorldCat as a *compilation*," it explicitly disclaims "copyright ownership of *individual records*" in WorldCat. (Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 3; Compl. Ex. E § 13.1, ECF No. 1-5 at PageID 9) (emphasis added). Further, OCLC references its "unique identifying number, the 'OCN,'" that it inserts into the records it collects from others, but nowhere does the Complaint claim that the OCN is proprietary. (Compl. ¶43, ECF 1, PageID8.) This sleight of hand is deliberate because OCLC knows that it has expressly disclaimed ownership of its OCN Number, claiming it is now in the public domain. *See* Jim Michalko, *OCLC Control Numbers—Lots of them; all public domain*, Hanging Together the OCLC Research Blog, (Sept. 23, 2013), https://hangingtogether.org/oclc-control-numbers-lots-of-them-all-public-domain/; Merrilee Proffitt, *OCLC Control Numbers in the wild*, Hanging Together the OCLC Research Blog, (Oct. 11, 2013), https://hangingtogether.org/oclc-control-numbers-in-the-wild/.[3]

---

[3] When deciding a motion to dismiss under Fed. Civ. R. 12(b)(6), a court may take "judicial notice of documents of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005.

In Count Two, OCLC contends that by virtue of the fact that WorldCat is "the world's preeminent cataloguing record service," it has many prospective business relationships. (Compl. ¶ 137, ECF No. 1 at PageID 25.) Without identifying any of these future customers, OCLC claims that Baker & Taylor interfered with future business relationships by building BTCat off of WorldCat's back and offering it as a "lower cost" alternative to WorldCat. (Compl. ¶¶ 136–41, ECF No. 1 at PageID 25–26.) Because competing at a lower cost is not illegal, this claim rests entirely on the same unsupported allegations in Count One that Baker & Taylor allegedly relied on improper interference with OCLC agreements to build the BTCat database.

Finally, OCLC's unjust enrichment claim is based on its allegation that Baker & Taylor "unjustly retained WorldCat records." (Compl. ¶ 151, ECF No. 1 at PageID 27.) It so alleges despite conceding both in the Complaint and the WorldCat Policy that it has no proprietary interest over records in WorldCat. (Compl. ¶ 42, ECF No. 1 at PageID 8; Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 3.) Count Four likewise arises entirely from the alleged tortious interference, and fails when that claim fails.

### III. LAW AND ARGUMENT

#### 1. Standard of Review under FED. CIV. R. 12(B)(6).

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) allows a defendant to test the legal sufficiency of the complaint. *Gardner v. Quicken Loans, Inc.*, 568 F. App'x 362, 365 (6th Cir. 2014. "In assessing a motion to dismiss under Rule 12(b)(6), this court construes the complaint in the light most favorable to the plaintiff," but the complaint "must provide 'more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.,* 668 F.3d 393, 403 (6th Cir. 2012) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Legal conclusions

6

must not be accepted as factual allegations, and the factual allegations in the complaint "must be enough to raise a right of relief above the speculative level on the assumptions that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (internal citations omitted).

On a motion brought under Fed. R. Civ. P. 12(b)(6), the court's inquiry is limited to the content of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. *See Amini v. Oberlin College*, 259 F.3d 483, 502 (6th Cir. 2001. ***"[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."*** *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (alteration in the original) (emphasis added). In this case, the exhibits OCLC chose to attach must be considered, because they purport to establish the contractual obligation of OCLC customers on which the claim of intentional interference is based.

### 2. <u>OCLC's Tortious Interference with Contractual Relationships Claim Collapses.</u>

Under Ohio law, the elements of tortious interference with contract claim are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; and (5) resulting damages.[4] *See Sophia's Cure Inc. v. AveXis, Inc.*, No. 2:16-CV-865, 2017 WL 4541449, at *6 (S.D. Ohio Oct. 10, 2017. Further, "tortious interference with a contract requires the plaintiff to prove, as an element, an actual breach of contract." *Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 542 (6th Cir. 2014. To survive a Rule 12(b)(6) motion, the plaintiff must sufficiently allege "each

---

[4] Because OCLC has not alleged any facts that would suggest that the law of any forum other Ohio would apply, for purposes of this motion only, Baker & Taylor will assume that Ohio law applies.

7

of the[se] five elements." *Sparks v. Fitzhugh*, No. 1:22-CV-00638, 2023 WL 6383814, at *6 (N.D. Ohio Sept. 29, 2023.

OCLC claims that Baker & Taylor's "solicita[tion] of WorldCat customers to grant access to their cataloging records that include WorldCat records and a license for unlimited use of those WorldCat records . . . violates the WorldCat Policy."[5] (Compl. ¶ 133, ECF No. 1 at PageID 24–25.) Fatal to its claim, OCLC fails to identify any WorldCat customers that have granted access to WorldCat records through their collectionHQ agreements. (*See generally* Compl., ECF No. 1.) In fact, OCLC does not allege or define what a WorldCat customer is anywhere in the Complaint, nor, as set forth below, does the term appear in any of the purported "contracts." Most importantly, OCLC does not allege any contracts with WorldCat customers that prohibit them from granting Baker & Taylor access to WorldCat records through collectionHQ agreements.

Further, OCLC's tortious interference with contractual relationships claim fails because it fails to properly plead: (1) the existence of contract between OCLC and a third party with which Baker & Taylor interfered; (2) breach of that contract by the third party; or (3) intentional procurement of the breach by Baker & Taylor without justification:

- Although OCLC claims that the WorldCat Policy contractually prohibits WorldCat customers from allowing Baker & Taylor access to WorldCat records, the WorldCat policy is just that—a policy, not a contract.

- Even if it were a contract, the WorldCat Policy says nothing about "WorldCat customers" or "WorldCat records," let alone restrictions on how WorldCat customers may disseminate WorldCat records. As such, it is impossible for WorldCat customers to breach the WorldCat Policy by granting Baker & Taylor access to WorldCat records.

- Even if the WorldCat Policy were a contract and WorldCat customers breached it by giving Baker & Taylor access to WorldCat records, Baker & Taylor did not procure any such breach because the collectionHQ service agreements do not

---

[5] The Complaint defines the WorldCat Policy as the document entitled "WorldCat Rights and Responsibilities for the OCLC Cooperative," which is attached to the Complaint as Exhibit A. (Compl. ¶ 60, ECF No. 1 at PageID 11.)

8

> require subscribers to allow Baker & Taylor access to their catalogs, but rather merely give subscribers that option.

- OCLC cannot base a tortious interference with contractual relationships claim on Baker & Taylor's alleged access to WorldCat records because, by OCLC's own admission, they do not belong to WorldCat.

### a. The WorldCat "Policy" is not a Contract.

The existence of a contract with which the defendant interfered is the *sine qua non* of a tortious interference with contractual relationships claim. *See Marshall Goldman Motor Sales & Leasing v. Singh*, No. 1:24-CV-1191, 2025 WL 1256722, at *8 (N.D. Ohio Apr. 30, 2025 (holding that tortious interference with contract claim fails because "[w]hile Plaintiff alleges that it was in the business of buying and selling used luxury cars, it does not allege the existence of a specific contract to sell the Vehicle to a third party." (internal quotation marks omitted)). Although OCLC tries to characterize the WorldCat Policy as the "contract" that forms the basis of its tortious interference with contractual relationships claim, the WorldCat Policy itself contradicts OCLC's characterization.

For starters, Section 1 of WorldCat Policy repeatedly says that it is a "policy." (Compl. Ex. A, ECF No. 1-1 at PageID 2–3.) Consistent with that characterization, Section 1 of the WorldCat Policy contains no firm requirements for OCLC members but rather contains general aspirational guidelines for conduct. For instance, it advises OCLC members that it is their "responsibility" to "[m]ake reasonable efforts" to do certain things. As such, the WorldCat Policy does not "provide[] a basis for determining the existence of a breach and for giving an appropriate remedy"—preventing it from being a valid contract. *Cap. Equity Grp. v. Ripken Sports Inc.*, 744 F. App'x 260, 263 (6th Cir. 2018.

Second, the WorldCat Policy is not signed by the parties to be charged—which is typically how parties commit to contractual obligations. OCLC tries to get around (or obscure) this fact by

9

playing a fast and loose game of connect-the-dots. Starting with the Framework Agreement, OCLC alleges that "all OCLC customers who subscribe to WorldCat . . . agree to the terms of OCLC's Framework Agreement (which is attached as Exhibit E to the Complaint) and the accompanying "'Schedule(s).'" (Compl. ¶ 98, ECF No. 1 at PageID 17.) Continuing to Schedule 2, which OCLC does not attach to the Complaint, OCLC alleges that under Schedule 2, WorldCat customers agree that the "'use and transfer . . . of WorldCat Data is subject to the" WorldCat Policy. (Compl. ¶ 101, ECF No. 1 at PageID 18.) Thus, OCLC contends, the WorldCat Policy is a set of obligations to which its customers agree (*i.e.*, a contract).

OCLC mischaracterizes the lay of the land. First, the Framework Agreement never mentions WorldCat customers but rather talks about Institutions. (Compl. Ex. E, ECF No. 1-5 at PageID 2.) Moreover, not every Institution necessarily agrees to Schedule 2; only ones that select a service called WorldShare Metadata/OCLC Cataloging do. (Compl. Ex. E, ECF No. 1-5 at PageID 4–5.) And even if a particular Institution did agree to Section 2, by OCLC's own admission, that Section does not apply to WorldCat records—which is what OCLC's tortious interference with contractual relationships is based on. (Compl. ¶ 101, ECF No. 1 at PageID 24–25)—but rather only to "the use and transfer . . . of WorldCat Data." (Compl. § 101, ECF No. 1 at PageID 18.) In fact, the WorldCat Policy never mentions "WorldCat records," but defines "WorldCat Data." (Compl. Ex. A, ECF No. 1-1 at PageID 7.)

Finally, the WorldCat Policy cannot be a contract because OCLC has the unilateral ability to review and revise it. Ohio courts regularly hold that policies that may be changed by one party cannot be contracts because there is no "meeting of the minds" as to their terms. *See Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538–39 (S.D. Ohio 2023 ("Humana's 'Associate Work-Life Policies & Processes' in place during the time at issue explicitly state, as related to internal

10

complaint investigations, that it is 'subject to change or termination by Humana at any time.' Given the explicit language giving unilateral authority to Humana to alter the policy, Plaintiff's breach of contract claim must fail, as there is no evidence present indicating mutual assent."); *Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.*, 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004 ("Here, though Hillside's employee handbooks spelled out the FMLA's return to work requirements for medical leave, the handbooks contained clear and unambiguous language disclaiming contractual liability and reserving the right to change without notice the policies described. Thus, the handbooks demonstrate a lack of intent on the part of Hillside to be bound by their terms. They are nothing more than unilateral statements of company policy that create no contractual liability."); *Finsterwald-Maiden v. AAA S. Cent. Ohio*, 115 Ohio App. 3d 442, 447, 685 N.E.2d 786, 790 (1996) ("[T]he handbook states that AAA may change its policies and procedures as it deems necessary. Courts have considered provisions permitting the employer to unilaterally alter the handbook at any time as an indication of a lack of mutual assent.").

### b. OCLC Identifies No Actionable Violations.

Even if the Court were to find that the WorldCat Policy is an enforceable contract, OCLC's tortious interference with contractual relationships claim would still fail because, once again, OCLC cannot allege that any of its customers breached the WorldCat Policy as a result of Baker & Taylor's actions. *See OCLC, Inc. v. Anna's Archive*, No. 2:24-CV-144, 2025 WL 1235238, at *6 (S.D. Ohio Mar. 21, 2025) ("In its Complaint, OCLC neglects to allege any actual breach. OCLC has thus failed to state a claim for tortious interference with contract.").

For starters, as discussed before, by OCLC's own admission and the language of the WorldCat Policy, the WorldCat Policy governs WorldCat data—not WorldCat records. (Compl. ¶ 101, ECF No. 1 at PageID 18; Compl. Ex. A, ECF No. 1-1 at PageID 7.) Therefore, Baker &

11

Taylor's allegedly tortious collection of WorldCat records—which forms the basis of OCLC's tortious interference with contractual relationships claim (Compl. ¶ 101, ECF No. 1 at PageID 24–25)—does not amount to a breach of the WorldCat Policy. *See OCLC, Inc. v. Anna's Archive*, No. 2:24-CV-144, 2025 WL 1235238, at *6 (S.D. Ohio Mar. 21, 2025 ("In its Complaint, OCLC neglects to allege any actual breach. OCLC has thus failed to state a claim for tortious interference with contract.").

Moreover, OCLC does not identify any specific provisions of the WorldCat Policy (or any other agreement) that a collectionHQ subscriber would be violating by granting Baker & Taylor access to its catalog containing WorldCat records. Of the provisions that OCLC cites, Sections 3(B)(6)(b)–(c) of the WorldCat Policy, which relate to downloads and distribution, are the only ones conceivably relevant here. (Compl. ¶ 104, ECF No. 1 at PageID 19; Ex. A ¶ 3(B)(6)(b)–(d), ECF No. 1-1, PageID 5.) But these provisions relate to "mass downloading from WorldCat without OCLC's prior written consent" and "mass distribution of data directly from WorldCat to non-members without OCLC's prior consent." (Compl. ¶ 104, ECF No. 1 at PageID 19, Ex. A § 3(B)(6)(b)–(c), ECF No. 1-1, PageID 5.)

Critically, OCLC does not allege any downloading or distribution from WorldCat. Rather, the collectionHQ agreement gives subscribers the option to "authorize Baker & Taylor to access the subscriber library's catalog and to license all catalog records to Banker & Taylor." (Compl. ¶ 83, ECF No. 1 at PageID 14–15.) As OCLC explains, when a WorldCat record is in a library's catalog, the library has already "download[ed]" it from WorldCat (and possibly added "additional information" to the record). (Compl. ¶ 53, ECF No. 1 at PageID 10.) Even so, since neither the term "mass downloading" nor the term "mass distribution" is defined in the WorldCat Policy, or anywhere in the Complaint, there can be no breach of the undefined terms. Finally, OCLC makes

12

no allegation that any of its customers have actually breached their contract with OCLC; OCLC merely alleges that Baker & Tayler is "inducing WorldCat customers to violate their contractual agreements." (Comp. ¶ 97, ECF No. 1 at PageID 17).

### c. Baker & Taylor Did Not Induce a Breach – It Offered an Option.

In addition, OCLC fails to allege that Baker & Taylor intentionally procured the breach of the WorldCat Policy or that it acted without justification. As OCLC's allegations make clear, and contrary to OCLC's allegations suggesting otherwise, the collectionHQ agreement gives subscribers the choice to grant access to its catalog. (Compl. ¶ 84, ECF No. 1 at PageID 15.) The provision of the collectionHQ agreement states:

> In addition, as a subscriber to the Service, you have the *opportunity* to access Baker & Taylor's BT CAT community pool of cataloging records at no charge if you authorize the use of your cataloging records by Baker & Taylor. By signing this agreement, you are authorizing Baker & Taylor to utilize your cataloging records and are ***confirming that you have the right to make this authorization.***

(Compl. ¶ 84, ECF No. 1 at PageID 15) (emphasis added). In other words, Baker & Taylor is not procuring any breach; the subscriber is voluntarily choosing to grant Baker & Taylor access to its catalog, while representing to Baker & Taylor that they have the right to grant Baker & Taylor a license to their catalog. Because OCLC or WorldCat are not explicitly mentioned in this provision, and because each subscriber represents that they have the right to grant a license, there is no inducement.

Further, as this Court pointed out in another case involving OCLC, "[o]nly *improper* interference with a contract is actionable." *See OCLC, Inc.*, 2025 WL 1235238, at *6 (internal quotation marks and citation omitted). In that regard, the Court suggested that if data scraping from OCLC's website is not improper, there can be no tortious interference claim based on such data

13

scraping. *See id.* ("The Court questions when data scraping would be 'improper' enough for tortious interference . . . .").

OCLC concedes—both in the Complaint and in the WorldCat Policy—that it has no proprietary intertest in records in WorldCat as they are derived from third parties. (Compl. ¶ 42, ECF No. 1 at PageID 8; Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 3.) Accordingly, OCLC fails to assert a valid claim for tortious interference with contractual relationships here because Baker & Taylor is not acting improperly by accessing records that belong to third-parties that happen to have found their way onto WorldCat at some point. *See OCLC, Inc.*, 2025 WL 1235238, at *6 ("The Court questions when data scraping would be 'improper' enough for tortious interference . . . .").

### 2. **OCLC's Tortious Interference with Prospective Business Relationships Fails Because OCLC Failed to Allege a Single Lost Business Relationship.**

The elements of tortious interference with a business relationship are: (1) the existence of a prospective business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom. *Gentile v. Turkoly*, 2017-Ohio-1018, 86 N.E.3d 991, ¶ 24 (7th Dist. 2017). OCLC contends that by virtue of the fact that WorldCat is "the world's preeminent cataloguing record service," it has many prospective business relationships. (Compl. ¶ 137, ECF No. 1 at PageID 25.) Without identifying any of these future customers, OCLC claims that Baker & Taylor interfered with its future relationships with them by building BTCat of WorldCat's back and offering it as a "lower cost" alternative to WorldCat. (Compl. ¶¶ 136–41, ECF No. 1 at PageID 25–26.)

OCLC knows from a prior case in this Court where it failed to properly allege a tortious interference with prospective business relationships claim, "[a] vague assertion that a party

14

interfered with certain unspecified business relationships is insufficient to state a claim." *OCLC Inc.*, 2025 WL 1235238, at *6 (alteration in the original) (internal quotation marks and citation omitted). Nevertheless, OCLC again tries to assert this claim without "specify[ing] any particular customers it lost." *Id.* (Compl. ¶¶ 112, 123, 136–141, ECF No. 1 at PageID 20, 23, 25–26.) Likewise, the present claim before the Court must fail.

### 3. OCLC Cannot be Unjustly Enriched when OCLC Disclaims Ownership of WorldCat Data.

Under Ohio law, a claim for unjust enrichment requires the plaintiff to demonstrate that they conferred a benefit upon the defendant, that the defendant had knowledge of the benefit, and that the defendant retained the benefit under circumstances where it would be unjust to do so without payment. Unjust enrichment claims are predicated on the defendant's unjust retention of a benefit that is owed to the plaintiff. If the plaintiff does not have ownership or a right to the property, there is no benefit conferred upon the defendant that belongs to the plaintiff, and thus no unjust enrichment can occur. *See Liberty Mut. Ins. Co. v. Indus. Comm'n of Ohio,* 40 Ohio St. 3d 109, 110–111 ("an action in unjust enrichment will lie * * * when a party retains money or benefits which in justice and equity belong to another.") (internal citations omitted).

The Restatement of the Law 3d, Restitution and Unjust Enrichment, § 30, also emphasizes that quasi-contractual liability for unjust enrichment is based on the defendant's unjust retention of something to which the plaintiff has a right. If the item or idea taken by the defendant does not constitute "protectible property" under the law, the plaintiff cannot recover under a quasi-contractual theory for unjust enrichment. *See* Restatements of the Law 3d, Restitution and Unjust Enrichment, § 30 (*citing Stanley v. Columbia Broadcasting Sys., Inc.,* 35 Cal.2d 653, 221 P.2d 73 (1950) ("a defendant who makes use of an abstract idea that is common property is not unjustly

enriched thereby, since he has taken nothing to which the plaintiff or any other person has the right of exclusive ownership.")).

In another recent case before this Court involving OCLC, this Court suggested that OCLC could not state an unjust enrichment claim based on data a defendant obtained from the WorldCat website by data scraping if data scraping is not improper. *See OCLC Inc.*, 2025 WL 1235238, at *5 ("To establish its unjust enrichment claim, OCLC must adequately plead that Defendants retained the benefit of WorldCat's data under circumstances in which it was unjust to do so without payment." (internal quotation marks and citation omitted)).

OCLC does not allege that Baker & Taylor was data scaping, but rather that Baker & Taylor was unjustly enriched by "retain[ing] WorldCat records." (Compl. ¶ 151, ECF No. 1 at PageID 27.) But as discussed above, and leaving aside the fact that the term "WorldCat record" is undefined and cannot be the basis for any claim, there is nothing unjust about Baker & Taylor retaining such records because by OCLC's own admission, OCLC does not own these records. (Compl. ¶ 42, ECF No. 1 at PageID 8.); OCLC has explicitly disclaimed "copyright ownership of individual records" in WorldCat. (Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 3; Compl. Ex. E § 13.1, ECF No. 1-5 at PageID 9.); and OCLC has expressly disclaimed ownership of its OCN Number, claiming it was now in the public domain. *See* Jim Michalko, *OCLC Control Numbers— Lots of them; all public domain*, Hanging Together the OCLC Research Blog, (Sept. 23, 2013), https://hangingtogether.org/oclc-control-numbers-lots-of-them-all-public-domain/; Merrilee Proffitt, *OCLC Control Numbers in the wild*, Hanging Together the OCLC Research Blog, (Oct. 11, 2013), https://hangingtogether.org/oclc-control-numbers-in-the-wild/. Therefore, OCLC's claim for unjust enrichment fails.

IV.    **C**ONCLUSION.

For the reasons stated herein, Counts One, Two and Four should be dismissed for failure to state claims for which relief can be granted. Specifically:

- The tortious interference with contract claim fails because:

    - The WorldCat Policy is not a contract, and even if it were, it does not prohibit the conduct OCLC complains of—namely, Baker & Taylor's access to library catalogs voluntarily shared by collectionHQ subscribers (critically, OCLC concedes it does not own the records at issue); and

    - There is no inducement because the contract language cited by OCLC does not require a library to do anything, and when the written instrument contradicts the allegations in the Complaint, the written instrument prevails;

- The tortious interference with prospective business relationships claim fails because OCLC identifies no actual prospective customers or relationships—just vague allegations and speculation; and

- The unjust enrichment claim fails because Baker & Taylor cannot have been unjustly enriched by records OCLC admits it does not own.

Accordingly, the Court should dismiss the Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

                                                                           Respectfully submitted,

| /s/ Derek P. Hartman | /s/ Frank E. Noyes *admitted pro hac vice)* |
|---|---|
| Derek P. Hartman (0087869), Trial Attorney | Frank E. Noyes, II (PA Bar No. 48366) |
| Michael C. Cohan (0013542) | Nafiz Cekirge (CA Bar No. 255710) |
| CAVITCH FAMILO & DURKIN CO., L.P.A. | OFFIT KURMAN, P.A. |
| 1300 East Ninth Street, Twentieth Floor | 222 Delaware Avenue, Suite 1105 |
| Cleveland, Ohio 44114 | Wilmington, Delaware 19801 |
| Telephone: (216) 621-7860 | Telephone: 302-351-0900 |
| Facsimile: (216) 621-3415 | Facsimile: 302-351-0915 |
| Email: mcohan@cavitch.com | Email: fnoyes@offitkurman.com |
| dhartman@cavitch.com | nafiz.cekirge@offitkurman.com |

*Attorneys for Defendant Baker & Taylor, LLC*     *Attorneys for Defendant Baker & Taylor, LLC*

**CERTIFICATE OF SERVICE**

On May 27, 2025, this document was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties.

>
> */s/ Derek P. Hartman*
> Derek P. Hartman (0087869), Trial Attorney
> *One of the Attorneys for Defendant Baker & Taylor, LLC*