# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| OCLC, Inc., | Case No. 2:25-cv-309 |
| **Plaintiff,** | Judge Edmund A. Sargus, Jr. |
| v. | Magistrate Judge Elizabeth Preston Deavers |
| Baker & Taylor, LLC and Bridgeall Libraries, Ltd., | |
| **Defendants.** | |

---

## PLAINTIFF OCLC, INC.'S OPPOSITION TO DEFENDANT BAKER & TAYLOR, LLC'S PARTIAL MOTION TO DISMISS AND DEFENDANT BRIDGEALL LIBRARIES, LTD.'S RULE 12(B)(6) MOTION TO DISMISS

---

## **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................ 2

III.   LEGAL STANDARD....................................................................................... 6

IV.   ARGUMENT ..................................................................................................... 7

     A.    OCLC sufficiently alleged a claim of tortious interference with contract in its Complaint.................................................................................... 7

OCLC has adequately alleged that it had contracts with WorldCat customers, that Defendants knew about those contracts, and that Defendants intentionally and improperly induced WorldCat customers to breach their contractual obligations, and that OCLC was thereby damaged. *See NCR Corp. v. Korala Assocs.*, 512 F.3d 807, 817 (6th Cir. 2008).

         1.    OCLC alleges an enforceable contract with its WorldCat customers. ................................................................................... 7

OCLC's contracts with its WorldCat customers are made up of three documents: the Framework Agreement, Schedule 2 to the Framework Agreement, and the WorldCat Policy. Together, these documents lay out specific obligations for WorldCat customers and are an enforceable contract. Defendants' arguments to the contrary rely on incorrect arguments focused on semantics and inapposite caselaw. *See Daily Servs., LLC v. Transglobal, Inc.*, 221 N.E.3d 868, 882 (Ohio Ct. App. 2023); *Dakota Girls, LLC v. Phila. Indem. Ins. Co.*, 17 F.4th 645, 652 (6th Cir. 2021).

         2.    OCLC has alleged specific contractual violations. ...................... 11

OCLC has alleged that that some WorldCat customers breached their contracts with OCLC, specifically the prohibitions on transferring licenses for WorldCat records, mass downloading or distributing WorldCat records, and otherwise devaluing WorldCat. Defendants' arguments about definitions, factual issues, and OCLC's "failure" to specify which WorldCat customers breached their contracts are incorrect, inappropriate for a motion to dismiss, and unsupported by legal authority.

         3.    OCLC has alleged that Defendants intended to induce those violations................................................................................. 13

OCLC alleges that Defendants knew about OCLC's contracts with WorldCat customers and either intended to induce a breach of those contracts or were substantially certain a breach would occur. Defendants' argument that the wording of their contracts with collectionHQ subscribers protects them from liability seeks to obscure the alleged facts regarding scienter and is contrary to legal authority. *See Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 923 (S.D. Ohio 2017); *Total Quality Logistics, LLC v. Riffe*, No. 1:19-CV-23, 2022 WL 877396, at *13 (S.D. Ohio Mar. 24, 2022).

     B.    OCLC's Complaint sufficiently pleads that Defendants tortiously interfered with its prospective business relationships.......................................... 18

OCLC has adequately alleged that Defendants tortiously interfered with prospective business relationships. According to Defendants, OCLC needed to allege the names of specific

prospective customers with which Defendants interfered; however, this argument is foreclosed by caselaw. *See Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792, 807–08 (S.D. Ohio 2010); *Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc*., No. 1:15-CV-737, 2016 WL 3999315, at *5 (S.D. Ohio July 26, 2016).

C.      OCLC has adequately pled its unjust enrichment claim against
        Defendants. ..................................................................................................... 19

OCLC has alleged that Defendants have enriched themselves through their wrongful use of WorldCat records. Contrary to Defendants' argument, OCLC need not assert a "property right" in anything to state a claim for unjust enrichment. *Bunta v. Superior VacuPress, LLC*, 218 N.E.3d 838, 848 (Ohio 2022); *Keller Elec., Inc. v. Gilbert*, No. 17467, 1996 WL 183027, at *5 (Ohio Ct. App. Apr. 17, 1996).

D.      OCLC has sufficiently stated a claim against Bridgeall. ..................................... 22

Bridgeall's individual arguments are misplaced. The Complaint and Bridgeall's own contract show that Bridgeall is engaged in wrongdoing that tortiously interfered with OCLC's contracts and prospective business relationships and has been unjustly enriched by that wrongdoing. And Bridgeall's attempts to inject new facts is inappropriate at this stage.

V.      CONCLUSION ............................................................................................................ 23

**MEMORANDUM IN OPPOSITION**

Plaintiff OCLC, Inc. ("OCLC") respectfully submits this Memorandum in Opposition to Defendants Baker & Taylor, LLC's ("B&T") and Bridgeall Libraries, Ltd.'s ("Bridgeall") motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) (the "Motions"), Dkts. 34, 35.[1] For the reasons that follow, OCLC requests that the Court deny Defendants' Motions.

## I. INTRODUCTION

Defendants' Motions paint OCLC as an anti-competitive schemer who filed this lawsuit to stifle fair competition. To be clear, OCLC welcomes *fair* competition. But OCLC does not welcome Defendants' illegal conduct, nor must OCLC tolerate it. OCLC has sufficiently alleged that Defendants wrongfully obtained WorldCat records that OCLC invested significant time and money into enhancing and maintaining, which Defendants used to populate B&T's competing product, BTCat, and then offered BTCat at a significantly cheaper price than WorldCat or, in some cases, for free. That is *unfair* competition.

Defendants ask the Court to ignore the proper pleading standard and thus excuse their bad behavior. Defendants focus excessively on OCLC's apparent failure to include in its Complaint certain words verbatim from the underlying contracts between OCLC and its WorldCat customers. But the federal pleading standard does not rely on semantics or the presence of magic words, and Defendants fail to address the crux of OCLC's well-pled allegations. Defendants' arguments not only miss the purpose of a motion to dismiss, but they are incorrect. There are no "discrepancies" between the Complaint and the contract, and the only way Defendants are able

---

[1] This brief in opposition responds to Bridgeall's motion to dismiss on only the motion's Rule 12(b)(6) grounds for dismissal. Bridgeall largely incorporated by reference B&T's partial motion to dismiss. Bridgeall Mot., Dkt. 35, # 305–06. OCLC will address the two Motions together and cite to the B&T Motion unless otherwise stated. OCLC will respond to Bridgeall's Rule 12(b)(2) grounds after jurisdictional discovery is complete. June 11, 2025 Order, Dkt. 45 # 397–98.

to manufacture "discrepancies" between the two is by refusing to view the allegations in the light most favorable to OCLC and relying on a strained, unreasonable reading of the contract.

As to the unique objections to OCLC's claims against Bridgeall, Bridgeall misreads the Complaint's allegations and injects its own facts to argue that it played no part in B&T's alleged wrongdoing and that OCLC misunderstands Bridgeall's role in the dispute. These factual arguments are inappropriate for a motion to dismiss for failure to state a claim, which tests only the legal sufficiency of the allegations in the Complaint.

The Court should reject Defendants' misplaced arguments. OCLC has plausibly alleged claims for tortious interference with contract, tortious interference with prospective business relationships, and unjust enrichment against Defendants. The Court should, therefore, deny Defendants' Rule 12(b)(6) Motions.

## II.     STATEMENT OF FACTS

WorldCat is the world's leading bibliographic cataloging database. Compl., Dkt. 1, ¶ 29, # 6.[2] Libraries around the world use WorldCat to enhance and manage their catalogs. *Id.* ¶¶ 35–39, # 7–8. As is relevant here, WorldCat customers rely on WorldCat to access the gold standard of bibliographic records available in the WorldCat database, records that are continuously improved and enhanced by OCLC and the other WorldCat participants, and thereby use WorldCat to create, enhance, update, and otherwise manage their cataloging records. *Id.* ¶¶ 35–49, # 7–9. These improvements and enhancements are what make WorldCat so popular and so valuable. *Id.* ¶ 49, # 9.

To subscribe to WorldCat, an entity must agree to the Framework Agreement, including Schedule 2 of the Framework Agreement, and the WorldCat Rights and Responsibilities for the OCLC Cooperative (the "WorldCat Policy"). *Id.* ¶¶ 98–105, # 17–19; Sched. 2 (attached here as

---

[2] "#" refers to PageID number.

Exhibit F).[3] The Framework Agreement provides that OCLC is the "exclusive owner[] of all rights and interests in" OCLC's products, including WorldCat, and that the license granted to OCLC customers is "nontransferable." Compl., Dkt. 1, ¶¶ 98–99, # 17–18; Framework Agreement, Dkt. 1-5, §§ 5.1, 5.2, # 72. The Framework Agreement also requires WorldCat customers to abide by the WorldCat Policy. Compl., Dkt. 1, ¶ 101, # 17–18; Framework Agreement, Dkt. 1-5, § 13.1, # 75. Additionally, WorldCat customers, *i.e.*, those that subscribe to WorldCat, are also bound by Schedule 2, which expressly provides that WorldCat customers are bound by the WorldCat Policy. Sched. 2, § 3.3, Ex. F ("Institution agrees that the use and transfer by the Institution of WorldCat Data is subject to the Policy," defined as "the 'WorldCat Rights and Responsibilities for the OCLC Cooperative'" in § 2.2).

Among other responsibilities outlined in the WorldCat Policy, WorldCat customers may not engage in: (1) "mass downloading from WorldCat without OCLC's prior written consent"; (2) "mass distribution of data directly from WorldCat to non-members without OCLC's prior consent"; or (3) "other activities that diminish the value of WorldCat to the OCLC cooperative." WorldCat Policy, Dkt. 1-1, § 3(B)(6)(b)–(d), # 34. WorldCat customers do not have the right to share or transfer WorldCat data to another company for that company's commercial use under the WorldCat Policy. *Id.*; Compl., Dkt. 1, ¶ 105, # 19.

Since at least 2022, Defendants have included a provision in the standard terms for Bridgeall's collectionHQ service agreement that induces WorldCat customers that sign up for collectionHQ to breach their contract with OCLC (the "Provision"). Compl., Dkt. 1, ¶¶ 81–97, # 14–17. collectionHQ is a service owned by Bridgeall that helps libraries manage their

---

[3] OCLC did not attach Schedule 2 to its Complaint, which is legally sufficient without it. *See* Compl., Dkt. 1, ¶¶ 100–01, # 18. OCLC attaches Schedule 2 for convenience. *See Nixon v. Wilmington Tr. Co.*, 543 F.3d 354, 357, n.2 (6th Cir. 2008) (courts may consider contracts incorporated in the complaint on a motion to dismiss even if not attached).

collections. *Id.* ¶ 82, # 14. Through the Provision, libraries are required to authorize Defendants to use the customer's cataloging records. *Id.* ¶ 83, # 14; *see also* collectionHQ Standard Terms & Conditions, Dkt. 1-4, § 4.5, # 53 ("By signing this Agreement, you are authorizing Baker & Taylor to utilize your cataloging records[.]"). If a library is a WorldCat customer, that library's cataloging records will include almost exclusively WorldCat records. Compl., Dkt. 1, ¶ 13, # 3. So, when a WorldCat customer grants Defendants access to its cataloging records through the Provision, it is granting Defendants access to WorldCat records, which breaches the WorldCat customer's contractual obligations to OCLC. *Id.* ¶¶ 13–16, # 3–4. OCLC further alleges, upon information and belief, that Defendants and their affiliated entities are including similar contractual provisions in contracts for other products and services. *Id.* ¶¶ 85, 97 # 15, 17.

Defendants have tried to muddy the waters around how OCLC describes WorldCat customers, WorldCat records, and the documents that make up OCLC's contract with WorldCat customers. According to Defendants, the fact that OCLC uses phrases like "OCLC members," "Institutions," "WorldCat Subscribers," and "WorldCat Data" in the relevant agreements, but uses "WorldCat customers" and "WorldCat records" in the Complaint, means that OCLC has failed to state a claim. *E.g.*, B&T Mot., Dkt. 34, # 278–79. The Court should not get pulled into these invented issues. To clarify:

- "WorldCat Data" encompasses many types of data, including WorldCat records. Indeed, the WorldCat Policy defines "WorldCat Data" as "metadata for an information object, *generally in the form of a record*." WorldCat Policy, Dkt. 1-1, # 36 (emphasis added). This is not surprising, since "WorldCat" is defined as "a database of bibliographic records and holdings data representing library collections." *Id.*

- The Framework Agreement uses "Institution" to refer to the entity signing up for OCLC's services and/or products, including WorldCat. Framework Agreement, Dkt. 1-5, # 68.

- The WorldCat Policy defines "OCLC Members" as those entities that belong to the OCLC Cooperative. WorldCat Policy, Dkt. 1-1, # 35. An entity joins the OCLC Cooperative by agreeing to "contribute intellectual content to the cooperative" or to "share resources with other members." *Id*. Becoming a WorldCat customer is one way an entity agrees to "contribute intellectual content or share resources" and thus join the OCLC Cooperative.

That OCLC uses simplified naming conventions in its Complaint (as opposed to referring to WorldCat customers every time as "WorldCat customers, Institutions, and/or OCLC Members," and WorldCat records as "WorldCat records, metadata, and/or data") is no "sleight of hand." B&T Mot., Dkt. 34, # 279And it certainly does not mean that OCLC fails to state any claim that relies on the Framework Agreement or WorldCat Policy. Instead of viewing the Complaint in the light most favorable to OCLC, Defendants strain to create confusion in OCLC's allegations and attempt to read too much into OCLC's efforts to simplify various contractual terms and make the Complaint more reader friendly.

Defendants also try to create confusion with the different documents that make up OCLC's contract with WorldCat customers. There are three documents that make up the contract for WorldCat customers:

- The Framework Agreement. This is the document that OCLC and the customer execute and is used when a customer subscribes to any of OCLC's products or services. Framework Agreement, Dkt. 1-5, # 68–76; Compl; Dkt. 1, ¶ 98, # 17.

- Schedule 2 to the Framework Agreement.[4] Schedule 2 applies to those customers who subscribe to OCLC's cataloging and metadata services, the OCLC services through which customers gain access to WorldCat. Sched. 2, Ex. F; Framework Agreement, Dkt. 1-5, § 1, # 70; *see also* Compl., Dkt. 1, ¶¶ 100–01, # 18.

- The WorldCat Policy. Schedule 2 of the Framework Agreement incorporates the WorldCat Policy, stating that the "Institution agrees that the use and transfer by the Institution of WorldCat Data is subject to the Policy," which is the WorldCat Policy. Sched. 2, §§ 2.2, 3.3, Ex. F; *see also* Compl., Dkt. 1, ¶ 101, # 18.

Every customer that subscribes to WorldCat agrees to the Framework Agreement, including Schedule 2 and the WorldCat Policy.

## III.    LEGAL STANDARD

A complaint need not contain "detailed factual allegations"; rather, it must set forth enough factual content for the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). To determine whether a complaint states a facially plausible claim, the court must "construe the complaint in a light most favorable to the plaintiff, accept all well-pled factual allegations as true, and decide whether there is enough factual content to allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Cooperrider v. Woods*, 127 F.4th 1019, 1027 (6th Cir. 2025) (citation

---

[4] Schedule 2 defines "WorldCat Data" the same as the WorldCat Policy. Sched. 2, § 2.4, Ex. F. As noted *supra*, the WorldCat Policy defines WorldCat Data as "metadata for an information object, generally in the form of a record or records encoded in MARC format, whose source is or at one point in time was the WorldCat bibliographic database." WorldCat Policy, Dkt. 1-1, # 36.

omitted). A defendant is entitled to fair notice of the basis for a plaintiff's claim, but this threshold is satisfied when a complaint contains the operative facts of plaintiff's claims. *Twombly*, 550 U.S. at 555, n.3. OCLC's Complaint satisfies this standard and then some.

## IV. ARGUMENT

### A. OCLC sufficiently alleged a claim of tortious interference with contract in its Complaint.

To succeed on a claim for tortious interference with contract, a plaintiff must plead "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *NCR Corp. v. Korala Assocs.*, 512 F.3d 807, 817 (6th Cir. 2008) (quoting *Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)). OCLC plausibly alleges each element.

### 1. OCLC alleges an enforceable contract with its WorldCat customers.

OCLC has a legally enforceable contract with its WorldCat customers. When a customer subscribes to WorldCat, it agrees to the Framework Agreement and Schedule 2 to the Framework Agreement. Compl., Dkt. 1, ¶ 100, # 18; Framework Agreement, Dkt. 1-5, § 1, # 70. Compl., Dkt. 1, ¶ 100, # 18. As noted above, the Framework Agreement requires WorldCat customers to "abide by the requirements and policies applicable to OCLC members." Compl., Dkt. 1, ¶ 100, # 18; Framework Agreement, Dkt. 1-5, § 1§ 13.1, # 75. Moreover, Schedule 2 expressly incorporates the WorldCat Policy. Sched. 2, § 3.3, § 2.2, Ex. F. WorldCat customers, *i.e.*, those that subscribe to WorldCat, are bound by Schedule 2. Compl., Dkt. 1, ¶ 100, # 18; Sched. 2, Ex. F.

Therefore, a WorldCat customer agrees to the terms in the Framework Agreement, Schedule 2, and WorldCat Policy, which impose contractual obligations on WorldCat customers.

These prohibitions include prohibitions against licensing WorldCat records, mass downloads, mass distribution of WorldCat records, and any other activities that diminish the value of WorldCat. Compl., Dkt. 1, ¶ 104, # 19; WorldCat Policy, Dkt. 1-1, § 3(B)(6)(b)–(d), # 34; Framework Agreement, Dkt. 1-5, §§ 5.1, 5.2, # 72. WorldCat customers agree to those obligations in exchange for, among other things, a WorldCat subscription. Compl., Dkt. 1, ¶ 98, # 17; WorldCat Policy, Dkt. 1-1, § 3(A), # 33; Framework Agreement, Dkt. 1-5, § 4.1, # 70–71. In other words, between OCLC and WorldCat customers, there is an offer, an acceptance, mutual assent, and consideration and, therefore, an enforceable contract. *Daily Servs., LLC v. Transglobal, Inc.*, 221 N.E.3d 868, 882 (Ohio Ct. App. 2023) (citing cases).

Defendants' arguments to the contrary are incorrect. As an initial matter, Defendants argue that there are various flaws with OCLC's tortious interference with contract claim because contractual documents and the Complaint do not "define" certain words or phrases like "WorldCat record" or "mass distribution." *E.g.*, B&T Mot., Dkt. 34, # 284, 286, 290. Defendants are simply incorrect about what the Framework Agreement, Schedule 2, and the WorldCat Policy say about at least some of these terms as explained in the fact section above. *See supra* Part II. But more fundamentally, the presence of an undefined term does not render a contract unenforceable under Ohio law; the Court can interpret any such term. *See, e.g.*, *Dakota Girls, LLC v. Phila. Indem. Ins. Co.*, 17 F.4th 645, 652 (6th Cir. 2021).

Then, Defendants object to OCLC's terminology in its Complaint. Defendants state that the WorldCat Policy and Framework Agreement refer to the entities subscribing to WorldCat as "WorldCat Subscribers" or "Institutions," but that OCLC's Complaint refers to those entities as "WorldCat customers." B&T Mot., Dkt. 34, # 284. Defendants contend that this wording difference means that OCLC has not alleged an enforceable contract with WorldCat customers.

*Id.* # 279, 282–83. These "differences" exist, but a fair reading of the Complaint and the contractual documents show these differences are not the gotcha Defendants make them out to be. The Framework agreement uses "Institution" to refer to the entity signing up to be an OCLC customer, and when an OCLC customer subscribes to WorldCat, the customer specifically agrees to Schedule 2. Framework Agreement, Dkt. 1-5, # 68; Compl., Dkt. 1, ¶ 100, # 18. In turn, Schedule 2 expressly incorporates the WorldCat Policy. Sched. 2, § 3.3, Ex. F; Compl., Dkt. 1, ¶ 101, # 18. So, a WorldCat customer is an "Institution" that has entered into a Framework Agreement and agreed to Schedule 2, and thus the WorldCat Policy, as a subscriber to WorldCat. The WorldCat Policy addresses "OCLC Members," which are defined as those entities that belong to the OCLC Cooperative, and one of the ways an entity joins the OCLC Cooperative is by becoming a WorldCat customer. WorldCat Policy, Dkt. 1-1, # 35. Put simply, a "WorldCat customer" is an "Institution" and an "OCLC Member." Rather than use "WorldCat customer," "OCLC Member," and "Institution" each time in the Complaint, OCLC streamlined its allegations with "WorldCat customers." That is sufficient under federal pleading standards, and Defendants provide no precedent to the contrary.

Next, Defendants argue that OCLC does not have a contract with its customers because the WorldCat Policy is not a contract, but a "policy"; it does not impose specific contractual requirements; and it can be unilaterally amended by OCLC. B&T's Mot., Dkt. 34, # 284–85. None of these arguments is persuasive. Whether the WorldCat Policy *alone* is an enforceable contract is irrelevant because the Framework Agreement, including Schedule 2, is an enforceable contract, and Schedule 2 expressly incorporates the terms of the WorldCat Policy for WorldCat customers. In other words, the WorldCat Policy *in combination with the Framework Agreement* is a valid and enforceable contract. *See, e.g.*, *Am. Coal Sales Co. v. Nova Scotia Power Inc.*, No.

9

2:06-CV-94, 2009 WL 467576, at *27 (S.D. Ohio Feb. 23, 2009) ("Where one instrument incorporates another by reference, both must be read together.") (applying Ohio law).

Moreover, Defendants' argument that the WorldCat Policy does not impose clear obligations on WorldCat customers or remedies for breach is wrong. Defendants argue that because the WorldCat Policy requires customers only to make "reasonable efforts" to do certain things, it is not an enforceable agreement. Under Ohio law, contracts that require "reasonable efforts" or "best efforts" are enforceable. *E.g.*, *Ragen v. Hancor, Inc.*, No. 3:08 CV 1022, 2010 WL 301761, at *2 (N.D. Ohio Jan. 19, 2010). Additionally, the WorldCat Policy provides express prohibitions, including that WorldCat customers must refrain from mass downloading of WorldCat records, mass distribution of WorldCat records, and not engage in other activities that diminish the value of WorldCat. WorldCat Policy, Dkt. 1-1, § 3(B)(6)(b)–(d), # 34. And the Framework Agreement clearly outlines the effect of termination in the event of a material breach. Framework Agreement, Dkt. 1-5, §§ 6.2, 6.3, # 72. Defendants cite one case, which is inapplicable, as it addresses whether a letter of intent was specific enough to be an enforceable contract. *Cap. Equity Grp. v. Ripken Sports Inc.*, 744 F. App'x 260, 262–63 (6th Cir. 2018).

Defendants' argument that the WorldCat Policy is unenforceable because it can be "unilaterally" amended is likewise unconvincing. Crucially, OCLC cannot unilaterally amend the WorldCat Policy, as the text itself proves. The WorldCat Policy describes an involved, multi-step "change-adoption process" that includes the membership board and a public comment procedure. WorldCat Policy, Dkt. 1-1, § 6, # 34. Indeed, this process is so involved that OCLC has not changed the WorldCat Policy since 2010, as evidenced by the WorldCat Policy's effective date.

Additionally, the cases that Defendants rely on to argue that the unilateral ability to amend renders a contract unenforceable are legally and factually inapposite. Two cases

Defendants cite are employee handbook cases where the handbook was provided to the employee after they were hired (*i.e.*, after they entered into the employment relationship). *See Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.*, 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004); *Finsterwald-Maiden v. AAA S. Centr. Ohio*, 685 N.E.2d 786, 789 (Ohio Ct. App. 1996). Here, WorldCat customers can consider the WorldCat Policy when they agree to the Framework Agreement and Schedule, as Schedule 2 explicitly incorporates the WorldCat Policy. Therefore, there is mutual assent as to the WorldCat Policy. Moreover, all the handbooks in the cases cited by Defendants expressly disclaimed being a valid contract or provided that the handbook was subject to change by the employer at any time. *See Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538–39 (S.D. Ohio 2023); *Senter*, 335 F. Supp. 2d at 843; *Finsterwald-Maiden*, 685 N.E.2d at 790. The WorldCat Policy does not contain any such language.

### 2.     OCLC has alleged specific contractual violations.

OCLC alleges that its WorldCat customers breached their contract with OCLC by licensing their WorldCat records for use in and then downloading or otherwise transferring their WorldCat records to BTCat. Compl., Dkt. 1, ¶¶ 104–12, # 19–20. OCLC alleges that WorldCat customers are prohibited from mass downloading WorldCat records, mass distribution of WorldCat records, and otherwise diminishing the value of WorldCat. Compl., Dkt. 1, ¶¶ 104–16, # 19–21; WorldCat Policy, Dkt. 1-1, § 3(B)(6)(b)–(d), # 34. OCLC also pleads that Defendants are encouraging WorldCat customers to license their records for use by a commercial competitor, which devalues WorldCat and is contrary to the Framework Agreement, and to download all their WorldCat records from WorldCat and then give those records to BTCat, which violates the mass download and distribution provisions. Compl., Dkt. 1, ¶¶ 104–10, # 19–20; Framework Agreement, Dkt. 1-5, §§ 5.1, 5.2, # 72; WorldCat Policy, Dkt. 1-1, § 3(B)(6)(b)–(d), # 34. Because OCLC alleges that BTCat has WorldCat records in it, Compl., Dkt. 1, ¶ 89, # 16, and

that OCLC has lost WorldCat customers to BTCat who have uploaded their cataloging records to BTCat (all of which originate from WorldCat), OCLC adequately alleges WorldCat customers violated the above-described contract provisions. *Id.* ¶¶ 13–15, # 3–4.

Defendants argue that because the WorldCat Policy governs "WorldCat *Data*" and the complaint discusses the mass distribution of "WorldCat *records*," OCLC has not plausibly alleged a breach. Again, this is overly contrived—and it is not construing the Complaint in the light most favorable to OCLC. As the WorldCat Policy explains in its definition of "WorldCat Data," WorldCat Data is "generally in the form of a record or records." WorldCat Policy, Dkt. 1-1, # 36. WorldCat records *are* WorldCat data. OCLC also refers to both records and data throughout its Complaint, including that Defendants have populated BTCat with WorldCat data. *E.g.*, Compl., Dkt. 1, ¶¶ 2, 7, 9–11, 16, 61, # 1–4, 11.

Next, Defendants argue that OCLC has alleged only that WorldCat customers have authorized Defendants to access the customer's library catalog, which Defendants imply is not part of WorldCat, as it consists of downloaded records. *See* B&T Mot., Dkt. 34, # 286. That is not what OCLC's Complaint says, and Defendants are attempting to inject factual questions (from where and how libraries actually upload their cataloging records to BTCat and whether those records constitute WorldCat records). These factual disputes are inappropriate at this time.

Defendants also assert that OCLC has not identified any specific WorldCat customer that granted Defendants access to the customer's cataloging records. B&T Mot., Dkt. 34, # 282. Defendants provide no authority that a specific customer must be named in the Complaint for OCLC's allegations to have facial plausibility. In any case, OCLC has alleged that certain customers have breached the contracts by signing the Provision and thus licensing WorldCat records to Defendants. Compl., Dkt. 1, ¶ 96 & n.2, # 17. Moreover, OCLC has alleged that

BTCat contains WorldCat records, that Defendants are encouraging WorldCat customers (all of whose records are WorldCat records) to sign collectionHQ contracts which require authorization of Defendants' license to use and access to WorldCat records, and that Defendants have poached WorldCat customers who then upload WorldCat records to BTCat. *Id.* ¶¶ 82–97, 106–16, # 14–17, 19–21. Taking these allegations as true and drawing all reasonable inferences in OCLC's favor, it is certainly plausible that WorldCat customers have breached their agreements with OCLC as described above.

### 3. OCLC has alleged that Defendants intended to induce those violations.

OCLC has plausibly alleged that Defendants, by including the Provision in the collectionHQ contracts and similar provisions in contracts for other products and services, has intentionally induced WorldCat customers to breach their contracts with OCLC. OCLC pled that B&T had a licensing agreement with OCLC and has signed many third-party cataloging contracts with OCLC, demonstrating its awareness that OCLC protects WorldCat records with contractual limitations. Compl., Dkt. 1, ¶¶ 70–71, 111, # 12–13, 20. In fact, in February 2018, B&T warned its customers that it would not offer WorldCat records through B&T's products unless the library was a WorldCat cataloging customer and the proper third-party agreements were in place between OCLC and B&T. *Id.* ¶ 111, # 20. Additionally, it is common, industry-wide knowledge that OCLC uses contractual provisions like the Framework Agreement and WorldCat Policy to protect WorldCat. *Id.* ¶ 110, # 20. Finally, OCLC has alleged that Defendants continued their wrongful behavior even after OCLC sent Defendants a cease-and-desist letter. Compl., Dkt. 1, ¶¶ 115–16, # 21.

OCLC has also alleged that Defendants know that most libraries and academic institutions are WorldCat customers, meaning Defendants know that most libraries' cataloging records consist of WorldCat records. *See id.* ¶ 109, # 20. It is a reasonable inference that

Defendants thus know that if a library licenses or uploads its records to BTCat, those records will almost certainly include WorldCat records. Accordingly, OCLC has plausibly alleged that Defendants are "substantially certain" that if a library licenses or uploads its records to BTCat, that library will be breaching its contracts with OCLC. *Total Quality Logistics, LLC v. Riffe*, No. 1:19-CV-23, 2022 WL 877396, at *13 (S.D. Ohio Mar. 24, 2022) (explaining that a defendant intentionally procures a breach when the defendant "[wanted] the breach of contract, or [knew] that a breach of contract is substantially certain to result from the interference" (quoting *Union of Needletrades, Indus. & Textile Emps. AFL-CIO v. Am. Cap. Strategies, Ltd.*, 546 F. Supp. 2d 546, 561 (S.D. Ohio 2008))).

Defendants' arguments otherwise are unconvincing. First, Defendants attempt to re-write the collectionHQ Provision, describing the Provision as providing an "option" or a "choice" for collectionHQ customers to grant Defendants access to its cataloging records. B&T Mot., Dkt. 34, # 282, 287. The plain text speaks for itself: "*By signing this agreement, you are authorizing Baker & Taylor to utilize your cataloging records. . . . This authorization means that your cataloging records are licensed to Baker & Taylor* on a perpetual, fully paid-up, nonexclusive, non-transferable, and irrevocable, basis for use in [BTCat] and in any and all other products offered at any time by Baker & Taylor to its customers." Compl., Dkt. 1, ¶ 84, # 15; collectionHQ Standard Terms & Conditions, Dkt. 1-4, § 4.5, # 53. The only "voluntary" aspect of this Provision is whether the customer will sign the agreement and thereby opt into using BTCat; the Provision's text is clear that by signing the collectionHQ agreement, the library customer licenses all the cataloging records to B&T and authorizes B&T to use the cataloging records in BTCat or any other products.

Even if the Provision offered a "choice," it would make no difference. In any tortious interference with contract claim, the tortfeasor offers the breaching party a choice (*e.g.*, to work for the tortfeasor even if that violates a noncompete agreement). Defendants are attempting to add a new element to a tortious interference claim: that the tortfeasor must force the breaching party to violate its contract. That is simply not an element of the claim. *NCR Corp.*, 512 F.3d at 817 (quoting *Fred Siegel Co.*, 707 N.E.2d at 858).

Next, Defendants continue to invoke the "magic words" arguments. According to Defendants, because the Provision does not specifically mention "OCLC" or "WorldCat," it did not intentionally induce any WorldCat customers to breach its contract with OCLC. B&T Mot., Dkt. 34, # 282–83, 287. Defendants provide no caselaw supporting a rule that inducement requires specifically naming an entity or that entity's competing product or service. The lack of caselaw is unsurprising: if such a rule existed, parties could avoid liability for tortious interference by simply omitting the names of competing entities, products, and services when inducing someone to breach a contract.

Defendants also argue that because the Provision requires collectionHQ subscribers to confirm that they have the right to allow Defendants to use their cataloging records, Defendants are shielded from liability as to OCLC, a non-party to the collectionHQ contract. Said another way, B&T is attempting to turn this "disclaimer" language into a quasi-indemnification clause against OCLC, a non-party to the collectionHQ Provision. Yet again, Defendants cite to no legal support for this proposition.

In any case, Defendants' "disclaimer" language actually cuts against them. This Court has held that if a party structures its conduct to avoid litigation, that suggests the party knew that it was inducing a breach of contract. For example, in *Horter Investment Management, LLC v.*

*Cutter*, the defendants allegedly induced a competitor's contractor to breach a non-compete agreement. 257 F. Supp. 3d 892, 923 (S.D. Ohio 2017). The evidence showed that the defendant anticipated litigation as a result of its conduct and attempted to avoid liability by the way it structured its agreement with the contractor. *Id*. at 925. In part because of the defendant's actions to try to avoid liability, the Court concluded that the defendants were not entitled to summary judgment on the tortious interference with contract claim. *Id*. at 923–27. Applying *Horton* here, Defendants' disclaimer language suggests, when considered in conjunction with the other aforementioned allegations, *see supra* pp. 13–14, that Defendants knew that the Provision would induce WorldCat customers to breach their contract with OCLC by licensing and uploading WorldCat records and attempted to absolve itself of any responsibility for its role in the breach. Construed in the light most favorable to OCLC, this supports a reasonable inference that Defendants intentionally induced WorldCat customers to breach their contracts with OCLC.

Finally, Defendants argue that WorldCat records are derived from third parties, OCLC does not have a "proprietary interest" in them, and Defendants therefore did nothing wrong by also obtaining these third-party records. B&T Mot., Dkt. 34, #288. Defendants' motions lack any legal support for the position that the contract must involve a proprietary interest for interference to be improper. *Id*. This is, again, unsurprising. A proprietary interest is not an element of a tortious interference of contract claim, nor is it an element of a contract claim, which asks whether a valid promise has been made, and performance materially rendered. *See Daily Servs., LLC*, 221 N.E.3d at 882.

Defendants cite to a case about a pirate library datascraping and hacking a public website in the default judgment context, but this case provides more rhetorical value than legal support. B&T's Mot., Dkt. 34, # 288. In that case, OCLC alleged, among other things, that a current or

16

potential WorldCat customer "has or will opt to forego OCLC services" because of the defendant pirate library's illegal datascraping and hacking of OCLC's website. *OCLC, Inc. v. Anna's Archive*, No. 2:24-cv-144, 2025 WL 1235238, at *6 (S.D. Ohio Mar 21, 2025) (denying without prejudice OCLC's motion for default judgment and certifying state-law questions). This case provides no legal or factual support for Defendants' contention that a tortious interference claim requires a proprietary interest. *Id.* The same is true of the other propositions Defendants purport to cite this case for, as this case involved different legal theories of these Ohio law claims and vastly different facts.

But importantly, Defendants misstate the allegations. True, OCLC alleged that it receives some bibliographic records from third parties. Compl., Dkt. 1, ¶ 42, # 8. But OCLC also alleges that it enhances, de-dupes, merges, and otherwise modifies nearly every record in WorldCat, overlaying its own improvements and information from libraries and other third-parties over a high-quality, master record. *Id.* ¶¶ 44–46, # 9. These are WorldCat records, and these are the records that libraries use when they subscribe to WorldCat. *Id.* ¶ 49, # 9. It is these enhancements that create the critical value for WorldCat. *Id.* OCLC does not allege that Defendants obtained the un-enhanced versions of the bibliographic records from third parties to use in BTCat. Instead, OCLC alleges that Defendants are using the OCLC-enhanced WorldCat records and are populating BTCat with these enhanced records. *Id.* ¶ 117, # 21. Because Defendants are using the already-enhanced records in BTCat, they avoid the countless hours of work that goes into enhancing records and, therefore, can offer BTCat for a dramatically reduced price, which draws customers away from WorldCat to BTCat. *Id.* Wrongful use of the enhanced WorldCat records—not the use of unenhanced third-party records—is the basis of OCLC's tortious interference with contract claim. *See generally*, *id.*

17

**B.** **OCLC's Complaint sufficiently pleads that Defendants tortiously interfered with its prospective business relationships.**

Defendants raise only one objection to OCLC's claim of tortious interference with prospective business relationship—that it "fails because OCLC failed to allege a single lost business relationship." B&T Mot., Dkt. 34, # 288. However, "such specificity is not required at the pleadings stage." *Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792, 807–08 (S.D. Ohio 2010) (holding plaintiff sufficiently stated a claim of tortious inference without naming a specific business relationship interfered with by defendant). Ohio courts have found that "the tortious interference doctrine is broad enough to protect a party's prospective business relationship with the general public." *Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc.*, No. 1:15-CV-737, 2016 WL 3999315, at *5 (S.D. Ohio July 26, 2016) (citing *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 611 N.E.2d 955, 960-61 (Ohio Ct. App. 1992)).

OCLC goes beyond merely identifying the "general public." It identifies the third parties with whom OCLC has business relationships: "potential customers seeking a cataloging record service as part of their ILS/LSP platforms." Compl., Dkt. 1, ¶¶ 137–140, # 25–26. This is enough at the pleading stage. *See Williamson v. Rexam Beverage Can Co.*, 497 F. Supp. 2d 900, 910 (S.D. Ohio 2007) (identifying "the third persons as potential users, licensees or purchasers of the Proprietary Ultrasonic Technology" is sufficiently pleading prospective business relationships); *Spartan Chem. Co. v. Nat'l Chem. Lab'ys of PA, Inc.*, No. 3:17-cv-02487, 2018 WL 6169378, at *4 (N.D. Ohio Nov. 26, 2018) (finding identification of "a contract and business relationship with its authorized distributors" enough to establish interference with a business relationship claim at the pleadings stage). As described above, OCLC's allegations go beyond generalities, as OCLC has already lost current customers to BTCat, BTCat is offering a directly competing

service for less or for free, and OCLC has identified specific customers at risk. Compl., Dkt. 1, ¶¶ 96, n.2, 117–121, # 17, 21–22. Defendants have fair notice of the basis for OCLC's claim.

### C.  OCLC has adequately pled its unjust enrichment claim against Defendants.

Defendants assert that OCLC's unjust enrichment claim fails as Defendants "cannot be unjustly enriched when OCLC disclaims ownership of WorldCat data." B&T Mot., Dkt. 34, # 289. Defendants miss the mark with this argument. OCLC has properly alleged each element of an unjust enrichment claim. Compl., Dkt. 1, ¶¶ 149–154, # 27.

OCLC need not set forth "a property right" in the WorldCat records to establish an unjust enrichment claim. That is not the standard under Ohio law. An unjust enrichment claim "requires a showing that (1) a benefit was conferred by the plaintiff on the defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances in which it was unjust to do so without payment." *Bunta v. Superior VacuPress, LLC*, 218 N.E.3d 838, 848 (Ohio 2022). The "benefit" conferred by a plaintiff and unjustly retained by a defendant may take many forms. *See Abira Med. Lab'ys, LLC v. CareSource,* No. 3:24-CV-157, 2024 WL 4817444, at *6 (S.D. Ohio Nov. 18, 2024) (denying motion to dismiss unjust enrichment claim where plaintiff provided services to defendant). For example, "[c]ivil liability may be imposed to prevent an injustice when one party retains a benefit *from another's labors." Shaw v. J. Pollock & Co.,* 612 N.E.2d 1295, 1299–300 (Ohio 1992) (emphasis added).

OCLC's Complaint alleges that Defendants are unjustly enriched by their unauthorized retention and use of the fruits of OCLC's labor—its compilation, enhancement, and enrichment of bibliographic records, *i.e.*, WorldCat records and data—within B&T's competing product, BTCat. Compl., Dkt. 1, ¶¶ 43–49, 117, 151, # 8–9, 21, 27. This is enough to establish a benefit conferred and unjustly retained under Ohio law. *See Keller Elec., Inc. v. Gilbert*, No. 17467, 1996 WL 183027, at *5 (Ohio Ct. App. Apr. 17, 1996) ("Keller has adequately alleged unjust

retention of the benefit by claiming that Gilbert has enjoyed the fruits of Keller's labor without paying for it.").

Defendants' counterarguments do not persuade. Again, that OCLC used the term "WorldCat record" instead of "WorldCat Data" does not mean OCLC failed to state any claim based on WorldCat records, as set forth above. *See* B&T Mot., Dkt. 34, # 290.

Additionally, OCLC at no point disclaims "ownership" of its WorldCat records nor does OCLC contend that an OCN ("OCLC Control Number") is the only indicator of a WorldCat record.[5] *See id.* OCLC has never said that an OCN is the only indicator or value of a WorldCat record. Instead, a WorldCat record is valuable based on the many different enhancements and improvements to it. Compl., Dkt. 1, ¶ 49, # 90. Rather, Defendants misconstrue what benefit OCLC conferred, and what Defendants unjustly retained. In the Complaint, OCLC identifies that it does more than add the OCN to a record. *See id.* ¶ 43, # 8. OCLC adds value to the records in a multitude of other ways, including but not limited to:

- "OCLC adds Dewey Decimal Classification numbers and Faceted Application of Subject Terminology headings, which is derived from the Library of Congress Subject Headings." *Id.*

- "OCLC merges, de-duplicates, arranges, and adds metadata to enhance these records to support discovery of, exploration of, and access to the records." *Id.* ¶ 44, # 9.

---

[5] Defendants cite an OCLC blog post to support its position that OCLC has disclaimed ownership in WorldCat records. B&T Mot., Dkt. 34, # 290. Defendants again ignore the pleading standard by injecting factual issues into their Motions. The content of non-governmental websites, including blog posts, is not the proper subject of judicial notice. *Cranor v. MedUS, Inc.*, No. 1:23-CV-724, 2025 WL 841476, at *2 (S.D. Ohio Mar. 18, 2025); Fed. R. Evid. 201(b).

- "OCLC created embedded identifiers…[that] make WorldCat more discoverable through web search engines, like Google, and allow the user to link records back into the library catalog." *Id.* ¶ 45, # 9.

- "OCLC has also developed WorldCat record enhancements that automatically merge duplicate records." *Id.* ¶ 46, # 9.

- "The critical value of WorldCat is these modifications, improvements, and/or enhancements by OCLC." *Id.* ¶ 49, # 9.

Not once in its Complaint—or anywhere else—does OCLC disclaim its "ownership" in these modifications, improvements, or enhancements. Rather, OCLC seeks to protect them at every turn as evidenced by its WorldCat Policy, Framework Agreement, licensing agreements, and this very lawsuit. *See id.*; Dkts. 1-1, 1-2, 1-3, 1-5, # 30–47, 67–76. Defendants' citation to the Restatement on Restitution has no bearing here, as the section Defendants cite addresses self-interested intervention, *i.e.*, where a party acts under exigent circumstances to protect its property. Restatement (Third) of Restitution & Unjust Enrichment pt. II ch. 3 Intro. Note (WestLaw Update October 2024). Moreover, to the extent Defendants rely on the dissent in *Stanely v. Broadcasting Sys., Inc.*, 221 P.2d 73, 86 (Cal. 1950) (Schauer, J., dissenting), that dissenting opinion is both nonbinding and unpersuasive, including because *Stanley* is a copyright case, and this case is not.

Furthermore, OCLC is not alleging that Defendants are unjustly enriched by the mere retention of WorldCat records. *See* B&T Mot., Dkt. 34, # 290. This is an oversimplification. Rather, OCLC has alleged in its Complaint that Defendants have been unjustly enriched by its use and retention of WorldCat records without (1) paying for a license agreement to access such records; and (2) spending the millions of dollars and thousands of hours and effort required to

21

develop such high-quality records. *See* Compl., Dkt. 1, ¶¶ 12, 16, 151 # 3–4, 27. Defendants have gained customers because they incorporated WorldCat records into BTCat. *See id.* ¶¶ 17, 83, 87, 93, 119–122 # 4, 14–16, 22–23. Therefore, accepting OCLC's allegations in the Complaint as true, OCLC's unjust enrichment claim satisfies the Rule 12(b)(6) standard and should survive Defendants' Motions to dismiss.

### D. OCLC has sufficiently stated a claim against Bridgeall.

Separately, Bridgeall asserts that the claims against it fail because it is not a party to the collectionHQ agreement, has not been enriched by B&T's alleged bad conduct, and has not used WorldCat records in collectionHQ. Bridgeall Mot., Dkt. 35, #305–06. These arguments fall flat.

First, while it may be true that B&T, not Bridgeall, is the entity that signed the "sample agreement attached to the Complaint," *id.* # 306, the collectionHQ agreement states that B&T is entering into the agreement as the "owner ***and agent*** of Bridgeall," the agreement is for services that Bridgeall, not B&T, provides to the customer, Bridgeall's logo is displayed prominently on the front page of the agreement, and Bridgeall is referenced throughout. collectionHQ Standard Terms & Conditions, Dkt. 1-4, # 51. The agreement states that "Baker & Taylor hereby offers to supply the Service…to you…utilizing the software and services of its wholly owned indirect subsidiary Bridgeall." *Id*. # 49. It also provides that any "[n]otices by you must be given in writing and sent" to the mailing address and principal place of business *for Bridgeall* in Scotland or a collectionHQ email address. *Id*. § 21.8, # 64. A reasonable inference from these allegations and the Defendant's own contract (an exhibit to OCLC's Complaint) is that Bridgeall also engaged in activities that tortiously interfered with OCLC's contracts and relationships with prospective customers and has been unjustly enriched by its conduct.

Most importantly, these arguments fail because they either inject new facts[6] not in the Complaint or require the Court to read the Complaint in the light most favorable to Bridgeall, not OCLC. Both tactics are prohibited at the motion to dismiss stage. *Iqbal*, 556 U.S. at 678. When read in the light most favorable to OCLC, the Complaint states the following facts in support of its tortious interference claim against Bridgeall: "collectionHQ is owned by Baker & Taylor's subsidiary, Bridgeall," Compl., Dkt. 1, ¶ 82, # 14; WorldCat customers have contracts for Bridgeall's collectionHQ, *id.* ¶ 96, # 17; the collectionHQ terms and conditions contain a Provision permitting B&T to improperly use WorldCat records, *id.* ¶ 83, # 14–15; collectionHQ's, and thus, Bridgeall's, use of such Provision is "actively inducing WorldCat customers to violate their contractual provisions with OCLC," *id.* ¶ 97, # 17; and Bridgeall and B&T know of the WorldCat Policy and the benefit of WorldCat records, *id.* ¶¶ 15, 106, 150–51, # 3–4, 19, 27. Further, in addition to the above-referenced facts, OCLC's unjust enrichment claim against Bridgeall is supported by the fact that Bridgeall and B&T tie BTCat and collectionHQ together through the Provision. *Id.*, ¶¶ 81–84, # 14–15. Thus, B&T's inappropriate incorporation of WorldCat records into BTCat, without a licensing agreement, drives Bridgeall's collectionHQ subscriptions. *See id.* ¶ 12, # 3. Bridgeall, itself need not retain the records in order to be unjustly enriched by their improper retention and use. Bridgeall fails to point to anything within the Complaint, or its exhibits, that would contradict these allegations.

## V.     CONCLUSION

Accordingly, OCLC respectfully requests that the Court deny Defendants' motion to dismiss.

---

[6] Bridgeall cites to its Legowski declaration to support its arguments that the Complaint should be dismissed under Rule 12(b)(6). Bridgeall Mot., Dkt. 35, # 306.

Respectfully submitted,

*Jeffrey M. Walker*
Jeffrey M. Walker (0096567)
Kathryn M. Brown (0100426)
Traci L. Maritnez (0083989)
Brittany Silverman (0102263)
Erin Hassett (0099970)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: (614) 365-2700
Facsimile: (614) 365-2499
jeffrey.walker@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com
erin.hassett@squirepb.com

## CERTIFICATE OF SERVICE

On June 17, 2025, this document was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties.


*Jeffrey M. Walker*
One of the Attorneys for Plaintiff OCLC