# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| OCLC, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Baker & Taylor, LLC and Bridgeall Libraries, Ltd., <br><br> Defendants. | Case No. 2:25-cv-309 <br><br> Judge: Edmund A. Sargus <br><br> Magistrate: Elizabeth Preston Deavers |

## DEFENDANT BAKER & TAYLOR, LLC'S REPLY TO PLAINTIFF OCLC, INC.'S OPPOSITION TO MOTION TO DISMISS

TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. COUNT ONE: OCLC'S TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS CLAIM FAILS ........................................................................2

    A. The WorldCat Policy Is Not A Contract..................................................3

    B. OCLC Does Not Allege A Breach of The WorldCat Policy .........................6

    C. OCLC Did Not Induce Breach Of The WorldCat Policy............................8

        1. Subscribers Had A Choice To Share Their Catalogs ............................9

        2. OCLC's Tortious Interference With Contract Claim Cannot Be Supported By The Sharing Of WorldCat Records................................................................10

III. COUNT TWO: OCLC'S TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS CLAIM FAILS.............................................................12

IV. COUNT FOUR: OCLC'S UNJUST ENRICHMENT CLAIM FAILS....................13

V. CONCLUSION......................................................................................................14

TABLE OF AUTHORITIES

**Cases**

*Clark v. Liberty Univ., Inc.*, No. 6:20-CV-58, 2021 WL 1827256 (W.D. Va. May 7, 2021) ..................... 5, 6

*Finsterwald-Maiden v. AAA S. Cent. Ohio*, 115 Ohio App. 3d 442, 447, 685 N.E.2d 786 (1996) ........... 4, 6

*Golio v. Adena Health Sys.*, No. 2:11-CV-00757, 2012 WL 1409535 (S.D. Ohio Apr. 23, 2012) .............. 12

*Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538–39 (S.D. Ohio 2023) ............................................. 3, 6

*Horter Investment Management, LLC v. Cutter*, 257 F. Supp. 3d 892 (S.D. Ohio 2017) .......................... 10

*Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 542 (6th Cir. 2014) .................................................... 2

*Roulhac v. Sw. Reg'l Transit Auth.*, No. 1:07CV408, 2008 WL 920354 (S.D. Ohio Mar. 31, 2008) .......... 11

*Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.*, 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004) ........ 4, 6

*Sophia's Cure Inc. v. AveXis, Inc.*, No. 2:16-CV-865, 2017 WL 4541449 (S.D. Ohio Oct. 10, 2017) ...... 2, 8

*Tesler v. Miller/Howard Invs., Inc.*, No. 116CV00640TWPMPB, 2019 WL 429296 (S.D. Ind. Feb. 4, 2019) ........................................................................................................................................ 5

I.      **INTRODUCTION**

With its WorldCat bibliographic database facing serious competition from Defendant Baker & Taylor, LLC's BTCat product, Plaintiff OCLC, Inc. brings this lawsuit for the sole purpose of assailing BTCat. OCLC's central theory is that Baker & Taylor built BTCat on the "back" of WorldCat by gaining access to OCLC customers' bibliographic catalogs containing WorldCat records while providing an unrelated service called collectionHQ. Based on this theory, OCLC asserts claims against Baker & Taylor for: (1) tortious interference with contractual relationships (Count One); (2) tortious interference with prospective business relationships (Count Two); and (3) unjust enrichment (Count Four).[1] The Court should dismiss each claim under Federal Rule of Civil Procedure 12(b)(6).

*First*, the existence of a contract and breach of that contract are essential elements of a tortious interference with contract claim. OCLC contends that Baker & Taylor interfered with the WorldCat Policy governing its customers by accessing these customers' catalogs while providing the collectionHQ service.[2] But the WorldCat Policy is just that—a policy, not a contract. Moreover, the WorldCat Policy does not prohibit OCLC customers from sharing their catalogs with Baker & Taylor even if these catalogs contain WorldCat records. Unable to identify a valid contract and its breach by OCLC customers as a result of Baker & Taylor's conduct, OCLC cannot state a tortious interference with contract claim against Baker & Taylor.

*Second*, as this Court recently held in another OCLC case styled *OCLC, Inc. v. Anna's*

---

[1] Although Baker & Taylor does not challenge the third count for breach of contract at this juncture, it does not concede that this claim has merit, and reserves all rights.

[2] OCLC defines the "WorldCat Rights and Responsibilities for the OCLC Cooperative," attached as Exhibit A to the Complaint, as the "WorldCat Policy." (Compl. ¶ 60, ECF No. 1 at PageID 11.)

1

*Archive*, No. 2:24-CV-144, 2025 WL 1235238 (S.D. Ohio Mar. 21, 2025) (hereinafter "*Anna's Archive*"), to state a claim for interference with prospective business relationship, the plaintiff must identify the future business relationships that it claims were harmed.  As in *Anna's Archive*, OCLC fails to identify in any meaningful way any future business relationships that Baker & Taylor improperly interfered with.  What's more, OCLC's seeming contention that it can assert a tortious interference with business relationships claim against Baker & Taylor simply because Baker & Taylor legitimately introduced a competing product into the marketplace has no merit.  OCLC's tortious interference with prospective business relationships claim fails.

**Third**, as this Court also explained in *Anna's Archive*, OCLC cannot state an unjust enrichment claim unless it can adequately plead that Baker & Taylor improperly retained the benefit of WorldCat's data.  Here, in the WorldCat Policy, OCLC expressly disclaims any proprietary interest in WorldCat records.  As such, Baker & Taylor's use of WorldCat records in BTCat cannot be unjust as a matter of law.

**II.     COUNT ONE: OCLC'S TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS CLAIM FAILS**

As OCLC acknowledges, it cannot state a tortious interference with contract claim unless it properly pleads that Baker & Taylor induced WorldCat customers to breach their contracts with OCLC.  (Opp'n, ECF No. 46 at PageID 408.)  *See Sophia's Cure Inc. v. AveXis, Inc.*, No. 2:16-CV-865, 2017 WL 4541449, at *6 (S.D. Ohio Oct. 10, 2017) (stating that the "existence of a contract" is an essential element of a tortious interference with contract claim).  *See also Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 542 (6th Cir. 2014) ("[T]ortious interference with a contract requires the plaintiff to prove, as an element, an actual breach of contract.").

Here, OCLC's tortious interference claim rests entirely on "violat[ions] of the WorldCat Policy." (Compl. ¶ 133, ECF No. 1 at PageID 24–25.)  But even accepting the allegations of the

2

Complaint as true, OCLC cannot state a viable tortious interference with contract claim based on the WorldCat Policy because: (1) the WorldCat Policy is not a contract; (2) OCLC fails to allege a breach of the WorldCat Policy; and (3) Baker & Taylor never induced third parties to breach the WorldCat Policy.

### A. The WorldCat Policy Is Not A Contract

OCLC's first problem is that the WorldCat Policy is not a contract, but rather what OCLC calls it—a policy. (Compl. Ex. A § 1, ECF 1–1 at PageID 32 ("This policy was created . . . .").) Indeed, the WorldCat Policy has all the hallmarks of a policy. As an initial matter, the WorldCat Policy consists largely of aspirational guidelines for conduct. For instance, it advises OCLC members that it is their "responsibility" to "[m]ake reasonable efforts" to do certain things.[3] (Compl. Ex. A, ECF No. 1–1 at PageID 34.)

But the biggest indicator that the WorldCat Policy is not a contract but rather a policy is the fact that OCLC retains the right to unilaterally change the WorldCat Policy. (Opp'n Ex. F, Schedule 2 § 2.2, ECF No. 46-1 at PageID 428 (stating that the WorldCat Policy may be "modified from time to time" by OCLC); Compl. Ex. A § 6, ECF No. 1-1 at PageID 34 (permitting OCLC to unilaterally change the WorldCat Policy).) Ohio courts consistently hold that policies subject to unilateral modification cannot be contracts because there is no "meeting of the minds" between the parties. *See Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538–39 (S.D. Ohio 2023) (Given

---

[3] Citing *Ragen v. Hancor, Inc.*, No. 3:08 CV 1022, 2010 WL 301761, at *2 (N.D. Ohio Jan. 19, 2010), OCLC contends that Ohio law recognizes contracts that require "reasonable efforts" or "best efforts" are enforceable." (Opp'n, ECF No. 46 at PageID 411.) Even if this is true as a general proposition, the point here is that the WorldCat Policy is too vague in its aspirational suggestions and possible remedies to be enforceable. *See Cap. Equity Grp. v. Ripken Sports Inc.*, 744 F. App'x 260, 263 (6th Cir. 2018) (holding that "an agreement is [not] sufficiently certain for enforcement if it [does not] provides a basis for determining the existence of a breach and for giving an appropriate remedy.")

3

the explicit language giving unilateral authority to Humana to alter the policy, Plaintiff's breach of contract claim must fail, as there is no evidence present indicating mutual assent."); *Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.*, 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004) (holding that employee handbooks that "reserve[ed] the right to change without notice the policies described" indicated that the handbooks amounted to "nothing more than unilateral statements of company policy that create no contractual liability"); *Finsterwald-Maiden v. AAA S. Cent. Ohio*, 115 Ohio App. 3d 442, 447, 685 N.E.2d 786, 790 (1996) ("Courts have considered provisions permitting the employer to unilaterally alter the handbook at any time as an indication of a lack of mutual assent.").

In response to this fatal flaw, OCLC advances several unpersuasive arguments. **First**, seemingly conceding that the WorldCat Policy itself is not a contract, OCLC claims that "[w]hether the WorldCat Policy *alone* is an enforceable contract is irrelevant because the Framework Agreement, including Schedule 2, is an enforceable contract, and Schedule 2 expressly incorporates the terms of the WorldCat Policy for WorldCat customers. In other words, the WorldCat Policy *in combination with the Framework Agreement* is a valid and enforceable contract." (Opp'n, ECF No. 46 at PageID 410 (emphasis in the original).) OCLC's attempt to transform the WorldCat Policy into a contract by trying to incorporate it into other contracts is unavailing.

OCLC continues to play fast and loose with documentary language. Nowhere does Schedule 2 "expressly incorporate[ ] the terms of the WorldCat Policy for WorldCat customers." (Opp'n, ECF No. 46 at PageID 410.) Rather, Schedule 2 says that the "use and transfer by the Institution" that has selected the service governed by Schedule 2 "is subject to the [WorldCat]

4

Policy."[4] (Opp'n Ex F § 3.3, ECF No. 46-1 at PageID 428.)

More importantly, the WorldCat Policy cannot magically become a contract simply by incorporation by reference into other contracts. *See Clark v. Liberty Univ., Inc.*, No. 6:20-CV-58, 2021 WL 1827256, at *5–*6 (W.D. Va. May 7, 2021) ("This language itself shows that the Title IX Policy is subject to continual modification and review, preventing it from being mutually binding and enforceable. . . . Because different versions of the policy can exist over time, subject to the unilateral revisions of the University, the Title IX policy cannot be a contract, even if it is incorporated under a valid contract."); *Tesler v. Miller/Howard Invs., Inc.*, No. 116CV00640TWPMPB, 2019 WL 429296, at *6 (S.D. Ind. Feb. 4, 2019) ("But this incorporation by reference into what may be a contract is not enough to create a contract out of the Employee Policies . . . ."), *modified on reconsideration*, No. 116CV00640TWPMPB, 2019 WL 1003334 (S.D. Ind. Mar. 1, 2019).

***Second***, despite the plain language of the WorldCat Policy and Schedule 2 that the WorldCat Policy is subject to revision by OCLC, OCLC contends that "OCLC cannot unilaterally amend the Policy" because the process is "involved," includes the "membership board," and a "public comment procedure." (Opp'n, ECF No. 46 at PageID 411.) But as clear as day, Section 6 of the WorldCat Policy says that OCLC may unilaterally review and change the Policy. (Compl. Ex. A, ECF No. 1–1 at PageID 34.) It is of no consequence whether or not the process of changing the WorldCat Policy is involved or, at OCLC's discretion, open to comment from "the OCLC governance structure" or the public. (Compl. Ex. A, ECF No. 1–1 at PageID 34.) The fact that OCLC can unilaterally change the WorldCat Policy prevents there from being a "meeting of the

---

[4] Responding to Baker & Taylor's motion by pairing the WorldCat Policy with Schedule 2 is especially odd given that OCLC did not even bother attaching Schedule 2 to its Complaint.

minds" between OCLC and the WorldCat customer as to the terms of the WorldCat Policy. *See Hines*, 689 F. Supp. 3d at 538–39 (holding that a policy that is subject to unilateral change cannot be a contract because there is no mutual assent as to the policy's terms); *See Senter*, 335 F. Supp. 2d at 843 (same); *Finsterwald-Maiden*, 115 Ohio App. 3d at 447 (same).

***Third***, OCLC contends that even if it can unilaterally change the WorldCat Policy, it is still a valid contract because OCLC provided the WorldCat Policy to the WorldCat customer at the time it executed the Framework Agreement and Schedule 2 (which OCLC incorrectly contends "incorporates the WorldCat Policy"), and the WorldCat Policy does not expressly disclaim that it is a contract. (Opp'n, ECF No. 46 at PageID 412.) But the point is not when the WorldCat Policy was provided to the customer or what disclaimers it contains; rather, it is that OCLC can unilaterally change the WorldCat Policy—which prevents a "meeting of the minds" between OCLC and WorldCat customers as to the terms of the WorldCat Policy. *See Clark*, 2021 WL 1827256, at *1, *5–*6 (holding that even if the student agreed to abide by the school's Title IX Policy at the time it entered into the school's Financial Responsibility Agreement and the Title IX Policy is incorporated into that agreement, the Title IX policy "cannot be a contract" because it is "subject to the unilateral revisions of the University").

      **B.**      <u>**OCLC Does Not Allege A Breach of The WorldCat Policy**</u>

Even if the WorldCat Policy were a contract (which it is not), OCLC fails to identify its breach by OCLC customers in its allegations. ***First***, for the WorldCat Policy to become part of any purported contract, OCLC plays a dubious game of connect-the-dots between a so-called "Framework Agreement," numerous optional schedules referenced in that agreement, and the separate WorldCat Policy. (Opp'n, ECF No. 46 at PageID 406–07.) According to OCLC, "[w]hen a customer subscribes to WorldCat, it agrees to the Framework Agreement and Schedule 2," which

6

"expressly incorporates the WorldCat Policy." (Opp'n, ECF No. 46 at PageID 408.) But the links between the Framework Agreement, Schedule 2, and the WorldCat Policy are not as straightforward as OCLC suggests. For starters, the Framework Agreement makes no mention of "WorldCat customers." Rather, it states that an "Institution" that selects a service called "WorldShare Metadata/OCLC Cataloging" is subject to Schedule 2. (Compl., ECF No. 1–5 at PageID 70.) In turn, the "Institution" that signs on to Schedule 2 does agree to be subject to the WorldCat Policy in certain instances. (Compl. Ex. A, ECF No. 1–5 at PageID 36.)

OCLC concedes that the terminology that it uses in the Complaint and terminology in the Framework Agreement, Schedule 2, and the WorldCat Policy are "differen[t]," but brushes the differences off as a means of streamlining. (Opp'n, ECF No. 46 at PageID 410.) But contractual language matters. ***Second***, citing Sections 3(B)(6)(b)–(d) of the WorldCat Policy, OCLC contends that "WorldCat customers are prohibited from mass downloading WorldCat records, mass distribution of WorldCat records, and otherwise diminishing the value of WorldCat."[5] (Opp'n, ECF No. 46 at PageID 412.) Initially, the WorldCat Policy does not define "WorldCat record" anywhere—it only defines "WorldCat Data." (Compl., ECF 1–5 PageID 36.) Thus, because the WorldCat Policy places no restrictions on how "WorldCat records" are handled, a party cannot breach the WorldCat Policy *vis-à-vis* "WorldCat records." Again, contractual language matters.

---

[5]  In its Opposition, OCLC also contends that Baker & Taylor procured breach of Sections 5.1 and 5.2 of the Framework Agreement by "encouraging WorldCat customers to license their records for use by a commercial competitor, which devalues WorldCat and is contrary to the Framework Agreement." (Opp'n, ECF No. 46 at PageID 413.) But the sections say nothing about a signatory to the Framework Agreement being unable to license its own records to an OCLC competitor or anyone else, or about devaluing WorldCat. (Compl. Ex. E §§ 5.1-5.2, ECF No. 1–5 at PageID 72.) In any event, the Complaint makes clear that OCLC's tortious interference with contract claim is based solely on the WorldCat Policy. (Compl. ¶ 133, ECF No. 1 at PageID 24–25.)

7

Moreover, OCLC does not allege that Baker & Taylor caused WorldCat customers to engage in "mass downloading" or "mass distribution" from WorldCat—whatever those vague terms may mean.[6] Rather, OCLC alleges that Baker & Taylor is "actively encouraging OCLC's WorldCat customers to breach the . . . WorldCat Policy by including in their contracts for products and services a provision requiring libraries to grant Baker & Taylor access to and a license for using libraries' catalogs with WorldCat records—including populating BTCat with these records." (Compl. ¶ 107, ECF No. 1 at PageID 19.) In other words, OCLC does not allege that WorldCat customers are mass downloading or mass distributing from WorldCat, but rather alleges that they are giving Baker & Taylor "access" to their own catalogs.[7]

### C. OCLC Did Not Induce Breach Of The WorldCat Policy

As OCLC agrees, "intentional" and wrongful "procurement of the contract's breach" is an element of a tortious interference claim. (Opp'n, ECF No. 46 at PageID 408.) *See Sophia's Cure Inc.*, 2017 WL 4541449, at *6 (stating that the "intentional procurement of the contract's breach" is an essential element of a tortious interference with contract claim). Here, as a matter of law and based on the allegations in the Complaint, Baker & Taylor could not have intentionally and

---

[6] OCLC contends that its customers' sharing of their catalogs diminished the value of WorldCat and thus violated the WorldCat Policy. (Opp'n, ECF No. 46 at PageID 412.) The relevant provision in the WorldCat Policy, Section 3(6)(d), prohibits "diminish[ing] the value of WorldCat to the OCLC cooperative." (Compl. Ex. A, ECF No. 1–5 at PageID 34.) It is unclear what this provision means, and it is far too vague to constitute an enforceable contractual provision. *See Preston v. First Bank of Marietta*, 16 Ohio App.3d 4, 6, 473 N.E.2d 1210 (1983) (holding that a "contract is illusory and unenforceable" when a party "must guess at his obligation").

[7] OCLC incorrectly contends that Baker & Taylor is "inject[ing] factual questions" regarding "from where and how libraries actually upload their cataloging records to BTCat" by arguing that WorldCat customers do not mass download or mass distribute from WorldCat, but rather share their catalogs with Baker & Taylor. (Opp'n, ECF No. 46 at PageID 413.) But this is not the case as OCLC does not allege mass downloading or mass distribution from WorldCat anywhere in the Complaint—only that WorldCat customers' give Baker & Taylor access to their own catalogs. (Compl. ¶ 107, ECF No. 1 at PageID 19.)

8

wrongfully procured the breach of the WorldCat Policy (or the Framework Agreement or Schedule 2) by entering into the collectionHQ agreement with its subscribers because: (1) subscribers had a choice to share their catalogs, and were required by Baker & Taylor to confirm that they had authority to do so, and (2) OCLC cannot properly state a tortious interference claim based on WorldCat records over which it claims no proprietary interest.

### 1. Subscribers Had A Choice To Share Their Catalogs

As the Complaint makes clear, the collectionHQ agreement provides each subscriber with a choice as to whether to grant Baker & Taylor access to its catalog and the subscriber confirms that it has the right to share any WorldCat records in its catalog with Baker & Taylor:

> In addition, as a subscriber to the Service, *you have the opportunity* to access Baker & Taylor's BT CAT community pool of cataloging records at no charge if you authorize the use of your cataloging records by Baker & Taylor. *By signing this agreement*, *you are authorizing Baker & Taylor to utilize your cataloging records and are confirming that you have the right to make this authorization.* (emphasis added).

(Compl. ¶ 84, ECF No. 1 at PageID 15.) In other words, the responsibility is, as it should be, entirely on the subscriber as to whether it wants to, and is permitted to, share its catalog with Baker & Taylor.

OCLC's contrary arguments are unavailing. **First**, despite the clear language in the collectionHQ agreement, OCLC doubles down on its erroneous position that the collectionHQ agreement *requires* the subscriber to grant Baker & Taylor access to its catalog. (Opp'n, ECF No. 46 at PageID 415.) The Court can see for itself from the language above that the collectionHQ agreement contains no such requirement.

**Second**, OCLC contends that Baker & Taylor is "attempting to add a new element to a tortious interference claim: that the tortfeasor must force the breaching party to violate its contract." (Opp'n, ECF No. 46 at PageID 416.) It is not. To the contrary, the quoted language

9

from the collectionHQ agreement affirmatively reminds the customer that it may have an obligation not to share certain records—thereby *discouraging*, not inducing, a potential breach. Again, OCLC mischaracterizes Baker & Taylor's position. What Baker & Taylor is saying is that by giving the subscriber the choice to share its catalog with Baker & Taylor, and by the subscriber confirming that it has the right to share its catalog with Baker & Taylor, Baker & Taylor cannot be "'substantially certain' that if a library licenses or uploads its records to BTCat, the library will be breaching its contracts with OCLC." (Opp'n, ECF No. 46 at PageID 415.) Indeed, the opposite is true, and Baker & Taylor should be entitled to assume that each collectionHQ customer was authorized to share its catalog.

***Third***, OCLC cynically argues that because Baker & Taylor asks subscribers to confirm that they have authority to share their catalog, "this supports a reasonable inference that [Baker & Taylor] intentionally induced WorldCat customers to breach their contracts with OCLC." (Opp'n, ECF No. 46 at PageID 417.) In other words, OCLC argues that Baker & Taylor's attempt to ensure that subscribers can properly share their catalogs with it (and thereby protect third-party rights) is somehow evidence of wrongdoing. This manifestly incorrect position is not supported by the authority OCLC cites, *Horter Investment Management, LLC v. Cutter*, 257 F. Supp. 3d 892, 923 (S.D. Ohio 2017).[8] (Opp'n, ECF No. 46 at PageID 416–17.)

### 2. OCLC's Tortious Interference With Contract Claim Cannot Be Supported By The Sharing Of WorldCat Records

In addition, as this Court pointed out in *Anna's Archive*, "[o]nly *improper* interference with

---

[8] OCLC's position is rich given that OCLC, like many businesses, also puts the onus of protecting third-party rights on its members; for instance, the WorldCat Policy says that it is the member's responsibility to "[m]ake reasonable efforts to ensure that their contributions to WorldCat do not violate the rights of any third party." (Compl. Ex. A § 3(3), ECF No. 1–1 at PageID 34.)

10

a contract is actionable." 2025 WL 1235238, at *6 (emphasis in the original) (internal quotation marks and citation omitted). In that regard, *Anna's Archive* suggested that if scraping OCLC's "publicly available data" (*i.e.*, data over which it cannot claim a proprietary interest) from OCLC's worldcat.org website is not improper, then there can be no tortious interference claim based on such data scraping. *See id.* at *5–*6 ("The Court questions when data scraping would be 'improper' enough for tortious interference . . . .").

Here, OCLC concedes—both in the Complaint and the WorldCat Policy attached to the Complaint—that it has no proprietary interest in records in WorldCat. (Compl. ¶ 42, ECF No. 1 at PageID 8; Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 32.) Rather, OCLC only claims that it is "WorldCat as a compilation" that has "value." (Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 32.) Just as OCLC could not assert a claim for tortious interference with contract based on data on its website, it cannot assert that claim based on non-proprietary WorldCat records. *See Anna's Archive*, 2025 WL 1235238, at *5–*6.

In the face of *Anna's Archive*, OCLC claims that there is no "legal support for the position that the contract must involve a proprietary interest for interference to be improper," and seems to backtrack from its prior position that it has no proprietary interest over individual WorldCat records. (Opp'n, ECF No. 46 at PageID 417–18.) *Anna's Archive* speaks for itself: a tortious interference claim based on records over which OCLC does not claim an ownership interest is questionable at best. *See* 2025 WL 1235238, at *6. Moreover, the Court should not allow OCLC to contradict the allegations in the Complaint in its Opposition. *See Roulhac v. Sw. Reg'l Transit Auth.*, No. 1:07CV408, 2008 WL 920354, at *4 (S.D. Ohio Mar. 31, 2008) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss . . . ." (citation omitted)).

11

### III. COUNT TWO: OCLC'S TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS CLAIM FAILS

As Baker & Taylor explained in its Motion, OCLC's claim for tortious interference with prospective business relationships based on "[a] vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim." (Mot., ECF No. 34 at PageID 288–89 (*citing Anna's Archive*, 2025 WL 1235238, at *6 (alteration in the original) (internal quotation marks and citation omitted)).) Here, OCLC's claim fails because, as in *Anna's Archive*, OCLC fails to "specify any particular customers it lost." *Id.*

OCLC's contrary contention that its identification of "potential customers seeking a cataloging record service as part of their ILS/LSP platforms" is enough to plead a tortious interference with prospective business relationship claim was rejected in *Anna's Archive* and should be rejected here as well. *See* 2025 WL 1235238, at *6 (holding that OCLC's identification of "potential WorldCat® customers" was insufficient to state a tortious interference with prospective business relationship claim).

Further, "[t]ortious interference with business relationships occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *Golio v. Adena Health Sys.*, No. 2:11-CV-00757, 2012 WL 1409535, at *6 (S.D. Ohio Apr. 23, 2012) (internal quotation marks and citation omitted). The elements of the claim are: (1) the existence of a business relationship; (2) the wrongdoer's knowledge thereof; (3) the wrongdoer's intentional procurement of a breach of the business relationship; (4) lack of justification; and (5) resulting damages. *See id.*

OCLC's gripe here appears to be that Baker & Taylor is offering "a directly competing service for less or for free" in BTCat. (Opp'n, ECF No. 46 at PageID 419–20.) But simply offering

12

a competing product—which, as explained above, BTCat properly built—cannot be the basis of a tortious interference with future business relationships claim. *See Golio*, 2012 WL 1409535, at *6 (holding that "lack of justification" for taking business away from a party is an essential element of a tortious interference with future business relationships claim).

## IV.     COUNT FOUR: OCLC'S UNJUST ENRICHMENT CLAIM FAILS

As Baker & Taylor explains in its Motion, OCLC cannot state an unjust enrichment claim based on Baker & Taylor's "ret[ention] [of] WorldCat records." (Mot., ECF No. 34 at PageID 290.) This is because OCLC does not claim ownership over individual WorldCat records, which are often contributed by third parties and freely move through the library system, but rather over the "compilation" of WorldCat records in WorldCat. (Compl. ¶ 42, ECF No. 1 at PageID 8; Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 32.)

Although OCLC devotes several pages to argue that WorldCat records have value, OCLC has already disclaimed ownership in the WorldCat records themselves, and the Court should not let it essentially amend its Complaint in its Opposition. *See Roulhac*, 2008 WL 920354, at *4 (S.D. Ohio Mar. 31, 2008) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss . . . ." (citation omitted)). Indeed, the Court does not need to look any further than its decision in *Anna's Archive* where it explained that there could be no unjust enrichment based on the retention of WorldCat data if it is not "unjust to do so without payment." 2025 WL 1235238, at *6 (internal quotation marks and citation omitted). It simply cannot be unjust for Baker & Taylor to retain WorldCat records when OCLC expressly states that there is no "value . . . in the ownership of the [WorldCat] records themselves." (Compl. Ex. A § 2(C), ECF No. 1-1 at PageID 32.)

13

## V. CONCLUSION

The Court should dismiss OCLC's claims for: (1) tortious interference with contractual relationships (Count One); (2) tortious interference with prospective business relationships (Count Two); and (3) unjust enrichment (Count Four) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Baker & Taylor entered into agreements with subscribers, some of whom voluntarily, and after confirming they were allowed to do so, shared their own catalogs with Baker & Taylor. OCLC had no contracts with subscribers to prevent subscribers from doing so—even if their catalogs had WorldCat records as OCLC contends. Nor was it improper for Baker & Taylor to populate BTCat with any records from the subscribers' catalogs. OCLC's lawsuit is a thinly-veiled attempt to damage BTCat, which it views as a serious competitive threat to WorldCat. The Court should not countenance this tactic and should grant Baker & Taylor's Motion.

Respectfully submitted,

/s/ *Derek P. Hartman*
Derek P. Hartman (0087869), Trial Attorney
Michael C. Cohan (0013542)
CAVITCH FAMILO & DURKIN CO., L.P.A.
1300 East Ninth Street, Twentieth Floor
Cleveland, Ohio 44114
Telephone:   (216) 621-7860
Facsimile:    (216) 621-3415
Email:         mcohan@cavitch.com
                 dhartman@cavitch.com

*Attorneys for Defendant Baker & Taylor, LLC*

/s/ *Frank E. Noyes*    (admitted pro hac vice)
Frank E. Noyes, II (PA Bar No. 48366)
Nafiz Cekirge (CA Bar No. 255710)
OFFIT KURMAN, P.A.
222 Delaware Avenue, Suite 1105
Wilmington, Delaware 19801
Telephone:   302-351-0900
Facsimile:    302-351-0915
Email:         fnoyes@offitkurman.com
                 Nafiz.cekirge@offitkurman.com

*Attorneys for Defendant Baker & Taylor, LLC*

**CERTIFICATE OF SERVICE**

On July 1, 2025, this document was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties.

/s/ *Derek P. Hartman*
Derek P. Hartman (0087869), Trial Attorney
*One of the Attorneys for Defendant Baker & Taylor, LLC*