# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

OCLC, Inc.,

        Plaintiff,

    v.

Baker & Taylor, LLC and Bridgeall
Libraries, Ltd.,

        Defendants.

Case No. 2:25-cv-309

Judge Edmund A. Sargus, Jr.

Magistrate Judge Elizabeth Preston
Deavers

---

## PLAINTIFF OCLC, INC.'S OPPOSITION TO DEFENDANT BRIDGEALL LIBRARIES, LTD.'S RULE 12(B)(2) MOTION TO DISMISS

# TABLE OF CONTENTS

MEMORANDUM IN OPPOSITION ........................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

LEGAL STANDARD ............................................................................................... 4

ARGUMENT .......................................................................................................... 5

I.      EXERCISING SPECIFIC JURISDICTION OVER BRIDGEALL COMPORTS WITH DUE PROCESS ........................................................................... 5

For the exercise of specific jurisdiction to be consistent with due process, (1) "the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state," (2) "the cause of action must arise from the defendant's activities" in the forum, and (3) "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). Each element is satisfied here: Bridgeall's direct conduct and its indirect conduct directed at Ohio through its agent, Baker & Taylor, demonstrate purposeful availment; OCLC's claims against Bridgeall arise from its conduct in Ohio; and Bridgeall's connection with Ohio is substantial, justifying the Court's exercise of specific jurisdiction over Bridgeall.

A.      Bridgeall has purposefully availed itself of acting in Ohio and causing consequences in Ohio. ........................................................................... 6

        1.      Bridgeall's direct contacts with Ohio establish purposeful availment. ......................................................................... 6

A defendant purposefully avails itself of the forum when the "defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (citation omitted). Contacts cannot be "random," "fortuitous," or "attenuated." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (citation omitted). Courts look at the nature and quality of a defendant's intentional interactions with the forum to assess purposeful availment. *See, e.g.*, *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 671 (6th Cir. 2023). Bridgeall has deliberately forged substantial contacts with Ohio at every stage of Bridgeall's business surrounding collectionHQ, including Bridgeall's sales efforts, post-sales support, and marketing and outreach conduct, all aimed deliberately at Ohio.

        2.      Bridgeall has contacts with Ohio through its agent, Baker & Taylor. ........................................................................... 13

Bridgeall has also purposefully availed itself of Ohio through the contacts of its agent, Baker & Taylor, in connection with collectionHQ. "[A] corporation can purposefully avail itself of a forum by directing its agents . . . to take action there." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Stolle Mach. Co., LLC v. RAM Precision Indus.*, No. 3:10-cv-155, 2011 WL 6293323, at *8 (S.D. Ohio Dec. 15, 2011). Baker & Taylor acted under actual authority from Bridgeall when it undertook

activities in Ohio related to collectionHQ. Alternatively, Baker & Taylor acted pursuant to apparent authority, which Bridgeall subsequently ratified.

3.    Bridgeall's Arguments to the Contrary Ignore Factual Reality. ............. 16

Bridgeall's three counterarguments fail. Bridgeall's conduct in connection with collectionHQ is not akin to putting a product into the stream commerce, Bridgeall need not have a physical presence in Ohio for specific jurisdiction to lie, and purposeful availment turns on the quality of contacts with Ohio, not the number. *See, e.g.*, *CompuServe*, 89 F.3d at 1264 (physical presence not required); *Sullivan*, 79 F.4th at 671 (quality not number of contacts).

B.    OCLC's claims arise from Bridgeall's activities in Ohio. ................................... 18

Whether the plaintiff's claims arise from its activities in and contacts with the forum "is a 'lenient standard,' requiring only that the cause of action have a 'substantial connection' to the defendant's activity in the state." *MAG IAS Holdings*, 854 F.3d at 903 (quoting *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)). A claim arises from activities in the forum state when the claim is "'made possible by' or 'lie[s] in the wake of' the defendant's contacts." *Air Prods.*, 503 F.3d at 553 (citation omitted). A cause of action need not "'formally "arise from" defendant's contacts with the forum.'" *Bird*, 289 F.3d at 875 (citation omitted). Courts assess whether "a defendant's contacts with the forum state are *related* to the operative facts of the controversy." *CompuServe*, 89 F.3d at 1267 (emphasis added). Here, OCLC's claims arise from Bridgeall's Ohio activities.

C.    This Court's exercise of personal jurisdiction over Bridgeall is reasonable. ...... 20

Courts analyze three factors for foreign entities to determine whether exercising jurisdiction is reasonable: "(1) the burden on the defendant; (2) the interest of the forum state; [and] (3) the plaintiff's interest in obtaining relief[.]" *Schneider v. Hardesty*, 669 F.3d 693, 703-04 (6th Cir. 2012); *MAG IAS Holdings*, 854 F.3d at 904. Each factor demonstrates personal jurisdiction is reasonable here.

II.    BRIDGEALL'S CONDUCT SATISFIES THE LONG-ARM STATUTE ..................... 21

Bridgeall's connections to Ohio satisfy five provisions of the statute: transacting business in Ohio (Ohio Rev. Code § 2307.382(A)(1)); contracting in Ohio (§ 2307.382(A)(2)); causing tortious injury by act or omission in Ohio (§ 2307.382(A)(3))); causing tortious injury in Ohio by act or omission when defendant regularly does business in Ohio (§ 2307.382(A)(4)); and causing injury in Ohio when there is a reasonable expectation the injury will be felt in Ohio (§ 2307.382(A)(6).

CONCLUSION ................................................................................................................. 22

## **MEMORANDUM IN OPPOSITION**

Expedited discovery paints a different picture than the one Defendant Bridgeall Libraries, Limited ("Bridgeall") depicts in its motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) (the "Motion"). Though Bridgeall insists that it has minimal contacts with Ohio, the facts elicited in limited discovery thus far demonstrate this is simply not true. The evidence shows that Bridgeall has substantial connections with Ohio related to its collectionHQ service, which is its flagship service and one of the primary methods through which Defendant Baker & Taylor, LLC ("Baker & Taylor"), Bridgeall's corporate parent at the time, obtained WorldCat records for use in BTCat. BTCat is a direct competitor to OCLC's premiere cataloging product, WorldCat.

Bridgeall has repeatedly reached into Ohio by, among other things, seeking out and communicating with Ohio customers and using Baker & Taylor as its agent to conduct business in Ohio. In fact, Bridgeall directly received bibliographic records and data from some of OCLC's Ohio WorldCat customers, pursuant to the offending collectionHQ licensing and assignment provision identified in the Complaint, and Bridgeall transferred records to Baker & Taylor for potential use in BTCat. Bridgeall is not just a passive actor in the events underlying this litigation. Rather, Bridgeall is an active, deliberate participant in eliciting breaches of WorldCat customer agreements, both on its own and through Baker & Taylor. These actions underlie OCLC's claims against Bridgeall, including tortious interference of contract and prospective business relationships and unjust enrichment.

Specific personal jurisdiction lies over Bridgeall, and the Court should deny Bridgeall's motion to dismiss for lack of personal jurisdiction.

## STATEMENT OF FACTS

WorldCat is the world's leading bibliographic cataloging database, and WorldCat is the heart of OCLC's library products and services. Compl., Dkt. 1, ¶ 29, # 6.[1] OCLC continuously improves and enhances the bibliographic records in WorldCat, including the bibliographic records and data that WorldCat customers have contributed to WorldCat. *E.g.*, *id.* ¶¶ 35–61, # 7-11. OCLC's significant enhancements to bibliographic records, including the bibliographic data contributed by WorldCat customers, has made WorldCat popular and valuable to libraries around the World. *Id.* ¶¶ 35–49, # 7–9.

To subscribe to WorldCat, an entity must agree to the Framework Agreement, including Schedule 2 of the Framework Agreement and the WorldCat Rights and Responsibilities for the OCLC Cooperative (the "WorldCat Policy"). *Id.* ¶¶ 98–105, # 17–19; Sched. 2, Dkt. 46-1. Among other things, this contract provides that WorldCat customers may not engage in: (1) "mass downloading from WorldCat without OCLC's prior written consent"; (2) "mass distribution of data directly from WorldCat to non-members without OCLC's prior consent"; or (3) "other activities that diminish the value of WorldCat to the OCLC cooperative." WorldCat Policy, Dkt. 1-1, § 3(B)(6)(b)–(d), # 34. WorldCat customers do not have the right to share or transfer WorldCat data to another company for that company's commercial use under the WorldCat Policy. *Id.*; Compl., Dkt. 1, ¶ 105, # 19. Moreover, OCLC grants WorldCat customers a license to use WorldCat records via the Framework Agreement, but WorldCat customers cannot grant a license to others for use under the contract. Framework Agreement, Dkt. 1-5, § 5.2(a), # 72 ("OCLC grants Institution a nonexclusive, nontransferable license to install and use the Product for the noncommercial purposes described in the Product Description and the applicable Schedule.").

---

[1] "#" refers to PageID number.

2

Bridgeall owns collectionHQ, a service that helps libraries manage their collections. Compl., Dkt. 1, ¶ 82, # 14. When signing up for collectionHQ, a customer must agree to the collectionHQ Terms and Conditions applicable to that service. Section 4.5 of the collectionHQ Terms and Conditions requires libraries to license their cataloging records to and authorize Defendant Baker & Taylor, LLC ("Baker & Taylor") to use the customer's cataloging records for any purpose, including in BTCat. Compl., Dkt. 1, ¶ 84, # 14; collectionHQ Terms & Conditions, Dkt. 1-4, § 4.5, # 53 ("By signing this Agreement, you are authorizing Baker & Taylor to utilize your cataloging records[.]"). If a library is a WorldCat customer, that library's cataloging records will include WorldCat records. Compl., Dkt. 1, ¶ 13, # 3.

It appears that there are 163 instances where a Bridgeall United States customer agreed to Section 4.5, of 285 instances of a United States customer signing a collectionHQ agreement where Section 4.5 could have been included. BAKER00058290 (Ex. B); Decl. of K. Brown (Ex. A) ¶¶ 8–9. There are 131 WorldCat customers, including at least six Ohio WorldCat customers, who agreed to Section 4.5 since 2022. Ex. A ¶¶ 8–12. To carry out Section 4.5, Bridgeall has libraries upload their cataloging records via File Transfer Protocol, which Bridgeall then transfers to Baker & Taylor. Dep. Tr. of Steven Legowski (Ex. C.) at 163:13–19; Dep. Tr. of Daniel Johnson (Ex. D) at 184:4–11.[2]

Bridgeall, through its collectionHQ service, has tortiously interfered with OCLC's contracts with its WorldCat customers. Compl., Dkt. 1, ¶ 105, # 19. By including Section 4.5 in its collectionHQ contracts, Bridgeall is inducing customers to violate the contractual provisions that prohibit WorldCat customers from transferring their license to use WorldCat. Bridgeall is also inducing customers to violate the contractual prohibitions against downloading and

---

[2] The final transcripts for all depositions taken during expedited discovery are still being reviewed by the witnesses for any potential corrections and certification. OCLC plans to submit updated, certified versions of the transcripts cited herein (with any relevant corrections) once that review and certification process is complete.

distributing WorldCat records, sharing WorldCat records with a direct cataloging competitor, here, BTCat (which diminishes the value of WorldCat), and creating a derivative version of WorldCat. Additionally, Bridgeall has tortiously interfered with OCLC's prospective customers by transferring WorldCat records to a direct competitor—its parent, Baker & Taylor, for use in BTCat—that can offer WorldCat records (or derivatives thereof) for a fraction of OCLC's price and has caused OCLC to lose prospective WorldCat customers. *E.g.*, *id.* ¶¶ 96 – 97, # 16–17.

Bridgeall's conduct also constitutes unjust enrichment. Bridgeall has benefited from Defendants' ability to bundle collectionHQ services with BTCat, which is now a better cataloging service because of the WorldCat records it incorporates and for which it has not paid, leading to better sales of Bridgeall's collectionHQ. *See* Dep. Tr. of Travis Kelley (Ex. E) at 205:3–9 (agreeing that the purpose of bundling BTCat and collectionHQ is to make the products more "attractive for the client").

On May 27, 2025, Bridgeall filed its motion to dismiss against OCLC for lack of personal jurisdiction and failure to state a claim, and Baker & Taylor filed its partial motion to dismiss against OCLC for failure to state a claim. Mot., Dkt. 35; Baker & Taylor Mot., Dkt. 34. The parties completed briefing of Defendants' motions to dismiss for failure to state a claim. Dkt. Nos. 46–48. This Court ordered jurisdictional discovery as to Bridgeall. Apr. 28, 2025 Order, Dkt. 27, # 257. The Court granted the parties' joint motion to extend the briefing schedule for Bridgeall's Rule 12(b)(2) motion to dismiss, as jurisdictional discovery was ongoing. June 11, 2025 Order, Dkt. 45. OCLC's response in opposition to Bridgeall's Motion now follows.

## LEGAL STANDARD

A plaintiff makes a prima facie case for personal jurisdiction over a defendant by alleging supporting facts in its complaint. *Peters Broad. Eng'g, Inc. v. 24 Cap., LLC*, 40 F.4th 432, 437 (6th Cir. 2022). The burden then shifts to the defendant whose "motion to dismiss must be

supported by evidence." *Id*. The burden then returns "to the plaintiff, 'who may no longer "stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."'" *Id*. at 437–38 (quoting *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020)). The Court views the pleadings and evidence "in a light most favorable to the plaintiff" and does "not weight 'the controverting assertions of the party seeking dismissal.'" *Id*. at 438 (citation omitted).

## ARGUMENT

This Court has specific personal jurisdiction[3] over Bridgeall based on both OCLC's allegations and the factual record developed during the limited expedited and jurisdictional discovery conducted thus far in this litigation.[4] This Court's exercise of personal jurisdiction is proper under both federal due process and Ohio's long-arm statute. *See Malone*, 965 F.3d at 502. First, Bridgeall's contacts in Ohio, both through Bridgeall itself and Baker & Taylor—Bridgeall's agent in connection with some collectionHQ activities in the United States—are continuous and systematic, meaning jurisdiction is proper under federal due process. Second, Bridgeall's conduct satisfies Ohio's amended long-arm statute to the extent a separate analysis under the statute is necessary.

**I.    Exercising Specific Jurisdiction over Bridgeall Comports with Due Process.**

Federal district courts have jurisdiction over nonresident defendants where the exercise of jurisdiction would comport with "traditional notions of fair play and substantial justice." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Sixth Circuit has a three-prong test for specific jurisdiction: (1) "the defendant must purposefully avail himself of the privilege of acting in the

---

[3] OCLC does not contend that this Court has general jurisdiction over Bridgeall.
[4] For example, the parties have agreed that records and information available through their customer resource management tools will be collected and reviewed as part of merits discovery.

forum state or causing a consequence in the forum state," (2) "the cause of action must arise from the defendant's activities" in the forum, and (3) "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). This Court's exercise of specific jurisdiction over Bridgeall satisfies each of these three prongs because Bridgeall's direct conduct and its indirect conduct directed at Ohio through its agent, Baker & Taylor, demonstrate purposeful availment; OCLC's claims against Bridgeall arise from that conduct in Ohio; and Bridgeall's connection with Ohio is substantial enough to justify the Court's exercise of specific jurisdiction over Bridgeall.

### A. Bridgeall has purposefully availed itself of acting in Ohio and causing consequences in Ohio.

#### 1. Bridgeall's direct contacts with Ohio establish purposeful availment.

The purposeful availment prong is satisfied where the "defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum state." *CompuServe*, 89 F.3d at 1263 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)). The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts or of the 'unilateral activity of another party or third person.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (quoting *Burger King*, 471 U.S. at 475)). Courts look at the nature and quality of a defendant's intentional interactions with the forum to assess purposeful availment—not the number of contacts. *See Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 671 (6th Cir. 2023); *Capitol Specialty Ins. Corp. v. Splash Dogs, LLC*, 801 F. Supp. 2d 657, 670 (S.D. Ohio 2011) (defendant purposefully availed himself by conducting business in Ohio when he "participated in the promotion and hosting" of an event

6

that took place in Columbus, Ohio "for purposes of commercial gain"); *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988) (defendant was subject to personal jurisdiction because he "originated and maintained the required contacts with Ohio by his letters and telephone calls" into the state).

Similarly, courts find the purposeful availment prong satisfied where defendants maintain a close business relationship with forum residents. *See MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 901 (6th Cir. 2017) (finding purposeful availment where out-of-state defendant had, inter alia, directed and controlled operations in Michigan, travelled to Michigan on occasion to meet with executives and customers, and initiated calls and emails to Michigan to direct business). A close business relationship may arise from communications with forum residents, and when such communications "form the bases for the action," purposeful availment is demonstrated. *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001).

Bridgeall has significantly and deliberately forged substantial contacts with Ohio, which is apparent at every stage of Bridgeall's business surrounding collectionHQ—its flagship service. This includes Bridgeall's sales efforts, post-sales support, and marketing and outreach conduct, all aimed deliberately at Ohio.

***Sales***. The deposition testimony of Bridgeall's corporate representative, Mr. Steven Legowski, was clear—Bridgeall directly solicits and closes sales with customers in the United States, including customers in Ohio. Though Bridgeall at times relies on Baker & Taylor *as its agent* to generate sales leads (*see infra* Part I.A.2), Bridgeall also makes its own sales in Ohio. Bridgeall has one employee, Mr. Jamie Wright, who was primarily responsible for demoing Bridgeall's collectionHQ services and closing sales. Ex. C at 46:19–47:4. Mr. Wright was collectionHQ's director of customer experience and had a team of customer success managers

(including Baker & Taylor employees in the United States) dedicated to collectionHQ. *Id.* at 46:19–47:4, 50:9–15. Mr. Wright was specifically responsible for Ohio within his sales territory during at least part of the relevant time period. BAKER00043057 (Ex. F).

As part of his responsibilities, Mr. Wright directly communicated with collectionHQ customers and coordinated with Baker & Taylor salespeople to offer collectionHQ services, including as part of a bundle with BTCat and other Baker & Taylor products. *See, e.g.*, BAKER00053336 (Ex. G) (corresponding directly with customer), BAKER00055646 (Ex. H) (bundling collectionHQ and BTCat products); BAKER00035026 (Ex. I) (directly working with customers and Baker & Taylor); BAKER00035005 (Ex. J) (same). As part of this bundling process, Bridgeall was responsible for determining what unique pricing and discounts Bridgeall would offer a given library. *See* Ex. C at 97:21–22. Bridgeall even contracts with customers directly for collectionHQ services. *E.g.*, BAKER00001782 (Ex. K); BAKER00057995 (Ex. L) (form contract); BAKER00058025 (Ex. M) (same); *see also* Ex. C at 58:16–17 ("I believe I've seen some [collectionHQ] agreements that are directly with Bridgeall Libraries."). Based on a report produced by Defendants, eighteen Ohio libraries have contracted directly with Bridgeall for collectionHQ services, twelve of which are WorldCat Customers. Ex. B, Ex. A ¶¶ 8, 13–14.[5]

According to Bridgeall, it has at least nineteen Ohio customers. Legowski Decl., Dkt. 35-1, ¶ 24. Additionally, there is evidence that Bridgeall directly communicated with customers, closed sales, visited customers, and set unique discounts and bundles for libraries. The present evidence demonstrates that Bridgeall had these direct contacts with some Ohio libraries and supports the inference that Bridgeall had similar contacts with the other Ohio libraries.

---

[5] For the purposes of limited discovery, the parties agreed that Defendants could provide exemplar contracts for collectionHQ and BTCat, along with reports outlining relevant information regarding which customers signed contracts with the relevant provisions. There appear to be some potential inconsistencies between the reports and produced documents. OCLC intends to explore each of these contracts and the customer relationships more fully in merits discovery.

Expedited, limited discovery has confirmed as much, and OCLC expects full merits discovery to strengthen the factual evidence of Bridgeall's connections with Ohio.

For example, Mr. Wright received a commission for all his sales of collectionHQ services to Ohio libraries. *See, e.g.*, BAKER00033556 (Ex. N) (███████████); BAKER00042657 (Ex. O) (█████████████████████████████████████████████). Mr. Wright even visited the ████████████████████ as part of Bridgeall's sales and marketing efforts. Ex. C at 102:5–9. When significant business relationships such as these exist, courts have found a defendant has purposefully availed itself of the forum state. *See Am. Greetings*, 839 F.2d at 1170 (communications with customers); *MAG IAS Holdings*, 854 F.3d at 901 (business meetings in forum and customer communications).

Of these Ohio customers, at least six signed collectionHQ contracts containing Section 4.5. Ex. B (listing ██████████████████████████████████████████ ██████████████████████). Two more Ohio libraries agreed to share data via collectionHQ with Baker & Taylor for BTCat. BAKER00051941 (Ex. P) (███████████████ ████████████). Unsurprisingly, Bridgeall had input into and approved Section 4.5 (Ex. C at 63:3–5), illustrating Bridgeall's active, deliberate role in interfering with OCLC's WorldCat customer contracts, including with Ohio customers.

At this time, Bridgeall has produced a report showing that there are ninety-three libraries who uploaded data to collectionHQ that Bridgeall subsequently transferred to Baker & Taylor but has not yet been uploaded into BTCat, and sixty-three of those libraries are WorldCat customers. BAKER00058292 (Ex. Q); Ex. A ¶¶ 15–16. Two of those sixty-three WorldCat customers are based in Ohio. Ex. A. ¶ 17. However, other documents suggest more Ohio WorldCat customers uploaded data. *See* BAKER00016225 (Ex. R) (email noting ███████████

███ uploaded records to collectionHQ for transfer to BTCat); BAKER00032961 (Ex. S) (email noting ███████████ uploaded records to collectionHQ); Ex. C at 133:17–19 ("Q. So does that mean that customers were themselves uploading their data to collectionHQ? A. Yes."). Inducing Ohio customers to purchase Bridgeall services, as described above, and transmit their data from Ohio to Baker & Taylor amounts to far more than random or fortuitous contacts with Ohio. *See Corp. Bertec v. Sparta Software Corp.*, No. 2:19-CV-04623, 2020 WL 2112162, at *5 (S.D. Ohio May 4, 2020) (holding communications interfering with a business relationship in the forum amount to purposeful availment).

Moreover, the collectionHQ standard Terms and Conditions includes a choice of law provision which provides: "This Agreement shall be governed by, subject to and interpreted in accordance with the laws of the State where You are located." *E.g.*, Ex. BAKER00058010; Ex. T at 14. In contract-related actions, courts consider choice-of-law provisions in favor of the forum as evidence of purposeful availment. *See, e.g.*, *Sullivan*, 79 F.4th at 671 ("Entering into contracts in the forum state subject to the forum-state's laws that create an ongoing relationship, alongside placing one's products directly into the forum state, can satisfy purposeful availment."); *CompuServe*, 89 F.3d at 1264 (finding that defendant purposefully availed itself of acting in Ohio, in part because contracts were "governed by Ohio law, with an Ohio-based company"). For five Ohio customers, Bridgeall agreed to the application of Ohio law, and Bridgeall has at least two contracts with non-Ohio libraries that are also governed by Ohio law. *See* Ex. B; Dep. Tr. of Amandeep Kochar (Ex. U) at 276:22–277:6 (agreeing Ohio law would apply to an Ohio library under this provision); Ex. C at 66:17–19 (same).

***Post-sale customer implementation and support.*** Bridgeall's relationships with its collectionHQ customers, including its Ohio customers, do not end at the point of sale. After the

sale of the collectionHQ service, Bridgeall must begin the process of implementing the service for a customer. Ex. C at 131:1–12. At this point, Bridgeall employees work directly with the customer on implementation. *See id.* at 131:19–23. This includes Ohio library customers for Bridgeall. *E.g.*, BAKER0003001 (Ex. V) (noting implementation was underway for ████████ ████████████████████████████████████████████████████████████████████████ ██████ ).

After a customer has gone through implementation, Bridgeall employees are responsible for technical support, customer support, and customer retention and success. Ex. U at 178:5–7. The collectionHQ contracts require Bridgeall to provide "a data-driven collection management solution designed to assist libraries in optimizing their collections through evidence-based methodologies." Legowski Decl., Dkt. 35-1, ¶ 9. CollectionHQ also provides libraries with "valuable analytics." *Id.* ¶ 16. Many libraries rely on collectionHQ services daily, meaning Bridgeall provides a daily service to customers. Ex. C at 34:15–16. As such, these contracts have created an "ongoing relationship" between Bridgeall and Ohio collectionHQ customers that demonstrate purposeful availment. *Sullivan*, 79 F.4th at 671; *Schneider v. Hardesty*, 669 F.3d 693, 702 (6th Cir. 2012). Again, OCLC expects merits discovery to further demonstrate Bridgeall's ongoing relationships with its Ohio customers.

***Customer outreach***. Bridgeall has also targeted Ohio in deliberate outreach and marketing efforts designed to attract and retain collectionHQ customers. From April 3–5, 2024, the Public Library Association conference was held in Columbus. ALA Conferences & Preconferences (Ex. W). Bridgeall's corporate representative, Mr. Legowski (one of the two highest ranking Bridgeall employees) attended, as did Mr. Wright and another Bridgeall employee. Ex. C at 122:25–124:5. During this conference, Bridgeall connected with libraries,

encouraged libraries to subscribe to collectionHQ services, and hosted a promotional event. *Id.* at 124:16–125:11.

Bridgeall has also hosted and directed Ohio-specific events for collectionHQ customers, including events called "The Collection Connection – Central and Southwest Ohio" and the "collectionHQ Northeast Ohio Forum." The Collection Connection (Ex. X); collectionHQ NE Ohio Forum (Ex. Y). These events, which provide networking opportunities for Ohio collectionHQ customers and advice on how to use the service, are hosted on the campuses of Bridgeall's Ohio library customers. Exs. X, Y. Bridgeall's corporate representative testified that the aim of these events is "to promote the product with the purpose of retention, ensuring customers renew their subscriptions." Ex. C at 115:20–23. This Court has found a defendant purposefully availed itself of Ohio by conducting business in Ohio that included "participat[ing] in the promotion and hosting" of events in the forum for "commercial gain." *Capitol Specialty*, 801 F. Supp. 2d at 670. Here, Bridgeall's corporate representative explained that Mr. Wright would have directed his team, including those in the United States who may be Baker & Taylor employees, to schedule and host such events during at least some of the relevant time period. *See* Ex. C at 117:3–10. This is yet another instance of Bridgeall reaching directly into Ohio to sell and market its collectionHQ services.

Bridgeall has also extensively relied on Ohio customers to provide marketing support, demonstrating an additional avenue in which Bridgeall directly reaches into Ohio to strengthen its overall business. Of the forty case studies Bridgeall shares on its website, two of those case studies are from Ohio libraries—Worthington Public Library and Twinsburg Public Library. Ex. A ¶¶ 18–19. Additionally, Cuyahoga County Public Library has provided one of the four video testimonials featured on Bridgeall's website. *Id.* ¶¶ 20–21.

Between Bridgeall's own actions in its sales process, customer support, and customer outreach, Bridgeall has created meaningful, ongoing connections with Ohio. These substantial contacts are the result of Bridgeall's deliberate actions directed at Ohio, such that Bridgeall cannot claim it could not reasonably anticipate being haled into an Ohio court.

### 2. Bridgeall has contacts with Ohio through its agent, Baker & Taylor.

Bridgeall's purposeful availment also extends to its contacts via Baker & Taylor as its agent. The Supreme Court has recognized that "a corporation can purposefully avail itself of a forum by directing its agents . . . to take action there." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Similarly, courts in the Sixth Circuit have found that an agent's contacts with Ohio may be imputed to a defendant principal to establish personal jurisdiction. *See Stolle Mach. Co., LLC v. RAM Precision Indus.*, No. 3:10-cv-155, 2011 WL 6293323, at *8 (S.D. Ohio Dec. 15, 2011). Courts examine agency relationships to ensure that the court does not "ignore the realities of modern business relationships" when assessing purposeful availment. *Inter-City Prods. Corp. v. Willey*, 149 F.R.D. 563, 572 (M.D. Tenn. 1993) (citing *Burger King*, 471 U.S. at 476).

An agency relationship can bring a non-forum resident defendant within this Court's jurisdiction through actual or apparent authority. *See Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 730 F. Supp. 2d 683, 692 (W.D. Ky. 2010), *aff'd*, 536 F. App'x 558 (6th Cir. 2013); *Stolle*, 2011 WL 6293323, at *8. Actual authority exists where the principal grants or confers upon the agent the power to bind the principal and act on its behalf. *See MJR Int'l, Inc. v. Am. Arb. Ass'n*, 596 F. Supp. 2d 1090, 1097 (S.D. Ohio) (citing *Master Consol. Corp. v. BancOhio Nat'l Bank,* 575 N.E.2d 817, 820 (Ohio 1991)). Under Ohio law, an agent acts with apparent authority if "[(1)] the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such

13

authority, and (2) [] the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Master Consol.*, 575 N.E.2d at 822; *see Nee v. State Indus., Inc.*, 3 N.E.3d 1290, 1308 (Ohio Ct. App. 2013). Even if a purported agent is not initially authorized to act for the principal, "the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." *Red Square, LLC v. HDAV Outdoor, LLC*, No. 2:14-cv-2064, 2015 WL 5162523, at *3 (S.D. Ohio Sept. 3, 2015) (quoting *Stolle*, 2011 WL 6293323, at *3); *Stolle*, 2011 WL 6293323, at *8–9 (holding that principal ratified its agent's conduct for jurisdictional purposes by knowingly accepting benefits from the agent's actions).

Baker & Taylor acted as Bridgeall's agent to locate initial sales leads, market Bridgeall's collectionHQ services, and enter into contracts on Bridgeall's behalf. *See* Compl., Dkt. 1, ¶¶ 12, 82, # 3, 14; Legowski Decl., Dkt. 35-1, ¶¶ 14, 25–27. Both Baker & Taylor's and Bridgeall's corporate representatives testified that Baker & Taylor was acting as Bridgeall's agent in sales and marketing in the United States for collectionHQ, including in Ohio. Ex. U at Tr. 176:19–21 (Q. "So was [Bridgeall] acting as an agent when it did sales and marketing to customers? A. Yes."), 177:2–5 (Q. "[I]f they presented at a library or online, they were acting as the agent of Bridgeall? A. Correct."); Ex. C at 53:21–24 (Q. "So the Baker & Taylor employees in that [sales] context are acting for the benefit of collectionHQ, right? A. Yes."). Moreover, the collectionHQ contract expressly states that Baker & Taylor is acting as Bridgeall's agent when Baker & Taylor enters into contracts on behalf of Bridgeall: "This Agreement is a legal agreement between You and Baker & Taylor, LLC, as indirect owner and agent of Bridgeall Libraries Limited[.]" Ex. T at 3; BAKER00057910 (Ex. Z); Ex. U at 176:7–9 ("A. Baker & Taylor always acted as an agent if it signed contracts on behalf of Bridgeall."); Ex. C at 57:20–22. This is evidence of an express

or actual agency relationship. Accordingly, any conduct by Baker & Taylor to promote, sell, or execute services for collectionHQ in the United States, including in Ohio and the nineteen Ohio collectionHQ customers, is attributable to Bridgeall.

The Seventh Circuit recently addressed a similar fact pattern in *Bilek v. Federal Insurance Co.*, where the defendant had another company seek business on its behalf in the forum, which served as the basis of the plaintiff's complaint. *See* 8 F.4th 581, 591 (7th Cir. 2021). There, the court found that personal jurisdiction was proper. *Id.* at 587, 592 (applying the Restatement (Third) of Agency approach to find actual authority). The court noted that "attributing an agent's suit-related contacts to a principal to establish specific personal jurisdiction poses no due process bar" because of "the fundamental agency principle that a principal is liable for the wrongful acts of an agent acting within its authority." *Id.* at 591. *Bilek* illustrates that the fact Baker & Taylor undertook actions on Bridgeall's behalf in connection with collectionHQ is no defense for Bridgeall to personal jurisdiction—in fact, it is further evidence of Bridgeall's own contacts with Ohio as a forum through its agent. To conclude otherwise would be to "ignore the realities" of Bridgeall's relationship with Baker & Taylor.

Alternatively, Baker & Taylor acted pursuant to apparent authority from Bridgeall when it undertook actions in support of collectionHQ. First, as the testimony *supra* shows, at a minimum, Bridgeall held Baker & Taylor out to the public as having authority or allowed Baker & Taylor to act with authority to sell and market Bridgeall's collectionHQ services. Second, libraries would reasonably believe Baker & Taylor had the authority to act on behalf of Bridgeall to sell and market collectionHQ services. When Baker & Taylor communicated with customers, it often cross-sold and bundled Bridgeall's collectionHQ with its own products and services, indicating it had the ability to sell collectionHQ. Ex. E at 195:10–13, 197:1–4 (agreeing the fact

that a product or service was offered by Bridgeall was not an obstacle to Baker & Taylor bundling those products and services with BTCat). Bridgeall's representative conceded some Bridgeall employees used Baker & Taylor email addresses, Ex. C at 86:3–16, and that customers may not know they are dealing with a Bridgeall employee, as opposed to a Baker & Taylor employee, or, presumably, visa versa, *see id.* at 53:7–8. Any reasonable library customer would believe that Baker & Taylor had the authority to sell and market collectionHQ (indeed, Baker & Taylor is Bridgeall's parent). And when Bridgeall executed the collectionHQ contracts entered into by Baker & Taylor as its agent, Bridgeall ratified Baker & Taylor's conduct, *i.e.*, where Baker & Taylor sold, marketed, or otherwise managed collectionHQ services on Bridgeall's behalf. Accordingly, these contacts through Baker & Taylor—including Ohio contacts—should be attributed to Bridgeall for the purposeful availment analysis.

Bridgeall's own contacts with Ohio as a forum and its contacts with Ohio through Baker & Taylor, its agent, demonstrate that Bridgeall purposefully availed itself of Ohio as a forum. Therefore, Bridgeall should have known that it may be haled into an Ohio court to defend itself.

### 3. Bridgeall's arguments to the contrary ignore factual reality.

Bridgeall appears to argue that at most, it placed its collectionHQ service into the "stream of commerce," which is insufficient under a stream-of-commerce-plus approach to purposeful availment. Mot. at 9. The facts uncovered during limited, expedited discovery debunk the assertion that Bridgeall passively placed a product or service into the stream of commerce. Bridgeall is not a manufacturer who has placed a good into the stream of commerce to meet a customer wherever the customer happens to find the good in the marketplace; Bridgeall's collectionHQ is a "service" that requires substantial contacts beyond a single point of sale. As described above, Bridgeall (including through its agent, Baker & Taylor) identifies sales leads, develops leads with marketing and physical visits in Ohio, and then manages the customer's

service, requiring continuous communications with customers and reaching into Ohio where the customer is an Ohio library. *See supra* Part I.A.1–2. These repeated, meaningful contacts form an ongoing business relationship between Bridgeall and its Ohio collectionHQ customers. For these reasons, this is not an instance where a defendant has simply placed a product or service into the stream of commerce.

Bridgeall also relies on the location of Bridgeall's business, employees, and assets outside of Ohio to argue there is no specific jurisdiction. Mot. at 10. But the Sixth Circuit does not require any "physical presence" in the forum state for purposeful availment. *CompuServe*, 89 F.3d at 1264; *S. Mach. Co.*, 401 F.2d at 382. Indeed, courts routinely find purposeful availment where defendants maintain no physical presence in the forum state. *E.g.*, *Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 910 (6th Cir. 1988) (finding personal jurisdiction and noting that "physical presence of the defendant is irrelevant"); *Wilson v. Ancestry.com LLC*, 653 F. Supp. 3d 441, 452 (S.D. Ohio 2023).

Finally, Bridgeall argues that it has "only" nineteen collectionHQ customers based in Ohio. Mot. at 4. The Sixth Circuit, however, has held that it is not the number of contacts but the quality of those contacts with the forum. *Sullivan*, 79 F.4th at 671 (quality not number of contacts). Accordingly, the Court should resist Bridgeall's invitation to engage in such an analysis. Instead, courts look at the nature and scope of the defendant's contacts in the forum. As Bridgeall's contacts with Ohio are deliberate, substantial, and continuous, and it is the nature of those contacts that determine whether a defendant has purposefully availed itself of the privilege of conducting business in Ohio as a forum. Here, Bridgeall has established, substantial contacts with Ohio.

**B.     OCLC's claims arise from Bridgeall's activities in Ohio.**

The second prong of the *Southern Machine* test, that the plaintiff's claims arise from its activities in and contacts with the forum, "is a 'lenient standard,' requiring only that the cause of action have a 'substantial connection' to the defendant's activity in the state." *MAG IAS Holdings*, 854 F.3d at 903 (quoting *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)). A claim arises from activities in the forum state when the claim is "'made possible by' or 'lie[s] in the wake of' the defendant's contacts." *Air Prods*, 503 F.3d at 553 (citation omitted). Importantly, a cause of action need not "'formally "arise from" defendant's contacts with the forum; rather, this criterion requires only "that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities.""" *Bird*, 289 F.3d at 875 (citation omitted). Under this prong of the *Southern Machine* test, courts assess whether "a defendant's contacts with the forum state are *related* to the operative facts of the controversy." *CompuServe*, 89 F.3d at 1267 (emphasis added).

This Court has jurisdiction over a defendant if one element of the plaintiff's claim was at least in part made possible by the defendant's tortious conduct in the forum. *See Safetech*, 503 F.3d at 553. In *Safetech*, the district court found that the plaintiff's claims did not arise out of the defendant's contacts in the forum because the claims involved transactions that occurred outside the state. *See id.* The Sixth Circuit reversed, holding that the fact that "[o]ne element" of the plaintiff's cause of action was made possible by the parties' business relationship in the forum and that this was sufficient satisfy the arising-from prong. *Id.*

Here, OCLC's tort claims all relate to Bridgeall's conduct (including the conduct of its agent, Baker & Taylor) that interferes with OCLC's contracts and business relations in Ohio. Bridgeall has, through its collectionHQ contracts, induced OCLC WorldCat customers, including Ohio customers, to license, upload, and distribute or otherwise share WorldCat records through

18

BTCat. *See* Compl., Dkt. 1, ¶¶ 82–97; *see also supra* Part I.A. Moreover, OCLC has lost at least one prospective Ohio-based customer, which it has learned in discovery is a collectionHQ and BTCat customer. OCLC_00002983 (Ex. AA) (identifying ███████████████████ as such). These contacts form the basis of OCLC's claims regarding its Ohio WorldCat customers, and therefore, these contacts are substantially related to the rest of Bridgeall's tortious activities that give rise to the same claims for WorldCat customers outside Ohio.

Bridgeall's two arguments to the contrary fail. First, Bridgeall asserts that "[i]t is impossible for the causes of action to arise out of Bridgeall's conduct in Ohio" because OCLC does not allege that Baker & Taylor accessed WorldCat records through an Ohio customer. Mot. at 11. Bridgeall misconstrues the lenient standard in this Circuit for the arising-from prong, which requires only that the claim is "'made possible by' or 'lie in the wake of' the defendant's contacts." *Safetech*, 503 F.3d at 553 (citation omitted); *Bird*, 289 F.3d at 875. Indeed, the Sixth Circuit has explained that only one element of a claim must relate to a defendant's in-forum contacts. *Id.* Bridgeall's contacts with Ohio exceed this one-element minimum, as OCLC has claims against Bridgeall for each claim based on an Ohio customer. Additionally, the allegations and facts show that Bridgeall itself was engaged in the wrongdoing, including that Bridgeall included in its contracts a provision that led WorldCat customers to grant Baker & Taylor a license to their WorldCat records.

Second, Bridgeall argues that "Bridgeall does not directly interact with any of the customer libraries." Mot. at 11. Bridgeall filed its motion prior to the completion of expedited discovery, and expedited discovery has proven Bridgeall has significant interactions with customer libraries, as well as interactions with customers through Baker & Taylor, its agent, for its collectionHQ services. And Bridgeall did more than just interact with the customer libraries.

Although not required under this "arising under" factor, Bridgeall received cataloging records directly from Ohio WorldCat customers pursuant to Section 4.5 of the collectionHQ agreement and subsequently transferred Ohio customer records to Baker & Taylor for potential use in BTCat or any other Baker & Taylor products or services.

### C. This Court's exercise of personal jurisdiction over Bridgeall is reasonable.

Personal jurisdiction over Bridgeall is reasonable and consistent with Sixth Circuit precedent. There is an "inference of reasonableness" when the first two prongs of the personal jurisdiction test are satisfied such that the third prong is typically met. *Schneider v. Hardesty*, 669 F.3d 693, 703 (6th Cir. 2012) (citations omitted). Courts analyze three factors for foreign entities to determine whether exercising jurisdiction is reasonable: "(1) the burden on the defendant; (2) the interest of the forum state; [and] (3) the plaintiff's interest in obtaining relief[.]" *Id.* at 703–04; *see also MAG IAS Holdings*, 854 F.3d at 904 (noting courts omit a fourth factor when the defendant is foreign). Each factor demonstrates personal jurisdiction is reasonable here.

For the first factor, Bridgeall "might face a burden in having to defend a lawsuit in Ohio, [but] they cannot reasonably object to this burden" if they "allegedly transacted business" in the state. *Bird*, 289 F.3d at 875. Bridgeall admits to transacting business in Ohio. *E.g.*, Legowski Decl., Dkt. 35-1, ¶ 24; *see supra* Part I.A. Bridgeall also has collectionHQ contracts with customers that contemplate the application of Ohio law. *E.g.*, Ex. T at 14. Moreover, Bridgeall executives have travelled to Ohio as recently as 2024, so its burden to travel to Ohio to defend this litigation is not too unmanageable.

Expedited discovery has also demonstrated that Bridgeall faces no significant burden in participating in this lawsuit. For example, document and deposition discovery is manageable through electronic discovery and virtual proceedings. Bridgeall is also represented by the same

counsel as Baker & Taylor, which was Bridgeall's corporate parent until June 2025. Bridgeall has not articulated any burden for defending the litigation in Ohio other than the burden of defending any litigation in any forum. *See* Mot. at 13. Whatever burden Bridgeall may face by litigating a defense in Ohio is minimal and should have been expected given its extensive contacts with Ohio as a forum.

The second factor is also met here because "Ohio has a legitimate interest in protecting the business interests of its citizens." *Bird*, 289 F.3d at 875; *see also Intera Corp.*, 428 F.3d at 618 (finding that this interest is equally strong for resident corporations of the state). OCLC's claims arise under Ohio law. *See* Compl., Dkt. 1, ¶¶ 130–54. Naturally, Ohio has a strong interest in protecting a resident corporation, OCLC, from unfair competition and having a court in Ohio interpret state law.

The third and final factor for this inquiry also leans in favor of jurisdiction being reasonable. OCLC is a resident corporation of Ohio that exercised its autonomy as plaintiff to bring its suit in this forum. *Id.* ¶ 25. Given the extent of OCLC's injury in its home state, this Court's exercise of jurisdiction over Bridgeall comports with due process.

## II.     Bridgeall's Conduct Satisfies Ohio's long-arm statute.

Courts in this district are split on whether the 2021 Amendment to Ohio's long-arm statute makes the statute coextensive with due process for specific jurisdiction. *Compare, e.g.*, *C.T. v. Red Roof Inns, Inc.*, No. 2:19-CV-5384, 2021 WL 2942483, at *10 (S.D. Ohio July 1, 2021) (Marbley, J.) (holding that the amended Ohio long-arm statute is now coextensive with due process), *with Premier Prop. Sales Ltd. v. Gospel Ministries Int'l, Inc.*, 539 F. Supp. 3d 822, 827 n.2 (S.D. Ohio 2021) (Newman, J.) (holding that the long-arm and due process analyses have not merged); *see also AmaTech Grp. Ltd. v. Fed. Card Servs., LLC*, No. 1:21-cv-406, 2022 WL 44674, at *5 (S.D. Ohio Jan. 5, 2022) (Cole, J.) (observing most courts have held the

amended long-arm statute is coextensive with due process). Even if a separate long-arm statute analysis is required, Bridgeall's conduct satisfies the statute.

Bridgeall's connections to Ohio satisfy five provisions of the statute. First, Bridgeall "[t]ransact[s] business" in Ohio. Ohio Rev. Code § 2307.382(A)(1). This provision is broadly interpreted. *E.g.*, *Goldstein v. Christiansen*, 638 N.E.2d 541, 544 (Ohio 1994); *InFrasys, Inc. v. Bros. Pavement Prods., Corp.*, 152 N.E.3d 1274, 1284 (Ohio Ct. App. 2020). Bridgeall transacts business in Ohio, including by soliciting and retaining Ohio customers, visiting Ohio, enlisting Ohio customers to participate in marketing Bridgeall's products, etc. Second, Bridgeall has contracted with Ohio customers for the collectionHQ service, satisfying a second ground. § 2307.382(A)(2). Bridgeall's persuasion of Ohio customers to license and upload data for use in BTCat satisfies three additional provisions as well. §§ 2307.382(A)(3) (tortious injury by act or omission in Ohio), (A)(4) (tortious injury in Ohio by act or omission when defendant regularly does business in Ohio), & (A)(6) (reasonable expectation of injury in Ohio).

## CONCLUSION

Accordingly, OCLC respectfully requests that the Court deny Defendant Bridgeall Libraries, Ltd.'s motion to dismiss for lack of personal jurisdiction.

Respectfully submitted,

*/s/ Jeffrey M. Walker*
Jeffrey M. Walker (0096567)
Kathryn M. Brown (0100426)
Traci L. Maritnez (0083989)
Brittany Silverman (0102263)
Erin Hassett (0099970)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: (614) 365-2700
Facsimile: (614) 365-2499

22

jeffrey.walker@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com
erin.hassett@squirepb.com

## CERTIFICATE OF SERVICE

On August 29, 2025, this document was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties. As-filed copies this document were also served via email upon all counsel of record.

*/s/ Jeffrey M. Walker*
One of the Attorneys for Plaintiff OCLC