Exhibit C

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF OHIO

 3                 EASTERN DIVISION

 4                   *   *   *

 5   OCLC, INC.,

 6        Plaintiff,

 7        vs.              CASE NO. 2:25-cv-00309

 8   BAKER & TAYLOR, LLC;

 9   BRIDGEALL LIBRARIES, LTD.,

10        Defendants.

11                   *   *   *

12        Deposition of STEVEN LEGOWSKI, Witness

13   herein, called by the Plaintiff for

14   cross-examination pursuant to the Rules of Civil

15   Procedure, taken before me, Kathy S. Wysong, RPR,

16   a Notary Public in and for the State of Ohio, at

17   200 St. Vincent Street, Glasgow, Scotland, on

18   Monday, August 18, 2025, at 6:09 a.m. Eastern.

19                   *   *   *

20

21

22

23

24

25
```

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 2

| | |
|---|---|
| 1 | EXAMINATION CONDUCTED PAGE |
| 2 | BY MS. BROWN:........................ 7 |
| 3 | |
| 4 | EXHIBITS MARKED |
| 5 | (Plaintiff's Exhibit 81, notice of |
| 6 | deposition, was marked for purposes |
| 7 | of identification.).................. 10 |
| 8 | (Plaintiff's Exhibit 82, LinkedIn |
| 9 | profile, was marked for purposes of |
| 10 | identification.)..................... 19 |
| 11 | (Plaintiff's Exhibit 3, complaint |
| 12 | for injunctive relief and damages, |
| 13 | was previously marked for purposes |
| 14 | of identification.).................. 41 |
| 15 | (Plaintiff's Exhibit 83, |
| 16 | BAKER00058010-58024, was marked for |
| 17 | purposes of identification.).......... 55 |
| 18 | (Plaintiff's Exhibit 84, |
| 19 | BAKER00058025-58039, was marked for |
| 20 | purposes of identification.).......... 67 |
| 21 | (Plaintiff's Exhibit 85, |
| 22 | BAKER00058040-58041, was marked for |
| 23 | purposes of identification.).......... 70 |
| 24 | |
| 25 | |

Page 3

| | |
|---|---|
| 1 | (Plaintiff's Exhibit 86, |
| 2 | BAKER00058042-58043, was marked for |
| 3 | purposes of identification.).......... 74 |
| 4 | (Plaintiff's Exhibit 87, |
| 5 | BAKER00057995-58009, was marked for |
| 6 | purposes of identification.).......... 75 |
| 7 | (Plaintiff's Exhibit 88, |
| 8 | BAKER00058044-58045, was marked for |
| 9 | purposes of identification.).......... 77 |
| 10 | (Plaintiff's Exhibit 89, |
| 11 | BAKER00057910-57927, was marked for |
| 12 | purposes of identification.).......... 79 |
| 13 | (Plaintiff's Exhibit 90 |
| 14 | BAKER00058273, was marked for |
| 15 | purposes of identification.).......... 81 |
| 16 | (Plaintiff's Exhibit 91, |
| 17 | BAKER00001476-1479, was marked for |
| 18 | purposes of identification.).......... 84 |
| 19 | (Plaintiff's Exhibit 92 |
| 20 | BAKER00055646-55647, was marked for |
| 21 | purposes of identification.).......... 95 |
| 22 | (Plaintiff's Exhibit 93, |
| 23 | BAKER00053336-53343, was marked for |
| 24 | purposes of identification.).......... 97 |
| 25 | |

Page 4

| | |
|---|---|
| 1 | (Plaintiff's Exhibit 26, |
| 2 | BAKER00035026-35032, was previously |
| 3 | marked for purposes of |
| 4 | identification.)..................... 99 |
| 5 | (Plaintiff's Exhibit 94, |
| 6 | BAKER00040863-40865, was marked for |
| 7 | purposes of identification.).......... 104 |
| 8 | (Plaintiff's Exhibit 95, |
| 9 | BAKER00054329-54331, was marked for |
| 10 | purposes of identification.).......... 109 |
| 11 | (Plaintiff's Exhibit 96, cHQ |
| 12 | upcoming events northeast, was |
| 13 | marked for purposes of |
| 14 | identification.)..................... 114 |
| 15 | (Plaintiff's Exhibit 97, cHQ |
| 16 | upcoming events central, was marked |
| 17 | for purposes of identification.)...... 120 |
| 18 | (Plaintiff's Exhibit 98, upcoming |
| 19 | conferences, was marked for purposes |
| 20 | of identification.).................. 122 |
| 21 | (Plaintiff's Exhibit 99, cHQ |
| 22 | LinkedIn post, was marked for |
| 23 | purposes of identification.).......... 127 |
| 24 | |
| 25 | |

Page 5

| | |
|---|---|
| 1 | (Plaintiff's Exhibit 100, |
| 2 | BAKER00051941, was marked for |
| 3 | purposes of identification.).......... 143 |
| 4 | (Plaintiff's Exhibit 101, |
| 5 | BAKER00014808-14811, was previously |
| 6 | marked for purposes of |
| 7 | identification.)..................... 151 |
| 8 | (Plaintiff's Exhibit 14, |
| 9 | BAKER00005068, was previously marked |
| 10 | for purposes of identification.)...... 159 |
| 11 | (Plaintiff's Exhibit 77, |
| 12 | BAKER00021733, was previously marked |
| 13 | for purposes of identification.)...... 163 |
| 14 | (Plaintiff's Exhibit 102, Bridgeall |
| 15 | Supplemental Responses, was marked |
| 16 | for purposes of identification.)...... 165 |
| 17 | (Plaintiff's Exhibit 37, |
| 18 | OCLC_00000034-43, 1-7, was |
| 19 | previously marked for purposes of |
| 20 | identification.)..................... 173 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2 (Pages 2 - 5)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 6

```
1  APPEARANCES:
2  On behalf of the Plaintiff:
3      Squire Patton Boggs, LLP
4  By:  Kathryn M. Brown, Esq.
       Jeffrey M. Walker, Esq.
5      2000 Huntington Center
       41 South High Street
6      Columbus, Ohio  43215
       614-365-2700
7      kathryn.brown@squirepb.com
       jeffrey.walker@squirepb.com
8
   On behalf of the Defendants:
9
       Offit Kurman
10
   By:  Frank E. Noyes, II, Esq.
11     222 Delaware Avenue
       Suite 1105
12     Wilmington, Delaware  19801
       302-351-0900
13     fnoyes@offitkurman.com
14     Cavitch Familo & Durkin
15  By:  Derek P. Hartman, Esq.
       Michael Cohan, Esq.
16     1300 East Ninth Street
       20th Floor
17     Cleveland, Ohio  44114
       216-621-7860
18     dhartman@cavitch.com
       mcahon@cavitch.com
19
              * * *
20
21
22
23
24
25
```

Page 7

```
1            STEVEN LEGOWSKI
2  of lawful age, Witness herein, having been first
3  duly cautioned and sworn, as hereinafter
4  certified, was examined and said as follows:
5            CROSS-EXAMINATION
6  BY MS. BROWN:
7      Q.  Good morning, Mr. Legowski.  My name
8  is Katie Brown.  We've never met before except the
9  twenty seconds before we got started, right?
10     A.  Yes.
11     Q.  And I am counsel for OCLC, plaintiff
12  in this case.  Do you understand that?
13     A.  Yes.
14     Q.  Would you please state your full name
15  for the record?
16     A.  Steven Legowski.
17     Q.  And could you please spell Legowski?
18     A.  L-E-G-O-W-S-K-I.
19     Q.  Thank you.  Have you ever been
20  deposed before?
21     A.  No.
22     Q.  Have you ever testified at trial or
23  an arbitration or any other type of court
24  proceeding?
25     A.  No.
```

Page 8

```
1      Q.  Okay.  So before we get started, I
2  think it might be helpful for us to lay some
3  ground rules to make this easier on Ms. Wysong,
4  who is the court reporter.
5          The court reporter is going to make a
6  written record of our conversation.  Okay?
7      A.  Okay.
8      Q.  So she'll need us both to speak
9  loudly and clearly, which is particularly
10  important since we're on Zoom.  So I will try to
11  pause after my questions to give the sound time to
12  be transmitted and for your counsel to object and
13  then you should feel free to answer, but speak
14  slowly and clearly so she can take the record
15  down.
16          It's also important that we don't
17  speak over each other.  I'll do my best not to
18  speak over you, if you'll do the same for me.  And
19  if it becomes difficult for the court reporter,
20  I'm sure she'll remind us.
21          In addition, please give me audible
22  answers, okay?  No nods, no uh-huhs.  We need to
23  make sure that the record is clear.  Do you
24  understand?
25     A.  Yes.
```

Page 9

```
1      Q.  Okay.  If you need to take a break,
2  please let me know.  All I ask is that you answer
3  whatever question I have asked and then we can
4  take a break.  Does that sound fair?
5      A.  Yes.
6      Q.  Okay.  If you do not understand the
7  question, please let me know and I'll repeat or
8  rephrase.  If you answer a question, I will assume
9  you understood the question.  Can we agree to
10  that?
11     A.  Yes.
12     Q.  You have a lawyer here today,
13  Mr. Noyes.  He will sometimes object to my
14  questions, but you must still answer my questions
15  after he's stated his objection.  The only
16  exception is if your lawyer instructs you not to
17  answer and you choose to follow his instruction.
18  Do you understand that?
19     A.  Yes.
20     Q.  Finally, is there any reason you
21  can't provide truthful or accurate testimony
22  today?
23     A.  No.
24     Q.  Is there any medication or substance
25  in your system that impacts your memory or your
```

3 (Pages 6 - 9)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 10

1 ability to understand?
2     A.  No.
3     Q.  Is there any other health condition
4 that would impact your memory or ability to
5 understand?
6     A.  No.
7     Q.  And do you understand that you are
8 under oath and required to testify truthfully?
9     A.  Yes.
10     Q.  And that your testimony is as if in
11 front of a judge and jury?
12     A.  Yes.
13     Q.  Okay.  Thank you.
14        (Plaintiff's Exhibit 81, notice of
15 deposition, was marked for purposes of
16 identification.)
17 BY MS. BROWN:
18     Q.  I'm going to share what we're going
19 to mark as Exhibit 81.  And this is the notice of
20 deposition, Mr. Legowski, if you would like to
21 pull it up for yourself.
22     A.  Okay.  I have it in front of me.
23     Q.  Have you seen this notice before?
24     A.  I believe I have.
25     Q.  Okay.

Page 11

1     A.  I may have seen this, yes.
2     Q.  Okay.  So I'm going to direct you to
3 page three, and you'll see topics listed, and the
4 topics that Bridgeall has designated for are
5 topics four, five, six, seven, eight, nine, and
6 ten, if you want to read those.
7     A.  Okay.  So that was four, five --
8     Q.  Yes.
9     A.  -- seven -- sorry, could you --
10     Q.  No, that's okay.  And if it's
11 helpful, I'm also showing it on my screen so you
12 can see exactly where I'm looking.  So it's four,
13 five, six, seven, and ten, and then topics eight
14 and nine to the extent they overlap with the
15 previous topics I just listed.  Is that your
16 understanding of the topics that you're here to
17 testify on?
18     A.  I'm just reading through those.
19     Q.  No problem.
20     A.  Yes, that seems fair.
21        MR. NOYES:  And let me just note on
22 the record, in meeting and conferring with
23 counsel, we discussed the wording of some of these
24 topics and it was modified slightly from how it
25 appears in the notice of deposition.

Page 12

1        MS. BROWN:  We share the same
2 understanding.
3 BY MS. BROWN:
4     Q.  All right.  Mr. Legowski, was this
5 notice provided by your attorneys?
6     A.  Yes.
7     Q.  And you understand that Bridgeall
8 Libraries Limited is a defendant in this action?
9     A.  Yes.
10     Q.  And that you've been designated to
11 speak as a -- or I guess on behalf of Bridgeall;
12 is that right?
13     A.  Yes.
14     Q.  Okay.  What did you do to prepare for
15 your deposition?
16     A.  I discussed -- had discussions with
17 my lawyers.
18     Q.  And before you go further, I just
19 want to make it clear that I'm not interested in
20 the conversations you've had with your lawyers or
21 what you discussed specifically.  I'm just trying
22 to find out what you did to prepare.
23     A.  I reviewed copies of our customer
24 contract just so I was aware of the content.  I
25 reviewed some processes I wasn't directly involved

Page 13

1 in as part of my role with Bridgeall just so I had
2 more of an awareness.
3     Q.  Could you repeat that last word?
4     A.  Awareness.  So I had more -- some
5 awareness --
6     Q.  Oh, awareness.
7     A.  -- of processes, yeah, that I wasn't
8 directly involved in.
9     Q.  Okay.  When you said that you were
10 reviewing processes, were you reviewing documents?
11     A.  Processes more relate to processes as
12 far as the operations of the business that I
13 hadn't been directly involved in.
14     Q.  Okay.  Did you speak with other
15 Bridgeall employees to prepare for your
16 deposition?
17     A.  Yes.
18     Q.  Okay.  And what were their names?
19     A.  I spoke with Jamie Wright, Ollie
20 Downs or Oliver Downs, Dan Fish, Susan Love, and
21 Nicole Cochrane.
22     Q.  Anyone else?
23     A.  I believe that covers the key people
24 I spoke to.
25     Q.  And when you spoke to Mr. Wright,

4 (Pages 10 - 13)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 14

1 what topics was that in connection with?
2    A. That was in connection with sales of
3 collectionHQ products.
4    Q. Okay. What about Mr. Downs?
5    A. That was in relation to the
6 implementation process and the receiving of data
7 from our customers.
8    Q. And Mr. Fish?
9    A. The same as Ollie Downs, receiving of
10 data.
11    Q. Do both Mr. Downs and Mr. Fish work
12 on data then?
13    A. Yes. Dan is more senior. He is
14 essentially one of the -- the primary architect of
15 our products.
16    Q. And what about Ms. Love?
17    A. Regarding invoicing of customers.
18    Q. And Ms. Cochrane?
19    A. The same, invoicing.
20    Q. Did you review communications or
21 e-mails in connection with your preparation?
22    A. I haven't recently.
23    Q. Okay. Did you review any documents
24 on your own?
25    A. Can you explain -- what do you mean

Page 15

1 by on my own?
2    Q. I guess, did you do any of your own
3 research for this preparation? Did you go back
4 and look through any e-mails or any documents that
5 you might have that were not provided to you by
6 counsel?
7    A. I've looked at documents that were
8 not directly provided by the counsel, yes.
9    Q. And what kinds of documents were
10 those?
11    A. Customer agreements.
12    Q. Okay. Any other types?
13    A. No, I can't think of any other
14 documents.
15    Q. Okay. I think we discussed that you
16 spoke with those five individuals. How many times
17 did you meet with them?
18    A. I've had one meeting with Jamie over
19 the past week. I've had one meeting with Ollie
20 and Dan.
21    Q. And then Ms. Love and Ms. Cochrane?
22    A. That has been more -- probably more
23 messaging or e-mail questions.
24    Q. Okay. How many times did you meet
25 with your counsel to prepare for today?

Page 16

1    A. I think three times.
2    Q. And how long were those meetings?
3    A. Approximately two hours.
4    Q. Okay. And were those by Zoom?
5    A. Teams.
6    Q. Okay. When you met with your
7 attorneys, was anyone else present or listening by
8 phone?
9    A. No.
10    Q. Okay. Have you talked to anyone
11 about this deposition or case besides your
12 counsel?
13    A. No.
14    Q. Okay. Are you married?
15    A. Yes.
16    Q. Have you talked about this lawsuit or
17 deposition with family members?
18    A. Not in any detail other than I will
19 be attending.
20    Q. Okay. So if we can switch back to
21 the exhibit, Mr. Legowski. For each of these
22 topics I'd like to confirm a few things with you.
23 Are you prepared to testify because you have
24 personal knowledge regarding these topics?
25    A. Yes.

Page 17

1    Q. Are you prepared to testify about
2 information known or reasonably known to
3 Bridgeall?
4    A. Yes.
5    Q. Are there any topics listed here that
6 you are not prepared to testify on?
7       MR. NOYES: Objection to the form.
8 BY MS. BROWN:
9    Q. You can answer, Mr. Legowski. And I
10 should clarify. Of the topics we've discussed,
11 are there any you're not ready to testify on?
12    A. The points that are named, you know,
13 I will answer as well as I can and as well as I
14 understand information.
15    Q. Fair enough. Is there anyone else at
16 Bridgeall who would have knowledge regarding these
17 topics?
18    A. Well, some of the topics, the people
19 that I've spoke to that I've mentioned may have,
20 you know, certain knowledge on certain points.
21    Q. Okay. Would someone at Baker &
22 Taylor have knowledge about these topics?
23    A. Yes.
24    Q. And who would those people be?
25    A. Fred Harvey. He is VP of sales. Don

5 (Pages 14 - 17)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 18

1 Johnson. Amandeep Kochar I would imagine would
2 have -- be able to speak to some of these. And
3 the legal counsel at Baker & Taylor I would
4 imagine to a degree. Yeah.
5     Q. Okay. Anyone else?
6     A. Corrine Legacy. I think those are
7 the key people that come to mind.
8     Q. Okay. Would you say that you are the
9 person at Bridgeall who is best suited to testify
10 regarding these topics today?
11     A. I would, yes.
12     Q. So we can put that exhibit to the
13 side, well, metaphorically put it to the side.
14         So we're going to talk a little bit
15 about your background, Mr. Legowski. So where do
16 you currently live?
17     A. I live in Hamilton, Scotland, UK.
18     Q. Okay. And how long have you lived
19 there?
20     A. I've lived in Hamilton since the year
21 2000.
22     Q. Okay. And before that where did you
23 live?
24     A. I lived in a place called Viewpark
25 Uddingston in Scotland.

Page 19

1     Q. Okay. What is your date of birth?
2     A. It's the ███████████████.
3     Q. And who do you currently live with?
4     A. My wife.
5     Q. Okay.
6         (Plaintiff's Exhibit 82, LinkedIn
7 profile, was marked for purposes of
8 identification.)
9 BY MS. BROWN:
10     Q. So I'm going to share what we're
11 going to mark as Plaintiff's Exhibit 82. And this
12 is your LinkedIn profile, Mr. Legowski, if you
13 want to pull that up on your own screen.
14     A. Thank you.
15     Q. So if you could review that and let
16 me know if you recognize the document?
17     A. Yes.
18     Q. Is this your LinkedIn profile?
19     A. Yes, it appears to be. Yes, that
20 looks accurate.
21     Q. And did you create your LinkedIn
22 profile?
23     A. Yes.
24     Q. And is it up to date?
25     A. Yes.

Page 20

1     Q. Okay. So we're going to use this
2 just to help walk us through your background. So
3 if you go to the last page of the document, or you
4 can look at the screen that I'm sharing, I'd like
5 to learn a little bit more about your education.
6 So could you please tell me about your bachelor's
7 of engineering?
8     A. Yes. So that was a -- I attended
9 university during -- while I was working for
10 Jabil, which is on my profile also, and that was,
11 you know, one or two days, and I worked every week
12 to study and attend university over the course of
13 those three years.
14     Q. Okay. And I see that you have an
15 engineering degree in electrical and electronics;
16 is that right?
17     A. That's correct.
18     Q. Is that, like, building electrical or
19 is that more like computers?
20     A. It was computers it was related to.
21 That was my job at the time.
22     Q. Okay. What about your postgraduate
23 diploma?
24     A. So that -- that was -- I moved
25 from -- one position in the company I worked for

Page 21

1 at the time, Jabil, moved from their electrical
2 engineering department into a position within the
3 IT at a different location but with the same
4 company so I started studying the postgraduate
5 diploma for information technology, more
6 programming, web development.
7     Q. Okay. So you were going to
8 educate -- or you were attending school while you
9 were at Jabil, I think is how you said it?
10     A. Jabil.
11     Q. Jabil?
12     A. Jabil, yes. Correct.
13     Q. And what kind of company is Jabil?
14     A. Electronics manufacturer.
15     Q. What kind of electronics were they
16 making?
17     A. Oh. So they were making mainframe
18 systems, so computers, but they did move into --
19 eventually move into a lot of other areas such as
20 aerospace I believe, defense as well. I was
21 primarily working on the computer systems area of
22 that company.
23     Q. Okay. Understood. So it looks
24 like -- why don't we start with your position
25 after you graduated from your four-year program,

6 (Pages 18 - 21)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 30

1  Q.  Okay.  And what is Dan Johnson's
2 position?
3      A.  Dan, he is -- I think he's senior
4 vice president of I believe something like
5 software services at Baker & Taylor.
6      Q.  And you mentioned that you
7 coordinated finance with Baker & Taylor.  Are
8 there any other business functions that you
9 coordinated on behalf of Bridgeall with Baker &
10 Taylor?
11     A.  No, that was mostly -- that was
12 really just the finance.  You know, forecasting
13 expenses essentially, that was -- the budgets was
14 primarily what I was involved in.
15     Q.  Okay.  And then -- so now vice
16 president, technology and software services.  What
17 was involved in that role?
18     A.  That was really just a promotion by
19 my boss, performance based.
20     Q.  And is that -- I'm sorry.  I didn't
21 mean to cut you off.
22     A.  That's okay.
23     Q.  And when you say boss, is that
24 Mr. Johnson?
25     A.  That's correct.

Page 31

1      Q.  Okay.  Were your responsibilities
2 mostly the same?
3      A.  Yes.
4      Q.  Okay.  So title promotion?
5      A.  Yes.
6      Q.  And then recently it looks like you
7 were promoted to managing director; is that
8 correct?
9      A.  That's correct.
10     Q.  And have your responsibilities
11 changed in this position?
12     A.  Yes.
13     Q.  Okay.  How have they changed?
14     A.  So this was after the sale of
15 collectionHQ to the new organization Valsoft.  I
16 was promoted to managing director.  Obviously some
17 of the functions that were provided by Baker &
18 Taylor to support this business have moved so
19 that's the position that Valsoft has given me as
20 far as running collectionHQ.
21     Q.  What support has moved from Baker &
22 Taylor to Valsoft after the transaction?
23     A.  Primarily sales.  We were dependent
24 on -- so I was -- if I go back to vice president,
25 I was one of the two vice presidents responsible

Page 32

1 for key functional departments.  So Fred Harvey
2 was vice president of sales and he overseen sales,
3 marketing, and customer services for Bridgeall
4 Libraries.
5      Q.  Was Mr. Harvey a Baker & Taylor
6 employee or a Bridgeall employee?
7      A.  Yes.  Sorry.  Baker & Taylor
8 employee.  I believe he still is.
9      Q.  So as two vice presidents, you
10 represented Bridgeall, he represented Baker &
11 Taylor, and you both coordinated, or how would you
12 describe that relationship?
13     A.  So we were both responsible for
14 different departments of the Bridgeall Libraries'
15 business -- on running that business.  I was in
16 charge of technology, the software development,
17 customer implementation, so working with our
18 customers, getting them set up.  And the general
19 operational activities for the office here in
20 Glasgow, Fred was responsible for sales, customer
21 experience, and marketing, so it was split.
22     Q.  Okay.  And going back to managing
23 director, is that still the split today?
24     A.  So we -- when Valsoft purchased the
25 business, we now have a VP of sales that works --

Page 33

1 that reports directly to me.  However, we still --
2 he -- Baker & Taylor still support -- we have a
3 sales agreement where we still support sales for
4 collectionHQ so the VP of sales that reports to me
5 still coordinates sales activities with Fred who
6 previously was primarily responsible for that.
7      Q.  Okay.  And what is the name of the VP
8 of sales that reports to you now?
9      A.  That is Jamie Wright.
10     Q.  Oh, okay.  And who do you currently
11 report to?
12     A.  I report to Peter Blanchard.
13     Q.  And is he a Valsoft employee?
14     A.  Yes.
15     Q.  So you've mentioned cHQ, ESP, and DEI
16 Analysis.  I'd like to learn a little bit more
17 about those products.  Could you explain to me
18 what cHQ is?
19     A.  Yeah, in general terms cHQ is a stock
20 performance management software application.  So
21 it's a software audit service.  So our customers
22 primarily were public libraries who were looking
23 for software that could help them essentially
24 manage their stock better, which really means
25 ensuring that they have the titles for the patrons

9 (Pages 30 - 33)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 34

1 essentially.
2        So the product looks at circulation;
3 you know, our book has been checked out.  Also the
4 condition of material; our books, you know,
5 they've been checked out so many times so maybe
6 you need to remove and get rid of those books and
7 replace nice fresh books so patrons coming in
8 they've got -- so it's really essentially stock
9 management analytics.  It provides actions --
10 recommending actions for librarians to take to be
11 able to manage their stock.
12        Q.  So when a library is using cHQ, do
13 they run the program monthly?  How often do they
14 run the analytics?
15        A.  I would say some libraries probably
16 use it daily.  You know, we have a team -- a
17 customer success management team, our customer
18 experience team who is part of the service
19 delivery from us, you know, work with customers
20 and provide advice on how often they should run
21 certain reports.  We also have functionality that
22 allows them to schedule running certain reports
23 and action plans.  So, yeah, so, you know,
24 customers -- you get some customers more actively
25 using our product than others, but we --

Page 35

1        (Technical difficulties.)
2        MS. BROWN:  I think I lost
3 Mr. Legowski.
4 BY MS. BROWN:
5        Q.  Mr. Legowski, I'm sorry, we lost you
6 for one moment.  Could you repeat the last part of
7 your testimony?
8        A.  Yeah.  So yeah, I was saying on the
9 frequency of customers using the application, I
10 would imagine some use it daily, most I would hope
11 use it daily, and we provide that support to
12 customers.  We've got automation schedule
13 management that they should be performing certain
14 tasks within the application, so.
15        Q.  Okay.  And when a library is using
16 cHQ, how do they provide data or information for
17 the analysis?
18        A.  They send data to us -- well, they
19 send to us, to an FTP site.
20        Q.  And is the data bibliographic
21 records?  What's the data?
22        A.  The data is via ILS extract or, you
23 know, whichever base that they want to send us
24 from their ILS, their integrated library system,
25 or LMS, library management system.  So they --

Page 36

1 they essentially send us the data from their
2 implementation team.
3        Q.  And in ILS extract, what is the data
4 typically?
5        A.  It would be information on the
6 collections.  You know, so you have like fiction
7 and nonfiction, and then you have the older -- the
8 book titles split out by those genres, so fiction
9 and adult fiction, adult fiction mystery, those
10 types of things.  So the collections and how they
11 actually manage the collections in the library.
12        The information about the bookshelf
13 will contain the book titles or the author, the
14 publisher, when was it published, et cetera.  As
15 well as circulation is one of the key -- key
16 pieces of data.  As I mentioned, we have action
17 plans focused on ensuring that libraries maintain
18 stock that is being used so the circulation data
19 is one of the key points.
20        Q.  Okay.  And when you receive these
21 files at collectionHQ, are they -- what's the data
22 extension or the file extension name?
23        A.  Generally it's Marc.
24        Q.  Okay.  Got it.  So if I say
25 bibliographic record, do you understand that I'm

Page 37

1 referring to a Marc record or a Marc data?
2        A.  Yeah.  Yeah.
3        Q.  Okay.  So if I refer to it that way,
4 we'll be -- we'll understand each other?
5        A.  That's right.
6        Q.  Okay.  Great.  You also mentioned --
7 or we talked briefly about cHQ Lite and
8 cHQacademic.  How are those different than the
9 regular -- or I guess the original collectionHQ
10 product?
11        A.  So cHQ Lite was, as the name
12 indicated, a version of collectionHQ, a more
13 affordable version of the product.  So you can
14 imagine, you know -- there's less features.  We
15 provide some core features, but, you know, it's
16 for small libraries who maybe have smaller budgets
17 to be able to get value at a lower price point.
18        Q.  Okay.  Does that mean that the
19 analysis is a little higher level?  Does that mean
20 the analysis is run less often?  I guess, how does
21 that translate?
22        A.  The -- I would say the setup is
23 more -- it's a more basic setup.  So when I
24 mentioned libraries' collections with how they,
25 you know, manage their stock, you know, you start

10 (Pages 34 - 37)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 42

1  Q. So we are going to move on to what's
2 Plaintiff's Exhibit 3, and that is the complaint
3 if you want to pull that up, Mr. Legowski, and I
4 will also share my screen.
5  A. I'm sorry, could you repeat which
6 document?
7  Q. It's called a complaint,
8 C-O-M-P-L-A-I-N-T.
9  A. Yeah, I found that.
10  Q. Okay. And so you mentioned this
11 lawsuit so I'll represent to you that this is the
12 complaint which in the United States is the case
13 initiating document in a lawsuit. Have you ever
14 seen this document before? And feel free to
15 scroll through on your own copy.
16  A. Yeah, I believe I've seen this only
17 recently.
18  Q. Okay. Did you see this document in
19 connection with your preparation for today?
20  A. Yes.
21  Q. Okay. What do you understand this
22 lawsuit to be about?
23  MR. NOYES: Objection to the form.
24 You can answer.
25  THE WITNESS: Okay. So as far as I'm

Page 43

1 aware, OCLC -- that the case is about OCLC
2 contesting or regarding data that I think OCLC
3 says is their data and it's to do with BTCat.
4 BY MS. BROWN:
5  Q. Okay.
6  A. So very general terms.
7  Q. Okay. Do you know what the claims
8 are in this case?
9  A. I mean, I've not really looked
10 specifically. I scoped through the document but
11 not -- I couldn't speak to it specifically.
12  Q. Okay. And that's fine. I'm just
13 trying to get your current understanding so no
14 problem. But you're aware this is a case in the
15 United States, right?
16  A. Yes.
17  Q. And that it was filed in federal
18 court in Ohio?
19  A. Yes.
20  Q. Okay. Did you review any other
21 filings in this case for your preparation, any
22 motions or anything else that appeared in the
23 federal court?
24  A. No.
25  Q. Okay. Except for your conversations

Page 44

1 with your lawyers, which I don't want to hear
2 about since that's privileged, has Bridgeall ever
3 discussed any of OCLC's restrictions on its data?
4  A. No.
5  Q. What about restrictions on customers?
6  A. What do you mean by that, Katie?
7  Q. So I guess when I say restrictions,
8 I'm curious what you understand restrictions to
9 mean, so any type of restriction.
10  MR. NOYES: Objection to the form.
11  THE WITNESS: I'm trying to
12 understand that question. So you're asking if I'm
13 aware of any restrictions we have placed on our
14 customers?
15 BY MS. BROWN:
16  Q. I apologize. Let me rephrase. Are
17 you aware of any restrictions that OCLC has placed
18 on its customers?
19  A. No.
20  Q. Okay. Are you aware of any other
21 restrictions placed on libraries or library data
22 in the library technology industry?
23  A. No.
24  Q. Okay. Before the transaction with
25 Valsoft, what was Bridgeall's relationship with

Page 45

1 Baker & Taylor in connection to collectionHQ?
2  A. Well, Baker & Taylor owned -- owned
3 Bridgeall Libraries so essentially they -- I would
4 say they were owners of the business and the
5 products. That's probably the primary
6 relationship.
7  Q. Okay. You mentioned financial
8 support that Baker & Taylor provided to Bridgeall.
9 Over the course of your employment at Bridgeall,
10 what other types of support has Baker & Taylor
11 provided Bridgeall?
12  A. Yeah, so financial services, IT. So
13 our, for example, Office 365 is all provided by
14 Baker & Taylor, security on our hardware was
15 provided by Baker & Taylor, legal.
16  Q. And what resources did Baker & Taylor
17 provide for collectionHQ specifically that we
18 haven't talked about? I think you might have
19 mentioned marketing at one point.
20  A. Yeah. So --
21  MR. NOYES: Let me just -- if I may
22 just not -- not an objection, but this is part of
23 a topic that was covered by Aman, so to the extent
24 you're asking these questions, since it's a part
25 of number two, he's -- I have no problem with this

12 (Pages 42 - 45)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 46

1 witness answering but he's not acting as the
2 designee for Bridgeall on this topic.
3         MS. BROWN: I think this might be
4 under topic five, Frank, but we can discuss that
5 after the fact.
6         MR. NOYES: Okay. Well, to the
7 extent it is covered within topic two, he's not
8 here as a designee on that topic.
9         MS. BROWN: We understand.
10 BY MS. BROWN:
11     Q. Mr. Legowski, you can continue.
12     A. Yeah, okay, so the other services
13 were marketing, which Fred was responsible for,
14 and customer experience.
15     Q. And how did that fit with
16 Mr. Wright's roles. I think you said that he
17 might also have been in sales, but maybe I -- I
18 don't want to misstate your testimony.
19     A. No, I can explain that. So Jamie
20 reported to Fred who was VP of sales at Baker &
21 Taylor so Jamie reporting to Fred was
22 responsible -- probably half of his time was
23 demoing the products and closing sales. So he
24 wasn't, you know, lead generating, you know -- it
25 wasn't field sales but demo and close of sales due

Page 47

1 to his product knowledge. He was also director of
2 customer experience and that team had several
3 customer success managers who post sale would
4 support the customers with the products.
5     Q. Okay. So I want to unpack some of
6 that. So you said Jamie was not lead generation.
7 When you say lead generation, what do you mean by
8 that?
9     A. You have certain functions within a
10 sales team who would be -- you know, it could be
11 cold calling. You know, generating interest for
12 the product. No, maybe I'll go back actually
13 slightly.
14         I won't say that he didn't do that
15 completely because, you know, attending events,
16 which we do, you know, library events and various
17 communications with customers, that's actually
18 lead gen as well. He wasn't out there on the road
19 and trying to generate interest. You know, most
20 of his sales roles was, you know, stepping in when
21 there was interest, speaking to an opportunity,
22 and then demoing and then getting the sales calls,
23 that was primarily that role.
24     Q. Okay. But Mr. Wright did have
25 customer interactions?

Page 48

1     A. Yes.
2     Q. Okay. And did that include U.S.
3 customers?
4     A. Yes.
5     Q. Okay. You also mentioned customer
6 success managers. Were those Baker & Taylor or
7 Bridgeall employees?
8     A. For the United States it was Baker &
9 Taylor employees.
10     Q. Okay. And it sounds like if it was a
11 customer success manager in the UK, it was a
12 Bridgeall employee?
13     A. Yes. That's correct.
14     Q. Did the U.S. customer success
15 managers cover the U.S. territories?
16     A. Yes.
17     Q. Did the UK customer success managers
18 have any role with U.S. customers?
19     A. I believe that started only recently
20 with our cHQacademic product.
21     Q. And was that before or after the
22 Valsoft transaction?
23     A. I'm actually not a hundred percent
24 sure on that.
25     Q. That's okay. Maybe just one point of

Page 49

1 background for me. When was collectionHQacademic
2 launched?
3     A. That was launched in July of 2024.
4     Q. Okay. So prior to the transaction?
5     A. That was launched prior to the
6 transaction, yes.
7     Q. Okay. So Jamie is someone who
8 reports to you, correct?
9     A. As of the sale, yes.
10     Q. Okay. But prior to that, he was
11 reporting to Mr. Harvey who was a Baker & Taylor
12 employee?
13     A. Correct.
14     Q. Okay. And other people, like the
15 customer success managers that you discussed, are
16 those people that report to Mr. Wright?
17     A. They did prior to the sale.
18     Q. Okay. So prior to the sale, is it
19 fair to say that you were at least providing some
20 oversight of those individuals?
21     A. Some oversight of -- sorry, which
22 individuals?
23     Q. Of Jamie and the customer success
24 managers.
25     A. I wasn't providing any oversight, no,

13 (Pages 46 - 49)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 50

1 not to that team prior to the sale, no.
2     Q.  Okay.  Were you providing any
3 guidance or direction?
4     A.  Well, Jamie, being an employee of
5 Bridgeall Libraries, yeah, I could say, you know,
6 there would be certain things such as if there was
7 an HR query, something like that, that would be
8 oversight, yeah.
9     Q.  Okay.  Was Jamie overseeing all of
10 the customer success managers?
11     A.  At that time, yes.
12     Q.  Okay.  And is that regardless of
13 whether they were a Baker & Taylor or a Bridgeall
14 employee?
15     A.  Yes.
16     Q.  Okay.  Do you know how many full-time
17 employees Baker & Taylor had supporting
18 collectionHQ -- or I guess Bridgeall generally?
19     A.  All right.  Okay.  As a whole with
20 all the departments that I mentioned, I
21 couldn't -- I don't have a number.  Customer
22 success, I know we had four at the time, customer
23 success managers employed by Baker & Taylor.  We
24 had one implementation support person employed by
25 Baker & Taylor.  We had one full-time salesperson

Page 51

1 who worked alongside Jamie in that sales function
2 who reported to -- who did report and still does,
3 I believe, to Fred.  So they were a hundred
4 percent collectionHQ sales.
5     Q.  What is the name of the
6 implementation support person?
7     A.  John Anderson.
8     Q.  Okay.  And the salesperson?
9     A.  Jane Herb.
10     Q.  Is that H-E-R-B?
11     A.  That's correct.
12     Q.  And Mr. Anderson and Ms. Herb, they
13 are Baker & Taylor employees, correct?
14     A.  Jane is.  John was.
15     Q.  Did Baker & Taylor and Bridgeall
16 share any office space or any other physical
17 infrastructure?  I guess prior to the transaction
18 did they?
19     A.  I'm sorry, any office location, any
20 physical?  No.
21     Q.  Okay.  What about servers or network
22 infrastructure?
23     A.  Not product related.  Our product --
24 Bridgeall Libraries' products, sorry, are all
25 hosted on our instance of AWS.  We do use Baker &

Page 52

1 Taylor's Office 3 for all of those services.
2     Q.  Okay.  In the documents we've seen a
3 lot of collectionHQ e-mail addresses.  Are all
4 collectionHQ e-mail addresses Baker & Taylor employees
5 or are some of them Baker & Taylor employees?
6     A.  So everybody employed directly by
7 Bridgeall Libraries should have a collectionhq.com
8 e-mail address, but they also have a Baker &
9 Taylor e-mail address.  It's just how the Baker &
10 Taylor IT configured that.  So primary address is
11 collectionhq.com, but everybody, including myself,
12 I have an @baker-taylor.com e-mail address as
13 well.  The U.S. employees who are employed
14 directly by Baker & Taylor to support Bridgeall
15 Libraries, I believe they have just
16 baker-taylor.com e-mail addresses.  I don't think
17 they had collectionHQ addresses.
18     Q.  Okay.  Is there a way to tell the
19 difference between a Baker & Taylor or Bridgeall
20 employee using one of those collectionHQ e-mails
21 or not really?
22     A.  Could -- I'm sorry.
23     Q.  That was a bad question.  Let me ask
24 it again.  When you're receiving e-mails from
25 somebody at a collectionHQ e-mail address, is

Page 53

1 there any way to tell if they're a Bridgeall or a
2 B&T employee?
3     A.  I mean, I would just know that they
4 were either collectionHQ employee.
5     Q.  That's fair.  Would a customer be
6 able to tell the difference or not?
7     A.  I'm not -- I'm not sure if a customer
8 would be able to tell.
9     Q.  Okay.  But they would see the
10 collectionHQ e-mail, right?
11     A.  Yes, they would.
12     Q.  Okay.  When Baker & Taylor is, you
13 know, covering the U.S. territory with customer
14 service and sales, are they acting as Bridgeall's
15 agent or acting on behalf of Bridgeall?
16     A.  Well, as far as I understand, certain
17 salespeople that work for Fred Harvey were
18 responsible for generating sales leads for
19 collectionHQ's products, and as well we had Jane
20 who was hundred percent selling our products.
21     Q.  Okay.  So the Baker & Taylor
22 employees in that context are acting for the
23 benefit of collectionHQ, right?
24     A.  Yes.  I can't specify how much
25 resource or what salespeople, but as far as I'm

14 (Pages 50 - 53)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 54

1 aware, they had salespeople representing our
2 products.
3      Q.   Okay.  Mr. Legowski, you mentioned
4 that you had reviewed contracts in preparation for
5 this deposition and we are now going to talk about
6 contracts.
7      A.   Okay.
8      Q.   So are you aware that last week
9 Bridgeall's counsel produced example contracts to
10 OCLC?
11      A.   I wasn't aware -- I was aware that
12 contracts were provided to the legal counsel.
13      Q.   And were you part of the collections
14 process for those documents?
15      A.   I was involved, yes.
16      Q.   Okay.  Our understanding is that we
17 do not have any collectionHQ agreements prior to
18 2019 and 2020.  Is that accurate as far as you
19 know?
20      A.   Sorry.  Which specific agreements?
21      Q.   Any collectionHQ agreement.
22      A.   I'm actually not a hundred percent
23 sure on that.
24      Q.   Okay.  That's no problem.  Okay.  So
25 I want to walk through some of the example

Page 55

1 contracts that were provided to us and more or
2 less understand the different versions with you.
3          (Plaintiff's Exhibit 83,
4 BAKER00058010-58024, was marked for purposes of
5 identification.)
6 BY MS. BROWN:
7      Q.   So we're going to turn to Plaintiff's
8 Exhibit 83, and that, Mr. Legowski, is -- you'll
9 find it in your file folder, it will be
10 BAKER00058010, and I'll also be sharing my screen.
11      A.   I have it here.
12      Q.   So feel free to scroll through it and
13 let me know when you're ready to discuss.
14      A.   Yeah, I think I'm fine.
15      Q.   Okay.  Do you recognize this
16 document?
17      A.   Yes.
18      Q.   Okay.  I'll represent to you that the
19 file name of this document is collectionHQ
20 subscription agreement North America March 2024.
21 Does that sound like a document title that you're
22 familiar with?
23      A.   Yes.
24      Q.   Okay.  What is the March 2024 version
25 of the collectionHQ agreement compared to any

Page 56

1 other version?  I guess what makes it the March
2 2024 version?
3      A.   Oh.  I am not a hundred percent sure
4 what changed --
5      Q.   Okay.
6      A.   -- from the previous one.
7      Q.   That's okay.  We're going to walk
8 through some of the pertinent provisions and maybe
9 that will refresh your memory.
10      A.   Okay.
11      Q.   So if you look on the very first
12 page, it says offer for subscription to the
13 collectionHQ service, and if you look at the first
14 paragraph, it says Baker & Taylor, LLC hereby
15 offers to supply the service, defined below, to
16 the undersigned organization, you, on a
17 subscription basis as provided herein, utilizing
18 the software and services of Baker & Taylor, LLC's
19 wholly-owned subsidiary Bridgeall Libraries
20 Limited.  So is this -- do you understand what
21 I've just read?
22      A.   Yes.
23      Q.   So is this an agreement between
24 Baker & Taylor, Bridgeall, and the customer, or
25 how do you understand that paragraph?

Page 57

1      A.   So Baker & Taylor are providing the
2 services that are -- they're supplying the
3 services that are developed and provided by
4 Bridgeall Libraries, which is part of Baker &
5 Taylor.
6      Q.   Okay.  And then if we keep scrolling,
7 this is on -- this will be page three at the start
8 of the standard terms and conditions for the
9 service.  Are you with me?
10      A.   Yes.
11      Q.   The second paragraph on the page says
12 this agreement is a legal agreement between you
13 and Baker & Taylor, LLC, as indirect owner and
14 agent of Bridgeall Libraries Limited.  Do you
15 understand that here Bridgeall is designating
16 Baker & Taylor as an agent?
17      A.   Yes.
18      Q.   And what do you understand that to
19 mean here?
20      A.   I would expect it's a sales agent
21 that is going to be directly with Baker & Taylor
22 because the customer is based in the U.S.
23      Q.   Okay.  So is this agreement between
24 Bridgeall and a customer, or no?
25      A.   I would say indirectly.

15 (Pages 54 - 57)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 58

1  Q.  Okay.  So when it comes to a U.S.
2 customer, Baker & Taylor is acting as Bridgeall's
3 agent, at least that's what the contract says,
4 right?
5  A.  Yes, I would agree with that.
6  MR. NOYES:  Sorry, I was on mute.  I
7 objected to the form of the last two questions but
8 did not do anything other than just a form
9 objection.
10  MS. BROWN:  No problem.
11 BY MS. BROWN:
12  Q.  Prior to the transaction,
13 Mr. Legowski, did Baker & Taylor, as Bridgeall's
14 agent, enter into all the cHQ agreements with U.S.
15 customers?
16  A.  I believe I've seen some agreements
17 that are directly with Bridgeall Libraries.
18  Q.  And why would there be a difference
19 between entering a contract with a U.S. customer
20 as Bridgeall versus Baker & Taylor as an agent for
21 Bridgeall?
22  A.  I believe -- well, as far as my
23 understanding, some customers would prefer if they
24 already work with Baker & Taylor, they would --
25 you know, they would want to sign an agreement

Page 59

1 with Baker & Taylor.
2  Q.  Okay.  But some U.S. customers might
3 have an agreement directly with Bridgeall if
4 they're not already working with Baker & Taylor?
5  A.  Yes.  That could be the case, yes.
6  Q.  Okay.  So I'm going to keep
7 scrolling.  We're going to go to Section 4.5 in
8 case you would like to follow along in your own
9 document --
10  A.  Okay.
11  Q.  -- but this is on page five of
12 fifteen.
13  A.  Okay.
14  Q.  So if you could read that paragraph
15 and just -- you can read it to yourself.  Just let
16 me know when you've had a chance to read it.
17  MR. HARTMAN:  While he's reading
18 that, I just want to make sure I heard this
19 correct, this is Exhibit 83?  I thought the
20 LinkedIn profile was Exhibit 83.
21  MS. BROWN:  The LinkedIn exhibit is
22 82.
23  MR. HARTMAN:  Okay.
24  MS. BROWN:  And then the complaint is
25 Plaintiff's Exhibit 3.

Page 60

1  MR. HARTMAN:  Okay.  Thank you.
2 Sorry.
3  MS. BROWN:  And just to make it clear
4 on the record, the first exhibit we led with today
5 was Exhibit 81 and that was Bridgeall's notice of
6 deposition.
7  MR. HARTMAN:  Got it.
8  THE WITNESS:  Yeah, I've read that
9 section.
10 BY MS. BROWN:
11  Q.  Okay.  Great.  So I want to read the
12 first sentence, in addition, as a subscriber to
13 the service, you have the opportunity to access
14 Baker & Taylor's BTCat community pool of
15 cataloging records at no charge if you authorize
16 the use of your cataloging records by Baker &
17 Taylor.  What do you understand that first
18 sentence to mean?
19  A.  Basically the customer is authorizing
20 Baker & Taylor to use their catalog records and
21 they will be able to access BTCat for free.
22  Q.  Okay.  And if you go to the next
23 sentence, by signing this agreement, you are
24 authorizing Baker & Taylor to utilize your
25 cataloging records and are confirming that you

Page 61

1 have the right to make this authorization.  Did I
2 read that right?
3  A.  That seems correct.
4  Q.  Is that the authorization you're
5 talking about?
6  MR. NOYES:  Objection to the form.
7 BY MS. BROWN:
8  Q.  You can answer.
9  A.  I believe so, yes.
10  Q.  So by signing the agreement, the
11 customer is authorizing Baker & Taylor?
12  MR. NOYES:  Objection to the form.
13  THE WITNESS:  Should I answer?
14 BY MS. BROWN:
15  Q.  Yes.  Yes, unless your counsel
16 instructs you not to answer, he'll lodge an
17 objection but you still provide an answer.
18  A.  Okay.  I mean, that's what that
19 appears to say to me, yes.
20  Q.  Okay.  Do you know who Travis Kelley
21 is?
22  A.  I do, yes.
23  Q.  ███████████████████████████
    ██████████████████████████████████████
    ██████████████████████████████

16 (Pages 58 - 61)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 62



5       MR. NOYES:  Objection to the form.
6       THE WITNESS:  I can't really speak
7 for the customer.
8 BY MS. BROWN:
9       Q.  What's your understanding of why they
10 would want it removed?
11      A.  I've actually not -- I've not
12 actually been aware of a specific reason.  I'm
13 aware of a customer asking for it to be removed.
14 The reason I couldn't really speak to.
15      Q.

Page 64

1

8       A.  Sorry, Katie, could you repeat that,
9 please?
10      Q.

Page 63

1

20      Q.  Which agreements were these added to?
21 Strike that.  Which provision -- strike that
22 again.

Page 65

1

5       Q.  And I have some examples so we'll --
6       A.  Okay.
7       Q.

10      Q.  Okay.  We're -- oh, I apologize.
11      A.  I'll go back.  When I said no, not
12 that I'm aware.
13      Q.  The next section that I want to speak
14 with you about is Section 21.9.  And I will give
15 you a page number if you would also like to look
16 at it on your screen.
17      A.  Okay.
18      Q.  This is on page fourteen of fifteen
19 of the exhibit.
20      A.  Okay.
21      Q.  So if you read 21.9, it says this
22 agreement shall be governed by, subject to, and
23 interpreted in accordance with the laws of the
24 state where you are located.  Did I read that
25 right?

17 (Pages 62 - 65)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY



Page 66

1    A.  Yes.
2    Q.  And what do you understand this
3 provision to mean?
4    A.  Be governed by the laws of a
5 particular state of a -- where the customer is
6 located.
7    Q.  So this is in reference to a U.S.
8 agreement, correct?
9    A.  Yes.
10    Q.  And would a state include any state
11 in the U.S.?
12       MR. NOYES:  Objection to the form.
13 You can answer.
14       THE WITNESS:  I would have to assume
15 so, but I couldn't confirm.
16 BY MS. BROWN:
17    Q.  Okay.  And that would include Ohio,
18 correct, since it's a state?
19    A.  I would assume so, yes.
20    Q.  ███████████████████████
   ███████████████████████████████
   ██████████████████████████████
   █ ███████████████
   █ ██████████████████

Page 67

1    A.  ████████████████
   ███████████████████████████████
   █████████████████████████████
   █ ████████
   █ █████████████████████
   █ ████████████████████
   ████████████████████████████████
   ████████████████████
15    Q.  Okay.
16       MS. BROWN:  We've been going for
17 about an hour, how about a five-minute break.
18       MR. NOYES:  It's been more like an
19 hour and a half, but I agree to a five-minute
20 break.
21       MS. BROWN:  Okay.  No problem.
22       THE WITNESS:  Thank you.
23       (Pause in proceedings.)
24       (Plaintiff's Exhibit 84,
25 BAKER00058025-58039, was marked for purposes of

Page 68

1 identification.)
2 BY MS. BROWN:
3    Q.  All right, Mr. Legowski, we're going
4 to look at a different contract.  This is going to
5 be Plaintiff's 84, and in your file, Mr. Legowski,
6 it will be BAKER00058025.
7    A.  I've got that.
8    Q.  Okay.  Do you recognize this
9 document?
10    A.  Yes.
11    Q.  What is it?
12    A.  It is a contract template for
13 collectionHQ products.
14    Q.  Okay.  And I will represent to you
15 that this file name is collectionHQ subscription
16 agreement ROW 2024.  Do you know what ROW means?
17    A.  Rest of world.
18    Q.  And what do you mean by rest of
19 world?
20       MR. NOYES:  Objection to the form.
21       THE WITNESS:  My understanding is
22 outside of the U.S.
23 BY MS. BROWN:
24    Q.  Okay.  And how is this contract
25 different than the collectionHQ contract we just

Page 69

1 reviewed?
2    A.  The subscription is directly with
3 Bridgeall Libraries Limited.
4    Q.  Okay.  And why is there that
5 difference?
6    A.  Because Baker & Taylor are all in the
7 U.S.  Our other customers came directly with
8 Bridgeall.
9    Q.  Okay.  And we can scroll through
10 this.  So you mentioned that this contract is
11 directly with the customer, and it looks like
12 that's accurate in the first paragraph where it
13 says we, Bridgeall Libraries Limited, hereby offer
14 to supply the service to the undersigned
15 organization on a subscription basis.  Is that
16 accurate?
17    A.  Yes.
18    Q.  ███████████████████████████
   ████████████████████████████████████
   █ ███████████████████████
   █ █████████████████████████
   █ ██████████████████
25       MR. NOYES:  Objection to the form.

18 (Pages 66 - 69)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 82

1 identification.)
2 BY MS. BROWN:
3    Q.  So this will be Plaintiff's Exhibit
4 90.  And for you, Mr. Legowski, this will be
5 BAKER00058273.
6    A.  Okay, I have that.
7    Q.  Okay.  If you want to flip through
8 that document, just let me know when you're ready.
9    A.  Yeah, I've had a quick look.
10    Q.  Okay.  Do you recognize this
11 document?
12    A.  Yes.
13    Q.  What is it?
14    A.  ██████████████

██████████████████████████████
██████████████████████████████
██████ ██████████████████████
██████ ██████████████████████
███████████████████████████
████ ████████████████████
████ █████████████████
███ ████████████████████

Page 83

1 ██████████████████████████
████████████████████████████████
████████████████████████████████
███ ██████████████████████████
████████████████████████████████
████████████████

10    MR. NOYES:  Objection to the form.
11 BY MS. BROWN:
12    Q.  And I guess part of my confusion is
13 that you can see in the date signed column there's
14 some 2023 dates, and so I'm not sure what this
15 2022 refers to.
16    MR. HARTMAN:  Katie, I can -- well, I
17 can explain if you want to go off the record or
18 you can ask him, of course.
19    MS. BROWN:  That's okay.  We can just
20 continue if counsel is willing to clarify.
21    MR. HARTMAN:  Sure.
22    MS. BROWN:  But we can do that at
23 another time.  Thank you.
24 BY MS. BROWN:
25    Q.  So the next tab, Mr. Legowski, is

Page 84

1 through the year 2024.  Do you know why there's no
2 2023 tab?
3    A.  I would -- looking at the data on
4 this, I would say that all the contracts relevant
5 to this information that you're presenting are in
6 the other list.  I seen some dates 2023 in your
7 prior list.
8    Q.  Okay.  I think that's all I have
9 since your counsel has noted that we can clarify
10 some things with them after your deposition, so
11 thank you.
12    A.  Okay.
13    (Plaintiff's Exhibit 91,
14 BAKER00001476-1479, was marked for purposes of
15 identification.)
16 BY MS. BROWN:
17    Q.  Thanks for your patience.  I'm going
18 to share with you what will be Plaintiff's Exhibit
19 90.
20    MR. NOYES:  I think the last one was
21 90.
22    MS. BROWN:  Oh, that's right.  Thank
23 you, Frank.  It's 91.
24 BY MS. BROWN:
25    Q.  So Plaintiff's 91.  And for you,

Page 85

1 Mr. Legowski, that will be BAKER00001476?
2    A.  I have that.
3    Q.  Okay.  Let me know when you've had a
4 chance to review this document.
5    A.  Okay.  Yeah, I looked at the first
6 couple of e-mails in that.
7    Q.  Okay.  Do you recognize this
8 document?
9    A.  No.
10    Q.  Okay.  That makes sense since you
11 were not on the e-mail, but I was hoping we could
12 still ask you some questions about it.  Susan
13 Love, is she the individual we discussed earlier?
14    A.  Yeah.
15    Q.  And can you remind me, what is her
16 role?  Invoicing?
17    A.  It's primarily Salesforce
18 administrator.
19    Q.  Salesforce the database?
20    A.  Salesforce -- yeah, the application,
21 the software, yes.
22    Q.  Okay.  And I think you mentioned that
23 Nicole Cochrane, who appears on the to line, also
24 works with Ms. Love?
25    A.  Also invoicing, takes care of

22 (Pages 82 - 85)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY



Page 86

1 invoicing process.
2     Q. Okay. And who is Deanna Lechman?
3     A. Deanna is one of our customer success
4 managers in U.S.
5     Q. Is that specifically for Bridgeall
6 products?
7     A. Yes.
8     Q. Okay. Do you know why she's using a
9 Baker & Taylor e-mail as opposed to a collectionHQ
10 e-mail?
11     A. Yeah, that kind of confirms that the
12 U.S. employees who were employed by Baker &
13 Taylor, even though they worked for Bridgeall, are
14 over products, it looks as if they didn't have a
15 collectionHQ e-mail address, they only had the
16 Baker & Taylor, so, yeah.
17     Q. Okay. So is Ms. Love -- and I
18 apologize, I think you already testified to this
19 already, but Ms. Love, is she a Bridgeall
20 employee?
21     A. Yes.
22     Q. And same for Ms. Cochrane?
23     A. Yes.
24     Q. Okay. Thank you. So if you scroll
25 to page -- I guess it's the bottom of the first

Page 87

1 page, it looks like ███████████
   ████████ is sending an e-mail to Deanna, if you
3 want to review that e-mail.
4     A. Okay. Yeah, I've read that.
5     Q. So in the second paragraph where
6 ██████ says secondly, question on a passage in
7 the amendment's second paragraph, what do you
8 understand ████████ to be asking here?
9     A. Yeah, I think he -- well, he seems to
10 be questioning the wording of that paragraph.
11 Yeah, so he's basically stating there that the
12 gray highlighted part is indicating he can opt
13 out, whereas the blue part he's suggesting that it
14 seems mandatory, and he's looking for
15 clarification of that.
16     Q. Do you know what clarification he may
17 have received on this? If you scroll up, it looks
18 like --
19     A. Yeah, I don't see a response
20 specifically to that, so -- yeah, I can't see a
21 response.
22     Q. ██████████████████████
████████████████████████████████████
███ ████████

Page 88

1     Q. ████████████████
██████████████████████████
██████████
█████████████████████████
9       MR. NOYES: Objection to the form.
10 Calls for a legal conclusion. You can answer.
11       THE WITNESS: ████████████
████████████████████
██████████████
█████████████████
████████████████████
18       ██████████████████████
█████████
███████████████████████████
23       MR. NOYES: Objection to the form.
24 You can answer.
25       THE WITNESS: ████

Page 89

1 BY MS. BROWN:
2     Q. ██████████████████
██████████████████████████
████████████
6       MR. NOYES: Objection to form.
7       MS. BROWN: Frank, was that objection
8 to form?
9       MR. NOYES: Yes. I'm sorry.
10 BY MS. BROWN:
11     Q. ████████████████
██████████████████████████
███████████████████████████████
████████████████████████████
██████████████████
██████████████████
████████████████████
18 █████████
███████████████████████████
████████
█████████████████████████
████████████
24     Q. Okay. And I know that we -- that
25 you've testified that Baker & Taylor provided

23 (Pages 86 - 89)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 90

1  marketing support to Bridgeall. Am I -- am I
2  recalling that correctly?
3       A. Providing marketing support,
4  overseeing marketing because we do have marketing
5  staff at Bridgeall. So Fred Harvey was
6  responsible for marketing for Bridgeall.
7       Q. Was -- did Bridgeall have a strategy
8  for marketing?
9       A. What do you mean by strategy, Katie?
10  Sorry.
11       Q. Maybe a plan would be the best way to
12  put it, a plan, an area of focus, a decision how
13  to target different customers maybe in different
14  areas or different types of customers.
15       A. I have -- I'm aware that there was a
16  marketing plan on the marketing activities. I've
17  been involved in conversations that are around
18  that.
19       Q. So is that a joint effort between
20  Baker & Taylor and Bridgeall?
21       A. Given that we have marketing staff
22  here, then yes.
23       Q. Okay. So Bridgeall had input in --
24       A. Absolutely. Yes. Yes.
25       MR. NOYES: Objection to the form.

Page 91

1  BY MS. BROWN:
2       Q. Let me restate that, Mr. Legowski, so
3  I can finish the whole question and you can
4  answer. I know it's tough to remember to do that,
5  but that will be for the court reporter.
6       So Bridgeall had input in the
7  marketing strategy, right?
8       A. Yes.
9       Q. Okay. What was the strategy when it
10  came to U.S. customers?
11       MR. NOYES: Objection to the form.
12  You can answer.
13       THE WITNESS: What do you mean,
14  Katie, in specific to U.S. customer strategy?
15  BY MS. BROWN:
16       Q. Let me back up. Was there a -- maybe
17  I'll ask a more general question first. Was there
18  a specific strategy for U.S. customers compared to
19  non-U.S. customers?
20       A. I would say the strategy would
21  probably only differ if we were rolling out a
22  product in the U.S. only.
23       Q. How would it differ?
24       A. Really it would only -- it would
25  differ because if we were only marketing, for

Page 92

1  example, a new product, such as cHQacademic, then
2  we would be focusing marketing probably primarily
3  in the U.S. because that's where we were trying to
4  target.
5       Q. Okay. In general, were Baker &
6  Taylor and Bridgeall products sold together or
7  alongside each other or was it a separate
8  marketing effort?
9       A. As far as marketing, as I understand
10  it, it was a separate effort. So marketing of the
11  product was separate.
12       Q. Okay. What was included in marketing
13  at Bridgeall? I guess, what were the pieces of
14  the plan?
15       MR. NOYES: Objection to the form.
16  You can answer.
17       THE WITNESS: Okay. I mean, key
18  marketing activities I would say include, you
19  know, certain marketing campaigns that would go
20  out via e-mail promoting the products.
21       We would have marketing events such
22  as arranging customer user groups, hosting
23  webinars, so that would be promoted via the
24  marketing team where we could promote the products
25  and ask potential customers to join.

Page 93

1       Attending library events -- library
2  association events to market our products.
3  I think those are the key --
4  BY MS. BROWN:
5       Q. Okay.
6       A. -- key points.
7       Q. So you testified that the marketing
8  was separate, correct?
9       A. Yes. As far as I'm aware, yes.
10       Q. Okay. Were Bridgeall products sold
11  with Baker & Taylor products? Were they bundled
12  together at times?
13       A. At times, yes.
14       Q. Okay. How did that work?
15       A. The part of the process that I'm --
16  ███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██ ██████████████████████████████
██ ████████████████████████
██ ███████████████████████████████
█████████████████████████████

24 (Pages 90 - 93)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY



Page 94

1 ██████
██ ████████████████
███████████ would that person have reported
4 to Jamie Wright?
5 ██████████████
██████████████████████
██████████████████████
████████████████████
11     Q.  And that would be at Baker & Taylor?
12     A.  Baker & Taylor department, yes.
13     Q.  Okay.  Did Bridgeall have any input
14 on setting prices for U.S. customers?
15        MR. NOYES:  Objection to the form.
16 You can answer.
17        THE WITNESS:  So the sales price
18 was -- that was set by the sales team.  So that
19 was the Baker & Taylor sales team.
20 BY MS. BROWN:
21     Q.  Okay.  So Bridgeall didn't have any
22 input in that?
23     A.  No.
24     Q.  Okay.  As part of this bundling
25 process between Baker & Taylor and Bridgeall

Page 95

1 products, was that a coordinated effort between
2 Bridgeall and Baker & Taylor?
3     A.  Other than the Baker & Taylor sales
4 team representing our products, that's the only
5 collaboration.
6     Q.  Would -- and I'll -- let's move to a
7 document that might be helpful here.
8        (Plaintiff's Exhibit 92
9 BAKER00055646-55647, was marked for purposes of
10 identification.)
11 BY MS. BROWN:
12     Q.  This will be Plaintiff's Exhibit 92.
13 For you, Mr. Legowski, it will be BAKER00055646.
14     A.  Okay.  I have that.
15     Q.  I'll give you a minute to look at
16 this document and just let me know when you're
17 ready.
18     A.  Okay.  Okay.
19     Q.  Do you recognize this e-mail?
20     A.  I don't.
21     Q.  And that makes sense because you're
22 not on it, but do you know who Travis Kelley is?
23     A.  Yes.
24     Q.  And who is he?
25     A.  He is a Baker & Taylor salesperson.

Page 96

1     Q.  Okay.  And what product does he sell?
2     A.  BTCat.
3     Q.  Okay.  And Jamie Wright, he is a
4 Bridgeall employee, correct?
5     A.  Correct.
6     Q.  Okay.  So if you go to the e-mail
7 from Mr. Kelley to -- I'm not sure who librarian
8 is, but the ██████████████, I guess Steve,
9 Steve from the ██████████████ it looks like
10 there's the option to bundle cHQ and BTCat.  Is
11 that how you understand the e-mail?
12     A.  Yes.
13     Q.  Okay.  Was cHQ and BTCat bundled
14 together frequently?
15     A.  I'm not sure.
16     Q.  Okay.  But it was bundled together at
17 least in some instances?
18     A.  It appears so, yes.
19     Q.  Okay.  And in a situation like this
20 where there's the potential for bundling, is that
21 something that Jamie Wright would have had input
22 on on the pricing?
23     A.  Jamie would have been involved in the
24 sale of cHQ or DEI, I would imagine.
25     Q.  Okay.  And what would that

Page 97

1 involvement look like normally?
2     A.  Yeah, I mean, it would potentially,
3 if the customer wanted to see a demo.  The sales
4 process would usually be we've got an opportunity.
5 There would be then a demo of the product for the
6 customer and then there would be a price provided
7 or a quote to the customer for the product.  So,
8 yeah, Jamie would be the person -- the
9 salesperson -- as the other salesperson also would
10 do, they would present the price to the customer.
11     Q.  ████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██ ██████████
18     Q.  The decision to waive the CHQ fee,
19 would that have been made by Mr. Wright or
20 Mr. Kelley?  Who would have made that decision?
21     A.  The CHQ fee, it would have been Jamie
22 that makes that decision.
23     Q.  Okay.
24        (Plaintiff's Exhibit 93,
25 BAKER00053336-53343, was marked for purposes of

25 (Pages 94 - 97)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 94



11      Q.   And that would be at Baker & Taylor?
12      A.   Baker & Taylor department, yes.
13      Q.   Okay.  Did Bridgeall have any input
14  on setting prices for U.S. customers?
15          MR. NOYES:  Objection to the form.
16  You can answer.
17          THE WITNESS:  So the sales price
18  was -- that was set by the sales team.  So that
19  was the Baker & Taylor sales team.
20  BY MS. BROWN:
21      Q.   Okay.  So Bridgeall didn't have any
22  input in that?
23      A.   No.
24      Q.   Okay.  As part of this bundling
25  process between Baker & Taylor and Bridgeall

Page 95

1  products, was that a coordinated effort between
2  Bridgeall and Baker & Taylor?
3      A.   Other than the Baker & Taylor sales
4  team representing our products, that's the only
5  collaboration.
6      Q.   Would -- and I'll -- let's move to a
7  document that might be helpful here.
8          (Plaintiff's Exhibit 92
9  BAKER00055646-55647, was marked for purposes of
10  identification.)
11  BY MS. BROWN:
12      Q.   This will be Plaintiff's Exhibit 92.
13  For you, Mr. Legowski, it will be BAKER00055646.
14      A.   Okay.  I have that.
15      Q.   I'll give you a minute to look at
16  this document and just let me know when you're
17  ready.
18      A.   Okay.  Okay.
19      Q.   Do you recognize this e-mail?
20      A.   I don't.
21      Q.   And that makes sense because you're
22  not on it, but do you know who Travis Kelley is?
23      A.   Yes.
24      Q.   And who is he?
25      A.   He is a Baker & Taylor salesperson.

Page 96

1      Q.   Okay.  And what product does he sell?
2      A.   BTCat.
3      Q.   Okay.  And Jamie Wright, he is a
4  Bridgeall employee, correct?
5      A.   Correct.
6      Q.   Okay.  So if you go to the e-mail
7  from Mr. Kelley to -- I'm not sure who librarian
8  is, but the ████████████ I guess Steve,
9  Steve from the ████████████, it looks like
10  there's the option to bundle cHQ and BTCat.  Is
11  that how you understand the e-mail?
12      A.   Yes.
13      Q.   Okay.  Was cHQ and BTCat bundled
14  together frequently?
15      A.   I'm not sure.
16      Q.   Okay.  But it was bundled together at
17  least in some instances?
18      A.   It appears so, yes.
19      Q.   Okay.  And in a situation like this
20  where there's the potential for bundling, is that
21  something that Jamie Wright would have had input
22  on on the pricing?
23      A.   Jamie would have been involved in the
24  sale of cHQ or DEI, I would imagine.
25      Q.   Okay.  And what would that

Page 97

1  involvement look like normally?
2      A.   Yeah, I mean, it would potentially,
3  if the customer wanted to see a demo.  The sales
4  process would usually be we've got an opportunity.
5  There would be then a demo of the product for the
6  customer and then there would be a price provided
7  or a quote to the customer for the product.  So,
8  yeah, Jamie would be the person -- the
9  salesperson -- as the other salesperson also would
10  do, they would present the price to the customer.
11      Q.



18      Q.   The decision to waive the CHQ fee,
19  would that have been made by Mr. Wright or
20  Mr. Kelley?  Who would have made that decision?
21      A.   The CHQ fee, it would have been Jamie
22  that makes that decision.
23      Q.   Okay.
24          (Plaintiff's Exhibit 93,
25  BAKER00053336-53343, was marked for purposes of

25 (Pages 94 - 97)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 98

1 identification.)
2 BY MS. BROWN:
3    Q.  Okay.  We're going to move on to what
4 will be Plaintiff's Exhibit 93, and for you,
5 Mr. Legowski, that will be BAKER00053336.
6    A.  Okay, I have that.
7    Q.  If you want to review this e-mail,
8 just let me know when you're ready.
9    A.  Okay.  Yeah, I've read the first few
10 e-mails.
11    Q.  Okay.  And is this another instance
12 of bundling BTCat with collectionHQ, as far as you
13 see it?
14    A.  Yeah.  Yes.
15    Q.  So if you go to page two -- and it's
16 also on my screen if you want to follow --
17    A.  Okay.
18    Q.  -- there's an e-mail from Travis
19 Kelley to ███████████, and it looks like
20 they're offering a flat price for BTCat and the
21 DEI Analysis.  Is that accurate?
22    A.  I don't understand what DEI work is
23 referring to.
24    Q.  Could that be referring to something
25 besides the DEI Analysis tool?

Page 99

1    A.  It could -- yeah, it could
2 potentially be.
3    Q.  Okay.  But you're not sure?
4    A.  I'm not sure.  I mean, I would
5 imagine if it was related to the DEI Analysis
6 product, it would have said DEI Analysis --
7    Q.  Okay.
8    A.  -- subscription, but, yeah, I'm not a
9 hundred percent.
10    Q.  That's helpful.
11        (Plaintiff's Exhibit 26,
12 BAKER00035026-35032, was previously marked for
13 purposes of identification.)
14 BY MS. BROWN:
15    Q.  We'll move on to what has been
16 previously marked as Plaintiff's Exhibit 26.  For
17 you, Mr. Legowski, that will be BAKER00035026.
18    A.  Okay, I have that.
19    Q.  If you want to review that
20 e-mail and then just let me know when you're
21 ready.
22    A.  Okay.  Okay, I've had a quick review.
23    Q.  Okay.  Can you tell me what's
24 happening in this e-mail chain?
25    A.  Yes.  So I've got an idea.  So it

Page 100

1 appears to be a lead -- a potential BTCat
2 subscription sale.  I obviously can see where OCLC
3 has been mentioned.
4    Q.  And if you go to the last page of the
5 document, I'll do that here as well, it looks like
6 Jamie Wright is reaching out to ███████████
7 ███.
8    A.  Uh-huh.
9    Q.  Is this an instance of Mr. Wright
10 setting up a demo like we discussed?
11    A.  Yeah, it appears to be.  Yeah, he
12 mentions collectionHQ, which is the flagship
13 product.
14    Q.  Would -- and here it says my
15 colleague Fred Harvey informed me you would like
16 to see a live demo of collectionHQ.  Did I read
17 that correctly?
18    A.  Yes.
19    Q.  So I think, and I don't want to
20 misstate your testimony, but I think you
21 previously testified that Mr. Wright did not do a
22 lot of lead generation.  Is this an instance where
23 Baker & Taylor did the lead generation?
24    A.  Yes.
25    Q.  What were the instances where

Page 101

1 Mr. Wright generated the leads himself -- or what
2 would be an example or how would that look?
3    A.  I would say that it was less -- Jamie
4 generating leads was probably less proactive at
5 that part of the sales.  If Jamie happened to
6 generate leads through maybe attending an event, a
7 library event and speaking to customers, yeah,
8 absolutely, he would have generated leads.  But,
9 yes, that is -- the lead has been generated and
10 it's now getting passed to Jamie, which was more
11 the situation I would say.
12    Q.  Okay.  When -- what kinds of events
13 would Mr. Wright attend that might result in sales
14 leads?
15    A.  Library association events such as
16 the American Library Association, the Public
17 Library Association events.  There was an event
18 called the Charleston Library Event, I believe, in
19 the U.S.  So various events.  There's some in the
20 UK.  CILIP, which is an acronym which is
21 C-I-L-I-P, is a UK library type association event.
22    Q.  Okay.  So he traveled to the U.S. and
23 outside the U.S. for these events?
24    A.  Yes.
25    Q.  Okay.  Did Mr. Wright ever visit

26 (Pages 98 - 101)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 114

1 little bit about Bridgeall and collectionHQ's
2 marketing. I have a question in connection with
3 that. Do you know what the Collection Connection
4 is?
5    A. I don't think so. I've not had
6 that --
7    Q. Okay. And so maybe looking at a
8 document is helpful.
9        (Plaintiff's Exhibit 96, cHQ upcoming
10 events northeast, was marked for purposes of
11 identification.)
12 BY MS. BROWN:
13    Q. Okay. This will be Plaintiff's
14 Exhibit 96. So, Mr. Legowski, for you it will be
15 cHQ upcoming events northeast, and I will also
16 share my screen.
17    A. I've got that.
18    Q. Okay. You're very fast. Okay. If
19 you can take a look at the document and then just
20 let me know when you're ready.
21    A. Okay. Yeah, okay.
22    Q. Okay. I'll represent to you this is
23 an image of collectionHQ's website. Are you
24 familiar with the website?
25    A. Yes.

Page 115

1    Q. And this is under the events tab.
2 This is specifically upcoming events. Are you
3 familiar with this part of the website?
4    A. Yes.
5    Q. So I'm showing you some events that
6 are called collectionHQ NE Ohio forum. Do you
7 know what NE Ohio means?
8    A. Is that northeast?
9    Q. Yes, northeast Ohio. And this looks
10 like it's an event from October 27, 2016. What
11 would a forum -- or I guess what would this
12 meeting look like, if you know?
13    A. Our customer forums are generally --
14 we refer to them as user groups as well. It would
15 be a group of our customers -- we would host an
16 event. We would have a group of our -- it has
17 been in the past few years existing customers. We
18 have one of the customer success managers host an
19 event, maybe more than one, depending on how many
20 customers. It would really be to promote the
21 product with the purpose of retention, ensuring
22 customers renew their subscriptions, so showing
23 them new features, et cetera.
24    Q. Thank you. That's helpful. So those
25 customer success managers, would they be on site?

Page 116

1 I'm not sure what location in -- it looks like
2 Cleveland Heights library. So would the customer
3 success manager be on site for this meeting?
4    A. I -- it could be -- it's not very
5 clear if it was, like, a webinar type event or --
6 yeah, in the UK we have done on site, but I'm not
7 sure for the U.S. This could possibly be either
8 on site or via webinar.
9    Q. Okay. Is this something -- is an
10 event like this something that a Bridgeall
11 employee would be involved in?
12    A. I don't imagine so. Our U.S.
13 customers, I can see Randy who was one of the
14 customer success managers, he seems to be the key
15 host for this, so yeah, we wouldn't travel over to
16 the U.S. for a user forum.
17    Q. Okay. Would Jamie Wright have any
18 sort of input into these programs since he does
19 these demos?
20    A. At that time -- so I'm looking at the
21 dates here. So I know that Jamie was -- he was a
22 part of that team, either he was a manager of that
23 team. He was essentially a customer success
24 manager himself I believe at that time so he would
25 have -- region would have still been -- I think it

Page 117

1 would have just been the UK and possibly other
2 European regions so I don't think he would have.
3    Q. What about later on, maybe in the
4 last several years, would he have been involved in
5 these types of forums?
6    A. I believe he would have been involved
7 to the point he was the manager of that team, so
8 he was the director of customer experience and he
9 would have directed that team to schedule and host
10 similar events.
11    Q. Mr. Wright would direct those types
12 of events?
13    A. No, he would direct his team to
14 schedule and host them. He wouldn't be attending
15 or hosting them in the U.S.
16    Q. And you mentioned a man named Randy
17 Becker. He appears on page three, which is
18 another northeast Ohio forum event from 2018. Is
19 Randy Becker a Bridgeall employee or a Baker &
20 Taylor employee?
21    A. He was a Baker & Taylor employee.
22    Q. Okay. And would he have been on
23 Jamie Wright's team or would there have been -- I
24 guess who would he have reported to, Mr. Becker?
25    A. At that time I believe that the

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 118

1 director of customer experience was Kathy Graham.
2     Q. Is that Graham?
3     A. Graham, G-R-A-H-A-M.
4     Q. And was she a Baker & Taylor
5 employee?
6     A. Yes.
7     Q. Okay. And who did she report to?
8     A. I'm actually not sure if that changed
9 over time.
10     Q. Okay. To the best of your
11 recollection.
12     A. I remember she had -- she reported to
13 Ryan Gallagher at one point, possibly Scott
14 Crawford, but I'm not a hundred percent sure.
15     Q. And were all these individuals,
16 including Ms. Graham, were they ultimately under
17 Fred Harvey or who were they ultimately situated
18 under?
19     A. Well, these were -- so going back
20 that number of years, Scott Crawford was a senior
21 person. I think he reported directly to Aman.
22     Q. Oh, okay. Got it.
23     A. Kathy was, I believe, the next
24 leadership level down from Scott so that's why I
25 think she may have reported to Scott but I'm -- as

Page 119

1 I say, I remember she definitely reported to Ryan
2 Gallagher, but I can't place the exact years for
3 that.
4     Q. I understand. I've been asking you
5 about a lot of events that have happened a while
6 ago so I can appreciate that.
7     For these types of forum events, you
8 said that Mr. Wright would direct people on his
9 team to schedule these sorts of events. Did
10 Bridgeall have any input on the programming in
11 these events or any say in what kinds of topics
12 were covered?
13     A. Well, Jamie representing the products
14 that we developed, in the past couple of years
15 Jamie would have had, you know, I would imagine,
16 input on how we promote our products.
17     Q. And that includes promoting in the
18 U.S., correct?
19     A. Yes.
20     Q. Okay.
21     A. As part of Fred's team, yes, he would
22 have. Yes.
23     Q. Understood. And when Baker & Taylor
24 employees were planning these events and, you
25 know, attending these events, were they doing so

Page 120

1 at the direction of Bridgeall or as Bridgeall's
2 agent?
3     MR. NOYES: Object to the form.
4     THE WITNESS: I mean, the direction
5 of that team was ultimately Fred Harvey, but Jamie
6 being the director of customer experience would
7 have a key role in the customer experience side of
8 things, which this is, so yes, for the U.S.
9 BY MS. BROWN:
10     Q. Okay. And these actions were for the
11 benefit or on behalf of Bridgeall, right, because
12 it was connected to the collectionHQ product?
13     A. Yes.
14     Q. Okay.
15     (Plaintiff's Exhibit 97, cHQ upcoming
16 events central, was marked for purposes of
17 identification.)
18 BY MS. BROWN:
19     Q. I'm going to go to the next exhibit,
20 which is for you, Mr. Legowski, it will be cHQ
21 upcoming events central is the name of the
22 document.
23     A. I've got it.
24     Q. Okay. You can review and just let me
25 know when you've had a chance to review it. And

Page 121

1 this is Plaintiff's Exhibit 97.
2     A. Okay.
3     Q. Okay. So this is an event page on
4 collectionHQ's website that's titled the
5 Collection Connection-central and southwest Ohio.
6 Does this refresh your memory about what the
7 Collection Connection might be?
8     A. No, I'm not -- I don't think I've
9 seen this before.
10     Q. Okay. No problem. Do you know what
11 this type of event is, even if you've never seen
12 this specific name?
13     A. It appears to be a similar event, I
14 would say, as -- let me see. Yeah, it seems to
15 be, yeah, very similar to the previous events
16 talking about the latest enhancements and to
17 discuss best practices, which tells me that it's
18 for existing customers.
19     Q. Okay. And this is from 2024,
20 correct?
21     A. Yes.
22     Q. Do you know if this was an event that
23 Jamie Wright had any sort of role in?
24     A. I'm not a hundred percent sure.
25     Q. Okay. Do you think that it's

31 (Pages 118 - 121)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 122

1 possible that this was part of the visit he had to
2 Columbus?
3     A. Well, no, because that visit -- that
4 occurred in April 2024. That was --
5     Q. Okay.
6     A. Yeah.
7     Q. Okay.
8     MR. NOYES: Katie, I would just note
9 that the right side of this exhibit seems to be
10 cut off.
11     MS. BROWN: Yeah, I noticed that.
12 It's cut off on collectionHQ's website as well. I
13 tried to fix that but it's just how the image
14 appears, but thank you for flagging.
15     (Plaintiff's Exhibit 98, upcoming
16 conferences, was marked for purposes of
17 identification.)
18 BY MS. BROWN:
19     Q. Okay. We are going to go to the next
20 exhibit. This will be Plaintiff's Exhibit 98, and
21 for you, Mr. Legowski, it will be upcoming
22 conferences, and I will also share my screen. All
23 set?
24     A. All set.
25     Q. Okay. So this is a web page from the

Page 123

1 American Library Association. Specifically it's a
2 web page for the Public Library Association. And
3 if you scroll to the bottom of the first page,
4 there is an entry that says PLA 2024 conference,
5 April 3 through 5, 2024, Columbus, Ohio. Do you
6 see where I am reading?
7     A. Yes.
8     Q. Okay. Do you know if this was the
9 event that Mr. Wright attended?
10     A. Yes.
11     Q. Okay. And as part of that event, did
12 he then also visit the Columbus library or any of
13 the individual libraries in Ohio?
14     A. Yes, Columbus. I believe Columbus,
15 yes.
16     Q. Okay. So both the PLA conference and
17 the Columbus Metro Library?
18     A. I believe that -- it was the library
19 was in the area so I believe it was that library,
20 yes.
21     Q. Okay. And was Mr. Wright
22 representing Bridgeall and collectionHQ at the
23 PLA?
24     A. It was representing, yeah,
25 collectionHQ products, yeah.

Page 124

1     Q. Would any other Bridgeall employees
2 have attended with him?
3     A. Yes.
4     Q. Who are those employees?
5     A. Myself.
6     Q. Okay.
7     A. And Neil Kyle.
8     Q. Is that N-I-E-L?
9     A. N-I --
10     Q. That's okay. We can get the
11 spelling. And it's Kyle like K-Y-L-E?
12     A. That's correct, yes.
13     Q. And when -- so when all three of you
14 were there, what sorts of events did you do at the
15 PLA?
16     A. So we were part of the Baker & Taylor
17 event. So at these library conferences there is
18 an event hall and Baker & Taylor had a booth
19 promoting all of their products, and we attended
20 as part of the Baker & Taylor entourage to promote
21 the collectionHQ products.
22     Q. Were there any presentations that you
23 or others that were there for collectionHQ did?
24     A. I believe we held an event
25 specifically for our products.

Page 125

1     Q. When you say our products, do you
2 mean Bridgeall?
3     A. Yeah. Yeah, Bridgeall. Yes.
4     Q. Okay. Are there any other promotions
5 or types of activities that your entourage did
6 while at the conference in Columbus?
7     A. That would primarily have been at the
8 Baker & Taylor booth promoting collectionHQ among
9 the rest of that team or with -- as I say, I
10 believe we held a specific collectionHQ promotion
11 event in one of the meeting rooms at the event.
12     Q. Okay.
13     A. Yeah, I think --
14     Q. When you -- oh, I apologize. Are you
15 done with your answer?
16     A. Yes. Yeah. Sorry.
17     Q. Sorry about that. While you were at
18 the PLA event, did any customers sign up for
19 collectionHQ? Let me rephrase. Did any libraries
20 sign up for collectionHQ at the PLA conference in
21 Columbus?
22     A. I don't recall any libraries
23 subscribing to the product at that event.
24     Q. Would there be a way to determine if
25 any libraries signed up at that event?

32 (Pages 122 - 125)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 126

1   A.  I mean, the only way I can think is
2   if the same -- the subscription agreement --
3       Q.  Do you mean the date of the
4   subscription agreement or --
5       A.  Yeah.
6       Q.  Okay.
7       A.  Yeah.
8       Q.  Is the -- I apologize.  I'm sorry.
9   It's the Zoom.
10      You mentioned that Bridgeall uses
11  Salesforce.  If a customer signed up as a result
12  of the PLA conference in 2024, would that be noted
13  in Salesforce?
14      A.  I am not a hundred percent sure that
15  we track -- I can't a hundred percent sure answer
16  that.
17      Q.  Okay.  Of -- so between yourself,
18  Mr. Wright, and Mr. Kyle, who would be the most
19  likely to remember if a library signed up as a
20  result of the event?
21      A.  Mr. Wright.
22      Q.  Okay.  In general, for library
23  conferences, prior to the transaction, did
24  Bridgeall attend most events?  So I know there's
25  like an ALA conference, for instance.  Did

Page 127

1   Bridgeall attend the ALA conference.
2       A.  We did in 2024, yes.
3       Q.  And does Bridgeall attend the ALA
4   every year?
5       A.  I can speak for the past two years.
6   I've attended both 2025 and 2024.
7       Q.  Okay.  And could you please remind
8   me, where were those conferences in the last two
9   years?
10      A.  So the PLA one there in '24.  ALA
11  in '24 was San Diego.
12      Q.  Okay.
13      A.  And then the other one you've got on
14  the screen was Philadelphia.
15      Q.  Okay.  Thank you.  Does Bridgeall
16  plan to do those activities -- or scratch that.
17      Does Bridgeall plan to attend the ALA
18  this year -- or I guess the upcoming year?
19      A.  We're not Bridgeall anymore.
20      Q.  Oh, I apologize.  Does collectionHQ
21  plan to attend any upcoming conferences?
22      A.  We are planning on attending ALA next
23  year, yes.
24      (Plaintiff's Exhibit 99, cHQ LinkedIn
25  post, was marked for purposes of identification.)

Page 128

1   BY MS. BROWN:
2       Q.  This will be Plaintiff's Exhibit 99.
3   For you, Mr. Legowski, it will be cHQ LinkedIn
4   post.
5       A.  Uh-huh.
6       Q.  So this is a LinkedIn post by
7   collectionHQ that says let's grab a coffee and
8   talk about collection management and then some of
9   the hashtags say PLA 2024, Ohio Libraries.  Do you
10  know if this is the event that collectionHQ hosted
11  as part of the PLA?
12      A.  I believe that is -- yes.
13      Q.  Okay.  And you can see in the
14  paragraph that begins with join us at PLA 2024,
15  the second sentence says we'll be hosting a short
16  coffee break for anyone who is interested in
17  becoming a collectionHQ customer.  So what would
18  have been part of that event?  Would it have been
19  at the booth or where would it have been?
20      A.  That would have been at a -- I'm sure
21  the event would have been at one of the event hall
22  meeting rooms.
23      Q.  Would this kind of event include a
24  demo?
25      A.  Not so much a demo, but probably

Page 129

1   presentation of -- using PowerPoint of features
2   on -- yeah, and maybe some best practices.
3       Q.  Okay.  Does collectionHQ rely on
4   library input in developing its products?
5       A.  Yes, we welcome library -- our
6   customers' input.
7       Q.  Are there any libraries that are
8   particularly important partners for collectionHQ
9   or Bridgeall?
10      A.  I wouldn't say any specific
11  libraries.
12      Q.  Okay.  Earlier I mentioned a library
13  called Cuyahoga.  Are you familiar with that
14  customer?
15      A.  I'm not familiar with the customer.
16  I do -- the name is a name I've heard as one of
17  our customers.
18      Q.  Okay.  There are parts of
19  collectionHQ's website where case studies and
20  video testimonials are posted by customers.  Are
21  you aware of that part of the website?
22      A.  Yes.
23      Q.  And you don't have to worry about
24  pulling it up, I just have general questions.  How
25  does collectionHQ -- or I guess Bridgeall decide

33 (Pages 126 - 129)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 130

1 which case studies and which video testimonials to
2 feature?
3     A. I'm actually not sure. That's one of
4 the marketing team's activities. To be honest,
5 I'm not sure how you would identify -- I would
6 imagine they would reach out to customers for that
7 feedback, but I'm not sure of the process.
8     Q. Okay. Do you know how many case
9 studies and video testimonials are featured on the
10 website?
11     A. I don't know.
12     Q. Okay. Would it surprise you to know
13 that three of them are from libraries in Ohio?
14     A. Would it surprise me?
15     Q. Yes.
16     A. It wouldn't surprise me. I don't
17 think so.
18     Q. Okay. So we've talked about how
19 collectionHQ solicits customers, how they go to
20 events, and how Bridgeall, you know, brings those
21 customers to the collectionHQ table. What happens
22 after a customer signs up for collectionHQ? Is
23 there an onboarding process?
24     A. Yes.
25     Q. And what is involved in that process?

Page 131

1     A. The sale. The activities are passed
2 from the sales team to the collectionHQ
3 implementation team. There is a member of that
4 team -- at that time when it was Bridgeall
5 Libraries, there was a member of the team in the
6 U.S. who worked initially directly with the
7 customer to arrange the data -- to work with the
8 customer on how they wanted their data presented
9 in collectionHQ. That was basically the basis for
10 how we would implement them, they send us the data
11 and how that data gets into the system and how it
12 is then presented into the system.
13     Q. Okay. So you said there's a U.S.
14 employee. Are they -- were they a Baker & Taylor
15 employee?
16     A. They were, yes.
17     Q. Okay. Were any Bridgeall employees
18 involved in the implementation process?
19     A. Yes. The implementation team are
20 based -- are Bridgeall Libraries employees and are
21 based here in the UK. The one employee that
22 capped off that process was part of that team, but
23 he was the only U.S. employee of that team.
24     Q. And what was the name of that
25 employee?

Page 132

1     A. That was John Anderson.
2     Q. Okay. So if an Ohio library were
3 being onboarded, a UK team would have been working
4 with that library to onboard them at some point in
5 the implementation process?
6     A. Yes.
7     Q. Okay. As part of that onboarding
8 process, would the library receive credentials to
9 the cHQ platform?
10     A. They would once they had -- the setup
11 was complete. I think that's usually -- they
12 wouldn't get access prior. It would be set up and
13 then they would receive credentials.
14     Q. Okay. And was there any training
15 involved either in the implementation or I guess
16 throughout a customer's relationship with
17 Bridgeall?
18     A. Training would usually start after
19 implementation, yes.
20     Q. Okay. And was that optional or was
21 it part of, you know, some sort of educational
22 process that every customer took part in?
23     A. It was basically part of the
24 onboarding process. It was -- I'm sure there were
25 standard steps taken just to make sure the

Page 133

1 customer got up and running. We want the customer
2 to be using the product, so yes, there was
3 training. Yes.
4     Q. And the training, was that provided
5 by Bridgeall or was that provided by Baker &
6 Taylor?
7     A. That was provided by -- for those
8 customers, the customer success manager, that
9 would have been, for U.S. customers, one of the
10 Baker & Taylor employee customer success managers.
11     Q. Okay. I think earlier, Mr. Legowski,
12 you testified that there was an FTP link and that
13 was how customers shared their data; is that
14 right?
15     A. Yes. FTP or FTP Secure, one of the
16 two.
17     Q. So does that mean that customers were
18 themselves uploading their data to collectionHQ?
19     A. Yes.
20     Q. Okay. And would a Bridgeall employee
21 e-mail the library with a link and then they would
22 do the upload? What was that process like?
23     A. I believe the -- yeah, we would need
24 to share the location for the data with the
25 customer.

34 (Pages 130 - 133)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 134

1 Q. And when you say location, do you
2 mean -- was it web based or --
3 A. I believe FTP, yeah, it would be --
4 that's a good question. It's been not long since
5 I've looked at anything like that. The process as
6 FTP, so it was electronically transferred by the
7 customer to us.
8 Q. Okay. So just to confirm, this was
9 an active upload by customer, this wasn't
10 collectionHQ reaching into the library system?
11 A. No.
12 Q. Okay. So Bridgeall was specifically
13 asking customers to upload their data?
14 A. Well, in order to deliver the
15 service, the customer -- part of it is the
16 customer has to upload its data.
17 Q. Okay. Would you say that the
18 onboarding process for collectionHQ was driven by
19 Bridgeall?
20 A. Yes. The implementation part of it,
21 yes.
22 Q. Okay. Would you say that the
23 implementation and onboarding process involves
24 collaborating -- or collaboration between Baker &
25 Taylor and Bridgeall?

Page 135

1 A. Yes.
2 Q. [redacted]

7 MR. NOYES: Objection to the form.
8 BY MS. BROWN:
9 Q. [redacted]
13 MR. NOYES: Objection to the form.
14 THE WITNESS: [redacted]
15 BY MS. BROWN:
16 Q. Okay.
17 MR. NOYES: Katie, it might -- I
18 would just point out that -- I'm not sure that you
19 asked this question, but collectionHQ, Ltd. is a
20 separate company, I believe.
21 MS. BROWN: Okay.
22 BY MS. BROWN:
23 Q. With that clarification,
24 Mr. Legowski, that collectionHQ is a separate
25 entity, does that change any of your prior

Page 136

1 testimony or is all of your testimony about
2 collectionHQ, does it also apply to Bridgeall, I
3 guess, as the prior owner of collectionHQ prior to
4 the transaction?
5 A. It doesn't change any of my answers
6 in relation to Bridgeall Libraries, no.
7 Q. Okay. [redacted]
17 Q. Okay. And I apologize, I didn't mean
18 to interrupt you.
19 A. That's okay.
20 Q. Does that include all Bridgeall
21 customers or is that limited to just collectionHQ,
22 the flagship product?
23 A. I'm confident that if not all, the
24 majority are collectionHQ, the flagship product.
25 Q. Okay. Has Bridgeall enriched the

Page 137

1 Marc records it's received from libraries or
2 otherwise altered the data in any way?
3 A. So that's two different questions I
4 think --
5 Q. Okay.
6 A. -- either enriched or altered.
7 Q. What about -- why don't we -- I'll
8 ask you about both. Why don't we start with
9 enriched.
10 A. So that would mean -- well, I'm going
11 to state the meaning from my interpretation of,
12 you know, we are maybe adding data to that --
13 Q. Okay.
14 A. And so the answer to that would be
15 yes.
16 Q. Okay. And what are you adding to
17 that data?
18 A. [redacted]

22 Q. Does -- I'm so sorry?
23 A. No, that's okay.
24 Q. Please finish.
25 A. [redacted]

35 (Pages 134 - 137)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY



Page 158

1    Q.

Page 159

1    A.

18    Q.   Okay.  Thank you.  I appreciate that.
19 That chart was tough to follow.
20       (Plaintiff's Exhibit 14,
21 BAKER00005068, was marked for purposes of
22 identification.)
23 BY MS. BROWN:
24    Q.   So we'll move on now to what will be
25 Plaintiff's Exhibit 102, and for you,

Page 160

1 Mr. Legowski, it will be BAKER00032961.
2    A.   32961?
3    Q.   Yes.
4    A.   Okay.
5    Q.   Oh, I apologize.  We're actually
6 going to go to what has been marked previously as
7 Exhibit 14 and that's BAKER5068.  My mistake.
8    A.   5068?
9    Q.   Yes, that will be the last four
10 digits.
11    A.   Okay.
12    Q.   If you want to review that document,
13 Mr. Legowski, and then just let me know when
14 you're ready.
15    A.   Okay.  Okay.
16    Q.   Okay.  Do you recognize this e-mail
17 or e-mails like it?
18    A.   No.
19    Q.   Okay.  So you've never seen an e-mail
20 like this.
21       MR. NOYES:  Objection to the form.
22 You can answer.
23       THE WITNESS:  Yeah, I don't believe
24 I've seen an e-mail like this.
25 BY MS. BROWN:

Page 161

1    Q.   Okay.  Do you have any understanding
2 of what this e-mail is showing?
3    A.   So it looks -- so the first part of
4 the -- sorry, you want the same part?  So I would
5 take the first statement as -- so that's cHQ
6 support.  So the BTCat records approved, I would
7 say that's the approval to send the cHQ Marc file
8 to Baker & Taylor.
9    Q.   And that's from Susan Love who is a
10 collectionHQ employee, correct?
11    A.   Susan Love, yes, a Salesforce
12 administrator, yes.
13    Q.   Okay.  So is she sending the FTP link
14 to Baker & Taylor in this e-mail?
15    A.   I think this is an automated --
16 possibly an -- it looks like -- I'm just trying
17 to -- yeah, it looks as if that link is to our FTP
18 site.
19    Q.   Okay.  And if you go to the e-mail
20 above it, it looks like there's an e-mail from
21 support@collectionhq.com and it's signed by Shital
22 Markad.  Do you know who Shital Markad is?
23    A.   Yes.
24    Q.   And what is their role?
25    A.   She is an implementation technician.

41 (Pages 158 - 161)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 162

1     Q.  Okay.  And what do you understand her
2  e-mail to be saying?
3     A.  It looks as if -- so the following
4  file has been uploaded to that looks like a file
5  path on the FTP server, and it looks as if she
6  stated of the file.  So I would imagine, looking
7  at the e-mail below -- so that -- the below e-mail
8  was the authorization confirmation that the
9  customer has saying the contract and is authorized
10 to send the Marc file to Baker & Taylor with the
11 location, and then the above e-mail is Shital, the
12 implementation technician, confirming that she has
13 uploaded that file.
14    Q.  Does Bridgeall track downloads from
15 those FTP servers that Baker & Taylor may be
16 downloading from?
17    A.  Sorry, Katie, you said Baker &
18 Taylor?
19    Q.  I'll rephrase.  Sorry, I can
20 rephrase.  That was a bad question.
21       So when Baker -- strike that.
22       When Bridgeall has an FTP, can it
23 track who has downloaded from that FTP?
24    A.  Yeah, I'm just -- so the process is
25 that we pass that data to Baker & Taylor?  I'm

Page 163

1  just trying to understand the --
2     Q.  So I guess -- at the bottom of the
3  e-mail it says link to account in cHQ, correct?
4  That's not the FTP, correct?
5     A.  That's a Salesforce link.
6     Q.  Okay.
7     A.  So that's -- that link there
8  actually, I'm looking at that, I believe that will
9  be the customer's account in Salesforce, and I
10 believe that that is referenced to confirming the
11 authorization of the customer for us to send the
12 file -- the Marc file to Baker & Taylor.
13    Q.  Okay.  And I think I realize now what
14 I misunderstood earlier.  Is it -- is what's
15 happening in this e-mail collectionHQ support is
16 uploading the records to a Baker & Taylor provided
17 FTP?
18    A.  Yes.  That is what's happening here.
19 Yes.
20    Q.  Okay.  Thank you.  Sorry, I
21 misunderstood.
22    A.  That's fine.
23       (Plaintiff's Exhibit 77,
24 BAKER00021733, was previously marked for purposes
25 of identification.)

Page 164

1  BY MS. BROWN:
2     Q.  We're going to now move on to
3  Plaintiff's Exhibit 77.  For you, Mr. Legowski,
4  that will be BAKER00021733.
5     A.  Okay.
6     Q.  And if you could let me know when
7  you've had a chance to review the e-mail, that
8  would be great.
9     A.  Okay.
10       MR. NOYES:  Katie, could you repeat
11 that?  I was distracted for a second.
12       MS. BROWN:  I just asked Mr. Legowski
13 to review the e-mail and then let me know when
14 he's ready.
15       MR. NOYES:  Right.  I meant which
16 Bates number.
17       MS. BROWN:  Oh, I apologize.  21733.
18       MR. NOYES:  Okay.  Thank you.  And
19 that's 77?
20       MS. BROWN:  Yes, that was previously
21 marked as 77.
22       THE WITNESS:  Okay.
23 BY MS. BROWN:
24    Q.  Mr. Legowski, I know you are not on
25 this e-mail, but if you go to the bottom of the

Page 165

1  e-mail, there's a discussion with Baker & Taylor
2  about processing data from cHQ, and I was
3  wondering, do you have any understanding of how
4  Baker & Taylor, prior to the transaction,
5  processed the data from collectionHQ into BTCat?
6     A.  No.
7     Q.  Okay.
8       (Plaintiff's Exhibit 102, Bridgeall
9  Supplemental Responses, was marked for purposes of
10 identification.)
11 BY MS. BROWN:
12    Q.  So this will be Plaintiff's Exhibit
13 102.  Have you seen this document before,
14 Mr. Legowski, and if you need to review, that's no
15 problem?  For you I think it will show up as
16 Bridgeall supplemental responses?
17    A.  Bridgeall supplemental responses, is
18 that the one?
19    Q.  Yes, you've got it.
20    A.  Yeah, I've got it.  Yeah, I may have
21 seen -- I've seen documents formatted like this, I
22 would just need to read through it, but --
23    Q.  Do you know if you signed a
24 verification for the interrogatories in this
25 document?

42 (Pages 162 - 165)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

Page 178

1    Q.  Okay.  So I only have a few more
2 questions for you, Mr. Legowski.  One of the
3 topics that we identified in the beginning of your
4 deposition was topic ten, which is the factual
5 basis for Bridgeall's position that the Court in
6 this litigation lacks personal jurisdiction over
7 Bridgeall.  Do you recall that?
8    A.  I think I do.
9    Q.  And if it's helpful, I can pull up --
10    A.  Yeah, I think I've got it here as
11 well.
12    Q.  Okay.  I will pull it back up so we
13 have it right in front of us.  And for the record,
14 this is Exhibit 81.  Okay.  So my question is why
15 does Bridgeall believe that the federal court in
16 Ohio lacks personal jurisdiction over Bridgeall?
17    MR. NOYES:  Objection.  Calls for a
18 legal conclusion.
19 BY MS. BROWN:
20    Q.  Let me rephrase.  What is the factual
21 basis for Bridgeall's position that the court in
22 Ohio lacks jurisdiction over Bridgeall?
23    MR. NOYES:  Objection.  Calls for a
24 legal conclusion, and I would point out that this
25 deposition included an extensive line of questions

Page 179

1 regarding context with Ohio.
2    MS. BROWN:  I'm entitled to determine
3 what Bridgeall's position is so my question
4 stands.
5    MR. NOYES:  Right.  But you're asking
6 him to imply facts to legal -- legal principles
7 and arguments, and that calls for a legal
8 conclusion.
9    MS. BROWN:  I asked for the factual
10 basis.
11    MR. NOYES:  Right.  The factual basis
12 for a legal conclusion is itself a legal
13 conclusion because it requires the witness to
14 understand which facts apply to a particular legal
15 position and why.
16    MS. BROWN:  That's fine.  We can deal
17 with that off the record at another time.
18 BY MS. BROWN:
19    Q.  Mr. Legowski, do you know factually
20 why Bridgeall believes that the court in Ohio does
21 not have jurisdiction over Bridgeall?
22    MR. NOYES:  Same objection.
23 BY MS. BROWN:
24    Q.  Do you need me to ask the question
25 again, Mr. Legowski?

Page 180

1    A.  Sorry.  I don't know the answer to
2 that question.
3    Q.  Okay.  Give me one minute.
4    MS. BROWN:  Can we take a brief
5 break.
6    MR. NOYES:  Sure.
7    (Pause in proceedings.)
8    MS. BROWN:  I don't have any further
9 questions.
10    MR. NOYES:  Okay.  We have no
11 cross-examination or additional questions.
12    MS. BROWN:  Okay.  I do have one
13 statement to read.  OCLC is going to leave this
14 deposition open for the same reasons as those OCLC
15 noted on the record for the 30(b)(6) depositions
16 of Baker & Taylor.  So OCLC leaves open the
17 deposition and reserves the right to explore the
18 Rule 30(b)(6) topics noticed for today during the
19 rest of discovery.
20    MR. NOYES:  And I would incorporate
21 or reiterate my response in I think Mr. Kochar's
22 deposition and confirm, you know, the position we
23 took there.  And also just to clarify, even though
24 the deposition may be technically left open,
25 there's no objection to our talking to

Page 181

1 Mr. Legowski, correct?
2    MS. BROWN:  That's correct.  All
3 right.  I think we're off the record, Kathy.
4    (Thereupon, signature was not
5 waived.)
6    (Thereupon, the deposition was
7 concluded at 11:34 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

46 (Pages 178 - 181)

CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY

**Page 182**

1 STATE OF OHIO          )
2 COUNTY OF MONTGOMERY )  SS: CERTIFICATE
3          I, Kathy S. Wysong, RPR, a Notary
4 Public within and for the State of Ohio, duly
5 commissioned and qualified,
6          DO HEREBY CERTIFY that the
7 above-named STEVEN LEGOWSKI, was by me first duly
8 sworn to testify the truth, the whole truth and
9 nothing but the truth.
10          Said testimony was reduced to
11 writing by me stenographically in the presence
12 of the witness and thereafter reduced to
13 typewriting.
14          I FURTHER CERTIFY that I am not a
15 relative or Attorney of either party, in any
16 manner interested in the event of this action,
17 nor am I, or the court reporting firm with which
18 I am affiliated, under a contract as defined in
19 Civil Rule 28(D).
20
21
22
23
24
25

**Page 183**

1          IN WITNESS WHEREOF, I have hereunto set
2 my hand and seal of office at Dayton, Ohio, on
3 this 20th day of August, 2025.
4
5
6          _Kathy S. Wysong_
          ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
          KATHY S. WYSONG, RPR
7          NOTARY PUBLIC, STATE OF OHIO
          My commission expires 12-25-2028
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 184**

1               Veritext Legal Solutions
2                    1100 Superior Ave
                       Suite 1820
3                   Cleveland, Ohio 44114
                   Phone: 216-523-1313
4
   August 21, 2025
5
   To: Frank E. Noyes, II, Esq.
6
   Case Name: OCLC Inc v. Baker & Taylor LLC Bridgeall Libraries Ltd
7
   Veritext Reference Number: 7528037
8
   Witness:  Steven Legowski      Deposition Date:  8/18/2025
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

**Page 185**

1               DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 7528037
3      CASE NAME: OCLC Inc v. Baker & Taylor LLC Bridgeall Libraries
   Ltd
      DATE OF DEPOSITION: 8/18/2025
4      WITNESS' NAME: Steven Legowski
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9 Date          Steven Legowski
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13      They signed the foregoing Sworn
         Statement; and
14      Their execution of this Statement is of
         their free act and deed.
15
      I have affixed my name and official seal
16
   this _____ day of _____, 20____.
17
   _____
18 Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25

47 (Pages 182 - 185)

**CONFIDENTIAL TESTIMONY/ATTORNEYS' EYES ONLY**

Page 186

1        DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 7528037
3        CASE NAME: OCLC Inc v. Baker & Taylor LLC Bridgeall Libraries Ltd
        DATE OF DEPOSITION: 8/18/2025
4        WITNESS' NAME: Steven Legowski
5       In accordance with the Rules of Civil
        Procedure, I read the entire transcript of
6       my testimony or it has been read to me.
7       I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
8       well as the reason(s) for the change(s).
9       I request that these changes be entered
        as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13    _____
14   Date        Steven Legowski
        Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18        in the appended Errata Sheet;
        They signed the foregoing Sworn
19        Statement; and
        Their execution of this Statement is of
20        their free act and deed.
21      I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
        Notary Public
24
     _____
25     Commission Expiration Date

Page 187

1        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 7528037
3    PAGE/LINE(S) /      CHANGE    /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
     _____  _____
20  Date        Steven Legowski
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24  _____
25  Commission Expiration Date

48 (Pages 186 - 187)