# EXHIBIT U

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3               ~~~~~~~~~~~~~~~~~~~~
 4    OCLC, INC.
 5             Plaintiff,
 6
 7        vs.           Case No.  2:25-cv-0039
 8
 9    BAKER & TAYLOR, LLC; BRIDGEALL LIBRARIES, LTD.,
10             Defendants.
11
12               ~~~~~~~~~~~~~~~~~~~~
13             (ATTORNEYS' EYES ONLY
14          PURSUANT TO PROTECTIVE ORDER)
15               ~~~~~~~~~~~~~~~~~~~~
16
17               VOLUME I OF II
18             30(b)(6) Deposition of:
19               AMANDEEP KOCHAR
20
                 August 14, 2025
21                  9:55 a.m.
22                  Taken at:
                  Offit Kurman
23        227 West Trade Street, Suite 2600
             Charlotte, North Carolina
24
25          Joyce Lynn Shannon, RPR
```

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 2

```
 1  APPEARANCES:
 2
 3      On behalf of the Plaintiff:
 4      Squire Patton Boggs (US), LLP, by
 5      JEFFREY M. WALKER, ESQ.
 6      KATHRYN M. BROWN, ESQ.
 7      2000 Huntington Center
 8      41 South High Street
 9      Columbus, Ohio  43215
10      (614) 365-2700
11      jeffrey.walker@squirepb.com
12      kathryn.brown@squirepb.com
13
14      On behalf of the Defendant:
15      Offit Kurman, by
16      FRANK NOYES, II, ESQ.
17      222 Delaware Avenue, Suite 1105
18      Wilmington, Delaware  19801
19      (267) 338-1381
20      fnoyes@offitkurman.com
21          AND
22
23
24
25
```

Page 3

```
 1  APPEARANCES, Continued:
 2
 3      Cavitch, Familo & Durkin, by
 4      DEREK P. HARTMAN, ESQ.
 5      1300 E. 9th Street, 20th Floor
 6      Cleveland, Ohio  44114
 7      (216) 621-7860
 8      dhartman@cavitch.com
 9
10          ~ ~ ~ ~ ~
11
12  ALSO PRESENT:
13      Julie Presas
14
15          ~ ~ ~ ~ ~
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          TRANSCRIPT INDEX
 2
 3  APPEARANCES.............................   2
 4
 5  INDEX OF EXHIBITS ......................   5
 6
 7  EXAMINATION OF AMANDEEP KOCHAR
 8  By Mr. Walker...........................   7
 9
10  REPORTER'S CERTIFICATE..................  306
11
12  EXHIBIT CUSTODY:
13  EXHIBITS RETAINED BY COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          INDEX OF EXHIBITS
 2  NUMBER      DESCRIPTION          MARKED
 3  Exhibit 3  Complaint for Injunctive      65
               Relief and Damages
 4
    Exhibit 30  Agreement Between the       280
 5             Yavapai County Free Library
               District and Baker & Taylor,
 6             LLC, For BTCat Library
               Cataloging Utility, Database
 7             Management, and Related
               Services
 8
    Exhibit 31  Offer for Subscription to   273
 9             the collectionHQ Service to
               San Rafael Public Library
10
    Exhibit 39  LinkedIn Profile of          11
11             Amandeep Kochar
12  Exhibit 40  Notice of Deposition         55
13
    Exhibit 41  Notice of Deposition of      55
14             Amandeep Kochar
15  Exhibit 42  Defendant Baker & Taylor, .... 77
               LLC's Supplemental Responses
16             to Plaintiff OCLC, Inc.'s
               First Set of Interrogatories
17             and Requests for Production
18  Exhibit 43  Organizational Chart         78
               Prepared by Attorney Walker
19
    Exhibit 44  06-27-2025 Valsoft Press    137
20             Release
21  Exhibit 45  Follow-up Questions         154
               Regarding OCLC Injunction
22             and Litigation
23  Exhibit 46  06-17-2025 Asset Purchase   171
               Agreement
24
    Exhibit 47  WinWire B&T Executive Review  217
25
```

2 (Pages 2 - 5)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 6

1
2  Exhibit 48  07-27-2020 E-mail Stream     229
            Between Whitney Bretzman,
3           Amandeep Kochar and Others
4  Exhibit 49  08-12-2020 Teams Invitation   242
            from Eric Throndson to Fred
5           Harvey and Others
6  Exhibit 50  Review of Sales Opportunities  248
7  Exhibit 51  01-09-2020 Document Re:       254
            Follett and B&T Regarding
8           BTCat
9  Exhibit 52  Belvedere Tiburon Third       264
            Party Cataloging and Record
10          Processing Agreement with
            Baker & Taylor
11
    Exhibit 53  Washington County            271
12          Cooperative Library Services
            Third Party Cataloging and
13          Record Processing Agreement
            with Baker & Taylor
14
    Exhibit 54  List of Customers Who Signed   277
15          the collectionHQ Agreement
16  Exhibit 55  2022 BT BTCat License         296
            Agreement Terms and
17          Conditions
18  Exhibit 56  BT BTCat License 2025         296
            Agreement
19
    Exhibit 57  Excel File with List of        302
20          Customers Who Signed the
            BTCat Agreement
21
22
23
24
25

Page 7

1       AMANDEEP KOCHAR, of lawful age, called
2  for examination, as provided by the Federal
3  Rules of Civil Procedure, being by me first
4  duly sworn, as hereinafter certified, deposed
5  and said as follows:
6       EXAMINATION OF AMANDEEP KOCHAR
7  BY MR. WALKER:
8       Q.   So I'm Jeff Walker from OCLC, Inc.
9            We've never met before, correct?
10      A.   We haven't.
11      Q.   Okay.  And could you please state
12  your full name for the record?
13      A.   It's Amandeep Kochar.  My middle
14  name is Singh, but I use it infrequently.
15      Q.   Okay.  And do you understand that
16  your testimony today that you're giving, you're
17  under oath?
18      A.   Yes.
19      Q.   Okay.  And do you understand that
20  the oath has the same meaning and effect as if
21  you were testifying in Court?
22      A.   Yes.
23      Q.   Is there anything that might affect
24  your ability to answer the questions I'll be
25  asking you today?

Page 8

1       A.   Not that I'm aware of.
2       Q.   So no medical conditions that would
3  prevent it?
4       A.   No.
5       Q.   And no medications or other substances?
6       A.   No.
7       Q.   Okay.  What is your current address?
8       A.   ████████████████████████
   ████████████████████  That's my home
10  address.  And 2810 Coliseum Centre Drive is our
11  office address.
12      Q.   And what's your date of birth?
13      A.   ████████████
14      Q.   Okay.  So I'm sure your Counsel
15  went over some ground rules with you and gave
16  you some tips.  I wanted to just establish some
17  ground rules for our deposition so you
18  understand and we can communicate more
19  effectively.
20      A.   Sure.
21      Q.   So the court reporter is sitting
22  next to us, and she's going to be taking down
23  everything that you and I say today, so you
24  must respond to any questions audibly and with
25  words.  So if you shake your head yes or no,

Page 9

1  she won't take that down.  And uh-huhs and
2  things like that are usually not as clear.
3       A.   Okay.
4       Q.   And then I ask that you speak
5  loudly and clearly.  And I will try to do the
6  same.  Please wait for me to finish asking a
7  question before you respond, and I will do my
8  best to wait for you to finish your response
9  before I start speaking again.
10      A.   Thank you.
11      Q.   If you don't hear or don't
12  understand a question that I've asked, please
13  let me know, and I will repeat it or rephrase
14  it.
15           I'm not here to try to trick you
16  today.  I'm here to try to get your answers to
17  the questions I'm asking.
18           If you answer a question, I assume
19  that you understood the question.
20           Is that fair?
21      A.   Yes.
22      Q.   Okay.  If you need a break, let me
23  know.  I'll just ask that if we have a line of
24  questioning pending, that we finish up that
25  line of questioning, and then we can take the

3 (Pages 6 - 9)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

|  | Page 10 |
|---|---|

1 break.
2　　　Is that fair?
3　　A.　Sure.
4　　Q.　Okay.  You have a Lawyer here today.
5　　A.　Yes.
6　　Q.　Your Lawyer will sometimes object
7 to my questions, but you still must answer my
8 questions after he has stated his objection.
9 The only exception is if your Lawyer instructs
10 you not to answer, and you choose to follow his
11 instructions.
12　　　Is that understood?
13　　A.　Yes.
14　　Q.　Have you ever had your deposition
15 taken before?
16　　A.　No.
17　　Q.　Okay.  Have you ever testified in
18 Court?
19　　A.　I've been in business a long time.
20 Not that I can remember, yes.
21　　Q.　Okay.  Have you ever been convicted
22 of a crime?
23　　　MR. NOYES:  Objection.
24　　　You can answer.
25　　A.　No.

|  | Page 11 |
|---|---|

1　　Q.　Okay.  Have you ever filed for
2 bankruptcy?
3　　A.　No.
4　　Q.　Okay.  Do you have a LinkedIn profile?
5　　A.　Yes.
6　　Q.　Okay.  And we're going to mark your
7 LinkedIn profile as an Exhibit.
8　　A.　Okay.
9　　Q.　And that's to kind of help walk
10 through your background and educational history.
11　　A.　Sure.
12　　　- - - - -
13　　　(Thereupon, Plaintiff's Exhibit 39,
14　　　LinkedIn Profile of Amandeep Kochar,
15　　　was marked for purposes of
16　　　identification.)
17　　　- - - - -
18　　Q.　So I've handed you what's been
19 marked Plaintiff's Exhibit 39.  And feel free
20 to take a look at it and let me know when
21 you're ready.
22　　A.　Okay.
23　　　(Witness complies with request.)
24　　　It seems to be okay.
25　　Q.　Did you create your LinkedIn profile?

|  | Page 12 |
|---|---|

1　　A.　Yes.
2　　Q.　And do you update it regularly?
3　　A.　Infrequently.
4　　Q.　Okay.  So when was the last time
5 you updated it?
6　　A.　I cannot recall, but it would have
7 been to update some of these recognitions
8 probably as they happen.  I don't usually
9 change the update.  And as you can see, it
10 still marks out the subsidiaries in U.K. and
11 Australia, which I'm no longer a part of it, so
12 I haven't updated it recently.
13　　Q.　Besides what you just identified,
14 are there any other updates that you think are
15 relevant to your background?
16　　A.　I would have to read through all of
17 this, but I haven't updated it in a while.  But
18 other than those, I don't think there would be
19 any material changes.
20　　Q.　So I'd like to talk a little bit
21 about your personal background and employment.
22　　A.　Sure.
23　　Q.　So first could we talk about your
24 education?
25　　A.　Sure.

|  | Page 13 |
|---|---|

1　　Q.　So what formal education have you
2 received?
3　　A.　A graduate degree in Business
4 Development, Business Administration.
5　　Q.　And where was that from?
6　　A.　From the Indian Institute of
7 Technology in Kharagpur, India.
8　　Q.　And when did you graduate from
9 there?
10　　A.　2007.
11　　Q.　Okay.  And then any other education?
12　　A.　Well, my undergrad degree before that.
13　　Q.　And what was your undergrad in?
14　　A.　It was a Bachelor's in Information
15 Technology from Delhi University.
16　　Q.　Okay.  And did you also study
17 software development --
18　　A.　Yes.
19　　Q.　-- as part of that?
20　　A.　Yes.
21　　Q.　When did you graduate from there?
22　　A.　2004.
23　　Q.　Okay.  And then you have on here
24 Harvard Business School.
25　　A.　Uh-huh.

4 (Pages 10 - 13)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 14

1    Q.   Was that a degree?
2    A.   No.  It was an Emerging Leaders
3 Program that a previous employer had sponsored
4 through Howard Business Publishing.
5    Q.   And who is that prior employer that
6 sponsored it?
7    A.   HCL Technologies.
8    Q.   And was that a full year that you
9 spent there or --
10   A.   It was working emerging -- it was
11 part-time while you work, you study and you
12 take tests.  I'm not really sure how long it
13 lasted, but it was between 2010 through 2011
14 probably.
15   Q.   And did it have a specific industry
16 focus?
17   A.   I can't recall.  I think it was a
18 general emerging.  I was a young leader back
19 then, so it was general management I was in.
20   Q.   Because it says "publishing
21 corporate learning."
22   A.   Uh-huh.
23   Q.   Was it all people from the
24 publishing business that attended?
25   A.   The HBS Publishing Corporate

Page 15

1 Learning is the name of the program, but our
2 corporate entity at that time had probably
3 engaged them to pick some leaders that they
4 wanted to partake in this program.
5    Q.   Okay.
6    A.   I think HBS Publishing Corporate
7 Learning was the name of the program.
8    Q.   Okay.  So how long have you been at
9 Baker & Taylor?
10   A.   Through different ownerships.  I
11 started at Baker & Taylor in 2014, if I recall
12 correctly.
13   Q.   Okay.  And so 2014.
14   A.   Uh-huh.
15   Q.   And what was your role in 2014 when
16 you started?
17   A.   Sure.  I was Executive Vice
18 President for Software Products and Services in
19 our preK-12 school library business.
20   Q.   Okay.  And so were you in charge of
21 all the technology products then?
22   A.   Yes.
23   Q.   Okay.  And what were those products
24 at the time?
25   A.   For development.  We actually had a

Page 16

1 whole suite of products.  So our e-commerce
2 platform, our software development platform for
3 collectionHQ, which we shall be talking about
4 later.  And there are several smaller products
5 that I was in charge of that we sold to
6 libraries and retailers.  One of them was
7 called CollectConnect, which is a software
8 product.  And then, if I remember correctly,
9 there was another product called Content Cafe.
10   Q.   Okay.  And so what was your role
11 with regard to collectionHQ at that time?
12   A.   I was --
13        MR. NOYES:  Let me just object.
14 I'm not sure he finished his answer.
15        MR. WALKER:  Oh, apologies.
16        MR. NOYES:  He may have, but I'm
17 not sure.
18        MR. WALKER:  Yeah.
19        THE WITNESS:  Let's just answer
20 your question, if you can ask that again, Jeff.
21   Q.   Yes.  What was your role for
22 collectionHQ at that point?
23   A.   I oversaw product development for
24 collectionHQ.  I did not oversee sales or
25 marketing of the product.

Page 17

1    Q.   So you were on the technical side?
2    A.   Yes.
3    Q.   Did you work with salespeople at all?
4    A.   Yes.
5    Q.   Okay.  How did you work with them?
6    A.   Understanding what the market needs
7 were, what needed to be put in the product
8 development plan, and to support them with
9 customers occasionally.
10   Q.   And so would that include things
11 like demos?
12   A.   Give me a minute to think because
13 my role has evolved quite a bit, and I don't do
14 that currently.
15   Q.   Sure.
16   A.   Not directly, because I was
17 supervising product development, I had product
18 managers who engaged in product demos, so not
19 directly.
20   Q.   But did you help prepare any of the
21 demos or oversee people that were doing the demos?
22   A.   I oversaw product managers, yes.
23   Q.   And those product managers were
24 direct reports to you?
25   A.   Yes.

5 (Pages 14 - 17)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 18

1    Q.   During that time, do you know what
2  entity actually owned collectionHQ?
3    A.   At that time, I was not aware, but
4  I am now.
5    Q.   Okay.
6    A.   Through the evolution of my role, I
7  became privy to the corporate entity structure.
8  But back then, I was not aware.
9    Q.   Okay.  And so as far as you know --
10  strike that.
11       Were you a Baker & Taylor employee?
12       What is the entity that you were
13  employed by?
14    A.   Baker & Taylor.
15    Q.   Okay.  And that is Baker & Taylor,
16  Ltd.?
17    A.   Baker & Taylor, LLC.
18    Q.   LLC.
19       Okay.  And were the salespeople
20  also Baker & Taylor?
21    A.   Back then, no.  The salespeople
22  were employed by Bridgeall.  And we had two
23  salespeople who are no longer with -- who have
24  not been with the company for a while.
25    Q.   Were there other people that worked

Page 19

1  in relation to collectionHQ besides sales and
2  then your technology team?
3    A.   I'm trying to work my memory back
4  then just because things have evolved.
5    Q.   I understand.
6    A.   There may have been other people
7  who were engaged, but my focus was product
8  development for collectionHQ.
9    Q.   Thank you.  And then were there
10  other products that you failed to mention that
11  you were in charge of during that time?
12    A.   I can look at my notes if there are
13  others.  So there's Axis 360, which is the
14  digital e-commerce platform, which since has
15  been renamed Boundless Title Source 360, which
16  is an e-commerce platform, collectionHQ, which
17  I've spoken about, and then I've also given you
18  CollectConnect and Content Cafe.
19    Q.   Okay.
20    A.   I'm sure there may have been some
21  other smaller internal software products, but
22  those are as far as I can remember currently.
23    Q.   Okay.  So what was your next
24  position after that?
25    A.   In Baker & Taylor?

Page 20

1    Q.   Yes.
2    A.   So after that I was promoted to
3  Executive Vice President of Digital Content,
4  Software Products and Services.  That was a
5  position that I picked up.  The addition was to
6  have the P & L responsibility for the digital
7  content business, which was called Axis 360,
8  which has now since been renamed Boundless.
9    Q.   And when you say responsibility for
10  the P & L, what does that mean?
11    A.   It means that I was responsible to
12  report to the CEO about the financial and
13  revenue performance of the products, in
14  addition to product and software development
15  responsibilities.
16    Q.   Okay.  And did you directly report
17  to the CEO on that?
18    A.   I reported to the President of
19  Baker & Taylor, who reported to the CEO.  At
20  this point in time, Baker & Taylor was owned by
21  the Follett Corporation in 2016.
22    Q.   Okay.
23    A.   I was employed by Baker & Taylor,
24  but Baker & Taylor was ultimately owned, so we
25  had a President of Baker & Taylor, to whom I

Page 21

1  reported at that particular time.
2    Q.   And then the President, who was that?
3    A.   David Cully, who is since deceased.
4    Q.   And then the CEO?
5    A.   At that time -- they've had several
6  CEOs.  Forgive me, I cannot remember his name
7  right now.
8    Q.   Okay.  And besides the
9  responsibility for P & L, were there any
10  additional responsibilities with this position?
11    A.   That was the material addition.  So
12  other than product development, IT, digital
13  sales -- digital and software sales were the
14  significant addition.
15    Q.   And were there additional products
16  that were added during that time?
17    A.   The product suite remained the same.
18    Q.   Okay.  And do you recall when
19  Follett acquired Baker & Taylor?
20    A.   I cannot remember the month, but I
21  believe the year was 2016.
22    Q.   Okay.  And when they acquired
23  Baker & Taylor, did Baker & Taylor become a
24  division?
25    A.   Yes --

6 (Pages 18 - 21)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 22

1    Q.   Okay.
2    A.   -- to the best of my knowledge.
3    Q.   Okay.  And your employer was still
4  Baker & Taylor?
5    A.   That's right.
6    Q.   Okay.  And then what about your
7  next position?
8    A.   So in 2019, when the President,
9  David Cully, as I mentioned, retired, I was
10  promoted to General Manager.  They kept my VP
11  title.  They removed the President title, I
12  believe.  So at that point in time, I was
13  responsible for the overall business of Baker &
14  Taylor, which meant the sales, products, IT
15  reported to me, with the exception of shared
16  services like legal and finance, that reported
17  directly to Follett Corporation.
18    Q.   Okay.  And that on your resume in
19  your LinkedIn profile is June, 2019 to
20  November, 2021.
21    A.   That's correct.
22    Q.   Okay.  So just taking a step back,
23  we have December, 2017 to May, 2019.
24    A.   Oh, we missed one.  I apologize.  I
25  was looking at the top of the page.  I missed a

Page 23

1  date.  My title has changed so many times, I
2  have forgotten half the titles.
3    Q.   I get it.  That's why I provided
4  this, just to help you.
5    A.   So there is a step in there, which
6  is 2017 to 2019.  At that point in time I was
7  responsible for sales, product management
8  services and technology ops for Baker & Taylor.
9  I did not run merchandising or retail at that
10  point, which was run by another peer.  David
11  Cully was still in charge, and I reported to
12  him.  So essentially I ran the public library
13  P & L.
14    Q.   Okay.
15    A.   And I ran the technology operations
16  for Baker & Taylor.
17    Q.   Okay.
18    A.   So that was the next upgrade, I guess.
19    Q.   Were there any additional products
20  or services that you rolled out during that
21  time or were developing?
22    A.   From 2017 to 2019, it's a smaller
23  time frame, at that time, because we were owned
24  by the Follett Corporation and we were trying
25  to always optimize our operations, we had made

Page 24

1  a decision to in-source our cataloging
2  technology and processing software.  We were
3  using an external software prior to that.  And
4  we decided that it would be economically
5  advantageous if we were to develop our own
6  software for our internal use for efficiency
7  means.  And that was, as far as my memory
8  serves, conceived in that time period.
9    Q.   Okay.  Do you remember when that
10  was conceived?
11    A.   2018 is what comes to mind, but
12  forgive me if I don't know the month around it.
13    Q.   First half or second half?
14    A.   I cannot recall, Jeff.
15    Q.   Okay.
16       MR. NOYES:  Let me just, if I may,
17  make sure we're on the same page about this
18  because this is all in the nature of
19  background, which is fine, but in terms of the
20  boundaries of his appearance as a designee for
21  Baker & Taylor, I don't think we're up
22  timeline-wise to where that begins.  And
23  there's also an issue about if you're asking
24  him questions under a topic related to a period
25  where Baker & Taylor was owned by Follett, he's

Page 25

1  not speaking for Follett.
2       MR. WALKER:  I understand.
3       MR. NOYES:  Okay.  So hopefully
4  that's enough of a clarification.  So if you
5  need to, you know, restate a question or
6  something, but going forward I just want to
7  make sure that we are on the same page, that
8  there's a limit to what he's actually being
9  presented for as a designee.
10       MR. WALKER:  Understood.  Just so
11  the record is clear, I think some of what he's
12  getting into is relevant to Topic 8, the
13  development of BTCat.
14       MR. NOYES:  But the time frame for
15  Topic 8 does not start until 2018.
16       MR. WALKER:  Well, that was our
17  understanding until today.  We didn't know it
18  was in development or at least conceived in
19  2018.
20       MR. HARTMAN:  We're still on the
21  record.
22       MR. WALKER:  Yeah, that's fine.
23       MR. NOYES:  Okay.  That's fine.  To
24  the extent your current background questions
25  also related to development of BTCat, which is

7 (Pages 22 - 25)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 26

1 a topic, and it relates to a time period where
2 Baker & Taylor was owned by Follett, I'll agree
3 that he speaks for Baker & Taylor, but not
4 Follett.
5        MR. WALKER:  Understood.
6 Understood.
7        MR. NOYES:  Are you clear on that,
8 Aman?
9        THE WITNESS:  Yes.
10        MR. NOYES:  Okay.
11    Q.   Okay.  You believe it was sometime
12 in 2018 that this product cataloging software
13 was at least first conceived?
14    A.   It was conceived for internal
15 efficiency reasons, yes.
16    Q.   Okay.  Were there other products
17 that you were developing during that period of
18 time?
19    A.   There's a whole suite of products
20 during that time.  There may have been some
21 smaller ones that I've since -- I cannot
22 recall.  But if there are any, I'd be happy to
23 acknowledge them.
24    Q.   Okay.  And were you also in charge
25 of development for collectionHQ at this time?

Page 27

1    A.   Indirectly, because all the sales,
2 product development, services technology
3 reported to me, so I was the catchall, so
4 indirectly.
5    Q.   So you were the person that oversaw
6 the development -- the individuals that were
7 directly developing collectionHQ?
8    A.   No, no.  It would have been the
9 person in charge at collectionHQ who oversaw
10 the product development at that point of time.
11    Q.   Okay.  Did you get updates?
12    A.   Yes, yes.
13    Q.   Okay.  So I think now let's skip
14 ahead to the one we were talking about before,
15 which is --
16    A.   Sure.
17    Q.   -- your next position at Baker &
18 Taylor.
19    A.   I believe during that time frame
20 Follett had eliminated the CEO position, and
21 the Chairman became the interim CEO.  And I was
22 appointed to the Executive Committee.  At that
23 point of time I was an employee of Follett
24 Corporation.  And the only additional charge,
25 as far as memory serves, is that I was also

Page 28

1 responsible for Follett's K-12 business'
2 technology operations.
3    Q.   And just to clarify, what was your
4 title during that time?
5    A.   It was Executive Vice President at
6 Follett, and General Manager at Baker & Taylor,
7 that's why it says EVP and GM.
8    Q.   And that was from June, 2019 to
9 November of 2021?
10    A.   Correct.
11    Q.   And then what happened in November,
12 2021?
13    A.   In November of 2021, I had the
14 opportunity to acquire Baker & Taylor.  And
15 Baker & Taylor was -- went through a
16 disposition from Follett.  And in 2021, Baker &
17 Taylor was an independent organization.
18    Q.   Okay.  And we'll briefly touch on
19 that transaction a little bit in a second.
20        So from that day forward, have you
21 had the same position at Baker & Taylor?
22    A.   Yes.
23    Q.   And what is that position?
24    A.   It's President and CEO.
25    Q.   Okay.  And in your LinkedIn profile

Page 29

1 it says President and Group CEO at Baker &
2 Taylor.
3    A.   That's the correct designation, yes.
4    Q.   Okay.  And what is the Baker &
5 Taylor group?
6    A.   Baker & Taylor group back then
7 consisted of all the subsidiaries within
8 Baker & Taylor, which included Baker & Taylor,
9 LLC, which included BookMasters, which included
10 our Australian subsidiaries, James Bennett,
11 which were held through corporations, and our
12 U.K. entity, which was Bridgeall Libraries,
13 which was held through different entities, and
14 they all rolled up into Baker & Taylor.
15    Q.   You said, "back than."
16        Has that changed?
17    A.   We have had two dispositions since.
18 Three dispositions.  Correction, please.  One
19 was for our U.K. retail business, which I
20 believe was in 2022, and then the two
21 dispositions, one for our Australian
22 subsidiary, James Bennett, which was held by
23 Blackwell, and collectionHQ, Bridgeall, which
24 is held through several entities, as well.  So
25 that was the Baker & Taylor group then, and

8 (Pages 26 - 29)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 30

1 we've had three dispositions since.
2    Q.  Understood. So prior to those
3 dispositions, you were the President and CEO of
4 all of that?
5    A.  Yes. We did not have a President
6 position for the subsidiaries.
7    Q.  And were you the CEO of all of those?
8    A.  We did not have a designated CEO.
9 There was only a CEO at the group level.
10    Q.  And what are your responsibilities
11 as the President and CEO of the group?
12    A.  Primarily to supervise the staff,
13 set direction, set guidelines for the staff,
14 review the performance, and drive shareholder
15 value.
16    Q.  Okay. And are you responsible for
17 global public and academic library sales?
18    A.  Indirectly.
19    Q.  Okay. Who are the people that are
20 directly responsible for that?
21    A.  It would be my head of sales, who
22 is responsible for all sales for public and
23 academic libraries.
24    Q.  Okay. And is that all sales of all
25 products to public and academic libraries?

Page 31

1    A.  That's correct.
2    Q.  Okay. And so any products that are
3 provided by any of the subsidiaries?
4    A.  Well, no, not the foreign
5 subsidiaries. The foreign subsidiaries had, in
6 past tense, their own sales teams.
7    Q.  And those foreign subsidiaries
8 would be who?
9    A.  It would be James Bennett and
10 Bridgeall, who were then -- who have gone
11 through disposition. But now since we are
12 primarily focused on the domestic U.S. market,
13 so it reports into my head of sales.
14    Q.  Okay. So back then, for example,
15 with Bridgeall, they had their own sales team?
16    MR. NOYES: Object to form.
17    You can answer.
18    A.  They had their own sales team,
19 which reported into the head of sales --
20    Q.  Okay.
21    A.  -- yes.
22    Q.  And did they have a specific
23 geographic scope that they focused on, or they
24 handled sales for all of their products?
25    A.  They handled sales for most of

Page 32

1 their products, but they collaborated with the
2 Baker & Taylor team occasionally.
3    Q.  Okay. We'll get into how they
4 collaborated a little later.
5    A.  Sure.
6    Q.  Are you responsible for leading
7 supply chain for the global group?
8    A.  Indirectly, yes.
9    Q.  Okay. And who's in charge of
10 supply chain?
11    A.  Eric McGarvey.
12    Q.  And what's his position?
13    A.  Senior VP of Merchandising and
14 Supply Chain.
15    Q.  And he directly reports to you?
16    A.  Correct.
17    Q.  And he's in charge of supply chain
18 for all of the subsidiaries?
19    A.  Give me a minute as I formulate
20 this. No. He is responsible for the U.S.
21 domestic supply chain. When we had an
22 Australian subsidiary, they had their own
23 merchandising and supply chain.
24    Q.  And then what about Bridgeall?
25    A.  Bridgeall was in the software

Page 33

1 services. Supply chain here in this respect
2 refers to the physical supply of books that we
3 sell. So Bridgeall had no correlation.
4    Q.  What about technology, are you
5 responsible for the technology of the group?
6    A.  Indirectly.
7    Q.  Okay. Who is the person directly
8 in charge of that?
9    A.  Dan Johnson.
10    Q.  Dan Johnson.
11    And is he in charge of technology
12 for all of the group?
13    A.  For core products. But for
14 subsidiaries, especially Australia, they had
15 their own technology group. But Dan is
16 responsible -- was responsible for technology
17 operations for Baker & Taylor and Bridgeall.
18 And now that Bridgeall-collectionHQ is no
19 longer there, he's focused on our domestic
20 business.
21    Q.  Okay. And why did the Australian
22 entity have its own technology group?
23    A.  For a lot reasons, I believe. "A,"
24 that we were unable to leverage some of our
25 global technology suppliers to drive

9 (Pages 30 - 33)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 34

1  efficiencies.  It was beneficial for them to
2  have their own core product development.  Their
3  market needs were different.  Some enterprise
4  support was provided from here, like e-mail
5  security and so on and so forth.
6      Q.   But that wasn't the case for Bridgeall?
7      A.   Could you clarify what was not the
8  case?
9      Q.   So some of those distinctions as to
10 why the Australian subsidiary had its own
11 technology team, as opposed to Bridgeall.
12     A.   They did, that's why Bridgeall had
13 their own technology team, which was supervised
14 out of Baker & Taylor, but they were a
15 self-contained product development shop.
16     Q.   Okay.  What do you mean by "self
17 contained"?
18     A.   All product development out of
19 Bridgeall was happening in Bridgeall.
20     Q.   Okay.  So they never collaborated
21 with the technology team for Baker & Taylor?
22         MR. NOYES:  Object to form.
23     A.   They did.
24     Q.   How did they collaborate?
25     A.   I'm sure there were several other

Page 35

1  ways that Dan can answer how they collaborated
2  because Dan oversaw both the Baker & Taylor
3  team and the person that was responsible for
4  the Bridgeall technology team, as well --
5      Q.   Okay.
6      A.   -- which is Steve Legwoski.
7      Q.   So those would be the two best
8  people to talk to about collaboration
9  between --
10     A.   Technology collaboration, yes.
11     Q.   Any other collaboration that they
12 would be better to speak to than you?
13     A.   If it comes to me, I will let you
14 know.  There may be some other areas.
15     Q.   But nothing comes to mind right
16 now?
17     A.   Not right now.
18     Q.   What about partnership strategy,
19 did you oversee that?
20     A.   Indirectly.  We have a leader that
21 oversees partnerships and alliances.
22     Q.   Okay.  So that leader, who is it?
23     A.   Arun Seth.
24     Q.   Okay.  And they're a Bridgeall
25 employee?

Page 36

1      A.   No.  They're a Baker & Taylor
2  employee.
3      Q.   Apologies.
4          What is that person's title?
5      A.   Senior VP for Corporate
6  Partnerships and Procurement.
7      Q.   And so what are they in charge of?
8      A.   They are in charge of all
9  contracting partnership relationship management.
10     Q.   When you say, "partnership," what
11 do you mean by that?
12     A.   It could be partnerships with our
13 third-party organizations.  They support any
14 kind of mergers and acquisition opportunities.
15 And they run all corporate procurement.
16     Q.   Okay.  And when you say
17 "third-party organizations," what kind of
18 third-party organizations?
19     A.   Any and all.  Any third-party
20 organization that we do partnerships with,
21 whether it be for physical product
22 distribution, digital content and so on and so
23 forth.  There's several partnership examples.
24     Q.   Can you provide any more specifics
25 on this?

Page 37

1      A.   They would be the ones that would
2  explore other products that Baker & Taylor
3  should represent as part of our sales strategy.
4  They would work with existing partners in
5  managing the relationship.
6      Q.   And would that include any sort of
7  partnerships related to your software products?
8      A.   Yes.
9      Q.   Okay.  And what kind of
10 partnerships would those be?
11     A.   These could be corporate
12 partnerships with other third parties who were
13 interested in selling our products, engaging
14 with them, creating a business case, doing the
15 contract work, and then managing the
16 relationship with them.
17     Q.   Would that include licensing?
18     A.   Yes.
19     Q.   And would that include -- so, for
20 example, you're familiar with my client, OCLC,
21 correct?
22     A.   Yes.
23     Q.   Would that include that aspect of
24 partnerships, as well?
25     A.   The answer is a little ambiguous

10 (Pages 34 - 37)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 38

1 because our former relationship with OCLC was
2 terminated before this position was created,
3 and since we have no contract with OCLC, so
4 they are not part of this. We don't have a
5 partnership with OCLC other than the
6 third-party relationships that our libraries
7 may have with OCLC.
8     Q.   And by "third-party relationships,"
9 are you referring to cataloging relationships?
10     A.   Yes.
11     Q.   So back when there was a
12 partnership, this position did not exist?
13     A.   Correct.
14     Q.   When the partnership did not exist,
15 who was responsible for that?
16     A.   I was.
17     Q.   You were?
18     A.   Yes.
19     Q.   Directly?
20     A.   Yes.
21     Q.   Why is that?
22     A.   Back then when we had the contract,
23 as you will see, I was responsible directly for
24 software products and services. I may have had
25 teams who collaborated with OCLC.

Page 39

1     Q.   Okay. And so that was from 2019 to
2 what time period that you were in charge of
3 that partnership?
4     A.   That would have been -- I would
5 have to ransack my brain on when that was all
6 happening here, as well.
7     Q.   And when you refer to that
8 partnership, are you referring to the 2019
9 License Agreement?
10     A.   That's right. That was the only
11 partnership that I was involved with.
12     Q.   Okay. And did you help negotiate
13 that?
14     A.   Yes.
15     Q.   Were you the primary negotiator?
16     A.   In consultation with my team, yeah.
17     Q.   And who were the other members of
18 your team that you consulted?
19     A.   Back then, we had a leader for
20 cataloging. Several people have left, so I'd
21 have to look at the year and the chart when
22 they left. But I'm sure I took counsel from my
23 team back then. There were several individuals.
24 Somebody ran cataloging. Somebody ran
25 warehouse operations.

Page 40

1     Q.   But you were the primary decision
2 maker?
3     A.   I was negotiating on behalf of the
4 company.
5     Q.   And you were the primary decision
6 maker?
7     A.   I was negotiating on behalf of the
8 company, and I was taking my recommendations to
9 the CEO.
10     Q.   So the CEO was the primary decision
11 maker?
12     A.   In 2019, depending on what month it
13 was, we either had a President or the CEO, yes.
14     Q.   Do you recall who the primary
15 decision maker was for the 2019 License Agreement?
16     A.   It would have been David Cully at
17 that time in 2019.
18     Q.   And he was --
19     A.   The President of Baker & Taylor,
20 that's right.
21     Q.   So you would have made a recommendation
22 to him?
23     A.   Yes.
24     Q.   You were the lead negotiator, though?
25     A.   I was representing the company, yeah.

Page 41

1     Q.   So that's a yes?
2     A.   Your interpretation, but yes, I was
3 negotiating on behalf of the company.
4     Q.   Okay. How is that different from
5 being the lead negotiator?
6     A.   I don't know what the lead
7 negotiator is. Maybe you can define it for me.
8     Q.   It would be the person that was the
9 primary negotiator with OCLC.
10     A.   Yes, there were -- there may have
11 been conference calls where there were several
12 people present, but I was there, as well. But
13 I was representing the company in negotiations
14 with OCLC, yes.
15     Q.   Are you also in charge of publisher
16 relations?
17     A.   Indirectly.
18     Q.   Okay. And what does publisher
19 relations entail?
20     A.   It's co-mingled with supply chain,
21 essentially working with our publishers to make
22 sure that we are ordering the supply of books,
23 that we receive them, and that we are able to
24 service libraries.
25     Q.   And does that touch on any of the

11 (Pages 38 - 41)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 42

1 software or digital stuff that we've been
2 talking about?
3    A.   No.
4    Q.   And who is the person in charge of
5 publisher relations?
6    A.   Eric McGarvey is in charge of
7 supply chain.
8    Q.   And then you are also in charge of
9 international operations for Baker & Taylor; is
10 that right?
11    A.   Used to be.  Like I said, I haven't
12 updated this.  The international operations
13 were primarily in the U.K. and Australia, which
14 have been disposed, so yes.
15    Q.   So now you're only focused on the
16 United States?
17    A.   Correct.
18    Q.   Do you have customers outside the
19 United States?
20    A.   Yes.
21    Q.   But from an operations perspective,
22 there are no offices or employees or entities
23 outside of the United States?
24    A.   We have entities that still exist,
25 but nonoperational entities.

Page 43

1    Q.   And what entities are those?
2    A.   So the entities that held
3 Bridgeall, so Bridgeall Libraries.  I think
4 we're going to cover this probably in the
5 corporate structure piece, but maybe we can
6 preempt this.
7    Q.   If it's related to Bridgeall, we
8 can discuss that a little later if you want.
9    A.   Yes.  That's Bridgeall, and that's
10 primarily it.
11        And we have an India entity,
12 Baker & Taylor IT Services, that acts as a
13 global capability center for us.
14    Q.   And do they provide collective
15 services to all the entities?
16    A.   Yes.
17    Q.   And has that always been the case
18 during your time as CEO?
19    A.   It was formulated in my time as the
20 CEO.
21    Q.   So when did that -- when did you
22 actually implement that?
23    A.   I would put it at 2022.
24    Q.   2022.  First half or second?
25    A.   Likely to be second half.

Page 44

1    Q.   Okay.  Closer to the end of the
2 year or middle?
3    A.   I wouldn't know.  I mean, we're
4 talking about formulation of an entity, so we'd
5 have to define what it was, when it was
6 formulated.  But the second half of 2022.
7    Q.   Okay.  And so since the second half
8 of 2022, Baker & Taylor group has provided
9 collective services to all of the other
10 entities -- I'm sorry -- that India entity
11 under Baker & Taylor has provided collective
12 services to everyone?
13    A.   No.  They did not provide any
14 services to Bridgeall Libraries because there
15 was no overlap.  They started out as an IT
16 Services support, so they were providing
17 support to Baker & Taylor U.S.  They provided
18 support to our James Bennett subsidiaries in
19 Australia.  And now they're focused on Baker &
20 Taylor U.S.A.
21    Q.   So they never provided any IT
22 services for collectionHQ?
23    A.   No product development, software
24 development services.  There may have been
25 indirect IT support, for example, our IT

Page 45

1 support, e-mail exchange, Microsoft management,
2 administrative services that may have been
3 provided, but I'm not equipped to answer it
4 with that minutia.  But there was no product
5 development or direct software development for
6 Bridgeall that happened at Baker & Taylor India
7 IT Services.
8    Q.   And does Baker & Taylor India IT
9 Services provide software development for other
10 products?
11    A.   Yes, for Baker & Taylor.
12    Q.   Do they provide it for BTCat?
13    A.   Yes.
14    Q.   Okay.  So they may have provided
15 indirect services to Bridgeall and
16 collectionHQ; is that correct?
17    A.   IT support.
18    Q.   And what do you mean by that?
19    A.   An example could be that we had
20 somebody in Baker & Taylor India that was part
21 of our global Microsoft account management
22 team, providing Office 365 support or e-mail
23 exchange support.  But Dan Johnson should be
24 able to answer that in more detail if you'd
25 like to know that.

12 (Pages 42 - 45)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 46

1    Q.   Okay.  If you had to characterize
2 your management style as a CEO, how would you
3 characterize it?
4    A.   Servant leadership.  I like to make
5 myself redundant in making sure that the
6 company is successful.
7    Q.   Okay.  So what do you mean by
8 "servant leadership"?
9    A.   I like to make sure that the people
10 who work with me feel supported, and that I'm
11 available for them when they need me without
12 questioning their decisions or judgments or
13 micromanaging them.
14    Q.   Okay.  So you support them?
15    A.   (Witness nodding.)
16    Q.   Would you consider yourself
17 involved in the day-to-day of Baker & Taylor?
18    A.   Yes.
19    Q.   What does your normal day look like
20 as a CEO?
21    A.   Well, today I'm with you people.
22 But under normal things, I'll be pulled into
23 various directions, whether it be to manage an
24 opportunity that has some exceptions that need
25 to be approved, if it is supply chain or if

Page 47

1 it's an IT-related issue.  So providing counsel
2 and guidance and leaving the decision to my team.
3    Q.   Do you interact with customers?
4    A.   Yes.
5    Q.   A lot?
6    A.   I like to do more than I can afford
7 to, but yes.
8    Q.   And what are the ways in which you
9 interact with customers?
10    A.   Any and all ways, in person, at
11 conferences, virtual conferences.
12    Q.   And how often do you have
13 conferences with customers?
14    A.   I don't know how to quantify it,
15 but I like to go at least to our annual
16 conference, the American Libraries Association
17 conference.  In some years I've done a couple
18 of other conferences, as well.  And a few times
19 a year I'll visit customers with the sales
20 teams to get a feel for the field.
21    Q.   And what kind of customers do you
22 visit with the sales teams?
23    A.   Mostly libraries.
24    Q.   Any libraries in particular you
25 recall?

Page 48

1    A.   I visited quite a few in the past.
2 I visited -- I'll give you two -- Queens Public
3 in New York, and Clark County in Las Vegas.
4 But I visit a lot of customers.
5    Q.   Clark County, that's actually where
6 I grew up.
7    A.   Las Vegas?
8    Q.   Yeah.
9        Have you ever visited libraries in
10 Ohio?
11    A.   Yes.
12    Q.   Which libraries?
13    A.   As I can recall, big cities come to
14 mind, Cleveland, Columbus, Cuyahoga, Parma County.
15    Q.   Okay.  Cuyahoga Library, are they a
16 big customer for you guys?
17    A.   Yes.
18    Q.   And they actually contribute quite
19 a bit to marketing materials; don't they?
20    A.   With their permission, whenever
21 they're able to support, yeah.
22    Q.   So that's a yes?
23    A.   I don't know what a lot means,
24 Jeff, but they contribute to our marketing
25 materials with their permission.

Page 49

1    Q.   And that includes for Bridgeall?
2    A.   I'm not sure.  Steve can answer
3 this better, if they've contributed for
4 Bridgeall.  Like I said, I'm indirectly
5 responsible for this.  But as far as my memory
6 tells me, they have offered willingly to
7 support marketing efforts for Baker & Taylor.
8    Q.   Are there other libraries in Ohio
9 that have contributed to marketing efforts?
10    A.   I'm not sure.  We have several
11 customers, you know, large companies.  We have
12 several customers in and outside of Ohio who
13 willingly contribute to our marketing efforts.
14    Q.   And Cuyahoga is one of those
15 several, correct?
16    A.   Yes.
17    Q.   So I see on here you have a
18 position on the Board of Directors at United
19 for Libraries at the ALA.
20    A.   Correct.
21    Q.   What is the United for Libraries?
22    A.   It's a division of the ALA that is
23 focused on Trustees and Boards of Directors.
24    Q.   And so what kind of things do they
25 deal with?

13 (Pages 46 - 49)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 50

1    A.   The division?
2    Q.   Yes.
3    A.   They deal with training for library
4 Trustees and the Library Board.
5    Q.   Okay.  And what kind of topics are
6 provided in those trainings?
7    A.   That would be a question for them.
8 But generally the topics would be -- I'm
9 guessing, I'm not deep into that -- but how to
10 run a library, how to be a good Trustee.
11    Q.   Who else is on the board with you;
12 do you know?
13    A.   Yeah, it's a large board, which is
14 primarily comprised of either current or former
15 librarians or librarians who run large Friends
16 of the Libraries groups.  And there are a few
17 corporate members, like myself.
18    Q.   And do you recall any of the other
19 corporate members?
20    A.   The one that I can recall clearly
21 is Skip Dye from Penguin Random House.
22    Q.   And that's a publishing company?
23    A.   That's correct.
24    Q.   And on that board you're
25 interacting with a lot of librarians and then a

Page 51

1 few corporate representatives?
2    A.   Yes.  I would say most of the
3 people on the board, whether they're librarians
4 or not, I'm not sure, but many of them have
5 served previously within the Friends or the
6 foundations that support libraries, but I'm not
7 sure if they actually have a library degree.
8 But they're in the library world, if you will.
9    Q.   Library land?
10    A.   Library land.
11    Q.   So it seems like you're pretty
12 tuned into library land; is that fair?
13    A.   Yes.  This is the world I live in.
14    Q.   Yeah, yeah.  I imagine living in
15 that world, you like to stay updated on what's
16 going on in the industry; is that fair?
17    A.   I try to.
18    Q.   Okay.  And how do you try to make
19 sure you're staying up to date?
20    A.   Mostly with information and news
21 that's published publicly.
22    Q.   Okay.  What are your favorite
23 public publications?
24    A.   I read the Wall Street Journal as
25 much as I can, but I don't get a lot of time

Page 52

1 often.  But my primary source of information
2 would be my interaction with customers and any
3 information that my team brings me.
4    Q.   Okay.  And do you ever read any
5 library-specific materials?
6    A.   When I have the chance, I will
7 sometimes read Library Journal, LJ.  I don't
8 know of any library-specific publications.
9    Q.   Any blogs?
10    A.   On occasion if somebody sends me
11 something, I would read it, but I don't believe
12 I'm a subscriber to a library-specific blog.
13    Q.   Do any of the librarians ever send
14 you new things?
15    A.   I'm sure they have in the past.
16    Q.   And do you often read those?
17    A.   Sometimes.
18    Q.   Okay.  I'd like to briefly talk
19 about what you did to prepare for today, if
20 that's all right.
21    A.   Are we done with the background?
22    Q.   Yes.  You can set it to the side,
23 for sure.
24        So what did you do, if anything, to
25 prepare for today's deposition?

Page 53

1    A.   Spent time with Counsel and read
2 through the documents as much as I could.  In
3 some cases, I was -- when I was reading some
4 documents, I was confused, and so I sought
5 clarification.  In some cases I remained
6 confused.  But I was able to glance at the
7 documents that I was provided with that would
8 be relevant to this deposition.
9    Q.   And I don't want to get into any of
10 your conversations with Counsel.
11    A.   Uh-huh.
12    Q.   How often did you meet with them,
13 or how many times?
14        Better question.
15    A.   Frequently virtually.  And in
16 person, yesterday and today.
17    Q.   Okay.  And if you had to ballpark
18 it, how much time did you spend preparing with
19 Counsel?
20    A.   In hours, I don't -- how many hours
21 I spent with Counsel?
22    Q.   Yes.
23    A.   I wouldn't know how to estimate it.
24 I'd have to do some math in my mind.  Thinking,
25 I had a 90-minute video call one day, and two

14 (Pages 50 - 53)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 54

1 hours some other day, and four hours yesterday.
2 So I wouldn't know how to -- over what time
3 period, Jeff?
4      Q.   In preparation for your deposition.
5      A.   Specifically for the deposition?
6      Q.   That's right.
7      A.   It's hard to estimate because in
8 several conversations with Counsel, we spent
9 some time on depositions, some time on other
10 matters, so it's very hard for me to estimate.
11     Q.   Okay. I understand.
12          Do you think it's less than ten?
13     A.   No, it's more than ten hours.
14     Q.   Do you think it's more than 20?
15     A.   I'm not sure. But let's say more
16 than ten hours.
17     Q.   Somewhere between ten and 20?
18     A.   I'll say ten. If you really want
19 an answer, I'll have to go through my calendar
20 schedule.
21     Q.   We don't need that. That's fine.
22          And you understand that Baker &
23 Taylor has designated you to speak on
24 particular topics, correct?
25     A.   Yes.

Page 55

1      Q.   And that Bridgeall has also
2 designated you to speak on particular topics?
3      A.   Yes.
4      Q.   So we have copies of the Deposition
5 Notices that we are marking as Exhibits 40 and
6 41.
7          - - - - -
8          (Thereupon, Plaintiff's Exhibit 40,
9          Notice of Deposition, was marked for
10         purposes of identification.)
11         - - - - -
12         (Thereupon, Plaintiff's Exhibit 41,
13         Notice of Deposition of Amandeep
14         Kochar, was marked for purposes of
15         identification.)
16         - - - - -
17         MR. WALKER: And you'll notice, we
18 actually highlighted these to try to make it
19 quicker.
20         MR. NOYES: Thank you.
21     Q.   So this is our understanding
22 beforehand of the topics that you're prepared
23 to testify on.
24     A.   Uh-huh.
25     Q.   I'll let you take a look at these,

Page 56

1 and I'll ask you a couple questions.
2          MR. NOYSE: Let me just note, while
3 he's reviewing it, in one or more of our meet
4 and confers we discussed the language of the
5 topics, and agreed to clarifications that are
6 slightly different than what's still listed as
7 the topics.
8          MR. WALKER: Understood. And I'm
9 sure you'll let me know when we're getting there.
10         MR. NOYSE: Okay.
11         THE WITNESS: Okay.
12     Q.   So maybe open up the Baker & Taylor
13 notice, which should be Exhibit 40.
14         So you're prepared to speak on
15 Topics 1 through 4, correct?
16     A.   Yes.
17     Q.   And then on 5, you're prepared to
18 talk about everything except Baker & Taylor's
19 knowledge and understanding of WorldCat records
20 and data?
21     A.   Correct.
22     Q.   And then for No. 8, you're prepared
23 to speak about the development of and
24 investment in BTCat?
25     A.   Yes.

Page 57

1      Q.   And then 9, you're prepared to
2 speak on that topic?
3      A.   Yes.
4      Q.   For 10 --
5          MR. NOYSE: Let me just interject.
6 As part of the meet and confer process, you
7 identified specific paragraphs, and we pointed
8 that out to him. So to the extent that he is
9 prepared on that topic, it's with the
10 understanding that you've identified specific
11 paragraphs. And I don't know that we need to
12 be Draconian about that, but that's part of the
13 understanding.
14         MR. WALKER: I was just getting to
15 10.
16     Q.   So on 10, there are specific
17 paragraphs that we've identified with Counsel
18 that you're prepared to speak on.
19     A.   Yes.
20     Q.   And then for 11, you're prepared to
21 testify about document requests related to the
22 other topics we've covered, right?
23     A.   Yes. Other -- could you expand on
24 "other topics"?
25         MR. NOYES: I think our

15 (Pages 54 - 57)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 58

1  understanding is, to the extent there are
2  references to Discovery Responses relating to
3  the other topics he's talking about, he's
4  prepared to address the Discovery Responses as
5  they relate to those topics.
6        MR. WALKER:  That's right.
7     Q.  And then the last one, you're
8  prepared to speak on 12?
9     A.  Yes.
10    Q.  Do you also have personal knowledge
11 on these topics?
12    A.  Would you define "personal
13 knowledge" for me just so I can differentiate
14 personal and professional?
15    Q.  That you know it from your own
16 experience, not based on your separate
17 preparations for today's deposition.
18    A.  It would mostly come from
19 preparation for the deposition.
20    Q.  Okay.  So you said that you also
21 spoke with other individuals to prepare for
22 today's deposition; is that accurate?
23    A.  To prepare?
24    Q.  Yes.
25    A.  I may have sought information to

Page 59

1  prepare, yes.
2     Q.  Okay.  Who else did you speak with?
3     A.  I would have spoken with Dan
4  Johnson, Counsel.  I'm trying to think.  My
5  head of cataloging services.
6     Q.  And who is that?
7     A.  Trisha Vreeman.
8        Those would be the ones that I
9  would have sought any information to prepare.
10    Q.  Okay.  So for Dan Johnson, are
11 there specific topics that you sought
12 information from him on?
13    A.  Just topics that I did not have
14 specific information, that I needed to get
15 clarification on.
16    Q.  And what would those be?
17    A.  Development of BTCat, investment in
18 BTCat, and the technology aspects related to it.
19    Q.  Okay.  Did you speak with him at
20 all about efforts to solicit customers, No. 9?
21    A.  No.
22    Q.  Okay.  Did you speak with him about
23 No. 5?
24    A.  We had a discussion with Counsel --
25    Q.  And I don't want to know the

Page 60

1  contents of it if it's with Counsel.
2     A.  It was in the presence of Counsel.
3     Q.  Okay.  Would you say you're the
4  person at Baker & Taylor who's best suited to
5  speak on these topics?
6     A.  For the purposes of this matter, yes.
7     Q.  Okay.  Let's go ahead and look at
8  the other Exhibit.  So this is Exhibit 41.  And
9  our understanding is that you're prepared to
10 speak on Topics 1 through 3, and then No. 11,
11 and then 8, with the same caveats, that we've
12 identified specific paragraphs with Counsel.
13       Are all of those accurate?
14    A.  Yes.
15    Q.  And then 9, to the extent the
16 Discovery Responses or documents are relevant
17 to the other topics you've been assigned?
18    A.  Yes.
19    Q.  Okay.
20       MR. NOYES:  Yeah, so Derek has
21 pointed out, in regard to the Topic 3, which is
22 the sale of collectionHQ, I think as we're
23 aware, there is an NDA, Nondisclosure
24 Agreement, that was put into place in
25 connection with that transaction between

Page 61

1  Baker & Taylor and the purchasers, Valsoft.
2  And it has limitations that apply to talking
3  about the transaction.
4        We are prepared today to allow the
5  Witness to address those with the understanding
6  that not only is that AEO, but it's subject to
7  and without waiver to the NDA.  And so we're
8  not going to prevent him from discussing that
9  topic because it's restricted by an NDA that
10 applies between Baker & Taylor and another
11 company.
12       MR. WALKER:  Okay.  Understood.
13    Q.  And you're prepared to testify
14 about all of the topics we just discussed?
15    A.  Yes --
16    Q.  Okay.
17    A.  -- to the best of my knowledge.
18    Q.  And it's actually to the best of
19 Bridgeall's knowledge.
20    A.  Correct.
21    Q.  Who else at Bridgeall, before the
22 transaction, would have had knowledge regarding
23 these topics?
24       MR. NOYES:  Objection.  Which
25 topics?

16 (Pages 58 - 61)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 62

1      MR. WALKER:  These topics for
2  Bridgeall.
3      MR. NOYES:  Oh, okay.
4      THE WITNESS:  These topics for
5  Bridgeall?
6      Q.   Yes, the ones that you are speaking
7  on behalf of Bridgeall for.
8      A.   There would be several individuals
9  that may know some topics.
10     Q.   Okay.  Who are they?
11     A.   Steve Legowski.  Jamie Wright would
12 be one.
13     Q.   Anyone else?
14     A.   There were a couple more
15 individuals that were made aware of a potential
16 acquisition a couple of weeks before the
17 acquisition was consummated.  And that would be
18 the only relevance of No. 3.  But they did not
19 have a view of the timing and structure,
20 underlying agreements and communications, but
21 they were made aware of a potential
22 transaction.
23     Q.   And who were those people?
24     A.   It would be Dan Fish.
25     Q.   And who else?

Page 63

1      A.   I'm trying to think if there was
2  anyone else.  His first name is Ollie.  His
3  last name escapes me.  But these were the
4  leadership team at Bridgeall for Steve
5  Legowski.  And that is the team that -- the
6  Valsoft team.  And so they were made aware of a
7  potential transaction.
8      Q.   Okay.  Are all four of the people
9  you mentioned no longer employees of Bridgeall?
10     A.   They're employees with Valsoft.
11 They're no longer employees of Bridgeall.
12     Q.   So they've left?
13     A.   That's correct.  They're with Valsoft.
14     Q.   And Jamie Wright, who is he?
15     A.   At that time, he was head of
16 customer success.
17     Q.   Okay.  Is that like sales?
18     A.   Sales support, so partial sales and
19 partial customer -- so customer success.
20     Q.   So like retention, as well?
21     A.   Yes.
22     Q.   And Dan Fish?
23     A.   He's on the technology side, so he
24 would be a technologist.
25     Q.   And is he the one that -- did he

Page 64

1  report to Dan Johnson?
2      A.   He reported to Steve Legowski.
3      Q.   Okay.  And then Ollie?
4      A.   Ollie was head of implementation of
5  collectionHQ.  He reported to Steve Legowski,
6  as well.
7      Q.   And what's implementation?
8      A.   After a customer signs an
9  agreement, they go through a process of taking
10 them live, guiding them through.  That's the
11 process.
12     Q.   So like collecting information
13 about their systems and all that kind of stuff?
14     A.   Correct.
15     Q.   Okay.  Did you speak with any of
16 them in preparation for your deposition?
17     A.   No.
18     Q.   Okay.  Did you speak with anyone
19 besides Counsel in preparation for your
20 deposition on the Bridgeall topics?
21     A.   No.
22     Q.   Okay.  Did you review documents?
23     A.   Yes.
24     Q.   Were all of those provided by Counsel?
25     A.   Yes.

Page 65

1      Q.   Okay.  Would you say you are the
2  person from Bridgeall who's best suited to
3  testify regarding the topics we've just
4  identified?
5      A.   Yes.
6      Q.   Okay.  Do you know if your
7  documents have been collected in relation to
8  this litigation?
9      A.   Yes.
10     Q.   Do you understand that Baker &
11 Taylor has produced certain of your
12 communications and documents as part of this
13 litigation?
14     A.   Yes.
15     Q.   And that it has also produced
16 documents collected from others at the company?
17     A.   Yes.
18     Q.   Okay.  We are going to hand you
19 what has been marked as Plaintiff's Exhibit
20 No. 3.
21       - - - - -
22       (Thereupon, Plaintiff's Exhibit 3,
23       Complaint for Injunctive Relief and
24       Damages, which was previously
25       marked, was introduced for purposes

17 (Pages 62 - 65)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 66

1 of identification.)
2      - - - - -
3      Q.   So do you understand that OCLC has
4 filed this lawsuit against Baker & Taylor and
5 Bridgeall?
6      A.   Yes.
7      Q.   Okay.  I'll let you go ahead and
8 review that Complaint if you need to.
9          (Discussion had off record.)
10      Q.   Are you finished reviewing it?
11      A.   Yes.
12      Q.   Okay.  Have you seen this document
13 before?
14      A.   Yes.
15      Q.   Okay.  What is it?
16      A.   It's a lawsuit that OCLC has
17 brought against Baker & Taylor and Bridgeall.
18      Q.   Okay.  And you understand it's the
19 Complaint with the allegations against both
20 Defendants?
21      A.   Yes.
22      Q.   Okay.  Do you understand that the
23 lawsuit was filed in Federal Court in Ohio?
24      A.   Yes.
25      Q.   Okay.  Have you reviewed that

Page 67

1 document in preparation for your testimony
2 today?
3      A.   Yes.
4      Q.   Okay.  Have you reviewed any of the
5 other filings in this case?
6      A.   Yes.
7      Q.   What filings have you reviewed?
8      A.   The Answers to the Interrogatories,
9 Responses to the Interrogatories.
10      Q.   When you say, "Interrogatories," do
11 you mean Defendants' Responses to the
12 Interrogatories?
13      A.   Correct.
14      Q.   Okay.  What other pleadings or
15 documents related to the litigation?
16      MR. NOYES:  Objection to the form.
17      In preparation for the deposition
18 or generally?
19      Q.   Let's do generally.
20      A.   The responses that my Counsel has
21 provided for me to review and the base
22 documents for contracts, our previous contract
23 with OCLC, and a cursory review of OCLC's
24 website for its member rights and reservations.
25 I don't remember the exact title of the document.

Page 68

1      Q.   The WorldCat rights and
2 responsibilities?
3      A.   Rights and responsibilities.  That
4 was a cursory review, yes.
5      Q.   Are you aware that OCLC is also
6 seeking a Preliminary Injunction?
7      A.   Yes.
8      Q.   And have you reviewed that?
9      A.   Yes.
10      Q.   And then are you aware that
11 Defendants have filed motions to dismiss?
12      A.   Correct.
13      Q.   And have you reviewed those?
14      A.   Yes.
15      Q.   And of those documents, which of
16 those did you review in preparation for today's
17 deposition?
18      A.   All of them to a certain degree.
19      Q.   Okay.  What do you understand
20 OCLC's claims to be in this litigation?
21      MR. NOYES:  Objection to the extent
22 it calls for a legal conclusion.
23      MR. WALKER:  Sure.
24      MR. NOYES:  You can answer.
25      THE WITNESS:  I believe that OCLC

Page 69

1 is trying to assert that Baker & Taylor's BTCat
2 cataloging utility was in some way or form
3 created or enhanced by OCLC, by anything that
4 is in OCLC.
5      Q.   Okay.  So do you understand that
6 the allegations are that Baker & Taylor has
7 used WorldCat records in the creation and
8 enhancement of BTCat?
9      A.   I understand that to a degree that
10 I do not know what a WorldCat record is.
11      Q.   Okay.  Do you understand that the
12 allegation is that Defendants have used records
13 that were from WorldCat to create and enhance
14 BTCat?
15      MR. NOYES:  Objection to the form.
16      You can answer.
17      A.   I understand that there were
18 records that may have an identifier that was
19 put in by OCLC into records that may exist in
20 WorldCat.  And I understand what the objection
21 is.
22      Q.   Okay.  And when you say you
23 understand what the objection is, what do you
24 mean?
25      A.   I understand what the Complaint is.

18 (Pages 66 - 69)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 70

1    Q.   Do you know anything else about --
2  what else do you know about the lawsuit?
3         MR. NOYES:  Objection to the form.
4    A.   Everything that's in the Complaint.
5    Q.   Okay.  Have you spoken with anyone
6  about the lawsuit besides your Lawyers?
7    A.   In my organization, on an as-needed
8  basis with publicly-available information when
9  it was filed to manage PR with my team.
10   Q.   Okay.  Anyone else?
11   A.   And if a customer ever asked me a
12 question about it.
13   Q.   Okay.  So let's talk about each of
14 those.
15   A.   Okay.
16   Q.   So when you say you discussed it
17 internally with your team based on
18 publicly-available information, what did you
19 mean by that?
20   A.   That I discussed it on the basis
21 that the Complaint was filed.
22   Q.   Who did you discuss it with?
23   A.   With my senior team and my
24 executive team that reports to me.
25   Q.   And who does that include?

Page 71

1    A.   This includes leaders from the
2  various functions, the various functions of
3  operations.
4    Q.   And who specifically?
5    A.   My head of sales, my head of
6  merchandizing, my head of marketing, head of
7  IT, head of contracts, all of my executive team.
8    Q.   Okay.  And what did you guys discuss?
9    A.   That a lawsuit --
10        MR. NOYES:  Objection to the extent
11 that these conversations took place outside of
12 Counsel.
13   Q.   Yes.  Apologies.  I don't want to
14 know, if your Counsel was there, what you guys
15 discussed.  And that's true of any question I
16 ask.
17   A.   The discussion was simply about how
18 to manage our responses.  We took advice from
19 our Counsel, prepared our response, discussed
20 with the team, and they had a response to go
21 out with.
22   Q.   Okay.  So those discussions -- did
23 you have discussions outside the presence of
24 Counsel about the Complaint?
25   A.   Sometimes.

Page 72

1    Q.   Okay.  And who would those have
2  been with?
3    A.   With my executive team.  There were
4  several individuals, which included Dan Johnson
5  and Steve Legowski.
6    Q.   Who else?
7    A.   It would be my head of PR, which
8  would be Whitney Bretzman, my head of supply
9  chain, Eric McGarvey, my head of contracts,
10 Arun Seth, head of the digital platform, Bharat
11 Mirgan.  I'm trying to go around the room in my
12 mind as to who else would be there.  It was
13 scheduled on short notice, so there may not
14 have been a couple of other individuals in
15 there, as well.
16   Q.   Okay.  So those are the people you
17 discussed with, based on what you recall today?
18   A.   That's correct.
19   Q.   You mentioned that part of that may
20 have been a discussion about PR; is that right?
21   A.   That's correct.
22        MR. NOYES:  I don't object to that
23 question, but I want to just clarify, our claim
24 as to protection for privileged conversation
25 extends to a conversation outside of Counsel if

Page 73

1  we said, "Please ask so and so about this."
2         So as you go forward, I'm just
3  instructing the Witness, if an answer involves
4  like you talking to someone because I asked you
5  to talk to someone, please consider that that's
6  also part of the privilege.
7         THE WITNESS:  So then these were
8  all -- because we did have our outside Counsel
9  in several of these conversations, as well.
10   Q.   Were there any that you didn't?
11        And based on his other instruction,
12 were there any that were not done at the
13 direction of Counsel?
14   A.   Not that I recall.  We were clear
15 that we had instructions.
16        MR. NOYES:  Let me just say, if
17 there's a specific question and it triggers a
18 response about a specific conversation, and the
19 Witness recalls that that wasn't a conversation
20 instigated by Counsel, that's fine to ask about
21 that.  And it may be sort of a conversation by
22 conversation issue.
23        MR. WALKER:  Sure.  Sure.
24   Q.   Yeah.  Obviously I will defer to
25 your Counsel on instructions there.

19 (Pages 70 - 73)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 74

1    A.   Sure.
2    Q.   I'll leave it to you two to kind of
3  police that, and I'll do my best to shy away
4  from anything there.
5    A.   Good.
6    Q.   So you mentioned conversations with
7  customers about the litigation.
8    A.   Yes.
9    Q.   What customers?
10    A.   I can recall one incident at ALA
11 where the customer asked me a question, "Where
12 does the lawsuit stand?"
13       That was the question in a larger
14 conversation.
15    Q.   Okay.  And when was that ALA?
16    A.   It was the end of June, I believe.
17    Q.   And who was the customer?
18    A.   I do not recall.  There were 30
19 customers in the room that I was speaking with.
20 But one of them had the opportunity to ask me.
21 I do not recall where they were from.
22    Q.   So it was a question to you in
23 front of the 30 people?
24    A.   It was a question to me in front of
25 some other customers, yes.

Page 75

1    Q.   Okay.  Do you recall who any of the
2  customers were?
3    A.   I'm trying to firm up my mind.
4  There were several interactions that I had
5  during that conference, and I want to make sure
6  that this particular meeting I'm able to give
7  you an accurate answer.  Let's put in Queens
8  Public.  I recall meeting with Queens in that
9  conference.
10    Q.   Okay.  And do you know who the
11 person from Queens was?
12    A.   It was -- if I recall correctly, it
13 was Nick Buron.
14    Q.   Nick Buron.
15       Was he the person that asked the
16 question?
17    A.   No.
18    Q.   Okay.  Can you remember anyone else?
19    A.   Not that my memory serves.
20    Q.   And what was the question again?
21    A.   The question was, "What is
22 happening with the OCLC lawsuit?"
23    Q.   Okay.  And what did you say?
24    A.   I said that we are currently in
25 litigation, and we believe that when the facts

Page 76

1  are applied to the law, that this case will be
2  dismissed.
3    Q.   And was there further discussion
4  besides that one exchange?
5    A.   No.
6    Q.   You said earlier you had several
7  conversations that you were trying to remember.
8    A.   Several conversations with
9  different customers throughout the conference.
10 I was trying to remember who was at that
11 particular conference that I was mentioning.
12    Q.   You're not saying you had several
13 conversations about the lawsuit?
14    A.   No.
15    Q.   Any other conversations with people
16 not Counsel or outside of Defendants?
17    A.   I don't believe so.
18       MR. WALKER:  Okay.  We've been
19 going at it for a while.
20       Do you need a break?
21       MR. NOYES:  It's been an hour and a
22 half.  Even though we've peeled off in a few
23 cases, let's take a short break.
24       THE WITNESS:  Thank you very much.
25       (Recess taken.)

Page 77

1       - - - - -
2       (Thereupon, Plaintiff's Exhibit 42,
3       Defendant Baker & Taylor, LLC's
4       Supplemental Responses to Plaintiff
5       OCLC, Inc.'s First Set of
6       Interrogatories and Requests for
7       Production, was marked for purposes
8       of identification.)
9       - - - - -
10    Q.   All right.  I again have two
11 Exhibits for you.  Sorry, this one is not
12 stapled.  And then we have one other.
13       So this is Exhibit 42.
14       THE WITNESS:  I was going to ask,
15 what's the color differentiation?
16       MS. BROWN:  There isn't.
17       MR. WALKER:  It just means we've
18 used those.
19    Q.   Okay.  So Exhibit 42, do you
20 recognize that?
21    A.   Yes.
22    Q.   Okay.  What is it?
23    A.   It's Supplemental Responses to the
24 Interrogatories.
25    Q.   And it's Baker & Taylor's

20 (Pages 74 - 77)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 78

1 Supplemental Responses, correct?
2     A.   Correct.
3         - - - - -
4         (Thereupon, Plaintiff's Exhibit 43,
5         Organizational Chart Prepared by
6         Attorney Walker, was marked for
7         purposes of identification.)
8         - - - - -
9     Q.   And then Exhibit 43 you will not
10 recognize.  And I apologize if it's not -- it's
11 something I created, right, to try to make
12 sense of Interrogatory No. 1.
13     A.   Okay.
14     Q.   So if you can -- let's refer to
15 Interrogatory No. 1, but I'll also potentially
16 being referring to this to make sure I have a
17 clear understanding of the corporate structure.
18     A.   Okay.
19     Q.   And so at the top of the chart I
20 have Baker & Taylor United Acquisition Holding
21 Company.
22     A.   Uh-huh.
23     Q.   Is that the ultimate parent of all
24 the Baker & Taylor group entities?
25     A.   Yes.  The name is inaccurate, though.

Page 79

1     Q.   Okay.
2     A.   It should be BTAC United, B-T-A-C
3 United Acquisition Holding Company.
4     Q.   BTAC United?
5     A.   Yes.
6     Q.   And so it's BTAC United Holding
7 Company?
8     A.   BTAC United Acquisition Holding
9 Company.
10     Q.   Is there a Baker & Taylor United
11 Acquisition Holding Company?
12     A.   No.
13     Q.   That doesn't exist.
14         And when we talk about this BTAC
15 United Acquisition Holding Company, do you know
16 if it's a C-corp, an S-corp?
17         What is it?
18     A.   LLC.
19     Q.   It's an LLC.
20         And do you know what --
21     A.   Just a moment, if I can interrupt
22 for a minute.
23         I did remember a conversation about
24 the lawsuit as I was in my room.
25     Q.   Okay.

Page 80

1     A.   That conversation was with a
2 partner organization, which is the ByWater
3 Corporation, and one of the principals had
4 simply asked me about the lawsuit.  I
5 remembered it so I'm putting it on the record.
6     Q.   No.  Thank you.  And that --
7 apologies.
8     A.   I was just saying, that was not
9 prompted by Counsel, and I wanted to get that
10 on the record.
11     Q.   I appreciate that.  If that
12 happens, if you recall something, you know,
13 please --
14     A.   That was just it.
15     Q.   -- volunteer it.
16         So partner, ByWater Corporation.
17         Who were the individuals from that?
18     A.   Again, I do not remember.  There
19 were just two principals.  It was either
20 Brendan or Nate.  I may not recall the
21 conversation.  It was very brief.  They may
22 have just asked me -- I do remember them asking
23 me, and me responding saying, you know, "We're
24 in litigation, and when the facts are applied
25 to the law, we believe this will be dismissed."

Page 81

1     Q.   And there was no further discussion
2 about the impact on the company?
3     A.   It was just very brief.
4         MR. NOYES:  Just remember to let
5 him finish his question before you start
6 answering.
7     Q.   There was no discussion about the
8 impact on BTCat or collectionHQ?
9     A.   No.
10     Q.   And when was that conversation?
11     A.   It would be in the time frame
12 before ALA, but I'm not able to recall it
13 correctly.  It was an off-the-cuff conversation.
14     Q.   Okay.  Was anyone else there?
15     A.   (Witness shaking head.)
16     Q.   It was just you and this one
17 representative from partner, ByWater Corporation?
18     A.   Yes.
19     Q.   Okay.  Going back to BTAC United
20 Acquisition Holding Company, do you know what
21 legal jurisdiction --
22     A.   Delaware.
23     Q.   And its headquarters?
24     A.   Charlotte, North Carolina.
25     Q.   Okay.  And does it have any -- it's

21 (Pages 78 - 81)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 82

1 a holding corporation, so it doesn't have any
2 other locations?
3     A.   Correct.
4     Q.   Who owns the entity?
5     A.   The entity is owned by -- the
6 shareholding is divided between several
7 individuals, me being one of them.
8     Q.   Okay.  So you're one of the owners?
9     A.   Yes.
10     Q.   Who are the other owners?
11         MR. NOYES:  Objection.
12         You can answer.
13     A.   We have Chris Myers and Brad Lucas
14 and Eric McGarvey.
15     Q.   And what was the last name?
16     A.   McGarvey.
17     Q.   And are any of those other owners
18 employees of Baker & Taylor?
19     A.   Yes.  Brad Lucas and Eric McGarvey.
20     Q.   And what is Brad Lucas' position?
21     A.   He's Senior VP of Corporate
22 Finance.
23     Q.   And what about Eric McGarvey?
24     A.   Senior VP for Merchandising and
25 Supply Chain.

Page 83

1     Q.   And then what percentage of the
2 shares do you own?
3         MR. NOYES:  Objection.
4         You can answer.
5     A.   Approximately 95 percent.
6     Q.   95.  Do you know the breakdown of
7 the others?
8     A.   Chris Myers has two and a half,
9 approximations by the shares as they're
10 divided, and the remaining is divided equally
11 between Brad and Eric.
12     Q.   And has that ownership changed at
13 all since you first acquired the company?
14     A.   Yes.  We had two past senior
15 employees who have since exited the business,
16 and the company has bought back their equity.
17     Q.   Okay.  And who were those senior
18 employees?
19     A.   We had Brad Murchison, who was --
20 and Pete Chapel.
21     Q.   And Brad doesn't have a position at
22 the company now?
23     A.   No.  Brad is outside Counsel for us
24 now.
25     Q.   Okay.  What was his position before

Page 84

1 he left?
2     A.   He was in-house General Counsel
3 before.
4     Q.   And when did he depart?
5         MR. NOYES:  Objection to the form.
6     A.   2022, I believe.
7     Q.   Okay.  So when you originally
8 purchased the company, were all five of these
9 individuals owners?
10     A.   Yes.
11     Q.   What was Brad Murchison's ownership
12 share?
13     A.   He was .5 percent, I believe.
14     Q.   And what about Pete Chapel?
15     A.   Pete was 1 percent, I believe.
16     Q.   So when they sold, the company
17 bought it back?
18     A.   Yes.
19     Q.   And did that roll into your
20 ownership shares?
21     A.   No.  It's listed as unused,
22 unallocated.
23     Q.   Okay.  What is your role in BTAC
24 United Acquisition Holding Company?
25     A.   President.

Page 85

1     Q.   And then are there any other
2 individuals that are officers of this company?
3     A.   That's correct.
4     Q.   Who are they?
5     A.   It's Steve Hennen.
6     Q.   Okay.  Who else?
7     A.   And Brad Lucas' secretary.
8     Q.   And what is Steve Hennen's position?
9     A.   He's CFO.
10     Q.   Is there a Board of Directors?
11     A.   Yes.
12     Q.   Who's on the board?
13     A.   It's myself and my family presently.
14     Q.   And who from your family?
15     A.   My father and my brother.
16     Q.   What's your father's name?
17     A.   Mahendra, M-a-h-e-n-d-r-a, Mahendra
18 Kochar.
19     Q.   And your brother?
20     A.   Jagdeep Kochar.
21     Q.   How do you spell that?
22     A.   J-a-g-d-e-e-p, Jagdeep.
23     Q.   Anyone else on the board?
24     A.   Not presently.
25     Q.   Were there other people on the

22 (Pages 82 - 85)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 86

1 board before?
2    A.  Yes.
3    Q.  Who were those people?
4    A.  Chris Myers and Ted Offit.
5    Q.  And when was their tenure?
6    A.  Their tenure completed -- Ted, last
7 month. And Chris Myers, earlier this year.
8    Q.  And Ted Myers -- sorry.
9    A.  Ted Offit last month, and Chris
10 Myers earlier this year.
11    Q.  Okay. And of the individuals you
12 mentioned, how many of them served on the board
13 when you originally purchased Baker & Taylor?
14    A.  They were my founding original
15 Board of Directors.
16    Q.  So you originally had a founding
17 board of five?
18    A.  Yes.
19    Q.  Okay. When was this entity created?
20    A.  November -- I believe either
21 October or November, 2021.
22    Q.  As a result of the sale?
23    A.  Correct.
24    Q.  Okay. And I guess I could be a
25 little more specific on that.

Page 87

1    A.  Sure.
2    Q.  So when we say, "the sale," what do
3 you understand me to be referring to?
4    A.  It's better if you explain it.
5    Q.  Okay. So was there a transaction
6 in which you purchased?
7    A.  Yes.
8    Q.  And who did you purchase it from?
9    A.  From the Follett Corporation.
10    Q.  And that was in November --
11    A.  Of 2021.
12    Q.  Okay. So this entity was created
13 in relation to that transaction? (Indicating)
14    A.  Correct.
15    Q.  Okay. Then as you can see in
16 Exhibit 43, at least based on the description
17 and Interrogatory 1, these are the three
18 entities that are directly owned by BTAC United
19 Acquisition Holding Company; is that accurate?
20    A.  No.
21    Q.  Okay.
22    A.  BTAC United Acquisition Holding
23 Company holds BTAC Acquisition Holding, LLC, on
24 the right.
25    Q.  Okay.

Page 88

1    A.  And that holds BTAC Holding Corp.
2 And that holds Baker & Taylor, LLC.
3    Q.  And then what about BookMasters?
4    A.  BookMasters is owned by Baker &
5 Taylor, LLC.
6    Q.  Okay. So it goes BTAC United
7 Acquisition Holding Company, BTAC Acquisition
8 Holdings, LLC, BTAC Holding Corp., and then
9 Baker & Taylor, LLC, and then it owns several,
10 different entities?
11    A.  Correct.
12    Q.  Okay. So let's now talk about BTAC
13 Acquisition Holdings, LLC.
14    A.  Okay.
15    Q.  That's an LLC.
16      What legal jurisdiction?
17    A.  In Delaware, as far as I'm aware.
18    Q.  Headquarters?
19    A.  Charlotte.
20    Q.  Same address?
21    A.  Same address.
22    Q.  Same office location?
23    A.  Correct.
24    Q.  No other locations?
25    A.  No.

Page 89

1    Q.  And do you have a role in that entity?
2    A.  Yes. All of those are holding
3 entities, so it would be President.
4    Q.  The same board?
5    A.  The only entity that has a board is
6 the topmost entity, which is BTAC United
7 Acquisition Holdings.
8    Q.  So as far as BTAC Acquisition
9 Holdings, LLC, are there other officers?
10    A.  I will have to verify. I'm not
11 sure today. Because of the complex entity
12 structure, it may or may not have it.
13    Q.  I agree, it's a complex structure,
14 which is why I tried to put together this, and
15 obviously it's not accurate.
16      Okay. So this is a holding company?
17    A.  Yes.
18    Q.  And then the next one is BTAC
19 Holdings Corp.?
20    A.  Uh-huh.
21    Q.  And you said that's also a Delaware
22 entity?
23    A.  And holding company.
24    Q.  Right. And its office location is
25 here?

23 (Pages 86 - 89)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 90

```
 1      A.   Yes.
 2           MR. NOYES:  I know we're running
 3  through sort of routine questions, but please
 4  let him finish.
 5           THE WITNESS:  Okay.
 6      Q.   And the officers of that entity?
 7      A.   Same, to my knowledge.
 8      Q.   Same as BTAC United?
 9      A.   Uh-huh.
10      Q.   I'm sorry, when I say "United,"
11  BTAC United Acquisition Holding Company?
12      A.   I will have to validate that.  I am
13  for sure.
14      Q.   As the is CEO?
15      A.   As President.
16      Q.   As President.
17           Is that an LLC, as well, or is it a
18  corporation?
19      A.   I believe it's an LLC.
20      Q.   Okay.  Then Baker & Taylor, LLC, is
21  the next entity underneath that; is that right?
22      A.   Correct.
23      Q.   And that one is a Defendant in this
24  litigation?
25      A.   Correct.
```

Page 91

```
 1      Q.   Okay.  And that is also a Delaware
 2  corporation?
 3      A.   Yes.
 4      Q.   LLC?
 5      A.   Yes.
 6      Q.   And its headquarters?
 7      A.   Charlotte, North Carolina.
 8      Q.   Same address?
 9      A.   Yes.
10      Q.   Does it have other locations?
11      A.   Yes.
12      Q.   Where?
13      A.   We have an office in Bridgewater,
14  New Jersey.
15      Q.   Okay.
16      A.   We have an office warehouse in
17  Momence, Illinois.  We have an office and
18  warehouse in Commerce, Georgia.  And we have a
19  small office in Reno, Nevada.
20      Q.   Any other locations?
21      A.   Baker & Taylor IT Services India is
22  a subsidiary of LLC, so they're over in India.
23      Q.   But as far as Baker & Taylor, LLC,
24  those are the only locations for Baker &
25  Taylor, LLC?
```

Page 92

```
 1      A.   Yeah.  Excluding Baker & Taylor IT
 2  and BookMasters, yes.
 3      Q.   How many employees do they have?
 4      A.   Baker & Taylor, LLC, approximately
 5  1,000.
 6      Q.   Are most of those employees here in
 7  Charlotte?
 8      A.   No.
 9      Q.   Where are most of the employees?
10      A.   Momence, Illinois, and Commerce,
11  Georgia.
12      Q.   Okay.  Do you have employees in
13  Ohio?
14      A.   We don't have an office in Ohio.
15  I'm not sure of a remote employee in Ohio,
16  but -- I'm not sure if we have a remote
17  employee in Ohio, but we don't have an office.
18      Q.   But you may have employees there?
19      A.   If at all, there may be one remote
20  employee in a sales position, but I'm not sure
21  if they shifted their residence.
22      Q.   And you have a role in this entity,
23  as well?
24      A.   Yes.
25      Q.   What is that role?
```

Page 93

```
 1      A.   That's President and CEO.
 2      Q.   Who's the other management there?
 3           MR. NOYES:  Objection to this to
 4  the extent it was asked and answered earlier
 5  because this is the company he discussed when
 6  you were going through his background.
 7      Q.   Okay.  Are there any additional
 8  people we haven't discussed before that are
 9  part of the executive team?
10      A.   No.
11      Q.   Okay.  The only entity that has a
12  board is the holding company, correct?
13      A.   That's correct.
14      Q.   When was this entity created?
15      A.   Baker & Taylor, LLC?
16      Q.   Yes.
17      A.   It predates me.
18      Q.   Okay.  What assets does it have?
19      A.   It's the operation entity of the
20  group, so all the assets are in Baker & Taylor,
21  LLC.
22      Q.   Okay.  So does this include BTCat?
23      A.   Correct.
24      Q.   Does it include collectionHQ?
25      A.   It includes Bridgeall.
```

24 (Pages 90 - 93)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 94

1    Q.   Bridgeall?
2    A.   Correct, through the U.K. chain.
3    Q.   Okay.  And obviously we're talking
4 about pre-Valsoft transaction.
5    A.   Yes.
6    Q.   And you understand when I say,
7 "Valsoft transaction," I'm referring to the
8 transaction this year in which the assets for
9 Valsoft were sold -- I'm sorry, for Bridgeall
10 were sold to a company called Valsoft?
11   A.   Yes.
12   Q.   Okay.  And we'll return to that.
13        Baker & Taylor has a lot of products --
14   A.   Uh-huh.
15   Q.   -- and in a lot of different parts
16 of the library publishing industry.  I'd like
17 to understand kind of who owns what products
18 and who handles what products.
19   A.   Who --
20        MR. NOYES:  Is that a question?
21        MR. WALKER:  Not yet.
22        MR. NOYES:  That's helpful, but I
23 just want to make sure.  Let him know when
24 you're ready for him to answer.
25        MR. WALKER:  Sure.

Page 95

1    Q.   When we're talking about Baker &
2 Taylor, LLC, what are the products that they
3 own directly?
4    A.   All the products at Baker & Taylor
5 are owned directly by Baker & Taylor, LLC.  Its
6 physical distribution products, digital
7 distribution products and our software products
8 are all owned by Baker & Taylor, LLC.
9    Q.   Okay.  When you say, "physical
10 distribution products," what are you referring to?
11   A.   Sale and distribution of physical
12 products, whether it be books or reading material.
13   Q.   So does that include like Baker &
14 Taylor book leasing?
15   A.   Yes.
16   Q.   Okay.  Or the paw prints?
17   A.   Yes.
18   Q.   So it's actually the physical media?
19   A.   Correct.
20   Q.   And is it mostly publishing?
21   A.   No.  It's product that we serve --
22 or that we receive from other publishers, so
23 distribution, not publishing.
24   Q.   Okay.  And then when you say,
25 "digital," what do you mean?

Page 96

1    A.   Equivalent to physical, we sell
2 digital versions of the physical content,
3 whether it be an e-book or an e-audio book to
4 libraries.
5    Q.   Okay.  And so that's also distribution?
6    A.   That's right.
7    Q.   Okay.  And then software, what does
8 that include?
9    A.   Just to clarify, this is pre-Valsoft
10 transaction.
11   Q.   Sure.
12   A.   Pre-Valsoft transaction, it
13 included the collectionHQ products, the BTCat
14 product, CollectConnect products, Content Cafe
15 products.
16   Q.   Anything else?
17   A.   I'm trying to recall, but that's
18 the majority of them.
19   Q.   So how about I run through a list
20 and you can tell me?
21   A.   Sure.
22   Q.   Boundless?
23   A.   That was the digital distribution
24 product.
25   Q.   SelectionHQ?

Page 97

1    A.   That was part of collectionHQ.
2    Q.   Okay.  ParentTV?
3    A.   ParentTV is a third-party digital
4 platform that we resell.
5    Q.   Okay.  And then WorkForge?
6    A.   Third-party software that we resell.
7    Q.   Okay.  So it's not in that software
8 group you were talking about?
9    A.   No.  What I called on was the
10 software products that we create and sell.
11 These are third-party products that we resell.
12   Q.   Now after the Valsoft transaction,
13 that would be the relationship you have now --
14   A.   Finish your question.
15   Q.   -- that would be -- that would be
16 the arrangement you have now?
17   A.   Correct.
18   Q.   What about ePop Library?
19   A.   That was part of digital distribution.
20   Q.   Okay.  PressReader?
21   A.   Third-party.
22   Q.   Okay.  Distribution?
23   A.   Third-party digital distribution.
24   Q.   Okay.  ComicPlus?
25   A.   Third-party digital distribution.

25 (Pages 94 - 97)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 98

1    Q.   Evidence-Based Selection Planning?
2    A.   That's part of collectionHQ.
3    Q.   Okay.  DEI Analysis?
4    A.   Part of collectionHQ.
5    Q.   CollectConnect?
6    A.   I gave you that name already.
7    Q.   Oh, that's right.
8         TitleSource 360?
9    A.   That's an in-house e-commerce
10 platform.
11   Q.   Okay.  So it doesn't really fall
12 into one of these?
13   A.   We don't sell that.  It's where our
14 customers place their orders.
15   Q.   Okay.  What about Collection
16 Development Services?
17   A.   That's a service we provide.
18   Q.   Does that use software?
19   A.   Sometimes.  Internal software.
20   Q.   Would that use collectionHQ software?
21   A.   Sometimes.
22   Q.   Would that use BTCat software?
23   A.   Sometimes.
24   Q.   Okay.  Then what about Customized
25 Library Services?

Page 99

1    A.   This is physical manipulation of a
2 book to a library's specifications.
3    Q.   So what does that mean?
4    A.   It means when we receive a book
5 from a publisher, a library may want a sticker
6 on it or a spine label or they may want an
7 office ID tag attached to it.  Those are
8 library services.
9    Q.   And you mentioned the collectionHQ
10 products.
11   A.   Uh-huh.
12   Q.   Does that include collectionHQ
13 Academic?
14   A.   Yes.
15   Q.   And that's a separate product?
16   A.   Yes.
17   Q.   What about collectionHQ Lite?
18   A.   Yes.
19   Q.   Okay.  Is TechExpress collectionHQ?
20   A.   No.
21   Q.   What is that?
22   A.   TechExpress is an internal product
23 by Baker & Taylor, where customers can download
24 their MARC records for the purchases -- for the
25 book purchases that they made from Baker & Taylor.

Page 100

1    Q.   And does that interact with BTCat?
2    A.   Yes.
3    Q.   Does that interact with collectionHQ?
4    A.   No.
5    Q.   Is it ever used to -- is
6 collectionHQ ever used to inform that?
7    A.   No.
8    Q.   Okay.  Then when we talk about
9 BTCat, are there different BTCat products?
10   A.   No.
11   Q.   There's just one product?
12   A.   Yes.
13   Q.   Okay.  So when it comes to the
14 collectionHQ products pre-Valsoft transaction,
15 were those held by Baker & Taylor, LLC?
16   A.   They were held by Bridgeall Libraries.
17   Q.   Okay.  What about for BTCat?
18   A.   It's held by Baker & Taylor, LLC.
19   Q.   Okay.  What about CollectConnect?
20   A.   Baker & Taylor, LLC.
21   Q.   And Content Cafe?
22   A.   Baker & Taylor, LLC.
23   Q.   Okay.  Then as you look down the
24 chain -- I'm sorry, I'm going to refer you back
25 to Exhibit 43.

Page 101

1         So Baker & Taylor, LLC, you've
2 corrected, owns BookMasters, Inc.?
3    A.   Correct.
4    Q.   They also owned Blackwell Pacific
5 and James Bennett?
6    A.   Correct.
7    Q.   And that was a stock sale in May of
8 2025?
9    A.   That's correct.
10   Q.   And that was publishing?
11   A.   No.  Distribution.
12   Q.   Distribution of published materials?
13   A.   Correct.
14   Q.   Okay.  And then it also owns BTAC
15 RE Holdings, LLC?
16   A.   Correct.
17   Q.   What is that entity?
18   A.   It is BTAC Real Estate Holdings.
19 We have two parcels of land in New Jersey that
20 it holds.
21   Q.   Are those its only assets?
22   A.   That's correct.
23   Q.   And what are those pieces of land
24 or that property?
25         What is it used for?

26 (Pages 98 - 101)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 102

1    A.   Just pieces of land, undeveloped.
2    Q.   Okay.  Is that its official location?
3    A.   In New Jersey?
4    Q.   Its headquarters?
5    A.   I'm not sure.
6    Q.   Okay.  When was that entity created?
7    A.   It predates me.
8    Q.   Okay.  When you say "predates me,"
9 it predates the 2021 transaction?
10   A.   Yes.  It also predates my
11 employment with Baker & Taylor, or my
12 interaction with Baker & Taylor.
13   Q.   Okay.  And then you've mentioned
14 Baker & Taylor IT Services India Private Ltd.
15   A.   Uh-huh.
16   Q.   Is that a partnership?
17   A.   No.  It's a wholly-owned subsidiary
18 by Baker & Taylor, LLC.
19   Q.   So is it an LLC?
20   A.   No.  It's located in India.  It's a
21 private limited company.
22   Q.   Okay.  And do you have any sense
23 for what that's akin to here in the United States?
24   A.   I wouldn't be able to give you the
25 distinction.

Page 103

1    Q.   Okay.  Its headquarters are where
2 in India?
3    A.   It's in New Delhi, India.
4    Q.   And does it have other locations?
5    A.   No.
6    Q.   How many employees does it have?
7    A.   The last count that my memory
8 serves, about 175 to 200, in that range.
9    Q.   And it's an operating entity?
10   A.   Yes.
11   Q.   Okay.  And you've discussed this a
12 little, but what services does it provide and
13 to which of these entities?
14   A.   It provides services to Baker &
15 Taylor, LLC.  And previously it provided
16 services to James Bennett.
17   Q.   And so what services does it
18 provide to Baker & Taylor, LLC?
19   A.   It provides IT support,
20 development, finance and accounting support,
21 marketing support, HR support, cataloging support.
22       Am I missing anything?
23       And sales support.
24   Q.   And then what did it provide to
25 James Bennett?

Page 104

1    A.   Cataloging services support.
2    Q.   Does it contribute to any research
3 and development?
4    A.   It creates in-house software
5 development.  It contributes to in-house
6 software development.
7    Q.   Does it contribute to BTCat?
8    A.   Yes.
9    Q.   In what ways?
10   A.   Development and cataloging services.
11   Q.   Okay.  So what do you mean by
12 "development"?
13   A.   Software development for BTCat.
14   Q.   Okay.  And then "cataloging
15 services," what does that mean?
16   A.   It means we have customers who
17 require us to create customized MARC records
18 for them, and we create records for them.
19   Q.   Okay.  And so this entity has
20 access to BTCat and the information included in
21 that product?
22   A.   The employees of this do work in
23 BTCat, yes.
24   Q.   And you said it also provided HR
25 services?

Page 105

1    A.   HR support.
2    Q.   What do you mean by that?
3    A.   It is global HR support for our
4 corporate HR team here.  So they help in
5 running reports, help in medical claims
6 administration, whatever they need.
7    Q.   And it's more on the technical side?
8    A.   Administrative side.
9    Q.   Oh, administrative side.
10       Okay.  Do they support legal?
11   A.   No.
12   Q.   Okay.  Are there other entities
13 that we've discussed that contribute to R & D
14 for BTCat?
15   A.   No.
16   Q.   So it's just Baker & Taylor IT
17 Services India and Baker & Taylor, LLC?
18   A.   That's correct.
19   Q.   Okay.  Are there others that we've
20 already discussed that deal with product
21 management related to Baker & Taylor?
22   A.   Product management?
23   Q.   Yes.
24   A.   No.
25   Q.   Okay.  What about sales and marketing?

27 (Pages 102 - 105)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 106

1    A.  There is an interaction -- or was
2  an interaction between the Bridgeall sales team
3  and the Baker & Taylor sales team, so they may
4  have had an interaction where they may have
5  bundled the products together.
6    Q.  All right.  And just to be clear, I
7  was asking about the entities we've already
8  discussed, but we can get to Bridgeall in a
9  second.
10    A.  I thought you meant on the page.
11  My apologies.
12    Q.  It was probably my fault.  I'm not
13  being clear.
14    So I guess since you've answered
15  it, besides Bridgeall, is there anyone else on
16  this page that provided R & D support to
17  Baker & Taylor, LLC, for BTCat?
18    A.  I don't believe so.
19    Q.  Okay.  So no one at Bridgeall
20  provided research and development support for
21  Baker & Taylor, LLC?
22    A.  Not to my knowledge.  Steve may
23  also be the right person to answer the R & D
24  question since he oversaw technical development
25  at Bridgeall.

Page 107

1    Q.  Okay.  And then sales and
2  marketing, did anyone else besides potentially
3  some of the people from Bridgeall provide sales
4  and marketing support for BTCat?
5    A.  At Baker & Taylor IT services India
6  we have, which we've spoken about.
7    Q.  Yes, yes.  Thank you.  I omitted
8  that from my question.
9    So the two entities that provide
10  sales and marketing support to Baker & Taylor,
11  LLC, for BTCat are Bridgeall Libraries,
12  Limited -- was before the transaction, and
13  Baker & Taylor IT Services India Private Ltd.?
14    A.  Correct.
15    Q.  Do all of these entities use common
16  servers?
17    A.  There are no servers.  This is all
18  in the cloud.
19    Q.  Okay.  What do you mean by that?
20    A.  It's all on Microsoft Azure.
21    Q.  I'm not a technical person, so
22  maybe this is a question for the technical
23  folks, but don't you have to store the data
24  somewhere?
25    A.  It's in my Microsoft Azure's cloud.

Page 108

1    Q.  Okay.  And is that through like
2  Amazon Web Services?
3    A.  Microsoft Azure, which is a
4  competitor to Amazon AWS.
5    Q.  Okay.  Got it.
6    And that's for all of the products
7  that you guys use?
8    A.  For Baker & Taylor, LLC, yes.  And
9  Steve would be able to give you the Bridgeall
10  hosting.
11    Q.  Okay.  That's fair.
12    We can go through some of these
13  pretty quickly.
14    Yankee Book Peddler is also owned
15  by Baker & Taylor, LLC, correct?
16    A.  Yes.
17    Q.  Okay.  And that is a U.K. company?
18    A.  Yes.
19    Q.  And where is its headquarters?
20    A.  In -- I'll have to -- I will verify
21  this.  This predates me, so I'm unsure of this.
22    Q.  Okay.  So this was created before
23  you had any involvement with Baker & Taylor?
24    A.  Correct.
25    Q.  Okay.  Then Baker & Taylor U.K.

Page 109

1  Investments, Ltd.?
2    A.  Same.
3    Q.  Okay.  And do you hold positions in
4  both of those entities?
5    A.  Yes.
6    Q.  And what are you in those entities?
7    Let's do Yankee Book Peddler first.
8    A.  As a director.
9    Q.  You're on the board?
10    A.  Yes.
11    Q.  Okay.  And any other positions there?
12    A.  No.  I'm there as a sole director.
13    Q.  And is it a holding company?
14    A.  They're all holding companies.
15    Q.  Okay.  So the only operating
16  companies are Baker & Taylor, LLC, Baker &
17  Taylor IT Services India Private Ltd.,
18  Bridgeall Libraries?
19    A.  Uh-huh.
20    Q.  James Bennett?
21    A.  Yeah.
22    Q.  And then you see Advance Marketing.
23    Was that an operating entity?
24    A.  No.
25    Q.  So it's Baker & Taylor, LLC,

28 (Pages 106 - 109)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 110

1 Baker & Taylor -- I guess of the ones I named,
2 which are the operating entities?
3     A.   Baker & Taylor, LLC, James Bennett,
4 Bridgeall Libraries, Limited, and Baker &
5 Taylor IT Services India Private Limited.
6     Q.   Okay.  As for Baker & Taylor U.K.
7 Investments, Ltd., do you have a position on that?
8     A.   I would be listed as a director on
9 the holding companies.
10    Q.   But no other officer or --
11    A.   Not that I'm aware of.
12    Q.   Advance Marketing, similar?
13    A.   Similar.
14    Q.   And do you know if it's a U.K. entity?
15    A.   They all predate me.
16    Q.   Then we get to Bridgeall Libraries,
17 Ltd.
18    A.   Uh-huh.
19    Q.   What jurisdiction?
20    A.   Scottish.
21    Q.   Okay.  And where is its headquarters?
22    A.   In Glasgow, Scotland.
23    Q.   Where are its offices?
24    A.   Glasgow, Scotland.
25    Q.   Any other offices?

Page 111

1     A.   No.
2     Q.   Okay.  Is it an LLC?
3     A.   It's an Ltd., Limited.  That's U.K. law.
4     Q.   Where are its employees?
5     A.   In --
6     Q.   Again, this is pre transaction.
7         But where were its employees?
8         MR. NOYES:  Why don't we just
9 assume they're all pre transaction unless you
10 specify?
11        MR. WALKER:  That's right.  We can
12 do that.
13        THE WITNESS:  Okay.  The majority
14 of the employees are in Glasgow, Scotland.
15    Q.   Okay.  Are they in other locations,
16 as well?
17    A.   The employees of Bridgeall
18 Libraries, Limited, are in Glasgow, Scotland.
19    Q.   Then why don't they have employees elsewhere?
20    A.   The other employees pre transaction
21 were employed by other subsidiaries of Baker &
22 Taylor.
23    Q.   Oh, so which subsidiaries were they
24 employed by?
25    A.   In the U.S., it would be Baker &

Page 112

1 Taylor, LLC.
2     Q.   Okay.
3     A.   And in James Bennett, they were
4 James Bennett and Baker & Taylor employees.
5     Q.   Okay.  So how many employees does
6 Bridgeall Libraries have?
7     A.   I would approximate between 30 to
8 50, depending on the time.
9         (Recess taken.)
10        -   -   -
11    Q.   So you had mentioned that there
12 were employees for Bridgeall Libraries that
13 were actually employed by Baker & Taylor.
14    A.   That's not correct.  What I meant
15 was that there are employees that were
16 employees of Baker & Taylor, LLC, and James
17 Bennett that provided sales support or customer
18 service support for Bridgeall Libraries.
19    Q.   Okay.  And let's talk about Baker &
20 Taylor.
21    A.   Sure.
22    Q.   How many employees?
23    A.   I would estimate about five to
24 eight employees.
25    Q.   Okay.  And James Bennett?

Page 113

1     A.   One or two.
2     Q.   Okay.  And the Baker & Taylor
3 employees, were they located in the United
4 States?
5     A.   Yes.
6     Q.   Where were they located?
7     A.   All over.
8     Q.   Okay.  And what about the James
9 Bennett?
10    A.   In Australia.
11    Q.   The Baker & Taylor employees, were
12 any in Ohio?
13    A.   I'm not sure.
14    Q.   Did they exclusively provide sales
15 and marketing services to Bridgeall?
16    A.   Yes.
17    Q.   Okay.
18    A.   They provided -- clarification.
19 They provided services not to Bridgeall.  They
20 provided services to our customers, but
21 servicing the Bridgeall products.
22    Q.   Okay.  Why is that distinction
23 important to you?
24    A.   Because they were Baker & Taylor
25 employees.

29 (Pages 110 - 113)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 114

1    Q.   Okay.  So they didn't sell other
2  Baker & Taylor products?
3    A.   Some of them did.  Some of them did
4  not.
5    Q.   Okay.  So some of them only sold
6  products for Bridgeall?
7    A.   Correct.
8    Q.   Okay.  So I wanted to briefly talk
9  about the relationship between BTCat and
10  collectionHQ.
11        Did Bridgeall Libraries and
12  collectionHQ receive any benefits from BTCat?
13    A.   Can you define "benefits" for me?
14    Q.   What do you understand "benefits"
15  to mean?
16    A.   Give me an idea, Jeff.  Just tell
17  me what you mean, and I'll answer yes or no.
18    Q.   What, if anything, was shared
19  between BTCat and collectionHQ?
20        MR. NOYES:  Object to form.
21    A.   BTCat and collectionHQ as products?
22    Q.   Yes.
23    A.   Technically?
24    Q.   Sure.
25    A.   It's a technical answer.  You can

Page 115

1  ask this to Dan.  I'm not -- he'll be the
2  person who can give you what was shared between
3  those two products.
4    Q.   What about nontechnically?
5    A.   What was shared between them?
6    Q.   Yes.
7    A.   I think I've answered before that
8  there was sales management oversight for both
9  the products that was shared.  And there was
10  enterprise IT oversight that was provided.
11    Q.   Okay.  Did Baker & Taylor, LLC,
12  provide legal --
13    A.   In addition, finance and accounting
14  support for Bridgeall.
15    Q.   Okay.  So Bridgeall had shared
16  services for financial and accounting?
17    A.   Correct.
18    Q.   Shared --
19    A.   It was provided by Baker & Taylor.
20    Q.   And what about legal services?
21    A.   On occasion there was contract
22  legal available to Bridgeall in the U.K., and
23  Baker & Taylor, LLC, provided support in other
24  areas.
25    Q.   Who handled drafting the

Page 116

1  contracts for Bridgeall?
2    A.   They were standard -- as I
3  understand, there are some standard contracts
4  that are managed by the sales team.  And if
5  they have to go through any exceptions, they go
6  through that chain of approvals.
7    Q.   Okay.  And so the customer
8  contracts, were those drafted by Baker & Taylor
9  people?
10    A.   I'm not sure who drafted the
11  original collectionHQ forms.  They predate me.
12  But Baker & Taylor provided assistance when
13  needed.
14    Q.   Okay.  So if there were changes
15  made to the original contracts, Baker & Taylor
16  was involved in those?
17    A.   They could have been, depending
18  upon which jurisdiction.  If it was an
19  Australia customer, then Baker & Taylor U.S.
20  would not be involved in it.
21    Q.   But they were involved on any U.S.
22  customers?
23    A.   They could have been.
24    Q.   As far as the form contract goes,
25  did they provide any input on the changes to

Page 117

1  the original terms and conditions?
2    A.   I'm certain that they may have
3  provided inputs from time to time, yes.
4        (Discussion had off record.)
5    Q.   So are you familiar with WorldCat?
6    A.   I know of its existence.
7    Q.   Okay.  What is WorldCat?
8    A.   As I understand it, it's a database
9  of MARC records.
10    Q.   Okay.  Do you have any other
11  understanding of what it does, what it is?
12    A.   It's owned by OCLC.
13    Q.   Okay.  Do you have any employees
14  that worked for OCLC?
15    A.   I wouldn't have that knowledge.
16    Q.   Okay.  Do you have any consultants
17  that worked for OCLC?
18    A.   I wouldn't have that knowledge, but
19  not to my knowledge.
20    Q.   Who would be the people who would
21  have that knowledge?
22    A.   If we employed any people that
23  previously had OCLC employment, I guess my HR
24  team.
25    Q.   And who would that be?

30 (Pages 114 - 117)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 118

1　A.　My HR leader, Hannah Correll.
2　　　MR. NOYES: What topic is that, or
3 is that just inquiry?
4　　　MR. WALKER: Yeah, just inquiry.
5　Q.　Have you ever seen a WorldCat record?
6　A.　Can you tell me what a WorldCat
7 record is?
8　Q.　It's a record from WorldCat.
9　A.　A record from WorldCat?
10　　I'm not sure I've ever -- I've been
11 maybe a part of a demonstration or a review
12 somewhere, but I haven't searched for it or
13 reached out for a record from WorldCat.
14　Q.　Okay.
15　　　MR. NOYES: And just so I'm clear,
16 Topic 5, Sub A, WorldCat records and data is
17 Dan Johnson.
18　　　MR. WALKER: Right. I understand.
19　　　MR. NOYES: Okay.
20　Q.　Are you aware that OCLC places
21 restrictions on customers and their use of
22 records from WorldCat?
23　A.　Not particularly. They may choose
24 to do it, but I'm not privy to any contracts
25 that OCLC may have with our customers.

Page 119

1　Q.　Is Baker & Taylor aware of this?
2　A.　That OCLC places restrictions?
3　　　Only in assumptions, that it's a
4 good business practice. They may or may not.
5 We don't know.
6　Q.　Why is it a good business practice?
7　A.　Just contracts, you want to make
8 sure that contractually you know what you're
9 getting into it.
10　Q.　So what kind of restrictions would
11 you put on something like that?
12　　　MR. NOYES: Objection to the form.
13　A.　It's just conjecture. There could
14 be many, many different clauses. You can put
15 any kind of restrictions on the usage.
16　Q.　What are some of those that you
17 might place on the usage?
18　　　MR. NOYSE: Objection to the form.
19　A.　They could put restrictions on the
20 jurisdiction, different features, so on and so
21 forth.
22　Q.　Okay. And you've been doing
23 software product development and sales for a
24 long time, right?
25　A.　For a while.

Page 120

1　Q.　Yeah. And for those products and
2 sales, have you ever placed restrictions on a
3 customer's use of those software products?
4　A.　I'm sure we have.
5　Q.　Okay. What kind of restrictions
6 have you placed on them?
7　A.　Different products have different
8 restrictions.
9　Q.　Okay. So maybe let's throw out BTCat.
10　　What kind of restrictions have you
11 put on customers' use of BTCat?
12　A.　Depending on their engagement with
13 BTCat, the restrictions can vary.
14　Q.　So depending on the engagement,
15 what does that mean?
16　A.　They could be using BTCat just as a
17 utility. They could be using BTCat as a
18 utility in a database. They could be using
19 BTCat as part of their third-party subscription
20 services.
21　Q.　So let's talk about each of those.
22　　For the utility, what do you mean
23 by that?
24　A.　They're accessing BTCat's utility
25 to create or enhance any records that they may

Page 121

1 choose.
2　Q.　So is that for cataloging?
3　A.　Yeah.
4　Q.　And what restrictions does Baker &
5 Taylor place on customers that use the utility?
6　A.　General restrictions, like the
7 software will not be abused and that it will be
8 used in the real form that the customer
9 understands it should be used.
10　Q.　Okay. So software restrictions.
11　　Any other restrictions?
12　A.　I'm sure there are plenty in the
13 contract. I don't have it in front of me.
14　Q.　Would they place any restrictions
15 on the use of data?
16　A.　That depends on the form. That
17 depends on the contract. Some data is
18 protected. Some isn't.
19　Q.　Okay. So for the contract that
20 applies to the utility, does it restrict
21 customers' use of BTCat data?
22　A.　If they're accessing BTCat data
23 perhaps, yes. If they're using it for their
24 own creation of their MARC records and they're
25 able to do it, they own it.

31 (Pages 118 - 121)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 122

1    Q.   Are they able to share that data
2  with others?
3      A.   If they create it and if they own
4  it, yes, they can.
5      Q.   Okay.  What do you mean by "if they
6  own it"?
7      A.   If they create the record, if they
8  enhance the record and they have it in their
9  private institution files and they deem it not
10 to be shared with anyone, then they can choose
11 to do whatever they want.
12     Q.   So if they download a BTCat record
13 and make improvements, they can --
14     A.   We --
15     Q.   Go ahead.
16     A.   I was just saying, we're only
17 talking about the utility.  So the utility
18 doesn't have access with the database.
19     Q.   So you can't download with the
20 utility?
21     A.   You can download, but you don't
22 have access to our database, meaning the BTCat
23 database.  The utility is like a Microsoft word
24 processor, you can type things into it.
25     Q.   So it's to make edits, changes,

Page 123

1  deletions, that kind of stuff?
2      A.   If it's technical restrictions,
3  then I think Dan might be the right person to
4  give you the answer more technically.
5      Q.   I'm talking more contracts.
6           So the utility and database, is
7  that like -- what do you refer to that as?
8           Does that have a name?
9      A.   It's BTCat.
10     Q.   Okay.  So there's BTCat, BTCat
11 utility?
12     A.   They can choose to only have access
13 to the BTCat utility.
14     Q.   Okay.  And then you can do an
15 add-on to have access to the database?
16     A.   Correct.
17     Q.   And what is the database?
18     A.   The database is a collection of
19 MARC records within BTCat.
20     Q.   Okay.  And how many records are there?
21     A.   Dan can give you the exact answer.
22     Q.   Okay.  Do you have an estimate?
23     A.   Approximately 90 million.
24     Q.   90 million.
25          MR. NOYES:  Let me just -- for

Page 124

1  orientation, I believe we're in Topic 8, which
2  doesn't really directly relate to BTCat
3  contracts, but I just want to make sure because
4  8 divides certain topics between Aman and Dan
5  Johnson.  So if I'm misunderstanding and this
6  is not Topic 8, then if you could clarify.
7          MR. WALKER:  I think this is
8  related to the contracts that we've talked about.
9          MR. NOYES:  Because 4 is
10 subscription contracts, but that's for
11 collectionHQ.
12         MR. WALKER:  No.
13         MR. NOYES:  Okay.  4(B), agreements
14 between Defendants other than collectionHQ.
15 Okay.  Okay.
16         MR. WALKER:  Yeah.
17     Q.   So utility and database.
18          So for those customers, does
19 Baker & Taylor place restrictions on the use of
20 records from the database?
21     A.   It's situational.  For third-party
22 contracts where we are creating records on
23 behalf of a customer, it's stored in a
24 customer's work file, which they have access
25 to, and they can do with it whatever they wish

Page 125

1  to do with it.
2      Q.   So that's for third-party cataloging?
3      A.   Correct.
4      Q.   Okay.  For those that are given
5  access to the utility and database for not
6  third-party cataloging, are there restrictions
7  on it?
8      A.   There may be certain restrictions,
9  Jeff, depending on the situation.  So a
10 customer can create their own records.  They
11 can access our database and edit a record and
12 make it their own, and then they can choose to
13 do whatever they want with it.  In many
14 situations, a record goes around to many
15 different institutions.
16     Q.   So a record that's in BTCat's
17 database that is downloaded by a customer, they
18 can use it however they want?
19     A.   They can choose to add or enhance
20 it the way that they want.
21     Q.   Can they share it however they want?
22     A.   Non-commercially.
23     Q.   Okay.  So if they shared it with a
24 competitor, you'd have a problem with that?
25          MR. NOYES:  Objection to the form.

32 (Pages 122 - 125)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 126

1      A.   Depending on the use of it.
2      Q.   So if they shared it with someone,
3  and then someone sold that record, would you
4  have a problem with that?
5      A.   Depending on their agreement with us.
6      Q.   Okay.  And do you ever have an
7  agreement where that's permitted?
8      A.   Where commercial rights are permitted?
9      Q.   Say that again.
10     A.   Where commercial rights are permitted?
11     Q.   Yes.
12     A.   I'm not aware.
13     Q.   Okay.  So as you sit here right
14 now, you can't think of a situation where you
15 permit that by contract?
16     A.   Situationally, Jeff, like I said,
17 if there were third-party arrangements in which
18 we are creating records on a customer's behalf,
19 if we are creating records at Baker & Taylor,
20 as we do, as the largest employers of
21 catalogers, then those records are part of our
22 database.
23     Q.   I understand that.  That's cataloging,
24 right?
25     A.   Correct.

Page 127

1      Q.   That's a separate service?
2      A.   Yes.
3      Q.   Okay.  I'm talking about people
4  that are given access, and they download the
5  record, and they do the changes and manipulations.
6      A.   Uh-huh.
7      Q.   Are they permitted to then share
8  that for commercial purposes?
9      A.   For commercial purposes, no.
10     Q.   Okay.  Why is that?
11     A.   The effort to create a record
12 within our database, so the commercial rights
13 are reserved by Baker & Taylor and BTCat.
14     Q.   Okay.  And so it's because of the
15 effort and investment that Baker & Taylor has
16 put into those records?
17     A.   The originality of it, the novelty of
18 it.
19     Q.   That you're adding -- what is
20 original about it?
21     A.   Either creation or material
22 enhancement.
23     Q.   Okay.  Is it also kind of the sweat
24 equity?
25     A.   I don't know what that means.

Page 128

1      Q.   Like the work that you're putting
2  in to improving or enhancing that record.
3      A.   I think it's hypothetical and
4  conjecture at this point, Jeff, because the
5  work put in by an original cataloger that has
6  book in hand in creating a record is very
7  different than somebody adding a field amongst
8  400 fields.
9      Q.   So I'm talking about Baker & Taylor.
10     A.   Yes.
11     Q.   Do you put in work to make your
12 records original in your database?
13     A.   Yes.
14     Q.   Is that one of the reasons why you
15 protect those records --
16         MR. NOYES:  Objection to the form.
17     Q.   -- from commercial use?
18     A.   In some cases, yes.
19     Q.   Not in all cases?
20     A.   There could be cases in which we
21 may have a partnership in which those rights
22 can be waived.
23     Q.   Okay.  Can you think of any
24 situation where you've done that already?
25     A.   Not yet.

Page 129

1      Q.   You haven't done it yet?
2      A.   Not yet.  But we have other
3  providers and other customers who use it.
4      Q.   Okay.  And so in that situation
5  where you enter into a partnership, would you
6  expect compensation as part of that partnership?
7      A.   Sometimes.
8         MR. NOYES:  Objection to the form.
9      Q.   Sometimes?
10     A.   Yeah.
11     Q.   So I think you testified you
12 understood that OCLC does place some
13 restrictions on customers' use of WorldCat
14 records; is that accurate?
15     A.   I briefly read the rights and
16 reservations document that was in there, but it
17 was very confusing to me to understand the
18 rights and the restrictions that are placed.
19 And also, I'm not privy to any restrictions in
20 any contracts that OCLC may have with their
21 customers.
22     Q.   Okay.  So are you saying you
23 weren't aware that they placed restrictions on
24 the use of WorldCat records?
25     A.   I'm saying there may or may not

33 (Pages 126 - 129)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 130

1 have been, but I'm not privy to any contracts
2 between OCLC and its customers.
3    Q.   So you don't know whether or not
4 OCLC placed restrictions on customers' use of
5 WorldCat?
6    A.   I'm unsure, yeah.
7    Q.   Okay.  You've never heard any
8 customer say that there are restrictions and
9 ways in which they can't use WorldCat records?
10    A.   If they understood it and
11 communicated maybe to somebody at Baker &
12 Taylor, but, you know, not me.
13         Just as a quick check-in, which --
14         MR. NOYES:  We're on 4.
15    A.   We're on 4?
16    Q.   Yes, we are.  I'm sorry.  I may hop
17 around a bit.
18    A.   I'm sorry.  I'm just trying to
19 organize my notes.  Okay.
20    Q.   So putting the contract aside,
21 whether or not you've seen it, are you aware
22 generally that OCLC places restrictions on its
23 customers' use of WorldCat data?
24    A.   Only through brief knowledge of
25 publicly-available information on a past

Page 131

1 litigation.
2    Q.   Okay.  And what litigation is that?
3    A.   I believe that there was one where
4 Clarivate was a Defendant.  And more recently I
5 was made aware of a matter with something
6 called Anna's Archive.  I apologize if I'm
7 mispronouncing that.
8    Q.   So the Clarivate litigation, when
9 did you first become aware of that?
10    A.   I would say I may have read it in
11 the past, I can't recall, but more recently in
12 one visit to OCLC's office with their CEO, I
13 was made aware that there was a past
14 litigation.
15    Q.   Okay.  And when was that visit?
16    A.   It was early this year.  I may not
17 recall the exact date.  It was right at the
18 time when OCLC withdrew from the acquisition
19 process of collectionHQ, somewhere in that time.
20    Q.   We can come back to that later.
21    A.   Sure.
22    Q.   So prior to that time you had never
23 heard anything from library land about the
24 Clarivate litigation?
25    A.   I'm sure I may have seen it, read

Page 132

1 through it in passing, but I don't think that I
2 may have paid enough attention to it.
3    Q.   And what are BTCat's main competitors?
4    A.   There are several.
5    Q.   Could you name a few?
6    A.   I would think that we have
7 SkyRiver, which I'm not sure who owns it now,
8 but it was a product out there.  I would
9 imagine it would be a product from TLC, it used
10 to be called ITS MARC, but I'm not sure what
11 it's called today.  I would say any open
12 databases out there.  I would say Library of
13 Congress, as well.
14    Q.   Okay.  Would you say WorldCat?
15    A.   In certain cases, it could be
16 considered a customer, a competitor, I would
17 say.  But we actively do not compete with any
18 other products out there.  We believe that all
19 products suit the different needs of different
20 customers.
21    Q.   So you've never compared -- have
22 you ever compared your product --
23    A.   I'm sure my team has.
24         MR. NOYES:  Let him finish the
25 question, please.

Page 133

1    Q.   Have you ever compared BTCat to
2 WorldCat?
3    A.   I'm sure my team has in instances.
4    Q.   Have you?
5    A.   In hindsight, in passive thought,
6 yeah.
7    Q.   What does that mean?
8    A.   It means not paying active
9 attention to it, but if some data was provided
10 to me, I may have compared it.
11    Q.   When you're talking with customers
12 or other libraries, have you ever discussed or
13 compared BTCat to WorldCat?
14    A.   I can't recall exact communications
15 with customers, but perhaps as a matter of
16 sales, I guess.
17    Q.   Okay.  What about in any potential
18 acquisitions?
19    A.   Yes.  The incident I could
20 potentially remember would be when Baker &
21 Taylor was part of the disposition by Follett,
22 there may have been discussions with potential
23 acquirers on the merits of BTCat.
24    Q.   Versus WorldCat?
25    A.   Just the merits of BTCat.  And if

34 (Pages 130 - 133)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 134

1 any one of them would have asked about
2 competitors, it may have come up.
3     Q.   Okay.  Have libraries with WorldCat
4 subscriptions ever asked whether they could
5 share bibliographic information or records or
6 data from WorldCat with Baker & Taylor?
7     A.   We don't offer legal advice to our
8 customers or prospects.  If they ask a question
9 like that, we always want to refer them,
10 saying, "You must know what you can and cannot
11 do."
12     Q.   So is the answer to that yes or no?
13     A.   No customer has asked me.
14     Q.   I'd like to repeat my question.
15     A.   Sure.
16     Q.   Have libraries with WorldCat
17 subscriptions ever asked whether they could
18 share bibliographic records or data with
19 Baker & Taylor?
20     A.   I'm unaware of it.  They may have
21 asked -- may or may not have asked somebody on
22 my team that's interacting with them, but I'm
23 not aware of it.
24     Q.   Okay.  Would you be surprised if
25 they did?

Page 135

1     A.   I'd be indifferent.
2     Q.   You'd be indifferent as to whether
3 or not customers are asking if they can share
4 WorldCat data with you?
5     A.   Whose customers, Jeff?
6     Q.   Your potential customers.
7     A.   So potential customers?
8     Q.   Or current customers.
9     A.   Can you ask your question again so
10 I have that clarification?
11     Q.   Would you be indifferent whether or
12 not current or potential customers are asking
13 your employees whether or not they can share
14 WorldCat data with Baker & Taylor?
15     A.   I would be indifferent, yes,
16 because I don't know their reasoning for asking
17 that question.  They need to know what they can
18 and cannot share.
19     Q.   Okay.  Would you expect your team
20 to follow up and see if there might be a
21 problem in ingesting that data into BTCat?
22     A.   Our team is focused on compliance
23 with the contract.  So if a customer or a
24 potential customer or a new customer is telling
25 us that they're authorized to share records, we

Page 136

1 trust them.
2     Q.   Is that the case even if you are
3 aware of restrictions?
4     A.   I don't know what restrictions.
5     Q.   If Baker & Taylor is aware of the
6 Framework Agreement, for example, and a
7 customer asks, would you expect your employees
8 to follow up and see if that was data that they
9 could use in BTCat?
10     MR. NOYES:  Objection to the form.
11     A.   I believe that the rights document,
12 restrictions document that you are referring
13 to, Jeff, is confusing to me, and we rely upon
14 our customers to have that understanding.
15     Q.   Okay.
16     MR. NOYSE:  And I noted an
17 objection to the form.
18     A.   We would expect that our customers
19 would comply with the contract that they're
20 signing with us.  And if they have questions
21 about the contract that they're signing with
22 us, we would clarify what it would mean without
23 offering legal advice, but we wouldn't comment
24 on any other third party that they have a
25 contract with.

Page 137

1     Q.   Has your team ever worked with a
2 customer or a potential customer to try to help
3 them avoid violating contractual obligations to
4 a third party?
5     A.   I don't believe so.  We want to
6 make sure that our customers are compliant with
7 any and all contracts they sign.  They
8 must know what they can and cannot do.
9         - - - - -
10     (Thereupon, Plaintiff's Exhibit 44,
11     06-27-2025 Valsoft Press Release,
12     was marked for purposes of
13     identification.)
14         - - - - -
15     Q.   Okay.  I have handed you what is
16 Exhibit 44.
17     A.   Yes.  Would you also tell me, Jeff,
18 where are we in the responsible section, since
19 you move around?
20     Q.   Yeah, yeah, yeah.  This is -- I
21 mean, first, I guess, what is that document?
22         Do you recognize it?
23     A.   It's a press release, I believe --
24     Q.   Okay.
25     A.   -- from Valsoft.

35 (Pages 134 - 137)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 138

1    Q.   Okay.  And you can take some time
2 and look at it.
3    A.   Okay.
4       (Witness complies with request.)
5       Okay.
6    Q.   So what is it a press release
7 about?
8    A.   It's about Valsoft acquiring the
9 assets of Bridgeall Libraries, I believe, for
10 collectionHQ.
11    Q.   So in answer to your earlier
12 question, this is Topic 4.
13    A.   Okay.  That's where I'm at.
14    Q.   Who is Valsoft?
15    A.   It's a Canada-based software
16 company.
17        - - - - -
18       (Luncheon recess taken.)
19        - - - - -
20
21
22
23
24
25

Page 139

1       AFTERNOON SESSION
2    CONTINUED EXAMINATION OF AMANDEEP KOCHAR
3 BY MR. WALKER:
4    Q.   We're back on the record.  And I
5 think where we left it off was, we have
6 Exhibit 44 in front of you, and we were about
7 to discuss the Valsoft transaction.
8    A.   Before that, Jeff, if we can go
9 back to a previous conversation we were having
10 about any contracts where we may have waived
11 commercial rights and so on and so forth.  I
12 did recall we have a contract with a customer
13 where we have waived certain restrictions,
14 provided commercial rights, and have also
15 waived the fee.  So we have a contract in place
16 in that circumstance that I wasn't able to
17 recall earlier.
18    Q.   Okay.  And what helped you recall
19 that?
20    A.   As I went back, you know, I knew
21 there was one, I wasn't able to recall where it
22 was, and as I was walking into the room, I
23 thought of it, so I thought when I come back,
24 I'll get that on the record.
25    Q.   And do you know who the customer

Page 140

1 was?
2    A.   It is Follett.
3    Q.   Okay.  Follett customer.
4       And what type of agreement is that?
5    A.   For them to be -- for them to use
6 BTCat and the database --
7    Q.   Okay.
8    A.   -- and its usage of the database,
9 usage of BTCat.
10    Q.   When you say, "usage of the
11 database," you mean BTCat records?
12    A.   Yes.
13    Q.   And you say that there were some
14 restrictions that were negotiated; is that right?
15    A.   Correct.
16    Q.   So which restrictions were
17 different from the standard terms and conditions?
18    A.   I believe the situation of that
19 agreement was a little different.  It occurred
20 when Baker & Taylor was not an independent
21 entity, so this was a contract in 2021, I
22 believe.  And so as I understand it, certain
23 commercial rights for the records that are
24 created by Follett and contributed into the
25 database, they have commercial rights for those

Page 141

1 records that they've contributed previously.
2    Q.   Is it in perpetuity or just they
3 contributed while the two entities were related?
4    A.   They have commercial rights in
5 perpetuity for the records that they've
6 contributed and created.
7    Q.   Okay.  And have they contributed
8 any -- to your knowledge, have they contributed
9 any records since Baker & Taylor separated?
10    A.   Yes.  It's an active contract.
11    Q.   Okay.  And so just to make sure I
12 understand it, any record that Follett creates
13 and adds to the BTCat database, they can sell,
14 market, use however they want?
15    A.   Correct.
16    Q.   Okay.  Is there a numerical cap on
17 that or no?
18    A.   I don't believe that there is.
19    Q.   Okay.  And do you know if that
20 agreement has been provided in this litigation?
21    A.   I'm unsure --
22    Q.   Okay.
23    A.   -- yeah.
24    Q.   And if you were going to try to
25 find it, do you have a sense for where -- who

36 (Pages 138 - 141)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 142

1 you'd talk to to locate it?
2    A.   I'd probably talk to Counsel.
3    Q.   Okay.  We can follow up with
4 Counsel afterwards.
5         Okay.  Anything else that you
6 recalled during the break?
7    A.   That was the thing that came to my
8 mind.  Back to Valsoft.
9    Q.   We're going to refer to this as the
10 Valsoft transaction, okay?
11   A.   Yes.
12   Q.   In this press release, do you see
13 in the fifth paragraph --
14   A.   Yes.
15   Q.   -- it has some language from you,
16 correct?
17   A.   Uh-huh.  Yes.
18   Q.   And it says that "We are excited to
19 enter this new chapter with Valsoft."
20   A.   Uh-huh.
21   Q.   Prior to this deal, did Baker &
22 Taylor have a business relationship with Valsoft?
23   A.   No.
24   Q.   Okay.  And then in the next
25 paragraph it states "collectionHQ will continue

Page 143

1 to operate under its existing brand and
2 leadership."
3    A.   Uh-huh.
4    Q.   So we were talking previously about
5 the employees that worked for Bridgeall
6 directly and then the employees that were
7 Baker & Taylor employees that supported some of
8 Bridgeall's sales and marketing and things like
9 that.
10   A.   Correct.
11   Q.   So this is talking about leadership,
12 right?
13        Did the entire leadership team from
14 Bridgeall leave with the transaction?
15   A.   I believe so.
16        Just a point of clarification.
17 This press release was issued by Valsoft, so
18 this is their issuance, right, so the
19 statements, other than my quote, are theirs.
20   Q.   Okay.  Is this statement accurate,
21 though, that collectionHQ will continue to
22 operate under its existing brand and leadership?
23   A.   I believe it's true.  That's what
24 that belief was potentially when they issued
25 the statement.  Whether that's true today or

Page 144

1 not, I don't know.
2    Q.   As far as when we looked at that
3 org chart, is the Bridgeall entity that we
4 talked about the only entity that had assets
5 that were part of this transaction?
6    A.   Correct.
7    Q.   Okay.  And what happened to that
8 Bridgeall entity?
9    A.   It has since been renamed.
10   Q.   Okay.  And what's its name?
11   A.   I believe it's Baker & Taylor Scotland.
12   Q.   Okay.  And is it a holding company?
13        Does it operate?
14   A.   It's -- there is no operations in
15 that company anymore.
16   Q.   It's just there, there's nothing?
17   A.   It's just there for tax purposes.
18   Q.   Got it.  And it doesn't hold any
19 assets?
20   A.   No.
21   Q.   So were you involved in the Valsoft
22 transaction?
23   A.   Yes.
24   Q.   In what capacity?
25   A.   The transaction on behalf of

Page 145

1 Baker & Taylor.
2    Q.   And was it only on behalf of
3 Baker & Taylor?
4    A.   Well, Baker & Taylor owned
5 Bridgeall, and so Baker & Taylor and Bridgeall.
6    Q.   I'm trying to understand, is
7 there -- when you're providing these answers,
8 if you can provide any distinction as we
9 discuss it, that would be helpful.
10   A.   Okay.
11        MR. NOYES:  You mean in terms of
12 whether he's speaking on behalf of Baker &
13 Taylor or Bridgeall?
14        MR. WALKER:  That's correct.
15        MR. NOYES:  Okay.
16   Q.   So what was the impetus for the
17 transaction?
18   A.   It was portfolio rationalization
19 for the Baker & Taylor group of companies.
20   Q.   And did you approach Valsoft or did
21 Valsoft approach you?
22   A.   Valsoft came to us through a
23 process we ran with an investment banker.
24   Q.   Okay.  And who was the investment
25 banker?

37 (Pages 142 - 145)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 146

1    A.   Berkery Noyse.
2    Q.   And so who was involved in those
3 initial discussions?
4    A.   With whom?
5    Q.   With Valsoft.
6    A.   It would have been -- the initial
7 discussions would have been me and my CFO,
8 Steve perhaps.
9    Q.   Any other discussions?
10   A.   It was me and my CFO, Steve Hennen.
11   Q.   And those were the only ones from
12 Baker & Taylor or Bridgeall?
13   A.   In the initial discussions, correct.
14   Q.   And who was on the other side?
15   A.   From Valsoft?
16   Q.   Correct.
17   A.   It would be a gentleman by the name
18 of Will Malouf, M-a-l-o-u-f.
19   Q.   Do you know his position?
20   A.   I'm not sure.
21   Q.   Okay.  Anyone else from Valsoft?
22   A.   He was the primary point of
23 contact.  At certain points there was a
24 gentleman named Peter Blanchard.  And there may
25 have been more towards the end of the

Page 147

1 transaction.
2    Q.   So was Will Malouf the primary
3 negotiator?
4    A.   I would say so.
5    Q.   Okay.  And then what did Peter
6 Blanchard do as part of the negotiations and
7 discussions?
8    A.   I think his goal was primarily to
9 understand the business.  And I believe he may
10 be the operating person to lead the company
11 after the transaction.  So that may have been
12 his role, but I'm not sure.
13   Q.   Okay.  And then did you have
14 Counsel for the transaction?
15   A.   Yes.
16   Q.   And who was that?
17   A.   We had U.K. Counsel and we had
18 Offit Kurman in the U.S.
19   Q.   Okay.  So Offit Kurman.
20        And then who was the U.K. Counsel?
21   A.   I believe it was Buckles, Buckles
22 Law.
23   Q.   Okay.  And who were the Attorneys
24 from Offit Kurman?
25   A.   Ryan -- I forget his last name.

Page 148

1 Apologies.  It's Ryan Alexander.  There we go.
2 And Katy Poole at Buckles Law.
3    Q.   So when did these discussions
4 start?
5    A.   I believe these discussions would
6 have started when we sought buyers for the
7 Bridgeall business.  And they may have started
8 in the November, December time frame of 2024.
9    Q.   Is it may or they did start in that
10 time period?
11   A.   They started in that time period --
12   Q.   Okay.
13   A.   -- when we were soliciting bids for
14 Bridgeall for collectionHQ.
15   Q.   And was that before Thanksgiving?
16   A.   I don't believe so.
17   Q.   Okay.  Did the parties enter into
18 an LOI?
19   A.   Later.  Early this year, yeah.
20   Q.   And when was that?
21   A.   I believe it was in May.  I don't
22 have the exact date.  But in May perhaps.
23   Q.   And do you know if that LOI
24 had an exclusivity provision?
25   A.   For Valsoft?

Page 149

1    Q.   Yes.
2    A.   Yes.
3    Q.   Okay.  Do you know how long that
4 exclusivity ran?
5        Until the close of transaction?
6    A.   I think it may have run its course
7 through the end of the LOI, not the end of the
8 transaction.
9    Q.   And the end of the LOI -- when was
10 the end of the LOI?
11   A.   I think there's a date in the LOI
12 that puts out when the LOI will expire.
13   Q.   And do you know if the LOI was
14 provided to Counsel for production in this case?
15   A.   Yes.
16   Q.   It was?
17   A.   The LOI with Valsoft?
18   Q.   Yes.
19   A.   Yes.
20   Q.   Okay.  Did Baker & Taylor and
21 Bridgeall have communications with Valsoft
22 about OCLC?
23   A.   Yes.
24   Q.   Okay.  What were those discussions?
25   A.   They were limited to the ongoing

38 (Pages 146 - 149)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 150

1 litigation.
2    Q.   Okay.  What does that mean?
3    A.   It means that we disclosed to them
4 that we were in litigation, and that Bridgeall
5 Libraries were a named Defendant.  And they
6 wanted to know our approach.  And those were
7 the nature of the discussions.
8    Q.   Okay.  Were there discussions about
9 the collectionHQ agreement and the provision
10 that is identified in the Complaint?
11    A.   Yes.
12    Q.   Did they ask questions about that
13 provision?
14    A.   Yes.
15    Q.   What did they ask?
16    A.   The nature of that provision and
17 what it meant.
18    Q.   And what did you tell them?
19    A.   That provision was in place to
20 support the needs of our library customers.
21    Q.   Did they ask whether or not that
22 provision violated OCLC's rights with its
23 customers?
24    A.   No, they did not ask that question.
25    Q.   Did they ask about BTCat?

Page 151

1    A.   Yes.
2    Q.   What did they ask about BTCat?
3    A.   They wanted to understand the
4 collectionHQ and BTCat relationship, if any.
5    Q.   And what is the relationship
6 between collectionHQ and BTCat?
7    A.   I think I've answered the sales and
8 marketing shared support structure.  And the
9 technical details I think you can ask Dan
10 Johnson tomorrow.
11    Q.   Okay.  Do you have any
12 understanding -- did Dan Johnson explain the
13 relationship between collectionHQ and BTCat or
14 was it you?
15    A.   I explained the business
16 relationship between collectionHQ and BTCat.
17    Q.   Okay.  And did someone explain the
18 technical relationship to them?
19    A.   We did not get into that level of
20 detail in the conversation with them.
21    Q.   Okay.  So what level of detail did
22 you get into?
23    A.   The level of detail about if a
24 customer so chooses to put their records in
25 collectionHQ, that provides authorization that

Page 152

1 those records can be sent over to Baker &
2 Taylor for BTCat.  That was that.
3    Q.   And was there a discussion about
4 whether that provision needed to be removed
5 from future contracts?
6    A.   I can't recall if there was a
7 specific question about removal of their
8 contract -- about that contract.  I can't
9 recall if there was any conversation about the
10 removal of that clause specifically.
11    Q.   Did they have questions about how
12 many customers had signed on to agreements that
13 had that provision in it?
14    A.   Yes.
15    Q.   And what was the answer?
16    A.   At that time, when we were having
17 that conversation, I wasn't sure, so I said we
18 would do the analysis and get back to them.
19    Q.   And did you get back to them?
20    A.   We submitted our disclosure for
21 what we believe the litigation is about.  We
22 may have gotten back to them with the answer
23 that there are several customers that have the
24 provision, and many customers that don't have
25 that clause.  And we told them that since they

Page 153

1 have the contracts, and the contracts were
2 moving, they could do their own analysis.
3    Q.   Okay.  Did you -- you said, "may."
4     Is that --
5    A.   We did not give them an answer.  We
6 said, "Now that we've produced all the
7 contracts for your diligence, you can do your
8 analysis."
9    Q.   And did they ever ask about that
10 issue when you said you wouldn't give them an
11 answer?
12    MR. NOYES:  Objection to the form.
13    A.   I didn't say I wouldn't give them
14 an answer.  We said, "You have all the
15 contracts to do your own analysis."
16    Q.   And is it your understanding that
17 some of the contracts have that provision, but
18 most don't?
19    A.   It's my understanding that some do
20 and some don't.
21    Q.   Okay.  Is that what you told them?
22    A.   Yes.
23    Q.   Were those communications in writing?
24    A.   Sometimes.
25    Q.   Okay.  The communications about

39 (Pages 150 - 153)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 154

1 their questions about this litigation and the
2 provision, was that in writing?
3     A.   The questions about the litigation
4 were not in writing.  What was provided as part
5 of the disclosure schedules of the contract for
6 the acquisition was in writing.
7     Q.   Okay.  So you had initial
8 discussions, and you said at the end of
9 November or December?
10    A.   That is when we started out with
11 Berkery Noyse to solicit offers.
12    Q.   So when did you have initial
13 discussions with Valsoft?
14    A.   I'd say in the December, January
15 time frame, yes.
16    Q.   And then you said the LOI was in May?
17    A.   Correct.
18    Q.   And when did the due diligence start?
19    A.   With Valsoft?
20    Q.   Correct.
21    A.   After we signed the LOI.
22    Q.   Okay.
23          - - - - -
24          (Thereupon, Plaintiff's Exhibit 45,
25          Follow-up Questions Regarding OCLC

Page 155

1          Injunction and Litigation, was
2          marked for purposes of
3          identification.)
4          - - - - -
5     Q.   Do you recognize that document?
6     A.   I recognize some parts of the
7 document, but not the full document completely,
8 so perhaps you can remind me.
9     Q.   This is a document you produced, so
10 I'm kind of relying on you to be able to
11 provide the information.
12    A.   As far as memory serves, this may
13 have been a document sent by Valsoft to Baker &
14 Taylor for clarifications on the litigation.
15 That's what I can glean from it.
16    Q.   Okay.  So have you ever seen this
17 document?
18    A.   I may have, but I'm unsure.
19 There's a lot of documents in there.  I'm unsure.
20    Q.   Okay.  Are these questions that
21 Valsoft asked you as part of the due diligence?
22    A.   Some of these questions, yeah.  I
23 recognize some of these questions, yeah.
24    Q.   Is it your understanding that these
25 are questions that they sent to you at

Page 156

1 Bridgeall and Baker & Taylor?
2     A.   It's my understanding that we've
3 answered some of these questions, that they may
4 have some of these questions, and we answered
5 them, yes.
6     Q.   I'm asking, do you know if this
7 document included -- if these questions in this
8 document came from Valsoft?
9     A.   I cannot recall this document
10 correctly, so I do not know if Valsoft created
11 it or if our Counsel created it.  I'm not able
12 to place who is the author of this document.
13    Q.   Okay.  So you said some of these
14 questions Valsoft asked you?
15    A.   That I can recall, in our
16 conversations, yes.
17    Q.   So maybe we can just walk through
18 some of them.
19    A.   If you'd like to.
20    Q.   I would.
21          So Strategic Scope of the
22 Injunction, this first bullet, do you recall
23 them asking you about that?
24    A.   Yes.
25    Q.   Okay.  Did you provide an answer?

Page 157

1     A.   Yes.
2     Q.   And what was that answer?
3     A.   The answer was that our
4 understanding of the Complaint that OCLC has
5 filed is against BTCat and the records that it
6 contains.
7     Q.   And so your answer was it wouldn't
8 affect other products?
9          MR. NOYES:  Objection to the form.
10    A.   My answer was that it can and will
11 affect other products.
12    Q.   What other products will it affect?
13          MR. NOYES:  Objection to the form.
14          Are you asking for his current
15 assessment or what he told them?
16          MR. WALKER:  Thank you.
17    Q.   As far as what did you tell them?
18    A.   I said it can impact other products
19 and services, that I told them.
20    Q.   And did they ask you which specific
21 ones?
22    A.   They may have.  I'm unable to
23 recall what was their follow-up to this.
24    Q.   Did they ask you if it would impact
25 collectionHQ?

40 (Pages 154 - 157)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 158

1      A.   Yes.
2      Q.   And what did you tell them?
3      A.   We said that it has the potential
4  to impact collectionHQ.
5      Q.   Did you tell them how?
6      A.   I told them that our customers
7  expect collectionHQ and BTCat to offer a
8  solution, and if collectionHQ is not allowed to
9  conduct itself in the same way, it could impact
10  the reputation of collectionHQ.
11      Q.   And how would this impact the
12  injunction -- to the extent you discussed it
13  with them, how would the injunction impact the
14  ability of collectionHQ to continue to operate?
15      A.   It wouldn't.
16      Q.   Would it impact --
17      A.   Are you on Question No. 1 or
18  Question No. 2?
19      Q.   No. 1.
20           So when they asked what its impact
21  on collectionHQ was, I understood your prior
22  testimony to be that it would impact its
23  operations.
24           Would it impact collectionHQ's
25  operations?

Page 159

1      A.   It would not impact collectionHQ
2  operations.  My prior testimony was that it may
3  impact collectionHQ's customer facing
4  reputation, that it was not allowed to
5  collaborate with BTCat anymore.
6      Q.   Okay.  So that it wasn't allowed to
7  offer -- bundle with BTCat services?
8      A.   Correct.
9      Q.   Okay.  What about Question 2, did
10  they ask that?
11      A.   Yes.
12           MR. NOYES:  Objection to the form.
13  Are you referring to "B"?
14           MR. WALKER:  No.  I'm referring to
15  the second bullet.
16           MR. NOYES:  Okay.
17      Q.   They asked that?
18      A.   Yes.
19      Q.   Did you answer it?
20      A.   Yes.
21      Q.   And what did you tell them?
22      A.   That it would not impact
23  Bridgeall's ongoing contracts or obligations to
24  customers.
25      Q.   That the injunction would not?

Page 160

1      A.   Yes.
2      Q.   Okay.  What about the third bullet?
3      A.   We had Counsel on the phone call to
4  answer that question.
5      Q.   Okay.  And I'm not asking for what
6  was in that legal opinion, but did you tell
7  them that you had obtained a legal opinion?
8           MR. NOYES:  Just object to the
9  form.  He didn't say there was a legal opinion.
10      Q.   Okay.  Was there a legal opinion?
11      A.   I let Counsel answer that question
12  on the call, so I wasn't the one to answer it.
13      Q.   Okay.  But did he answer on behalf
14  of Bridgeall?
15      A.   Yes.
16      Q.   Was there a legal opinion?
17      A.   Yes.
18      Q.   Did you share it with them?
19           And by "you," I mean Bridgeall or --
20      A.   The Counsel shared the opinion with
21  them.
22      Q.   On behalf of Bridgeall and Baker &
23  Taylor?
24      A.   Yes.
25      Q.   Okay.  Let's go down to "B."

Page 161

1      A.   Okay.
2      Q.   The first bullet, did they ask you
3  that question?
4      A.   Yes.
5      Q.   And did you provide a response?
6      A.   Yes.
7      Q.   And what was your response?
8      A.   ████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
13      Q.   And is that what you told them?
14      A.   Yes, at that time.
15      Q.   Okay.  Is it more than that now?
16      A.   I don't believe so.
17      Q.   You don't.
18           Okay.  Let's look at the next bullet.
19      A.   Okay.
20      Q.   Did they ask you that question?
21           MR. NOYES:  I just want to get the
22  Exhibit number.  Sorry.
23           MS. BROWN:  It's 45.
24           MR. NOYSE:  Thank you.
25      A.   Jeff, what question are you on?

41 (Pages 158 - 161)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 162

1    Q.   So we're under "B," Bullet 2.
2    A.   Okay.  If they asked that question,
3 I would not have answered it because I don't know.
4    Q.   Did they ask that question?
5    A.   I can't recall if they asked that
6 question.
7    Q.   And you still don't know to this
8 day what the answer is to that?
9         MR. NOYES:  Objection.
10    A.   This is a question best suited for
11 Dan Johnson to answer.
12    Q.   Okay.  So he'll know the answer to
13 that?
14    A.   He should know the answer to that.
15    Q.   Okay.  So let's go to the third
16 bullet under "B."
17         Did they ask you that question?
18    A.   Yes.
19    Q.   Did you answer it?
20    A.   I believe Counsel answered that
21 question.
22    Q.   On behalf of Bridgeall and Baker &
23 Taylor?
24    A.   Yes.
25    Q.   Do you know that Counsel answered

Page 163

1 that?
2    A.   I'm unsure if Counsel would have
3 answered that question.  I did not answer that
4 question.
5    Q.   Okay.  Would Dan also know the
6 answer to this question?
7         MR. NOYES:  Objection to the form.
8         Are you asking him whether this
9 question was asked and answered?
10         MR. WALKER:  Thank you, Frank.
11    Q.   Would Dan know the answer to the
12 question in Bullet 3 under "B"?
13    A.   Yes.
14    Q.   Would Mr. Legowski?
15    A.   No.
16    Q.   Does Dan have a position at Bridgeall?
17    A.   No.
18    Q.   So why would Dan know what audits
19 or tracking Bridgeall has done to ensure that
20 BTCat is not using WorldCat data?
21    A.   Dan supervised the technology staff
22 at Bridgeall, so Steve Legowski reported to Dan.
23    Q.   Okay.  Let's go down to "C."
24    A.   Okay.
25    Q.   There's only one bullet there.

Page 164

1    A.   Okay.
2    Q.   Did they ask you that question?
3         And by "they," I mean Valsoft.
4    A.   I'm unable to recall if they asked
5 that question.
6    Q.   Was there discussions about this at
7 all with Valsoft?
8    A.   About what, Jeff, if you can help
9 me understand what you're asking about?
10    Q.   Whether customers have transitioned
11 from WorldCat to BTCat due to the pricing and
12 licensing model built around collectionHQ.
13    A.   Let me read it.
14         I'm unaware -- I'm unsure that they
15 asked this question.
16    Q.   Okay.  Whether or not they asked
17 it, did you provide information in relation to
18 this, to the question, that would answer this
19 question?
20    A.   I answered this question, which has
21 been and is that we are unaware if a customer
22 is moving from any other product to BTCat for
23 what reason.  And that was our answer.
24    Q.   So customers never tell you why
25 they're moving to BTCat?

Page 165

1    A.   Sometimes they do, sometimes they
2 don't.
3    Q.   Okay.  So there are several of
4 these where you said you don't know or don't
5 recall.
6    A.   Uh-huh.
7    Q.   And you were the lead negotiator,
8 right?
9    A.   Yes.
10    Q.   Okay.  If you don't know, is there
11 someone else on your team that would have known
12 and had those discussions without you there?
13    A.   No.  My answer to your previous
14 questions is I'm unable to recall what specific
15 questions they may have asked around these
16 bullet points.
17    Q.   Okay.  The ones you specifically
18 said you don't recall?
19    A.   Yes.
20    Q.   Okay.  How about we do "E"?
21    A.   Okay.
22    Q.   The first bullet, did they ask you
23 that question?
24    A.   Yes.
25    Q.   Did you provide an answer?

42 (Pages 162 - 165)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 166

1    A.   Yes.
2    Q.   What was your answer?
3    A.   My answer was that Bridgeall --
4  I'll correct myself -- that Baker & Taylor has
5  not put any records in BTCat from Bridgeall in
6  the last two years from any of Bridgeall's
7  customers.  Correction.
8    Q.   And that is how your -- that was
9  part of a plan to mitigate in the event of a
10 Preliminary Injunction?
11   A.   The plan to mitigate was that the
12 injunction would not impact the operations at
13 Bridgeall simply because the records from
14 Bridgeall had not been a part of BTCat for the
15 last two years.
16   Q.   So you've already taken records out
17 of BTCat that were provided through Bridgeall?
18        MR. NOYES:  Objection to the form.
19   A.   No.  We haven't loaded any records
20 from Bridgeall, not taken out of BTCat.
21   Q.   You haven't loaded any records
22 recently?
23   A.   In the last two years.
24   Q.   Okay.  But there are records in
25 there that are from the Bridgeall agreements?

Page 167

1    A.   Yes.
2    Q.   Okay.  Let's look at Bullet 2.
3    A.   Okay.
4    Q.   Did they ask you that question?
5    A.   I'm unable to recall, but if it was
6  asked, Counsel would have answered.  I'm unable
7  to recall if they specifically asked this question.
8    Q.   You're unable to recall if they
9  asked the question or if you provided an answer?
10   A.   I'm unable to recall if they asked
11 this question specifically.
12   Q.   If this is a document -- is this a
13 document they sent you?
14   A.   I can't recall if this is a
15 document that they produced.
16   Q.   Was it surprise you -- sorry.
17 Strike that.
18        If this is a document that they
19 provided to you --
20   A.   Uh-huh.
21   Q.   -- would you have provided answers?
22   A.   We may have.  If these questions
23 were answered over a phone call, they may have
24 wanted to get specific answers, and they
25 skipped some of the questions.

Page 168

1    Q.   And were you on those phone calls?
2    A.   Yes.
3    Q.   And how long ago were those phone
4  calls?
5    A.   This would have been during the due
6  diligence, the major time period.
7    Q.   And how long was that?
8    A.   Two months ago.
9    Q.   So you can't recall from two months
10 ago?
11   A.   One phone call?
12   Q.   You're discussing this litigation,
13 this transaction is dependent on providing the
14 due diligence that they want, and you can't
15 recall these details?
16   A.   I wouldn't say that the transaction
17 was dependent on this litigation, Jeff.
18   Q.   Was it an important issue for them?
19   A.   They're the ones to answer that,
20 whether it was important or not.
21   Q.   Was it a concern that they raised?
22   A.   They asked questions about it.  I'm
23 not sure if they were concerned or not.
24   Q.   Okay.  So Bullet 2, you don't
25 recall if it was asked or if an answer was

Page 169

1  provided?
2    A.   Bullet 2 under "E"?
3    Q.   Correct.
4    A.   Yes.
5    Q.   Yes, you don't recall?
6    A.   I don't recall that this question
7  was asked and answered.
8    Q.   Okay.  What about for the third
9  bullet under "E," did they ask you that question?
10   A.   I'm unable to recall if they asked
11 this question.  If it was, it would have been
12 answered by Counsel on the phone.
13   Q.   And who would have been Counsel on
14 that phone call?
15   A.   We had outside General Counsel and
16 Counsel from Offit Kurman.
17   Q.   And so who specifically?
18   A.   We would have had Brad Richardson
19 as our General Counsel, Frank, Derek, and I'm
20 not able to recall if he had anyone else.
21 There may have been others.  But those were the
22 primary ones who would have answered the question.
23   Q.   Okay.  And is that true of all the
24 ones where you've said if it would have been
25 asked, Counsel would have answered it?

43 (Pages 166 - 169)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 170

1    A.   Yes.
2    Q.   Okay.  If you turn the page, if we
3  look under "F" --
4    A.   Yes.
5    Q.   -- let's look at the third bullet.
6    A.   Okay.
7    Q.   Did they ask that question?
8    A.   Yes.
9    Q.   Did you provide an answer?
10   A.   Counsel would have answered, yes.
11   Q.   I guess I'll ask you, as of the
12  time of due diligence, had Bridgeall begun
13  collecting and preserving internal
14  communications or documents for discovery?
15   A.   I believe so, yes.
16   Q.   And had it put in place any
17  litigation holds?
18   A.   I believe so.
19   Q.   It hadn't collected all the
20  collectionHQ agreements, though, at that point?
21   A.   I'm not sure of the exact protocol,
22  but this was communicated and done under
23  Counsel's advice, so whether they had been
24  collecting, they were collecting, how far along
25  they were, I'm not sure.

Page 171

1    Q.   And then what about the one bullet
2  under "G," did they ask that question?
3    A.   They may have asked it.  I believe
4  I remember them asking this, yes.
5    Q.   And did you provide an answer?
6    A.   Yes.
7    Q.   And what was your answer?
8    A.   Our answer is that we are all
9  looking for an amicable settlement between
10  these two organizations that libraries depend on.
11   Q.   Was there any more detail than that
12  in your answer?
13   A.   No.
14   Q.   Okay.  We're going to mark this as
15  Exhibit 46.
16   A.   Thank you very much.
17         - - - - -
18         (Thereupon, Plaintiff's Exhibit 46,
19         06-17-2025 Asset Purchase Agreement,
20         was marked for purposes of
21         identification.)
22         - - - - -
23   Q.   It's a pretty hefty document.
24   A.   You're telling me.  I lived through
25  it.

Page 172

1    Q.   I'm sure.  Do you recognize this
2  document?
3    A.   Yes.
4    Q.   What is it?
5    A.   Asset Purchase Agreement.
6    Q.   And it lists on the front the
7  parties to the agreement.
8    A.   Yes.
9    Q.   So Valsoft Ireland Limited and
10  Valsoft Scotland Limited --
11   A.   Uh-huh.
12   Q.   -- are they the acquirers?
13   A.   I believe so, yes.
14   Q.   Okay.  And then Bridgeall Libraries
15  Limited, you --
16   A.   Yes.
17   Q.   -- and Baker & Taylor, LLC?
18   A.   Correct.
19   Q.   And this was entered into on June 17?
20   A.   Yes.
21   Q.   Why are you a party to the contract?
22         MR. NOYES:  Objection to the form.
23   A.   They desired for me to be a party
24  to it.
25   Q.   Okay.  And do you have any

Page 173

1  obligations under the agreement personally?
2    A.   Just a noncompete, which is part of
3  the appeal.
4    Q.   Okay.  And what are -- and why is
5  Baker & Taylor, LLC, a party to the contract?
6    A.   Because it's the entity that owns,
7  through the chain in U.K., the operations
8  entity of Bridgeall Libraries.
9    Q.   Okay.  But this transaction was not
10  a sale of that entity, correct?
11   A.   Uh-huh.
12   Q.   It was a sale of assets?
13   A.   Correct.
14   Q.   What were those assets that were sold?
15   A.   Software assets primarily.
16   Q.   And which software assets specifically?
17   A.   CollectionHQ, collectionHQ
18  Academic, collectionHQ Lite, ESP.  They're all
19  listed in here.
20   Q.   Does that also include the DEI
21  analysis?
22   A.   Yes.
23   Q.   If you look under Definitions in
24  Section 1, it lists the Ancillary Agreements,
25  or it defines the Ancillary Agreements.

44 (Pages 170 - 173)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 174

1  Are you aware that there's also a
2  Sales Representation Agreement?
3  A.  Yes.
4  Q.  Do you know why it's not listed
5  here in the Ancillary Agreements?
6  A.  I believe because it's separate
7  than the Asset Purchase Agreement.
8  Q.  When we looked -- so if we looked
9  at the assigned contracts --
10  A.  Yes.
11  Q.  -- what is your understanding of
12  what contracts were assigned to Valsoft under
13  this transaction?
14  A.  As the definition says, "all
15  Contracts related to the Business or Acquired
16  Assets."
17  Q.  So does that include all of the
18  collectionHQ agreements, the customer agreements?
19  A.  With the exception of Section 7.12
20  of the Disclosure Schedule.
21  Q.  Okay.  And what is on Section 7.12
22  of the Disclosure Schedule, if you know?
23  A.  These may have some agreements in
24  which Baker & Taylor would have been the party
25  to the contract.

Page 175

1  Q.  And those were collectionHQ
2  customer agreements?
3  A.  Some of them were, and we did not
4  have assignable rights in them, so we could not
5  assign them.
6  Q.  And so these were not ones in which
7  Baker & Taylor entered into the agreement as an
8  agent of Bridgeall?
9  A.  They could have been either.  They
10  could either have been contracts where we did
11  not have assignable rights or they could have
12  been contracts where Baker & Taylor was an
13  agent, and it was part of a bid that included
14  multiple products, so it was hard to dis-enjoin
15  one product from that group.  So there could be
16  multiple reasons why 7.12 contracts were in
17  there.
18  Q.  So let me understand.  There's kind
19  of two categories you identified.
20  A.  Those were two examples of the
21  contracts, yes.
22  Q.  So in the first example, can you
23  explain that a little more?
24  A.  Which example, Jeff?
25  Which one is your first?

Page 176

1  Q.  That's the one where they weren't
2  assignable because -- and I don't want to
3  misspeak, but I think you had explained that
4  they were either only entered into by Baker &
5  Taylor, and not as an agent, is that fair,
6  or --
7  A.  Baker & Taylor always acted as an
8  agent if it signed contracts on behalf of
9  Bridgeall.
10  Q.  I think we see that in the
11  agreements, right, it says "acting as an agent
12  of Bridgeall"?
13  A.  Correct.
14  Q.  In what other ways related to
15  collectionHQ did Baker & Taylor act as an agent?
16  A.  You mean technically?
17  Just explain the question a little
18  more, Jeff, in other ways.
19  Q.  Yeah.  So was it acting as an agent
20  when it did sales and marketing to customers?
21  A.  Yes.
22  Q.  What about when it did demos or
23  conferences or things like that?
24  A.  CollectionHQ had their own team,
25  but they collaborated with the Baker & Taylor

Page 177

1  team, yes.
2  Q.  So if they presented at a library
3  or online, they were acting as the agent of
4  Bridgeall?
5  A.  Correct.
6  Q.  Were there other ways they were
7  acting as an agent in relation to collectionHQ
8  on behalf of Bridgeall?
9  A.  What other ways, Jeff?
10  Maybe you can educate me.
11  Q.  Were there other contracts that
12  acted as an agent for collectionHQ -- or for
13  Bridgeall in relation to collectionHQ, besides
14  customer contracts?
15  A.  I am not aware.  Some of these
16  outside of customer agreements, I'm not sure.
17  Q.  Who would know that?
18  A.  Depending on the kind of contract.
19  If there was an IT contract that covered it,
20  Bridgeall was covered through our global
21  insurance coverage.  So there would be
22  different contracts.  If there were specifics I
23  could answer.
24  Q.  What about if it's troubleshooting
25  or helping with customer relations, were the

45 (Pages 174 - 177)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 178

1 Baker & Taylor employees acting as agents for
2 Bridgeall?
3    A.   No.
4    Q.   No?
5    A.   If it was technical support,
6 customer support, customer success, it was
7 Bridgeall employees.
8    Q.   But if a Baker & Taylor agent was
9 involved, would you consider them acting as an
10 agent?
11    A.   I don't think they would act as an
12 agent because they would redirect the query to
13 the Bridgeall team.
14    Q.   And that's for technical, like,
15 troubles?
16    A.   For any -- after a sale, any other
17 query would be passed on to the Bridgeall team.
18    Q.   Okay.  Would marketing be acting as
19 an agent?
20    A.   Marketing, yes.
21       MR. NOYES:  I want to just note an
22 objection for the record to the extent you're
23 using the term "agent" in this series of
24 questions.  "Agent" can be a legal conclusion,
25 agency status.  If that's what you intended to

Page 179

1 ask him, I object.
2       MR. WALKER:  Understood.
3       MR. NOYES:  And he's not qualified
4 to make a legal conclusion about an agency
5 status.
6       MR. WALKER:  I understand.  That
7 objection could have been "it calls for a legal
8 conclusion," but I understand your objection.
9       MR. NOYES:  Okay.
10       MR. WALKER:  Yeah.
11    Q.   Okay.  Were these the only
12 contracts that weren't assigned, these that
13 were in Section 7.12(k)?
14    A.   As it says, all contracts related
15 were assigned, with the exception of the
16 contracts on 7.12(k) of the Disclosure Schedule.
17    Q.   And what are B&T bid contract, the
18 portion about B&T contract?
19    A.   On occasion there were library
20 customers who would issue a Request For
21 Proposal, which would include multiple
22 products.  And B&T was bid for multiple
23 products.  So if a bid was allocated to Baker &
24 Taylor for multiple products, there would be
25 one bid covering multiple products of Baker &

Page 180

1 Taylor.
2    Q.   And so you assigned the Bridgeall --
3    A.   Portion.
4    Q.   -- their portion of that bid?
5    A.   That's right.
6    Q.   So their products?
7    A.   As long as they were assignable, yes.
8    Q.   Okay.  And can you help me
9 understand that distinction?
10    A.   In certain contracts with certain
11 customers, they expect in writing to be either
12 notified or to give express permission before
13 we can assign contracts.
14    Q.   And did you seek that permission
15 for any of those contracts?
16    A.   This was for the contracts where we
17 needed to seek permission, we left it to the
18 Valsoft operating team to seek those -- any
19 express transition that was needed by any
20 contract that was to be done as post closure.
21    Q.   To your knowledge, has that been
22 done for any of those contracts?
23    A.   I'm not sure.
24    Q.   Okay.  Would they notify you if
25 they did?

Page 181

1    A.   If Baker & Taylor was a party, they
2 would.
3    Q.   Okay.  And my understanding is
4 Baker & Taylor is a party to these, right?
5    A.   To the bid contracts, yes.
6    Q.   Okay.  And now let's go back to
7 these other contracts in 7.12(k).
8       You said some of these also
9 couldn't be assigned, is that right, or were
10 you referring to the bid contracts before?
11    A.   I was referring to the bid
12 contracts.  But there may be some contracts
13 that have language that those cannot be
14 assigned.  Now, I haven't seen all the
15 contracts and I'm not sure who's the signing
16 party in those.  If a contract did not allow it
17 to be assigned, then we did not assign them.
18    Q.   And did you collect these contracts
19 for Valsoft?
20    A.   Yes.
21    Q.   Okay.  And provided them to them?
22    A.   Yes.
23    Q.   Okay.  So you should have them all
24 in one location?
25       MR. NOYES:  Objection to the form.

46 (Pages 178 - 181)

## ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 182

1    Q.   Are they easily accessible for you?
2         MR. NOYES:  Just for clarity,
3  you're talking about today?
4         MR. WALKER:  Within the next week.
5         THE WITNESS:  Within the next week?
6    Q.   Yes.
7    A.   The contracts were --
8         MR. NOYES:  No, no.  My question
9  was, you were asking if they're easily
10 accessible, do you mean currently or back at
11 the time of the transaction?
12        MR. WALKER:  I mean currently.
13        MR. NOYSE:  Okay.
14        THE WITNESS:  Since these contracts
15 have been transitioned over and these -- Jeff,
16 maybe correct me, are these --
17   Q.   Let me clear up any confusion.  I'm
18 talking about the ones that were specifically
19 carved out of this.
20   A.   Yes.
21   Q.   Do you have those available?
22   A.   I'm sure there is a location where
23 they're available.
24   Q.   Okay.
25        MR. NOYES:  I just object to the

Page 183

1  form of that because we're not looking at
2  Schedule 7.12(k).  Sometimes schedules are
3  blank.
4    Q.   And so if it's blank, there are no
5  contracts that fall under this?
6    A.   If it's blank, then there are no
7  contracts that needed to be withheld.
8    Q.   And then the B&T bid contract,
9  those are a separate issue that wouldn't be
10 listed in the schedule; is that right?
11   A.   Correct.
12   Q.   Okay.  And Baker & Taylor has those
13 bid contracts?
14   A.   Yes.
15   Q.   Okay.
16        (Recess taken.)
17        -  -  -
18   Q.   We're talking about the Asset
19 Purchase Agreement.
20   A.   Yes, sir.
21   Q.   Let's go ahead and go to Baker
22 Exhibit 54.  And when I say that, I mean the
23 number that's at the bottom right.
24   A.   Right.
25   Q.   Can you find it?

Page 184

1    A.   Yes.
2    Q.   Okay.  And I understand this is
3  probably one of the things that you were
4  discussing before that might be covered by the
5  NDA.
6         MR. NOYSE:  The entire discussion
7  is covered by the NDA.  Any price or financial
8  terms are especially covered.  In terms of,
9  like, topic general questions, I am not sure
10 that Valsoft would have a high level of
11 concern.  But I am sure that Valsoft will have
12 a high level of concern about any discussion of
13 specific financial terms.
14        MR. WALKER:  Okay.  And is this
15 consistent with what you were saying before,
16 that you're going to allow him to answer, but
17 it's subject to --
18        MR. NOYES:  No, I'm not going to --
19 in terms -- if you want to ask him what's
20 redacted, it would take it back to Valsoft, and
21 the information is the information.  It's a
22 number.
23        MR. WALKER:  Right.
24        MR. NOYES:  And if it's okay for us
25 to produce it to you, we'll produce it to you.

Page 185

1  I'm not going to let him answer it today
2  because we don't know if it's going to cause a
3  problem with Valsoft.
4         MR. WALKER:  Okay.
5         MR. NOYSE:  Is that fair?
6         Because, I mean, other than asking,
7  you know, "What is the price," you can ask him,
8  "Did you negotiate?"
9         I don't know what you would ask
10 him, but in terms of the information that's
11 redacted, I'm not willing to let him disclose
12 it until we get it specifically cleared by
13 Valsoft because that was important to them.
14        MR. WALKER:  So you're instructing
15 him not to answer those questions?
16        MR. NOYES:  I don't know what the
17 questions are going to be, but I know we're
18 looking at the redacted pages.
19        MR. WALKER:  As far as what's
20 behind the redacted information?
21        MR. NOYES:  Yes.
22   Q.   Okay.  So I'll go ahead and ask it,
23 and then confirm that you're following the
24 instruction of Counsel.
25        ███████████████████

47 (Pages 182 - 185)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Veritext Legal Solutions
www.veritext.com                                                        888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 190

[redacted]
Q. So if you turn to Baker 55461 --
A. 55641, Jeff?
Q. Correct. If it's helpful, it's also Section 8 that we're going to look at.
A. Thank you. Section 8, the Guarantor.
Q. Yes. So in this section, Baker & Taylor is the Guarantor?
A. Correct.
Q. What does that mean?
A. As the definition says, that Baker & Taylor will "absolutely, unconditionally and irrevocably guarantee to the Purchasers the due and punctual performance and observance by the Seller of all of its covenants, agreements, obligations, representations, warranties" and so on and so forth, if you'd like me to read.
Q. What do you understand that to mean?
A. That Baker & Taylor is representing that all covenants, agreements and obligations are truthful and have been done in performance

Page 191

of the assets.
Q. And is Baker & Taylor -- are they going to cover any amounts that are due or payable -- strike that.
How about we turn to Exhibit A?
A. Okay. Can you tell me the page number, Jeff?
Q. 55477.
A. That helps me navigate faster.
Q. Of course.
A. 55471?
Q. 55477.
A. Oh, geez. Yes, sir.
Q. Okay. [redacted]

Page 192

[redacted]

Page 193

[redacted]
Q. Now let's go back to Section 11, which starts on 55467.
A. 467, Jeff?
Q. 55467.
MR. NOYES: Section 11 of the agreement. (Indicating)
A. Where am I looking on this page, Jeff?
Q. So Section 11.2.
A. 11.2, yes, sir.
Q. Indemnification by the seller. You can go ahead and read it. And once you read it, if you could let me know what you understand this to be saying.
A. (Witness complies with request.)
Okay. Jeff, could you repeat your question?

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 194

1    Q.    What do you understand this provision
2 to be?
3    A.    Just standard indemnity provided by
4 a seller to hold the purchaser harmless for
5 third-party claims.
6    Q.    And so in this case, the Seller,
7 which is Bridgeall --
8    A.    Correct.
9    Q.    -- has agreed to indemnify the
10 Purchasers for certain claims; is that right?
11    A.    Correct.
12    Q.



Page 195

1



7    Q.    And what do you understand the
8 indemnity obligations for Bridgeall to be in
9 relation to this litigation?
10    A.    That Bridgeall would hold the
11 purchasers harmless for whatever damages, if
12 any, come out of this litigation.
13    Q.    And would that include any from
14 continued use of Section 4.5 under the
15 collectionHQ agreement?
16    MR. NOYES:  Object to form.
17    A.    Maybe ask it another way, Jeff.
18    Q.    Sure.  So would that include after
19 the transaction is closed if Valsoft shares
20 information from collectionHQ with BTCat?
21    A.    Uh-huh.
22    Q.    Would this provision cover that?
23    MR. NOYES:  Objection to the extent
24 it calls for a legal conclusion.
25    A.    I believe that we have -- that

Page 196

1 Bridgeall had ceased sending any records, so I
2 guess the point is moot whether it would be
3 covered or not.
4    Q.    What about licensing of records?
5    A.    Licensing of records to whom, Jeff?
6    Q.    To Baker & Taylor?
7    A.    There is no licensing provision
8 from -- maybe let me understand it a little
9 better.
10    Licensing from whom and to whom?
11    Q.    So it would be under the
12 collectionHQ agreement.  Under Section 4.5, it
13 included a provision under which the customer
14 agrees to license their records, the records
15 from their catalog, to Baker & Taylor for any
16 use, including BTCat, if future customer
17 agreements include that provision.
18    Is this indemnification provision
19 intended to cover that?
20    MR. NOYES:  Objection to the legal
21 conclusion.
22    A.    I'm not sure since that practice
23 has ceased, so I'm not sure what it would mean.
24    Q.    So is it your understanding that
25 they're no longer including Section 4.5 in

Page 197

1 those collectionHQ agreements?
2    A.    No.  It is my understanding that no
3 records are being shared.
4    Q.    Do you know if they are including
5 that provision in collectionHQ agreements?
6    A.    I do not know.
7    Q.    Would your sales team know after
8 the transaction?
9    A.    If the section is in the contract
10 or not, Jeff, is that what you're asking?
11    Q.    That's right.
12    A.    They may know.  I'm not sure if
13 they signed any new customers in the last two
14 and a half months since this has happened, but
15 they may know.
16    Q.    I'm not going to get it out unless
17 you want me to, but I wanted to briefly
18 understand the Sales Representation Agreement,
19 and just kind of skip over some stuff, right,
20 just so that we can better understand it.
21    MR. NOYES:  That's fine.
22    Q.    What is your understanding of
23 Baker & Taylor's relationship to Valsoft under
24 the Sales Representation Agreement?
25    A.    Just like any other third party

50 (Pages 194 - 197)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 198

1  that we represent and sell to our customers, we
2  would continue to represent and solicit
3  customers for collectionHQ.
4      Q.   Okay.  And so are you acting as
5  agents, like you did before with Bridgeall?
6          MR. NOYES:  Objection as to legal
7  conclusions.
8      A.   As a sales agent.
9      Q.   Okay.  And so are you sharing any
10 information with Valsoft besides customer
11 information after this transaction?
12     A.   What kind of information?
13     Q.   Any data.
14     A.   There is a Transition Services
15 Agreement which covered various aspects of
16 business continuity, which included finance and
17 accounting, marketing, IT services.  Until that
18 is in force, we continue to share and support
19 any information that is required for business
20 continuity.
21     Q.   Are you providing any bibliographic
22 data?
23     A.   Yes.
24     Q.   What data are you providing?
25     A.   It is the data contained in our

Page 199

1  protocol Content Cafe that is derived from data
2  received from publishers, so it is bibliographic
3  data that collectionHQ consumes.
4      Q.   Are you sharing any data from BTCat?
5      A.   No.
6      Q.   Okay.  Are they sharing any data
7  with you for use in BTCat?
8      A.   Like I said, we have not uploaded
9  any information that a customer agreed to be
10 uploaded in BTCat for the last two years.
11     Q.   Okay.  My question was, are they
12 sharing any bibliographic data with you for use
13 in BTCat?
14     A.   That has been received from customers,
15 Jeff?
16          I'm just trying to understand.
17 CollectionHQ may have their own set of data.
18          So what's the question?
19     Q.   I guess let's break that down.
20          Are they collecting data from
21 customers that they then use in collectionHQ?
22     A.   Yes.  That's the intent of
23 collectionHQ, they collect data.
24     Q.   Are they sharing any of that data
25 with you?

Page 200

1      A.   No.
2      Q.   Then what data are they sharing
3  from collectionHQ to BTCat?
4      A.   There is no data that is going from
5  collectionHQ to BTCat after the transaction.
6      Q.   And if a customer wishes to share
7  data through collectionHQ to BTCat, is that
8  still available?
9      A.   If the provision is there, a
10 customer can choose to do it, as they have.  We
11 have not put in any records even if a customer
12 authorized us, authorized Bridgeall, prior to
13 the transaction, for the last two years.  So we
14 have not uploaded any data from any customer
15 for the last two years.
16     Q.   How many BTCat records were there
17 two years ago?
18     A.   I wouldn't be able to recall the
19 exact amount from a point in time.
20     Q.   Is it less than 90 million?
21     A.   Yes.
22     Q.   Okay.  Where is that data coming
23 from, or where are those records coming from?
24     A.   IT sources.
25     Q.   What are those sources?

Page 201

1      A.   Let's mark this question for Dan.
2  He'll be able to give you the sources of data
3  for BTCat.
4      Q.   So it's your testimony that even if
5  a customer under the collectionHQ agreement
6  says, "Yes, we want to contribute," you are not
7  allowing them to contribute?
8      A.   We have not allowed -- we have not
9  uploaded them into our records.  We are not
10 disallowing them from sharing their data should
11 they choose on their own volition, but we are
12 not uploading that into BTCat.
13     Q.   So what are you doing with the data
14 if they do that?
15     A.   This was done prior to the transaction.
16 We have not uploaded that data.  Maybe in one
17 of the systems somewhere, but we did not use it.
18     Q.   So you're storing the data somewhere?
19     A.   Dan will able to answer that
20 question, where's that data.
21     Q.   But none of those records are
22 currently publicly available in BTCat?
23     A.   For the last two years.  I believe
24 the last time it was uploaded was October of
25 2023, I believe.

51 (Pages 198 - 201)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 202

1    Q.   I guess I understand Dan is going
2 to speak on it.
3        Do you have any personal
4 understanding of whether or not that data that
5 you referenced, that you say is being
6 voluntarily provided, is being used in any way
7 by Baker & Taylor?
8    A.   I have no personal knowledge, only
9 what I understand of Baker & Taylor.
10   Q.   And Dan is the person that would know?
11   A.   Yes.
12   Q.   Do you guys still bundle
13 collectionHQ with BTCat and other services?
14   A.   No.  We have not come across a
15 situation where we've had to bundle it.
16   Q.   Do you provide discounts or free
17 trials for BTCat or collectionHQ if they
18 subscribe to one or the other?
19   A.   I'm aware of situations where we
20 provide a trial service for BTCat.
21   Q.   Are there any other ways in which
22 you continue to collaborate with collectionHQ
23 post transaction?
24   A.   I think I've answered that, Jeff.
25 Various, different ways.

Page 203

1    Q.   So there are no other ways other
2 than the ones you've identified today?
3    A.   Yes.  If there were other ways that
4 I'm unaware of, there may be some transitional
5 services that are temporary in nature.
6    Q.   So besides those transitional
7 services, you're not aware of any other ways in
8 which you're collaborating with collectionHQ?
9    A.   There is the Sales Representation
10 Agreement in which the sales team continues to
11 collaborate.  There is the Transitional Service
12 Agreement for continuity of services, which are
13 temporary in nature.  And there's the
14 bibliographic data that Baker & Taylor sends to
15 collectionHQ for their analysis.
16   Q.   And that's the bibliographic data
17 we've discussed; is that right?
18   A.   It's the bibliographic.  I don't
19 know what -- when you say, "we've discussed," I
20 don't know what you mean.
21   Q.   What is that bibliographic data?
22   A.   It is data that is captured from
23 publishers, separate from MARC records.
24   Q.   Okay.  I think we're going to talk
25 a little bit about Topics 8 and 9 now.

Page 204

1        I think if you look at the topics,
2 these relate specifically to BTCat, right, its
3 development, investment?
4    A.   Are we done with this, Jeff?
5 (Indicating)
6        Can I park it?
7    Q.   You can park it.  I'll let you know
8 if you need to go back to it.
9    A.   I don't want the clutter.
10   Q.   I totally get it.
11   A.   We killed a lot of plants today
12 with these printouts.
13       MS. BROWN:  Don't worry.  You don't
14 get to keep those.  Those go to the Court
15 Reporter.
16       MR. WALKER:  Yeah, she'll keep them.
17   Q.   We've talked a little bit about
18 BTCat.
19       I think you've explained it before,
20 but can you just reorient us, what is BTCat?
21   A.   BTCat is a cataloging utility
22 database that is used across Baker & Taylor to
23 perform its core function.
24   Q.   Okay.  Have you heard the term "ILS"?
25   A.   Yes.

Page 205

1    Q.   What is an ILS?
2    A.   As I understand it, it's Integrated
3 Library System.
4    Q.   Okay.  And is an example of that
5 Alma?
6    A.   As I understand it, Alma, some
7 people have also called it a library management
8 service, so I'm not sure whether it's
9 classified as an ILS or LMS.
10   Q.   Would you consider BTCat an ILS or
11 LMS?
12   A.   No.
13   Q.   So it's something different?
14   A.   Correct.
15   Q.   Okay.  I know you've talked about
16 the three, different offerings of BTCat, right?
17       So we have utility, full and
18 project, right?
19   A.   Project?
20   Q.   Sorry.  Is there a third one?
21   A.   No.
22   Q.   It's just utility and full?
23   A.   Yes.
24   Q.   Okay.  And you've said utility --
25 so what functionality does utility -- what

52 (Pages 202 - 205)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 206

1 functionality -- what's the difference between
2 full and utility?
3     A.   Utility is only, like I said, an
4 editor to create or edit records.  They're able
5 to create, edit, search, do their work.
6     Q.   Okay.  And where do they -- do they
7 have search capability?
8     A.   Yes.
9     Q.   Where do they search?
10     A.   Where?
11     Q.   Yeah.  Where do they -- what are
12 the sources for what they're searching?
13     A.   Any sources that they have
14 available to them.  So it could be an open
15 database.  It could be the Library of Congress.
16 It could be a collaborative open MARC database.
17 I'm not aware of what is available to them.
18     Q.   If they're a WorldCat subscriber,
19 does it offer them to WorldCat?
20     A.   If they are, they have the ability
21 to do that.
22     Q.   Okay.  And then what's the
23 difference between utility -- what does full
24 add over utility?
25     A.   Full adds the Baker & Taylor

Page 207

1 database of MARC records.
2     Q.   And those are the Community Pool
3 records?
4     A.   There are two databases.  There is
5 the main BTCat database and there is the
6 Community Pool.
7     Q.   So what's the Community Pool?
8     A.   This is a database, as I understand
9 it, that has records that have been contributed
10 by either Baker & Taylor or its community of
11 customers, they've allowed the records to be
12 present in the Community Pool.
13     Q.   And the other database is the
14 bibliographic database?
15         You said Community Pool and Baker &
16 Taylor.
17     A.   Yeah, you can call it BTCat --
18 BT main.  So that's the records that we
19 produce, that we accumulate.
20     Q.   And what types of records are
21 included in there?
22     A.   Their own MARC records.
23     Q.   So are they only records that you
24 created for your own media that you are
25 distributing?

Page 208

1     A.   That is one of the sources.  But
2 we've been in business a long time, so we've
3 collected records.
4     Q.   Where else have you collected those
5 records from?
6     A.   It could be a variety of places.
7 If we subscribe to a database, like the Library
8 of Congress, that could be one source.  There
9 could be others.
10     Q.   Okay.  What would be others?
11     A.   I think if you want, like I said
12 before, a list of sources, Dan is the right
13 person to give you the list of the sources.
14     Q.   Okay.  And I guess if you know,
15 you're aware that there is a 2019 License
16 Agreement between OCLC and Baker & Taylor?
17     A.   Yes.
18     Q.   And that you received certain
19 records as part of that License Agreement?
20     A.   Correct.
21     Q.   Do you know which database those
22 records would be in?
23     A.   I'm unaware of which database they
24 would be.
25     Q.   So that's a question for Dan?

Page 209

1     A.   That's a question for Dan.
2     Q.   What is a BTCat record?
3     A.   What is a BTCat record?
4     Q.   Yes.
5     A.   These are MARC records that live in
6 the BTCat database.
7     Q.   Okay.  So it's a record within
8 either of those databases?
9     A.   Correct.
10     Q.   Okay.  Have you ever referred to
11 BTCat as anything else than BTCat internally or
12 externally?
13     A.   When we were developing it, there
14 may have been a project name, but I cannot
15 recall that.  I'm not sure if we called it
16 anything else.
17     Q.   But you can't remember -- nothing
18 recent?
19     A.   No.
20     Q.   So I think you testified earlier
21 that it was initially conceived in 2018.
22     A.   As memory serves, right.
23     Q.   I guess maybe before we jump into
24 that, why do you maintain two, separate databases?
25     A.   To keep track of what the community

53 (Pages 206 - 209)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 210

1 contributes and what they allow their other
2 fellow librarians to get the benefit of from
3 their work.
4 Q. I think you had testified before
5 that there are some Baker & Taylor records in
6 the Community Pool; is that right?
7 A. Records that we create.
8 Q. Okay. And this may be a question
9 for Dan, but your understanding, is there
10 overlap between the records you create and
11 Community Pool and then the records you
12 create -- or that are in the Baker & Taylor
13 database?
14 A. The Community Pool serves
15 librarians and their need to collaborate with
16 each other. And Baker & Taylor can be a
17 contributor to that database as a creator of
18 records.
19 Q. I don't think -- I don't think that
20 answered my question.
21      So are you aware whether or not
22 there's overlap between the records in the
23 Baker & Taylor bibliographic database and the
24 Baker & Taylor contributed records in the
25 Community Pool?

Page 211

1 A. Let's park that question for Dan.
2 He will give you the exact answer.
3 Q. Okay. So you don't know?
4 A. I'm not -- I wouldn't be able to
5 give you an accurate answer, yeah.
6 Q. So would you be guessing?
7 A. I don't want to guess.
8 Q. Okay. You've testified that
9 there's been no upload in the last two years.
10 A. That's my understanding.
11 Q. Do you know if that's to both
12 databases or just one?
13 A. There hasn't been any uploads to
14 BTCat, that's my understanding, since October
15 of '23.
16 Q. And to the extent the record pool
17 has increased in those two years, where would
18 those records be?
19 A. Like I said, Jeff, many different
20 sources. We subscribe to the Library of
21 Congress. We get fresh records from the
22 Library of Congress. And there are several
23 other sources that contribute to it, including
24 libraries that contribute to the Community Pool.
25 Q. Would you consider those uploads?

Page 212

1 A. I'm sorry?
2 Q. So when you identified those other
3 sources -- so any increase in the last two
4 years to BTCat, would you consider -- the
5 Library of Congress or records that you've
6 contributed or that you've made changes to and
7 added to BTCat, would you consider those uploads?
8 A. I don't know the technical
9 definition of uploads. I think we may be
10 talking about some different things. But if
11 you're talking about the increase of records
12 over last two years, without having added any
13 records from customers from Bridgeall, if
14 that's what you meant, Jeff.
15 Q. Okay. So you're not saying that
16 other customers haven't added, it's just
17 through Bridgeall they haven't added?
18 A. That's correct.
19 Q. Understood. Okay. So are you
20 aware of -- have you heard of CARL.Solution?
21 A. I know of its existence, yes.
22 Q. Is that something that -- let me
23 ask it this way: So you conceived of the idea
24 for BTCat in 2018.
25      What was the purpose of BTCat at

Page 213

1 that time, as you conceived it?
2 A. For internal efficiency gains. As
3 the largest creator and employer of cataloging
4 professionals, we were seeking to optimize how
5 cataloging records were produced.
6 Q. And then how did you go about that?
7 A. Of optimizing it?
8      We constructed and created from
9 scratch a software platform that was designed
10 to enhance cataloging efficiencies across
11 Baker & Taylor.
12 Q. Okay. And so you conceived it in
13 2018.
14      In 2019, did you start working on
15 the internal solution?
16 A. I believe we did.
17 Q. Okay. And did you engage any help
18 outside of -- let me pull back.
19      This was when you were owned by
20 Follett, correct?
21 A. Correct.
22 Q. So did Follett or Baker & Taylor,
23 the division, engage any third parties to assist?
24 A. Yes. We solicited the help of an
25 expert software development firm who did the

54 (Pages 210 - 213)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 214

1 development. These were software development
2 professionals. And they were part of a company
3 called WinWire, if memory serves right.
4     Q.   Were you involved in this process?
5     A.   In the early stages I was.
6     Q.   What was your role?
7     A.   To give guidance of what the
8 outcomes of the software product should be.
9     Q.   Okay. And at the time, what were
10 the things you wanted included in BTCat?
11    A.   The efficiency of searching,
12 creating, editing records.
13    Q.   So for searching --
14    A.   Yes.
15    Q.   -- what were you doing to make it
16 more efficient?
17    A.   The internal cataloging team had
18 struggled for a long time to search one source,
19 bring back the record, search another search,
20 bring back a record, third source, to create
21 the best record for our customers, and so we
22 had conceived a batch search ability that could
23 ping different databases available, bring back
24 those records, and create the record in a more
25 expeditious way.

Page 215

1     Q.   And so they were batch searching.
2          Were they using any sort of
3 protocol to batch search?
4     A.   I believe the technical protocol is
5 Z39.50.
6     Q.   And at this time, were you using
7 this with WorldCat, as well?
8     A.   Which time frame are we talking about?
9          This hadn't been developed. This
10 was in conception in that time.
11    Q.   In 2019?
12    A.   Yes.
13    Q.   So you actually hadn't started
14 having it search across different Z39.50?
15    A.   I can't recall the specific time
16 frame when we put it into testing or production
17 or live back then, but yeah.
18    Q.   Okay. And you said WinWire?
19    A.   Yes.
20    Q.   Did you involve other third parties?
21    A.   I can't recall if there were any
22 material third parties.
23    Q.   Okay. Did you involve libraries at
24 all?
25          And we're talking 2019.

Page 216

1     A.   I'm unaware. As part of the
2 product management, they may have, the team.
3     Q.   At the time were there other
4 similar products in the market to BTCat?
5     A.   We were developing Baker & Taylor
6 for internal efficiency gains, and we had an
7 alternative product, and we deemed that there
8 was no product out there that was available to
9 deliver the a efficiency that we sought, so we
10 had to invent it ourselves.
11    Q.   When you say, "internal," that
12 means you weren't going to make it customer
13 facing?
14    A.   At that point in time, our desire
15 was internal efficiencies.
16    Q.   And so when did that change?
17    A.   I believe after we started to go
18 live internally and discovered that the
19 efficiencies were quite significant, we wanted
20 to share it with our library customers who were
21 also burdened.
22    Q.   And so when did you go live?
23          MR. NOYES: Objection to the form.
24          Go ahead and answer.
25    Q.   Internally when did you go live?

Page 217

1          MR. NOYES: Thank you.
2     A.   I believe we went live -- "live" is
3 a varying term because it's a process of
4 onboarding customers internally. I believe we
5 went live in the 2019-2020 time frame.
6     Q.   Okay. Was WinWire still involved
7 at that point?
8     A.   They were.
9     Q.   Okay. Let's go ahead and mark this.
10         (Recess taken.)
11         - - - - -
12         (Thereupon, Plaintiff's Exhibit 47,
13         WinWire B&T Executive Review, was
14         marked for purposes of
15         identification.)
16         - - - - -
17    Q.   If I flip that page, this has been
18 marked as Exhibit 47.
19         Do you recognize this document?
20    A.   Yes.
21    Q.   You do.
22         What is it?
23    A.   It seems like it was an Executive
24 Review of some sort, or a project review of
25 some sort.

55 (Pages 214 - 217)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 218

1    Q.   It seems or it is?
2    A.   It seems to be.  I haven't looked
3 at what it is.  It's just the cover page.
4    Q.   Go ahead and take a look.
5    A.   Okay.
6        (Witness complies with request.)
7        Okay, Jeff.
8    Q.   Okay.  Have you seen this document
9 before?
10    A.   I cannot recall if I have.  It's
11 been five years.
12    Q.   Okay.  And you didn't review this
13 as part of your preparation?
14    A.   No, sir.
15    Q.   Not under the topic we've been
16 discussing?
17    A.   Can you remind me what topic we've
18 been discussing?
19    Q.   The development of BTCat.
20    A.   No, I did not review this specific
21 document.
22    Q.   Did you review any documents from
23 this time period regarding the development of
24 BTCat?
25    A.   From this time period, "this time

Page 219

1 period" being 2020?
2    Q.   Sure.
3    A.   I don't believe so.
4    Q.   Okay.  Did you talk to anyone else
5 in order to find out more information about the
6 development of BTCat in 2020?
7    A.   Dan Johnson.
8    Q.   Okay.  Was he involved in the
9 development of BTCat at this point?
10    A.   Yes.
11    Q.   Okay.  You were the lead, though?
12    A.   Dan Johnson was the lead.
13    Q.   Okay.  What was your role in the
14 development of BTCat at this point?
15    A.   I was the executive sponsor.
16    Q.   Okay.  What does that mean?
17    A.   In the initial phases, I set up the
18 goals and objectives to be accomplished for the
19 project.  That was that.
20    Q.   Okay.  So is your testimony today
21 that Dan is prepared to talk about the
22 development of BTCat during this time period?
23        MR. NOYES:  Objection to the form.
24    A.   Yes, to the point that I'm not able
25 to, the technical parts, yes, sir.

Page 220

1    Q.   Well, is he prepared to talk about
2 the partners, as well?
3    A.   I presume so.
4    Q.   And any libraries that may have
5 contributed?
6    A.   Yes.
7    Q.   And he's able to talk about any
8 other Baker & Taylor customers that may have
9 been involved in the development in 2019, 2020,
10 2021?
11    A.   Yes.
12    Q.   And do you have any knowledge about
13 any of those things?
14        MR. NOYES:  Objection to the form.
15    A.   Not that I can recall.
16    Q.   Okay.  So you aren't prepared to
17 speak about the development of BTCat?
18        MR. NOYES:  Objection to the form.
19    A.   I don't think that's correct.  I'm
20 not prepared to speak about the technical
21 development of BTCat.
22    Q.   Okay.  How is the contributions of
23 libraries a technical topic?
24        MR. NOYES:  Object to form.  This
25 is a topic, as you know, that we divided 1 and

Page 221

1 2 for Aman, and 3 through 5 for Dan Johnson
2 under the clarification.
3        MR. WALKER:  Sure.
4        MR. NOYES:  I think in discussing
5 that, we said that since Aman is going first,
6 you can ask him about the general topic, and
7 when you run up against a point where it
8 becomes something he says that's a Dan Johnson
9 question, that's how we'll handle it, because
10 Dan is going after Aman.
11        So I'm perfectly okay with you
12 asking him about these topics because he's not
13 coming back after Dan Johnson is testifying,
14 but as we run up to a point where he says,
15 "That's really" -- "Ask Dan," that's where
16 we're drawing the line, okay?
17        MR. WALKER:  All right.
18        MR. NOYES:  So whether this is
19 development or the design or some of each,
20 that's how I suggest we handle it.
21    Q.   Okay.  So what exactly are you
22 prepared for when it comes to the development?
23    A.   The rationale and the reasoning for
24 development of BTCat.
25    Q.   The rationale and the reasoning?

56 (Pages 218 - 221)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 222

1    A.   Yes.
2    Q.   Everything else Dan is prepared to
3 testify about?
4    A.   If it's technical in nature, which
5 is the software development of BTCat, that is
6 what Dan will address.
7    Q.   Okay.  So we won't have anyone that
8 we can ask questions to about who else was
9 involved in providing insights into what should
10 be done?
11    A.   That is Dan Johnson.
12    Q.   Okay.  All partnership information
13 is Dan Johnson?
14    A.   Yes, sir.
15    Q.   Okay.
16        MR. NOYES:  There also is the
17 subtopic of investment, which is part of No. 8,
18 which we designated for Aman.
19        MR. WALKER:  Sure.  Understood.
20    Q.   I guess maybe we plow through this
21 and see where your knowledge ends and where
22 you're not prepared and where it's going to
23 evolve with Dan then.
24        MR. NOYES:  And also let me just
25 say that it's our understanding that in the

Page 223

1 30(b)(6) format, it's not a question of knowing
2 something or not knowing something, it's who is
3 being designated to address the topic on behalf
4 of Baker & Taylor.
5        MR. WALKER:  I completely agree.
6 It's just clear he's not prepared to talk about
7 a lot of the things that we've been asking him
8 about in this time period, who was involved and
9 things like that.
10        MR. NOYES:  Right.
11        MR. WALKER:  And that would be a
12 Dan topic, is my understanding.
13    Q.   Okay.  So go ahead and open this
14 up.  The date is March of 2020.
15    A.   Uh-huh.
16    Q.   Okay.  So as of this time -- if you
17 look at -- they don't have page numbers.
18        If you look at the slide -- the
19 third slide that starts with BT Cat - Planned
20 Release Plan --
21    A.   Yes.
22    Q.   So do you see Release 1?
23    A.   Yes.
24    Q.   And Internal Cataloging?
25    A.   Uh-huh.

Page 224

1    Q.   What do you understand that to be?
2    A.   Internal cataloging to support
3 Baker & Taylor's business.
4    Q.   And what is different between that
5 and internal copy cataloging?
6    A.   Internal cataloging can mean
7 original cataloging, book in hand cataloging
8 that we do at Baker & Taylor.  And internal
9 copy cataloging means the copy cataloging
10 records that we produce for our customers to
11 support book sales.
12    Q.   Okay.  So the difference between
13 those two is that internal copy cataloging is
14 then provided out to customers?
15    A.   Yes.
16    Q.   Where internal cataloging is just
17 for internal use?
18    A.   We're creating that record, yes.
19    Q.   Are you providing that out to
20 customers?
21    A.   As part of the copy cataloging
22 process, yes, there is a way that a record is
23 created that can get modified through the copy
24 cataloging process.
25    Q.   And do you see, based on this

Page 225

1 timeline and the date of this presentation,
2 that Release 1 and Release 2 appear to have
3 been completed at that point?
4    A.   It would appear so, yeah.
5    Q.   And then the others appear to be
6 dates in the future; is that right?
7    A.   Correct.
8    Q.   And what do you understand Refined
9 Internal Functionality to include at that point?
10    A.   I couldn't answer what Refined
11 Internal Functionality would mean.
12    Q.   Okay.  What about External Beta
13 Release?
14    A.   This would be the release when we
15 would be releasing certain limited features to
16 external customers.
17    Q.   Okay.  And it wouldn't be released
18 to all customers at that point?
19    A.   That's what the beta release suggests.
20    Q.   Okay.  And what would be the
21 product that would be released at this point?
22        Is it just the cataloging product
23 or is it also the bibliographic database?
24    A.   I presume it would be a combination
25 of the two.

57 (Pages 222 - 225)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 226

1 Q. Okay. So at this point, was
2 Baker & Taylor already working on the
3 bibliographic database?
4 A. For our internal use, yes, as you
5 can see.
6 Q. Okay. Was it ingesting other
7 records into that database, besides what it was
8 cataloging, itself?
9 A. I think that's a Dan question, what
10 records were going into that database.
11 Q. At this time?
12 A. Yes.
13 Q. And so you have no knowledge on that?
14 A. No.
15 Q. Okay. Do you know who the external
16 beta release was released to?
17 A. I wouldn't be able to recall, no.
18 Q. And Dan will know that?
19 A. Yes.
20 Q. Was the plan then -- I see that
21 there's a Customer Release and a Final Customer
22 Release.
23 A. Uh-huh.
24 Q. Was the plan then to do a limited
25 customer release first, and then do a final

Page 227

1 customer release?
2 A. That's what this would suggest.
3 Q. Is that what you understand of the
4 development process that you had in place at
5 this time?
6 A. Yes. Uh-huh.
7 Q. If you can turn to this page right
8 here, BT Cat Project Summary, that is BTCat
9 Release 2.5.
10 A. Yes.
11 Q. Do you see the bullet that says
12 "Search BTCat Main for Bibliographic records
13 based on LC Classification"?
14 A. I see that bullet.
15 Q. Do you understand what that means?
16 A. I have limited understanding, but yes.
17 Q. What do you understand it to mean?
18 A. That you're able to search the
19 BTCat Main database with an LC classification
20 parameter.
21 Q. And that database is the one you
22 were building?
23 A. That is the database we've had.
24 Q. Okay. And does that include
25 records contributed by customers?

Page 228

1 A. No. That's BTCat Main, it's not
2 Community.
3 Q. Okay. Do you mind if we take a break?
4 MR. NOYES: No.
5 MR. WALKER: Okay.
6 (Recess taken.)
7 - - -
8 Q. So we're trying to streamline this
9 so that we know what topics and what documents
10 you're prepared to speak on.
11 A. All right.
12 Q. Are you prepared to speak on any
13 sales activity reports or documents like that?
14 A. Sales activity reports for --
15 Q. For BTCat.
16 A. Yes.
17 Q. You are.
18 Okay. What about any sort of
19 presentations, public presentations that you
20 gave to customers or at events, are you the
21 person for that, or is Dan?
22 A. I'll speak to that.
23 Q. Okay. What about anything about
24 competitive products and your competitive
25 research as part of the development, is that

Page 229

1 you or is that going to be a Dan topic?
2 A. Is it technical competence?
3 I mean, I'm not sure --
4 Q. Your presentations that you give at
5 ALA and other things like that.
6 A. I've got to think through that.
7 MR. NOYES: Which topic does that
8 fall under?
9 MS. BROWN: "9."
10 MR. NOYSE: Okay. Right.
11 A. I can speak to that.
12 Q. Okay. What about when we talk
13 about number of customers or subscribers during
14 time periods, or number of records?
15 A. Dan.
16 Q. Okay. So how about we turn to a
17 new Exhibit?
18 - - - - -
19 (Thereupon, Plaintiff's Exhibit 48,
20 07-27-2020 E-mail Stream Between
21 Whitney Bretzman, Amandeep Kochar
22 and Others, was marked for purposes
23 of identification.)
24 - - - - -
25 A. Could you tell me what Document

58 (Pages 226 - 229)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 230

1  Produced Natively is?
2     Q.   So it's when Defendants -- there
3  are certain documents they produce -- if it's
4  in Excel format, they produce it in native so
5  that we're able to review it so that --
6  sometimes it appears a little harder to read.
7  And we'll deal with that with one of these.
8     A.   Okay.
9     Q.   Are you ready?
10    A.   Yeah.
11    Q.   Okay.
12    A.   Sure.
13    Q.   So have you seen this document before?
14    A.   Yes.
15    Q.   Okay.  And you forwarded this
16  e-mail with attachments to Mr. Brad Lucas?
17    A.   That's correct.
18    Q.   Okay.  What is this document?
19    A.   It seems to be a BTCat Sales
20  Activity Report.
21    Q.   Okay.  Is it a BTCat Sales Activity
22  Report?
23    A.   Yes.
24    Q.   Okay.  And are these common reports
25  that Baker & Taylor creates?

Page 231

1     A.   Common reports for what, Jeff?
2     Q.   Sales activity.
3     A.   What do you mean, to BTCat?
4     Q.   Correct.
5     A.   Yes.
6     Q.   Okay.  How often do they create these?
7     A.   I am not sure how often they create
8  them now, but I am used to seeing them once a
9  month in the past.
10    Q.   Okay.  And do you review them?
11    A.   I may have reviewed them in the
12  past.
13    Q.   Do you review the ones you receive
14  now?
15    A.   No.
16    Q.   Okay.  It seems like you reviewed
17  this one?
18    A.   It seems like it, yeah.
19    Q.   At this point it lists Live EAP
20  Customers.
21         Do you know what that means?
22    A.   Early access.
23    Q.   Okay.  Early access.
24         So these are individuals that are
25  given access before it's been released publicly?

Page 232

1     A.   To get their feedback and product
2  development.
3     Q.   And the list underneath that, are
4  they libraries that are participants?
5     A.   Yes.
6     Q.   Okay.  And as part of that early
7  access or EAP, do they have to pay?
8     A.   As part of EAP, no.
9     Q.   Okay.  Do they contribute records?
10    A.   Did or did in the past, like do they?
11    Q.   Either.
12    A.   I mean, this is EAP, so there's no
13  concept of EAP today.
14    Q.   Okay.  When they were EAP, did they
15  contribute records?
16    A.   I cannot recall.  But this can be a
17  Dan follow-up question.  I cannot recall if
18  they were able to contribute records at that
19  point in time.
20    Q.   Okay.  So --
21    A.   The purpose of EAP simply was to
22  take feedback on the product.
23    Q.   Okay.  So you don't know if EAP
24  customers contributed records to BTCat?
25    A.   That's true, I don't recall.

Page 233

1     Q.   And Dan knows that?
2     A.   Dan should be able to know that,
3  yes.
4     Q.   Okay.  And then if you look under
5  Activities This Week --
6     A.   Are we looking at this page?
7     Q.   Go ahead and turn the page.  32870.
8     A.   Yes.
9     Q.   Okay.  It says "In Setup Cuyahoga."
10    A.   Yes.
11    Q.   Is that Cuyahoga Library?
12    A.   Yes, Cuyahoga County.
13    Q.   In Ohio?
14    A.   Correct.
15    Q.   Were they a participant in the EAP?
16    A.   It appears like that, yes.
17    Q.   Did they contribute records?
18    A.   Like I said, I'm not sure.  I'm not
19  aware if they contributed records.
20    Q.   It says under Activity This Week,
21  "Eric's regularly scheduled demo had 11 attendees."
22    A.   Uh-huh.
23    Q.   Then it lists -- they also -- "We
24  did one off demos for Cuyahoga and Onslow
25  County."

59 (Pages 230 - 233)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 234

1    A.   Uh-huh.
2    Q.   Who is Eric?
3    A.   Eric Throndson was a past employee
4 that was responsible for implementing and
5 training customers for Baker & Taylor.
6    Q.   And so he would do weekly demos for
7 customers?
8    A.   Yes.
9    Q.   Okay.  And then what is the Deep
10 Dive Training referenced in the third bullet?
11    A.   A follow-up training for customers
12 on specific features and functionalities.
13    Q.   Okay.  And then what about Fridays
14 Feedback Session on the next bullet?
15       MR. NOYES:  Objection to the form.
16    Q.   If you look at the next bullet, do
17 you see what I'm referring to?
18    A.   Yes.
19       What is the question, Jeff, about
20 that bullet?
21    Q.   What are these feedback sessions
22 that it's referencing?
23    A.   These are product development
24 feedback sessions.
25    Q.   And do these involve participants

Page 235

1 in the EAP?
2    A.   Yes.
3    Q.   So other libraries are providing
4 feedback?
5    A.   Yeah.
6    Q.   And it looks like you guys have
7 videos of those feedback sessions.
8    A.   We may have videos.  The timing of
9 this e-mail is 2020, so this was prior to
10 Baker & Taylor becoming independent.
11    Q.   And so you didn't keep copies of
12 those videos when you became independent?
13    A.   I'm unsure if we have a copy of
14 that, or Microsoft -- Microsoft very often has
15 an expiration or deletion policy.  Follett may
16 have had a policy to purge.  I'm not aware if
17 we have the video or not.
18    Q.   Let's go ahead and look at the next
19 attachment.
20    A.   Which one is that, Jeff?
21       Would you call out the number at
22 the bottom?
23    Q.   It doesn't --
24       MS. BROWN:  32875.
25       THE WITNESS:  I have that.

Page 236

1    Q.   Do you understand what this document
2 is?
3       If I point you to the attachments
4 under the cover e-mail --
5    A.   This was an attachment to this
6 e-mail?  (Indicating)
7    Q.   That's correct.
8       Would this be the EAP Customer
9 List?
10    A.   Yes.  It appears to be, yeah.
11    Q.   And so this lists each of the
12 libraries that are participating in the EAP
13 program?
14    A.   I would say that there may have
15 been a distinction between EAP and sales
16 activity, as well, but --
17    Q.   I think the next Excel is probably
18 sales activity.
19    A.   Okay.
20    Q.   So you can correct me if I'm wrong
21 once we look at that.
22    A.   Okay.  Let's assume that this is
23 the EAP, yes.
24    Q.   Okay.  We can turn to the next one
25 actually, which is 32877.

Page 237

1    A.   I have that.
2    Q.   Okay.  And then do you recognize
3 this as the Customer List?
4       I'm sorry.  No, the BTCat All
5 Opportunities, if you look at the top of the
6 document.  Not that first page.  The Excel
7 document.
8    A.   Okay.  This right here?  (Indicating)
9       MS. BROWN:  One more.
10    A.   This right here?  (Indicating)
11    Q.   Yes.  So in order to help you, let
12 me represent, if you turn two pages, we've
13 focused in on some of the fields to make it
14 more legible.
15       MR. NOYSE:  You zoomed in?
16       MR. WALKER:  We zoomed in.
17       MS. BROWN:  We didn't have Frank's
18 handy magnifier.
19    A.   Should I still be on this page?
20 (Indicating)
21    Q.   We did hide some fields.  But we're
22 just going to ask what some of the fields mean
23 and things like that.
24       So if you see at the top, it says
25 "BTCat All Opportunities."

60 (Pages 234 - 237)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 238

1    What do you know this document to
2 be?
3    A.  It's a Sales Opportunity Report.
4    Q.  And if you look under -- if you
5 look at the columns, what does "Stage" mean?
6    A.  Sales life cycle stage.
7    Q.  Okay.  And so what would a Lead be?
8    A.  A Lead would be a conversation.
9    Q.  Okay.  What about a Closed Lost?
10   A.  That a customer decided not to
11 pursue it.
12   Q.  Okay.  Is Demo after Lead?
13   A.  Yes.
14   Q.  And is there another step after Demo?
15       Is it Quote?
16   A.  It could be Quote or Contract.
17   Q.  And then if you look on the last
18 two pages, it says "Warm."
19       What do you understand that to be?
20       MR. NOYES:  The last two lines of
21 that page?
22   Q.  No.  Sorry.  If you look at the
23 second to the last page of this document --
24   A.  That's where I was at.
25   Q.  -- and the last entry about

Page 239

1 Hartford BTCat, it says "Warm."
2       What do you understand that to be?
3    A.  I would say Warm is the stage after
4 Quote.
5    Q.  Okay.  And then is there something
6 that comes after Warm?
7    A.  I think it's a stage called Hot.
8    Q.  Okay.
9    A.  Don't ask me why, but that is how
10 the salespeople feel about themselves.
11   Q.  And then after Hot --
12   A.  It's Closed.
13   Q.  Okay.  But not Closed Lost, but
14 Closed?
15   A.  Closed Won.
16   Q.  Is there a Closed 2?
17       MS. BROWN:  W-o-n.
18       THE WITNESS:  Thank you.
19   Q.  If you look at the Amount --
20   A.  Which one are you looking at, Jeff?
21   Q.  If you look at the top of the
22 zoomed in portion, under Amount, what does that
23 Amount represent?
24   A.  This Amount represents what we
25 believe that this customer's pricing will be.

Page 240

1    Q.  Okay.  And then under Description --
2    A.  Yes.
3    Q.  -- if you look, for example, like
4 at Brevard County Library Systems, Florida,
5 EAP, do you see that it says "Customer Looking
6 to Drop OCLC"?
7    A.  Uh-huh.
8    Q.  And then it goes on and explains.
9    A.  Yes, sir.
10   Q.  And I will represent to you that
11 there are several other discussions about OCLC
12 pricing, OCLC -- there's discussions about
13 dropping OCLC.
14   A.  Uh-huh.
15   Q.  So Baker & Taylor was tracking
16 which customers were OCLC customers, correct?
17   A.  Only if the customer gave that
18 information.
19   Q.  Did they ever ask them whether or
20 not the customers were OCLC customers?
21   A.  We would sell BTCat on its own
22 merit.  If a customer offered, we would capture
23 that.
24   Q.  Did your salespeople ever ask
25 customers if they had a contract with OCLC?

Page 241

1    A.  During the sales process, I'm not
2 aware.  That's not part of our sales pitch.  It
3 may come up during conversation.
4    Q.  When it did come up during
5 conversations, they'd note it, correct?
6    A.  If a customer said that they were,
7 they would probably note it in the sales area.
8    Q.  Did that change how Baker & Taylor
9 would treat them?
10   A.  In what way, Jeff?
11   Q.  In any way.
12   A.  We considered them just somebody
13 who is looking to get BTCat.
14   Q.  Would this change your pricing, for
15 example?
16   A.  I don't believe so, but there could
17 be situations.
18   Q.  Would it change whether or not they
19 could contribute data or records?
20   A.  I don't believe so.
21   Q.  Would it change whether or not they
22 could participate in the EAP?
23   A.  If they were part of EAP, I believe
24 we offered them a discount.
25   Q.  Okay.  But my question was, if you

61 (Pages 238 - 241)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 242

1 found out that someone was an OCLC customer,
2 would it change how you treated them when it
3 came to participating in the EAP?
4     A.   I don't believe so.
5        (Discussion had off record.)
6     A.   Are we still referring to these,
7 Jeff, or are we done with that?  (Indicating)
8     Q.   We are done with that.  Let's do
9 56827.
10        - - - - -
11        (Thereupon, Plaintiff's Exhibit 49,
12        08-12-2020 Teams Invitation from
13        Eric Throndson to Fred Harvey and
14        Others, was marked for purposes of
15        identification.)
16        - - - - -
17     Q.   All right.  This has been marked
18 Exhibit 49.
19        All right.  Have you seen this
20 document before?
21     A.   I don't think I have.
22     Q.   Okay.  Do you see on the attachments
23 it included BTCat All Opportunities?
24        Is that similar to the document we
25 were looking at before?

Page 243

1     A.   The one which will give me cataracts
2 later in life?
3     Q.   That's correct.  The one with Bates
4 Stamp Baker 56191.
5     A.   191.
6     Q.   You're not going to have to read it.
7     A.   I'm just looking at the columns to
8 compare.  Yes, it appears to be a --
9        MR. NOYES:  There's no question
10 pending.
11        THE WITNESS:  Oh, I thought he
12 asked a question.
13        MR. NOYES:  I think he just asked
14 you to -- well, restate your question.
15        THE WITNESS:  Restate your question.
16     Q.   Is this a similar report to what we
17 were looking at before, a Sales Report, BTCat
18 All Opportunities?
19     A.   Yes, it appears to be.
20     Q.   Would it surprise you that there
21 are other references in here that note when a
22 customer is an OCLC customer?
23     A.   No.  We capture information for all
24 leads, whether they're part of another product
25 or not.

Page 244

1     Q.   Okay.  And your salespeople never
2 focus on -- or make comparisons to BTCat and
3 WorldCat with customers?
4     A.   If they're asked, they can
5 represent what we believe are Baker & Taylor's
6 strengths.
7     Q.   Okay.  If you turn to the first
8 page, this e-mail, the subject is Intro to
9 BTCat For Inside Sales.
10        What would you understand this to be?
11     A.   So this is a training session for
12 our inside sales team.
13     Q.   So these are the people that have
14 interaction with customers?
15     A.   They would potentially, I'm
16 assuming.  Since it's marked "Intro To BTCat,"
17 I'm assuming they would eventually interact
18 with prospects.
19     Q.   Okay.  And then one of the -- or
20 two of the things that it identifies under
21 No. 1, Discussion of BTCat, our competitors and
22 strengths and weaknesses.
23     A.   Okay.
24     Q.   Who are the competitors of BTCat at
25 this time?

Page 245

1     A.   I'm not aware of what was said in
2 this presentation or this session or review
3 about the competitors at that time.
4     Q.   But who were the competitors of
5 BTCat at this time?
6     A.   We would assume that BTCat in the
7 market would compete with the likes of
8 SkyRiver, and I don't know who that owner is
9 now, ITS MARC from TLC, Library of Congress,
10 open databases and some customers maybe on
11 WorldCat.
12     Q.   And it would compete with WorldCat,
13 right?
14     A.   It may.
15     Q.   It may?
16     A.   Well, it would be a customer's
17 choice to see if it competes with it or not.
18 We don't pitch a customer our product to be
19 competing with anyone.  We say, "These are the
20 merits of our product."  If the customer
21 chooses to say that, "We are on WorldCat,"
22 that's their volition.
23     Q.   So would it surprise you if this
24 presentation listed WorldCat as a competitor?
25     A.   No, it wouldn't.

62 (Pages 242 - 245)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 246

1    Q.   Okay.  Would it surprise you if
2  when it compares strengths and weaknesses, that
3  it compares strengths and weaknesses between
4  WorldCat and BTCat?
5    A.   No, it wouldn't surprise me.
6    Q.   So WorldCat was a competitor?
7    A.   WorldCat was a product that existed
8  in the marketplace that our customers may
9  consider us to be a competitor, we don't.
10    Q.   So you don't consider it a competing
11  product?
12    A.   We don't compete with WorldCat.  We
13  compete on our own merits.
14    Q.   Do you consider WorldCat a competing
15  product?
16    A.   We compete with ourselves.
17    Q.   It's a yes or no question.
18         Do you consider WorldCat a
19  competing product to BTCat?
20    A.   I don't think it's a yes or no
21  question.  We compete with ourselves.
22    Q.   Would it surprise you that others
23  at Baker & Taylor consider it a competing
24  product?
25    A.   Potentially.

Page 247

1    Q.   Okay.  So Baker & Taylor considers
2  it a competing product?
3    A.   In certain situations in front of a
4  customer, if they're asking us to list the
5  merits of BTCat to WorldCat or OCLC.
6    Q.   So you had listed other products as
7  competing products, correct?
8    A.   No, I listed --
9    Q.   SkyRiver?
10    A.   Yes.
11    Q.   And you listed a couple others that
12  I don't remember off the top of my head.
13    A.   Sure.
14    Q.   And then you were really hesitant
15  to admit, you have been fighting me on this,
16  that WorldCat a competing product.
17         Why?
18         MR. NOYES:  Objection to the form.
19    A.   The intent here is to list products
20  that compete in this space.  Whether it is a
21  competitor of ours or not rests on a customer's
22  perception of our product.
23    Q.   Is WorldCat a competing product in
24  the space in which BTCat operates?
25    A.   If a customer deems that it's

Page 248

1  competition, it is.  If they don't, it isn't.
2    Q.   Okay.  Why won't you answer?
3         MR. NOYES:  Objection.  He's
4  answered that question in various forms six
5  times, so I'm objecting, asked and answered.
6  And each time was an answer, so to ask, "Why
7  won't you answer" is actually not a correct
8  question.
9         MR. WALKER:  But it's a yes or no
10  question, Frank.
11    Q.   The question is still out there.
12         Why won't you answer?
13    A.   I believe I've answered it, Jeff.
14    Q.   You've answered why you won't admit
15  it's a competing product?
16    A.   I believe I've answered your question.
17    Q.   We have a new document.
18         - - - - -
19         (Thereupon, Plaintiff's Exhibit 50,
20         Review of Sales Opportunities, was
21         marked for purposes of
22         identification.)
23         - - - - -
24         MR. HARTMAN:  Jeff, to confirm,
25  we're on Exhibit 50?

Page 249

1         MR. NOYES:  Does that say "50"?
2         THE WITNESS:  Yeah.
3    Q.   So I've put before you what's been
4  marked as Plaintiff's Exhibit 50.
5    A.   Yes.
6    Q.   I'll give you a chance to look at
7  it.  And I can direct your attention, if it's
8  helpful, to the page that at the top says
9  "BTCat."
10    A.   Okay.  Is that the only page to
11  focus on, Jeff?
12    Q.   Feel free to look at the others if
13  you want.  I'm only going to ask questions
14  about this one.
15    A.   Can you also tell me which section
16  are we still on?
17         Are we still on No. 8 here?
18         MR. NOYES:  No.  We're on 9.
19         THE WITNESS:  Apologies.
20         MR. NOYES:  Can I just clarify,
21  this is a native document, so it has one Bates
22  number?
23         MR. WALKER:  That's correct,
24  unfortunately.
25         MS. BROWN:  We noticed that some of

63 (Pages 246 - 249)

Case 2:25-mc-00030-SEP Doc 1-1 Filed 01/09/26 Page 85 of 155 PageID #: 4166
Case 2:25-mc-00030-SEP Doc 1-1 Filed 01/09/26 Page 85 of 155 PageID #: 4166
PAGEID #: 778

**ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER**

Page 250

1 the metadata in your production didn't have
2 families, so either that's not a child or an
3 attachment, but your client didn't provide the
4 data.
5      MR. WALKER:  We don't have a cover
6 e-mail.
7    Q.   Do you recognize this document?
8    A.   It appears to be a review of sales
9 opportunities across different products at
10 Baker & Taylor.
11    Q.   And the part that I pointed out to
12 you that has BTCat at the top, is this specific
13 to BTCat?
14    A.   It appears to be, yes.
15    Q.   And at this point, if you read that
16 first bullet under RF7 Assumptions, it says "We
17 think we will have 20 to 25 EAP customers that
18 are likely candidates to purchase BTCat, but
19 there is still uncertainty around their
20 provider and dates and our cataloging coverage
21 levels."
22    A.   Yes.
23    Q.   So at this point, were all the
24 customers you have had EAP?
25    A.   It appears to be.  I don't have a

Page 251

1 year or a date on this.  It just seems like
2 it's 2021.
3      It says -- what does it say?
4      It says 2021.  I don't have a date
5 on this document, what date this is, to be able
6 to answer that accurately.
7    Q.   And when did you have your first
8 BTCat paying customer?
9    A.   Hmm.  Dan may be able to give you
10 the exact date.  I remember the name, but I
11 don't remember the exact date in 2020 or 2021.
12    Q.   Okay.  What's the name?
13    A.   It was ███████
14    Q.   And you see it right here on the list?
15    A.   Yes, sir.
16    Q.   It says Y████████████████████
███████████████████████████████
███████████████
███████████████████████
██████████████████████████
24    A.   Yeah, I see it.  Thank you.
25    Q.   So at this point ██████ wasn't a

Page 252

1 customer, to your knowledge?
2    A.   No.
3    Q.   Okay.  Do you see in the notes
4 sometimes it still notes who the competitive
5 service is that they're currently subscribed to?
6    A.   Yes, sir.
7    Q.   Okay.  And it also says for Gayle
8 Borden, Illinois, SkyRiver, but previously paid
9 27,000 to OCLC.
10    A.   Yes.
11    Q.   Is that something that you guys
12 would have asked the customer about or they
13 would have volunteered?
14    A.   They would have volunteered.
15    Q.   Okay.  Were you doing any
16 competitor research about WorldCat or SkyRiver,
17 either about their functionalities or about
18 their pricing at this time?
19    A.   Whatever was available publicly.
20    Q.   And why were you doing that research?
21    A.   To gain market knowledge --
22    Q.   Okay.
23    A.   -- I'm assuming.
24    Q.   So you wanted to understand your
25 competitors' products?

Page 253

1    A.   We wanted to understand what does
2 this market mean.
3    Q.   And you wanted to understand how
4 you could market it?
5    A.   We wanted to understand what was
6 out there.
7    Q.   Did you want to understand how to
8 market it?
9    A.   We would market it on the merits
10 that we thought we have.  We wanted to
11 understand publicly-available information.
12    Q.   Okay.  And also information that
13 customers would share with you about these
14 competing products?
15    A.   If they did.
16    Q.   Okay.  And during that competitive
17 research, you guys never looked for any of the
18 contracts that applied to WorldCat?
19    A.   What contracts would those be, Jeff?
20    Q.   The contracts that governed WorldCat.
21    A.   We would have no reason to look at
22 a contract between a customer and OCLC.
23    Q.   But you were doing public searches
24 for these competing products, correct?
25    A.   At some point, yeah.

64 (Pages 250 - 253)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 254

1    Q.    So during this time you were
2  looking at what was publicly available?
3    A.    Sporadically, it would appear, what
4  we thought was necessary, yeah.
5    Q.    Okay.  Let's go ahead and mark
6  this, 53864.
7          - - - - -
8          (Thereupon, Plaintiff's Exhibit 51,
9          01-09-2020 Document Re:  Follett and
10         B&T Regarding BTCat, was marked for
11         purposes of identification.)
12         - - - - -
13   Q.    Let me know when you're ready.
14   A.    Okay, Jeff.
15   Q.    All right.  So unfortunately I
16 don't believe we have a cover e-mail for this
17 one either.
18   A.    Uh-huh.
19   Q.    But we do have the metadata, which
20 it says it is from January 9, 2020.
21         And at that time, Follett still
22 owned Baker & Taylor, correct?
23   A.    That's correct.
24   Q.    And it says at the top "Follett and
25 B&T have invested 1.5 million to develop a

Page 255

1  cataloging utility to replace the CARL system."
2    A.    Yes, sir.
3    Q.    Is that referring to BTCat at this
4  time?
5    A.    Yes.
6    Q.    Do you guys have any other
7  documentation that you're aware of to support
8  that number from this time period?
9    A.    How much we've invested?
10   Q.    Yes.
11   A.    Evidence to support that number?
12   Q.    Yes.
13   A.    Yes.
14   Q.    So 1.5 million as of January, 2020?
15   A.    I'm not sure if that is a number
16 that had been spent or will be spent, but it's
17 quoting have invested, so I'm not sure if
18 that's allocated monies or spent monies.
19   Q.    Understood.  Thank you.
20         Do you know how much was invested
21 in BTCat since then?
22   A.    Since its inception, since 2020?
23   Q.    Yes.
24   A.    Over $10 million.
25   Q.    And how much of that was invested

Page 256

1  during the time that Follett owned it?
2    A.    I'll have to divvy that up.  I'm
3  not really sure about the division of the
4  Follett time invested and the Baker & Taylor
5  investment.
6    Q.    And that doesn't include
7  contributions from like third parties like
8  libraries?
9    A.    Correct.
10   Q.    Okay.  Just one more thing on this.
11         If you look down at the fourth
12 paragraph --
13   A.    Yes, sir.
14   Q.    -- it says "In addition to internal
15 use, B&T will be selling subscriptions to BTCAT
16 to offer library customers an alternative to
17 OCLC and SkyRiver."
18   A.    Yes.
19   Q.    When it says "OCLC," you understand
20 that to be WorldCat, correct?
21   A.    I'm not sure.  OCLC, as I
22 understand, has several products.
23   Q.    Okay.  Do you understand WorldCat
24 to be the comparable product to SkyRiver, in
25 the same product space?

Page 257

1    A.    It could be, but I'm not sure of
2  other OCLC products, Jeff.
3    Q.    But it likely included WorldCat?
4    A.    Likely.
5    Q.    Okay.  So do you recall when the
6  official public launch was for BTCat?
7    A.    Official public launch?
8    Q.    Yes.
9    A.    I'd assume somewhere in 2020.
10   Q.    Okay.  So I think we found at least
11 in some of the documents that your official
12 public launch -- and also Mr. Kelley, who we've
13 deposed, said it was at the ALA conference in
14 March, 2022.
15   A.    Okay.  The official launch.  Okay.
16 Okay.
17   Q.    Do you recall that event at all?
18   A.    I think there are some
19 idiosyncrasies on what was beta, when we took
20 customers live, and when we announced it for
21 people, and then we started -- when we
22 announced it to the market.  So there may have
23 been some differentiation there, as well.
24   Q.    Okay.  So this date would be that
25 latter one, you announced it publicly to the

65 (Pages 254 - 257)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 258

1 market?
2    A.   No, I don't think so.  I think this
3 would be the date when it would be ready.
4        What date are we talking about?
5    Q.   Please go ahead and put that one
6 down.  I'm just asking about the ALA conference
7 in March, 2022.
8    A.   Yes.
9    Q.   That is when you publicly announced it?
10   A.   That is when we may have made a
11 launch announcement for it.
12   Q.   And then before that it was just
13 beta, just EAP or demos?
14   A.   Yes, I would assume so.  Yeah.
15   Q.   Did you have any paying customers
16 before that launch?
17   A.   Before 2022?
18   Q.   Yes, March of 2022.
19   A.   Yeah, I believe we did.
20   Q.   And were those people contributing
21 records to the BTCat database?
22   A.   I'm unsure.  Dan should be able to
23 answer that question, as to whether they were
24 contributing records or not.
25   Q.   And did you participate in that

Page 259

1 public launch in March, 2022?
2    A.   I'm unsure.  It was five years ago.
3 I may have.  I may not have.  If it was at ALA,
4 I may have met with customers, but I'm unsure.
5 I can't recall that far back.
6    Q.   Okay.  This is the official public
7 launch of BTCat, and you weren't there?
8    A.   I'm sure I was there.  You asked if
9 I was involved in it.  I'm sure I was at ALA.
10   Q.   Okay.  You just don't know if you
11 presented at it?
12   A.   That's correct.
13   Q.   Okay.  What would be your involvement?
14       Do you think you helped with the
15 presentation as far as preparing the slides,
16 providing input?
17   A.   If they asked for my input.  If my
18 product team asked for my input for it, yes.
19   Q.   So you don't recall, sitting here
20 today, whether you provided input?
21   A.   Input into what, Jeff?
22   Q.   Into the presentation.
23   A.   I do not recall if I provided input
24 into the presentation for the ALA in 2022.
25   Q.   Did you review the presentation in

Page 260

1 advance of today's deposition?
2    A.   The presentation for the launch?
3    Q.   Yes.
4    A.   I'm not aware of what presentation
5 or what materials they may have used.
6    Q.   We're in the same quandary because
7 we don't have a copy of it.
8    A.   Okay.
9    Q.   Do you know if any of those
10 materials still exist?
11       MR. NOYES:  Objection to the form.
12   A.   I'm not sure if they were created.
13 It could have been a different form.  It could
14 have been a panel of experts used to launch the
15 product, then maybe there weren't any
16 materials.  I'm not sure of what the modalities
17 of that launch were.
18   Q.   Okay.  Do you recall anything about
19 the launch event?
20   A.   I recall perhaps a discussion -- a
21 panel discussion.  That's what I can recall.
22   Q.   Okay.  And you don't recall if you
23 participated in that panel discussion?
24   A.   I don't recall how much or what my
25 participation would have been simply because I

Page 261

1 have a lot to do at conferences.
2    Q.   Did you look back through any of
3 your notes or e-mails to prepare for this
4 aspect of the topic?
5    A.   About the ALA conference in specific?
6    Q.   About your presentations and
7 communications with customers at these conferences.
8    A.   I looked back at my notes and
9 reviewed when I may have interacted with
10 customers, yes.
11   Q.   And there was no mention of this
12 conference?
13   A.   There was no mention of my
14 participation -- active participation at this
15 conference.
16   Q.   Was there a mention of this conference?
17   A.   Yes.
18   Q.   Okay.  And what did it mention?
19   A.   That we'd be talking to customers
20 about BTCat.
21   Q.   And you never asked to see a copy
22 of this presentation or any other presentations
23 in advance of today's deposition?
24       MR. NOYES:  Objection to the form.
25   A.   I may have.  I don't recall it

66 (Pages 258 - 261)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 262

1 right now.
2    Q.   Was the version of BTCat made
3 available at public launch different from the
4 BTCat that existed before then?
5    A.   I don't believe so.  It may have
6 had some advancements, but no material difference.
7    Q.   And at that point did it have
8 access to the database?
9    A.   It had access to the main database.
10    Q.   Okay.  At that point there
11 wasn't -- was there a Community Pool?
12    A.   I'm unsure.  Dan can answer that
13 question, if we had the community database at
14 that point or not.
15       MR. NOYES:  When you get to a
16 point, let's convene.  I'd like to take a break.
17       MR. WALKER:  Let me finish a few
18 more questions on this conference, and then we
19 can take a short break.
20    Q.   Was the version that was released
21 at that public launch different from today's
22 version?
23    A.   I think I've answered this, Jeff.
24 I believe there may have been some enhancements.
25    Q.   Okay.  And what enhancements are

Page 263

1 you aware of that were made?
2    A.   Between that version and today's
3 version?
4    Q.   Yes.
5    A.   Several, different features or
6 functionalities that may have been added that
7 Dan is better equipped to speak on.
8    Q.   What about your recollection?
9       You said that there are several
10 features that you're aware of.
11    A.   Several features internally and
12 externally.  Improvement of the performance of
13 BTCat, response queries, adding more involved
14 flow solutions for our internal efficiency
15 gains and customers' efficiency gains.  That's
16 what I can recall.
17    Q.   Any others?
18    A.   That would be material.  If there
19 are specific features that you'd like answers
20 on, I think Dan is the better person to answer
21 them.
22       MR. WALKER:  I think we can take a
23 break.
24       MR. NOYES:  Good.  I need one.
25       (Recess taken.)

Page 264

1       - - -
2    Q.   All right.  So Baker & Taylor also
3 provides third-party cataloging services, correct?
4    A.   Correct.
5    Q.   And has Baker & Taylor ever done
6 third-party cataloging for OCLC WorldCat customers?
7    A.   I'm sure some of the customers who
8 provide third-party cataloging services are
9 OCLC customers.
10    Q.   Okay.  And do you know how many?
11    A.   I don't know off the top of my
12 head.  Third-party cataloging records, I don't
13 have the exact count, but many of them.
14    Q.   How many third-party cataloging
15 customers, estimate, do you have?
16       MR. NOYES:  In total?
17       MR. WALKER:  Yes.
18       THE WITNESS:  At least 100.  Let's
19 go with that.
20       - - - - -
21       (Thereupon, Plaintiff's Exhibit 52,
22       Belvedere Tiburon Third Party
23       Cataloging and Record Processing
24       Agreement with Baker & Taylor, was
25       marked for purposes of

Page 265

1       identification.)
2       - - - - -
3    Q.   So we'll go ahead and show you
4 Baker 17.  Go ahead and take a look at that.
5    A.   To be sure, Jeff, you're still on
6 No. 9 here?
7    Q.   No.  We are back on 4.
8    A.   Okay.
9    Q.   All right.  Have you seen this
10 before?
11    A.   No.
12    Q.   Okay.  After looking at it, what do
13 you understand it to be?
14    A.   It's a third-party Cataloging
15 Record Processing Agreement between OCLC and
16 Belvedere Tiburon Library.
17    Q.   And who else?
18       If you look to the back.
19    A.   I'm sorry.  And Baker & Taylor.
20    Q.   Okay.  And Baker & Taylor is the
21 vendor?
22    A.   Yes.
23    Q.   So in a third-party cataloging
24 relationship, what does Baker & Taylor do for
25 the library?

67 (Pages 262 - 265)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 266

1     A.   I believe Belvedere Tiburon
2 Library.
3          BVT is listed as the vendor; is
4 that right?
5     Q.   I think Baker & Taylor signed as
6 the vendor, if you look at the signature.  The
7 library was Belvedere.
8     A.   Yes.
9     Q.   And then OCLC also signed it?
10    A.   I'm just going by the definition on
11 the first page where the library is listed as
12 the vendor.
13    Q.   Understood.
14    A.   Okay.  Yeah.
15    Q.   So in a third-party cataloging
16 situation like this, what does Baker & Taylor
17 do for the library?
18    A.   We provide cataloging and processing
19 services.
20    Q.   Okay.  And when it's an OCLC
21 customer, why would such an agreement be
22 entered into for an OCLC customer?
23    A.   If a library decided that they
24 don't want to catalog their own books, they
25 contract with a third-party vendor, I'm

Page 267

1 assuming, and we are one of the third-party
2 vendors who provide this service.
3     Q.   And as part of that, you get access
4 to WorldCat, correct?
5     A.   The library, as part of this
6 agreement, with approval from all three
7 parties, can provide access to OCLC software.
8     Q.   Okay.  And that would be WorldCat?
9     A.   WorldCat.
10    Q.   Okay.  So if you read the whereas
11 clause, the first whereas clause, you don't
12 have to read it out loud, do you see that it
13 defines WorldCat records?
14    A.   As other information?
15         Is that the definition of WorldCat
16 records, other information?
17    Q.   Is that your understanding from
18 reading that?
19    A.   I do not know.  Maybe you can help
20 me out.  I'm reading -- I'm trying to make
21 sense of the grammar.
22    Q.   Okay.  So you understand it would
23 just be other information that is defined as
24 WorldCat records here?
25         MR. NOYES:  Objection to the form.

Page 268

1     A.   I believe it's -- it could be a
2 combination, any and all of the bibliographic
3 data, holdings or information.
4     Q.   Maintained by OCLC and WorldCat?
5     A.   Yes.
6     Q.   You see in the next whereas clause
7 at the bottom of it, "In order for a vendor."
8         Is that Baker & Taylor?
9     A.   Perhaps.  Again, I'm going by the
10 definition where BVT is listed as the vendor in
11 the definition.  But Baker & Taylor has signed
12 on behalf of the vendor, yes.
13    Q.   Okay.  So you understand that in
14 order for Baker & Taylor to perform certain
15 cataloging services for the library, that would
16 be Belvedere --
17    A.   Yes.
18    Q.   -- it's necessary that Baker &
19 Taylor, the vendor, provide assurances
20 concerning its use of WorldCat; do you see that?
21    A.   Yeah, it says "OCLC-Derived
22 Records."
23    Q.   That's correct.
24    A.   It doesn't say "WorldCat."
25    Q.   It's concerning its use of WorldCat.

Page 269

1     A.   Oh, I was reading the sentence above.
2     Q.   Sure.  And then there are certain
3 restrictions in here, if you look at Paragraphs
4 3 through 5.
5     Q.   Okay.  3 to 5, you said?
6     A.   Yeah.
7     A.   Yes.
8     Q.   And you recognize those are
9 restrictions placed on the vendor's use of data
10 it obtains through WorldCat?
11    A.   Yes.  It also marks it as
12 OCLC-Derived Records, but perhaps there's no
13 definition of an OCLC-Derived Record.  But yes,
14 I understand the content.
15    Q.   So you understand that Baker &
16 Taylor could not use records that it obtained
17 as part of this third-party cataloging
18 agreement for certain purposes?
19    A.   Correct.
20    Q.   In fact, for purposes besides
21 cataloging for the customer?
22    A.   Correct.
23    Q.   Are you aware of other Third Party
24 Cataloging Agreements with OCLC?
25    A.   There are several customers.

68 (Pages 266 - 269)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 270

1    Q.   Okay.  Would it surprise you if
2 it's over 30?
3    A.   No, it wouldn't surprise me.
4    Q.   If it's over 50?
5    A.   It wouldn't surprise me.
6    Q.   Over 100?
7    A.   In that approximation.
8    Q.   Okay.  And in all of those do you
9 understand that there are restrictions placed
10 on Baker & Taylor's use of WorldCat records?
11        MR. NOYES:  Objection to the form.
12    A.   I'm not sure if this is the same
13 form used in all of those agreements --
14    Q.   Okay.
15    A.   -- whether the restrictions are
16 similar or not.
17    Q.   I'm not asking if they're the same.
18        Do you understand that OCLC places
19 restrictions on Baker & Taylor's use of
20 WorldCat records as part of third-party cataloging?
21    A.   In this form, yes, it does.
22    Q.   Okay.  And the other situations, do
23 you understand that they also place
24 restrictions on Baker & Taylor's use of third
25 party cataloging?

Page 271

1    A.   What is the other situation, Jeff?
2    Q.   The other third-party cataloging
3 relationships.
4    A.   Yeah, I haven't seen those forms,
5 but --
6    Q.   We can look at one other.
7        - - - - -
8        (Thereupon, Plaintiff's Exhibit 53,
9        Washington County Cooperative
10        Library Services Third Party
11        Cataloging and Record Processing
12        Agreement with Baker & Taylor, was
13        marked for purposes of
14        identification.)
15        - - - - -
16    Q.   So this is Plaintiff's Exhibit 53.
17        Do you recognize this as a Third
18 Party Cataloging Agreement?
19    A.   Yes.
20    Q.   And it's between Washington County
21 Cooperative Library Services and Baker & Taylor?
22    A.   Yes.
23    Q.   And you see in Section 7 that they
24 agree that OCLC is intended to be a third-party
25 beneficiary to this agreement?

Page 272

1    A.   I read that, yes.
2    Q.   Okay.  And you also see that it
3 also defines WorldCat and OCLC-Derived Records?
4    A.   Could you point me to where it's
5 defined?
6    Q.   The first whereas clause.
7    A.   It defines it as OCLC-Derived Records?
8    Q.   Correct.
9    A.   Yes.
10    Q.   What's defined as OCLC-Derived Records?
11    A.   Is that a question, Jeff?
12    Q.   I'm going to read it.  Are "copies
13 of bibliographic data, library holdings and
14 other information derived from the online
15 database of such information maintained by OCLC
16 Online Computer Library Center, Inc.," and then
17 "such database hereinafter referred to as
18 WorldCat, and such bibliographic data, library
19 holdings and other information hereinafter
20 referred to as 'OCLC-Derived Records.'"
21    A.   Yes.
22    Q.   And you also see the whereas clause
23 very similar to the one we saw before, that
24 says "In order for the library to continue
25 making OCLC-Derived Records available to

Page 273

1 vendor" -- which is Baker & Taylor, correct --
2    A.   Correct.
3    Q.   -- "it is necessary that vendor
4 provides assurances concerning the use of such
5 OCLC-Derived Records."
6    A.   I read that.
7    Q.   And then if you look at Sections 2
8 through 4, there are certain restrictions that
9 are placed on Baker & Taylor for its use of the
10 WorldCat records.
11    A.   Yes.
12    Q.   Okay.  And so would you be
13 surprised if the other vendor agreements had
14 restrictions like these in them?
15    A.   I wouldn't be surprised.
16    Q.   Okay.  So Baker & Taylor knows that
17 OCLC places restrictions on the use of WorldCat
18 records and data?
19        MR. NOYSE:  Objection to the form.
20    A.   In connection with Third Party
21 Cataloging and Processing Agreements, yes.
22    Q.   Okay.  This is Plaintiff's Exhibit 31.
23        - - - - -
24        (Thereupon, Plaintiff's Exhibit 31,
25        Offer for Subscription to the

69 (Pages 270 - 273)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 274

1    collectionHQ Service to San Rafael
2    Public Library, which was previously
3    marked, was introduced for purposes
4    of identification.)
5          - - - - -
6    A.   A question on the last point, Jeff,
7 if you don't mind.
8          Has the definition of WorldCat
9 Records and OCLC-Derived Records changed?
10   Q.   This is my time to ask questions,
11 not yours.
12         All right.  Do you recognize this
13 document?
14   A.   Yes.
15   Q.   What is it?
16   A.   It's an Offer For Subscription to
17 the collectionHQ Service for San Rafael Public
18 Library.
19   Q.   Is it also the agreement for
20 collectionHQ?
21   A.   Yes.
22   Q.   Okay.  And I think you already
23 testified to this, but let's just confirm:  So
24 Baker & Taylor in this context is entering into
25 these agreements as an agent for Bridgeall

Page 275

1 Libraries Limited?
2    A.   Yes.  I assume, yes.
3    Q.   So let's go ahead and look at
4 Section 4.5.
5    A.   Yes.
6    Q.   Okay.  Are you familiar with this
7 section?
8    A.   Yes.
9    Q.   Okay.  What is your understanding
10 of this section?
11   A.   This section provides collectionHQ
12 customers with the opportunity to collaborate
13 and contribute to the growth of other libraries
14 if they so choose from their own volition.
15   Q.   And that volition comes upon
16 signing the agreement, correct?
17   A.   Correct.
18   Q.   And you see here in 4.5 where it
19 says "By signing this Agreement, you are
20 authorizing Baker & Taylor to utilize your
21 cataloging records"?
22   A.   Correct.
23   Q.   Okay.  I'd also like to point you
24 to Section 21.9.  It's near the very end on
25 OCLC 31.

Page 276

1    A.   Yes.
2    Q.   Have you had a chance to read it?
3    A.   Not yet.
4    Q.   Go ahead.
5    A.   Yes.
6    Q.   Okay.  What do you understand this
7 provision to mean?
8    A.   21.8?
9    Q.   21.9.  It's a very short one.
10   A.   "This Agreement shall be governed
11 by, subject to and interpreted in accordance
12 with the laws of State where you are located."
13         MR. NOYES:  Objection to the extent
14 it calls for a legal conclusion.
15   A.   That's what I understand.
16   Q.   So this is directed at the customer?
17   A.   Yes.
18   Q.   Okay.  So do you understand this to
19 mean that the agreement is governed by the
20 state where the library is located?
21   A.   Yes.
22   Q.   Okay.  So if a library is located
23 in Ohio, it would be governed by the laws of
24 Ohio?
25   A.   That would be the interpretation if

Page 277

1 they signed an agreement with a clause like
2 this.  This one is in California.
3    Q.   That's right.  So if this were an
4 agreement in Ohio and it had this provision,
5 this would be governed by the laws of Ohio?
6    A.   That's what this states, yes.
7    Q.   Okay.
8    A.   Can I set this aside?  (Indicating)
9    Q.   I think you can set that aside for
10 now.
11         - - - - -
12         (Thereupon, Plaintiff's Exhibit 54,
13         List of Customers Who Signed the
14         collectionHQ Agreement, was marked
15         for purposes of identification.)
16         - - - - -
17   Q.   All right.  We're marking this as
18 Exhibit 54.  Feel free to take a look at it.
19   A.   (Witness complies with request.)
20   Q.   Have you ever seen this document
21 before?
22   A.   I don't recall it.
23   Q.   Okay.  So I can represent to you
24 that this was produced this week by Counsel.
25   A.   Okay.

70 (Pages 274 - 277)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 278

1    Q.   We are still trying to understand
2  some of it.
3         But maybe is this a better
4  question:  Going through this, is it more
5  fruitful to do it with Legowski?
6         MR. HARTMAN:  I do believe so.
7         MR. NOYSE:  If you want to ask him
8  a couple questions, what he understands about
9  it.
10         MR. HARTMAN:  Is there anything we
11 can clarify before you ask your questions?
12         MR. WALKER:  No.  I think it's okay.
13    Q.   So I will represent to you, this is
14 one of those Excel documents.  So there's a
15 couple tabs.  So the first page, the tab says
16 "pre-2022."  The second page says "2022."
17    A.   Okay.
18    Q.   And then the next one it's 2024,
19 that one.  (Indicating)
20    A.   Yeah.
21    Q.   Then it's 2025.  Okay.
22    A.   Okay.
23    Q.   And then we understand these are
24 individuals who have signed the collectionHQ
25 agreement.

Page 279

1    A.   Customers.
2    Q.   Yes.
3    A.   Yes.
4    Q.   Do you know if this includes other
5  agreements with Bridgeall?
6    A.   Other agreements with Bridgeall?
7    Q.   Like collectionHQ Academic, DEI.
8  You probably can't tell from this document.
9    A.   No.
10    Q.   I guess maybe one of the questions
11 for you would then be, in looking at this, it
12 looks like the collectionHQ agreement didn't
13 start including Section 4.5 until 2022.
14         Is that your recollection of when
15 they started including it?
16    A.   That sounds about right potentially,
17 yeah.
18    Q.   I don't recall if we covered this:
19 Do you know who drafted Section 4.5?
20    A.   I don't recall who drafted it.
21    Q.   Okay.  Is it something that would
22 have been collaborative between Baker & Taylor
23 and Bridgeall?
24    A.   I would assume so, yeah.
25    Q.   Okay.  So Baker & Taylor would have

Page 280

1  had a hand in drafting it, as well?
2    A.   There must have been collaboration.
3  That's fine.  That's all I have to say.
4    Q.   Do you know -- I guess this is
5  probably something else we need to discuss with
6  Counsel.  That's fine.  I think you can put
7  that aside for now.
8         (Discussion had off record.)
9         - - - - -
10         (Thereupon, Plaintiff's Exhibit 30,
11         Agreement Between the Yavapai County
12         Free Library District and Baker &
13         Taylor, LLC, For BTCat Library
14         Cataloging Utility, Database
15         Management, and Related Services,
16         which was previously marked, was
17         shown for purposes of
18         identification.)
19         - - - - -
20    Q.   This has already previously been
21 designated as Plaintiff's Exhibit 30.
22    A.   Okay.
23    Q.   Let me know when you're ready.
24    A.   All right.
25    Q.   Have you seen this before?

Page 281

1    A.   No.
2    Q.   Do you know what this document is?
3    A.   It appears to be an agreement
4  between Yavapai County Library and Baker &
5  Taylor for BTCat database management and
6  related services.
7    Q.   And if you turn to 1841 at the
8  bottom, do you recognize that document or that
9  piece of the document?
10    A.   Yeah.
11    Q.   Is it fair to say this is a form
12 BTCat Agreement, this specific page is a form
13 you guys use?
14    A.   Yes.
15    Q.   And then if you turn to 1848 to
16 1849, these are the typical Terms and
17 Conditions that you included in these
18 agreements at the time?
19    A.   Yes.
20    Q.   Okay.  So I just want to ask you a
21 couple questions about these two documents --
22 or these two parts of the document.
23    A.   Sure.
24    Q.   I understand that some of the other
25 stuff may look a little different, so we don't

71 (Pages 278 - 281)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 282

1 need to get into that right now.
2    A.   Okay.
3    Q.   So going back to 1841, if you look
4 under License of BT Cat, what do you understand
5 that paragraph to be saying?
6    A.   That Baker & Taylor is licensing
7 BTCat to the customer subject to this form and
8 the Terms and Conditions.
9    Q.   And the Terms and Conditions has a
10 link?
11    A.   Yes.
12    Q.   Okay.  And so the customer can find
13 the Terms and Conditions through that link?
14    A.   Correct.
15    Q.   And would you understand the Terms
16 and Conditions to be what we looked at
17 previously, 1848 to 1849?
18    A.   Yes.
19    Q.   Okay.  We've talked about the
20 different functionalities a little bit.  I know
21 Mr. Johnson is going to cover this tomorrow,
22 the different functionalities of BTCat.  So
23 there's the utility and then there's the more
24 expanded full version.
25    A.   Yes.

Page 283

1    Q.   The Terms and Conditions for that
2 agreement here on 1841, do those change
3 depending on what features are available?
4    A.   They may change if it's the utility
5 only or full, but I'm not aware that there's
6 material change in them.
7    Q.   Okay.  So these terms, do you
8 understand they actually do change?
9    A.   Yes.
10    Q.   The Terms and Conditions?
11    A.   Are we on 1848?
12    Q.   That's correct.
13    A.   I don't believe the Terms and
14 Conditions change much.
15    Q.   So they don't change.
16        Are they negotiable?
17    A.   The Terms and Conditions?
18    Q.   Yes.
19    A.   They can be if a customer wants to
20 change the Terms and Conditions.
21    Q.   And how often are they negotiated?
22        How often have you agreed to changes?
23    A.   I wouldn't be able to answer that.
24    Q.   Okay.
25    A.   The teams that manage this are

Page 284

1 empowered to make those changes if they so deem
2 appropriate.
3    Q.   Are you aware of any customer where
4 you've actually made changes?
5    A.   Yes.  We mentioned Follett earlier,
6 where we made changes to the BTCat Terms and
7 Conditions.
8    Q.   And potentially this one, itself,
9 Yavapai, right?
10    A.   This one potentially.  I'm not aware.
11    Q.   Yeah.  I'll represent to you that
12 potentially this preceding material, going
13 through 1838, potentially changes some of the
14 terms.
15    A.   Okay.
16    Q.   If we wanted to know all of the
17 customers that made changes to the Terms and
18 Conditions, and those changes were accepted by
19 Baker & Taylor, is that something you guys
20 would be able to get us?
21    A.   If it was a requirement and if we
22 could do it, yes.
23        MR. NOYES:  Just so I'm clear,
24 that's in terms of the BTCat Agreements?
25        MR. WALKER:  That's correct.

Page 285

1    Q.   Do you see -- we're on 1848, the
2 Terms and Conditions.
3    A.   Yes.
4    Q.   So Section 2.1.
5    A.   2.1?
6    Q.   2.01.  Sorry.
7        Do you understand that that places
8 restrictions on what the library can do with
9 records from the BTCat database?
10    A.   Yes.
11    Q.   Okay.  And you also understand 2.03
12 places certain restrictions on them?
13    A.   On the users and the customer.
14    Q.   On the library?
15    A.   On the library authorized users, yes.
16    Q.   So for 2.01, do you understand that
17 it makes it so they can't load records from the
18 BTCat database into a shared database?
19        MR. NOYES:  Object to form.
20    A.   Yes.
21    Q.   Why?
22    A.   Because the agreement is designed
23 to serve a specific purpose.
24    Q.   And what's that purpose?
25    A.   For them to utilize BTCat for their

72 (Pages 282 - 285)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 286

1 cataloging purposes.
2    Q.   And you don't want to allow them to
3 share those records with other libraries?
4    A.   The restriction is on the use of
5 BTCat and the database.
6    Q.   Say that again.
7    A.   The restriction is defining the use
8 of BTCat and the BTCat database for cataloging
9 purposes.
10    Q.   Okay.  But the customer is not
11 allowed to load them into a database where
12 others can access them?
13    A.   Correct, without permission.
14    Q.   And so in this situation you'd
15 expect them to come back to you and seek
16 written authorization if they were going to do
17 it?
18    A.   Yes.
19    Q.   And have you ever given written
20 authorization for that?
21    A.   Not to my recollection.
22    Q.   Okay.  And then 2.03 that we looked
23 at before, the last sentence says "Customer
24 shall not allow any access to BT Cat by other
25 libraries through consortia," again, "without

Page 287

1 Baker & Taylor's prior written consent"?
2    A.   Correct.
3    Q.   And so you understand that the
4 customer has to come to you in order to give
5 access to other libraries through these
6 methods, give them access to BTCat?
7    A.   Correct.
8    Q.   Okay.  Is one of the purposes of
9 this to protect the database?
10    A.   It's to protect BTCat and Baker &
11 Taylor.
12    Q.   And all the work and improvements
13 you made to the database?
14    A.   It's designed for a specific
15 purpose, a problem that libraries face, for
16 them to solve their cataloging inefficiencies.
17    Q.   But is it also meant to protect the
18 investment you've made into the database?
19    A.   It's meant to protect the purpose
20 of the product.
21    Q.   Is it also meant to protect the
22 investment you've made into it, the resources,
23 the individuals that have cataloged and added
24 Baker & Taylor original records, any
25 improvements you've made to records?

Page 288

1    A.   Like I said, Jeff, the intent is to
2 protect the purpose for which this product was
3 created, which was to drive cataloging
4 efficiencies.
5    Q.   Okay.  So it's not intended to
6 protect the investment and the time and all the
7 other records that you guys have created
8 originally?
9    A.   That's the indirect intention.
10    Q.   Okay.  But it is an intention?
11    A.   The intention is to protect the
12 product and the purpose of this agreement.  The
13 reason for putting restrictions on customers is
14 so that they know exactly what the purpose of
15 this is.  And if they choose to have a
16 different purpose than what is written here,
17 they can seek permission.
18    Q.   And have you ever granted that
19 permission?
20    A.   I don't believe we've been
21 approached or granted.
22    Q.   Let's look at Section 2.05.
23    A.   Yes.
24    Q.   Does BTCat have a copyright or
25 claim a copyright -- sorry.

Page 289

1        Does Baker & Taylor have a
2 copyright or claim a copyright on BTCat?
3    A.   We do not have a copyright or a
4 patent currently on BTCat?
5    Q.   And if it doesn't have a copyright
6 or a patent, is it still able to claim a right
7 to the records in BTCat?
8        MR. NOYES:  Objection to the extent
9 it calls for a legal conclusion.
10    A.   I'm not aware of the legal
11 framework that would protect any original work
12 that was created at Baker & Taylor.
13    Q.   Okay.  Do you understand that -- is
14 it your understanding that Baker & Taylor can
15 still enforce these restrictions on customers
16 absent a copyright or patent?
17    A.   Restrictions on the usage of the
18 product.
19    Q.   And the records?
20    A.   The product and the records.
21    Q.   Okay.  Let's look at 6.01.
22        And do you see 6.0 above it --
23    A.   Yes.
24    Q.   -- Propriety Protection?
25    A.   Yes.

73 (Pages 286 - 289)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 290

1    Q.   What do you think that means?
2         MR. NOYES:  Objection to the extent
3    it calls for a legal conclusion.
4         A.   It calls for protection of BTCat
5    and the BTCat database for the purposes of this
6    agreement.
7         Q.   Okay.  So 6.01, I'll give you a
8    chance to read it if you need to.
9         A.   Okay.
10        Q.   Do you understand this provision?
11             What do you understand this
12   provision to mean?
13        A.   That Baker & Taylor and its
14   licensers own BTCat and the BTCat database and
15   all related copyrights and rights now and in
16   the future.
17        Q.   Okay.  And based on this, this
18   doesn't depend on copyright?
19             MR. NOYES:  Objection to the form.
20   Calls for a legal conclusion.
21        A.   It may or may not.  I'm not sure
22   without Legal Counsel telling me whether this
23   can be enforced with or without a patent.
24        Q.   Do you know if your Counsel
25   reviewed this before you started using it as a

Page 291

1    form contract?
2         A.   Yes.
3         Q.   They did?
4         A.   I'm sure they were involved in
5    drafting this, so they must have reviewed it.
6    That's my assessment.
7         Q.   And they approved this language?
8         A.   Yes.
9         Q.   So this provision also then
10   prohibits access, use, copying, distribution of
11   any portion of the BTCat database, right?
12        A.   Yes.
13        Q.   What does that mean?
14        A.   That a customer can only use this
15   for the purposes of this contract, and cannot
16   have unauthorized access, use, copy,
17   modification, distribution of any part of the
18   BTCat database.
19        Q.   So any portion, does that include
20   any record?
21        A.   Yes.
22        Q.   Would you say these restrictions
23   are reasonable?
24             MR. NOYES:  Objection to the extent
25   it calls for a legal conclusion.

Page 292

1         A.   I would assume so.
2         Q.   And common industry practice?
3         A.   Perhaps.  I'm not familiar with
4    other industry contracts, but perhaps.
5         Q.   Okay.  Do most libraries know about
6    these types of restrictions?
7         A.   I can't comment on that.
8         Q.   You can't comment on the other
9    libraries?
10        A.   I can't comment on if all libraries
11   know about this.  Some know.  I don't know.
12        Q.   And I think you mentioned --
13        A.   Are we still on this?  (Indicating)
14        Q.   You can set it aside, I think.
15        A.   Okay.
16        Q.   You previously testified that in
17   some cases customers have negotiated changes to
18   the terms.
19        A.   Yes.
20        Q.   Do you know if they've ever
21   negotiated changes to Sections 6 or 6.01?
22        A.   Perhaps.  I'll have to go back and
23   look up who negotiated what.
24        Q.   Okay.  I'll point you to 6833 --
25        A.   Yes.

Page 293

1         Q.   -- and the e-mail on May 7 at
2    10:38 a.m., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23        Q.   Okay.  But it views 6.0 of the
24   Terms and Conditions as contrary to that.
25             MR. NOYES:  Objection to the form.

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 294

1      A.    That's what their interpretation of
2  6.0 is.
3      Q.    And that's what they're telling you?
4      A.    Yes.
5      Q.    Is that how you understand 6.0?
6      A.    That's how I understand 6.0.
7            From their perspective or how it's
8  drafted, Jeff?
9      Q.    How you understand that provision
10 in your agreement.
11     A.    We understand it the way that it's
12 drafted, that the library does not have the
13 ownership, and they're asking for clarification
14 language if they do.
15     Q.    So they're asking for you to amend
16 the Terms and Conditions --
17     A.    Yes.
18     Q.    -- section 6.0?
19     A.    Yes.
20     Q.    To no longer claim rights to the
21 record once it's downloaded to their ILS?
22     A.    They're asking for clarification.
23 Because they use the word "seems," to be saying
24 the opposite, so they're seeking clarification
25 and seeking an amendment, yes.

Page 295

1      Q.    Okay.  Is it your interpretation
2  that 6.0 does not permit the library to own the
3  record once it's downloaded from BTCat into the
4  library's ILS?
5      A.    I think it would depend on what the
6  definition of "own" is, but generally, yes.
7      Q.    Okay.  And do you know if the
8  addition that they asked for was added to this
9  agreement?
10     A.    I can only read what's in this
11 e-mail.  I haven't seen this before.
12     Q.    Okay.  Do you know if any other
13 customer has raised this issue with Baker &
14 Taylor before?
15     A.    I'm not aware of it.
16     Q.    Do you know if there are any other
17 instances in which you have agreed to amend
18 Section 6.0 of the Terms and Conditions?
19     A.    There may have been some instances.
20 I'm not aware of how many there would be.
21     Q.    But the standard is that 6.0 and
22 6.1 that we looked at, that's the standard
23 Terms and Conditions for your customers?
24     A.    That's how it's drafted.
25     Q.    Do you know if customers have asked

Page 296

1  to remove any other provisions in the Terms and
2  Conditions?
3      A.    I'm not aware of the specific Terms
4  and Conditions that customers have asked about.
5      Q.    Like Section 2.01.
6      A.    Can you point me to it?
7      Q.    Go back to Exhibit -- what is it --
8  Exhibit 30.  1848.
9      A.    I'm not aware if a customer has
10 asked for it or if we approved it.  My team
11 handles it on an as-needed basis.
12     Q.    So you don't know if anyone has
13 asked to remove that provision, for example?
14     A.    I don't know.
15     Q.    We have 58279.
16           - - - - -
17           (Thereupon, Plaintiff's Exhibit 55,
18           2022 BT Cat License Agreement Terms
19           and Conditions, was marked for
20           purposes of identification.)
21           - - - - -
22           (Thereupon, Plaintiff's Exhibit 56,
23           June, 2025 BT Cat License Agreement,
24           was marked for purposes of
25           identification.)

Page 297

1            - - - - -
2      Q.    So my understanding is 55 is
3  similar to the Terms and Conditions we looked
4  at before.
5      A.    It looks similar.
6      Q.    And it's from I think 2022.
7            And 56, which is Baker 58275, that
8  is a revised version --
9      A.    Okay.
10     Q.    -- that as best we can tell is from
11 June of this year.
12     A.    Okay.
13     Q.    Do you recall amending the Terms
14 and Conditions?
15     A.    Yes.
16     Q.    Okay.  And do you recall what
17 provisions you amended?
18     A.    I don't recall exactly what
19 provisions we amended.
20     Q.    So as best as we can tell -- we got
21 this a couple days ago.  I'll point you to 206,
22 207 and 208.
23     A.    Okay.
24     Q.    And you can compare it to the other
25 one.

75 (Pages 294 - 297)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 298

1    A.   (Witness complies with request.)
2    Q.   So for 206, what do you understand
3 that provision?
4    A.   Which one, Jeff, 55 or 56?
5    Q.   On Page 58276, Section 206, what do
6 you understand that provision to mean?
7    A.   A customer may choose to
8 participate with other licensees as part of a
9 community cataloging pool called BTCat
10 Community.
11    Q.   Okay.  So what is the purpose of
12 adding this provision?
13    A.   The purpose is to give our
14 customers a clarification on what the BTCat
15 Community cataloging pool is and what its
16 purpose is.
17    Q.   Okay.  And this is specifically to
18 the -- the BTCat Community is the broader
19 bibliographic database, correct?
20    A.   It's referring to only the BTCat
21 Community database.
22    Q.   That's right.  The bibliographic
23 database and then the community database?
24    A.   We have the BTCat Main database and
25 the BTCat Community database.

Page 299

1    Q.   This is the one where libraries can
2 contribute records, and I think you testified
3 that also some of the records you guys have
4 contributed, as well?
5    A.   I testified that Dan will be able
6 to map if there is any overlap between the
7 databases or not.
8    Q.   I guess if you look at the last
9 sentence --
10    A.   2.06?
11    Q.   Yes, 2.06.
12         What's the purpose of that sentence?
13         MR. NOYES:  Objection to the extent
14 it calls for disclosure of Attorney-client
15 privilege.
16         Don't answer in a way that
17 discloses something that you learned as a
18 result of an Attorney-client communication.
19 Answer without disclosing that, if you can.
20    A.   I will say upon Counsel's
21 recommendation, this section was modified.
22    Q.   Okay.  And I don't want you to
23 disclose any communications you had with Counsel.
24         I guess in reading this, is it fair
25 to say that you're putting the burden on the

Page 300

1 library to identify whether it can share the
2 record?
3         MR. NOYES:  Same objection.
4    A.   I believe the purpose of this is to
5 expand upon the earlier 2.06, to clarify the
6 roles that the library can play.  The burden
7 has always been on a library to decide if they
8 should or could contribute records or not.
9    Q.   And if Baker & Taylor knows that a
10 library has contributed records that might
11 infringe or that they might not be permitted
12 to, does it do anything?
13         MR. NOYES:  Hold on a second.
14         Could you read back that question?
15         (Question read by Reporter.)
16         MR. NOYES:  Okay.
17         THE WITNESS:  So can I answer?
18         MR. NOYES:  Yes.  If you understand
19 the question, I have no objection to the
20 question.
21         THE WITNESS:  Perhaps you can
22 clarify.
23         "Do anything," meaning what?
24    Q.   So perhaps that's the question.
25         When Baker & Taylor finds out that

Page 301

1 a library has contributed records that it's not
2 permitted to, does it do anything?
3    A.   We are not privy to what a customer
4 can or will do.  We're not privy to their
5 internal contracts with any other third party,
6 so we don't know the exact provisions of what
7 they are allowed and authorized to do or not.
8 So when they sign the contract, we assume that
9 they have vetted their actions, what they can
10 cannot do.
11    Q.   If you knew, would you do something?
12    A.   Knew what?
13    Q.   Knew that a record in BTCat was
14 uploaded and it wasn't -- and the library
15 wasn't permitted to upload it, would you do
16 something?
17    A.   If a library approached us and told
18 us that they had mistakenly done something that
19 they were not allowed to, we would work with
20 them to rectify the situation.
21    Q.   What if someone else came to you
22 and said, "This is actually our record and this
23 library didn't have a right to upload it"?
24         MR. NOYES:  Objection to the form
25 of the question, hypothetical.

76 (Pages 298 - 301)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 302

1   Q.   Would you do something?
2   A.   I would ask them that if their
3   contract is with a library, they must enforce
4   it.
5        MR. WALKER:  I think we're going to
6   do one more Exhibit, and then, Frank, are you
7   wanting to call it a day?
8        MR. NOYES:  I'm getting close.
9        MR. WALKER:  Let's go off the
10  record and discuss.
11       (Discussion had off record.)
12            - - - - -
13       (Thereupon, Plaintiff's Exhibit 57,
14       Excel File with List of Customers
15       Who Signed the BTCat Agreement, was
16       marked for purposes of
17       identification.)
18            - - - - -
19  Q.   So I've handed you what's
20  Plaintiff's Exhibit 57.
21  A.   Okay.
22  Q.   Have you seen this document before?
23  A.   It seems to be different tabs of an
24  Excel file with a list of customers.
25  Q.   Okay.  So this is another document

Page 303

1   that was provided by Counsel this week.
2   A.   Okay.
3   Q.   And the first tab says 2020 version
4   of BTCat.
5   A.   This page here?  (Indicating)
6   Q.   Yeah.  2020 version of BTCat.
7   (Indicating)
8   A.   Okay.
9   Q.   Okay.  So the second one which just
10  has State Library of Louisiana, it says 2025
11  version.
12  A.   Okay.
13  Q.   And our understanding is the two we
14  just looked at, the one that's been amended is
15  the 2025 version, the Terms and Conditions, so
16  that Exhibit 56 is the 2025 version.  That's
17  been amended.  Exhibit 55 is the 2020 version.
18  A.   Okay.
19  Q.   And this list on the 2020 version
20  of BTCat is the list of customers who have
21  signed it --
22  A.   Okay.
23  Q.   -- the 2020 version.
24       Then it has the date signed.  And
25  then for notes, it has some notes where, for

Page 304

1   example, if you look at Jackson County library
2   District --
3   A.   Jeff, there is a third page.
4        What is this for?
5        What is this about?  (Indicating)
6   Q.   Very good question.  The tab there
7   says "Original Contract Only."
8   A.   Okay.  What was the question, Jeff?
9   Q.   So going back to the 2020 version
10  tab, is it your understanding that when it has
11  a note, that those are the instances where the
12  agreement is -- well, if it has a note that
13  says "includes county contract" or "addendum"
14  or "includes city contract," that those are the
15  instances where the Terms and Conditions have
16  been amended or changed in some way.
17  A.   They may have been, or it may have
18  been a change from a standard contract, which
19  could simply be that instead of one customer,
20  it includes the city, or instead of the
21  customer signing, the city had signed.  There
22  could be many modifications that may be noted
23  in the notes.
24  Q.   ███████████████████████████
    ███████████████████████████████████████

Page 305

1   ██████████████████████████████████.
2   A.   ██████
3   Q.   And so either that means that you
4   didn't agree to amend it or maybe it's just not
5   captured by this document?
6   A.   Correct.
7   Q.   Okay.  I think that's all.  We can
8   address other questions to Counsel on this one.
9   A.   Okay.
10           - - - - -
11       (Proceedings adjourned at 6:59 p.m.)
12           - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

77 (Pages 302 - 305)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 306

```
 1        REPORTER'S CERTIFICATE
 2
 3  The State of North Carolina,   )
 4             SS:
 5  County of Lincoln.             )
 6
 7        I, Joyce L. Shannon, RPR, a Notary
 8  Public within and for the State of North
 9  Carolina, duly commissioned and qualified, do
10  hereby certify that the within named witness,
11  AMANDEEP KOCHAR, was by me first duly sworn to
12  testify the truth, the whole truth and nothing
13  but the truth in the cause aforesaid; that the
14  testimony then given by the above-referenced
15  witness was by me reduced to stenotype in the
16  presence of said witness; afterwards
17  transcribed, and that the foregoing is a true
18  and correct transcription of the testimony so
19  given by the above-referenced witness.
20        I do further certify that this
21  deposition was taken at the time and place in
22  the foregoing caption specified.
23
24
25
```

Page 307

```
 1        I do further certify that I am not
 2  a relative, counsel or attorney for either
 3  party, or otherwise interested in the event of
 4  this action.
 5        IN WITNESS WHEREOF, I have hereunto
 6  set my hand and affixed my seal of office at
 7  Maiden, North Carolina, on this 19th day of
 8  August, 2025.
 9
10
11
12
13
14  Joyce L. Shannon, RPR, Notary
15  Public within and for the State of
16  North Carolina
17
18  My commission expires August 18, 2028.
19
20
21
22
23
24
25
```

Page 308

```
 1              Veritext Legal Solutions
                   1100 Superior Ave
 2                    Suite 1820
                 Cleveland, Ohio 44114
 3              Phone: 216-523-1313
 4
    August 20, 2025
 5
    To: Frank Noyes, II, Esq.
 6
    Case Name: OCLC, Inc. v. Baker & Taylor, LLC, et al.
 7
    Veritext Reference Number: 7526485
 8
    Witness:  Amandeep Kochar , 30(b)(6) Vol. I     Deposition Date:
 9  8/14/2025
10
    Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
13  review the transcript and note any changes or corrections on the
14  included errata sheet, indicating the page, line number, change, and
15  the reason for the change.  Have the witness' signature notarized and
16  forward the completed page(s) back to us at the Production address
    shown
17
    above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
20  this letter, the reading and signing will be deemed waived.
21
    Sincerely,
22
    Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 309

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 7526485
 3  CASE NAME: OCLC, Inc. v. Baker & Taylor, LLC, et al.
    DATE OF DEPOSITION: 8/14/2025
 4  WITNESS' NAME: Amandeep Kochar , 30(b)(6) Vol. I
 5    In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7    I have made no changes to the testimony
      as transcribed by the court reporter.
                    _____
 9  Date          Amandeep Kochar , 30(b)(6) Vol. I
10    Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11  the referenced witness did personally appear
      and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
          Statement; and
14    Their execution of this Statement is of
          their free act and deed.
15
      I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
      _____
18    Notary Public
19    _____
      Commission Expiration Date
20
21
22
23
24
25
```

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 310

1    DEPOSITION REVIEW
     CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 7526485
3    CASE NAME: OCLC, Inc. v. Baker & Taylor, LLC, et al.
     DATE OF DEPOSITION: 8/14/2025
4    WITNESS' NAME: Amandeep Kochar , 30(b)(6) Vol. I
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9    I request that these changes be entered
     as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____    _____
     Date             Amandeep Kochar , 30(b)(6) Vol. I
14
     Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17   They have read the transcript;
     They have listed all of their corrections
18   in the appended Errata Sheet;
     They signed the foregoing Sworn
19   Statement; and
     Their execution of this Statement is of
20   their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
     Notary Public
24
     _____
25   Commission Expiration Date

Page 311

1    ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 7526485
3    PAGE/LINE(S) /     CHANGE     /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____
20   Date         Amandeep Kochar , 30(b)(6) Vol. I
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
     Notary Public
24
     _____
25   Commission Expiration Date

79 (Pages 310 - 311)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[& - 100]**                                                                 Page 1

| & | | | |
|---|---|---|---|
| **&**  1:9 3:3 5:5 | 95:1,4,5,8,13 | 166:4 172:17 | 280:12 281:4 |
| 5:15 6:10,13 | 99:23,25 | 173:5 174:24 | 282:6 284:19 |
| 15:9,11 18:11 | 100:15,18,20 | 175:7,12 176:4 | 287:1,10,24 |
| 18:14,15,17,20 | 100:22 101:1 | 176:7,15,25 | 289:1,12,14 |
| 19:25 20:6,10 | 102:11,12,14 | 178:1,8 179:23 | 290:13 295:13 |
| 20:19,20,23,24 | 102:18 103:14 | 179:25 181:1,4 | 300:9,25 308:6 |
| 20:25 21:9,19 | 103:18 105:13 | 183:12 190:10 | 309:3 310:3 |
| 21:23,23 22:4 | 105:16,17,21 | 190:15,23 | |
| 22:13 23:8,13 | 106:3,16,17,21 | 191:2 196:6,15 | **0** |
| 23:16 24:21,25 | 106:23 107:5 | 197:23 202:7,9 | **0039**  1:7 |
| 26:2,3 27:17 | 107:10,13 | 203:14 204:22 | **01-09-2020**  6:7 |
| 28:6,14,15,16 | 108:8,15,23,25 | 206:25 207:10 | 254:9 |
| 28:21 29:1,4,6 | 109:16,16,25 | 207:15 208:16 | **06-17-2025** |
| 29:8,8,14,25 | 110:1,3,4,6 | 210:5,12,16,23 | 5:23 171:19 |
| 32:2 33:17 | 111:21,25 | 210:24 213:11 | **06-27-2025** |
| 34:14,21 35:2 | 112:4,13,16,19 | 213:22 216:5 | 5:19 137:11 |
| 36:1 37:2 | 113:2,11,24 | 220:8 223:4 | **07-27-2020**  6:2 |
| 40:19 42:9 | 114:2 115:11 | 224:3,8 226:2 | 229:20 |
| 43:12 44:8,11 | 115:19,23 | 230:25 234:5 | **08-12-2020**  6:4 |
| 44:17,19 45:6 | 116:8,12,15,19 | 235:10 240:15 | 242:12 |
| 45:8,11,20 | 119:1 121:4 | 241:8 244:5 | **1** |
| 46:17 49:7 | 124:19 126:19 | 246:23 247:1 | **1**  56:15 60:10 |
| 54:22 56:12,18 | 127:13,15 | 250:10 254:22 | 78:12,15 84:15 |
| 60:4 61:1,10 | 128:9 130:11 | 256:4 264:2,5 | 87:17 158:17 |
| 65:10 66:4,17 | 133:20 134:6 | 264:24 265:19 | 158:19 173:24 |
| 69:1,6 77:3,25 | 134:19 135:14 | 265:20,24 | 220:25 223:22 |
| 78:20,24 79:10 | 136:5 140:20 | 266:5,16 268:8 | 225:2 244:21 |
| 82:18 86:13 | 141:9 142:21 | 268:11,14,18 | **1,000**  92:5 |
| 88:2,4,9 90:20 | 143:7 144:11 | 269:15 270:10 | **1.5**  254:25 |
| 91:21,23,24 | 145:1,3,4,5,12 | 270:19,24 | 255:14 |
| 92:1,4 93:15 | 145:19 146:12 | 271:12,21 | **10**  57:4,15,16 |
| 93:20 94:13 | 149:20 152:1 | 273:1,9,16 | 255:24 |
| | 155:13 156:1 | 274:24 275:20 | **100**  161:12 |
| | 160:22 162:22 | 279:22,25 | 264:18 270:6 |

Case 2:25-cv-03093-BRM-SDA Document 96-22 Filed 01/09/26 Page 82 of 154 PageID #: 54183
PAGEID #: 795

| | | | |
|---|---|---|---|
| **10:38** 293:2 | **1982** 8:13 | **2016** 20:21 | 258:17,18 |
| **11** 5:10 57:20 | **19th** 307:7 | 21:21 | 259:1,24 |
| 60:10 193:10 | | **2017** 22:23 | 278:16,16 |
| 193:14 233:21 | **2** | 23:6,22 | 279:13 296:18 |
| **11.2** 193:18 | **2** 4:3 158:18 | **2018** 24:11 | 297:6 |
| **11.2.** 193:17 | 159:9 162:1 | 25:15,19 26:12 | **2023** 201:25 |
| **11.4** 194:12 | 167:2 168:24 | 209:21 212:24 | **2024** 148:8 |
| **1100** 308:1 | 169:2 221:1 | 213:13 | 278:18 |
| **1105** 2:17 | 225:2 239:16 | **2019** 22:8,19,23 | **2025** 1:20 6:18 |
| **12** 15:19 28:1 | 273:7 | 23:6,22 28:8 | 101:8 278:21 |
| 58:8 | **2.01** 285:16 | 39:1,8 40:12 | 296:23 303:10 |
| **1300** 3:5 | **2.01.** 285:6 | 40:15,17 | 303:15,16 |
| **13054** 307:13 | 296:5 | 208:15 213:14 | 307:8 308:4 |
| **137** 5:19 | **2.03** 285:11 | 215:11,25 | **2028** 307:18 |
| **14** 1:20 | 286:22 | 220:9 | **206** 297:21 |
| **154** 5:21 | **2.05.** 288:22 | **2019-2020** | 298:2,5 |
| **15513** 8:8 | **2.06** 299:10 | 217:5 | **207** 297:22 |
| **17** 172:19 | 300:5 | **2020** 219:1,6 | **208** 297:22 |
| 265:4 | **2.06.** 299:11 | 220:9 223:14 | **20th** 3:5 |
| **171** 5:23 | **2.1** 285:5 | 235:9 251:11 | **21.8** 276:8 |
| **175** 103:8 | **2.1.** 285:4 | 254:20 255:14 | **21.9.** 275:24 |
| **18** 307:18 | **2.5.** 227:9 | 255:22 257:9 | 276:9 |
| **1820** 308:2 | **20** 54:14,17 | 303:3,6,17,19 | **216** 3:7 |
| **1838** 284:13 | 250:17 308:4 | 303:23 304:9 | **216-523-1313** |
| **1841** 281:7 | 309:16 310:22 | **2021** 22:20 | 308:3 |
| 282:3 283:2 | 311:22 | 28:9,12,13,16 | **217** 5:24 |
| **1848** 281:15 | **200** 103:8 | 86:21 87:11 | **222** 2:17 |
| 282:17 283:11 | **2000** 2:7 | 102:9 140:21 | **227** 1:23 |
| 285:1 296:8 | **2004** 13:22 | 220:10 251:2,4 | **229** 6:2 |
| **1849** 281:16 | **2007** 13:10 | 251:11 | **23** 211:15 |
| 282:17 | **2010** 14:13 | **2022** 6:16 | **24** 8:13 |
| **191** 243:5 | **2011** 14:13 | 29:20 43:23,24 | **242** 6:4 |
| **19801** 2:18 | **2014** 15:11,13 | 44:6,8 84:6 | **248** 6:6 |
| | 15:15 | 257:14 258:7 | |

Case 2:25-cv-03093-SB-PD Doc 1962-22 Filed 01/09/26 Page 83 of 154 Page ID #:4184
PAGEID #: 796

**[25 - 60]**

| | | | |
|---|---|---|---|
| **25** 250:17 | **338-1381** 2:19 | **44114** 3:6 | **55467** 193:11 |
| **254** 6:7 | **360** 19:13,15 | 308:2 | 193:13 |
| **2600** 1:23 | 20:7 98:8 | **45** 5:21 154:24 | **55471** 191:11 |
| **264** 6:9 | **365** 45:22 | 161:23 | **55477** 191:8,12 |
| **267** 2:19 | **365-2700** 2:10 | **46** 5:23 171:15 | **55641** 190:6 |
| **27,000** 252:9 | **39** 5:10 11:13 | 171:18 | **56** 6:18 296:22 |
| **271** 6:11 | 11:19 | **467** 193:12 | 297:7 298:4 |
| **273** 5:8 | | **47** 5:24 217:12 | 303:16 |
| **277** 6:14 | **4** | 217:18 | **56191** 243:4 |
| **280** 5:4 | **4** 56:15 124:9 | **48** 6:2 229:19 | **56827** 242:9 |
| **2810** 8:10 | 124:13 130:14 | **49** 6:4 242:11 | **57** 6:19 302:13 |
| **296** 6:16,18 | 130:15 138:12 | 242:18 | 302:20 |
| **2:25** 1:7 | 194:23 265:7 | | **58275** 297:7 |
| | 273:8 | **5** | **58276** 298:5 |
| **3** | **4.1** 185:25 | **5** 4:5 56:17 | **58279** 296:15 |
| **3** 5:3 60:10,21 | **4.5** 161:11 | 59:23 84:13 | |
| 62:18 65:20,22 | 187:24 195:14 | 118:16 221:1 | **6** |
| 163:12 221:1 | 196:12,25 | 269:4,5 | **6** 1:18 223:1 |
| 269:4,5 | 275:18 279:13 | **5,000** 251:18 | 292:21 308:8 |
| **30** 1:18 5:4 | 279:19 | **50** 6:6 112:8 | 309:4,9 310:4 |
| 74:18,23 112:7 | **4.5.** 275:4 | 248:19,25 | 310:13 311:20 |
| 223:1 270:2 | **40** 5:12 55:5,8 | 249:1,4 270:4 | **6.0** 289:22 |
| 280:10,21 | 56:13 | **51** 6:7 254:8 | 293:23 294:2,5 |
| 296:8 308:8 | **400** 128:8 | **52** 6:9 264:21 | 294:18 295:2 |
| 309:4,9 310:4 | **41** 2:8 5:13 | **53** 6:11 271:8 | 295:18,21 |
| 310:13 311:20 | 55:6,12 60:8 | 271:16 | 305:1 |
| **302** 6:19 | **4100** 251:17 | **53864** 254:6 | **6.0.** 294:6 |
| **306** 4:10 | **42** 5:15 77:2,13 | **54** 6:14 183:22 | **6.01** 290:7 |
| **31** 5:8 273:22 | 77:19 | 277:12,18 | 292:21 |
| 273:24 275:25 | **43** 5:18 78:4,9 | **55** 5:12,13 6:16 | **6.01.** 289:21 |
| **32870** 233:7 | 87:16 100:25 | 296:17 297:2 | **6.1** 295:22 |
| **32875** 235:24 | **43215** 2:9 | 298:4 303:17 | **60** 188:5,10,17 |
| **32877** 236:25 | **44** 5:19 137:10 | **55461** 190:5 | 189:2,6 |
| | 137:16 139:6 | | |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

## [614 - acquisitions]

Page 4

**614** 2:10
**621-7860** 3:7
**65** 5:3
**6833** 292:24
**6:59** 305:11

**7**

**7** 4:8 271:23
293:1
**7.12** 174:19,21
175:16 179:13
179:16 181:7
183:2
**7526485** 308:7
309:2 310:2
311:2
**77** 5:15
**78** 5:18

**8**

**8** 25:12,15
56:22 60:11
124:1,4,6
190:8,9 203:25
222:17 249:17
**8/14/2025**
308:9 309:3
310:3

**9**

**9** 57:1 59:20
60:15 203:25
229:9 249:18
254:20 265:6

**90** 53:25
123:23,24
200:20
**95** 83:5,6
**9:55** 1:21
**9th** 3:5

**a**

**a.m.** 1:21 293:2
**ability** 7:24
158:14 206:20
214:22
**able** 41:23
45:24 48:21
53:6 75:6
81:12 102:24
108:9 121:25
122:1 139:16
139:21 155:10
156:11 169:20
200:18 201:2
201:19 206:4
211:4 219:24
220:7 226:17
227:18 230:5
232:18 233:2
251:5,9 258:22
283:23 284:20
289:6 299:5
**above** 251:23
269:1 289:22
306:14,19
308:17

**absent** 289:16
**absolutely**
190:15
**abused** 121:7
**academic** 30:17
30:23,25 99:13
173:18 279:7
**accepted**
284:18
**access** 104:20
122:18,22
123:12,15
124:24 125:5
125:11 127:4
231:22,23,25
232:7 262:8,9
267:3,7 286:12
286:24 287:5,6
291:10,16
**accessible**
182:1,10
**accessing**
120:24 121:22
**accomplished**
219:18
**accordance**
276:11 309:5
310:5
**account** 45:21
**accountant**
193:1
**accounting**
103:20 115:13
115:16 192:20

192:25 198:17
**accumulate**
207:19
**accurate** 58:22
60:13 75:7
87:19 89:15
129:14 143:20
211:5
**accurately**
251:6
**acknowledge**
26:23 309:11
310:16
**acquire** 28:14
**acquired** 21:19
21:22 83:13
174:15 188:24
191:25
**acquirers**
133:23 172:12
**acquiring**
138:8
**acquisition**
36:14 62:16,17
78:20 79:3,8
79:11,15 81:20
84:24 87:19,22
87:23 88:7,7
88:13 89:7,8
90:11 131:18
154:6
**acquisitions**
133:18

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **act** 176:15 | 212:7,12,16,17 | **advancements** | 271:24 305:4 |
| 178:11 309:14 | 263:6 287:23 | 262:6 | **agreed** 56:5 |
| 310:20 | 295:8 | **advantageous** | 187:12 188:13 |
| **acted** 176:7 | **addendum** | 24:5 | 194:9 199:9 |
| 177:12 | 304:13 | **advice** 71:18 | 283:22 295:17 |
| **acting** 176:11 | **adding** 127:19 | 134:7 136:23 | **agreement** 5:4 |
| 176:19 177:3,7 | 128:7 263:13 | 170:23 | 5:23 6:10,13 |
| 178:1,9,18 | 298:12 | **aeo** 61:6 | 6:15,16,18,20 |
| 198:4 | **addition** 20:5 | **affect** 7:23 | 39:9 40:15 |
| **action** 307:4 | 20:14 21:11,14 | 157:8,11,12 | 60:24 64:9 |
| **actions** 301:9 | 115:13 256:14 | **affixed** 307:6 | 126:5,7 136:6 |
| **active** 133:8 | 295:8 | 309:15 310:21 | 140:4,19 |
| 141:10 261:14 | **additional** | **afford** 47:6 | 141:20 150:9 |
| **actively** 132:17 | 21:10,15 23:19 | **aforesaid** | 171:19 172:5,7 |
| **activities** 233:5 | 27:24 93:7 | 306:13 | 173:1 174:2,7 |
| **activity** 228:13 | **address** 8:7,10 | **afternoon** | 175:7 183:19 |
| 228:14 230:20 | 8:11 58:4 61:5 | 139:1 | 193:15 195:15 |
| 230:21 231:2 | 88:20,21 91:8 | **age** 7:1 | 196:12 197:18 |
| 233:20 236:16 | 222:6 223:3 | **agency** 178:25 | 197:24 198:15 |
| 236:18 | 305:8 308:16 | 179:4 | 201:5 203:10 |
| **acts** 43:12 | **adds** 141:13 | **agent** 175:8,13 | 203:12 208:16 |
| **actually** 15:25 | 206:25 | 176:5,8,11,15 | 208:19 264:24 |
| 18:2 25:8 | **adjourned** | 176:19 177:3,7 | 265:15 266:21 |
| 43:22 48:5,18 | 305:11 | 177:12 178:8 | 267:6 269:18 |
| 51:7 55:18 | **administration** | 178:10,12,19 | 271:12,18,25 |
| 61:18 95:18 | 13:4 105:6 | 178:23,24 | 274:19 275:16 |
| 112:13 189:13 | **administrative** | 198:8 274:25 | 275:19 276:10 |
| 215:13 236:25 | 45:2 105:8,9 | **agents** 178:1 | 276:19 277:1,4 |
| 248:7 283:8 | **admit** 247:15 | 198:5 | 277:14 278:25 |
| 284:4 301:22 | 248:14 | **ago** 168:3,8,10 | 279:12 280:11 |
| **add** 123:15 | **advance** 109:22 | 200:17 259:2 | 281:3,12 283:2 |
| 125:19 206:24 | 110:12 260:1 | 297:21 | 285:22 288:12 |
| **added** 21:16 | 261:23 | **agree** 26:2 | 290:6 294:10 |
| 194:25 195:2 | | 89:13 223:5 | 295:9 296:18 |

296:23 302:15 304:12
**agreements** 62:20 124:13 152:12 166:25 170:20 173:24 173:25 174:5 174:18,18,23 175:2 176:11 177:16 190:19 190:24 196:17 197:1,5 269:24 270:13 273:13 273:21 274:25 279:5,6 281:18 284:24
**agrees** 196:14
**ahead** 27:14 60:7 66:7 122:15 183:21 185:22 193:20 216:24 217:9 218:4 223:13 233:7 235:18 254:5 258:5 265:3,4 275:3 276:4
**akin** 102:23
**al** 308:6 309:3 310:3
**ala** 49:19,22 74:10,15 81:12 229:5 257:13 258:6 259:3,9 259:24 261:5
**alexander** 148:1
**allegation** 69:12
**allegations** 66:19 69:6
**alliances** 35:21
**allocated** 179:23 191:19 192:14 255:18
**allocation** 191:14,18
**allow** 61:4 181:16 184:16 210:1 286:2,24
**allowed** 158:8 159:4,6 201:8 207:11 286:11 301:7,19
**allowing** 201:7
**alma** 205:5,6
**alternative** 216:7 256:16
**aman** 26:8 124:4 221:1,5 221:10 222:18
**amandeep** 1:19 4:7 5:11,14 6:3 7:1,6,13 11:14 55:13 139:2 229:21 306:11 308:8 309:4,9 310:4,13 311:20
**amazon** 108:2 108:4
**ambiguous** 37:25
**amend** 294:15 295:17 305:4
**amended** 297:17,19 303:14,17 304:16
**amending** 297:13
**amendment** 294:25
**american** 47:16
**amicable** 171:9
**amount** 186:5 187:13 192:14 200:19 239:19 239:22,23,24
**amounts** 191:3
**analysis** 98:3 152:18 153:2,8 153:15 173:21 203:15
**ancillary** 173:24,25 174:5
**anna's** 131:6
**anniversary** 188:5,10,17 189:2,6
**announced** 257:20,22,25 258:9
**announcement** 258:11
**annual** 47:15
**answer** 7:24 9:18 10:7,10 10:24 16:14,19 31:17 35:1 37:25 45:3,24 49:2 54:19 68:24 69:16 73:3 75:7 82:12 83:4 94:24 106:23 114:17,25 123:4,21 134:12 138:11 152:15,22 153:5,11,14 156:25 157:2,3 157:7,10 159:19 160:4 160:11,12,13 162:8,11,12,14 162:19 163:3,6 163:11 164:18 164:23 165:13 165:25 166:2,3 167:9 168:19 168:25 170:9 171:5,7,8,12 177:23 184:16

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[answer - aspects]** Page 7

| | | | |
|---|---|---|---|
| 185:1,15 187:8 | **appear** 225:2,4 | **approved** | 163:9 164:4,15 |
| 201:19 211:2,5 | 225:5 254:3 | 46:25 291:7 | 164:16 165:15 |
| 216:24 225:10 | 309:11 310:15 | 296:10 | 167:6,7,9,10 |
| 248:2,6,7,12 | **appearance** | **approximate** | 168:22,25 |
| 251:6 258:23 | 24:20 | 112:7 | 169:7,10,25 |
| 262:12 263:20 | **appearances** | **approximately** | 171:3 194:19 |
| 283:23 299:16 | 2:1 3:1 4:3 | 83:5 92:4 | 194:20,22 |
| 299:19 300:17 | **appears** 230:6 | 123:23 | 195:1 243:12 |
| **answered** 93:4 | 233:16 236:10 | **approximation** | 243:13 244:4 |
| 106:14 115:7 | 243:8,19 250:8 | 270:7 | 248:5 252:12 |
| 151:7 156:3,4 | 250:14,25 | **approximatio...** | 259:8,17,18 |
| 162:3,20,25 | 281:3 | 83:9 | 261:21 295:8 |
| 163:3,9 164:20 | **appended** | **archive** 131:6 | 295:25 296:4 |
| 167:6,23 169:7 | 310:11,18 | **area** 241:7 | 296:10,13 |
| 169:12,22,25 | **applied** 76:1 | **areas** 35:14 | 304:25 |
| 170:10 202:24 | 80:24 253:18 | 115:24 | **asking** 7:25 9:6 |
| 210:20 248:4,5 | **applies** 61:10 | **arrangement** | 9:17 24:23 |
| 248:13,14,16 | 121:20 | 97:16 | 80:22 106:7 |
| 262:23 | **apply** 61:2 | **arrangements** | 135:3,12,16 |
| **answering** 81:6 | **appointed** | 126:17 | 156:6,23 |
| **answers** 9:16 | 27:22 | **arun** 35:23 | 157:14 160:5 |
| 67:8 145:7 | **appreciate** | 72:10 | 163:8 164:9 |
| 167:21,24 | 80:11 | **aside** 130:20 | 171:4 182:9 |
| 263:19 | **approach** | 277:8,9 280:7 | 185:6 197:10 |
| **anymore** | 145:20,21 | 292:14 | 221:12 223:7 |
| 144:15 159:5 | 150:6 | **asked** 9:12 | 247:4 258:6 |
| **apologies** 16:15 | **approached** | 70:11 73:4 | 270:17 293:8 |
| 36:3 71:13 | 288:21 301:17 | 74:11 75:15 | 293:10,22 |
| 80:7 106:11 | **appropriate** | 80:4,22 93:4 | 294:13,15,22 |
| 148:1 249:19 | 284:2 | 134:1,4,13,17 | **asks** 136:7 |
| **apologize** 22:24 | **approval** 267:6 | 134:21,21 | **aspect** 37:23 |
| 78:10 131:6 | **approvals** | 155:21 156:14 | 261:4 |
| **appeal** 173:3 | 116:6 | 158:20 159:17 | **aspects** 59:18 |
| | | 161:9 162:2,5 | 198:15 |

**[assert - b]**                                                              Page 8

| | | | |
|---|---|---|---|
| **assert** 69:1 | 236:22 245:6 | **australia** 12:11 | 62:15,21 63:6 |
| **assessment** | 257:9 258:14 | 33:14 42:13 | 68:5,10 88:17 |
| 157:15 291:6 | 275:2 279:24 | 44:19 113:10 | 110:11 118:20 |
| **asset** 5:23 | 292:1 301:8 | 116:19 | 119:1 126:12 |
| 171:19 172:5 | **assuming** | **australian** | 129:23 130:21 |
| 174:7 183:18 | 244:16,17 | 29:10,21 32:22 | 131:5,9,13 |
| 191:20 192:25 | 252:23 267:1 | 33:21 34:10 | 134:23 136:3,5 |
| **assets** 93:18,20 | **assumptions** | **author** 156:12 | 174:1 177:15 |
| 94:8 101:21 | 119:3 250:16 | **authorization** | 186:19,23 |
| 138:9 144:4,19 | **assurances** | 151:25 286:16 | 189:12,17 |
| 173:12,14,15 | 268:19 273:4 | 286:20 | 202:19 203:7 |
| 173:16 174:16 | **attached** 99:7 | **authorize** | 206:17 208:15 |
| 189:8,14,20 | 310:7 | 310:11 | 210:21 212:20 |
| 191:1,19,23 | **attachment** | **authorized** | 233:19 235:16 |
| **assign** 175:5 | 235:19 236:5 | 135:25 200:12 | 241:2 245:1 |
| 180:13 181:17 | 250:3 | 200:12 285:15 | 255:7 260:4 |
| **assignable** | **attachments** | 301:7 | 263:1,10 |
| 175:4,11 176:2 | 230:16 236:3 | **authorizing** | 269:23 283:5 |
| 180:7 | 242:22 | 275:20 | 284:3,10 |
| **assigned** 60:17 | **attended** 14:24 | **available** 46:11 | 289:10 295:15 |
| 174:9,12 | **attendees** | 70:8,18 115:22 | 295:20 296:3,9 |
| 179:12,15 | 233:21 | 130:25 182:21 | **aws** 108:4 |
| 180:2 181:9,14 | **attention** 132:2 | 182:23 200:8 | **axis** 19:13 20:7 |
| 181:17 192:7 | 133:9 249:7 | 201:22 206:14 | **azure** 107:20 |
| **assignment** | **attorney** 5:18 | 206:17 214:23 | 108:3 |
| 309:2 310:2 | 78:6 299:14,18 | 216:8 252:19 | **azure's** 107:25 |
| 311:2 | 307:2 | 253:11 254:2 | **b** |
| **assist** 213:23 | **attorneys** 1:13 | 262:3 272:25 | **b** 1:18 79:2 |
| **assistance** | 147:23 | 283:3 | 124:13 159:13 |
| 116:12 | **audibly** 8:24 | **ave** 308:1 | 160:25 162:1 |
| **association** | **audio** 96:3 | **avenue** 2:17 | 162:16 163:12 |
| 47:16 | **audits** 163:18 | **avoid** 137:3 | 223:1 308:8 |
| **assume** 9:18 | **august** 1:20 | **aware** 8:1 18:3 | 309:4,9 310:4 |
| 111:9 186:4 | 307:8,18 308:4 | 18:8 60:23 | |

Case 2:25-cv-00300-DJN-DEP Doc 19-2 Filed 01/09/26 Page 89 of 154 PageID #: 4190
PAGEID #: 802

| | | | |
|---|---|---|---|
| 310:13 311:20 | 15:9,11 18:11 | 102:18 103:14 | 183:12,21 |
| **b&t** 5:24 6:7 | 18:14,15,17,20 | 103:18 105:16 | 190:5,10,15,23 |
| 179:17,18,22 | 19:25 20:19,20 | 105:17,21 | 191:2 196:6,15 |
| 183:8 217:13 | 20:23,24,25 | 106:3,17,21 | 197:23 202:7,9 |
| 254:10,25 | 21:19,23,23 | 107:5,10,13 | 203:14 204:22 |
| 256:15 | 22:4,13 23:8 | 108:8,15,23,25 | 206:25 207:10 |
| **bachelor's** | 23:16 24:21,25 | 109:16,16,25 | 207:15 208:16 |
| 13:14 | 26:2,3 27:17 | 110:1,3,4,6 | 210:5,12,16,23 |
| **back** 14:18 | 28:6,14,15,16 | 111:21,25 | 210:24 213:11 |
| 18:8,21 19:3 | 28:21 29:1,4,6 | 112:4,13,16,19 | 213:22 216:5 |
| 22:22 29:6,15 | 29:8,8,14,25 | 113:2,11,24 | 220:8 223:4 |
| 31:14 38:11,22 | 32:2 33:17 | 114:2 115:11 | 224:3,8 226:2 |
| 39:19,23 81:19 | 34:14,21 35:2 | 115:19,23 | 230:25 234:5 |
| 83:16 84:17 | 36:1 37:2 | 116:8,12,15,19 | 235:10 240:15 |
| 100:24 131:20 | 40:19 42:9 | 119:1 121:4 | 241:8 243:4 |
| 139:4,9,20,23 | 43:12 44:8,11 | 124:19 126:19 | 244:5 246:23 |
| 142:8 152:18 | 44:17,19 45:6 | 127:13,15 | 247:1 250:10 |
| 152:19,22 | 45:8,11,20 | 128:9 130:11 | 254:22 256:4 |
| 181:6 182:10 | 46:17 49:7 | 133:20 134:6 | 264:2,5,24 |
| 184:20 193:10 | 54:22 56:12,18 | 134:19 135:14 | 265:4,19,20,24 |
| 204:8 213:18 | 60:4 61:1,10 | 136:5 140:20 | 266:5,16 268:8 |
| 214:19,20,23 | 65:10 66:4,17 | 141:9 142:21 | 268:11,14,18 |
| 215:17 221:13 | 69:1,6 77:3,25 | 143:7 144:11 | 269:15 270:10 |
| 259:5 261:2,8 | 78:20,24 79:10 | 145:1,3,4,5,12 | 270:19,24 |
| 265:7,18 282:3 | 82:18 86:13 | 145:19 146:12 | 271:12,21 |
| 286:15 292:22 | 88:2,4,9 90:20 | 149:20 152:1 | 273:1,9,16 |
| 296:7 300:14 | 91:21,23,24 | 155:13 156:1 | 274:24 275:20 |
| 304:9 308:16 | 92:1,4 93:15 | 160:22 162:22 | 279:22,25 |
| **background** | 93:20 94:13 | 166:4 172:17 | 280:12 281:4 |
| 11:10 12:15,21 | 95:1,4,5,8,13 | 173:5 174:24 | 282:6 284:19 |
| 24:19 25:24 | 99:23,25 | 175:7,12 176:4 | 287:1,10,24 |
| 52:21 93:6 | 100:15,18,20 | 176:7,15,25 | 289:1,12,14 |
| **baker** 1:9 5:5 | 100:22 101:1 | 178:1,8 179:23 | 290:13 295:13 |
| 5:15 6:10,13 | 102:11,12,14 | 179:25 181:1,4 | 297:7 300:9,25 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[baker - board]**                                     Page 10

| | | | |
|---|---|---|---|
| 308:6 309:3 | 268:12 | 283:13 288:20 | **bharat** 72:10 |
| 310:3 | **belief** 143:24 | 300:4 | **bibliographic** |
| **ballpark** 53:17 | **believe** 21:21 | **belvedere** 6:9 | 134:5,18 |
| **banker** 145:23 | 22:12 26:11 | 264:22 265:16 | 198:21 199:2 |
| 145:25 | 27:19 29:20 | 266:1,7 268:16 | 199:12 203:14 |
| **bankruptcy** | 33:23 52:11 | **beneficial** 34:1 | 203:16,18,21 |
| 11:2 | 68:25 74:16 | **beneficiary** | 207:14 210:23 |
| **base** 67:21 | 75:25 76:17 | 271:25 | 225:23 226:3 |
| **based** 58:16 | 80:25 84:6,13 | **benefit** 210:2 | 227:12 268:2 |
| 70:17 72:17 | 84:15 86:20 | **benefits** 114:12 | 272:13,18 |
| 73:11 87:16 | 90:19 106:18 | 114:13,14 | 298:19,22 |
| 98:1 138:15 | 124:1 131:3 | **bennett** 29:10 | **bid** 175:13 |
| 188:14 189:3 | 132:18 136:11 | 29:22 31:9 | 179:17,22,23 |
| 224:25 227:13 | 137:5,23 138:9 | 44:18 101:5 | 179:25 180:4 |
| 290:17 | 140:18,22 | 103:16,25 | 181:5,10,11 |
| **baseline** 188:19 | 141:18 143:15 | 109:20 110:3 | 183:8,13 192:9 |
| **basis** 70:8,20 | 143:23 144:11 | 112:3,4,17,25 | **bids** 148:13 |
| 296:11 | 147:9,21 148:5 | 113:9 | **big** 48:13,16 |
| **batch** 214:22 | 148:16,21 | **berkery** 146:1 | **birth** 8:12 |
| 215:1,3 | 152:21 161:16 | 154:11 | **bit** 12:20 17:13 |
| **bates** 243:3 | 162:20 170:15 | **best** 9:8 22:2 | 28:19 48:19 |
| 249:21 | 170:18 171:3 | 35:7 60:4 | 130:17 203:25 |
| **becoming** | 172:13 174:6 | 61:17,18 65:2 | 204:17 282:20 |
| 235:10 | 195:2,25 | 74:3 162:10 | **blackwell** |
| **begins** 24:22 | 201:23,25 | 214:21 297:10 | 29:23 101:4 |
| **begun** 170:12 | 213:16 215:4 | 297:20 | **blanchard** |
| **behalf** 2:3,14 | 216:17 217:2,4 | **beta** 225:12,19 | 146:24 147:6 |
| 40:3,7 41:3 | 219:3 239:25 | 226:16 257:19 | **blank** 183:3,4,6 |
| 62:7 124:23 | 241:16,20,23 | 258:13 | **blog** 52:12 |
| 126:18 144:25 | 242:4 244:5 | **better** 35:12 | **blogs** 52:9 |
| 145:2,12 | 248:13,16 | 49:3 53:14 | **board** 49:18 |
| 160:13,22 | 254:16 258:19 | 87:4 196:9 | 50:4,11,13,24 |
| 162:22 176:8 | 262:5,24 266:1 | 197:20 263:7 | 51:3 85:10,12 |
| 177:8 223:3 | 268:1 278:6 | 263:20 278:3 | 85:23 86:1,12 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[board - btcat]** Page 11

| | | | |
|---|---|---|---|
| 86:15,17 89:4 | **brand** 143:1,22 | 114:6,11 | **briefly** 28:18 |
| 89:5 93:12 | **break** 9:22 10:1 | 115:14,15,22 | 52:18 114:8 |
| 109:9 | 76:20,23 142:6 | 116:1 138:9 | 129:15 197:17 |
| **boards** 49:23 | 199:19 228:3 | 143:5,14 144:3 | **bring** 214:19 |
| **boggs** 2:4 | 262:16,19 | 144:8 145:5,5 | 214:20,23 |
| **book** 95:14 | 263:23 | 145:13 146:12 | **brings** 52:3 |
| 96:3,3 99:2,4 | **breakdown** | 148:7,14 | **broader** 298:18 |
| 99:25 108:14 | 83:6 | 149:21 150:4 | **brother** 85:15 |
| 109:7 128:6 | **brendan** 80:20 | 156:1 160:14 | 85:19 |
| 224:7,11 | **bretzman** 6:2 | 160:19,22 | **brought** 66:17 |
| **bookmasters** | 72:8 229:21 | 162:22 163:16 | **brown** 2:6 |
| 29:9 88:3,4 | **brevard** 240:4 | 163:19,22 | 77:16 161:23 |
| 92:2 101:2 | 293:5 304:24 | 166:3,5,13,14 | 204:13 229:9 |
| **books** 33:2 | **bridgeall** 1:9 | 166:17,20,25 | 235:24 237:9 |
| 41:22 95:12 | 18:22 29:12,23 | 170:12 172:14 | 237:17 239:17 |
| 266:24 | 31:10,15 32:24 | 173:8 175:8 | 249:25 |
| **borden** 252:6 | 32:25 33:3,17 | 176:9,12 177:4 | **bt** 6:16,18 |
| **bottom** 183:23 | 33:18 34:6,11 | 177:8,13,20 | 207:18 223:19 |
| 235:22 268:7 | 34:12,19,19 | 178:2,7,13,17 | 227:8 282:4 |
| 281:8 | 35:4,24 43:3,3 | 180:2 187:22 | 286:24 296:18 |
| **bought** 83:16 | 43:7,9 44:14 | 191:19,24 | 296:23 |
| 84:17 | 45:6,15 49:1,4 | 194:7 195:8,10 | **btac** 79:2,4,6,8 |
| **boundaries** | 55:1 61:21 | 196:1 198:5 | 79:14 81:19 |
| 24:20 | 62:2,5,7 63:4,9 | 200:12 212:13 | 84:23 87:18,22 |
| **boundless** | 63:11 64:20 | 212:17 274:25 | 87:23 88:1,6,7 |
| 19:15 20:8 | 65:2 66:5,17 | 279:5,6,23 | 88:8,12 89:6,8 |
| 96:22 | 93:25 94:1,9 | **bridgeall's** | 89:18 90:8,11 |
| **brad** 82:13,19 | 100:16 106:2,8 | 61:19 143:8 | 101:14,18 |
| 82:20 83:11,19 | 106:15,19,25 | 159:23 166:6 | **btcat** 5:6 6:8,16 |
| 83:21,23 84:11 | 107:3,11 108:9 | **bridgewater** | 6:18,20 25:13 |
| 85:7 169:18 | 109:18 110:4 | 91:13 | 25:25 45:12 |
| 230:16 | 110:16 111:17 | **brief** 80:21 | 56:24 59:17,18 |
| **brain** 39:5 | 112:6,12,18 | 81:3 130:24 | 69:1,8,14 81:8 |
| | 113:15,19,21 | | 93:22 96:13 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[btcat - call]**                                                                 Page 12

| | | | |
|---|---|---|---|
| 98:22 100:1,9 | 214:10 216:4 | 298:9,14,18,20 | 28:1 29:19 |
| 100:9,17 104:7 | 218:19,24 | 298:24,25 | 33:20 37:14 |
| 104:13,20,23 | 219:6,9,14,22 | 301:13 302:15 | 83:15 119:4,6 |
| 105:14 106:17 | 220:17,21 | 303:4,6,20 | 142:22 147:9 |
| 107:4,11 114:9 | 221:24 222:5 | **btcat's** 120:24 | 148:7 151:15 |
| 114:12,19,21 | 227:8,12,19 | 125:16 132:3 | 174:15 188:4 |
| 120:9,11,13,16 | 228:1,15 | **buckles** 147:21 | 188:15,21,24 |
| 120:17,19 | 230:19,21 | 147:21 148:2 | 189:1,6 192:6 |
| 121:21,22 | 231:3 232:24 | **building** | 192:11,12 |
| 122:12,22 | 237:4,25 239:1 | 227:22 | 193:5,6 198:16 |
| 123:9,10,10,13 | 240:21 241:13 | **built** 164:12 | 198:19 208:2 |
| 123:19 124:2 | 242:23 243:17 | **bullet** 156:22 | 224:3 |
| 127:13 133:1 | 244:2,9,16,21 | 159:15 160:2 | **buyers** 148:6 |
| 133:13,23,25 | 244:24 245:5,6 | 161:2,18 162:1 | **bvt** 266:3 |
| 135:21 136:9 | 246:4,19 247:5 | 162:16 163:12 | 268:10 |
| 140:6,9,11 | 247:24 249:9 | 163:25 165:16 | **bywater** 80:2 |
| 141:13 150:25 | 250:12,13,18 | 165:22 167:2 | 80:16 81:17 |
| 151:2,4,6,13,16 | 251:8 254:10 | 168:24 169:2,9 | **c** |
| 152:2 157:5 | 255:3,21 | 170:5 171:1 | |
| 158:7 159:5,7 | 256:15 257:6 | 227:11,14 | **c** 79:2,16 |
| 163:20 164:11 | 258:21 259:7 | 234:10,14,16 | 163:23 |
| 164:22,25 | 261:20 262:2,4 | 234:20 250:16 | **ca** 308:25 |
| 166:5,14,17,20 | 263:13 280:13 | **bundle** 159:7 | **cafe** 16:9 19:18 |
| 195:20 196:16 | 281:5,12 282:7 | 202:12,15 | 96:14 100:21 |
| 199:4,7,10,13 | 282:22 284:6 | **bundled** 106:5 | 199:1 |
| 200:3,5,7,16 | 284:24 285:9 | **burden** 299:25 | **calculate** |
| 201:3,12,22 | 285:18,25 | 300:6 | 188:12 |
| 202:13,17,20 | 286:5,8,8 | **burdened** | **calculation** |
| 204:2,18,20,21 | 287:6,10 | 216:21 | 188:14 |
| 205:10,16 | 288:24 289:2,4 | **buron** 75:13,14 | **calendar** 54:19 |
| 207:5,17 209:2 | 289:7 290:4,5 | **business** 10:19 | **california** |
| 209:3,6,11,11 | 290:14,14 | 13:3,4,24 14:4 | 277:2 |
| 211:14 212:4,7 | 291:11,18 | 14:24 15:19 | **call** 53:25 |
| 212:24,25 | 293:15 295:3 | 20:7 22:13 | 160:3,12 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[call - chain]** Page 13

167:23 168:11
169:14 207:17
235:21 302:7
**called** 7:1 16:7
16:9 20:7
94:10 97:9
131:6 132:10
132:11 205:7
209:15 214:3
239:7 298:9
**calls** 41:11
68:22 168:1,4
179:7 187:19
195:24 276:14
289:9 290:3,4
290:20 291:25
299:14
**canada** 138:15
**candidates**
250:18
**cap** 141:16
**capability**
43:13 206:7
**capacity**
144:24
**caption** 306:22
**capture** 240:22
243:23
**captured**
203:22 305:5
**carl** 255:1
**carl.solution**
212:20

**carolina** 1:23
8:9 81:24 91:7
306:3,9 307:7
307:16
**carved** 182:19
**case** 1:7 34:6,8
37:14 43:17
67:5 76:1
136:2 149:14
194:6 308:6
309:3 310:3
**cases** 53:3,5
76:23 128:18
128:19,20
132:15 292:17
**cash** 186:6
**cat** 223:19
227:8 282:4
286:24 296:18
296:23
**catalog** 196:15
266:24
**cataloged**
287:23
**cataloger** 128:5
**catalogers**
126:21
**cataloging** 5:6
6:9,12 24:1
26:12 38:9
39:20,24 59:5
69:2 103:21
104:1,10,14
121:2 125:2,6

126:23 204:21
213:3,5,10
214:17 223:24
224:2,5,6,7,7,9
224:9,13,16,21
224:24 225:22
226:8 250:20
255:1 264:3,6
264:8,12,14,23
265:14,23
266:15,18
268:15 269:17
269:21,24
270:20,25
271:2,11,18
273:21 275:21
280:14 286:1,8
287:16 288:3
298:9,15
**cataracts** 243:1
**catchall** 27:3
**categories**
175:19
**category**
191:21
**cause** 185:2
306:13
**caveats** 60:11
**cavitch** 3:3
**cavitch.com**
3:8
**ceased** 196:1,23
**center** 2:7
43:13 272:16

**centre** 8:10
**ceo** 20:12,17,19
21:4 27:20,21
28:24 29:1
30:3,7,8,9,11
40:9,10,13
43:18,20 46:2
46:20 90:14
93:1 131:12
**ceos** 21:6
**certain** 65:11
68:18 117:2
124:4 125:8
132:15 139:13
140:22 146:23
180:10,10
187:17 188:3
194:10 208:18
225:15 230:3
247:3 268:14
269:2,18 273:8
285:12
**certificate** 4:10
306:1 310:11
**certification**
309:1 310:1
**certified** 7:4
**certify** 306:10
306:20 307:1
**cfo** 85:9 146:7
146:10
**chain** 32:7,10
32:14,17,21,23
33:1 41:20

Case 2:25-cv-00093-SEP-EPD Doc # 96-22 Filed: 01/09/26 Page: 94 of 154 PAGEID #: 54195
PAGEID #: 807

42:7 46:25
72:9 82:25
94:2 100:24
116:6 173:7
**chairman**
27:21
**chance** 52:6
249:6 276:2
290:8
**change** 12:9
216:16 241:8
241:14,18,21
242:2 283:2,4
283:6,8,14,15
283:20 304:18
308:14,15
310:8 311:3
**changed** 23:1
29:16 83:12
274:9 304:16
**changes** 12:19
116:14,25
122:25 127:5
212:6 283:22
284:1,4,6,13,17
284:18 292:17
292:21 308:13
309:7 310:7,9
**chapel** 83:20
84:14
**chapter** 142:19
**characterize**
46:1,3

**charge** 15:20
16:5 19:11
23:11 26:24
27:9,24 32:9
32:17 33:8,11
36:7,8 39:2
41:15 42:4,6,8
**charlotte** 1:23
8:9 81:24
88:19 91:7
92:7
**chart** 5:18
39:21 78:5,19
144:3
**check** 130:13
**child** 250:2
**choice** 245:17
**choose** 10:10
118:23 121:1
122:10 123:12
125:12,19
200:10 201:11
275:14 288:15
298:7
**chooses** 151:24
245:21
**chris** 82:13
83:8 86:4,7,9
**circumstance**
139:16
**cities** 48:13
**city** 304:14,20
304:21

**civil** 7:3 309:5
310:5
**claim** 72:23
288:25 289:2,6
294:20
**claims** 68:20
105:5 194:5,10
**clarification**
25:4 53:5
59:15 113:18
135:10 143:16
221:2 293:10
294:13,22,24
298:14
**clarifications**
56:5 155:14
**clarify** 28:3
34:7 72:23
96:9 124:6
136:22 249:20
278:11 300:5
300:22
**clarity** 182:2
**clarivate** 131:4
131:8,24
**clark** 48:3,5
**clarke** 293:2
**classification**
227:13,19
**classified** 205:9
**clause** 152:10
152:25 267:11
267:11 268:6
272:6,22 277:1

**clauses** 119:14
**clear** 9:2 25:11
26:7 73:14
78:17 106:6,13
118:15 182:17
223:6 284:23
**cleared** 185:12
**clearly** 9:5
50:20
**cleveland** 3:6
48:14 308:2
**client** 37:20
250:3 299:14
299:18
**close** 149:5
302:8
**closed** 195:19
238:9 239:12
239:13,14,15
239:16
**closer** 44:1
**closing** 188:5
**closure** 180:20
**cloud** 107:18
107:25
**clutter** 204:9
**coliseum** 8:10
**collaborate**
34:24 159:5
202:22 203:11
210:15 275:12
**collaborated**
32:1,4 34:20
35:1 38:25

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[collaborated - companies]                                    Page 15

| | | | |
|---|---|---|---|
| 176:25 | 99:12,17,19 | **color** 77:15 | **commercially** |
| **collaborating** | 100:3,6,14 | **columbus** 2:9 | 125:22 |
| 203:8 | 114:10,12,19 | 48:14 | **commission** |
| **collaboration** | 114:21 116:11 | **columns** 238:5 | 307:18 309:19 |
| 35:8,10,11 | 124:11,14 | 243:7 | 310:25 311:25 |
| 280:2 | 131:19 138:10 | **combination** | **commissioned** |
| **collaborative** | 142:25 143:21 | 225:24 268:2 | 306:9 |
| 206:16 279:22 | 148:14 150:9 | **come** 48:13 | **committee** |
| **collect** 181:18 | 151:4,6,13,16 | 58:18 131:20 | 27:22 |
| 199:23 | 151:25 157:25 | 134:2 139:23 | **common** |
| **collectconnect** | 158:4,7,8,10,14 | 195:12 202:14 | 107:15 230:24 |
| 16:7 19:18 | 158:21 159:1 | 241:3,4 286:15 | 231:1 292:2 |
| 96:14 98:5 | 161:10 164:12 | 287:4 | **communicate** |
| 100:19 | 170:20 173:17 | **comes** 24:11 | 8:18 |
| **collected** 65:7 | 173:17,18 | 35:13,15 | **communicated** |
| 65:16 170:19 | 174:18 175:1 | 100:13 221:22 | 130:11 170:22 |
| 208:3,4 | 176:15,24 | 239:6 275:15 | **communication** |
| **collecting** | 177:7,12,13 | **comicplus** | 299:18 |
| 64:12 170:13 | 190:1,1 195:15 | 97:24 | **communicati...** |
| 170:24,24 | 195:20 196:12 | **coming** 200:22 | 62:20 65:12 |
| 199:20 | 197:1,5 198:3 | 200:23 221:13 | 133:14 149:21 |
| **collection** | 199:3,17,21,23 | **comment** | 153:23,25 |
| 98:15 123:18 | 200:3,5,7 | 136:23 292:7,8 | 170:14 261:7 |
| **collectionhq** | 201:5 202:13 | 292:10 | 299:23 |
| 5:9 6:15 16:3 | 202:17,22 | **commerce** 16:1 | **community** |
| 16:11,22,24 | 203:8,15 274:1 | 19:14,16 91:18 | 207:2,6,7,10,12 |
| 18:2 19:1,8,16 | 274:17,20 | 92:10 98:9 | 207:15 209:25 |
| 26:25 27:7,9 | 275:11 277:14 | **commercial** | 210:6,11,14,25 |
| 29:23 33:18 | 278:24 279:7 | 126:8,10 127:8 | 211:24 228:2 |
| 44:22 45:16 | 279:12 | 127:9,12 | 262:11,13 |
| 60:22 64:5 | **collectionhq's** | 128:17 139:11 | 298:9,10,15,18 |
| 81:8 93:24 | 158:24 159:3 | 139:14 140:23 | 298:21,23,25 |
| 96:13 97:1 | **collective** 43:14 | 140:25 141:4 | **companies** |
| 98:2,4,20 99:9 | 44:9,11 | | 49:11 109:14 |

Case 2:25-cv-00300-JES-KCD Doc 1 Filed 01/09/26 Page 96 of 154 PageID #: 809
Case 2:25-cv-00300-JES-KCD Doc 1-1 Filed 01/09/26 Page 96 of 154 PageID #: 4197
PAGEID #: 809

109:16 110:9
145:19
**company** 18:24
40:4,8,25 41:3
41:13 46:6
50:22 61:11
65:16 78:21
79:3,7,9,11,15
81:2,20 83:13
83:16,22 84:8
84:16,24 85:2
87:19,23 88:7
89:16,23 90:11
93:5,12 94:10
102:21 108:17
109:13 138:16
144:12,15
147:10 214:2
**comparable**
256:24
**compare** 243:8
297:24
**compared**
132:21,22
133:1,10,13
**compares**
246:2,3
**comparing**
188:20,23
**comparisons**
244:2
**compensation**
129:6

**compete** 132:17
245:7,12
246:12,13,16
246:21 247:20
**competence**
229:2
**competes**
245:17
**competing**
245:19 246:10
246:14,19,23
247:2,7,16,23
248:15 253:14
253:24
**competition**
248:1
**competitive**
228:24,24
252:4 253:16
**competitor**
108:4 125:24
132:16 245:24
246:6,9 247:21
252:16
**competitors**
132:3 134:2
244:21,24
245:3,4 252:25
**complaint** 5:3
65:23 66:8,19
69:25 70:4,21
71:24 150:10
157:4

**completed** 86:6
225:3 308:16
**completely**
155:7 223:5
**complex** 89:11
89:13
**compliance**
135:22
**compliant**
137:6
**complies** 11:23
138:4 193:23
218:6 277:19
298:1
**comply** 136:19
**comprised**
50:14
**computer**
272:16
**conceived** 24:8
24:10 25:18
26:13,14
209:21 212:23
213:1,12
214:22
**concept** 232:13
**conception**
215:10
**concern** 168:21
184:11,12
**concerned**
168:23
**concerning**
268:20,25

273:4
**conclusion**
68:22 178:24
179:4,8 187:19
195:24 196:21
276:14 289:9
290:3,20
291:25
**conclusions**
198:7
**conditions** 6:17
8:2 117:1
140:17 281:17
282:8,9,13,16
283:1,10,14,17
283:20 284:7
284:18 285:2
293:24 294:16
295:18,23
296:2,4,19
297:3,14
303:15 304:15
**conduct** 158:9
**conducting**
193:6
**confer** 57:6
**conference**
41:11 47:16,17
75:5,9 76:9,11
257:13 258:6
261:5,12,15,16
262:18
**conferences**
47:11,11,13,18

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[conferences - contribute]                                   Page 17

| | | | |
|---|---|---|---|
| 176:23 261:1,7 | **constructed** | **continues** | 129:20 130:1 |
| **confers**  56:4 | 213:8 | 203:10 | 137:7 139:10 |
| **confirm**  185:23 | **consultants** | **continuity** | 152:5 153:1,1 |
| 248:24 274:23 | 117:16 | 192:12 198:16 | 153:7,15,17 |
| **confused**  53:4,6 | **consultation** | 198:20 203:12 | 159:23 174:9 |
| **confusing** | 39:16 | **contract**  37:15 | 174:12,15 |
| 129:17 136:13 | **consulted** | 38:3,22 67:22 | 175:10,12,16 |
| **confusion** | 39:18 | 115:21 116:24 | 175:21 176:8 |
| 182:17 | **consumes** | 121:13,17,19 | 177:11,14,22 |
| **congress** | 199:3 | 126:15 130:20 | 179:12,14,16 |
| 132:13 206:15 | **consummated** | 135:23 136:19 | 180:10,13,15 |
| 208:8 211:21 | 62:17 | 136:21,25 | 180:16,22 |
| 211:22 212:5 | **contact**  146:23 | 139:12,15 | 181:5,7,10,12 |
| 245:9 | **contained** | 140:21 141:10 | 181:12,15,18 |
| **conjecture** | 34:15,17 | 152:8,8 154:5 | 182:7,14 183:5 |
| 119:13 128:4 | 198:25 | 161:10 172:21 | 183:7,13 |
| **connection** | **contains**  157:6 | 173:5 174:25 | 189:25 192:3,6 |
| 60:25 273:20 | **content**  16:9 | 177:18,19 | 192:9,10,12,16 |
| **consent**  287:1 | 19:18 20:3,7 | 179:17,18 | 253:18,19,20 |
| **consider**  46:16 | 36:22 96:2,14 | 180:20 181:16 | 292:4 301:5 |
| 73:5 178:9 | 100:21 199:1 | 183:8 197:9 | **contractual** |
| 205:10 211:25 | 269:14 | 238:16 240:25 | 137:3 |
| 212:4,7 246:9 | **contents**  60:1 | 253:22 266:25 | **contractually** |
| 246:10,14,18 | **context**  274:24 | 291:1,15 301:8 | 119:8 |
| 246:23 | **contingent** | 302:3 304:7,13 | **contrary** |
| **considered** | 187:16 | 304:14,18 | 293:24 |
| 132:16 241:12 | **continue** | **contracting** | **contribute** |
| **considers**  247:1 | 142:25 143:21 | 36:9 | 48:18,24 49:13 |
| **consisted**  29:7 | 158:14 198:2 | **contracts**  67:22 | 104:2,7 105:13 |
| **consistent** | 198:18 202:22 | 71:7 72:9 | 201:6,7 211:23 |
| 184:15 | 272:24 | 116:1,3,8,15 | 211:24 232:9 |
| **consortia** | **continued**  3:1 | 118:24 119:7 | 232:15,18 |
| 286:25 | 139:2 195:14 | 123:5 124:3,8 | 233:17 241:19 |
| | | 124:10,22 | 275:13 299:2 |

Case 2:25-cv-03093-SB-E Document 96-2 Filed 01/09/26 Page 89 of 155 Page ID #:4199
Case 2:25-cv-03093-SB-E Document 96-2 Filed 01/09/26 Page 89 of 155 Page ID #:4199
PAGEID #: 811

| | | | |
|---|---|---|---|
| 300:8 | **convicted** | **corporations** | 177:5 182:16 |
| **contributed** | 10:21 | 29:11 | 183:11 186:13 |
| 49:3,9 140:24 | **cooperative** | **correct** 7:9 | 187:6,23 190:7 |
| 141:1,3,6,7,8 | 6:12 271:9,21 | 22:21 28:10 | 190:12 192:2 |
| 207:9 210:24 | **copies** 55:4 | 29:3 31:1 | 192:17 194:8 |
| 212:6 220:5 | 235:11 272:12 | 32:16 37:21 | 194:11 205:14 |
| 227:25 232:24 | **copy** 224:5,9,9 | 38:13 42:17 | 208:20 209:9 |
| 233:19 299:4 | 224:13,21,23 | 45:16 49:15,20 | 212:18 213:20 |
| 300:10 301:1 | 235:13 260:7 | 50:23 54:24 | 213:21 220:19 |
| **contributes** | 261:21 291:16 | 56:15,21 61:20 | 225:7 230:17 |
| 104:5 210:1 | **copying** 291:10 | 63:13 64:14 | 231:4 233:14 |
| **contributing** | **copyright** | 67:13 68:12 | 236:7,20 |
| 258:20,24 | 288:24,25 | 72:18,21 78:1 | 240:16 241:5 |
| **contributions** | 289:2,2,3,5,16 | 78:2 82:3 85:3 | 243:3 247:7 |
| 220:22 256:7 | 290:18 | 86:23 87:14 | 248:7 249:23 |
| **contributor** | **copyrights** | 88:11,23 90:22 | 253:24 254:22 |
| 210:17 | 290:15 | 90:25 93:12,13 | 254:23 256:9 |
| **convene** 262:16 | **core** 33:13 34:2 | 93:23 94:2 | 256:20 259:12 |
| **conversation** | 204:23 | 95:19 97:17 | 264:3,4 267:4 |
| 72:24,25 73:18 | **corp** 79:16,16 | 101:3,6,9,13,16 | 268:23 269:19 |
| 73:19,21,22 | 88:1,8 89:19 | 101:22 105:18 | 269:22 272:8 |
| 74:14 79:23 | **corporate** | 107:14 108:15 | 273:1,2 275:16 |
| 80:1,21 81:10 | 14:21,25 15:2 | 108:24 112:14 | 275:17,22 |
| 81:13 139:9 | 15:6 18:7 36:5 | 114:7 115:17 | 282:14 283:12 |
| 151:20 152:9 | 36:15 37:11 | 123:16 125:3 | 284:25 286:13 |
| 152:17 238:8 | 43:5 50:17,19 | 126:25 140:15 | 287:2,7 298:19 |
| 241:3 | 51:1 78:17 | 141:15 142:16 | 305:6 306:18 |
| **conversations** | 82:21 105:4 | 143:10 144:6 | **corrected** 101:2 |
| 53:10 54:8 | **corporation** | 145:14 146:13 | **correction** |
| 71:11 73:9 | 20:21 22:17 | 146:16 154:17 | 29:18 166:7 |
| 74:6 76:7,8,13 | 23:24 27:24 | 154:20 159:8 | **corrections** |
| 76:15 156:16 | 80:3,16 81:17 | 166:4 169:3 | 308:13 310:17 |
| 241:5 | 82:1 87:9 | 172:18 173:10 | **correctly** 15:12 |
| | 90:18 91:2 | 173:13 176:13 | 16:8 75:12 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[correctly - customer]                                    Page 19

| | | | |
|---|---|---|---|
| 81:13 156:10 | **county**   5:5 6:11 | **covering** | **cully**   21:3 22:9 |
| **correlation** | 48:3,5,14 | 179:25 | 23:11 40:16 |
| 33:3 | 233:12,25 | **create**   11:25 | **current**   8:7 |
| **correll**   118:1 | 240:4 251:16 | 69:13 97:10 | 25:24 50:14 |
| **counsel**   8:14 | 271:9,20 | 104:17,18 | 135:8,12 |
| 39:22 47:1 | 280:11 281:4 | 120:25 122:3,7 | 157:14 189:20 |
| 53:1,10,19,21 | 304:1,13 306:5 | 125:10 127:11 | 251:17 |
| 54:8 57:17 | 309:10 310:15 | 206:4,5 210:7 | **currently**   17:14 |
| 59:4,24 60:1,2 | **couple**   47:17 | 210:10,12 | 19:22 75:24 |
| 60:12 64:19,24 | 56:1 62:14,16 | 214:20,24 | 182:10,12 |
| 67:20 71:12,14 | 72:14 247:11 | 231:6,7 | 201:22 252:5 |
| 71:19,24 72:25 | 278:8,15 | **created**   38:2 | 289:4 |
| 73:8,13,20,25 | 281:21 297:21 | 69:3 78:11 | **cursory**   67:23 |
| 76:16 80:9 | **course**   149:6 | 86:19 87:12 | 68:4 |
| 83:23 84:2 | 191:10 194:15 | 93:14 102:6 | **custody**   4:12 |
| 142:2,4 147:14 | **court**   1:1 4:13 | 108:22 140:24 | **customer**   48:16 |
| 147:17,20 | 7:21 8:21 | 141:6 156:10 | 63:16,19,19 |
| 149:14 156:11 | 10:18 66:23 | 156:11 207:24 | 64:8 70:11 |
| 160:3,11,20 | 204:14 309:7 | 213:8 224:23 | 74:11,17 |
| 162:20,25 | **covenants** | 260:12 288:3,7 | 112:17 116:7 |
| 163:2 167:6 | 190:19,24 | 289:12 | 116:19 121:8 |
| 169:12,13,15 | **cover**   43:4 | **creates**   104:4 | 124:23 125:10 |
| 169:16,19,25 | 191:3 195:22 | 141:12 230:25 | 125:17 130:8 |
| 170:10 185:24 | 196:19 218:3 | **creating**   37:14 | 132:16 134:13 |
| 277:24 280:6 | 236:4 250:5 | 124:22 126:18 | 135:23,24,24 |
| 290:22,24 | 254:16 282:21 | 126:19 128:6 | 136:7 137:2,2 |
| 299:23 303:1 | **coverage** | 214:12 224:18 | 139:12,25 |
| 305:8 307:2 | 177:21 250:20 | **creation**   69:7 | 140:3 151:24 |
| **counsel's** | **covered**   57:22 | 121:24 127:21 | 159:3 164:21 |
| 170:23 186:8 | 177:19,20 | **creator**   210:17 | 174:18 175:2 |
| 299:20 | 184:4,7,8 | 213:3 | 177:14,16,25 |
| **count**   103:7 | 196:3 198:15 | **crime**   10:22 | 178:6,6 189:25 |
| 264:13 | 279:18 | **cuff**   81:13 | 192:8 193:7,8 |
| | | | 196:13,16 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[customer - data]

Page 20

| | | | |
|---|---|---|---|
| 198:10 199:9 | 98:14 99:23 | 246:8 250:17 | 118:17 123:3 |
| 200:6,10,11,14 | 104:16 113:20 | 250:24 253:13 | 123:21 124:4 |
| 201:5 216:12 | 116:22 118:21 | 256:16 257:20 | 151:9,12 |
| 226:21,21,25 | 118:25 120:11 | 258:15 259:4 | 162:11 163:5 |
| 227:1 236:8 | 121:5,21 | 261:7,10,19 | 163:11,16,18 |
| 237:3 238:10 | 124:18 129:3 | 263:15 264:6,7 | 163:21,22 |
| 240:5,17,22 | 129:13,21 | 264:9,15 | 201:1,19 202:1 |
| 241:6 242:1 | 130:2,4,23 | 269:25 275:12 | 202:10 208:12 |
| 243:22,22 | 132:20 133:11 | 277:13 279:1 | 208:25 209:1 |
| 245:18,20 | 133:15 134:8 | 284:17 288:13 | 210:9 211:1 |
| 247:4,25 251:8 | 135:3,5,6,7,8 | 289:15 292:17 | 219:7,12,21 |
| 252:1,12 | 135:12 136:14 | 295:23,25 | 221:1,8,10,13 |
| 253:22 266:21 | 136:18 137:6 | 296:4 298:14 | 221:15 222:2,6 |
| 266:22 269:21 | 150:20,23 | 302:14,24 | 222:11,13,23 |
| 276:16 282:7 | 152:12,23,24 | 303:20 | 223:12 226:9 |
| 282:12 283:19 | 158:6 159:24 | **customized** | 226:18 228:21 |
| 284:3 285:13 | 164:10,24 | 98:24 104:17 | 229:1,15 |
| 286:10,23 | 166:7 176:20 | **cuyahoga** | 232:17 233:1,2 |
| 287:4 291:14 | 179:20 180:11 | 48:14,15 49:14 | 251:9 258:22 |
| 295:13 296:9 | 197:13 198:1,3 | 233:9,11,12,24 | 262:12 263:7 |
| 298:7 301:3 | 199:14,21 | **cv**  1:7 | 263:20 299:5 |
| 304:19,21 | 207:11 212:13 | **cycle**  238:6 | **data**  56:20 |
| **customer's** | 212:16 214:21 | **d** | 107:23 118:16 |
| 120:3 124:24 | 216:20 217:4 | **d**  85:17,22 | 121:15,17,21 |
| 126:18 239:25 | 220:8 224:10 | 105:13 106:16 | 121:22 122:1 |
| 245:16 247:21 | 224:14,20 | 106:23 194:23 | 130:23 133:9 |
| **customers**  6:14 | 225:16,18 | **damages**  5:3 | 134:6,18 135:4 |
| 6:20 17:9 | 227:25 228:20 | 65:24 195:11 | 135:14,21 |
| 42:18 47:3,9 | 229:13 231:20 | **dan**  33:9,10,15 | 136:8 163:20 |
| 47:13,19,21 | 232:24 234:5,7 | 35:1,2 45:23 | 198:13,22,24 |
| 48:4 49:11,12 | 234:11 240:16 | 59:3,10 62:24 | 198:25 199:1,3 |
| 52:2 59:20 | 240:16,20,20 | 63:22 64:1 | 199:4,6,12,17 |
| 74:7,9,19,25 | 240:25 244:3 | 72:4 115:1 | 199:20,23,24 |
| 75:2 76:9 | 244:14 245:10 | | 200:2,4,7,14,22 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[data - demonstration]**                                        Page 21

| | | | |
|---|---|---|---|
| 201:2,10,13,16 | 291:11,18 | **dear** 308:10 | 114:13 |
| 201:18,20 | 298:19,21,23 | **deceased** 21:3 | **defined** 267:23 |
| 202:4 203:14 | 298:23,24,25 | **december** | 272:5,10 |
| 203:16,21,22 | **databases** | 22:23 148:8 | **defines** 173:25 |
| 241:19 250:4 | 132:12 207:4 | 154:9,14 | 189:2 267:13 |
| 268:3 269:9 | 209:8,24 | **decide** 300:7 | 272:3,7 |
| 272:13,18 | 211:12 214:23 | **decided** 24:4 | **defining** 286:7 |
| 273:18 | 245:10 299:7 | 238:10 266:23 | **definition** |
| **database** 5:6 | **date** 8:12 23:1 | **decision** 24:1 | 174:14 189:5 |
| 117:8 120:18 | 51:19 131:17 | 40:1,5,10,15 | 190:14 212:9 |
| 122:18,22,23 | 148:22 149:11 | 47:2 | 266:10 267:15 |
| 123:6,15,17,18 | 188:6 223:14 | **decisions** 46:12 | 268:10,11 |
| 124:17,20 | 225:1 251:1,4 | **deed** 309:14 | 269:13 274:8 |
| 125:5,11,17 | 251:5,10,11 | 310:20 | 295:6 |
| 126:22 127:12 | 257:24 258:3,4 | **deem** 122:9 | **definitions** |
| 128:12 140:6,8 | 303:24 308:8 | 284:1 | 173:23 192:5 |
| 140:11,25 | 309:3,9,19 | **deemed** 216:7 | **degree** 13:3,12 |
| 141:13 204:22 | 310:3,13,25 | 308:20 | 14:1 51:7 |
| 206:15,16 | 311:20,25 | **deems** 247:25 | 68:18 69:9 |
| 207:1,5,8,13,14 | **dates** 225:6 | **deep** 50:9 234:9 | **dei** 98:3 173:20 |
| 208:7,21,23 | 250:20 | **defendant** 2:14 | 279:7 |
| 209:6 210:13 | **david** 21:3 22:9 | 5:15 77:3 | **delaware** 2:17 |
| 210:17,23 | 23:10 40:16 | 90:23 131:4 | 2:18 81:22 |
| 225:23 226:3,7 | **day** 28:20 | 150:5 | 88:17 89:21 |
| 226:10 227:19 | 46:17,17,19 | **defendants** | 91:1 |
| 227:21,23 | 53:25 54:1 | 1:10 66:20 | **deletion** 235:15 |
| 258:21 262:8,9 | 162:8 302:7 | 67:11 68:11 | **deletions** 123:1 |
| 262:13 272:15 | 307:7 309:16 | 69:12 76:16 | **delhi** 13:15 |
| 272:17 280:14 | 310:22 311:22 | 124:14 230:2 | 103:3 |
| 281:5 285:9,18 | **days** 297:21 | **defer** 73:24 | **deliver** 216:9 |
| 285:18 286:5,8 | 308:19 | **deferred** 187:5 | **demo** 233:21 |
| 286:11 287:9 | **deal** 49:25 50:3 | 187:10 | 238:12,14 |
| 287:13,18 | 105:20 142:21 | **define** 41:7 | **demonstration** |
| 290:5,14 | 230:7 | 44:5 58:12 | 118:11 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[demos - direction]                                                    Page 22

**demos**  17:11,18
  17:21,21
  176:22 233:24
  234:6 258:13
**depart**  84:4
**department**
  308:22
**depend**  171:10
  290:18 295:5
**dependent**
  168:13,17
**depending**
  40:12 112:8
  116:17 120:12
  120:14 125:9
  126:1,5 177:18
  283:3
**depends**  121:16
  121:17
**deposed**  7:4
  257:13
**deposition**  1:18
  5:12,13 8:17
  10:14 52:25
  53:8 54:4,5
  55:4,9,13
  58:17,19,22
  64:16,20 67:17
  68:17 260:1
  261:23 306:21
  308:8,12 309:1
  309:3 310:1,3
**depositions**
  54:9

**derek**  3:4 60:20
  169:19
**derived**  199:1
  268:21 269:12
  269:13 272:3,7
  272:10,14,20
  272:25 273:5
  274:9
**description**  5:2
  87:16 240:1
**design**  221:19
**designated**
  30:8 54:23
  55:2 222:18
  223:3 280:21
**designation**
  29:3
**designed**  213:9
  285:22 287:14
**designee**  24:20
  25:9
**desire**  216:14
**desired**  172:23
**detail**  45:24
  151:20,21,23
  171:11 186:25
**details**  151:9
  168:15
**develop**  24:5
  254:25
**developed**
  215:9
**developing**
  23:21 26:17

27:7 209:13
  216:5
**development**
  13:4,17 15:25
  16:2,23 17:8
  17:17 19:8
  20:14 21:12
  25:13,18,25
  26:25 27:2,6
  27:10 34:2,15
  34:18 44:23,24
  45:5,5,9 56:23
  59:17 98:16
  103:20 104:3,5
  104:6,10,12,13
  106:20,24
  119:23 204:3
  213:25 214:1,1
  218:19,23
  219:6,9,14,22
  220:9,17,21
  221:19,22,24
  222:5 227:4
  228:25 232:2
  234:23
**dhartman**  3:8
**difference**
  206:1,23
  224:12 262:6
**different**  15:10
  29:13 34:3
  41:4 56:6 76:9
  88:10 94:15
  100:9 119:14

119:20 120:7,7
  125:15 128:7
  132:19,19
  140:17,19
  177:22 195:6
  202:25 205:13
  205:16 211:19
  212:10 214:23
  215:14 224:4
  250:9 260:13
  262:3,21 263:5
  281:25 282:20
  282:22 288:16
  302:23
**differentiate**
  58:13
**differentiation**
  77:15 257:23
**digital**  19:14
  20:3,6 21:12
  21:13 36:22
  42:1 72:10
  95:6,25 96:2
  96:23 97:3,19
  97:23,25
**diligence**  153:7
  154:18 155:21
  168:6,14
  170:12
**direct**  17:24
  45:5 249:7
**directed**  276:16
**direction**  30:13
  73:13

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[directions - document]** Page 23

**directions**
46:23
**directly** 17:16
17:19 20:16
22:17 27:7
30:20 32:15
33:7 38:19,23
87:18 95:3,5
124:2 143:6
**director** 109:8
109:12 110:8
**directors** 49:18
49:23 85:10
86:15
**dis** 175:14
**disallowing**
201:10
**disclose** 185:11
186:8 187:1
299:23
**disclosed** 150:3
**discloses**
299:17
**disclosing**
195:3 299:19
**disclosure**
152:20 154:5
174:20,22
179:16 299:14
**discount**
241:24
**discounts**
202:16

**discovered**
216:18
**discovery** 58:2
58:4 60:16
170:14
**discuss** 43:8
70:22 71:8
139:7 145:9
280:5 302:10
**discussed** 56:4
61:14 70:16,20
71:15,19 72:17
93:5,8 103:11
105:13,20
106:8 133:12
158:12 190:2
203:17,19
**discussing** 61:8
168:12 184:4
218:16,18
221:4
**discussion**
59:24 66:9
71:17 72:20
76:3 81:1,7
117:4 152:3
184:6,12 242:5
244:21 260:20
260:21,23
280:8 302:11
**discussions**
71:22,23
133:22 146:3,7
146:9,13 147:7

148:3,5 149:24
150:7,8 154:8
154:13 164:6
165:12 240:11
240:12
**dismiss** 68:11
**dismissed** 76:2
80:25
**disposed** 42:14
**disposition**
28:16 31:11
133:21
**dispositions**
29:17,18,21
30:1,3
**distinction**
102:25 113:22
145:8 180:9
236:15
**distinctions**
34:9
**distributing**
207:25
**distribution**
36:22 95:6,7
95:10,11,23
96:5,23 97:19
97:22,23,25
101:11,12
186:15 291:10
291:17
**district** 1:1,1
5:5 280:12
304:2

**dive** 234:10
**divided** 82:6
83:10,10
220:25
**divides** 124:4
**division** 1:2
21:24 49:22
50:1 213:23
256:3
**divvy** 256:2
**document** 6:7
57:21 66:12
67:1,25 129:16
136:11,12
137:21 155:5,7
155:7,9,13,17
156:7,8,9,12
167:12,13,15
167:18 171:23
172:2 186:12
217:19 218:8
218:21 229:25
230:13,18
236:1 237:6,7
238:1,23
242:20,24
248:17 249:21
250:7 251:5
254:9 274:13
277:20 279:8
281:2,8,9,22
302:22,25
305:5

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[documentation - employee]

Page 24

**documentation**
255:7
**documents**
53:2,4,7 60:16
64:22 65:7,12
65:16 67:15,22
68:15 155:19
170:14 218:22
228:9,13 230:3
257:11 278:14
281:21
**doing** 17:21
37:14 119:22
201:13 214:15
252:15,20
253:23
**domestic** 31:12
32:21 33:19
**download**
99:23 122:12
122:19,21
127:4 293:20
**downloaded**
125:17 293:14
294:21 295:3
**draconian**
57:12
**drafted** 116:8
116:10 279:19
279:20 294:8
294:12 295:24
**drafting** 115:25
280:1 291:5

**drawing**
221:16
**drive** 8:8,10
30:14 33:25
288:3
**drop** 240:6
**dropping**
240:13
**due** 154:18
155:21 164:11
168:5,14
170:12 190:17
191:3
**duly** 7:4 306:9
306:11
**durkin** 3:3
**dye** 50:21

**e**

**e** 3:5 6:2 16:1
19:14,16 34:4
45:1,22 85:17
85:22,22 96:3
96:3 98:9
165:20 169:2,9
194:12 229:20
230:16 235:9
236:4,6 244:8
250:6 254:16
261:3 293:1,6
293:9 295:11
**eap** 231:19
232:7,8,12,13
232:14,21,23

233:15 235:1
236:8,12,15,23
240:5 241:22
241:23 242:3
250:17,24
258:13
**earlier** 76:6
86:7,10 93:4
138:11 139:17
209:20 284:5
300:5
**early** 131:16
148:19 214:5
231:22,23
232:6
**earnout** 187:25
188:2
**easily** 182:1,9
**eastern** 1:2
**economically**
24:4
**edit** 125:11
206:4,5
**editing** 214:12
**editor** 206:4
**edits** 122:25
**educate** 177:10
**education**
12:24 13:1,11
**educational**
11:10
**effect** 7:20
**effectively** 8:19

**efficiencies**
34:1 213:10
216:15,19
288:4
**efficiency** 24:6
26:15 213:2
214:11 216:6,9
263:14,15
**efficient** 214:16
**effort** 127:11
127:15
**efforts** 49:7,9
49:13 59:20
**eight** 112:24
**either** 40:13
50:14 80:19
86:20 127:21
175:9,10 176:4
180:11 187:8
207:10 209:8
232:11 250:2
252:17 254:17
305:3 307:2
**eliminated**
27:20
**email** 308:17
**emerging** 14:2
14:10,18
**employed**
18:13,22 20:23
111:21,24
112:13 117:22
**employee** 18:11
27:23 35:25

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[employee - event]**                                    Page 25

| | | | |
|---|---|---|---|
| 36:2 92:15,17 | **engage** 213:17 | 42:25 43:1,2 | **equivalent** 96:1 |
| 92:20 234:3 | 213:23 | 43:15 44:10 | **eric** 6:4 32:11 |
| **employees** | **engaged** 15:3 | 78:24 87:18 | 42:6 72:9 |
| 42:22 63:9,10 | 17:18 19:7 | 88:10 89:3 | 82:14,19,23 |
| 63:11 82:18 | **engagement** | 103:13 105:12 | 83:11 234:2,3 |
| 83:15,18 92:3 | 120:12,14 | 106:7 107:9,15 | 242:13 |
| 92:6,9,12,18 | **engaging** 37:13 | 109:4,6 110:2 | **eric's** 233:21 |
| 103:6 104:22 | **enhance** 69:13 | 141:3 186:16 | **errata** 308:14 |
| 111:4,7,14,17 | 120:25 122:8 | 186:17 | 308:19 310:7 |
| 111:19,20 | 125:19 213:10 | **entity** 15:2 18:2 | 310:10,18 |
| 112:4,5,12,15 | **enhanced** 69:3 | 18:7,12 29:12 | 311:1 |
| 112:16,22,24 | **enhancement** | 33:22 43:11 | **escapes** 63:3 |
| 113:3,11,25 | 69:8 127:22 | 44:4,10 82:4,5 | **esp** 173:18 |
| 117:13 135:13 | **enhancements** | 86:19 87:12 | **especially** |
| 136:7 143:5,6 | 262:24,25 | 89:1,5,6,11,22 | 33:14 184:8 |
| 143:7 178:1,7 | **enhancing** | 90:6,21 92:22 | **esq** 2:5,6,16 3:4 |
| **employer** 14:3 | 128:2 | 93:11,14,19 | 308:5 |
| 14:5 22:3 | **enjoin** 175:14 | 101:17 102:6 | **essentially** |
| 213:3 | **ensure** 163:19 | 103:9 104:19 | 23:12 41:21 |
| **employers** | **entail** 41:19 | 109:23 110:14 | **establish** 8:16 |
| 126:20 | **enter** 129:5 | 140:21 144:3,4 | **estate** 101:18 |
| **employment** | 142:19 148:17 | 144:8 173:6,8 | **estimate** 53:23 |
| 12:21 102:11 | **entered** 172:19 | 173:10 186:2 | 54:7,10 112:23 |
| 117:23 | 175:7 176:4 | **entry** 238:25 | 123:22 264:15 |
| **empowered** | 266:22 310:9 | **epop** 97:18 | **estimated** |
| 284:1 | **entering** | **equal** 186:6 | 251:17 |
| **enclosed** | 274:24 | 188:3 | **estimating** |
| 308:12 | **enterprise** 34:3 | **equally** 83:10 | 161:9,12 |
| **ends** 222:21 | 115:10 188:11 | **equipped** 45:3 | **et** 308:6 309:3 |
| **enforce** 289:15 | **entire** 143:13 | 263:7 | 310:3 |
| 302:3 | 184:6 309:5 | **equity** 83:16 | **evaluate** |
| **enforced** | 310:5 | 127:24 188:3 | 188:11 |
| 290:23 | **entities** 29:13 | 188:12,21,25 | **event** 166:9 |
| | 29:24 42:22,24 | 189:5 | 257:17 260:19 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[event - extent]**                                                    Page 26

| | | | |
|---|---|---|---|
| 307:3 | 302:14,24 | 60:8,8 65:19 | **exited** 83:15 |
| **events** 228:20 | **except** 56:18 | 65:22 77:2,13 | **expand** 57:23 |
| **eventually** | **exception** 10:9 | 77:19 78:4,9 | 300:5 |
| 244:17 | 22:15 174:19 | 87:16 100:25 | **expanded** |
| **evidence** 98:1 | 179:15 | 137:10,16 | 282:24 |
| 255:11 | **exceptions** | 139:6 154:24 | **expect** 129:6 |
| **evolution** 18:6 | 46:24 116:5 | 161:22 171:15 | 135:19 136:7 |
| **evolve** 222:23 | **exchange** 45:1 | 171:18 183:22 | 136:18 158:7 |
| **evolved** 17:13 | 45:23 76:4 | 191:5,16 | 180:11 286:15 |
| 19:4 | **excited** 142:18 | 217:12,18 | **expeditious** |
| **evp** 28:7 | **excluding** 92:1 | 229:17,19 | 214:25 |
| **exact** 67:25 | **exclusively** | 242:11,18 | **experience** |
| 123:21 131:17 | 113:14 | 248:19,25 | 58:16 |
| 133:14 148:22 | **exclusivity** | 249:4 254:8 | **expert** 213:25 |
| 170:21 200:19 | 148:24 149:4 | 264:21 271:8 | **experts** 260:14 |
| 211:2 251:10 | **executed** | 271:16 273:22 | **expiration** |
| 251:11 264:13 | 310:10 | 273:24 277:12 | 235:15 309:19 |
| 301:6 | **execution** | 277:18 280:10 | 310:25 311:25 |
| **exactly** 221:21 | 309:14 310:19 | 280:21 296:7,8 | **expire** 149:12 |
| 288:14 297:18 | **executive** 5:24 | 296:17,22 | **expires** 307:18 |
| **examination** | 15:17 20:3 | 302:6,13,20 | **explain** 87:4 |
| 4:7 7:2,6 139:2 | 27:22 28:5 | 303:16,17 | 151:12,17 |
| **example** 31:14 | 70:24 71:7 | **exhibits** 4:5,13 | 175:23 176:17 |
| 37:20 44:25 | 72:3 93:9 | 5:1 55:5 77:11 | **explained** |
| 45:19 136:6 | 217:13,23 | **exist** 38:12,14 | 151:15 176:3 |
| 175:22,24 | 219:15 | 42:24 69:19 | 204:19 |
| 205:4 240:3 | **exhibit** 4:12 5:3 | 79:13 260:10 | **explains** 240:8 |
| 241:15 296:13 | 5:4,8,10,12,13 | **existed** 246:7 | **explore** 37:2 |
| 304:1,24 | 5:15,18,19,21 | 262:4 | **express** 180:12 |
| **examples** 36:23 | 5:23,24 6:2,4,6 | **existence** 117:6 | 180:19 |
| 175:20 | 6:7,9,11,14,16 | 212:21 | **extends** 72:25 |
| **excel** 6:19 | 6:18,19 11:7 | **existing** 37:4 | **extent** 25:24 |
| 230:4 236:17 | 11:13,19 55:8 | 143:1,22 | 57:8 58:1 |
| 237:6 278:14 | 55:12 56:13 | | 60:15 68:21 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[extent - focused]**                                                    Page 27

| | | | |
|---|---|---|---|
| 71:10 93:4 | **families** 250:2 | **field** 47:20 | **firm** 75:3 |
| 158:12 178:22 | **familo** 3:3 | 128:7 | 213:25 |
| 187:18 192:23 | **family** 85:13,14 | **fields** 128:8 | **first** 5:16 7:3 |
| 195:23 211:16 | **far** 18:9 19:22 | 237:13,21,22 | 12:23 24:13 |
| 276:13 289:8 | 24:7 27:25 | **fifth** 142:13 | 26:13 43:24 |
| 290:2 291:24 | 49:5 88:17 | **fighting** 247:15 | 63:2 77:5 |
| 299:13 | 89:8 91:23 | **file** 6:19 124:24 | 83:13 109:7 |
| **external** 24:3 | 116:24 144:2 | 302:14,24 | 131:9 137:21 |
| 225:12,16 | 155:12 157:17 | **filed** 11:1 66:4 | 156:22 161:2 |
| 226:15 | 170:24 185:19 | 66:23 68:11 | 165:22 175:22 |
| **externally** | 259:5,15 | 70:9,21 157:5 | 175:25 221:5 |
| 209:12 263:12 | **faster** 191:9 | **files** 122:9 | 226:25 237:6 |
| **eyes** 1:13 | **father** 85:15 | **filings** 67:5,7 | 244:7 250:16 |
| | **father's** 85:16 | **final** 226:21,25 | 251:7 266:11 |
| **f** | **fault** 106:12 | **finance** 22:16 | 267:11 272:6 |
| | **favorite** 51:22 | 82:22 103:20 | 278:15 303:3 |
| **f** 146:18 170:3 | **features** 119:20 | 115:13 198:16 | 306:11 |
| **face** 287:15 | 225:15 234:12 | **financial** 20:12 | **fish** 62:24 |
| **facing** 159:3 | 263:5,10,11,19 | 115:16 184:7 | 63:22 |
| 216:13 | 283:3 | 184:13 | **five** 84:8 86:17 |
| **fact** 269:20 | **federal** 7:2 | **find** 141:25 | 112:23 218:11 |
| **facts** 75:25 | 66:23 | 183:25 219:5 | 259:2 |
| 80:24 | **fee** 139:15 | 282:12 308:12 | **flip** 217:17 |
| **failed** 19:10 | **feedback** 232:1 | **finds** 300:25 | **floor** 3:5 |
| **fair** 9:20 10:2 | 232:22 234:14 | **fine** 24:19 | **florida** 240:4 |
| 51:12,16 | 234:21,24 | 25:22,23 54:21 | **flow** 263:14 |
| 108:11 176:5 | 235:4,7 | 73:20 197:21 | **fnoyes** 2:20 |
| 185:5 281:11 | **feel** 11:19 46:10 | 280:3,6 | **focus** 14:16 |
| 299:24 | 47:20 239:10 | **finish** 9:6,8,24 | 19:7 244:2 |
| **fall** 98:11 183:5 | 249:12 277:18 | 81:5 90:4 | 249:11 |
| 229:8 | **fellow** 210:2 | 97:14 132:24 | **focused** 31:12 |
| **familiar** 37:20 | **ferguson** | 262:17 | 31:23 33:19 |
| 117:5 194:13 | 251:23 | **finished** 16:14 | 42:15 44:19 |
| 275:6 292:3 | | 66:10 194:16 | 49:23 135:22 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[focused - further]** Page 28

237:13
**folks**  107:23
**follett**  6:7
   20:21 21:19
   22:17 23:24
   24:25 25:1
   26:2,4 27:20
   27:23 28:6,16
   87:9 133:21
   140:2,3,24
   141:12 213:20
   213:22 235:15
   254:9,21,24
   256:1,4 284:5
**follett's**  28:1
**follow**  5:21
   10:10 135:20
   136:8 142:3
   154:25 157:23
   186:7 232:17
   234:11
**following**
   185:23
**follows**  7:5
**force**  198:18
**foregoing**
   306:17,22
   309:13 310:18
**foreign**  31:4,5
   31:7
**forget**  147:25
**forgive**  21:6
   24:12

**forgotten**  23:2
**form**  31:16
   34:22 67:16
   69:2,15 70:3
   84:5 114:20
   116:24 119:12
   119:18 121:8
   121:16 125:25
   128:16 129:8
   136:10,17
   153:12 157:9
   157:13 159:12
   160:9 163:7
   166:18 172:22
   181:25 183:1
   195:16 216:23
   219:23 220:14
   220:18,24
   234:15 247:18
   260:11,13
   261:24 267:25
   270:11,13,21
   273:19 281:11
   281:12 282:7
   285:19 290:19
   291:1 293:16
   293:25 301:24
**formal**  13:1
**format**  223:1
   230:4
**former**  38:1
   50:14
**forms**  116:11
   248:4 271:4

**formulate**
   32:19
**formulated**
   43:19 44:6
**formulation**
   44:4
**forth**  34:5
   36:23 119:21
   139:11 190:21
**forward**  25:6
   28:20 73:2
   308:16
**forwarded**
   230:15
**found**  242:1
   257:10
**foundations**
   51:6
**founding**  86:14
   86:16
**four**  54:1 63:8
**fourth**  256:11
**frame**  23:23
   25:14 27:19
   81:11 148:8
   154:15 215:8
   215:16 217:5
**framework**
   136:6 289:11
**frank**  2:16
   163:10 169:19
   248:10 302:6
   308:5

**frank's**  237:17
**fred**  6:4 242:13
**free**  5:5 11:19
   202:16 249:12
   277:18 280:12
   309:14 310:20
**frequently**
   53:15
**fresh**  211:21
**fridays**  234:13
**friends**  50:15
   51:5
**front**  74:23,24
   121:13 139:6
   172:6 247:3
**fruitful**  278:5
**full**  7:12 14:8
   155:7 205:17
   205:22 206:2
   206:23,25
   282:24 283:5
**function**
   204:23
**functionalities**
   234:12 252:17
   263:6 282:20
   282:22
**functionality**
   205:25 206:1
   225:9,11
**functions**  71:2
   71:2
**further**  76:3
   81:1 306:20

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[further - group]** Page 29

| | | | |
|---|---|---|---|
| 307:1 | **give** 17:12 | 163:23 181:6 | 222:22 226:10 |
| **future** 152:5 | 32:19 48:2 | 183:21,21 | 229:1 237:22 |
| 196:16 225:6 | 75:6 102:24 | 185:22 193:10 | 243:6 249:13 |
| 290:16 | 108:9 114:16 | 193:20 204:8 | 266:10 268:9 |
| **g** | 115:2 123:4,21 | 204:14 213:6 | 272:12 278:4 |
| | 153:5,10,13 | 216:17,22,24 | 282:3,21 |
| **g** 85:22 171:2 | 180:12 201:2 | 216:25 217:9 | 284:12 286:16 |
| **gain** 252:21 | 208:13 211:2,5 | 218:4 223:13 | 302:5 304:9 |
| **gains** 213:2 | 214:7 229:4 | 233:7 235:18 | **good** 50:10 |
| 216:6 263:15 | 243:1 249:6 | 254:5 258:5 | 74:5 119:4,6 |
| 263:15 | 251:9 287:4,6 | 264:19 265:3,4 | 263:24 304:6 |
| **gayle** 252:7 | 290:7 298:13 | 275:3 276:4 | **goodwill** |
| **geez** 191:13 | **given** 19:17 | 292:22 296:7 | 192:19 193:3,5 |
| **general** 14:18 | 125:4 127:4 | 302:9 | 193:7,8,9 |
| 14:19 22:10 | 231:25 286:19 | **goal** 147:8 | **gotten** 152:22 |
| 28:6 84:2 | 306:14,19 | **goals** 219:18 | **governed** |
| 121:6 169:15 | **giving** 7:16 | **goes** 88:6 | 253:20 276:10 |
| 169:19 184:9 | **glance** 53:6 | 116:24 125:14 | 276:19,23 |
| 221:6 | **glasgow** 110:22 | 240:8 | 277:5 |
| **generally** 50:8 | 110:24 111:14 | **going** 8:22 11:6 | **graduate** 13:3 |
| 67:18,19 | 111:18 | 25:6 43:4 | 13:8,21 |
| 130:22 295:6 | **glean** 155:15 | 51:16 61:8 | **grammar** |
| **generated** | **global** 30:17 | 65:18 76:19 | 267:21 |
| 193:6 | 32:7 33:25 | 77:14 81:19 | **grant** 161:11 |
| **gentleman** | 43:13 45:21 | 93:6 100:24 | **granted** 288:18 |
| 146:17,24 | 105:3 177:20 | 141:24 142:9 | 288:21 |
| **geographic** | **gm** 28:7 | 171:14 184:16 | **grew** 48:6 |
| 31:23 | **go** 47:15 54:19 | 184:18 185:1,2 | **griselda** 293:2 |
| **georgia** 91:18 | 60:7 64:9 66:7 | 185:17 186:7 | **ground** 8:15,17 |
| 92:11 | 71:20 72:11 | 189:19 190:8 | **group** 29:1,5,6 |
| **getting** 25:12 | 73:2 108:12 | 191:3 197:16 | 29:25 30:9,11 |
| 56:9 57:14 | 116:5,5 122:15 | 200:4 202:1 | 32:7 33:5,12 |
| 119:9 302:8 | 139:8 148:1 | 203:24 216:12 | 33:15,22 44:8 |
| | 160:25 162:15 | 221:5,10 | 78:24 93:20 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[group - holdback]                                                                    Page 30

| | **h** | **harmless** 194:4 | **help** 11:9 17:20 |
|---|---|---|---|
| 97:8 145:19 | **h** 85:17 | 195:11 | 23:4 39:12 |
| 175:15 | **half** 23:2 24:13 | **hartford** 239:1 | 105:4,5 137:2 |
| **groups** 50:16 | 24:13 43:24,25 | **hartman** 3:4 | 164:8 180:8 |
| **growth** 275:13 | 44:6,7 76:22 | 25:20 248:24 | 213:17,24 |
| **guarantee** | 83:8 197:14 | 278:6,10 | 237:11 267:19 |
| 190:16 | **hand** 65:18 | **harvard** 13:24 | **helped** 139:18 |
| **guarantor** | 128:6 224:7 | **harvey** 6:5 | 259:14 |
| 190:9,11 | 280:1 307:6 | 242:13 | **helpful** 94:22 |
| **guess** 23:18 | **handed** 11:18 | **hbs** 14:25 15:6 | 145:9 190:7 |
| 86:24 106:14 | 137:15 302:19 | **hcl** 14:7 | 249:8 |
| 110:1 117:23 | **handle** 221:9 | **he'll** 115:1 | **helping** 177:25 |
| 133:16 137:21 | 221:20 | 162:12 201:2 | **helps** 191:9 |
| 170:11 196:2 | **handled** 31:24 | **head** 8:25 | **hennen** 85:5 |
| 199:19 202:1 | 31:25 115:25 | 30:21 31:13,19 | 146:10 |
| 208:14 209:23 | **handles** 94:18 | 59:5 63:15 | **hennen's** 85:8 |
| 211:7 222:20 | 296:11 | 64:4 71:5,5,6,6 | **hereinafter** 7:4 |
| 279:10 280:4 | **handy** 237:18 | 71:7 72:7,8,9 | 272:17,19 |
| 299:8,24 | **hannah** 118:1 | 72:10 81:15 | **hereunto** 307:5 |
| **guessing** 50:9 | **happen** 12:8 | 247:12 264:12 | **hesitant** 247:14 |
| 211:6 | **happened** | **headquarters** | **hide** 237:21 |
| **guidance** 47:2 | 28:11 45:6 | 81:23 88:18 | **high** 2:8 184:10 |
| 214:7 | 144:7 197:14 | 91:6 102:4 | 184:12 |
| **guidelines** | **happening** | 103:1 108:19 | **highlighted** |
| 30:13 | 34:19 39:6 | 110:21 | 55:18 |
| **guiding** 64:10 | 75:22 | **hear** 9:11 | **hindsight** 133:5 |
| **guys** 48:16 71:8 | **happens** 80:12 | **heard** 130:7 | **history** 11:10 |
| 71:14 108:7 | **happy** 26:22 | 131:23 204:24 | **hmm** 251:9 |
| 194:24 202:12 | **hard** 54:7,10 | 212:20 | **hold** 109:3 |
| 235:6 252:11 | 175:14 | **hefty** 171:23 | 144:18 194:4 |
| 253:17 255:6 | **harder** 230:6 | **held** 29:11,13 | 195:10 300:13 |
| 281:13 284:19 | **hare** 293:3 | 29:22,24 43:2 | **holdback** |
| 288:7 299:3 | | 100:15,16,18 | 187:13,14 |

Case 2:25-cv-00093-JES-EPD Doc 109-12 Filed 01/09/26 Page 08/29/25 Page PageID #: 54212
PAGEID #: 824

**holding** 78:20
79:3,6,8,11,15
81:20 82:1
84:24 87:19,22
87:23 88:1,7,8
89:2,16,23
90:11 93:12
109:13,14
110:9 144:12
**holdings** 88:8
88:13 89:7,9
89:19 101:15
101:18 268:3
272:13,19
**holds** 87:23
88:1,2 101:20
170:17
**home** 8:9
**hop** 130:16
**hopefully** 25:3
**hosting** 108:10
**hot** 239:7,11
**hour** 76:21
**hours** 53:20,20
54:1,1,13,16
**house** 50:21
84:2 98:9
104:4,5
**howard** 14:4
**hr** 103:21
104:24 105:1,3
105:4 117:23
118:1

**huh** 13:25
14:22 15:14
53:11 55:24
78:22 89:20
90:9 94:14
99:11 102:15
109:19 110:18
127:6 142:17
142:20 143:3
165:6 167:20
172:11 173:11
195:21 223:15
223:25 226:23
227:6 233:22
234:1 240:7,14
254:18
**huhs** 9:1
**huntington** 2:7
**hypothetical**
128:3 301:25

**i**

**idea** 114:16
212:23
**identification**
11:16 55:10,15
66:1 77:8 78:7
137:13 155:3
171:21 217:15
229:23 242:15
248:22 254:11
265:1 271:14
274:4 277:15
280:18 296:20

296:25 302:17
**identified**
12:13 57:7,10
57:17 60:12
65:4 150:10
175:19 203:2
212:2
**identifier** 69:18
**identifies**
244:20
**identify** 300:1
**idiosyncrasies**
257:19
**ii** 1:17 2:16
186:19 308:5
**illinois** 91:17
92:10 252:8
**ils** 204:24 205:1
205:9,10
293:12,17,19
294:21 295:4
**imagine** 51:14
132:9
**impact** 81:2,8
157:18,24
158:4,9,11,13
158:16,20,22
158:24 159:1,3
159:22 166:12
**impetus** 145:16
**implement**
43:22
**implementati...**
64:4,7

**implementing**
234:4
**important**
113:23 168:18
168:20 185:13
**improvement**
263:12
**improvements**
122:13 287:12
287:25
**improving**
128:2
**inaccurate**
78:25
**inc.'s** 5:16 77:5
**inception**
255:22
**incident** 74:10
133:19
**include** 17:10
37:6,17,19,23
70:25 93:22,24
95:13 96:8
99:12 173:20
174:17 179:21
195:13,18
196:17 225:9
227:24 256:6
291:19
**included** 29:8,9
29:9 72:4
96:13 104:20
156:7 175:13
196:13 198:16

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[included - intended]**                                              Page 32

207:21 214:10
242:23 257:3
281:17 308:14
**includes**   49:1
71:1 93:25
279:4 304:13
304:14,20
**including**
196:16,25
197:4 211:23
279:13,15
**incorporated**
310:12
**increase**   189:4
212:3,11
**increased**
211:17
**indemnificati...**
193:19 196:18
**indemnify**
194:9
**indemnity**
194:3 195:8
**independent**
28:17 140:20
235:10,12
**index**   4:1,5 5:1
**india**   13:7
43:11 44:10
45:6,8,20
91:21,22
102:14,20
103:2,3 105:17
107:5,13

109:17 110:5
**indian**   13:6
**indicating**
87:13 193:15
204:5 236:6
237:8,10,20
242:7 277:8
278:19 292:13
303:5,7 304:5
308:14
**indifferent**
135:1,2,11,15
**indirect**   44:25
45:15 288:9
**indirectly**   27:1
27:4 30:18
32:8 33:6
35:20 41:17
49:4
**individuals**
27:6 39:23
58:21 62:8,15
72:4,14 80:17
82:7 84:9 85:2
86:11 231:24
278:24 287:23
**industry**   14:15
51:16 94:16
292:2,4
**inefficiencies**
287:16
**inform**   100:6
**information**
13:14 51:20

52:1,3 58:25
59:9,12,14
64:12 70:8,18
104:20 130:25
134:5 155:11
164:17 184:21
184:21 185:10
185:20 186:6,9
195:20 198:10
198:11,12,19
199:9 219:5
222:12 240:18
243:23 253:11
253:12 267:14
267:16,23
268:3 272:14
272:15,19
**infrequently**
7:14 12:3
**infringe**   300:11
**ingesting**
135:21 226:6
**initial**   146:3,6
146:13 154:7
154:12 219:17
**initially**   209:21
**injunction**   5:21
68:6 155:1
156:22 158:12
158:13 159:25
166:10,12
**injunctive**   5:3
65:23

**input**   116:25
259:16,17,18
259:20,21,23
**inputs**   117:3
**inquiry**   118:3,4
189:23
**inside**   244:9,12
**insights**   222:9
**instances**   133:3
295:17,19
304:11,15
**instigated**
73:20
**institute**   13:6
**institution**
122:9
**institutions**
125:15
**instructing**
73:3 185:14
187:7
**instruction**
73:11 185:24
186:8
**instructions**
10:11 73:15,25
**instructs**   10:9
**insurance**
177:21
**integrated**
205:2
**intended**
178:25 196:19
271:24 288:5

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[intent - jeff]** Page 33

| | | | |
|---|---|---|---|
| **intent** 199:22 | 216:18,25 | **invoked** 161:11 | **jagdeep** 85:20 |
| 247:19 288:1 | 217:4 263:11 | **involve** 215:20 | 85:22 |
| **intention** 288:9 | **international** | 215:23 234:25 | **james** 29:10,22 |
| 288:10,11 | 42:9,12 | **involved** 39:11 | 31:9 44:18 |
| **interact** 47:3,9 | **interpretation** | 46:17 116:16 | 101:5 103:16 |
| 100:1,3 244:17 | 41:2 276:25 | 116:20,21 | 103:25 109:20 |
| **interacted** | 294:1 295:1 | 144:21 146:2 | 110:3 112:3,4 |
| 261:9 | **interpreted** | 178:9 214:4 | 112:16,25 |
| **interacting** | 276:11 | 217:6 219:8 | 113:8 |
| 50:25 134:22 | **interrogatories** | 220:9 222:9 | **jamie** 62:11 |
| **interaction** | 5:16 67:8,9,10 | 223:8 259:9 | 63:14 |
| 52:2 102:12 | 67:12 77:6,24 | 263:13 291:4 | **january** 154:14 |
| 106:1,2,4 | **interrogatory** | **involvement** | 254:20 255:14 |
| 244:14 | 78:12,15 87:17 | 108:23 259:13 | **jeff** 7:8 16:20 |
| **interactions** | **interrupt** 79:21 | **involves** 73:3 | 24:14 48:24 |
| 75:4 | **intro** 244:8,16 | **ireland** 172:9 | 54:3 114:16 |
| **interested** | **introduced** | 186:2 | 125:9 126:16 |
| 37:13 307:3 | 65:25 274:3 | **irish** 186:1,20 | 128:4 135:5 |
| **interim** 27:21 | **invent** 216:10 | **irrevocably** | 136:13 137:17 |
| **interject** 57:5 | **invested** 254:25 | 190:16 | 139:8 161:25 |
| **internal** 19:21 | 255:9,17,20,25 | **issuance** | 164:8 168:17 |
| 24:6 26:14 | 256:4 | 143:18 | 175:24 176:18 |
| 98:19 99:22 | **investment** | **issue** 24:23 | 177:9 182:15 |
| 170:13 213:2 | 56:24 59:17 | 47:1 73:22 | 187:15 189:9 |
| 213:15 214:17 | 127:15 145:23 | 153:10 168:18 | 190:6 191:7 |
| 216:6,11,15 | 145:24 204:3 | 179:20 183:9 | 193:12,16,24 |
| 223:24 224:2,5 | 222:17 256:5 | 295:13 | 195:17 196:5 |
| 224:6,8,13,16 | 287:18,22 | **issued** 143:17 | 197:10 199:15 |
| 224:17 225:9 | 288:6 | 143:24 | 202:24 204:4 |
| 225:11 226:4 | **investments** | | 211:19 212:14 |
| 256:14 263:14 | 109:1 110:7 | **j** | 218:7 231:1 |
| 301:5 | **invitation** 6:4 | **j** 85:22 | 234:19 235:20 |
| **internally** | 242:12 | **jackson** 304:1 | 239:20 241:10 |
| 70:17 209:11 | | | 242:7 248:13 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[jeff - knowledge]**                                                  Page 34

| | | | |
|---|---|---|---|
| 248:24 249:11 | 297:11 | **know**  9:13,23 | 193:21 197:4,6 |
| 253:19 254:14 | **jurisdiction** | 11:20 18:1,9 | 197:7,12,15 |
| 257:2 259:21 | 81:21 88:16 | 24:12 25:5,17 | 202:10 203:19 |
| 262:23 265:5 | 110:19 116:18 | 35:14 41:6 | 203:20 204:7 |
| 271:1 272:11 | 119:20 | 44:3 45:25 | 205:15 208:14 |
| 274:6 288:1 | | 47:14 48:23 | 208:21 211:3 |
| 294:8 298:4 | **k** | 49:11 50:12 | 211:11 212:8 |
| 304:3,8 | **k**  28:1 179:13 | 52:8 53:23 | 212:21 220:25 |
| **jeffrey**  2:5 | 179:16 181:7 | 54:2 56:9 | 226:15,18 |
| **jeffrey.walker** | 183:2 | 57:11 58:15 | 228:9 231:21 |
| 2:11 | **kathryn**  2:6 | 59:25 62:9 | 232:23 233:2 |
| **jersey**  91:14 | **kathryn.brown** | 65:6 69:10 | 238:1 245:8 |
| 101:19 102:3 | 2:12 | 70:1,2 71:14 | 254:13 255:20 |
| **johnson**  33:9 | **katy**  148:2 | 75:10 79:15,20 | 259:10 260:9 |
| 33:10 45:23 | **keep**  204:14,16 | 80:12,23 81:20 | 264:10,11 |
| 59:4,10 64:1 | 209:25 235:11 | 83:6 90:2 | 267:19 279:4 |
| 72:4 118:17 | **kelley**  257:12 | 94:23 110:14 | 279:19 280:4 |
| 124:5 151:10 | 293:3 | 117:6 119:5,8 | 280:23 281:2 |
| 151:12 162:11 | **kept**  22:10 | 127:25 130:3 | 282:20 284:16 |
| 219:7,12 221:1 | **kharagpur** | 130:12 134:10 | 288:14 290:24 |
| 221:8,13 | 13:7 | 135:16,17 | 292:5,11,11,11 |
| 222:11,13 | **killed**  204:11 | 136:4 137:8 | 292:20 295:7 |
| 282:21 | **kind**  11:9 36:14 | 139:20,25 | 295:12,16,25 |
| **journal**  51:24 | 36:17 37:9 | 141:19 144:1 | 296:12,14 |
| 52:7 | 47:21 49:24 | 146:19 148:23 | 301:6 |
| **joyce**  1:25 | 50:5 64:13 | 149:3,13 150:6 | **knowing**  223:1 |
| 306:7 307:14 | 74:2 94:17 | 156:6,10 162:3 | 223:2 |
| **judgments** | 119:10,15 | 162:7,12,14,25 | **knowledge** |
| 46:12 | 120:5,10 123:1 | 163:5,11,18 | 22:2 56:19 |
| **julie**  3:13 | 127:23 155:10 | 165:4,10 174:4 | 58:10,13 61:17 |
| **jump**  209:23 | 175:18 177:18 | 174:22 177:17 | 61:19,22 90:7 |
| **june**  6:18 22:19 | 197:19 198:12 | 185:2,7,9,16,17 | 106:22 117:15 |
| 28:8 74:16 | **knew**  139:20 | 186:14 187:14 | 117:18,19,21 |
| 172:19 296:23 | 301:11,12,13 | 189:7,24 | 130:24 141:8 |

**[knowledge - libraries]** Page 35

| | | | |
|---|---|---|---|
| 180:21 202:8 | **larger** 74:13 | 118:1 | **legowski** 62:11 |
| 220:12 222:21 | **largest** 126:20 | **leaders** 14:2 | 63:5 64:2,5 |
| 226:13 252:1 | 213:3 | 15:3 71:1 | 72:5 163:14,22 |
| 252:21 | **las** 48:3,7 | **leadership** 46:4 | 278:5 |
| **known** 165:11 | **lasted** 14:13 | 46:8 63:4 | **legwoski** 35:6 |
| **knows** 233:1 | **launch** 257:6,7 | 143:2,11,13,22 | **letter** 308:20 |
| 273:16 300:9 | 257:12,15 | **leading** 32:6 | **level** 30:9 |
| **kochar** 1:19 4:7 | 258:11,16 | **leads** 243:24 | 151:19,21,23 |
| 5:11,14 6:3 7:1 | 259:1,7 260:2 | **learned** 299:17 | 184:10,12 |
| 7:6,13 11:14 | 260:14,17,19 | **learning** 14:21 | **levels** 250:21 |
| 55:14 85:18,20 | 262:3,21 | 15:1,7 | **leverage** 33:24 |
| 139:2 229:21 | **law** 76:1 80:25 | **leasing** 95:14 | **librarians** |
| 306:11 308:8 | 111:3 147:22 | **leave** 74:2 | 50:15,15,25 |
| 309:4,9 310:4 | 148:2 | 143:14 | 51:3 52:13 |
| 310:13 311:20 | **lawful** 7:1 | **leaving** 47:2 | 210:2,15 |
| **kurman** 1:22 | **laws** 276:12,23 | **left** 39:20,22 | **libraries** 1:9 |
| 2:15 147:18,19 | 277:5 | 63:12 84:1 | 16:6 29:12 |
| 147:24 169:16 | **lawsuit** 66:4,16 | 139:5 180:17 | 30:23,25 38:6 |
| **l** | 66:23 70:2,6 | **legal** 22:16 | 41:24 43:3 |
| | 71:9 74:12 | 68:22 81:21 | 44:14 47:16,23 |
| **l** 20:6,10 21:9 | 75:22 76:13 | 88:16 105:10 | 47:24 48:9,12 |
| 23:13 146:18 | 79:24 80:4 | 115:12,20,22 | 49:8,19,21 |
| 306:7 307:14 | **lawyer** 10:4,6,9 | 134:7 136:23 | 50:16 51:6 |
| **label** 99:6 | **lawyers** 70:6 | 160:6,7,9,10,16 | 96:4 100:16 |
| **land** 51:9,10,12 | **layperson** | 178:24 179:4,7 | 107:11 109:18 |
| 101:19,23 | 193:2 | 187:19 195:24 | 110:4,16 |
| 102:1 131:23 | **lc** 227:13,19 | 196:20 198:6 | 111:18 112:6 |
| **language** 56:4 | **lead** 40:24 41:5 | 276:14 289:9 | 112:12,18 |
| 142:15 181:13 | 41:6 147:10 | 289:10 290:3 | 114:11 133:12 |
| 195:4 291:7 | 165:7 219:11 | 290:20,22 | 134:3,16 138:9 |
| 294:14 | 219:12 238:7,8 | 291:25 308:1 | 150:5 161:9 |
| **large** 49:11 | 238:12 | 311:1 | 171:10 172:14 |
| 50:13,15 | **leader** 14:18 | **legible** 237:14 | 173:8 211:24 |
| | 35:20,22 39:19 | | 215:23 220:4 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[libraries - llc]**                                                          Page 36

| | | | |
|---|---|---|---|
| 220:23 232:4 | 294:12 295:2 | **lincoln**  306:5 | 68:20 74:7 |
| 235:3 236:12 | 300:1,6,7,10 | **line**  9:23,25 | 75:25 80:24 |
| 256:8 275:1,13 | 301:1,14,17,23 | 221:16 308:14 | 90:24 131:1,2 |
| 286:3,25 287:5 | 302:3 303:10 | 310:7 311:3 | 131:8,14,24 |
| 287:15 292:5,9 | 304:1 | **lines**  238:20 | 141:20 150:1,4 |
| 292:10 299:1 | **library's**  99:2 | **link**  282:10,13 | 152:21 154:1,3 |
| **library**  5:5,6,9 | 295:4 | **linkedin**  5:10 | 155:1,14 |
| 6:12 15:19 | **license**  6:16,18 | 11:4,7,14,25 | 168:12,17 |
| 23:12 30:17 | 39:9 40:15 | 22:19 28:25 | 170:17 195:3,9 |
| 48:15 50:3,4 | 161:11 196:14 | **list**  6:14,19 | 195:12 |
| 50:10 51:7,8,9 | 208:15,19 | 96:19 208:12 | **little**  12:20 |
| 51:10,12 52:5 | 282:4 296:18 | 208:13 232:3 | 28:19 32:4 |
| 52:7,8,12 | 296:23 | 236:9 237:3 | 37:25 43:8 |
| 94:16 97:18 | **licensees**  298:8 | 247:4,19 | 86:25 103:12 |
| 98:25 99:5,8 | **licensers** | 251:14 277:13 | 140:19 175:23 |
| 131:23 132:12 | 290:14 | 302:14,24 | 176:17 196:8 |
| 150:20 177:2 | **licensing**  37:17 | 303:19,20 | 203:25 204:17 |
| 179:19 205:3,7 | 164:12 196:4,5 | **listed**  56:6 | 230:6 281:25 |
| 206:15 208:7 | 196:7,10 282:6 | 84:21 110:8 | 282:20 |
| 211:20,22 | **life**  238:6 243:2 | 173:19 174:4 | **live**  51:13 |
| 212:5 216:20 | **likely**  43:25 | 183:10 192:24 | 64:10 209:5 |
| 233:11 240:4 | 250:18 257:3,4 | 245:24 247:6,8 | 215:17 216:18 |
| 245:9 256:16 | **likes**  245:7 | 247:11 266:3 | 216:22,25 |
| 265:16,25 | **limit**  25:8 | 266:11 268:10 | 217:2,2,5 |
| 266:2,7,11,17 | **limitations** | 310:7,17 | 231:19 257:20 |
| 266:23 267:5 | 61:2 | **listing**  310:7 | **lived**  171:24 |
| 268:15 271:10 | **limited**  102:21 | **lists**  172:6 | **living**  51:14 |
| 271:21 272:13 | 107:12 110:4,5 | 173:24 191:21 | **lj**  52:7 |
| 272:16,18,24 | 111:3,18 | 231:19 233:23 | **llc**  1:9 5:6 |
| 274:2,18 | 149:25 172:9 | 236:11 | 18:17,18 29:9 |
| 276:20,22 | 172:10,15 | **lite**  99:17 | 79:18,19 87:23 |
| 280:12,13 | 225:15 226:24 | 173:18 | 88:2,5,8,9,13 |
| 281:4 285:8,14 | 227:16 275:1 | **litigation**  5:22 | 88:15 89:9 |
| 285:15 293:13 | | 65:8,13 67:15 | 90:17,19,20 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[llc - main]**                                                                 Page 37

91:4,22,23,25
92:4 93:15,21
95:2,5,8
100:15,18,20
100:22 101:1
101:15 102:18
102:19 103:15
103:18 105:17
106:17,21
107:11 108:8
108:15 109:16
109:25 110:3
111:2 112:1,16
115:11,23
172:17 173:5
280:13 308:6
309:3 310:3
**llc's** 5:15 77:3
**llp** 2:4
**lms** 205:9,11
**load** 285:17
286:11
**loaded** 166:19
166:21
**locate** 142:1
**located** 102:20
113:3,6 276:12
276:20,22
**location** 88:22
89:24 102:2
181:24 182:22
**locations** 82:2
88:24 91:10,20
91:24 103:4

111:15
**loi** 148:18,23
149:7,9,10,11
149:12,13,17
154:16,21
**long** 10:19
14:12 15:8
119:24 149:3
168:3,7 180:7
208:2 214:18
**longer** 12:11
18:23 33:19
63:9,11 196:25
294:20
**look** 11:20
19:12 39:21
46:19 55:25
60:7 100:23
138:2 161:18
167:2 170:3,5
173:23 190:8
194:12 204:1
218:4 223:17
223:18 233:4
234:16 235:18
236:21 237:5
238:4,5,17,22
239:19,21
240:3 249:6,12
253:21 256:11
261:2 265:4,18
266:6 269:3
271:6 273:7
275:3 277:18

281:25 282:3
288:22 289:21
292:23 299:8
304:1
**looked** 144:2
174:8,8 218:2
253:17 261:8
282:16 286:22
295:22 297:3
303:14
**looking** 22:25
171:9 183:1
185:18 186:18
193:16 233:6
239:20 240:5
241:13 242:25
243:7,17 254:2
265:12 279:11
304:25
**looks** 235:6
279:12 297:5
**lost** 238:9
239:13
**lot** 33:23 47:5
48:4,23 50:25
51:25 94:13,15
155:19 204:11
223:7 261:1
**loud** 267:12
**loudly** 9:5
**louisiana**
303:10
**lucas** 82:13,19
82:20 85:7

230:16
**luncheon**
138:18
**lynn** 1:25

**m**

**m** 2:5,6 85:17
146:18
**madam** 308:10
**made** 23:25
40:21 62:15,21
63:6 99:25
116:15 131:5
131:13 212:6
258:10 262:2
263:1 284:4,6
284:17 287:13
287:18,22,25
309:7
**magnifier**
237:18
**mahendra**
85:17,17
**maiden** 307:7
**mail** 6:2 34:4
45:1,22 229:20
230:16 235:9
236:4,6 244:8
250:6 254:16
293:1,6,9
295:11
**mails** 261:3
**main** 132:3
207:5,18

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| 227:12,19 | managed 116:4 | marked 5:2 | marks 12:10 |
| 228:1 262:9 | management | 11:15,19 55:9 | 269:11 |
| 298:24 | 5:7 14:19 23:7 | 55:14 65:19,25 | material 12:19 |
| maintain | 36:9 45:1,21 | 77:7 78:6 | 21:11 95:12 |
| 209:24 | 46:2 93:2 | 137:12 155:2 | 127:21 215:22 |
| maintained | 105:21,22 | 171:20 217:14 | 262:6 263:18 |
| 268:4 272:15 | 115:8 205:7 | 217:18 229:22 | 283:6 284:12 |
| major 168:6 | 216:2 280:15 | 242:14,17 | materials 48:19 |
| majority 96:18 | 281:5 | 244:16 248:21 | 48:25 52:5 |
| 111:13 | manager 22:10 | 249:4 254:10 | 101:12 260:5 |
| make 24:17 | 28:6 | 264:25 271:13 | 260:10,16 |
| 25:7 41:21 | managers | 274:3 277:14 | math 53:24 |
| 46:4,9 51:18 | 17:18,22,23 | 280:16 296:19 | matter 60:6 |
| 55:18 75:5 | managing 37:5 | 296:24 302:16 | 131:5 133:15 |
| 78:11,16 94:23 | 37:15 | market 17:6 | 195:3 |
| 119:7 122:13 | manipulation | 31:12 34:3 | matters 54:10 |
| 122:25 124:3 | 99:1 | 141:14 216:4 | mcgarvey |
| 125:12 128:11 | manipulations | 245:7 252:21 | 32:11 42:6 |
| 137:6 141:11 | 127:5 | 253:2,4,8,9 | 72:9 82:14,16 |
| 179:4 214:15 | map 299:6 | 257:22 258:1 | 82:19,23 |
| 216:12 237:13 | marc 99:24 | marketing | mean 20:10 |
| 244:2 267:20 | 104:17 117:9 | 16:25 48:19,24 | 34:16 36:11 |
| 284:1 | 121:24 123:19 | 49:7,9,13 71:6 | 44:3 45:18 |
| maker 40:2,6 | 132:10 203:23 | 103:21 105:25 | 46:7 67:11 |
| 40:11,15 | 206:16 207:1 | 107:2,4,10 | 69:24 70:19 |
| makes 285:17 | 207:22 209:5 | 109:22 110:12 | 95:25 99:3 |
| making 46:5 | 245:9 | 113:15 143:8 | 104:11,15 |
| 272:25 | march 223:14 | 151:8 176:20 | 105:2 107:19 |
| malouf 146:18 | 257:14 258:7 | 178:18,20 | 114:15,17 |
| 147:2 | 258:18 259:1 | 198:17 | 120:15,22 |
| manage 46:23 | mark 11:6 | marketplace | 122:5 133:7 |
| 70:9 71:18 | 171:14 201:1 | 246:8 | 136:22 137:21 |
| 283:25 | 217:9 254:5 | marking 55:5 | 140:11 145:11 |
| | | 277:17 | 150:2 160:19 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[mean - move]**                                                      Page 39

164:3 176:16
182:10,12
183:22 185:6
190:13,22
191:22 196:23
203:20 219:16
224:6 225:11
227:17 229:3
231:3 232:12
237:22 238:5
253:2 276:7,19
290:12 291:13
298:6
**meaning** 7:20
122:22 300:23
**means** 20:11
24:7 48:23
77:17 99:4
104:16 127:25
133:8 150:3
187:14 216:12
224:9 227:15
231:21 290:1
305:3
**meant** 22:14
106:10 112:14
150:17 212:14
287:17,19,21
**media** 95:18
207:24
**medical** 8:2
105:5
**medications**
8:5

**meet** 53:12
56:3 57:6
**meeting** 75:6,8
187:17
**member** 67:24
**members** 39:17
50:17,19
**memory** 19:3
24:7 27:25
49:5 75:19
103:7 155:12
209:22 214:3
**mention** 19:10
261:11,13,16
261:18
**mentioned** 22:9
63:9 72:19
74:6 86:12
99:9 102:13
112:11 284:5
292:12
**mentioning**
76:11
**merchandising**
23:9 32:13,23
82:24
**merchandizing**
71:6
**mergers** 36:14
**merit** 240:22
**merits** 133:23
133:25 245:20
246:13 247:5
253:9

**met** 7:9 259:4
**metadata** 250:1
254:19
**methods** 287:6
**micromanagi...**
46:13
**microsoft** 45:1
45:21 107:20
107:25 108:3
122:23 235:14
235:14
**middle** 7:13
44:2
**midwest**
308:17 311:1
**million** 123:23
123:24 200:20
254:25 255:14
255:24
**mind** 24:11
35:15 48:14
53:24 72:12
75:3 142:8
228:3 274:7
**mingled** 41:20
**minute** 17:12
32:19 53:25
79:22
**minutia** 45:4
**mirgan** 72:11
**mispronounc...**
131:7
**missed** 22:24
22:25

**missing** 103:22
251:20,21
**misspeak** 176:3
**mistakenly**
301:18
**misunderstan...**
124:5
**mitigate** 166:9
166:11
**modalities**
260:16
**model** 164:12
**modification**
291:17
**modifications**
304:22
**modified**
224:23 299:21
**momence** 91:17
92:10
**moment** 79:21
**monies** 255:18
255:18
**month** 21:20
24:12 40:12
86:7,9 188:5
188:10,17
189:2,6 231:9
**months** 168:8,9
197:14
**moot** 196:2
**motions** 68:11
**move** 137:19

**[moving - november]**                                              Page 40

**moving** 153:2
 164:22,25
**multiple**
 175:14,16
 179:21,22,24
 179:25
**murchison**
 83:19
**murchison's**
 84:11
**myers** 82:13
 83:8 86:4,7,8
 86:10

**n**

**n** 85:17 239:17
**name** 7:12,14
 15:1,7 21:6
 63:2,3 78:25
 82:15 85:16
 98:6 123:8
 132:5 144:10
 146:17 147:25
 209:14 251:10
 251:12 308:6
 309:3,4,15
 310:3,4,21
**named** 110:1
 146:24 150:5
 306:10
**nassau** 251:22
**nate** 80:20
**native** 230:4
 249:21

**natively** 230:1
**nature** 24:18
 150:7,16 203:5
 203:13 222:4
**navigate** 191:9
**nda** 60:23 61:7
 61:9 184:5,7
**near** 275:24
**necessary**
 254:4 268:18
 273:3
**need** 9:22 25:5
 46:11,24 54:21
 57:11 66:8
 76:20 105:6
 135:17 204:8
 210:15 263:24
 280:5 282:1
 290:8
**needed** 17:7
 59:14 70:7
 116:13 152:4
 180:17,19
 183:7 296:11
**needs** 17:6 34:3
 132:19 150:20
**negotiable**
 283:16
**negotiate** 39:12
 185:8
**negotiated**
 140:14 195:4,6
 283:21 292:17
 292:21,23

**negotiating**
 40:3,7 41:3
 189:14
**negotiations**
 41:13 147:6
**negotiator**
 39:15 40:24
 41:5,7,9 147:3
 165:7
**nevada** 91:19
**never** 7:9 34:20
 44:21 130:7
 131:22 132:21
 164:24 244:1
 253:17 261:21
**new** 48:3 52:14
 91:14 101:19
 102:3 103:3
 135:24 142:19
 197:13 229:17
 248:17
**news** 51:20
**nick** 75:13,14
**nodding** 46:15
**non** 125:22
**noncompete**
 173:2
**nondisclosure**
 60:23
**nonoperational**
 42:25
**nontechnically**
 115:4

**normal** 46:19
 46:22
**north** 1:23 8:9
 81:24 91:7
 306:3,8 307:7
 307:16
**notarized**
 308:15
**notary** 306:7
 307:14 308:25
 309:10,18
 310:15,23
 311:23
**note** 56:2
 178:21 241:5,7
 243:21 304:11
 304:12 308:13
**noted** 136:16
 304:22
**notes** 19:12
 130:19 252:3,4
 261:3,8 303:25
 303:25 304:23
 305:1
**notice** 5:12,13
 55:9,13,17
 56:13 72:13
**noticed** 249:25
**notices** 55:5
**notified** 180:12
**notify** 180:24
**novelty** 127:17
**november**
 22:20 28:9,11

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[november - obtained]** Page 41

| | | | |
|---|---|---|---|
| 28:13 86:20,21 | 184:18,24 | 237:15 273:19 | 119:12,18 |
| 87:10 148:8 | 185:16,21 | 278:7 | 125:25 128:16 |
| 154:9 | 186:22 187:2,7 | **number** 5:2 | 129:8 136:10 |
| **noyes** 2:16 | 187:18 193:14 | 161:22 183:23 | 136:17 153:12 |
| 10:23 16:13,16 | 195:16,23 | 184:22 191:7 | 157:9,13 |
| 24:16 25:3,14 | 196:20 197:21 | 229:13,14 | 159:12 162:9 |
| 25:23 26:7,10 | 198:6 216:23 | 235:21 249:22 | 163:7 166:18 |
| 31:16 34:22 | 217:1 219:23 | 251:19 255:8 | 172:22 178:22 |
| 55:20 57:25 | 220:14,18,24 | 255:11,15 | 179:7,8 181:25 |
| 60:20 61:24 | 221:4,18 | 308:7,14 | 186:22 187:18 |
| 62:3 67:16 | 222:16,24 | **numbers** | 195:23 196:20 |
| 68:21,24 69:15 | 223:10 228:4 | 223:17 310:7 | 198:6 216:23 |
| 70:3 71:10 | 229:7 234:15 | **numerical** | 219:23 220:14 |
| 72:22 73:16 | 238:20 243:9 | 141:16 | 220:18 234:15 |
| 76:21 81:4 | 243:13 247:18 | | 247:18 248:3 |
| 82:11 83:3 | 248:3 249:1,18 | **o** | 260:11 261:24 |
| 84:5 90:2 93:3 | 249:20 251:22 | **o** 146:18 | 267:25 270:11 |
| 94:20,22 111:8 | 260:11 261:24 | 239:17 | 273:19 276:13 |
| 114:20 118:2 | 262:15 263:24 | **oath** 7:17,20 | 289:8 290:2,19 |
| 118:15,19 | 264:16 267:25 | **object** 10:6 | 291:24 293:16 |
| 119:12 123:25 | 270:11 276:13 | 16:13 31:16 | 293:25 299:13 |
| 124:9,13 | 284:23 285:19 | 34:22 72:22 | 300:3,19 |
| 125:25 128:16 | 289:8 290:2,19 | 114:20 160:8 | 301:24 |
| 129:8 130:14 | 291:24 293:16 | 179:1 182:25 | **objectives** |
| 132:24 136:10 | 293:25 299:13 | 195:16 220:24 | 219:18 |
| 145:11,15 | 300:3,13,16,18 | 285:19 | **obligations** |
| 153:12 157:9 | 301:24 302:8 | **objecting** 248:5 | 137:3 159:23 |
| 157:13 159:12 | 308:5 | **objection** 10:8 | 173:1 190:19 |
| 159:16 160:8 | **noyse** 56:2,10 | 10:23 61:24 | 190:24 195:8 |
| 161:21 162:9 | 57:5 119:18 | 67:16 68:21 | **observance** |
| 163:7 166:18 | 136:16 146:1 | 69:15,20,23 | 190:18 |
| 172:22 178:21 | 154:11 161:24 | 70:3 71:10 | **obtained** 160:7 |
| 179:3,9 181:25 | 182:13 184:6 | 82:11 83:3 | 269:16 |
| 182:2,8,25 | 185:5 229:10 | 84:5 93:3 | |

**[obtains - okay]**

Page 42

| | | | |
|---|---|---|---|
| **obtains** 269:10 | 267:7 268:4,21 | **official** 102:2 | 21:22 22:1,3,6 |
| **obviously** | 269:12,13,24 | 257:6,7,11,15 | 22:18,22 23:14 |
| 73:24 89:15 | 270:18 271:24 | 259:6 309:15 | 23:17 24:9,15 |
| 94:3 | 272:3,7,10,15 | 310:21 | 25:3,23 26:10 |
| **occasion** 52:10 | 272:20,25 | **offit** 1:22 2:15 | 26:11,16,24 |
| 115:21 179:19 | 273:5,17 274:9 | 86:4,9 147:18 | 27:11,13 28:18 |
| **occasionally** | 275:25 308:6 | 147:19,24 | 28:25 29:4 |
| 17:9 32:2 | 309:3 310:3 | 169:16 | 30:16,19,24 |
| **occurred** | **oclc's** 67:23 | **offitkurman.c...** | 31:2,14,20 |
| 140:19 | 68:20 131:12 | 2:20 | 32:3,9 33:7,21 |
| **oclc** 1:4 5:16,21 | 150:22 | **oh** 16:15 22:24 | 34:16,20 35:5 |
| 7:8 37:20 38:1 | **october** 86:21 | 62:3 98:7 | 35:22,24 36:16 |
| 38:3,5,7,25 | 201:24 211:14 | 105:9 111:23 | 37:9 39:1,12 |
| 41:9,14 66:3 | **offer** 5:8 134:7 | 191:13 243:11 | 41:4,18 44:1,7 |
| 66:16 67:23 | 158:7 159:7 | 269:1 | 45:14 46:1,7 |
| 68:5,25 69:3,4 | 206:19 256:16 | **ohio** 1:1 2:9 3:6 | 46:14 48:15 |
| 69:19 75:22 | 273:25 274:16 | 48:10 49:8,12 | 50:5 51:18,22 |
| 77:5 117:12,14 | **offered** 49:6 | 66:23 92:13,14 | 52:4,18 53:17 |
| 117:17,23 | 240:22 241:24 | 92:15,17 | 54:11 56:10,11 |
| 118:20,25 | **offering** 136:23 | 113:12 233:13 | 58:20 59:2,10 |
| 119:2 129:12 | **offerings** | 276:23,24 | 59:19,22 60:3 |
| 129:20 130:2,4 | 205:16 | 277:4,5 308:2 | 60:7,19 61:12 |
| 130:22 131:18 | **offers** 154:11 | **okay** 7:11,15 | 61:16 62:3,10 |
| 149:22 154:25 | **office** 8:11 | 7:19 8:7,14 9:3 | 63:8,17 64:3 |
| 157:4 208:16 | 45:22 88:22 | 9:22 10:4,17 | 64:15,18,22 |
| 240:6,11,12,13 | 89:24 91:13,16 | 10:21 11:1,4,6 | 65:1,6,18 66:7 |
| 240:16,20,25 | 91:17,19 92:14 | 11:8,22,24 | 66:12,15,18,22 |
| 242:1 243:22 | 92:17 99:7 | 12:4 13:11,16 | 66:25 67:4,14 |
| 247:5 252:9 | 131:12 307:6 | 13:23 15:5,8 | 68:19 69:5,11 |
| 253:22 256:17 | **officer** 110:10 | 15:13,20,23 | 69:22 70:5,10 |
| 256:19,21 | **officers** 85:2 | 16:10 17:5 | 70:13,15 71:8 |
| 257:2 264:6,9 | 89:9 90:6 | 18:5,9,15,19 | 71:22 72:1,16 |
| 265:15 266:9 | **offices** 42:22 | 19:19,23 20:16 | 74:15 75:1,10 |
| 266:20,22 | 110:23,25 | 20:22 21:8,18 | 75:18,23 76:18 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[okay - okay]                                                                         Page 43

| | | | |
|---|---|---|---|
| 77:19,22 78:13 | 115:11,15 | 153:3,21,25 | 205:15,24 |
| 78:18 79:1,25 | 116:7,14 117:7 | 154:7,22 | 206:6,22 |
| 81:14,19,25 | 117:10,13,16 | 155:16,20 | 208:10,14 |
| 82:8 83:17,25 | 118:14,19 | 156:13,25 | 209:7,10 210:8 |
| 84:7,23 85:6 | 119:22 120:5,9 | 159:6,9,16 | 211:3,8 212:15 |
| 86:11,19,24 | 121:10,19 | 160:2,5,10,13 | 212:19 213:12 |
| 87:5,12,15,21 | 122:5 123:10 | 160:25 161:1 | 213:17 214:9 |
| 87:25 88:6,12 | 123:14,20,22 | 161:15,18,19 | 215:18,23 |
| 88:14 89:16 | 124:13,15,15 | 162:2,4,12,15 | 217:6,9 218:5 |
| 90:5,20 91:1 | 125:4,23 126:6 | 163:5,23,24 | 218:7,8,12 |
| 91:15 92:12 | 126:13 127:3 | 164:1,16 165:3 | 219:4,8,11,13 |
| 93:7,11,18,22 | 127:10,14,23 | 165:10,17,20 | 219:16,20 |
| 94:3,12 95:9 | 128:23 129:4 | 165:21 166:24 | 220:16,22 |
| 95:16,24 96:5 | 129:22 130:7 | 167:2,3 168:24 | 221:11,16,21 |
| 96:7 97:2,5,7 | 130:19 131:2 | 169:8,23 170:2 | 222:7,12,15 |
| 97:20,22,24 | 131:15 132:14 | 170:6 171:14 | 223:13,16 |
| 98:3,11,15,24 | 133:17 134:3 | 172:14,25 | 224:12 225:12 |
| 99:19 100:8,13 | 134:24 135:19 | 173:4,9 174:21 | 225:17,20 |
| 100:17,19,23 | 136:15 137:15 | 178:18 179:9 | 226:1,6,15 |
| 101:14 102:2,6 | 137:24 138:1,3 | 179:11 180:8 | 227:24 228:3,5 |
| 102:8,13,22 | 138:5,13 | 180:24 181:3,6 | 228:18,23 |
| 103:1,11 | 139:18 140:3,7 | 181:21,23 | 229:10,12,16 |
| 104:11,14,19 | 141:7,11,16,19 | 182:13,24 | 230:8,11,15,18 |
| 105:10,12,19 | 141:22 142:3,5 | 183:12,15 | 230:21,24 |
| 105:25 106:19 | 142:10,24 | 184:2,14,24 | 231:6,10,16,23 |
| 107:1,19 108:1 | 143:20 144:7 | 185:4,22 | 232:6,9,14,20 |
| 108:5,11,17,22 | 144:10,12 | 186:11,14 | 232:23 233:4,9 |
| 108:25 109:3 | 145:10,15,24 | 187:4 191:6,14 | 234:9,13 |
| 109:11,15 | 146:21 147:5 | 191:20 192:3 | 236:19,22,24 |
| 110:6,21 111:2 | 147:13,19,23 | 192:18 193:24 | 237:2,8 238:7 |
| 111:13,15 | 148:12,17,23 | 194:18 198:4,9 | 238:9,12 239:5 |
| 112:2,5,19,25 | 149:3,20,24 | 199:6,11 | 239:8,13 240:1 |
| 113:2,8,17,22 | 150:2,8 151:11 | 200:22 203:24 | 241:25 242:22 |
| 114:1,5,8 | 151:17,21 | 204:24 205:4 | 244:1,7,19,23 |

www.veritext.com                                                             888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[okay - original]

Page 44

| | | | |
|---|---|---|---|
| 246:1 247:1 | 290:7,9,17 | **open** 56:12 | **opposed** 34:11 |
| 248:2 249:10 | 292:5,15,24 | 132:11 206:14 | **opposite** |
| 251:12 252:3,7 | 293:8,13,23 | 206:16 223:13 | 294:24 |
| 252:15,22 | 295:1,7,12 | 245:10 | **ops** 23:8 |
| 253:12,16 | 297:9,12,16,23 | **operate** 143:1 | **optimize** 23:25 |
| 254:5,14 | 298:11,17 | 143:22 144:13 | 213:4 |
| 256:10,23 | 299:22 300:16 | 158:14 | **optimizing** |
| 257:5,10,15,15 | 302:21,25 | **operates** | 213:7 |
| 257:16,24 | 303:2,8,9,12,18 | 247:24 | **order** 1:14 |
| 259:6,10,13 | 303:22 304:8 | **operating** | 219:5 237:11 |
| 260:8,18,22 | 305:7,9 | 103:9 109:15 | 268:7,14 |
| 261:18 262:10 | **ollie** 63:2 64:3 | 109:23 110:2 | 272:24 287:4 |
| 262:25 264:10 | 64:4 | 147:10 180:18 | **ordering** 41:22 |
| 265:8,12,20 | **omitted** 107:7 | **operation** | **orders** 98:14 |
| 266:14,20 | **onboarding** | 93:19 | **org** 144:3 |
| 267:8,10,22 | 217:4 | **operations** | **organization** |
| 268:13 269:5 | **once** 193:20 | 23:15,25 28:2 | 28:17 36:20 |
| 270:1,8,14,22 | 231:8 236:21 | 33:17 39:25 | 70:7 80:2 |
| 272:2 273:12 | 293:11,14 | 42:9,12,21 | **organizational** |
| 273:16,22 | 294:21 295:3 | 71:3 144:14 | 5:18 78:5 |
| 274:22 275:6,9 | **ones** 26:21 37:1 | 158:23,25 | **organizations** |
| 275:23 276:6 | 59:8 62:6 | 159:2 166:12 | 36:13,17,18 |
| 276:18,22 | 110:1 146:11 | 173:7 | 171:10 |
| 277:7,23,25 | 157:21 165:17 | **opinion** 160:6,7 | **organize** |
| 278:12,17,21 | 168:19 169:22 | 160:9,10,16,20 | 130:19 |
| 278:22 279:21 | 169:24 175:6 | **opportunities** | **orientation** |
| 279:25 280:22 | 182:18 203:2 | 6:6 36:14 | 124:1 |
| 281:20 282:2 | 231:13 | 237:5,25 | **original** 86:14 |
| 282:12,19 | **ongoing** 149:25 | 242:23 243:18 | 116:11,15 |
| 283:7,24 | 159:23 | 248:20 250:9 | 117:1 127:20 |
| 284:15 285:11 | **online** 177:3 | **opportunity** | 128:5,12 224:7 |
| 286:10,22 | 272:14,16 | 28:14 46:24 | 287:24 289:11 |
| 287:8 288:5,10 | **onslow** 233:24 | 74:20 238:3 | 304:7 |
| 289:13,21 | | 275:12 | |

[originality - participants]                                          Page 45

| | | | |
|---|---|---|---|
| **originality** | 207:22,24 | **pacific** 101:4 | **parenttv** 97:2,3 |
| 127:17 | 240:21 246:13 | **page** 22:25 | **park** 204:6,7 |
| **originally** 84:7 | 266:24 275:14 | 24:17 25:7 | 211:1 |
| 86:13,16 288:8 | 290:14 295:2,6 | 106:10,16 | **parma** 48:14 |
| **outcomes** 214:8 | **owned** 18:2 | 170:2 191:6 | **part** 12:11 |
| **outside** 42:18 | 20:20,24 23:23 | 193:16 217:17 | 13:19 14:11 |
| 42:23 49:12 | 24:25 26:2 | 218:3 223:17 | 37:3 38:4 |
| 71:11,23 72:25 | 82:5 87:18 | 227:7 233:6,7 | 45:20 57:6,12 |
| 73:8 76:16 | 88:4 95:5,8 | 237:6,19 | 65:12 72:19 |
| 83:23 169:15 | 101:4 102:17 | 238:21,23 | 73:6 93:9 97:1 |
| 177:16 213:18 | 108:14 117:12 | 244:8 249:8,10 | 97:19 98:2,4 |
| **overall** 22:13 | 145:4 188:4 | 266:11 278:15 | 118:11 120:19 |
| 186:15 | 189:1 191:24 | 278:16 281:12 | 126:21 129:6 |
| **overlap** 44:15 | 213:19 254:22 | 298:5 303:5 | 133:21 144:5 |
| 210:10,22 | 256:1 | 304:3 308:14 | 147:6 154:4 |
| 299:6 | **owner** 245:8 | 308:16 310:7 | 155:21 166:9 |
| **oversaw** 16:23 | **owners** 82:8,10 | 311:3 | 166:14 173:2 |
| 17:22 27:5,9 | 82:17 84:9 | **pages** 185:18 | 175:13 208:19 |
| 35:2 106:24 | **ownership** | 237:12 238:18 | 214:2 216:1 |
| **oversee** 16:24 | 83:12 84:11,20 | **paid** 132:2 | 218:13 222:17 |
| 17:21 35:19 | 293:11,14 | 186:20 252:8 | 224:21 228:25 |
| **oversees** 35:21 | 294:13 | **panel** 260:14 | 232:6,8 241:2 |
| **oversight** 115:8 | **ownerships** | 260:21,23 | 241:23 243:24 |
| 115:10 | 15:10 | **paragraph** | 250:11 267:3,5 |
| **own** 24:5 31:6 | **owns** 82:4 88:9 | 142:13,25 | 269:17 270:20 |
| 31:15,18 32:22 | 94:17 101:2,14 | 256:12 282:5 | 291:17 298:8 |
| 33:15,22 34:2 | 132:7 173:6 | **paragraphs** | 310:9 |
| 34:10,13 58:15 | | 57:7,11,17 | **partake** 15:4 |
| 83:2 95:3 | **p** | 60:12 269:3 | **partial** 63:18 |
| 121:24,25 | | **parameter** | 63:19 |
| 122:3,6 125:10 | **p** 3:4 20:6,10 | 227:20 | **participant** |
| 125:12 153:2 | 21:9 23:13 | **parcels** 101:19 | 233:15 |
| 153:15 176:24 | 85:22 | **parent** 78:23 | **participants** |
| 199:17 201:11 | **p.m.** 305:11 | | 232:4 234:25 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[participate - permitted]                                    Page 46

| | | | |
|---|---|---|---|
| **participate** | 36:20 37:7,10 | **patent** 289:4,6 | **percent** 83:5 |
| 241:22 258:25 | 37:12,24 | 289:16 290:23 | 84:13,15 |
| 298:8 | **parts** 94:15 | **patton** 2:4 | **percentage** |
| **participated** | 155:6 219:25 | **paw** 95:16 | 83:1 188:3,13 |
| 260:23 | 281:22 | **pay** 186:5 | **perception** |
| **participating** | **party** 6:9,12 | 188:13 232:7 | 247:22 |
| 236:12 242:3 | 36:13,17,18,19 | **payable** 191:4 | **perfectly** |
| **participation** | 38:6,8 97:3,6 | **paying** 133:8 | 221:11 |
| 187:25 260:25 | 97:11,21,23,25 | 251:8 258:15 | **perform** 204:23 |
| 261:14,14 | 120:19 124:21 | **payment** | 268:14 |
| **particular** 21:1 | 125:2,6 126:17 | 186:15,20 | **performance** |
| 47:24 54:24 | 136:24 137:4 | 187:5,10,11 | 20:13 30:14 |
| 55:2 75:6 | 172:21,23 | **peddler** 108:14 | 190:17,25 |
| 76:11 | 173:5 174:24 | 109:7 | 263:12 |
| **particularly** | 181:1,4,16 | **peeled** 76:22 | **period** 24:8,24 |
| 118:23 | 194:5 197:25 | **peer** 23:10 | 26:1,17 39:2 |
| **parties** 37:12 | 264:3,6,8,12,14 | **pending** 9:24 | 54:3 148:10,11 |
| 148:17 172:7 | 264:22 265:14 | 243:10 | 168:6 188:18 |
| 213:23 215:20 | 265:23 266:15 | **penguin** 50:21 | 218:23,25 |
| 215:22 256:7 | 266:25 267:1 | **people** 14:23 | 219:1,22 223:8 |
| 267:7 | 269:17,23 | 17:21 18:25 | 255:8 |
| **partner** 80:2,16 | 270:20,25 | 19:6 30:19 | **periods** 229:14 |
| 81:17 | 271:2,10,18,24 | 35:8 39:20 | **permission** |
| **partners** 37:4 | 273:20 301:5 | 41:12 46:9,21 | 48:20,25 |
| 220:2 | 307:3 | 51:3 62:23 | 180:12,14,17 |
| **partnership** | **passed** 178:17 | 63:8 72:16 | 286:13 288:17 |
| 35:18 36:9,10 | **passing** 132:1 | 74:23 76:15 | 288:19 |
| 36:23 38:5,12 | **passive** 133:5 | 85:25 86:3 | **permit** 126:15 |
| 38:14 39:3,8 | **past** 31:6 48:1 | 93:8 107:3 | 295:2 |
| 39:11 102:16 | 52:15 83:14 | 116:9 117:20 | **permitted** |
| 128:21 129:5,6 | 130:25 131:11 | 117:22 127:3 | 126:7,8,10 |
| 222:12 | 131:13 231:9 | 205:7 244:13 | 127:7 300:11 |
| **partnerships** | 231:12 232:10 | 257:21 258:20 | 301:2,15 |
| 35:21 36:6,12 | 234:3 | | |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[perpetuity - portion]                                        Page 47

| | | | |
|---|---|---|---|
| **perpetuity** | **pick** 15:3 | 229:19 242:11 | 143:16 146:22 |
| 141:2,5 | **picked** 20:5 | 248:19 249:4 | 170:20 188:22 |
| **person** 27:5,9 | **piece** 43:5 | 254:8 264:21 | 196:2 200:19 |
| 33:7 35:3 41:8 | 281:9 | 271:8,16 | 216:14 217:7 |
| 42:4 47:10 | **pieces** 101:23 | 273:22,24 | 219:9,14,24 |
| 53:16 60:4 | 102:1 | 277:12 280:10 | 221:7,14 225:3 |
| 65:2 75:11,15 | **ping** 214:23 | 280:21 296:17 | 225:9,18,21 |
| 106:23 107:21 | **pitch** 241:2 | 296:22 302:13 | 226:1 231:19 |
| 115:2 123:3 | 245:18 | 302:20 | 232:19 236:3 |
| 147:10 202:10 | **place** 60:24 | **plan** 17:8 166:9 | 250:15,23 |
| 208:13 228:21 | 71:11 98:14 | 166:11 223:20 | 251:25 253:25 |
| 263:20 | 119:17 121:5 | 226:20,24 | 262:7,10,14,16 |
| **person's** 36:4 | 121:14 124:19 | **planned** 223:19 | 272:4 274:6 |
| **personal** 12:21 | 129:12 139:15 | **planning** 98:1 | 275:23 292:24 |
| 58:10,12,14 | 150:19 156:12 | **plants** 204:11 | 296:6 297:21 |
| 202:3,8 | 170:16 227:4 | **platform** 16:2,2 | **pointed** 57:7 |
| **personally** | 270:23 306:21 | 19:14,16 72:10 | 60:21 250:11 |
| 173:1 309:11 | **placed** 120:2,6 | 97:4 98:10 | **points** 146:23 |
| 310:15 | 129:18,23 | 213:9 | 165:16 |
| **perspective** | 130:4 269:9 | **play** 300:6 | **police** 74:3 |
| 42:21 294:7 | 270:9 273:9 | **pleadings** | **policy** 235:15 |
| **pete** 83:20 | **places** 118:20 | 67:14 | 235:16 |
| 84:14,15 | 119:2 130:22 | **please** 7:11 9:6 | **pool** 207:2,6,7 |
| **peter** 146:24 | 208:6 270:18 | 9:12 29:18 | 207:12,15 |
| 147:5 | 273:17 285:7 | 73:1,5 80:13 | 210:6,11,14,25 |
| **phases** 219:17 | 285:12 | 90:3 132:25 | 211:16,24 |
| **phone** 160:3 | **plaintiff** 1:5 2:3 | 258:5 308:12 | 262:11 298:9 |
| 167:23 168:1,3 | 5:16 77:4 | 308:12 | 298:15 |
| 168:11 169:12 | **plaintiff's** | **plenty** 121:12 | **poole** 148:2 |
| 169:14 308:3 | 11:13,19 55:8 | **plow** 222:20 | **portfolio** |
| **physical** 33:2 | 55:12 65:19,22 | **point** 16:22 | 145:18 |
| 36:21 95:6,9 | 77:2 78:4 | 20:20 22:12 | **portion** 179:18 |
| 95:11,18 96:1 | 137:10 154:24 | 23:6,10 27:10 | 180:3,4 192:15 |
| 96:2 99:1 | 171:18 217:12 | 27:23 128:4 | 239:22 291:11 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[portion - primary]**                                    Page 48

| | | | |
|---|---|---|---|
| 291:19 | **preceding** | **preparing** | **pressreader** |
| **position** 19:24 | 284:12 | 53:18 259:15 | 97:20 |
| 20:5 21:10 | **predate** 110:15 | **presas** 3:13 | **presume** 220:3 |
| 22:7 27:17,20 | 116:11 | **presence** 60:2 | 225:24 |
| 28:21,23 30:6 | **predates** 93:17 | 71:23 306:16 | **pretty** 51:11 |
| 32:12 38:2,12 | 102:7,8,9,10 | **present** 3:12 | 108:13 171:23 |
| 49:18 82:20 | 108:21 | 41:12 207:12 | **prevent** 8:3 |
| 83:21,25 85:8 | **preempt** 43:6 | **presentation** | 61:8 |
| 92:20 110:7 | **prek** 15:19 | 225:1 245:2,24 | **previous** 14:3 |
| 146:19 163:16 | **preliminary** | 259:15,22,24 | 67:22 139:9 |
| **positions** 109:3 | 68:6 166:10 | 259:25 260:2,4 | 165:13 |
| 109:11 | **preparation** | 261:22 | **previously** 51:5 |
| **post** 180:20 | 54:4 58:19 | **presentations** | 65:24 103:15 |
| 202:23 | 64:16,19 67:1 | 228:19,19 | 117:23 141:1 |
| **potential** 62:15 | 67:17 68:16 | 229:4 261:6,22 | 143:4 252:8 |
| 62:21 63:7 | 218:13 | **presented** 25:9 | 274:2 280:16 |
| 133:17,22 | **preparations** | 177:2 259:11 | 280:20 282:17 |
| 135:6,7,12,24 | 58:17 | **presently** 85:13 | 292:16 |
| 137:2 158:3 | **prepare** 17:20 | 85:24 | **price** 184:7 |
| **potentially** | 52:19,25 58:21 | **preserving** | 185:7 186:20 |
| 78:15 107:2 | 58:23 59:1,9 | 170:13 | 187:12 189:11 |
| 133:20 143:24 | 261:3 | **president** 15:18 | 189:15 191:15 |
| 244:15 246:25 | **prepared** 5:18 | 20:3,18,25 | 191:18 192:15 |
| 279:16 284:8 | 55:22 56:14,17 | 21:2 22:8,11 | 251:17,18 |
| 284:10,12,13 | 56:22 57:1,9 | 28:5,24 29:1 | **pricing** 164:11 |
| **pr** 70:9 72:7,20 | 57:18,20 58:4 | 30:3,5,11 | 239:25 240:12 |
| **practice** 119:4 | 58:8 60:9 61:4 | 40:13,19 84:25 | 241:14 252:18 |
| 119:6 196:22 | 61:13 71:19 | 89:3 90:15,16 | **primarily** |
| 292:2 | 78:5 219:21 | 93:1 | 30:12 31:12 |
| **pre** 94:4 96:9 | 220:1,16,20 | **press** 5:19 | 42:13 43:10 |
| 96:12 100:14 | 221:22 222:2 | 137:11,23 | 50:14 147:8 |
| 111:6,9,20 | 222:22 223:6 | 138:6 142:12 | 173:15 |
| 278:16 | 228:10,12 | 143:17 | **primary** 39:15 |
| | | | 40:1,5,10,14 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[primary - program]**                                                    Page 49

41:9 52:1
146:22 147:2
169:22
**principals**  80:3
80:19
**printouts**
204:12
**prints**  95:16
**prior**  14:5 24:3
30:2 131:22
142:21 158:21
159:2 189:8
200:12 201:15
235:9 287:1
**private**  102:14
102:21 107:13
109:17 110:5
122:9
**privilege**  73:6
299:15
**privileged**
72:24
**privy**  18:7
118:24 129:19
130:1 301:3,4
**probably**  12:8
14:14 15:2
43:4 106:12
142:2 184:3
236:17 241:7
279:8 280:5
**problem**
125:24 126:4
135:21 185:3

287:15
**procedure**  7:3
309:5 310:5
**proceedings**
305:11
**process**  57:6
64:9,11 131:19
145:23 189:16
190:4 214:4
217:3 224:22
224:24 227:4
241:1
**processing**  6:10
6:13 24:2
264:23 265:15
266:18 271:11
273:21
**processor**
122:24
**procurement**
36:6,15
**produce**  184:25
184:25 207:19
224:10 230:3,4
**produced**
65:11,15 153:6
155:9 167:15
213:5 230:1
277:24
**product**  16:8,9
16:23,25 17:7
17:17,17,18,22
17:23 19:7
20:14 21:12,17

23:7 26:12
27:2,10 34:2
34:15,18 36:21
44:23 45:4
95:21 96:14,24
99:15,22
100:11 104:21
105:20,22
119:23 132:8,9
132:22 164:22
175:15 214:8
216:2,7,8
225:21,22
232:1,22
234:23 243:24
245:18,20
246:7,11,15,19
246:24 247:2
247:16,22,23
248:15 256:24
256:25 259:18
260:15 287:20
288:2,12
289:18,20
**production**
5:17 77:7
149:14 215:16
250:1 308:16
308:17,22
**products**  15:18
15:21,23 16:1
16:4 19:10,21
20:4,13 21:15
22:14 23:19

26:16,19 30:25
31:2,24 32:1
33:13 37:2,7
37:13 38:24
45:10 94:13,17
94:18 95:2,4,6
95:7,7,10,12
96:13,14,15
97:10,11 99:10
100:9,14 106:5
108:6 113:21
114:2,6,21
115:3,9 120:1
120:3,7 132:18
132:19 157:8
157:11,12,18
175:14 179:22
179:23,24,25
180:6 190:2
191:23 216:4
228:24 247:6,7
247:19 250:9
252:25 253:14
253:24 256:22
257:2
**professional**
58:14
**professionals**
213:4 214:2
**profile**  5:10
11:4,7,14,25
22:19 28:25
**program**  14:3
15:1,4,7

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[program - punctual]**                                    Page 50

| | | | |
|---|---|---|---|
| 236:13 | 103:12,18,24 | **provides** | 228:19 253:23 |
| **prohibits** | 107:3,9 113:14 | 103:14,19 | 257:6,7,12 |
| 291:10 | 115:12 116:25 | 151:25 188:2 | 259:1,6 262:3 |
| **project** 205:18 | 145:8 155:11 | 264:3 273:4 | 262:21 274:2 |
| 205:19 209:14 | 156:25 161:5 | 275:11 | 274:17 306:8 |
| 217:24 219:19 | 164:17 165:25 | **providing** | 307:15 309:10 |
| 227:8 | 170:9 171:5 | 44:16 45:22 | 309:18 310:15 |
| **promoted** 20:2 | 202:16,20 | 47:1 145:7 | 310:23 311:23 |
| 22:10 | 250:3 264:8 | 168:13 198:21 | **publications** |
| **prompted** 80:9 | 266:18 267:2,7 | 198:24 222:9 | 51:23 52:8 |
| **property** | 268:19 | 224:19 235:3 | **publicly** 51:21 |
| 101:24 | **provided** 7:2 | 259:16 | 70:8,18 130:25 |
| **proposal** | 23:3 31:3 34:4 | **provision** | 201:22 231:25 |
| 179:21 | 44:8,11,17,21 | 148:24 150:9 | 252:19 253:11 |
| **propriety** | 45:3,14 50:6 | 150:13,16,19 | 254:2 257:25 |
| 289:24 | 53:7 64:24 | 150:22 152:4 | 258:9 |
| **prospects** | 67:21 103:15 | 152:13,24 | **published** |
| 134:8 244:18 | 104:24 106:16 | 153:17 154:2 | 51:21 101:12 |
| **protect** 128:15 | 106:20 112:17 | 188:9 194:1,13 | **publisher** |
| 287:9,10,17,19 | 113:18,19,20 | 194:18 195:22 | 41:15,18 42:5 |
| 287:21 288:2,6 | 115:10,19,23 | 196:7,13,17,18 | 99:5 |
| 288:11 289:11 | 116:12 117:3 | 197:5 200:9 | **publishers** |
| **protected** | 133:9 139:14 | 276:7 277:4 | 41:21 95:22 |
| 121:18 | 141:20 149:14 | 290:10,12 | 199:2 203:23 |
| **protection** | 154:4 166:17 | 291:9 294:9 | **publishing** 14:4 |
| 72:24 289:24 | 167:9,19,21 | 296:13 298:3,6 | 14:20,24,25 |
| 290:4 | 169:1 181:21 | 298:12 | 15:6 50:22 |
| **protective** 1:14 | 194:3 202:6 | **provisions** | 94:16 95:20,23 |
| **protocol** | 224:14 259:20 | 296:1 297:17 | 101:10 |
| 170:21 199:1 | 259:23 303:1 | 297:19 301:6 | **pull** 213:18 |
| 215:3,4 | **provider** | **public** 5:9 | **pulled** 46:22 |
| **provide** 36:24 | 250:20 251:17 | 23:12 30:17,22 | **punctual** |
| 43:14 44:13 | **providers** | 30:25 48:2 | 190:17 |
| 45:9,12 98:17 | 129:3 | 51:23 75:8 | |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[purchase - questions]                                    Page 51

| | | | |
|---|---|---|---|
| **purchase** 5:23 | 248:21 254:11 | **queries** 263:13 | 210:8,20 211:1 |
| 87:8 171:19 | 264:25 269:18 | **query** 178:12 | 221:9 223:1 |
| 172:5 174:7 | 269:20 271:13 | 178:17 | 226:9 232:17 |
| 183:19 187:12 | 274:3 277:15 | **question** 9:7,12 | 234:19 241:25 |
| 189:11,15 | 280:17 286:1,9 | 9:18,19 16:20 | 243:9,12,14,15 |
| 191:15,18 | 287:8 290:5 | 25:5 50:7 | 246:17,21 |
| 192:15 250:18 | 291:15 296:20 | 53:14 70:12 | 248:4,8,10,11 |
| **purchased** 84:8 | 296:24 302:16 | 71:15 72:23 | 248:16 258:23 |
| 86:13 87:6 | **pursuant** 1:14 | 73:17 74:11,13 | 262:13 272:11 |
| **purchaser** | **pursue** 238:11 | 74:22,24 75:16 | 274:6 278:4 |
| 186:1,20,21 | **put** 17:7 43:23 | 75:20,21 81:5 | 300:14,15,19 |
| 192:1 194:4 | 60:24 69:19 | 94:20 97:14 | 300:20,24 |
| **purchasers** | 75:7 89:14 | 106:24 107:8 | 301:25 304:6,8 |
| 61:1 188:4,11 | 119:11,14,19 | 107:22 132:25 | **questioning** |
| 189:1 190:17 | 120:11 127:16 | 134:8,14 135:9 | 9:24,25 46:12 |
| 194:10 195:11 | 128:5,11 | 135:17 138:12 | **questions** 5:21 |
| **purchases** | 151:24 166:5 | 150:24 152:7 | 7:24 8:24 9:17 |
| 99:24,25 | 170:16 194:21 | 158:17,18 | 10:7,8 24:24 |
| **purge** 235:16 | 200:11 215:16 | 159:9 160:4,11 | 25:24 56:1 |
| **purpose** 187:9 | 249:3 258:5 | 161:3,8,20,25 | 90:3 136:20 |
| 212:25 232:21 | 280:6 | 162:2,4,6,10,17 | 150:12 152:11 |
| 285:23,24 | **puts** 149:12 | 162:21 163:3,4 | 154:1,3,25 |
| 287:15,19 | **putting** 80:5 | 163:6,9,12 | 155:20,22,23 |
| 288:2,12,14,16 | 128:1 130:20 | 164:2,5,15,18 | 155:25 156:3,4 |
| 298:11,13,16 | 288:13 299:25 | 164:19,20 | 156:7,14 |
| 299:12 300:4 | | 165:23 167:4,7 | 165:14,15 |
| **purposes** 11:15 | **q** | 167:9,11 169:6 | 167:22,25 |
| 55:10,14 60:6 | **qualified** 179:3 | 169:9,11,22 | 168:22 178:24 |
| 65:25 77:7 | 306:9 | 170:7 171:2 | 184:9 185:15 |
| 78:7 127:8,9 | **quandary** | 176:17 182:8 | 185:17 222:8 |
| 137:12 144:17 | 260:6 | 186:23 193:25 | 249:13 262:18 |
| 155:2 171:20 | **quantify** 47:14 | 199:11,18 | 274:10 278:8 |
| 192:12 217:14 | **queens** 48:2 | 201:1,20 | 278:11 279:10 |
| 229:22 242:14 | 75:7,8,11 | 208:25 209:1 | 281:21 305:8 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[quick - recollection]                                         Page 52

**quick** 130:13
**quicker** 55:19
**quickly** 108:13
**quite** 17:13
48:1,18 216:19
**quote** 143:19
238:15,16
239:4
**quoting** 255:17

**r**

**r** 85:17 105:13
106:16,23
**rafael** 5:9 274:1
274:17
**raised** 168:21
295:13
**ran** 23:12,15
39:24,24
145:23 149:4
**random** 50:21
**range** 103:8
**ransack** 39:5
**rationale**
221:23,25
**rationalization**
145:18
**reached** 118:13
**read** 12:16
51:24 52:4,7
52:11,16 53:1
129:15 131:10
131:25 164:13
190:21 193:20

193:20 194:14
230:6 243:6
250:15 267:10
267:12 272:1
272:12 273:6
276:2 290:8
295:10 300:14
300:15 309:5,6
309:12 310:5,6
310:17
**reading** 53:3
95:12 267:18
267:20 269:1
299:24 308:20
**ready** 11:21
94:24 230:9
254:13 258:3
280:23
**real** 101:18
121:8
**really** 14:12
54:18 98:11
124:2 221:15
247:14 256:3
**reason** 164:23
253:21 288:13
308:15 310:8
311:3
**reasonable**
291:23
**reasoning**
135:16 221:23
221:25

**reasons** 26:15
33:23 128:14
175:16
**recall** 12:6
14:17 15:11
21:18 24:14
26:22 40:14
47:25 48:13
50:18,20 72:17
73:14 74:10,18
74:21 75:1,8
75:12 80:12,20
81:12 96:17
131:11,17
133:14 139:12
139:17,18,21
152:6,9 156:9
156:15,22
157:23 162:5
164:4 165:5,14
165:18 167:5,7
167:8,10,14
168:9,15,25
169:5,6,10,20
194:22 200:18
209:15 215:15
215:21 218:10
220:15 226:17
232:16,17,25
257:5,17 259:5
259:19,23
260:18,20,21
260:22,24
261:25 263:16

277:22 279:18
279:20 297:13
297:16,18
**recalled** 142:6
**recalls** 73:19
**receipt** 308:19
**receive** 41:23
95:22 99:4
114:12 231:13
**received** 13:2
199:2,14
208:18
**recent** 209:18
**recently** 12:12
131:4,11
166:22
**recess** 76:25
112:9 138:18
183:16 217:10
228:6 263:25
**recognitions**
12:7
**recognize**
77:20 78:10
137:22 155:5,6
155:23 172:1
217:19 237:2
250:7 269:8
271:17 274:12
281:8
**recollection**
263:8 279:14
286:21

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[recommendation - related]                                    Page 53

| | | | |
|---|---|---|---|
| **recommendat...** | 124:20,22 | 258:24 264:12 | **referencing** |
| 40:21 299:21 | 125:10 126:18 | 267:13,16,24 | 234:22 |
| **recommendat...** | 126:19,21 | 268:22 269:12 | **referred** 209:10 |
| 40:8 | 127:16 128:12 | 269:16 270:10 | 272:17,20 |
| **record** 6:9,13 | 128:15 129:14 | 270:20 272:3,7 | **referring** 38:9 |
| 7:12 25:11,21 | 129:24 130:9 | 272:10,20,25 | 39:8 78:16 |
| 66:9 69:10 | 134:5,18 | 273:5,10,18 | 87:3 94:7 |
| 80:5,10 117:4 | 135:25 140:11 | 274:9,9 275:21 | 95:10 136:12 |
| 118:5,7,8,9,13 | 140:23 141:1,5 | 285:9,17 286:3 | 159:13,14 |
| 122:7,8,12 | 141:9 151:24 | 287:24,25 | 181:10,11 |
| 125:11,14,16 | 152:1 157:5 | 288:7 289:7,19 | 234:17 242:6 |
| 126:3 127:5,11 | 166:5,13,16,19 | 289:20 299:2,3 | 255:3 298:20 |
| 128:2,6 139:4 | 166:21,24 | 300:8,10 301:1 | **refers** 33:2 |
| 139:24 141:12 | 196:1,4,5,14,14 | **rectify** 301:20 | **refined** 225:8 |
| 178:22 209:2,3 | 197:3 200:11 | **redacted** | 225:10 |
| 209:7 211:16 | 200:16,23 | 184:20 185:11 | **regard** 16:11 |
| 214:19,20,21 | 201:9,21 | 185:18,20 | 60:21 |
| 214:24 224:18 | 203:23 206:4 | 186:6,12 | **regarding** 5:21 |
| 224:22 242:5 | 207:1,3,9,11,18 | 192:14 | 6:7 61:22 65:3 |
| 264:23 265:15 | 207:20,22,23 | **redirect** 178:12 | 154:25 218:23 |
| 269:13 271:11 | 208:3,5,19,22 | **reduced** 306:15 | 254:10 |
| 280:8 291:20 | 209:5 210:5,7 | **redundant** 46:5 | **regularly** 12:2 |
| 293:11,14 | 210:10,11,18 | **refer** 39:7 | 233:21 |
| 294:21 295:3 | 210:22,24 | 78:14 100:24 | **relate** 58:5 |
| 300:2 301:13 | 211:18,21 | 123:7 134:9 | 124:2 204:2 |
| 301:22 302:10 | 212:5,11,13 | 142:9 | **related** 5:7 |
| 302:11 310:9 | 213:5 214:12 | **reference** 308:7 | 24:24 25:25 |
| **records** 56:19 | 214:24 224:10 | 309:2 310:2 | 37:7 43:7 47:1 |
| 69:7,12,18,19 | 226:7,10 | **referenced** | 57:21 59:18 |
| 99:24 104:17 | 227:12,25 | 202:5 234:10 | 67:15 105:21 |
| 104:18 117:9 | 229:14 232:9 | 306:14,19 | 124:8 141:3 |
| 118:16,22 | 232:15,18,24 | 309:11 310:15 | 174:15 176:14 |
| 120:25 121:24 | 233:17,19 | **references** 58:2 | 179:14 189:25 |
| 123:19,20 | 241:19 258:21 | 243:21 | 192:6 280:15 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

281:6 290:15
**relates** 26:1
**relating** 58:2
**relation** 19:1
65:7 87:13
164:17 177:7
177:13 195:9
**relations** 41:16
41:19 42:5
177:25
**relationship**
36:9 37:5,16
38:1 97:13
114:9 142:22
151:4,5,13,16
151:18 197:23
265:24
**relationships**
38:6,8,9 271:3
**relative** 307:2
**release** 5:20
137:11,23
138:6 142:12
143:17 223:20
223:22 225:2,2
225:13,14,19
226:16,21,22
226:25 227:1,9
**released** 225:17
225:21 226:16
231:25 262:20
**releasing**
225:15

**relevance**
62:18
**relevant** 12:15
25:12 53:8
60:16
**relief** 5:3 65:23
**rely** 136:13
**relying** 155:10
**remained** 21:17
53:5
**remaining**
83:10
**remember**
10:20 16:8
19:22 21:6,20
24:9 67:25
75:18 76:7,10
79:23 80:18,22
81:4 133:20
171:4 209:17
247:12 251:10
251:11
**remembered**
80:5
**remind** 155:8
218:17
**remote** 92:15
92:16,19
**removal** 152:7
152:10
**remove** 296:1
296:13 305:1
**removed** 22:11
152:4

**renamed** 19:15
20:8 144:9
**reno** 91:19
**reorient** 204:20
**repeat** 9:13
134:14 193:24
**rephrase** 9:13
**replace** 255:1
**report** 20:12,16
64:1 230:20,22
238:3 243:16
243:17
**reported** 20:18
20:19 21:1
22:15,16 23:11
27:3 31:19
64:2,5 163:22
**reporter** 4:13
8:21 204:15
300:15 309:7
**reporter's** 4:10
306:1
**reports** 17:24
31:13 32:15
70:24 105:5
228:13,14
230:24 231:1
**represent** 37:3
198:1,2 237:12
239:23 240:10
244:5 277:23
278:13 284:11
**representation**
174:2 197:18

197:24 203:9
**representations**
190:20
**representative**
81:17
**representatives**
51:1
**representing**
40:25 41:13
190:23
**represents**
239:24
**reputation**
158:10 159:4
**request** 11:23
138:4 179:20
189:22 193:23
218:6 277:19
298:1 310:9,11
**requests** 5:17
57:21 77:6
**require** 104:17
**required**
198:19 308:25
**requirement**
284:21
**requirements**
187:17
**research** 104:2
106:20 228:25
252:16,20
253:17
**resell** 97:4,6,11

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[reservations - right]                                      Page 55

| | | | |
|---|---|---|---|
| **reservations** 67:24 129:16 | **restate** 25:5 243:14,15 | **retention** 63:20 | 72:20 77:10 |
| **reserved** 127:13 | **restrict** 121:20 | **retired** 22:9 | 78:11 87:24 |
| **residence** 92:21 | **restricted** 61:9 | **return** 94:12 | 89:24 90:21 |
| **resources** 287:22 | **restriction** 286:4,7 | **returned** 308:19 | 96:6 98:7 106:6,23 |
| **respect** 33:1 | **restrictions** 118:21 119:2 | **revenue** 20:13 | 111:11 118:18 |
| **respond** 8:24 9:7 | 119:10,15,19 120:2,5,8,10,13 | **review** 5:24 6:6 30:14 64:22 | 119:24 123:3 126:13,24 |
| **responding** 80:23 | 121:4,6,10,11 121:14 123:2 | 66:8 67:21,23 68:4,16 118:11 | 131:17 140:14 143:12,18 |
| **response** 9:8 71:19,20 73:18 | 124:19 125:6,8 129:13,18,19 | 217:13,24,24 218:12,20,22 | 165:8 176:11 180:5 181:4,9 |
| 161:5,7 263:13 | 129:23 130:4,8 | 230:5 231:10 | 183:10,23,24 |
| **responses** 5:15 58:2,4 60:16 | 130:22 136:3,4 136:12 139:13 | 231:13 245:2 248:20 250:8 | 184:23 186:3 187:22 189:3 |
| 67:9,11,20 71:18 77:4,23 | 140:14,16 269:3,9 270:9 | 259:25 308:13 309:1 310:1 | 194:10,16 197:11,19 |
| 78:1 | 270:15,19,24 273:8,14,17 | **reviewed** 66:25 67:4,7 68:8,13 | 203:17 204:2 205:16,18 |
| **responsibilities** 20:15 21:10 | 285:8,12 288:13 289:15 | 231:11,16 261:9 290:25 | 208:12 209:22 210:6 214:3 |
| 30:10 68:2,3 | 289:17 291:22 292:6 | 291:5 | 221:17 223:10 225:6 227:7 |
| **responsibility** 20:6,9 21:9 | **rests** 247:21 | **reviewing** 56:3 66:10 | 228:11 229:10 237:8,10 |
| **responsible** 20:11 22:13 | **result** 86:22 299:18 | **revised** 297:8 | 242:17,19 245:13 251:14 |
| 23:7 28:1 30:16,20,22 | **resume** 22:18 **retail** 23:9 | **rf7** 250:16 **richardson** 169:18 | 254:15 262:1 264:2 265:9 |
| 32:6,20 33:5 33:16,16 35:3 | 29:19 **retailers** 16:6 | **ridge** 8:8 **right** 21:7 22:5 | 266:4 274:12 277:3,17 |
| 38:15,23 49:5 137:18 234:4 | **retained** 4:13 | 35:15,17 39:10 40:20 42:10 52:20 54:6 57:22 58:6 | 279:16 280:24 282:1 284:9 289:6 291:11 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[right - search]**

Page 56

| | | | |
|---|---|---|---|
| 293:18 298:22 | 96:19 149:6 | 198:8 203:9,10 | 250:16 251:3,4 |
| 301:23 | 221:7,14 | 224:11 228:13 | 251:16 252:7 |
| **rights**  67:24 | **running**  90:2 | 228:14 230:19 | 254:20,24 |
| 68:1,3 126:8 | 105:5 | 230:21 231:2 | 256:14,19 |
| 126:10 127:12 | **ryan**  147:25 | 236:15,18 | 268:21 272:24 |
| 128:21 129:15 | 148:1 | 238:3,6 241:1 | 275:19 278:15 |
| 129:18 136:11 | | 241:2,7 243:17 | 278:16 286:23 |
| 139:11,14 | **s** | 244:9,12 | 303:3,10 304:7 |
| 140:23,25 | **s**  79:16 308:16 | 248:20 250:8 | 304:13 |
| 141:4 150:22 | 310:8,8 311:3 | **salespeople** | **schedule**  54:20 |
| 161:11 175:4 | **sale**  60:22 | 17:3 18:19,21 | 174:20,22 |
| 175:11 290:15 | 86:22 87:2 | 18:23 239:10 | 179:16 183:2 |
| 294:20 | 95:11 101:7 | 240:24 244:1 | 183:10 187:11 |
| **role**  15:15 | 173:10,12 | **san**  5:9 274:1 | **scheduled** |
| 16:10,21 17:13 | 178:16 | 274:17 | 72:13 233:21 |
| 18:6 84:23 | **sales**  6:6 16:24 | **saved**  293:11 | **schedules** |
| 89:1 92:22,25 | 19:1 21:13,13 | **saw**  272:23 | 154:5 183:2 |
| 147:12 214:6 | 22:14 23:7 | **saying**  76:12 | **school**  13:24 |
| 219:13 | 27:1 30:17,21 | 80:8,23 122:16 | 15:19 |
| **roles**  300:6 | 30:22,24 31:6 | 129:22,25 | **scope**  31:23 |
| **roll**  84:19 | 31:13,15,18,19 | 134:10 184:15 | 156:21 |
| **rolled**  23:20 | 31:24,25 37:3 | 193:22 212:15 | **scotland** |
| 29:14 | 47:19,22 63:17 | 282:5 294:23 | 110:22,24 |
| **room**  72:11 | 63:18,18 71:5 | **says**  14:20 28:7 | 111:14,18 |
| 74:19 79:24 | 92:20 103:23 | 29:1 142:18 | 144:11 172:10 |
| 139:22 | 105:25 106:2,3 | 174:14 176:11 | **scottish**  110:20 |
| **routine**  90:3 | 107:1,3,10 | 179:14 188:17 | **scratch**  213:9 |
| **rpr**  1:25 306:7 | 112:17 113:14 | 188:20,25 | **seal**  307:6 |
| 307:14 | 115:8 116:4 | 189:5 190:14 | 309:15 310:21 |
| **rules**  7:3 8:15 | 119:23 120:2 | 201:6 221:8,14 | **search**  206:5,7 |
| 8:17 309:5 | 133:16 143:8 | 227:11 233:9 | 206:9 214:18 |
| 310:5 | 151:7 174:2 | 233:20 237:24 | 214:19,19,22 |
| **run**  23:9,10 | 176:20 197:7 | 238:18 239:1 | 215:3,14 |
| 36:15 50:10,15 | 197:18,24 | 240:5 249:8 | 227:12,18 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[searched - services]**                                    Page 57

| | | | |
|---|---|---|---|
| **searched** | **see** 12:9 38:23 | 181:14 218:8 | 299:12 |
| 118:12 | 49:17 87:15 | 230:13 242:19 | **separate** 58:16 |
| **searches** | 109:22 135:20 | 265:9 271:4 | 99:15 127:1 |
| 253:23 | 136:8 142:12 | 277:20 280:25 | 174:6 183:9 |
| **searching** | 176:10 185:25 | 295:11 302:22 | 203:23 209:24 |
| 206:12 214:11 | 222:21 223:22 | **selection** 98:1 | **separated** |
| 214:13 215:1 | 224:25 226:5 | **selectionhq** | 141:9 |
| **second** 24:13 | 226:20 227:11 | 96:25 | **september** 8:13 |
| 28:19 43:24,25 | 227:14 234:17 | **self** 34:15,16 | **series** 178:23 |
| 44:6,7 106:9 | 237:24 240:5 | **sell** 33:3 96:1 | **servant** 46:4,8 |
| 159:15 238:23 | 242:22 245:17 | 97:10 98:13 | **serve** 95:21 |
| 278:16 300:13 | 251:14,24 | 114:1 141:13 | 285:23 |
| 303:9 | 252:3 261:21 | 198:1 240:21 | **served** 51:5 |
| **secretary** 85:7 | 267:12 268:6 | **seller** 187:21 | 86:12 |
| **section** 137:18 | 268:20 271:23 | 190:18 193:19 | **servers** 107:16 |
| 161:11 173:24 | 272:2,22 | 194:4,6 | 107:17 |
| 174:19,21 | 275:18 285:1 | **selling** 37:13 | **serves** 24:8 |
| 179:13 185:25 | 289:22 305:1 | 256:15 | 27:25 75:19 |
| 187:24 190:8,9 | **seeing** 231:8 | **send** 52:13 | 103:8 155:12 |
| 190:10 193:10 | **seek** 180:14,17 | **sending** 196:1 | 209:22 210:14 |
| 193:14,17 | 180:18 286:15 | **sends** 52:10 | 214:3 |
| 195:14 196:12 | 288:17 | 203:14 | **service** 5:9 |
| 196:25 197:9 | **seeking** 68:6 | **senior** 32:13 | 41:24 98:17 |
| 249:15 271:23 | 213:4 294:24 | 36:5 70:23 | 112:18 127:1 |
| 275:4,7,10,11 | 294:25 | 82:21,24 83:14 | 202:20 203:11 |
| 275:24 279:13 | **seems** 11:24 | 83:17 | 205:8 252:5 |
| 279:19 285:4 | 51:11 217:23 | **sense** 78:12 | 267:2 274:1,17 |
| 288:22 294:18 | 218:1,2 230:19 | 102:22 141:25 | **services** 5:7 |
| 295:18 296:5 | 231:16,18 | 267:21 | 6:12 15:18 |
| 298:5 299:21 | 251:1 293:6,21 | **sent** 152:1 | 20:4 22:16 |
| **sections** 273:7 | 294:23 302:23 | 155:13,25 | 23:8,20 27:2 |
| 292:21 | **seen** 66:12 | 167:13 | 33:1 38:24 |
| **security** 34:5 | 118:5 130:21 | **sentence** 269:1 | 43:12,15 44:9 |
| | 131:25 155:16 | 286:23 299:9 | 44:12,14,16,22 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[services - sit]**                                                                     Page 58

| | | | |
|---|---|---|---|
| 44:24 45:2,7,9 | **settlement** | 285:18 | 266:5,9 268:11 |
| 45:15 59:5 | 171:9 | **shareholder** | 277:1,13 |
| 91:21 98:16,25 | **setup** 233:9 | 30:14 | 278:24 302:15 |
| 99:8 102:14 | **several** 16:4 | **shareholding** | 303:21,24 |
| 103:12,14,16 | 21:5 29:24 | 82:6 | 304:21 309:13 |
| 103:17 104:1 | 34:25 36:23 | **shares** 83:2,9 | 310:18 |
| 104:10,15,25 | 39:20,23 41:11 | 84:20 195:19 | **significant** |
| 105:17 107:5 | 49:10,12,15 | **sharing** 198:9 | 21:14 216:19 |
| 107:13 108:2 | 54:8 62:8 72:4 | 199:4,6,12,24 | **signing** 136:20 |
| 109:17 110:5 | 73:9 75:4 76:6 | 200:2 201:10 | 136:21 181:15 |
| 113:15,19,20 | 76:8,12 82:6 | **she'll** 204:16 | 275:16,19 |
| 115:16,20 | 88:9 132:4 | **sheet** 308:14 | 304:21 308:20 |
| 120:20 157:19 | 152:23 165:3 | 310:7,10,18 | **signs** 64:8 |
| 159:7 198:14 | 211:22 240:11 | 311:1 | **similar** 110:12 |
| 198:17 202:13 | 256:22 263:5,9 | **shifted** 92:21 | 110:13 216:4 |
| 203:5,7,12 | 263:11 269:25 | **shop** 34:15 | 242:24 243:16 |
| 264:3,8 266:19 | **shake** 8:25 | **short** 72:13 | 270:16 272:23 |
| 268:15 271:10 | **shaking** 81:15 | 76:23 262:19 | 297:3,5 |
| 271:21 280:15 | **shannon** 1:25 | 276:9 | **simply** 71:17 |
| 281:6 | 306:7 307:14 | **show** 265:3 | 80:4 166:13 |
| **servicing** | **share** 84:12 | **showing** 191:17 | 232:21 260:25 |
| 113:21 | 122:1 125:21 | **shown** 280:17 | 304:19 |
| **session** 139:1 | 127:7 134:5,18 | 308:16 | **sincerely** |
| 234:14 244:11 | 135:3,13,18,25 | **shy** 74:3 | 308:21 |
| 245:2 | 160:18 198:18 | **side** 17:1 52:22 | **singh** 7:14 |
| **sessions** 234:21 | 200:6 216:20 | 63:23 105:7,8 | **sir** 183:20 |
| 234:24 235:7 | 253:13 286:3 | 105:9 146:14 | 191:13 193:18 |
| **set** 5:16 30:13 | 300:1 | **sign** 137:7 | 194:17 218:14 |
| 30:13 52:22 | **shared** 22:15 | 301:8 | 219:25 222:14 |
| 77:5 199:17 | 114:18 115:2,5 | **signature** 266:6 | 240:9 251:15 |
| 219:17 277:8,9 | 115:9,15,18 | 307:13 308:15 | 252:6 255:2 |
| 292:14 307:6 | 122:10 125:23 | **signed** 6:14,20 | 256:13 308:10 |
| **seth** 35:23 | 126:2 151:8 | 152:12 154:21 | **sit** 126:13 |
| 72:10 | 160:20 197:3 | 176:8 197:13 | |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[sitting - specifically]                                                    Page 59

| | | | |
|---|---|---|---|
| **sitting** 8:21 | 21:13 24:2,3,6 | 241:12 | **speak** 9:4 35:12 |
| 259:19 | 26:12 32:25 | **sorry** 44:10 | 54:23 55:2 |
| **situation** 125:9 | 37:7 38:24 | 77:11 86:8 | 56:14,23 57:2 |
| 126:14 128:24 | 42:1 44:23 | 90:10 94:9 | 57:18 58:8 |
| 129:4 140:18 | 45:5,9 95:7 | 100:24 130:16 | 59:2,19,22 |
| 202:15 266:16 | 96:7 97:6,7,10 | 130:18 161:22 | 60:5,10 64:15 |
| 271:1 286:14 | 98:18,19,20,22 | 167:16 205:20 | 64:18 202:2 |
| 301:20 | 104:4,6,13 | 212:1 237:4 | 220:17,20 |
| **situational** | 119:23 120:3 | 238:22 251:20 | 228:10,12,22 |
| 124:21 | 121:7,10 | 265:19 285:6 | 229:11 263:7 |
| **situationally** | 138:15 173:15 | 288:25 | **speaking** 9:9 |
| 126:16 | 173:16 191:21 | **sort** 37:6 73:21 | 25:1 62:6 |
| **situations** | 191:23 213:9 | 90:3 215:2 | 74:19 145:12 |
| 125:14 202:19 | 213:25 214:1,8 | 217:24,25 | **speaks** 26:3 |
| 241:17 247:3 | 222:5 267:7 | 228:18 | **specific** 14:15 |
| 270:22 | **sold** 16:5 84:16 | **sought** 53:4 | 31:22 52:5,8 |
| **six** 248:4 | 94:9,10 114:5 | 58:25 59:9,11 | 52:12 57:7,10 |
| **skip** 27:13 | 126:3 173:14 | 148:6 216:9 | 57:16 59:11,14 |
| 50:21 197:19 | **sole** 109:12 | **sounds** 279:16 | 60:12 73:17,18 |
| **skipped** 167:25 | **solicit** 59:20 | **source** 19:15 | 86:25 152:7 |
| **skyriver** 132:7 | 154:11 198:2 | 24:1 52:1 | 157:20 165:14 |
| 245:8 247:9 | **solicited** 213:24 | 208:8 214:18 | 167:24 184:13 |
| 252:8,16 | **soliciting** | 214:20 | 215:15 218:20 |
| 256:17,24 | 148:13 | **sources** 200:24 | 234:12 250:12 |
| **slide** 223:18,19 | **solution** 158:8 | 200:25 201:2 | 261:5 263:19 |
| **slides** 259:15 | 213:15 | 206:12,13 | 281:12 285:23 |
| **slightly** 56:6 | **solutions** | 208:1,12,13 | 287:14 296:3 |
| **small** 91:19 | 263:14 308:1 | 211:20,23 | **specifically** |
| **smaller** 16:4 | 311:1 | 212:3 | 54:5 71:4 |
| 19:21 23:22 | **solve** 287:16 | **south** 2:8 | 152:10 165:17 |
| 26:21 | **somebody** | **southern** 1:1 | 167:7,11 |
| **software** 13:17 | 39:24,24 45:20 | **space** 247:20 | 169:17 173:16 |
| 15:18 16:2,7 | 52:10 128:7 | 247:24 256:25 | 182:18 185:12 |
| 19:21 20:4,14 | 130:11 134:21 | | 204:2 298:17 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[specifications - subscriptions]**                                    Page 60

| | | | |
|---|---|---|---|
| **specifications** 99:2 | **standard** 116:2 116:3 140:17 194:3 295:21 295:22 304:18 | **status** 178:25 179:5 | **structure** 18:7 43:5 62:19 78:17 89:12,13 151:8 |
| **specifics** 36:24 177:22 | **stapled** 77:12 | **stay** 51:15 | **struggled** 214:18 |
| **specified** 306:22 | **start** 9:9 25:15 81:5 148:4,9 154:18 213:14 279:13 | **staying** 51:19 | **study** 13:16 14:11 |
| **specify** 111:10 | **stenotypy** 306:15 | **stuff** 42:1 64:13 123:1 197:19 281:25 |
| **spell** 85:21 | **step** 22:22 23:5 238:14 | **style** 46:2 |
| **spend** 53:18 | **started** 15:11 15:16 44:15 148:6,7,11 154:10 215:13 216:17 257:21 279:15 290:25 | **steve** 35:6 49:2 62:11 63:4 64:2,5 72:5 85:5,8 106:22 108:9 146:8,10 163:22 | **sub** 118:16 |
| **spent** 14:9 53:1 53:21 54:8 255:16,16,18 | **subject** 61:6 184:17 244:8 276:11 282:7 |
| **spine** 99:6 | **sticker** 99:5 | **submitted** 152:20 |
| **spoke** 58:21 | **starts** 193:11 223:19 | **stock** 101:7 | **subscribe** 202:18 208:7 211:20 |
| **spoken** 19:17 59:3 70:5 107:6 | **store** 107:23 | **stored** 124:23 | **subscribed** 252:5 309:10 310:14 311:21 |
| **state** 7:11 276:12,20 303:10 306:3,8 307:15 309:10 310:15 | **storing** 201:18 | |
| **sponsor** 219:15 | **strategic** 156:21 | |
| **sponsored** 14:3 14:6 | **strategy** 35:18 37:3 | **subscriber** 52:12 206:18 |
| **sporadically** 254:3 | **stated** 10:8 | **stream** 6:2 229:20 | **subscribers** 229:13 |
| **squire** 2:4 | **statement** 143:20,25 309:13,14 310:19,19 | **streamline** 228:8 | **subscription** 5:8 120:19 124:10 273:25 274:16 |
| **squirepb.com** 2:11,12 | **street** 1:23 2:8 3:5 51:24 | |
| **ss** 306:4 | **statements** 143:19 | **strengths** 244:6 244:22 246:2,3 | |
| **staff** 30:12,13 163:21 | **states** 1:1 42:16 42:19,23 102:23 113:4 142:25 277:6 | **strike** 18:10 167:17 191:4 | **subscriptions** 134:4,17 |
| **stage** 238:5,6 239:3,7 | | |
| **stages** 214:5 | | |
| **stamp** 243:4 | | |
| **stand** 74:12 | | |

www.veritext.com                                                    888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[subscriptions - systems]                                             Page 61

| | | | |
|---|---|---|---|
| 256:15 | **supervised** | **supported** | 180:23 181:15 |
| **subsection** | 34:13 163:21 | 46:10 143:7 | 182:22 184:9 |
| 186:18,19 | **supervising** | **sure**  8:14,20 | 184:11 190:3 |
| 187:25 194:23 | 17:17 | 10:3 11:11 | 195:5,18 |
| **subsidiaries** | **supplemental** | 12:22,25 14:12 | 196:22,23 |
| 12:10 29:7,10 | 5:15 77:4,23 | 15:17 16:14,17 | 197:12 205:8 |
| 30:6 31:3,5,5,7 | 78:1 | 17:15 19:20 | 209:15 219:2 |
| 32:18 33:14 | **supplier**  193:9 | 24:17 25:7 | 221:3 222:19 |
| 44:18 111:21 | **suppliers**  33:25 | 27:16 32:5 | 229:3 230:12 |
| 111:23 | **supply**  32:7,10 | 34:25 39:22 | 231:7 233:18 |
| **subsidiary** | 32:14,17,21,23 | 41:22 46:5,9 | 247:13 255:15 |
| 29:22 32:22 | 33:1,2 41:20 | 49:2,10 51:4,7 | 255:17 256:3 |
| 34:10 91:22 | 41:22 42:7 | 51:19 52:15,23 | 256:21 257:1 |
| 102:17 | 46:25 72:8 | 54:15 56:9 | 259:8,9 260:12 |
| **substances**  8:5 | 82:25 | 68:23 73:23,23 | 260:16 264:7 |
| **subtopic** | **support**  17:8 | 74:1 75:5 | 265:5 269:2 |
| 222:17 | 34:4 36:13 | 78:16 87:1 | 270:12 281:23 |
| **success**  63:16 | 44:16,17,18,25 | 89:11 90:13 | 290:21 291:4 |
| 63:19 178:6 | 45:1,17,22,23 | 92:15,16,20 | **surprise**  167:16 |
| **successful**  46:6 | 46:14 48:21 | 94:23,25 96:11 | 243:20 245:23 |
| **suggest**  221:20 | 49:7 51:6 | 96:21 102:5 | 246:1,5,22 |
| 227:2 | 63:18 103:19 | 112:21 113:13 | 270:1,3,5 |
| **suggests**  225:19 | 103:20,21,21 | 114:24 116:10 | **surprised** |
| **suit**  132:19 | 103:21,23 | 118:10 119:8 | 134:24 273:13 |
| **suite**  1:23 2:17 | 104:1 105:1,3 | 120:4 121:12 | 273:15 |
| 16:1 21:17 | 105:10 106:16 | 124:3 131:21 | **sweat**  127:23 |
| 26:19 308:2 | 106:20 107:4 | 131:25 132:7 | **sworn**  7:4 |
| **suited**  60:4 | 107:10 112:17 | 132:10,23 | 306:11 309:10 |
| 65:2 162:10 | 112:18 115:14 | 133:3 134:15 | 309:13 310:14 |
| **sullivan**  8:8 | 115:23 150:20 | 137:6 141:11 | 310:18 311:21 |
| **summary**  227:8 | 151:8 178:5,6 | 146:20 147:12 | **system**  205:3 |
| **superior**  308:1 | 198:18 224:2 | 152:17 168:23 | 255:1 |
| **supervise**  30:12 | 224:11 255:7 | 170:21,25 | **systems**  64:13 |
| | 255:11 | 172:1 177:16 | 201:17 240:4 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[systems - taylor]**                                                                 Page 62

| | | | |
|---|---|---|---|
| 293:20 | 223:6 229:12 | 40:19 42:9 | 119:1 121:5 |
| **t** | **talked** 124:8 | 43:12 44:8,11 | 124:19 126:19 |
| **t** 79:2 | 144:4 204:17 | 44:17,20 45:6 | 127:13,15 |
| **tab** 278:15 | 205:15 282:19 | 45:8,11,20 | 128:9 130:12 |
| 303:3 304:6,10 | **talking** 16:3 | 46:17 49:7 | 133:21 134:6 |
| **tabs** 278:15 | 27:14 42:2 | 54:23 56:12 | 134:19 135:14 |
| 302:23 | 44:4 58:3 61:2 | 60:4 61:1,10 | 136:5 140:20 |
| **tag** 99:7 | 73:4 94:3 95:1 | 65:11 66:4,17 | 141:9 142:22 |
| **take** 9:1,25 | 97:8 122:17 | 69:6 77:3 | 143:7 144:11 |
| 11:20 14:12 | 123:5 127:3 | 78:20,24 79:10 | 145:1,3,4,5,13 |
| 55:25 76:23 | 128:9 133:11 | 82:18 86:13 | 145:19 146:12 |
| 138:1 184:20 | 143:4,11 182:3 | 88:2,5,9 90:20 | 149:20 152:2 |
| 194:15 218:4 | 182:18 183:18 | 91:21,23,25 | 155:14 156:1 |
| 228:3 232:22 | 192:9 212:10 | 92:1,4 93:15 | 160:23 162:23 |
| 262:16,19 | 212:11 215:8 | 93:20 94:13 | 166:4 172:17 |
| 263:22 265:4 | 215:25 258:4 | 95:2,4,5,8,14 | 173:5 174:24 |
| 277:18 | 261:19 | 99:23,25 | 175:7,12 176:5 |
| **taken** 1:22 | **tax** 144:17 | 100:15,18,20 | 176:7,15,25 |
| 10:15 76:25 | **taylor** 1:9 5:5 | 100:22 101:1 | 178:1,8 179:24 |
| 112:9 138:18 | 5:15 6:10,13 | 102:11,12,14 | 180:1 181:1,4 |
| 166:16,20 | 15:9,11 18:11 | 102:18 103:15 | 183:12 190:11 |
| 183:16 217:10 | 18:14,15,17,20 | 103:18 105:16 | 190:15,23 |
| 228:6 263:25 | 19:25 20:19,20 | 105:17,21 | 191:2 196:6,15 |
| 306:21 | 20:23,24,25 | 106:3,17,21 | 202:7,9 203:14 |
| **talk** 12:20,23 | 21:19,23,23 | 107:5,10,13 | 204:22 206:25 |
| 35:8 52:18 | 22:4,14 23:8 | 108:8,15,23,25 | 207:10,16 |
| 56:18 70:13 | 23:16 24:21,25 | 109:16,17,25 | 208:16 210:5 |
| 73:5 79:14 | 26:2,3 27:18 | 110:1,3,5,6 | 210:12,16,23 |
| 88:12 100:8 | 28:6,14,15,17 | 111:22 112:1,4 | 210:24 213:11 |
| 112:19 114:8 | 28:21 29:2,5,6 | 112:13,16,20 | 213:22 216:5 |
| 120:21 142:1,2 | 29:8,8,14,25 | 113:2,11,24 | 220:8 223:4 |
| 203:24 219:4 | 32:2 33:17 | 114:2 115:11 | 224:8 226:2 |
| 219:21 220:1,7 | 34:14,21 35:2 | 115:19,23 | 230:25 234:5 |
| | 36:1 37:2 | 116:8,12,15,19 | 235:10 240:15 |

**[taylor - testimony]**                                    Page 63

| | | | |
|---|---|---|---|
| 241:8 246:23 | 93:9 105:4 | **technology** | **terms** 6:16 |
| 247:1 250:10 | 106:2,3 116:4 | 13:7,15 15:21 | 24:19 117:1 |
| 254:22 256:4 | 117:24 132:23 | 19:2 23:8,15 | 140:17 145:11 |
| 264:2,5,24 | 133:3 134:22 | 24:2 27:2 28:2 | 184:8,8,13,19 |
| 265:19,20,24 | 135:19,22 | 33:4,5,11,15,16 | 185:10 192:25 |
| 266:5,16 268:8 | 137:1 143:13 | 33:22,25 34:11 | 281:16 282:8,9 |
| 268:11,14,19 | 165:11 176:24 | 34:13,21 35:4 | 282:13,15 |
| 269:16 271:12 | 177:1 178:13 | 35:10 59:18 | 283:1,7,10,13 |
| 271:21 273:1,9 | 178:17 180:18 | 63:23 163:21 | 283:17,20 |
| 273:16 274:24 | 197:7 203:10 | **ted** 86:4,6,8,9 | 284:6,14,17,24 |
| 275:20 279:22 | 214:17 216:2 | **tell** 96:20 | 285:2 292:18 |
| 279:25 280:13 | 244:12 259:18 | 114:16 118:6 | 293:24 294:16 |
| 281:5 282:6 | 296:10 | 137:17 150:18 | 295:18,23 |
| 284:19 287:11 | **teams** 6:4 31:6 | 157:17 158:2,5 | 296:1,3,18 |
| 287:24 289:1 | 38:25 47:20,22 | 159:21 160:6 | 297:3,13 |
| 289:12,14 | 242:12 283:25 | 164:24 189:18 | 303:15 304:15 |
| 290:13 295:14 | **techexpress** | 191:6 229:25 | **testified** 10:17 |
| 300:9,25 308:6 | 99:19,22 | 249:15 279:8 | 129:11 209:20 |
| 309:3 310:3 | **technical** 17:1 | 297:10,20 | 210:4 211:8 |
| **taylor's** 56:18 | 105:7 106:24 | **telling** 135:24 | 274:23 292:16 |
| 69:1 77:25 | 107:21,22 | 171:24 290:22 | 299:2,5 |
| 197:23 224:3 | 114:25 123:2 | 294:3 | **testify** 55:23 |
| 244:5 270:10 | 151:9,18 178:5 | **tells** 49:6 | 57:21 61:13 |
| 270:19,24 | 178:14 212:8 | **temporary** | 65:3 222:3 |
| 287:1 | 215:4 219:25 | 203:5,13 | 306:12 |
| **team** 19:2 | 220:20,23 | **ten** 54:12,13,16 | **testifying** 7:21 |
| 31:15,18 32:2 | 222:4 229:2 | 54:17,18 | 221:13 |
| 34:11,13,21 | **technically** | **tense** 31:6 | **testimony** 7:16 |
| 35:3,4 39:16 | 114:23 123:4 | **tenure** 86:5,6 | 67:1 158:22 |
| 39:18,23 45:22 | 176:16 | **term** 178:23 | 159:2 201:4 |
| 47:2 52:3 63:4 | **technologies** | 192:20 204:24 | 219:20 306:14 |
| 63:5,6 70:9,17 | 14:7 | 217:3 | 306:18 309:6,7 |
| 70:23,24 71:7 | **technologist** | **terminated** | 310:6,9,12 |
| 71:20 72:3 | 63:24 | 38:2 | |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[testing - time]**                                                  Page 64

| | | | |
|---|---|---|---|
| **testing** 215:16 | 129:11 132:1,6 | 162:15 169:8 | 21:1,5,16 |
| **tests** 14:12 | 139:5 147:8 | 170:5 194:5 | 22:12 23:6,21 |
| **thank** 9:10 19:9 | 149:6,11 151:7 | 197:25 205:20 | 23:23,23 24:8 |
| 55:20 76:24 | 151:9 176:3,10 | 213:23 214:20 | 25:14 26:1,18 |
| 80:6 107:7 | 178:11 192:5 | 215:20,22 | 26:20,25 27:10 |
| 157:16 161:24 | 202:24 203:24 | 223:19 234:10 | 27:19,23 28:4 |
| 163:10 171:16 | 204:1,19 | 256:7 264:3,6 | 39:2 40:17 |
| 190:9 217:1 | 208:11 209:20 | 264:8,12,14,22 | 43:18,19 51:25 |
| 239:18 251:24 | 210:4,19,19 | 265:14,23 | 53:1,18 54:2,9 |
| 255:19 | 212:9 220:19 | 266:15,25 | 54:9 63:15 |
| **thanksgiving** | 221:4 226:9 | 267:1 269:17 | 81:11 112:8 |
| 148:15 | 229:6 236:17 | 269:23 270:20 | 117:3,3 119:24 |
| **theirs** 143:19 | 239:7 242:21 | 270:24 271:2 | 131:18,19,22 |
| **thing** 142:7 | 243:13 246:20 | 271:10,17,24 | 138:1 148:8,10 |
| 256:10 | 250:17 257:10 | 273:20 301:5 | 148:11 152:16 |
| **things** 9:2 | 257:18 258:2,2 | 304:3 | 154:15 161:8 |
| 17:10 19:4 | 259:14 262:23 | **thirty** 308:19 | 161:14 168:6 |
| 46:22 49:24 | 263:20,22 | **thought** 106:10 | 170:12 182:11 |
| 52:14 122:24 | 266:5 274:22 | 133:5 139:23 | 187:1 188:15 |
| 143:8 176:23 | 277:9 278:12 | 139:23 243:11 | 188:22,23 |
| 184:3 212:10 | 280:6 290:1 | 253:10 254:4 | 189:4 194:15 |
| 214:10 220:13 | 292:12,14 | **three** 29:18 | 200:19 201:24 |
| 223:7,9 229:5 | 295:5 297:6 | 30:1 87:17 | 208:2 213:1 |
| 237:23 244:20 | 299:2 302:5 | 205:16 267:6 | 214:9,18 215:6 |
| **think** 12:14,18 | 305:7 | **throndson** 6:4 | 215:8,10,15 |
| 14:17 15:6 | **thinking** 53:24 | 234:3 242:13 | 216:3,14 217:5 |
| 17:12 24:21 | **third** 6:9,12 | **throw** 120:9 | 218:23,25,25 |
| 25:11 27:13 | 36:13,17,18,19 | **tiburon** 6:9 | 219:22 223:8 |
| 43:3 54:12,14 | 37:12 38:6,8 | 264:22 265:16 | 223:16 226:11 |
| 57:25 59:4 | 97:3,6,11,21,23 | 266:1 | 227:5 229:14 |
| 60:22 63:1 | 97:25 120:19 | **time** 10:19 12:4 | 232:19 244:25 |
| 115:7 123:3 | 124:21 125:2,6 | 14:11 15:2,24 | 245:3,5 248:6 |
| 124:7 126:14 | 126:17 136:24 | 16:11 18:1,3 | 252:18 254:1 |
| 128:3,23 | 137:4 160:2 | 19:11 20:20 | 254:21 255:4,8 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[time - troubleshooting]**                                    Page 65

| | | | |
|---|---|---|---|
| 256:1,4 274:10 | **together** 89:14 | 64:20 65:3 | 168:16 173:9 |
| 281:18 288:6 | 106:5 | 124:4 203:25 | 174:13 182:11 |
| 306:21 | **told** 152:25 | 204:1 221:12 | 187:22 188:16 |
| **timeline** 24:22 | 153:21 157:15 | 228:9 | 189:4,8 193:4 |
| 225:1 | 157:19 158:6 | **topmost** 89:6 | 195:19 197:8 |
| **times** 23:1 | 161:13 301:17 | **total** 186:15 | 198:11 200:5 |
| 47:18 53:13 | **tomorrow** | 264:16 | 200:13 201:15 |
| 248:5 | 151:10 282:21 | **totally** 204:10 | 202:23 |
| **timing** 62:19 | **took** 39:22 | **touch** 28:18 | **transcribed** |
| 235:8 | 71:11,18 | 41:25 | 306:17 309:7 |
| **tina** 293:3 | 257:19 | **towards** 146:25 | **transcript** 4:1 |
| **tips** 8:16 | **top** 22:25 78:19 | 192:15 | 308:12,13 |
| **title** 19:15 | 237:5,24 | **track** 209:25 | 309:5,12 310:5 |
| 22:11,11 23:1 | 239:21 247:12 | **tracking** | 310:11,17 |
| 28:4 36:4 | 249:8 250:12 | 163:19 240:15 | **transcription** |
| 67:25 | 254:24 264:11 | **trade** 1:23 | 306:18 |
| **titles** 23:2 | **topic** 24:24 | **training** 50:3 | **transition** |
| **titlesource** 98:8 | 25:12,15 26:1 | 234:5,10,11 | 180:19 198:14 |
| **tlc** 132:9 245:9 | 57:2,9 60:21 | 244:11 | **transitional** |
| **today** 7:16,25 | 61:9 118:2,16 | **trainings** 50:6 | 203:4,6,11 |
| 8:23 9:16 10:4 | 124:1,6 138:12 | **transaction** | **transitioned** |
| 25:17 46:21 | 184:9 218:15 | 28:19 60:25 | 164:10 182:15 |
| 52:19 53:16 | 218:17 220:23 | 61:3,22 62:22 | **travis** 293:2,9 |
| 61:4 67:2 | 220:25 221:6 | 63:7 87:5,13 | **treat** 241:9 |
| 72:17 89:11 | 223:3,12 229:1 | 94:4,7,8 96:10 | **treated** 242:2 |
| 132:11 143:25 | 229:7 261:4 | 96:12 97:12 | **trial** 202:20 |
| 182:3 185:1 | **topics** 50:5,8 | 100:14 102:9 | **trials** 202:17 |
| 190:2 203:2 | 54:24 55:2,22 | 107:12 111:6,9 | **trick** 9:15 |
| 204:11 219:20 | 56:5,7,15 | 111:20 139:7 | **tried** 89:14 |
| 232:13 259:20 | 57:22,24 58:3 | 142:10 143:14 | **triggers** 73:17 |
| **today's** 52:25 | 58:5,11 59:11 | 144:5,22,25 | **trisha** 59:7 |
| 58:17,22 68:16 | 59:13 60:5,10 | 145:17 147:1 | **troubles** 178:15 |
| 260:1 261:23 | 60:17 61:14,23 | 147:11,14 | **troubleshooti...** |
| 262:21 263:2 | 61:25 62:1,4,9 | 149:5,8 168:13 | 177:24 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[true - underlying]**                                    Page 66

| | | | |
|---|---|---|---|
| **true** 71:15 | 80:19 83:8,14 | **u.s.** 31:12 32:20 | **unaware** |
| 143:23,25 | 101:19 107:9 | 44:17 111:25 | 134:20 164:14 |
| 169:23 186:11 | 113:1 115:3 | 116:19,21 | 164:21 189:22 |
| 232:25 306:17 | 141:3 166:6,15 | 147:18 | 203:4 208:23 |
| **trust** 136:1 | 166:23 168:8,9 | **u.s.a.** 44:20 | 216:1 |
| **trustee** 50:10 | 171:10 175:19 | **uh** 9:1 13:25 | **uncertainty** |
| **trustees** 49:23 | 175:20 186:16 | 14:22 15:14 | 250:19 |
| 50:4 | 186:17 197:13 | 53:11 55:24 | **unconditiona...** |
| **truth** 306:12,12 | 199:10 200:13 | 78:22 89:20 | 190:16 |
| 306:13 | 200:15,17 | 90:9 94:14 | **under** 7:17 |
| **truthful** 190:25 | 201:23 207:4 | 99:11 102:15 | 24:24 44:11 |
| **try** 9:5,15,16 | 209:24 211:9 | 109:19 110:18 | 46:22 143:1,22 |
| 51:17,18 55:18 | 211:17 212:3 | 127:6 142:17 | 161:10 162:1 |
| 78:11 137:2 | 212:12 224:13 | 142:20 143:3 | 162:16 163:12 |
| 141:24 189:13 | 225:25 237:12 | 165:6 167:20 | 169:2,9 170:3 |
| **trying** 19:3 | 238:18,20 | 172:11 173:11 | 170:22 171:2 |
| 23:24 59:4 | 244:20 281:21 | 195:21 223:15 | 173:1,23 |
| 63:1 69:1 | 281:22 303:13 | 223:25 226:23 | 174:12 183:5 |
| 72:11 75:3 | **type** 122:24 | 227:6 233:22 | 185:25 191:20 |
| 76:7,10 96:17 | 140:4 | 234:1 240:7,14 | 192:13,25 |
| 130:18 145:6 | **types** 207:20 | 254:18 | 194:23 195:14 |
| 199:16 228:8 | 292:6 | **ultimate** 78:23 | 196:11,12,13 |
| 267:20 278:1 | **typical** 281:16 | **ultimately** | 197:23 201:5 |
| **tuned** 51:12 | | 20:24 | 218:15 221:2 |
| **turn** 170:2 | **u** | **unable** 33:24 | 229:8 233:4,20 |
| 187:24 190:5 | | 157:22 164:4 | 236:4 238:4 |
| 191:5 227:7 | **u** 146:18 | 165:14 167:5,6 | 239:22 240:1 |
| 229:16 233:7 | **u.k.** 12:10 | 167:8,10 | 244:20 250:16 |
| 236:24 237:12 | 29:12,19 42:13 | 169:10 | 282:4 |
| 244:7 281:7,15 | 94:2 108:17,25 | **unallocated** | **undergrad** |
| **two** 18:22 | 110:6,14 111:3 | 84:22 | 13:12,13 |
| 29:17,20 35:7 | 115:22 147:17 | **unauthorized** | **underlying** |
| 48:2 53:25 | 147:20 173:7 | 291:16 | 62:20 |
| 74:2 77:10 | 186:21 | | |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **underneath** | 265:13 267:22 | **understands** | **unused** 84:21 |
| 90:21 232:3 | 268:13 269:14 | 121:9 278:8 | **update** 12:2,7,9 |
| **understand** | 269:15 270:9 | **understood** | **updated** 12:5 |
| 7:15,19 8:18 | 270:18,23 | 9:19 10:12 | 12:12,17 42:12 |
| 9:12 19:5 25:2 | 276:6,15,18 | 25:10 26:5,6 | 51:15 |
| 54:11,22 65:10 | 278:1,23 | 30:2 56:8 | **updates** 12:14 |
| 66:3,18,22 | 281:24 282:4 | 61:12 129:12 | 27:11 |
| 68:19 69:5,9 | 282:15 283:8 | 130:10 158:21 | **upgrade** 23:18 |
| 69:11,17,20,23 | 285:7,11,16 | 179:2 212:19 | **upload** 211:9 |
| 69:25 87:3 | 287:3 289:13 | 222:19 255:19 | 301:15,23 |
| 94:6,17 114:14 | 290:10,11 | 266:13 | **uploaded** 199:8 |
| 116:3 117:8 | 293:4 294:5,6 | **undeveloped** | 199:10 200:14 |
| 118:18 126:23 | 294:9,11 298:2 | 102:1 | 201:9,16,24 |
| 129:17 140:22 | 298:6 300:18 | **unfortunately** | 301:14 |
| 141:12 145:6 | **understanding** | 249:24 254:15 | **uploading** |
| 147:9 151:3 | 17:6 25:17 | **united** 1:1 | 201:12 |
| 164:9 175:18 | 55:21 56:19 | 42:16,19,23 | **uploads** 211:13 |
| 179:6,8 180:9 | 57:10,13 58:1 | 49:18,21 78:20 | 211:25 212:7,9 |
| 184:2 188:19 | 60:9 61:5 | 79:2,3,4,6,8,10 | **usage** 119:15 |
| 190:22 191:16 | 78:17 117:11 | 79:15 81:19 | 119:17 140:8,9 |
| 191:22 192:4 | 136:14 151:12 | 84:24 87:18,22 | 140:10 289:17 |
| 192:18,23,24 | 153:16,19 | 88:6 89:6 90:8 | **use** 7:14 24:6 |
| 193:3,22 194:1 | 155:24 156:2 | 90:10,11 | 98:18,20,22 |
| 195:7 196:8 | 157:4 174:11 | 102:23 113:3 | 107:15 108:7 |
| 197:18,20 | 181:3 188:8 | **university** | 118:21 120:3 |
| 199:16 202:1,9 | 196:24 197:2 | 13:15 | 120:11 121:5 |
| 205:2,6 207:8 | 197:22 202:4 | **unsure** 108:21 | 121:15,21 |
| 224:1 225:8 | 210:9 211:10 | 130:6 141:21 | 124:19 125:18 |
| 227:3,15,17 | 211:14 222:25 | 155:18,19 | 126:1 128:17 |
| 236:1 238:19 | 223:12 227:16 | 163:2 164:14 | 129:3,13,24 |
| 239:2 244:10 | 267:17 275:9 | 194:20 235:13 | 130:4,9,23 |
| 252:24 253:1,3 | 289:14 297:2 | 258:22 259:2,4 | 136:9 140:5 |
| 253:5,7,11 | 303:13 304:10 | 262:12 | 141:14 195:14 |
| 256:19,22,23 | | | 196:16 199:7 |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[use - volunteer]**                                                                 Page 68

| | | | |
|---|---|---|---|
| 199:12,21 | 206:2,3,23,24 | **valuation** | 303:17,19,23 |
| 201:17 224:17 | 255:1 280:14 | 188:15 189:7 | 304:9 |
| 226:4 256:15 | 282:23 283:4 | 189:10,17,19 | **versions** 96:2 |
| 268:20,25 | **utilize** 275:20 | 189:24 | **versus** 133:24 |
| 269:9,16 | 285:25 | **value** 30:15 | 186:21 |
| 270:10,19,24 | | 188:4,12,12,21 | **vetted** 301:9 |
| 273:4,9,17 | **v** | 188:25 189:6 | **vice** 15:17 20:3 |
| 281:13 286:4,7 | **v** 308:6 309:3 | 189:14 | 28:5 |
| 291:10,14,16 | 310:3 | **variations** | **video** 53:25 |
| 294:23 | **validate** 90:12 | 195:6 | 235:17 |
| **used** 42:11 69:7 | **valsoft** 5:19 | **variety** 208:6 | **videos** 235:7,8 |
| 69:12 77:18 | 61:1 63:6,10 | **various** 46:23 | 235:12 |
| 100:5,6 101:25 | 63:13 94:4,7,9 | 71:2,2 198:15 | **view** 62:19 |
| 121:8,9 132:9 | 94:10 96:9,12 | 202:25 248:4 | **views** 293:23 |
| 202:6 204:22 | 97:12 100:14 | **vary** 120:13 | **violated** 150:22 |
| 231:8 260:5,14 | 137:11,25 | **varying** 217:3 | **violating** 137:3 |
| 270:13 | 138:8,14 139:7 | **vegas** 48:3,7 | **virginia** 251:16 |
| **users** 285:13,15 | 142:8,10,19,22 | **vendor** 265:21 | **virtual** 47:11 |
| **using** 24:3 | 143:17 144:21 | 266:3,6,12,25 | **virtually** 53:15 |
| 120:16,17,18 | 145:20,21,22 | 268:7,10,12,19 | **visit** 47:19,22 |
| 121:23 163:20 | 146:5,15,21 | 273:1,3,13 | 48:4 131:12,15 |
| 178:23 215:2,6 | 148:25 149:17 | **vendor's** 269:9 | **visited** 48:1,2,9 |
| 290:25 | 149:21 154:13 | **vendors** 267:2 | **vol** 308:8 309:4 |
| **usually** 9:2 | 154:19 155:13 | **verify** 89:10 | 309:9 310:4,13 |
| 12:8 | 155:21 156:8 | 108:20 | 311:20 |
| **utility** 5:6 69:2 | 156:10,14 | **veritext** 308:1,7 | **volition** 201:11 |
| 120:17,18,22 | 164:3,7 172:9 | 311:1 | 245:22 275:14 |
| 120:24 121:5 | 172:10 174:12 | **veritext.com.** | 275:15 |
| 121:20 122:17 | 180:18 181:19 | 308:17 | **volume** 1:17 |
| 122:17,20,23 | 184:10,11,20 | **version** 262:2 | **voluntarily** |
| 123:6,11,13 | 185:3,13 186:1 | 262:20,22 | 194:25 202:6 |
| 124:17 125:5 | 189:10 194:19 | 263:2,3 282:24 | **volunteer** |
| 204:21 205:17 | 195:1,19 | 297:8 303:3,6 | 80:15 |
| 205:22,24,25 | 197:23 198:10 | 303:11,15,16 | |

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[volunteered - wilmington]                                            Page 69

**volunteered**
  252:13,14
**vp**  22:10 32:13
  36:5 82:21,24
**vreeman**  59:7
**vs**  1:7

**w**

**w**  239:17
**wait**  9:6,8
**waived**  128:22
  139:10,13,15
  308:20
**waiver**  61:7
**walk**  11:9
  156:17
**walker**  2:5 4:8
  5:18 7:7,8
  16:15,18 25:2
  25:10,16,22
  26:5 55:17
  56:8 57:14
  58:6 61:12
  62:1 68:23
  73:23 76:18
  77:17 78:6
  94:21,25
  111:11 118:4
  118:18 124:7
  124:12,16
  139:3 145:14
  157:16 159:14
  163:10 179:2,6
  179:10 182:4

182:12 184:14
184:23 185:4
185:14,19
204:16 221:3
221:17 222:19
223:5,11 228:5
237:16 248:9
249:23 250:5
262:17 263:22
264:17 278:12
284:25 302:5,9
**walking**  139:22
**wall**  51:24
**want**  25:6 43:8
  53:9 54:18
  59:25 71:13
  72:23 75:5
  94:23 99:5,6
  119:7 122:11
  124:3 125:13
  125:18,20,21
  134:9 137:5
  141:14 161:21
  168:14 176:2
  178:21 184:19
  197:17 201:6
  204:9 208:11
  211:7 249:13
  253:7 266:24
  278:7 281:20
  286:2 299:22
**wanted**  8:16
  15:4 80:9
  114:8 150:6

151:3 167:24
197:17 214:10
216:19 252:24
253:1,3,5,10
284:16
**wanting**  302:7
**wants**  283:19
  293:13
**warehouse**
  39:25 91:16,18
**warm**  238:18
  239:1,3,6
**warranties**
  190:20
**washington**
  6:11 271:9,20
**way**  69:2
  125:20 158:9
  195:17 202:6
  212:23 214:25
  224:22 241:10
  241:11 294:11
  299:16 304:16
**ways**  35:1 47:8
  47:10 104:9
  130:9 176:14
  176:18 177:6,9
  202:21,25
  203:1,3,7
**we've**  7:9 30:1
  42:1 57:17,22
  60:11 65:3
  76:18,22 77:17
  105:13,19

106:7 107:6
124:8 153:6
156:2 190:2
192:9 202:15
203:17,19
204:17 208:2,2
218:15,17
223:7 227:23
237:12 255:9
257:12 282:19
288:20
**weaknesses**
  244:22 246:2,3
**web**  108:2
**website**  67:24
**week**  182:4,5
  233:5,20
  277:24 303:1
**weekly**  234:6
**weeks**  62:16
**went**  8:15
  28:15 139:20
  192:15 217:2,5
**west**  1:23
**whereof**  307:5
**whitney**  6:2
  72:8 229:21
**wholly**  102:17
**willing**  185:11
  187:1
**willingly**  49:6
  49:13
**wilmington**
  2:18

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

[winwire - years]                                                    Page 70

winwire  5:24
  214:3 215:18
  217:6,13
wise  24:22
wish  124:25
wishes  200:6
withdrew
  131:18
withheld  183:7
witness  11:23
  16:19 26:9
  46:15 56:11
  61:5 62:4
  68:25 73:3,7
  73:19 76:24
  77:14 81:15
  90:5 111:13
  138:4 182:5,14
  193:23 218:6
  235:25 239:18
  243:11,15
  249:2,19
  264:18 277:19
  298:1 300:17
  300:21 306:10
  306:15,16,19
  307:5 308:8,12
  309:1,4,11
  310:1,4,15
witness'  308:15
won  239:15
word  122:23
  294:23

words  8:25
work  14:11
  17:3,5 19:3
  37:4,15 46:10
  104:22 124:24
  128:1,5,11
  206:5 210:3
  287:12 289:11
  301:19
worked  18:25
  117:14,17
  137:1 143:5
workforge  97:5
working  14:10
  41:21 213:14
  226:2
world  51:8,13
  51:15
worldcat  56:19
  68:1 69:7,10
  69:13,20 117:5
  117:7 118:5,6
  118:8,9,13,16
  118:22 129:13
  129:24 130:5,9
  130:23 132:14
  133:2,13,24
  134:3,6,16
  135:4,14
  163:20 164:11
  206:18,19
  215:7 244:3
  245:11,12,21
  245:24 246:4,6

246:7,12,14,18
247:5,16,23
252:16 253:18
253:20 256:20
256:23 257:3
264:6 267:4,8
267:9,13,15,24
268:4,20,24,25
269:10 270:10
270:20 272:3
272:18 273:10
273:17 274:8
worry  204:13
wright  62:11
  63:14
writing  153:23
  154:2,4,6
  180:11
written  286:16
  286:19 287:1
  288:16
wrong  236:20

        y

yankee  108:14
  109:7
yavapai  5:5
  280:11 281:4
  284:9
yeah  16:18
  25:22 39:16
  40:25 48:8,21
  50:13 51:14,14
  60:20 73:24

92:1 109:21
118:4 120:1
121:3 124:16
129:10 130:6
133:6 137:20
137:20,20
141:23 148:19
155:22,23
176:19 179:10
204:16 206:11
207:17 211:5
215:17 225:4
230:10 231:18
235:5 236:10
249:2 251:24
253:25 254:4
258:14,19
266:14 268:21
269:6 271:4
278:20 279:17
279:24 281:10
284:11 303:6
305:2
year  14:8 21:21
  39:21 44:2
  47:19 86:7,10
  94:8 131:16
  148:19 251:1
  297:11
years  47:17
  166:6,15,23
  199:10 200:13
  200:15,17
  201:23 211:9

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

**[years - zoomed]**                                                    Page 71

| | |
|---|---|
| 211:17 212:4 | |
| 212:12 218:11 | |
| 259:2 | |
| **yesterday** | |
| 53:16 54:1 | |
| **york**   48:3 | |
| 251:13,16,19 | |
| 251:21,25 | |
| **young**   14:18 | |
| **z** | |
| **z39.50**   215:14 | |
| **z39.50.**   215:5 | |
| **zoomed**   237:15 | |
| 237:16 239:22 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS

## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.