# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| OCLC, Inc., | Case No. 2:25-cv-309 |
| **Plaintiff,** | Judge Edmund A. Sargus, Jr. |
| v. | Magistrate Judge Elizabeth Preston Deavers |
| Baker & Taylor, LLC and Bridgeall Libraries, Ltd., | |
| **Defendants.** | |

---

## PLAINTIFF OCLC, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................... 2

   I.   OCLC Creates, Improves, and Enhances WorldCat Records, and WorldCat Records are the Gold Standard in the Library Services Industry .................................................... 2

   II.  The Framework Agreement that Binds OCLC's WorldCat Customers is Unambiguous. . 5

LAW AND ARGUMENT ..................................................................................................... 10

   I.   Evidence from Expedited Discovery Shows a Likelihood of Success on the Merits. ...... 10

     A.  OCLC has shown a likelihood of success on the merits on its tortious interference of contract claim. .................................................................................................... 10

       1.   OCLC's Framework Agreement is a valid contract. ............................................... 10

OCLC's Framework Agreement is a valid and binding contract that includes the Agreement itself, along with Schedule 2 and the WorldCat Policy. The WorldCat Policy is properly incorporated into the Framework Agreement through Schedule 2 and is an enforceable part of the Framework Agreement for WorldCat customers. *See, e.g.*, *Rosecrance Health Network v. Nationwide Life Ins. Co.*, No. 2:07–CV–1140, 2009 WL 799076, at *6 n.1 ("A document incorporated by reference into a contract is part of the contract itself."); *AM. Coal Sales Co. v. Nova Scotia Power, Inc.*, No. 2:06-CV-94, 2009 WL 467576, at *27 (S.D. Ohio Feb. 23, 2009) ("Where one instrument incorporates another by reference, both must be read together[.]").

       2.   Defendants know about OCLC's contractual restrictions on WorldCat records. ...... 16

A defendant must have actual knowledge of the contract, which in this context "requires only knowledge of the contractual relationship sufficient to put the defendant on notice that its actions could interfere with an existing contract." *E.g.*, *Crown Equip. Corp. v. Toyota Material Handling, USA, Inc.*, 202 F. App'x 108, 111 (6th Cir. 2006); *see also Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 925 (S.D. Ohio 2017) (to establish the knowledge element, a plaintiff must simply show that the defendant "knows of the contract," even if the defendant is mistaken as to whether the agreement is legally binding or misunderstands its legal effect). There is both direct and indirect evidence that Defendants knew of the restrictions from the Framework Agreement for WorldCat customers (including Schedule 2 and the WorldCat Policy) on sharing WorldCat credentials and records.

       3.   Defendants intentionally procured breaches of OCLC's Framework Agreement.... 20

Under Ohio law, a defendant induces a breach in a tortious interference claim when "the defendant knew that interference was certain or substantially certain to occur as a result of its actions." *E.g.*, *Ginn v. Stonecreek Dental Care*, 30 NE.3d 1034, 1041 (Ohio Ct. App. 2015); *Kent State Univ. v. Bradley Univ.*, 136 N.E.3d 774, 779 (Ohio Ct. App. 2019). First, Defendants' conduct caused WorldCat customers to violate the Framework Agreement (including Schedule 2 and the WorldCat Policy) in several ways, including by requiring OCLC customers to provide

Defendants access to WorldCat records through the uploads via § 4.5 of the collectionHQ agreement, WorldCat customers' credentials, and having BTCat customers, who are also WorldCat customers contribute their records to BTCat. Second, Defendants knew about the prohibitions on sharing and transferring WorldCat records or credentials outside of the OCLC cooperative.

4.  Defendants' interference lacks jlets do nubustification. ........................................... 28

For interference to be actionable, the interference must be improper. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999). Courts balance various factors in consideration of whether an interference is justifiable. *Id.* The balance of these factors shows Defendants' interference is unjustified. Defendants know that OCLC places contractual limitations on the sharing of WorldCat records and credentials, but Defendants still allowed BTCat customers who are also WorldCat customers to upload WorldCat records. Pertinent interests also weigh in favor of lack of justification as OCLC's interest and public interest with regard to the Framework Agreement, including Schedule 2 and the WorldCat Policy, and protecting the club good is critical.

5.  Defendants' improper interference has harmed OCLC. ........................................... 30

Defendants' improper interference has caused irreparable harm to OCLC. This harm includes lost customers, loss of reputational goodwill, harm to WorldCat and its contributing members, and harm to all OCLC products that rely on WorldCat. Accordingly, though some measure of damages is appropriate, OCLC seeks injunctive relief due to irreparable injury, *i.e.*, harm that cannot be adequately measured in damages.

B.  OCLC has demonstrated a likelihood of success on the merits on its tortious interference of prospective business relationships claim....................................................... 33

OCLC has met its burden to demonstrate a likelihood of success on the merits for tortious interference with prospective business relationships. OCLC has identified seven prospective customers that it has lost to BTCat, Defendants knowledge of these customers, and that Defendants are intentionally interfering, without justification or privilege, with OCLC's prospective customers by using and retaining OCLC's enhanced records to populate BTCat through use of the collectionHQ Provision and WorldCat customers' credentials. *See Gray-Jones v. Jones*, 738 N.E.2d 64, 102 (Ohio Ct. App. 2000) (affirming the trial court's holding that the defendant had tortiously interfered with a prospective business relationship).

C.  OCLC has established a likelihood of success on the merits on its breach of contract claim............................................................................................................................. 35

OCLC established in its Motion for Preliminary Injunction each of the four elements of breach of contract under Ohio law. Of these four elements, Baker & Taylor only contests breach. At this stage, OCLC has met its burden to demonstrate a likelihood of success in showing Baker & Taylor breached the parties' 2019 license agreement by exceeding its allotted number of downloads.

D. OCLC has shown a likelihood of success on the merits on its unjust enrichment claim. 37

A party may recover under an unjust enrichment claim when the subject matter at issue falls outside of the *scope* of a contract. *See A1 Heating & Cooling, Inc. v. Thomas*, No. 2023 CA 0017, 2024 WL 157882, at *7 (Ohio Ct. App. Jan. 12, 2024). "Civil liability may be imposed to prevent an injustice when one party retains a benefit *from another's labors*." *Shaw v. J. Pollock & Co.,* 612 N.E.2d 1295, 1299–300 (9th Dist. 1992) (emphasis added). Defendants are unjustly enriched by their unauthorized retention and use of the fruits of OCLC's labor--the enhanced WorldCat records, which Defendants obtained through various improper means, including means outside of the parties' 2019 license agreement.

II. OCLC has Demonstrated Irreparable Harm. .................................................................. 39

An injury is irreparable if it is "not fully compensable by monetary damages." *Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. Mar. 10, 2025) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). And an injury is "not fully compensable by money damages" if "the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 550 (6th Cir. 2007) (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). OCLC has demonstrated irreparable injuries, including lost customers and disminishment in the value of WorldCat, products and services that rely on WorldCat, and customer goodwill.

III. The Balance of Equities Weighs in Favor of Granting a Preliminary Injunction............. 44

This Court should grant OCLC's Motion, as OCLC's harm far outweighs any potential harm to others. *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 568 (6th Cir. 1982). Defendants have alleged harm to Baker & Taylor and its customers. First, not only have Defendants admitted that harm to Baker & Taylor is minimal, but case law supports granting a preliminary injunction as Baker & Taylor's harm is self-inflicting. *See Concentrix CVG Customer Mgmt. Grp. Inc. v. Daoust,* No. 1:21-CV-131, 2021 WL 1734284, at *16 (S.D. Ohio May 3, 2021). Second, Defendants' customers have other means by which they can obtain bibliographic records and cataloging services, minimizing their harm.

IV. The Preliminary Injunction Will Serve the Public Interest............................................... 47

Given OCLC's likelihood of success on the merits, it is in the public interest to protect OCLC's contractual relations with its customers and prospective customers from the Defendants' unfair competition. *See Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 551 (protecting contractual relations is in the public interest). Without an injunction, OCLC's employees, WorldCat customers, and other OCLC customers will continue to suffer from the instability and unpredictability that stems from Defendants' interference with contractual obligations. *See Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011),

V.   The Evidence Demonstrates a Minimal Bond is Appropriate. ......................................... 48

The harm to Defendants from any preliminary injunction will be minimal, justifying only a minimal bond.

CONCLUSION.......................................................................................................................... 48

Defendants focus much of their brief in opposition to OCLC's Motion for a Preliminary Injunction ("Mot.") on the allegations in the Complaint and ignore the relevant facts elicited during the expedited discovery in this case. Indeed, much of Defendants' brief reads like their previously-filed Rule 12(b)(6) briefing. And in the handful of instances in which Defendants attempt to grapple with evidence in their brief, they make several key admissions that support OCLC's requested injunctive relief. Defendants admit that BTCat contains millions of records with WorldCat indicators, which are indicative of a WorldCat record or a derivative thereof—millions more than the number of WorldCat records Baker & Taylor was permitted to download and use under the 2019 License Agreement. *E.g.*, Opp. at 10, 11. Defendants admit that more than 50% of their collectionHQ customers signed a collectionHQ agreement with § 4.5 (Opp. at 10), and over 80% of such customers are WorldCat customers.[1] Defendants admit that 309 WorldCat customers transferred bibliographic records to Defendants pursuant to § 4.5 for use in BTCat, and that records for certain of these WorldCat customers were uploaded into BTCat Community.[2]

Defendants further admit that Baker & Taylor added provisions similar to § 4.5 to its current BTCat subscription agreement *after* OCLC filed this litigation, that at least one WorldCat customer has signed this updated BTCat agreement, and that Baker & Taylor now enables and encourages BTCat subscribers to upload bibliographic records from their catalogs directly to BTCat. And Defendants admit that they have paused a number of the wrongful activities that OCLC has asked this Court to enjoin, demonstrating that Defendants will not be harmed if the Court orders them to cease such activities through the remainder of this litigation. These (and other) admissions and the evidence obtained in limited discovery thus far illustrate that OCLC's requested preliminary injunction is necessary and appropriate.

---

[1] *See* K. Brown Decl. (Ex. 18) ¶ 6.
[2] Ex. 18 ¶¶ 15, 19–20.

OCLC's claims, the pertinent contract language, and the evidence speak for themselves. For the reasons that follow, OCLC meets its burden to show that its requested preliminary injunctive relief is appropriate.

## <u>BACKGROUND</u>

Defendants make two critical factual misunderstandings. First, Defendants misunderstand OCLC's WorldCat service and product, primarily how WorldCat works and the extent of technological investments and enhancements made by WorldCat to the bibliographic records in WorldCat, *i.e.*, WorldCat records. Second, Defendants misinterpret the contractual agreement that applies to WorldCat customers, which consists of OCLC's Framework Agreement, Schedule 2 to the Framework Agreement (which applies to WorldCat products and services), and the WorldCat Rights and Responsibilities for the OCLC Cooperative (which is incorporated by reference into Schedule 2). OCLC corrects those misunderstandings below.

## I. OCLC Creates and Substantially Improves and Enhances WorldCat Records.

WorldCat is a bibliographic record database, along with associated products and services, that libraries use to catalog the materials held by the library. B. Murphy Decl. ¶ 6 (Ex. 1). When a library "catalogs" materials, the library creates or finds a bibliographic record that represents those materials, which enables a library's materials to be searched for, or "discovered," by patrons, researchers, academic centers, and more. *See id.* at ¶¶ 6–7. WorldCat is an aggregation of bibliographic records, including those contributed by WorldCat customers,[3] that allows libraries to share the work of cataloging. *Id.* OCLC aggregates this data, strives to curate the most complete and precise records, and continuously enhances the records and ensures data integrity. *Id.* ¶¶ 6–10.

---

[3] Defendants claim that Baker & Taylor is "one of the largest contributors of records to OCLC's WorldCat record repository" through its original cataloging services to libraries, Opp. at 4, but this is untrue. Baker & Taylor is not a large or significant contributor of records to WorldCat. Ex. 1 ¶ 76.

A WorldCat customer may find a record from WorldCat and use that record to represent a work, rather than create a record from scratch. *Id.* ¶ 7. Additionally, a WorldCat customer may use WorldCat to manage its own cataloging workflows. *Id.* ¶ 11.

There are six stages or phases in the lifecycle of a record in WorldCat. *Id.* ¶ 12. **First**, OCLC collects bibliographic data from contributors. *Id.* ¶¶ 13–16. If a WorldCat customer would like to send batches of records to OCLC, OCLC staff perform an initial set up for that customer to ensure the quality and completeness of their records. *Id.* ¶ 16. This allows OCLC to determine how to best receive and process data from WorldCat customers so that data is in the best condition possible for the following stages. *Id.* ¶¶ 18–20. In just the last four months, OCLC has received 143,541,347 bibliographic records through batch file transfer. *Id.* ¶ 22.

**Second**, OCLC prepares the data for loading into WorldCat. *Id.* ¶ 23. These systems rely on "sophisticated preprocessing and transformation workflows designed to ensure optimal data quality and system compatibility." *Id.* ¶¶ 23, 26–27. This phase includes identifying data formats and converting the data into OCLC's proprietary format, which involves APIs created by OCLC; and robust integrity checks to validate a record's completeness and accuracy. *Id.* ¶¶ 24–25.

**Third**, OCLC has a comprehensive system process that applies extensive quality control measures and matching algorithms to make sure contributed records are of the highest quality, that unique information is incorporated into WorldCat, and that duplicate records do not enter WorldCat. *Id.* ¶ 29. This stage includes multi-layered quality enhancement, advanced fingerprinting and matching, intelligent deduplication and resolution, strategic record retention and field integration of records—all of which is the result of *millions* of lines of code and tens of thousands of rules created and maintained by OCLC. *Id.* ¶¶ 30–36.[4]

---

[4] OCLC also creates WorldCat records through original and copy cataloging. A staff of fourteen catalogers create approximately 160,000 WorldCat records a year. Ex. 1 ¶ 77.

**Fourth**, for the records that are not identified through OCLC's algorithms as part of existing WorldCat records, OCLC creates new bibliographic records. *Id.* ¶ 37. As part of this process, records undergo a rigorous assessment using error levels, some of which require manual review. *Id.* ¶ 38. A record finally only receives an OCLC Control Number (OCN) after all these proceeding steps across stages one, two, three, and four are completed. *Id.* ¶ 39. Accordingly, a record that receives an OCN has undergone a rigorous validation process, and the addition of an OCN reflects OCLC's assessment that the record is complete, accurate, high-quality, etc. The records added to OCLC also are comprehensively indexed, which facilitates resource sharing and searching. *Id.* ¶ 41.

**Fifth**, even after records are ingested into WorldCat, WorldCat records receive continuous enrichment. *Id.* ¶ 43. These enrichments fall into three categories, including fixing sparse records or records with severe or critical errors, services for enrichment of WorldCat records, and processes for updating WorldCat records. *Id.* ¶ 44. All these enrichments involve significant time and effort, the use of scripts, code, services, applications, and/or algorithms created by OCLC, and manual inspection and improvement. *Id.* ¶¶ 45–67. Some of the continued enhancements involve creating linked data in records through the Headings Control Service, adding Dewey Decimal numbers and other identifiers that also create linked data relationships between records and authorities, automatically updating records when new data is contributed, and de-duping. *Id.* OCLC has recently enhanced these processes—which have been developed over decades—with artificial intelligence. *Id.* ¶ 66.

**Sixth**, WorldCat customers directly export WorldCat records for use in their integrated library systems and/or library services platforms ("ILS/LSP"). *Id.* ¶ 68. At this stage, libraires may

choose to receive automatic updates, record merging/replacing, and other features of WorldCat that enable libraries to maintain their records. *Id.*

Because of the substantial investments made by OCLC into WorldCat records and data, OCLC requires a subscription to use WorldCat.

## II.   The Framework Agreement that Binds OCLC's WorldCat Customers is Unambiguous.

Every OCLC customer signs a Framework Agreement, which is OCLC's version of a master service agreement. Framework Agreement (Ex. 2) at § 4.1; B. Rozek Dep. Tr. (Ex. 3) at 28:11–21. The Framework Agreement for each OCLC customer includes the schedules that apply to the services and products that the customer will receive from OCLC. Ex. 2 at § 2; Ex. 3 at 34:2–4. When a library signs the Framework Agreement, the library signs a version of the contract that includes the applicable schedules in hard copy or through a linked page next to the box that is checked for the schedule corresponding to the service(s) and/or product(s)—libraries do not guess which schedules apply. Ex. 2 at p. 3; *see* Ex. 3 at 39:12–18 (OCLC's sales department determines what schedules apply based on the customer's subscribed products and services); 68:2–15 (OCLC's sales and legal departments determine what schedules apply and provide that information to customers).

OCLC's relationships with its WorldCat customers are contractually defined by the Framework Agreement, including Schedule 2, "WorldShare Metadata/OCLC Cataloging," which expressly incorporates the WorldCat Rights and Responsibilities for the OCLC Cooperative ("WorldCat Policy"). Ex. 2 at Sched. 2, §§ 2.2, 3.3. OCLC's tortious interference of contract claim is limited to these WorldCat customers, which are only those OCLC customers who have agreed to Schedule 2—the applicable schedule for cataloging access to WorldCat. *E.g.*, B. Rozek Decl., Dkt. 5-1, ¶ 25. OCLC's current interference of contract claim does not apply to all OCLC

5

customers or any OCLC customers who have not agreed to Schedule 2.[5] OCLC's claims apply to the more than 10,000 libraries that have cataloging subscriptions to WorldCat. *See id.* ¶ 19.

This lawsuit implicates several important provisions in the main body of the Framework Agreement. First, § 5, "Ownership and Licenses." Ex. 2 at § 5. Section 5.1(a) expressly states that "OCLC and/or its licensors or suppliers are the exclusive owners of and retain all right, title, and interest (including all copyrights, trademarks, patents, and any other proprietary rights) to the Products, Services, WorldCat, and all other materials produced or provided by OCLC." *Id.* at § 5.1(a). "WorldCat" includes the WorldCat database that consists of bibliographic data "and related files maintained by OCLC." *Id.* at § 3.12. WorldCat is also a metadata service (a "Hosted Service") that consists of certain "Products" that are licensed to customers. *See* Ex. 2 at WorldCat Policy, § 3.6; *see also* Products & Services, https://www.oclc.org/en/services.html (last visited Sept. 12, 2025). Therefore, § 5.1(a) provides that OCLC retains all ownership interests, including contractual interests, in WorldCat as a Product, Service, and database, including the WorldCat records and data contained within the database.

Section 5.2(b) provides that all customers retain all ownership interest in "Institution Data." Ex. 2 at § 5.2(b). "Institution Data" is any data provided by a customer, including data about the library's individual "holdings" (what materials the library "holds" or offers patrons); any unique library data like circulation, patron, and acquisition data; and any other data provided to OCLC. *Id.* at § 3.4. However, customers grant OCLC and its users (*i.e.*, other customers), "a global, perpetual, non-exclusive, royalty-free, transferable and sub-licensable right to host, reproduce, transmit, store, publish distribute, modify, create derivative works from, and otherwise use"

---

[5] OCLC has other products and services that are governed by different schedules, all of which are incorporated into the Framework Agreement. OCLC may seek to expand its claims to include intentional interference with any of these other schedules as merits discovery progresses.

Institution Data that the customer has shared ("Shared Data"). *Id.* at §§ 3.10, 5.2(b). OCLC relies on this license to incorporate Shared Data into WorldCat records for use by WorldCat customers, while maintaining ownership interest in the overall WorldCat record, which includes not only Shared Data but data and other enhancements added by OCLC. *See id.* §§ 3.12, 5.1(a), (b); *see also* Ex. 1. In exchange, OCLC grants WorldCat customers a license to use OCLC's Products and Services, here, WorldCat. Ex. 2 at § 5.2(a).

The Framework Agreement also outlines limitations on customers' use of OCLC's Products and Services. A customer can only use the Products and Services "in accordance with the terms of this Agreement and for the purposes specified in the Product Descriptions." *Id.* at § 4.4. Additionally, customers cannot use Products and Services to "alter, reverse-engineer, interfere with, circumvent, copy, or create a derivative work of, any aspect of the Product or Service" without OCLC's written consent. *Id.* at § 11.1(g). Customers must also "prevent the unauthorized use of the Products and Services," including unauthorized use of the customer's credentials for the Products and Services. *Id.* at § 11.2.

Schedule 2 provides specific limitations on the customer's use of WorldCat. Schedule 2 states, "Institution agrees that the use and transfer by the Institution of WorldCat Data is subject to the Policy." Ex. 2 at Sched. 2, § 3.3. The "Policy" is defined as the WorldCat Rights and Responsibilities for the OCLC Cooperative (the "WorldCat Policy"). *Id.* at WorldCat Policy, § 2.2. Put simply, Schedule 2 of the Framework Agreement expressly incorporates the WorldCat Policy by reference. WorldCat Data, which is defined in the WorldCat Policy, is "metadata for an information object, generally in the form of a record or records encoded in MARC format, whose source is or at one point in time was in the WorldCat bibliographic database." *Id.* at WorldCat

Policy, § 2.4 ("WorldCat Data"). WorldCat records includes WorldCat Data, *id.*, which OCLC refers to simply as "WorldCat records" here for convenience.

The WorldCat Policy provides the rights and responsibilities of WorldCat customers. *See* Ex. 3 at 22:18–21 (WorldCat customers are "Institutions" who have signed the Framework Agreement and "OCLC members" who are bound by the WorldCat Policy). WorldCat is a unique product and service offering. Both OCLC and WorldCat customers contribute to WorldCat to create value, and WorldCat is thus properly viewed as a "club good," *i.e.*, a good that used by one party does not diminish the ability of another to use the good (unlike a private good), but a good that excludes use by others who do not contribute to the maintenance or cost of providing the good (unlike a public good). Ex. 2, WorldCat Policy, pp. 2–3, 6. Accordingly, the benefit of WorldCat inures to the WorldCat Cooperative, which includes OCLC and its contributing members. *Id.* at pp. 2–3, 5. The WorldCat Policy is not just "aspirational language" (Opp. at 19), but a practical explanation of how WorldCat, as a club good and "shared community resource" designed for a "cooperative of members," operates with WorldCat customers, OCLC, and third parties. *E.g.*, *Id.* at WorldCat Policy, § 2(D). And the WorldCat Policy is clear—WorldCat is not a "public good," *id.*, *i.e.*, a resource that can be shared publicly without regard for the contributions of OCLC or WorldCat customers. For this reason, OCLC is also responsible for protecting WorldCat records and data, as they contain contributions from WorldCat customers for which customers retain all ownership right and interest. *E.g.*, *id.* at WorldCat Policy, § 2(B) ("OCLC is the steward of the WorldCat database[.]").

With this in mind, the WorldCat Policy provides certain rights to customers, including the rights (1) to use extracted WorldCat data in their library catalogs and ILS/LSPs (including those that are not offered by OCLC), (2) to use extracted WorldCat data to promote research, including

private and institutional research and the ability to search for library materials across libraries; (3) to transfer extracted WorldCat data to individuals to support their research, as well as library consortia or other non-members of OCLC for "institutional or collaborative" use; and (4) to transfer extracted WorldCat data representing the customer's library holdings for use in other services or products (even if not provided by OCLC) as long as the service or product "directly benefit[s] the OCLC member." *Id.* at WorldCat Policy, § 3(A). When WorldCat records are transferred to non-members, WorldCat customers must ensure that subsequent uses are consistent with the WorldCat Policy. *Id.* at WorldCat Policy, § 3(A)(3), (4). And when WorldCat records are transferred for use in other products or services that benefit the WorldCat customer, *i.e.*, to other third-party commercial entities, OCLC requires written agreements to ensure use and re-use of the WorldCat record comport with the WorldCat Policy. *Id.* at WorldCat Policy, § 3(A)(4).

To ensure that WorldCat is properly protected as a club good amongst members, the Policy also sets forth responsibilities for customers. These responsibilities include making reasonable efforts to (1) abide by the Policy and ensuring that customers' agents abide by the Policy, (2) "attribute the OCLC cooperative as a contributor in works or services based substantially on WorldCat data," and (3) "ensure that the subsequent re-use and transfer of their WorldCat data by non-members is consistent with this policy." *Id.* at WorldCat Policy, § 3(B)(1), (4), (5). Additionally, customers must "encourage and practice responsible use of OCLC systems and services," including by "not permitting unauthorized use of OCLC" log-in credentials, "not engaging in mass downloading from WorldCat without OCLC's prior written consent," "not engaging in mass distribution of data directly from WorldCat to non-members without OCLC's prior written consent," and "not engaging in other activities that diminish the value of WorldCat to the OCLC cooperative." *Id.* at WorldCat Policy, § 3(B)(6).

## LAW AND ARGUMENT

Each factor of the balancing test for preliminary injunctions weighs in favor of granting OCLC a preliminary injunction, which the discovery from this litigation so far demonstrates.

## I.     Evidence from Expedited Discovery Shows a Likelihood of Success on the Merits.

### A.     OCLC has shown a likelihood of success on the merits on its tortious interference of contract claim.

#### 1.     OCLC's Framework Agreement is a valid contract.

Defendants make no argument that the main body of the Framework Agreement and Schedule 2 are not a valid contract. *See* Opp. at 29–34. Instead, Defendants reiterate the arguments from their Rule 12(b)(6) motion—that the WorldCat Policy is not part of the Framework Agreement for WorldCat customers and that the WorldCat Policy on its own is not a valid contract. *Id.*; Dkts. 34, 35. However, the WorldCat Policy is properly incorporated into the Framework Agreement through Schedule 2 and is an enforceable part of the Framework Agreement for WorldCat customers.

For WorldCat customers, the Framework Agreement consists of the main-body Framework Agreement and Schedule 2. *See* Ex. 2 at §§ 1, 2, Sched 2. Schedule 2 directly incorporates the WorldCat Policy by express reference, providing that a WorldCat customer "agrees that the use and transfer by the Institution of WorldCat Data is subject to the Policy," defined as the WorldCat Policy. *Id.* at Sched. 2, §§ 2.4, 3.3. A library that subscribes to WorldCat thus signs a version of the Framework Agreement that includes Schedule 2, which includes the WorldCat Policy—all of which forms the contract between OCLC and its WorldCat customers. *See, e.g.*, *Rosecrance Health Network v. Nationwide Life Ins. Co.*, No. 2:07–CV–1140, 2009 WL 799076, at *6 n.1 ("A document incorporated by reference into a contract is part of the contract itself."); *AM. Coal Sales Co. v. Nova Scotia Power, Inc.*, No. 2:06-CV-94, 2009 WL 467576, at *27 (S.D. Ohio Feb. 23,

10

2009) ("Where one instrument incorporates another by reference, both must be read together[.]");
*see also* Opp. to Mot. to Dismiss, Dkt. 46 at # 408–09.

Defendants' counterarguments miss the mark. Defendants argue that Schedule 2 does not incorporate the WorldCat Policy into the Framework Agreement. Opp. at 30. Schedule 2's plain language demonstrates that this is inaccurate. Ex. 2 at Sched. 2, §§ 2.4, 3.3 ("Institution agrees that the use and transfer by the Institution of WorldCat Data is subject to the [WorldCat] Policy."). Defendants state that Schedule 2 "merely states the customer agrees that its use and transfer of 'WorldCat Data is subject to the Policy'" (Opp. at 30), but Defendants provide no explanation why this language is insufficient. Schedule 2 states that customers agreeing to Schedule 2 agree to abide by the WorldCat Policy and provides a link to the WorldCat Policy. That is textbook incorporation. *See, e.g.*, *Ewalt v. GateHouse Media Ohio Holdings II, Inc.*, No. 2:19-CV-4262, 2023 WL 2018775, at *19 (S.D. Ohio Feb. 15, 2023) ("To incorporate a document successfully, the contract 'must clearly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract.'" (citation omitted)); Construction of multiple documents together as one contract— Incorporation of documents by reference, 18 Ohio Jur. 3d Contracts § 118 (Westlaw June 2025 Update) (collecting authorities). Defendants cite no authority that contradicts this basic principle.

Section 13.7 of the Framework Agreement does not change this analysis. *See* Opp. at 16, 30. Section 13.7 provides: "This Agreement and any schedules constitute the complete agreement between the parties and supersedes and replaces all prior agreements[.]" Ex. 2 at § 13.7. Schedule 2 incorporates the WorldCat Policy by reference and is thus part of the Framework Agreement entered into by WorldCat customers. Defendants' reliance on case law considering parol evidence and contracts that do not address the incorporation-by-reference doctrine are therefore irrelevant.

*See Absolute Mach. Tools v. Sw. Indus. Sales, Inc.*, No. 04CA008611, 2005 WL 1819518, at *2 (Ohio Ct. App. Aug. 3, 2005) (parol evidence); *Burton v. Elsea*, No. 97CA2556, 1999 WL 1285874, at *2 (Ohio Ct. App. Dec. 27, 1999) (no incorporation by reference).[6]

Defendants also argue that the WorldCat Policy is not enforceable because it can be unilaterally changed. Opp. at 33; Partial Mot. to Dismiss, Dkt. 34 at # 284. The plain language of the WorldCat Policy shows that OCLC's ability to amend the document is not unilateral, as the "change-adoption process" includes the membership board and public comment period. Ex. 2 at WorldCat Policy, § 6. The cases Defendants rely on are inapplicable, as they address employee handbooks that specifically disclaimed being part of a valid contract. *See Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.*, 335 F. Supp. 2d 836, 843 (N.D. Ohio 2004); *Finsterwald-Maiden v. AAA S. Ctr. Ohio*, 685 N.E.2d 786, 789–90 (Ohio Ct. App. 1996); *Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538–39 (S.D. Ohio 2023). Two of these cases also address instances where the employee received the handbook *after* they were hired. *See Senter*, 335 F. Supp. 2d at 839–40; *Finsterwald-Maiden*, 684 N.E.2d at 789; *see also* OCLC Opp. to Mot. to Dismiss, Dkt. 46 at # 411–12. The WorldCat Policy does not disclaim being a contract, and WorldCat customers agree to the WorldCat Policy at the time they enter the Framework Agreement, as it is expressly referenced and hyperlinked in Schedule 2.

Defendants also argue that the WorldCat Policy itself is not a contract (Opp. at 31), but this is irrelevant, as the WorldCat Policy is incorporated by reference into the Framework Agreement and Schedule 2. In any case, Defendants' assertions that the WorldCat Policy consists of only

---

[6] Defendants state, "Mr. Rozek admitted that § 13.7 excludes the Policy and that the Policy is not part of the 'complete agreement.'" Opp. at 16. Mr. Rozek's testimony in response to defense counsel's question about the meaning of § 13.7 speaks for itself: "[T]he written agreement and schedules that are incorporated in this agreement, **which then by reference includes the [WorldCat Policy]**, is the complete agreement and supercedes [sic] any oral discussions between the parties." Ex. 3 at 41:11–15. (emphasis added).

"aspirational language and mixed messages" because it encourages sharing of WorldCat records in a manner consistent with the policy (Opp. at 31–33) are not supported by the WorldCat Policy's text. Section 3(A) of the WorldCat Policy sets forth the permissible use and sharing of WorldCat records. For instance, this section permits WorldCat customers to use WorldCat records in their ILS/LSP and to share WorldCat records with other library services when those services directly benefit the WorldCat customer. Ex. 2 at WorldCat Policy, § 3(A)(1), (4). The only provision that could hypothetically authorize a WorldCat customer's sharing records with Defendants is § 3(A)(4), which is not applicable absent the agreements between the WorldCat customer and Defendants that limit the Defendants' use of the WorldCat records and data.

Moreover, contractual provisions cannot be read in isolation. *See Saunders v. Mortensen*, 801 N.E.2d 452, 455 (Ohio 2004) ("[A] contract is to be read as a whole and the intent of each part gathered from a consideration of the whole."); *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co*., 210 F.3d 672, 685 (6th Cir. 2000) ("[The] construction of the contract should attempt to harmonize all the provisions rather than produce conflict in them." (citation omitted)). A WorldCat customer's ability to use and share records must be construed alongside its responsibilities to the OCLC Cooperative, responsibilities that include certain prohibitions. Ex. 2 at WorldCat Policy, § 3(B). WorldCat members cannot permit unauthorized use of their WorldCat credentials, "engag[e] in mass distribution of data directly from WorldCat to non-members without OCLC's prior written consent," or "engag[e] in other activities that would diminish the value of WorldCat to the OCLC Cooperative." *Id.* at WorldCat Policy, §§ 3(B)(6)(a), (6)(c), (6)(d). WorldCat members also have an obligation to "ensure that the subsequent re-use and transfer of their WorldCat data by non-members is consistent with this policy and OCLC's public purposes and supports the long-term viability and utility of WorldCat." *Id.* at WorldCat Policy, § 3(B)(5). Read

with the customer "rights," these "responsibilities" prohibit the use and transfer of WorldCat records in a manner that would enable entities that are not WorldCat customers to receive the benefits from WorldCat without contributing to "the long-term viability and utility of WorldCat." This is important because a club good, like WorldCat, excludes those who do not contribute to the upkeep (*i.e.*, do not subscribe to WorldCat or license WorldCat records) or improvement of the club good (contribute data directly to WorldCat). *See id.* at WorldCat Policy, pp. 2–3, 5–6.

This case is not a close call as to what is permitted under the WorldCat Policy. When each provision is read together and construed to have independent meaning, the WorldCat Policy permits the use and sharing of data that serves libraries and supports research, scholarship, and discovery of library materials directly. Contrary to Defendants' assertions, the WorldCat Policy does not encourage the widespread sharing of WorldCat records with competing commercial cataloging services that do not contribute to WorldCat and share WorldCat records with non-contributing libraries. This is consistent with the unique purpose of the OCLC Cooperative and role of WorldCat as a club good. *See Saunders*, 801 N.E.2d at 455. Defendants interpret each section of the WorldCat Policy in isolation to create ambiguity, which is contrary to Ohio law. *See Lincoln Elec. Co.*, 210 F.3d at 685.

Defendants also mischaracterize OCLC's claimed ownership interest in WorldCat records. Defendants argue that Bill Rozek, one of OCLC's Rule 30(b)(6) representatives, testified that even if OCLC only adds an OCLC Control Number ("OCN"), "OCLC has far-reaching and permanent ownership of every record that is imported into WorldCat from any source, even as against its own members." Opp. at 34. Defendants conflate WorldCat records (and the enhancements that OCLC adds to them) with "Institution Data," specifically, "Shared Data," notwithstanding the clear text of the Framework Agreement. The Framework Agreement expressly states that OCLC customers

14

(including WorldCat customers) retain ownership interest in any data that they contribute or share with OCLC, which would include any bibliographic data in the record that the customer contributes for inclusion in WorldCat. Ex. 2 at § 5.1(b). Importantly, an OCLC customer retains ownership over the original, unenhanced record that it contributes to WorldCat and is free to share that original, unenhanced record as it chooses. *Compare* Ex. 1 at Ex. ii, p. 1 (original, unenhanced record Baker & Taylor submitted to WorldCat) *with id.*, p. 3 (fully corrected, enhanced, and improved WorldCat record for the same book today). An OCLC customer that shares Institution Data with OCLC (*i.e.*, Shared Data) grants OCLC and any OCLC customers a license to use that data, but OCLC does not purport to own that Shared Data. Ex. 2 at § 5.2(b). This license allows WorldCat customers to use every component of a WorldCat record—including contributions of bibliographic data from other WorldCat customers. OCLC asserts contractual ownership interest in each WorldCat record as a whole, as these records represent significant enhancements performed by WorldCat and data contributed by OCLC and other WorldCat customers. *Id.* at § 5.1(a). This is true even when an OCN is "just" added, as this reflects substantial enhancements, though the OCN is seldom the only enhancement in a WorldCat record. Ex. 1 ¶¶ 13–40; Compl., Dkt. 1, ¶ 48.

Defendants also argue that this interpretation, *i.e.*, that OCLC owns WorldCat records and the WorldCat database, "strips § 5.1(b) of meaning." Opp. at 16–17. But as set forth above, Institution Data is distinct from a WorldCat record, and Defendants' interpretation of § 5.1(b) conflates Institution Data with a WorldCat record. *Compare* Ex. 2 at § 3.4 *with id.* at § 3.12; WorldCat Policy at 6 ("WorldCat Data"); Sched. 2 at § 2.4. The only way to give every part of § 5 of the Framework Agreement meaning is to interpret Institution Data as distinct from a WorldCat record, as OCLC's interpretation does.

Finally, Defendants assert that OCLC "disclaims any rights in individual records" because the WorldCat Policy notes that OCLC does not claim a copyright interest in individual WorldCat records. Opp. at 31–32. As in the motion to dismiss briefing, Defendants insist on collapsing copyright interests with all other ownership interests. *See* Dkts. 34, 35. The plain text of § 5.1(a) contemplates non-copyright ownership interests, including those created by the Framework Agreement itself, which OCLC does not disclaim (as this litigation demonstrates). OCLC maintains a contractual ownership interest in individual records but not a copyright interest in individual records, which is consistent with the entire Framework Agreement. Notably, Baker & Taylor takes the same approach to BTCat records. *See* Ex. 13 at 289:13–20 (agreeing Baker & Taylor enforces contractual interests of ownership in BTCat records even without a copyright interest in the records).

### 2. Defendants know about OCLC's contractual restrictions on WorldCat records.

A defendant must have actual knowledge of the contract, which in this context "requires only knowledge of the contractual relationship sufficient to put the defendant on notice that its actions could interfere with an existing contract." *E.g.*, *Crown Equip. Corp. v. Toyota Material Handling, USA, Inc.*, 202 F. App'x 108, 111 (6th Cir. 2006); *see also Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 925 (S.D. Ohio 2017) (to establish the knowledge element, a plaintiff must simply show that the defendant "knows of the contract," even if the defendant is mistaken as to whether the agreement is legally binding or misunderstands its legal effect). This court has rejected attempts "to heighten the 'actual knowledge of the contract' requirement to an 'actual knowledge of the *specific terms* of the contract' standard." *WesBanco Bank, Inc. v. Facility Sols. Grp., Inc.*, No. 1:24-CV-601, 2025 WL 2403295, at *6 (S.D. Ohio Aug. 19, 2025).

There is both direct and indirect evidence that Defendants knew of the restrictions from the Framework Agreement for WorldCat customers on sharing WorldCat credentials and records. Start with direct evidence. As an initial matter, the Framework Agreement, Schedule 2, and the WorldCat Policy are all publicly available online and easily found through basic Google searches. Baker & Taylor[7] also received invoices and renewal notices from OCLC for certain services that specifically linked to the Framework Agreement and all Schedules. *E.g.*, BAKER00010643 (Ex. 4); BAKER00010637 (Ex. 5). Libraries also shared links to the WorldCat Policy with Baker & Taylor. BAKER00032425 (Ex. 6). Travis Kelley, the Baker & Taylor employee responsible for all BTCat sales, admitted that he knew OCLC had contractual restrictions on the sharing of WorldCat records and agreed that OCLC's contractual restrictions on WorldCat records are common industry knowledge. T. Kelly Dep. Tr. (Ex. 7) at 150:19–151:5 ("Q. So is the answer to my question, are you aware that OCLC puts restrictions on WorldCat records, is the answer to that question, Yes?" A. "Yes."); 288:7–11. Mr. Kelley was also aware of a dispute between OCLC and a library consortia about sharing WorldCat records with nonsubscribers. *Id.* at 296:23–279:10; *see also* BAKER00007203 (Ex. 8).

Next, the indirect evidence. Mr. Daniel Johnson, one of Baker & Taylor's corporate representatives, admitted he knew that OCLC placed contractual restrictions on the sharing of WorldCat records because of Baker & Taylor's "personal experience . . . that we have licensed records . . . from OCLC in the past, and have had specific restrictions on those [records]." D. Johnson Dep. Tr. (Ex. 9) at 58:6–20. Baker & Taylor's 2019 License Agreement with OCLC illustrated that OCLC contractually restricts access to WorldCat records, and thus Baker & Taylor

---

[7] Baker & Taylor's knowledge of OCLC's contractual prohibitions should be attributed to Bridgeall because Baker & Taylor was Bridgeall agent in connection with sales legal, and other activities in the United States in connection with BTCat and collectionHQ. *See* OCLC Opp. to Rule 12(b)(2), Dkt. 61, # 526–29.

knew that OCLC did not permit extracting and using WorldCat records in a commercial service outside of a contract relationship with OCLC. Baker & Taylor even admitted it has gone back since this litigation was filed and removed some WorldCat records that it discovered were in BTCat in violation of the 2019 Licensing Agreement. *Id.* at 204:5–16.

Baker & Taylor also knows about OCLC's contractual restrictions on WorldCat records through its third-party cataloging agreements. Baker & Taylor performs cataloging services for libraries, and when those libraries are WorldCat customers, OCLC requires an agreement between OCLC, Baker & Taylor, and the library receiving the cataloging service. These agreements limit Baker & Taylor's use of WorldCat records to only perform cataloging services for the library. *E.g.*, BAKER00000017 (Ex. 10); BAKER00000085 (Ex. 11). And as part of these third-party agreements, OCLC prohibited Baker & Taylor from using WorldCat customer credentials; instead, OCLC issued unique credentials to Baker & Taylor exclusively for those specific cataloging services. Ex. 1.¶ 75.

Baker & Taylor had also hired an "OCLC consultant" (BAKER00009892 (Ex. 12)), which suggests that Baker & Taylor hired an individual with intimate knowledge of OCLC's cataloging services. This would include the restrictions OCLC places on WorldCat records from the Framework Agreement, Schedule 2, and the WorldCat Policy.

OCLC's Framework Agreement, Schedules, and the WorldCat Policy are also publicly available on OCLC's website,[8] as is OCLC's prior unfair competition lawsuit, and industry coverage of the lawsuit, based on similar claims as those at issue here.[9] Baker & Taylor's corporate

---

[8] OCLC, *Framework Agreement* (May 2025), https://policies.oclc.org/content/dam/legal/framework/OCLC-Framework-Agreement-Loc-US-EN-US.pdf; OCLC, *WorldCat Rights & Responsibilities for the OCLC Cooperative* (June 2, 2010), https://www.oclc.org/en/worldcat/cooperative-quality/policy.html (last visited Sept. 12, 2025).
[9] *OCLC v. Clarivate, PLC*, No. 2:22-cv-2470 (S.D. Ohio); Marshall Breeding, *OCLC Sues Clarivate over MetaDoor and its use of WorldCat Records*, https://librarytechnology.org/document/27420/oclc-sues-clarivate-over-metadoor-and-its-use-of-worldcat-records (June 2022).

representative, CEO Amandeep Kochar, testified that Baker & Taylor conducts market research and keeps updated with news in the library industry, indicating Baker & Taylor would have likely seen these documents. A. Kochar Dep. Tr. Vol. I (Ex. 13) at 252:15–21; 51:14–21.

Importantly, OCLC's contractual provisions that prohibit the sharing of WorldCat records with non-WorldCat customers or commercial competitors are industry standard, according to Mr. Kelley. Ex. 7 at 268:23–25. And OCLC's provisions come as no surprise to Defendants, as Baker & Taylor has similar provisions in its own contracts, including prohibitions on sharing credentials, proscriptions on sharing bibliographic records in a shared database, and statements that Baker & Taylor owns BTCat records and the BTCat database. BAKER00058279 (Ex. 14) at §§ 2.01 ("Customer shall not load any records from the BT Cat Database into a shared record or union database, without express written permission from Baker & Taylor) 2.02–.03 (credentials), 6.01 ("Customer acknowledges and agrees that Baker & Taylor and/or its licensors own BT CAT and the BT CAT Database and all related copyrights and other exploitation rights and interests[.]"). Mr. Kochar also admitted that under the BTCat agreement, BTCat customers can only share BTCat records "non-commercially," *i.e.*, not with a competitor. Ex. 13 at 125:21–126:1. Mr. Kelley also testified that about "80 percent of the time I probably know" which libraries are WorldCat customers (Ex. 7 at 147:2–3), supporting the inference that Defendants should be aware that OCLC's WorldCat record restrictions are likely to come up often.

Finally, OCLC made Defendants aware of the claims and relevant agreements on February 25, 2025, when OCLC issued its cease-and-desist letter. Letter (Ex. 15) at 1–2. Defendants not only continued to engage in the wrongdoing afterwards, but Baker & Taylor amended their BTCat customer agreements and practices after the filing of this lawsuit, adding provisions similar to the § 4.5 provision, and encouraging WorldCat customers to violate their agreements with OCLC and

19

permit those customers to directly upload WorldCat records to BTCat. BAKER00058275 (Ex. 16) at §§ 2.06–2.09.

Taken together, this evidence shows that Defendants had sufficient knowledge of OCLC's contractual relationships with WorldCat customers to put them on notice that using WorldCat credentials and incorporating WorldCat records from customers into BTCat could interfere with OCLC's contracts. *See Crown Equip.*, 202 F. App'x at 111.

### 3. Defendants intentionally procured breaches of OCLC's Framework Agreement.

Defendants' conduct caused WorldCat customers to violate the Framework Agreement (including Schedule 2 and the WorldCat Policy) in several ways.

***First***, Defendants included § 4.5 in the collectionHQ agreement, which WorldCat customers then signed. When a WorldCat customer signs § 4.5 of the collectionHQ agreement, the customer grants Defendants a "perpetual, fully paid-up . . . and irrevocable" license for use of the WorldCat customer's bibliographic records, which include WorldCat records, "for use in BT CAT and in any and all other products offered at any time by Baker & Taylor." *E.g.*, BAKER00057980 (Ex. 17) at § 4.5. Defendants neither quote nor address this part of § 4.5. Opp. at 9–10. When a WorldCat customer signs § 4.5, the customer violates §§ 5.1(a) and 5.2(b) of the Framework Agreement. Section 5.1(a) provides that OCLC is the "exclusive owner[] of and retain[s] all right, title and interest . . . to the Products, Services, [and] WorldCat." Ex. 2 at §§ 5.1(a), 5.2(b). Section 5.2(a) states that OCLC grants customers a "nontransferable license to install and use the Product solely for noncommercial uses." *Id.* at § 5.2(a). Under these provisions, customers do not have the authority to grant others, like Defendants, an unlimited license to their WorldCat records.

Defendants produced reports showing approximately how many WorldCat customers have signed § 4.5 of the collectionHQ agreement. At least 131 WorldCat customers have signed § 4.5

20

in an active collectionHQ contract. K. Brown Decl. (Ex. 18) ¶ 6; BAKER00058290 (Ex. 19). And at least 12 WorldCat customers signed § 4.5 in an inactive collectionHQ contract. Ex. 18 ¶ 8; BAKER00058298 (Ex. 20).

**Second**, by including § 4.5 in the collectionHQ agreement, Defendants induced WorldCat customers to transmit and share the WorldCat customer's library catalogs, which necessarily include WorldCat records. Section 4.5 states that a WorldCat customer agrees to share and will share their cataloging records with Baker & Taylor for use in BTCat or any other product if the customer signs the collectionHQ agreement. Ex. 17 at § 4.5. WorldCat customers' contribution of WorldCat records to BTCat violates § 11.1(g) of the Framework Agreement. Section 11.1(g) prohibits use of a Product or Service, such as WorldCat, "to alter, reverse-engineer, interfere with, circumvent, copy, or create a derivative work of, any aspect of the Product or Service" without OCLC's permission. Ex. 2 at § 11.1(g). By encouraging WorldCat customers to sign § 4.5, through which customers contribute their bibliographic records (which include WorldCat records), Baker & Taylor has access to and incorporates WorldCat records into BTCat—a competing cataloging service. When WorldCat records are shared with Defendants and incorporated into BTCat, a competing service, WorldCat customers are helping create a derivative of the WorldCat database.

Customers also violate the WorldCat Policy provisions permitting sharing and transferring WorldCat data only to further academic research (§ 3(A)(3)) and when sharing and transferring WorldCat data is necessary to perform services on behalf of the library that directly benefits the library and even then, only if a separate agreement between the library and agent exists that limits the agent's use of WorldCat data (§ 3(A)(4)). Ex. 2 at WorldCat Policy. The sharing and transfer of WorldCat records that Defendants encourage is inconsistent with both of these provisions, and

thus, WorldCat customers violate Section 3(A)(B)(1), which requires compliance with the WorldCat Policy.

Customers have also violated §§ 3(B)(4), (5), and (6) of the WorldCat Policy. Section 3(B)(4) requires that OCLC be attributed as a source of data. There is no such attribution here. Section 3(B)(5) requires that WorldCat customers make sure use of WorldCat records is consistent with the WorldCat Policy and ensure the "long-term viability and utility of WorldCat." Sharing WorldCat records with a direct competitor, who then shares such records for a discounted price to non-WorldCat members, undercuts WorldCat and WorldCat customer's contributions to WorldCat. *E.g.*, M. Sauer-Games Dep. Tr. (Ex. 21) at 188:10–16; Ex. 3 at 115:24–116:4. WorldCat customers cannot distribute large amounts of data that comes directly from WorldCat without violating § 3(B)(6)(c). Most of WorldCat customers' bibliographic records *are* WorldCat records—that is the purpose of a WorldCat subscription. Ex. 1 ¶ 74. Moreover, WorldCat customers extract and import records directly from WorldCat into their ILS/LSP. *Id.* ¶ 68. Though customers may add local data and delete certain fields that their system does not use, the records that remain in a library's ILS/LSP is a WorldCat record or includes data therefrom. Accordingly, when a WorldCat customer shares or transfers WorldCat records, they are distributing WorldCat records that come directly from WorldCat.

Relatedly, Defendants encourage BTCat customers to upload their WorldCat records to BTCat community. For the same reasons that WorldCat customers sharing their records through § 4.5 is impermissible under the Framework Agreement, WorldCat customer's direct contribution of WorldCat records to BTCat is also violative.

There is evidence that WorldCat customers have shared and/or transferred WorldCat records to Defendants. Defendants produced a report that listed the number of WorldCat records

in the main data repository and BTCat community repository, both of which contain records with WorldCat record identifiers. BAKER00058296 (Ex. 22); Ex. 9 at 115:4 (records shared through § 4.5 added to community repository), 161:23–24 (records downloaded under the 2019 License Agreement "could be stored in all repositories"), 179:20–180:5 (records shared through § 4.5 could be added to main repository).[10] There are ▮▮▮▮▮ such records. Ex. 18 ¶ 11. There are 37 million records total across these two repositories. *Id.* ¶ 12. This means that more than ▮▮▮ of these two repositories consist of WorldCat records. *Id.* ¶ 13. This figure alone demonstrates that BTCat contains far more than the approximately 22,000 WorldCat records Baker & Taylor acknowledged it extracted from WorldCat under the 2019 Licensing Agreement. *See infra* Part I.C. Put simply, the fact that there are more than ▮▮▮▮▮ records made available to all BTCat subscribers in BTCat that incorporate WorldCat records and data demonstrates that WorldCat customers have been induced to share and transfer their records, breaching the above-described provisions.[11]

Other evidence demonstrates the same. At least 24 current and former WorldCat customers have contributed their bibliographic records to BTCat. Ex. 18 ¶ 14; BAKER00057823 (Ex. 23). Defendants have also identified libraries that have shared their bibliographic records with Defendants, but those records have not yet been integrated into BTCat. For some libraries, the records are in Baker & Taylor's possession, and of these 124 libraries, 49 are current and former WorldCat Customers. Ex. 18 ¶ 19; BAKER00058297 (Ex. 24). For other libraries, the company that acquired Bridgeall possesses their records, and of those 299 libraries, 236 are current and

---

[10] Defendants assert only the community repository is relevant (Opp. at 11) but provide no reason why WorldCat records in excess of the amount allowed by the 2019 License Agreement anywhere in BTCat are not relevant. Moreover, Defendants acknowledge that subscribers have access to records stored in two main repositories: BTCat Main (approx. 8 million records) and Community Pool (approx. 29 million records) (Opp. Br. at 6, 7-8), so the existence of more than ▮▮▮▮▮ WorldCat records within both those repositories is clearly relevant.

[11] The number of records in BTCat that contain WorldCat records and/or data is likely higher than ▮▮▮▮▮ because (1) defendants only searched for a small subset of WorldCat indicators given that this is limited, expedited discovery, and (2) there is evidence that Defendants have helped create macros for WorldCat customers to remove data fields, including OCLC indicators like the OCN. *See* Ex. 7 at 64:3–11.

former WorldCat customers. Ex. 18 ¶ 20; Ex. 24. At any time, Defendants could incorporate this data into BTCat.

Furthermore, Defendants have produced a report that shows they have actually incorporated records from WorldCat customers into BTCat. According to this report, 42 BTCat customers have contributed 1,395,762 bibliographic records. Ex. 18 ¶ 16. There are 24 current and former WorldCat customers on this report, and they have contributed 623,893 bibliographic records. *Id.* ¶ 17.

***Fourth***, Defendants ask WorldCat customers to share their WorldCat record credentials with Defendants in connection with signing up for BTCat. Sharing WorldCat records in this manner also violates § 3(B)(6)(a) of the WorldCat Policy, and § 11.2 of the Framework Agreement. Section 11.2 also prohibits the unauthorized use of Products and Services like WorldCat, which includes unauthorized usage of credentials. Ex. 2 at § 11.2. Importantly, unauthorized uses of Products and Services under the Framework Agreement includes § 11.1(e), as well as § 5.2(a), when a WorldCat customer uses WorldCat for commercial purposes, *i.e.*, giving records to commercial, non-library entities like Defendants; this is contrary to the license OCLC grants WorldCat customers. Once they have these credentials, Baker & Taylor can use them to search for and download WorldCat records and incorporate them into BTCat.

Baker & Taylor asks for and inputs WorldCat credentials as part of the form that BTCat customers fill out to start the service. Ex. 7 at 24:9–13; BAKER00025943 (Ex. 25). In light of the large number of WorldCat records in BTCat, it is a reasonable inference that Baker & Taylor has used these credentials to extract WorldCat records directly from WorldCat, incorporate those records and data into BTCat, and share those records with non-WorldCat customers, which is also a violation of §§ 3(B)(6)(b) and (c) of the WorldCat Policy.

Not only did all of the aforementioned conduct by Defendants result in WorldCat customers breaching their contractual obligations, but Defendants induced those breaches. Under Ohio law, a defendant induces a breach in a tortious interference claim when "the defendant knew that interference was certain or substantially certain to occur as a result of its actions." *E.g.*, *Ginn v. Stonecreek Dental Care*, 30 NE.3d 1034, 1041 (Ohio Ct. App. 2015); *Kent State Univ. v. Bradley Univ.*, 136 N.E.3d 774, 779 (Ohio Ct. App. 2019). Given the evidence described above, Defendants knew that encouraging WorldCat customers to upload records to BTCat and having WorldCat customers upload all their bibliographic records through § 4.5 of the collectionHQ agreement was substantially likely to result in a breach of OCLC's Framework Agreement, including Schedule 2 and the WorldCat Policy. Defendants knew about the prohibitions on sharing and transferring WorldCat records or credentials outside of the OCLC cooperative. *See supra* Part.I.A.3. And considering that Defendants knew about these contractual obligations for WorldCat customers, it is no surprise that asking for WorldCat customers' credentials and receiving and integrating WorldCat records into BTCat would result in breaches of those obligations. Indeed, Defendants had no process to confirm libraries may share records, even if they were aware of potential issues with these WorldCat customers. Ex. 7 at 9–16, S. Legowski Dep. Tr. (Ex. 26) at 139:24–140:1.

***Defendants' Counterarguments***. Defendants address only § 4.5 of the collectionHQ agreement; Defendants do not address any other conduct, including encouraging and allowing WorldCat customers to contribute WorldCat records to BTCat. Opp. at 38–40. Regardless, Defendants' arguments that § 4.5 does not constitute inducement are unpersuasive.

First, Defendants argue that OCLC has not demonstrated Defendants include § 4.5 in the collectionHQ agreement for the purpose of causing contractual interference (Opp. at 39), but OCLC's claims proceed on the other prong of the intent test—whether Defendants knew that

interference was substantially likely to occur. *E.g.*, *Kent*, 136 N.E.3d at 779. Defendants attempt again to ratchet up the requirements of Ohio law, arguing that Defendants acted with a legitimate business purpose and implying that OCLC must demonstrate that Defendants must have acted for the sole purpose of interfering with OCLC's contracts. Opp. at 39. But under Ohio law, "'intentional procurement' is not the equivalent of 'hatching' the plan"; rather, "[t]he rule applies 'to an interference that is incidental to the actor's independent purpose and desire but known to him as a necessary consequence of action.'" *Ashwood Comput. Co., Inc. v. Zumasys, Inc.*, No. 1:20-CV-00029, 2024 WL 3373307, at *12 (S.D. Ohio July 10, 2024). Given Defendants' knowledge of OCLC's contractual restrictions, Defendants knew that interference with these contracts was a necessary consequence of adding § 4.5 to the collectionHQ agreement (along with the operation of BTCat generally).

Second, Defendants assert that there is no substantial certainty of interference because "███████ of collectionHQ customers" have opted out of § 4.5. Opp at 39. This assertion disregards the fact that, based on Defendants' own calculations, ██ of customers have opted into § 4.5, and thus granted a license to Baker & Taylor. Indeed, 80% of those who opted in to § 4.5 are WorldCat customers. *See* Ex. 18 ¶ 6. It also ignores that WorldCat customers have already provided records pursuant to that provision. The interference *has* already happened, as WorldCat customers have already breached their contractual provisions by sharing WorldCat credentials, purporting to license WorldCat records to Defendants, and sharing and transferring WorldCat data to Defendants for use in a competing product and for use by non-WorldCat customers. Here, there is not just substantial certainty of interference—there is actual interference.

Third, Defendants contend that the text of § 4.5 cannot induce any breach of contract because § 4.5 requires customers to authorize that they are permitted to upload records and because

the library controls what is submitted to collectionHQ and BTCat. Opp. at 39–40. These arguments disregard the standard for intentional procurement of a breach, which is simply whether Defendants know or reasonably should know that interference is substantially likely to occur based on their conduct. Because Defendants should reasonably know that their conduct would cause interference in OCLC's contracts with its WorldCat customers, it is no defense that Defendants included in § 4.5 a clause that attempts to shift the blame to the customer or that libraries are the ones uploading the records. Defendants provide no legal authority supporting their assertion that including this provision is fatal to OCLC's tortious interference of contract claim.

Moreover, these arguments disregard the plain text of § 4.5. *See* Opp. at 39–40. As OCLC explained in its opposition to Defendants' motion to dismiss for failure to state a claim, the text is clear—by signing the collectionHQ agreement, customers grant Baker & Taylor an unlimited license to the records in the library's catalog, which in the case of a WorldCat customer includes WorldCat records and data. This is a breach of the Framework Agreement. Additionally, the customer agrees to provide bibliographic records from their catalog, and WorldCat customers have actually shared those bibliographic records (which are WorldCat records) due to this provision. The deposition testimony has made clear that ███████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ (Ex. 26 at 64:10–24), WorldCat customers agreed to and actually did upload their WorldCat records to collectionHQ, many of which were transferred to Defendants and some of which were incorporated into Baker & Taylor.

Defendants finally argue that even though the updated BTCat agreement contains a provision similar to § 4.5 in the collectionHQ agreement, there is no contractual interference. Opp. at 40–41. As with § 4.5 of the collectionHQ agreement, Defendants' inclusion of such a provision

in the BTCat contract is an intentional procurement of a breach because Defendants should have known (given their knowledge of OCLC's contractual prohibitions on WorldCat record usage) that including this provision was substantially certain to result in a breach of contract by WorldCat customers. And even if BTCat works on a record-by-record basis (Opp. at 41), there are also still breaches of the Framework Agreement and Schedule 2, as set forth above.

### 4. Defendants' interference lacks justification.

For interference to be actionable, the interference must be improper. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999). Ohio follows § 767 of the Restatement (Second) of Torts, which provides a test to determine whether interference is improper by weighing certain factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at 860.

The balance of these factors shows Defendants' interference is unjustified. Take the nature of Defendants' conduct and Defendants' motive, or intent. Defendants know that OCLC places contractual limitations on the sharing of WorldCat records and credentials, but Defendants still allowed BTCat customers who are also WorldCat customers to upload WorldCat records, solicited WorldCat credentials, and encouraged libraries to upload bibliographic records from their catalogs through § 4.5 of the collectionHQ agreement. Additionally, § 4.5 has nothing to do with the collectionHQ agreement and is exclusively for the benefit of Baker & Taylor—even though it is

28

present in a contract for services from collectionHQ. *See* Ex. 27 at 62:20–63:2.[12] It appears that this provision was snuck into a contract for services that are unrelated to cataloging (collectionHQ), which may result in less scrutiny from a library. Defendants' conduct is especially suspect, as Baker & Taylor has contractual protections on BTCat records that are comparable to those imposed on WorldCat customers. Ex. 13 at 121:4–25. Defendants' own actions also directly interfere with OCLC's contracts with its WorldCat customers, rather than a third-party or other intermediary.

Next, the pertinent interests. OCLC's interest with regard to its Framework Agreement, including Schedule 2 and the WorldCat Policy, is critical. WorldCat is OCLC's cornerstone product, warranting strong contractual protection for WorldCat and its records and data, as well as WorldCat customers who contribute to the database. This agreement is valid and enforceable, warranting protection from this Court. Defendants' interests at stake here are exclusively economic, to acquire business, decrease development costs for BTCat by misusing WorldCat records, and thereby increase profits. These interests can be vindicated without imperiling OCLC's interests in its contracts with customers. Finally, the public interest counsels finding improper interference. Libraries subscribe to WorldCat so that they can contribute to WorldCat and receive a benefit in exchange—enhanced records. Defendants' conduct undermines libraries' contributions (financial, data, and otherwise) to WorldCat.

Defendants argue that they are entitled to the privilege of competition under § 768 under the Restatement (Second) of Torts. Opp. at 41. This privilege only applies when a contract is "terminable at will." *Fred Siegel*, 707 N.E.2d at 860. The Framework Agreement is not terminable

---

[12] These circumstances distinguish OCLC's inclusion of language in the Framework Agreement where the OCLC customer warrants they have permission to share data with OCLC. *See* Opp. at 42. Unlike Defendants, OCLC does not know of any contractual obligations that its OCLC customers may be violating by sharing data with OCLC.

at will. The agreement may only be terminated at the end of a subscription or renewal period, which is an annual term; when one party has become insolvent or similar; or when there is a material breach without cure. Ex. 2 at § 6.2. Accordingly, the Framework Agreement cannot be terminated for any reason at any time. *See Power Mktg. Direct, Inc. v. Ball*, No. 2:03-CV-1004, 2004 WL 5826149, at *8 (S.D. Ohio Apr. 6, 2004) (holding a contract was not terminable at will because the contract "does not state that the agreement may be terminated at will by the licensee"). Accordingly, the competition privilege under § 768 is inapplicable, and Defendants' arguments about the privilege of competition are not relevant.

### 5.    Defendants' improper interference has harmed OCLC.

As discussed further below, *see infra* Part.II, Defendants' improper interference has caused irreparable harm to OCLC. This harm includes lost customers, loss of reputational goodwill, harm to WorldCat and its contributing members, and harm to all OCLC products that rely on WorldCat. OCLC Supp. Disco. Resp. (Ex. 27) at 20–21. Accordingly, though some measure of damages is appropriate, OCLC seeks injunctive relief due to irreparable injury, *i.e.*, harm that cannot be adequately measured in damages.

In any case, Defendants' conduct has already caused harm to OCLC. Baker & Taylor offers BTCat, which contains WorldCat records, for a much lower fee. *See, e.g.*, BAKER00035026 (Ex. 28) (█████████████████████████████); Ex. 7 at 224:3–9. Discovery has confirmed that OCLC has already lost 36 WorldCat customers. Ex. 18 ¶ 21.; *see also* BAKER00058295 (Ex. 29). This is circumstantial evidence that when a WorldCat customer has left for BTCat, which is cheaper, it is due to Defendants' interference with OCLC's customers, who have provided WorldCat records to Defendants for free. But for Defendants' efforts to improperly obtain WorldCat records and receive a license to use those records, Defendants would not be able to offer WorldCat records and data in BTCat.

Defendants' improper interference has also caused harm to WorldCat and its contributing members, products that rely on WorldCat, and a loss of customer goodwill. *See infra* Part II.

None of Defendants' counterarguments succeed. Defendants argue that OCLC did not specifically reference lost customers in Count I. Opp. at 44. It is unclear why Defendants focus on the pleading standard in the context of a Motion for Preliminary Injunction that has included limited discovery proceedings, but OCLC certainly alleges that lost customers are a source of its harm in the complaint. Compl., Dkt. 1, ¶¶ 112, 119–21 # 20, 22. Regardless, in expedited discovery, OCLC produced a list of lost WorldCat customers to BTCat. OCLC_00002401 (Ex. 30). For this reason, Defendants' argument that OCLC has not made a "showing" of lost customers (Opp. at 45) is inaccurate and disregards the discovery in this case.

Next, Defendants contend that the list is insufficient because it does not provide reasons why customers left. Opp. at 44. Again, this is limited, expedited discovery (not full-blown merits discovery with third-party discovery), and the parties expressly agreed not to produce data from their respective client management systems (like Salesforce). Moreover, OCLC has produced underlying documentation, where available and easily accessible, demonstrating that WorldCat customers were leaving for BTCat because BTCat is less expensive than WorldCat. *E.g.*, OCLC_00000046 (Ex. 31); OCLC_00000050 (Ex. 32). But often, customers do not tell OCLC why they left. Ex. 21 at 172:2–5. The fact that customers canceled their WorldCat subscriptions for BTCat because BTCat is cheaper is indirect evidence that Defendants' interference via BTCat has caused OCLC to lose WorldCat customers.

Defendants also argue that there is no evidence that WorldCat customers have left WorldCat for BTCat because BTCat is not an exact replica of WorldCat since BTCat has a smaller repository of records. Opp. at 45. OCLC's theory of the case is that WorldCat customers have left

BTCat because they can obtain high-quality, enhanced WorldCat bibliographic records and data for a lower price, as Defendants did not have to incur the expense of developing those records—not that BTCat is an exact copy of WorldCat. Ex. 21 at 186:16–23; Ex. 9 at 54:1–10 (explaining BTCat "roll[s] up" what would be multiple records in WorldCat into one record in BTCat). Because BTCat records encompass what would be several records in WorldCat, even Mr. Johnson agreed that the number of bibliographic records between WorldCat and BTCat is not the best comparator. Ex. 9 at 55:8–10. As a result, these customers will not pay WorldCat's higher price when it appears that much of the same service is offered elsewhere for less. Ex. 21 at 185:20–186:2. This is especially true because Defendants intentionally reduce their pricing proposals to prospective customers based on OCLC's subscription fees and prospective customers are choosing BTCat over WorldCat due to price. OCLC_00001584 (Ex. 33); BAKER00055392 (Ex. 34).

Moreover, the difference in the number of records in BTCat versus WorldCat database is irrelevant, as a library can accomplish their cataloging mission with a lesser number of high-quality records in a cataloging database. Ex. 21 at 197:15–22. Defendants are producing portions of their high-quality records by taking WorldCat records and data and claiming them as their own. *Id.* 198:1–18 ("We are hearing from customers that moving to BTCat they can get the access to WorldCat records for half the price and that has been a direct quote."). Accordingly, it is sufficient at this stage of the litigation (where OCLC need not prove its case in full) that OCLC has pointed to evidence that BTCat contains WorldCat records and data, which it offers more cheaply than WorldCat, and that WorldCat customers left WorldCat because BTCat is cheaper.

Defendants further mischaracterize the nature of OCLC's injury concerning the true value of WorldCat. It is not that Defendants merely diminish "the number or quality of records in WorldCat[.]" Opp. at 46. Rather, it is that Defendants are freeriding off OCLC's system of record

32

management and improvements to reduce the synergistic value of WorldCat as a service. WorldCat customers contribute to this record-sharing service to obtain the unique benefits that OCLC offers compared to its competitors. They also contribute their records and data in return for a commitment that OCLC will place and enforce certain restrictions on the use of WorldCat records and data, including "Shared Data," outside the WorldCat cooperative. Every new customer that subscribes to WorldCat improves the quality of the service for all customers by subjecting more records to OCLC's improvements, making the records club goods. Ex. 2 at WorldCat Policy, pp. 2–3, 6. The result is OCLC's loss of customers and goodwill, which has a compounding effect on WorldCat and OCLC's other offerings. Defendants could have built-out BTCat without WorldCat records and data and interfering with OCLC's WorldCat customer contracts. Instead, Defendants chose this misappropriation scheme as a shortcut to unfairly compete with OCLC's superior service.[13]

**B.    OCLC has demonstrated a likelihood of success on the merits on its tortious interference of prospective business relationships claim.**

OCLC has met its burden to demonstrate a likelihood of success on the merits for tortious interference with prospective business relationships. Defendants primarily argue that OCLC has not specified any prospective customers that it has lost to BTCat. *See* Opp. at 48–49. However, Defendants disregard the evidence from discovery that establishes specific prospective customers that OCLC lost to BTCat.

OCLC originally identified ▆▆▆ prospective customers that it has lost to BTCat, including



. *See* OCLC_00002983 (Ex. 35). OCLC knows that these prospective customers chose BTCat over

---

[13] Defendants' speculative contention that WorldCat may have "records with [Baker & Taylor] identifiers" is irrelevant. Opp. at 46. Defendants do not claim that OCLC is misusing Baker & Taylor's records. Given Baker & Taylor's prior third-party cataloging services to WorldCat customers and provision of records to OCLC as a third-party cataloger and a licensed vendor, it would not be surprising or improper if such identifiers exist in WorldCat records.

WorldCat based on information the prospective customers provided to OCLC. *See* Ex. 21 at 184:14–20 ("Because they've told the sales reps that they're considering BTCat either as a replacement or a new system for them"). For example, in an email to OCLC, ███████████ indicated they were going to BTCat over WorldCat as it "worked better within [their] budget compared to OCLC." Ex. 33. Defendants' report of BTCat customers' contracts with Baker & Taylor confirms that ████ prospective WorldCat customers ended up using BTCat. Ex. 18 ¶ 22.

OCLC has also satisfied the second element of its claim, as Defendants have knowledge of such prospective customers. Defendants are sophisticated players in the industry; they must know that any library they solicit to subscribe to BTCat is likely considering subscribing to WorldCat. Ex. 21 at 184:21–25. Evidence produced in discovery shows that Defendants know that BTCat and WorldCat compete and that prospective customers compare and consider the two products. *See* BAKER00026518 (Ex. 36); Ex. 34; BAKER00007661(Ex. 37); Ex. 13 at 133:11–16, 247:1–5. OCLC has identified at least one prospective customer, ████████████████████, where Defendants set their BTCat pricing based on the assumed OCLC subscription fee. *See, e.g.*, Ex. 34. Defendants considered OCLC pricing and ██████████████████████████. *Id*. At this stage, this is enough to establish Defendants' knowledge that OCLC had these prospective business relationships.

Lastly, OCLC has sufficiently established that Defendants are intentionally interfering, without justification or privilege, with OCLC's prospective customers by using and retaining OCLC's enhanced records to populate BTCat through use of § 4.5 of the collectionHQ agreement and WorldCat customers' credentials. *See supra* Part I.A3.

Defendants argue again that they cannot intentionally interfere with OCLC's prospective customers because BTCat is not a "replica" of WorldCat. Opp. at 50. These arguments fail for the

34

same reasons as those above. *See id.* This improper conduct is intentionally interfering with OCLC's ability to establish new business relationships. *See Gray-Jones v. Jones*, 738 N.E.2d 64, 102 (Ohio Ct. App. 2000) (affirming the trial court's holding that the defendant had tortiously interfered with a prospective business relationship).

Defendants again argue that OCLC must provide statements from customers that they are going to BTCat specifically because BTCat is a comparable database to WorldCat. Opp. at 50. Prospective customers need not make this statement for OCLC to understand that they compare the two products. Prospective customers obviously think BTCat is comparable to WorldCat—or the library would not choose BTCat over WorldCat. And again, many prospective customers do not share with OCLC the reasons for not moving forward with WorldCat.[14] Defendants are likely to have additional information on why prospective customers chose BTCat over WorldCat in their sales representatives' emails and their Sales Force platform, which the parties jointly decided was too burdensome to search for at the preliminary injunction stage. *See* Ex. 7 at 200:20–201:2 (testifying that Defendants use SalesForce to take notes on conversations with customers).

### C. OCLC has established a likelihood of success on the merits on its breach of contract claim.

OCLC established in its Motion each of the four elements of breach of contract under Ohio law. *See* Mot. at 14–15. Of these four elements, Baker & Taylor only contests breach. At this stage, OCLC has met its burden to demonstrate a likelihood of success in showing Baker & Taylor breached the 2019 License Agreement by exceeding its allotted number of downloads.

BTCat contains far more than the 22,076 records Baker & Taylor contends it extracted. Opp. at 51. Especially important here is there are more than ███████ WorldCat records in BTCat

---

[14] There are likely instances where the conversation or email was not logged on SalesForce. Ms. Sauer-Games, OCLC's Chief Product Officer, testified that sales representatives ***could*** document the conversation with the cancelled customer in SalesForce, not that the representative is required to or always does so. *See* Ex. 21 at135:10–16.

main, which is where Baker & Taylor has explained that WorldCat records extracted under the 2019 License Agreement are stored. Ex. 18 ¶ 11; Ex. 22. This is more than ██ of the records of the 8 million records in BTCat main. *See* Opp. at 7. Although it is possible that all but 22,076 of these WorldCat records in BTCat came directly from WorldCat customers pursuant to § 4.5 collectionHQ agreements or some other wrongful means, there is a reasonable inference that a portion of these additional WorldCat records in BTCat came from breaches of the 2019 License Agreement—whether exceeding the permitted number of downloads or copying and pasting data from WorldCat records in direct violation of the 2019 License Agreement.

Additionally, Ms. Sauer-Games testified that while OCLC cannot identify the exact number of records downloaded by Baker & Taylor under the License Agreement, industry practice indicates that Baker & Taylor extracted over half a million records. Ex. 21 at 114:19–25; 115:22–116:1. Defendants dismiss Ms. Sauer-Games' testimony (Opp. at 51), but her industry knowledge and experience is valid circumstantial evidence of excess downloads under the 2019 License Agreement. Defendants also characterize Mr. Johnson's testimony regarding the 22,076 records as "unequivocal" (Opp. at 34), but Mr. Johnson admitted that this number of extracted WorldCat records may not be accurate because Baker & Taylor overwrote some of the records' data, causing Baker & Taylor to lose the "traceability" of the downloaded WorldCat record. *See* Ex. 9 at 164:21–165:22.

Baker & Taylor also relies on Mr. Johnson's testimony to argue that Baker & Taylor did not retain downloaded records because of the results of searches. Opp. at 51–52. But Baker & Taylor provides no evidentiary support for this assertion. The portion of Mr. Johnson's testimony Defendants cited does not indicate this is true, and elsewhere in his testimony, Mr. Johnson testified that when BTCat customers conduct certain searches through the BTCat platform,

including searches targeting OCLC, the results are not retained in short-term memory (though Mr. Johnson testified that Baker & Taylor tried to find a way to retain the full data from those search results for future use). Ex. 9 at 122:6–124:11. Mr. Johnson did not offer this testimony in connection with Baker & Taylor's extractions under the 2019 License Agreement.

Baker & Taylor also ignores the remainder of the arguments OCLC put forth to establish a breach. Specifically, Baker & Taylor does not address the additional breach identified by OCLC— Baker & Taylor's failure to provide a written report after the first year of the Agreement indicating which records it downloaded. Mot. at 15. Similarly, Baker & Taylor fails to address OCLC's contention that Baker & Taylor misrepresented the number of records it downloaded from WorldCat. Mot. at 15. Baker & Taylor have thus waived any opposition to these arguments. *Humphrey v. United States Att'y Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (stating that where party failed to respond to argument, any opposition was waived).

### D. OCLC has shown a likelihood of success on the merits on its unjust enrichment claim.

Defendants improperly limit OCLC's unjust enrichment claim as "expressly based on an alleged breach of the 2019 License Agreement." Opp. at 52. Defendants not only misunderstand OCLC's allegations but, yet again, disregard the evidence that has been unearthed during discovery.

A party may recover under an unjust enrichment claim when the subject matter at issue falls outside of the *scope* of a contract. *See A1 Heating & Cooling, Inc. v. Thomas*, No. 2023 CA 0017, 2024 WL 157882, at *7 (Ohio Ct. App. Jan. 12, 2024). Here, OCLC's unjust enrichment claim falls outside the 2019 License Agreement. OCLC has alleged that Defendants have been unjustly enriched by their use and retention of WorldCat records without (1) paying for a license to access such records or (2) spending the millions of dollars and thousands of hours and effort

required to develop such high-quality records. *See* Compl., Dkt. 1, ¶¶ 12, 16, 151 # 3–4, 27; *see also* Motion, Dkt. 5, PageID # 105; Ex. 21 at 186:16–23.

Evidence in discovery has shown that Defendants obtained WorldCat records not only through downloading in excess under the License Agreement, but through other avenues. Defendants impermissibly obtained access to WorldCat records through the uploads via § 4.5 of the collectionHQ agreement, improper retention and use of WorldCat customers' credentials, and BTCat customers contributing their records to BTCat. *See supra* Part I.A.3. This conduct is outside the terms of the 2019 License Agreement and recoverable under OCLC's claim of unjust enrichment.[15]

Defendants fail to present a single substantive argument alleging that OCLC has not satisfied its burden in establishing the elements of its unjust enrichment claim. "Civil liability may be imposed to prevent an injustice when one party retains a benefit *from another's labors*." *Shaw v. J. Pollock & Co.,* 612 N.E.2d 1295, 1299–300 (9th Dist. 1992) (emphasis added). Defendants are unjustly enriched by their unauthorized retention and use of the fruits of OCLC's labor—its compilation, enhancement, and enrichment of bibliographic records, *i.e.*, WorldCat records and data—within BTCat. Compl., Dkt. 1, ¶¶ 43–49, 117, 151, # 8–9, 21, 27; *see also* Ex. 1 (describing the extensive processes and enhancements to WorldCat records). Defendants have gained customers because they incorporated WorldCat records and data into BTCat. *See supra* Part I.A.5.

Further, Bridgeall and Baker & Taylor bundle BTCat and collectionHQ together. Ex. 7 at 191:4–22. Thus, Baker & Taylor's use and incorporation of WorldCat records into BTCat, without a license agreement, drives Bridgeall's collectionHQ subscriptions because the collectionHQ

---

[15] To the extent the Court finds that OCLC's current unjust enrichment claim as articulated in the Complaint is somehow limited to just the use of records in excess or in violation of the 2019 License Agreement, OCLC seeks leave to amend the Complaint to supplement Count IV with these additional bases for unjust enrichment that have been further evidenced during the limited discovery thus far.

service is presented alongside BTCat. Bridgeall itself need not retain the records in order to be unjustly enriched by their improper retention and use. This is enough to establish a benefit conferred and unjustly retained under Ohio law. *See Keller Elec., Inc. v. Gilbert*, No. 17467, 1996 WL 183027, at *5 (Ohio Ct. App. Apr. 17, 1996) ("Keller has adequately alleged unjust retention of the benefit by claiming that Gilbert has enjoyed the fruits of Keller's labor without paying for it.").

## II.     OCLC has Demonstrated Irreparable Harm.

The Court should reject Defendants' arguments that OCLC cannot show irreparable harm. As OCLC has explained, an injury is irreparable if it is "not fully compensable by monetary damages." *Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. Mar. 10, 2025) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). And an injury is "not fully compensable by money damages" if "the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

OCLC can show several types of classic irreparable injuries. First, OCLC has identified customers it has already lost—and more customers it is at risk of losing—because of Defendants' wrongful actions. Ex. 3 at 152:10–154:5. By extension, the loss of these customers has diminished WorldCat's value, particularly because it is a club good, and the further impact on all the products and services that rely on WorldCat. Ex. 3 at 150:12–20 (explaining that one of the irreparable harms to OCLC was the "potential deterioration of other products and services that rely on WorldCat" and that the "valuation of WorldCat itself would diminish"). Third, Defendants' improper conduct has interfered with OCLC's customer relationships and diminished OCLC's customer goodwill. *E.g.*, *id.* at 118:18–24 (explaining that actions like Defendants' "could

diminish the goodwill and value we have in WorldCat" and "diminishes the goodwill that we have

with the [library] community"). These types of harm are irreparable injuries. *E.g., Mech. Constr.*

*Managers, LLC v. Paschka*, No. 3:21-CV-302, 2022 WL 1591605, at \*11 (S.D. Ohio May 19,

2022) ("Finally, because money damages would prove difficult to calculate based on potential loss

of customers and prospective customers, [the Plaintiff] has shown the potential of irreparable

harm." (citation omitted)); *United HealthCare Servs., Inc. v. Corzine*, No. 2:21-CV-319, 2021 WL

961217, at \*19 (S.D. Ohio Mar. 15, 2021) (finding "irreparable harm in the form of 'interference

with customer relationships' and the 'loss of fair competition'").[16]

    According to Defendants, OCLC identified only two types of irreparable harm—lost

customers and diminishment of WorldCat—and neither are significant enough to constitute

irreparable injury. Opp. at 55–58. Most fundamentally, this argument fails because it rests on the

faulty premise that only a significant monetary harm can be an irreparable injury. That is not the

standard for irreparable harm. *E.g.*, *Becerra*, 131 F.4th at 370 (instructing that an injury is

irreparable if it is "not fully compensable by monetary damages" (quoting *Overstreet v. Lexington-*

*Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). Nor is it what OCLC argues. OCLC

has argued the opposite: that portions of the harm from Defendants' action cannot be quantified.

    Next, Defendants mischaracterize OCLC's argument as including only two types of

irreparable harm (loss customers and diminishment of WorldCat). OCLC also argues that it is

suffering irreparable harm because of defendants' interference with OCLC's customer

relationships and diminishment of customer goodwill. And OCLC has backed up this argument

with evidence. *E.g.*, Ex. 3 at 118:18–24 (explaining that actions like Defendants' actions "could

---

[16] Defendants assert that cases OCLC cites do not provide support for its argument and proceed to distinguish these
cases factually. Opp. at 58. OCLC cited these cases only for black letter law under a different factor of the balancing
test—the balancing of equities. Mot. at 19.

diminish the goodwill and value that we have in WorldCat" and "diminishes the goodwill that we have with the [library] community"). This interference with OCLC's customer relationships and loss of goodwill are, on their own, enough to support injunctive relief. *E.g.*, *Certified Restoration*, 511 F.3d at 550 (finding irreparable injury in the context of an alleged violation of a non-compete agreement and explaining that the "likely interference with customer relationships resulting from the breach" of a binding agreement and the "loss of fair competition" are injuries that are "not fully compensable by money damages" because "the nature of the[se] loss[es] would make the damages difficult to calculate." (citation omitted)).

Defendants' arguments about OCLC's lost customers also fall flat. Defendants claim OCLC's loss of customers is not irreparable harm because OCLC can identify specific customers that left OCLC for BTCat and these customers make up a small percentage of OCLC's customer base. Opp. at 55–57. Defendants' argument that the already identified lost customers making up a small percentage of OCLC's customer base is a red herring. That OCLC can identify *some* customers who left WorldCat for BTCat does not mean that OCLC can identify *every* such customer—nor is OCLC required to do so at this stage. Further, OCLC has already identified several customers that are "at risk" of leaving OCLC for BTCat. OCLC has further explained that the rate at which it is losing customers to BTCat is "accelerating significantly." Ex. 3 at 166:7–13 The fact that OCLC has identified a small percentage customer base it has lost thus far says nothing about the future number of customers OCLC could lose without the Court's intervention.

More importantly, Defendants' argument that OCLC has not identified "enough" lost customers rests on Defendants' incorrect premise that irreparable harm must reach a certain threshold of financial magnitude. Unsurprisingly, Defendants cite no case law for this proposition. And of course, the correct legal rule cuts the other way: when a harm has a quantifiable financial

41

magnitude, it is not an irreparable injury. *E.g.*, *Certified Restoration*, 511 F.3d at 550 (instructing

that an injury is "not fully compensable by money damages" if "the nature of the plaintiff's loss

would make the damages difficult to calculate." (quoting *Basicomputer Corp.*, 973 F.2d at 511).

Defendants also argue that any diminishment in WorldCat's value is not irreparable harm.

According to Defendants, because OCLC's revenue has increased in recent years, it has not

suffered irreparable injury in the form of diminishment of WorldCat's value. Again, much of this

argument relies on a false premise that "irreparable harm" must be harm that is an existential threat

or of a certain monetary value. That is not the legal standard.

Moreover, Defendants' arguments about OCLC's revenue are misplaced. That OCLC's

revenue increased some amount since 2022 *in spite of* Defendants' wrongful actions tells the Court

nothing about how revenues may have increased *in the absence* of Defendants' wrongful conduct.

In other words, without Defendants' wrongful conduct, OCLC's revenues may have increased

even more. But of course, such hypothetical revenue streams are notoriously difficult to calculate,

which is precisely why they cannot be easily compensated by damages.

Additionally, Defendants misunderstand OCLC's "diminishment" argument. WorldCat is

a club good and the more libraries that participate in WorldCat, the more valuable it is. Thus, the

diminishment of WorldCat's value is not that records are being removed from WorldCat or that

revenue is down. Rather, here, the diminishment comes from the fact that fewer libraries are

subscribing to and participating in WorldCat, which reduces their contributions to WorldCat and

the value of WorldCat as a club good. Again, WorldCat customers contribute records and data to

WorldCat with an understanding that other WorldCat customers will comply with the restrictions

imposed by the Framework Agreement (which includes the WorldCat Policy) and that OCLC will

protect WorldCat from violations of those obligations by customers and misuse of WorldCat by

non-customers. Defendants' wrongdoing directly and indirectly damages those WorldCat customer relationships, thereby diminishing WorldCat as a product and service, a subscriber-community resource, and a club good.

WorldCat's quality is directly linked to the number of customers it has because the more libraries and institutions that participate in WorldCat and catalog their bibliographic records with OCLC, the more records are improved and are available through WorldCat. *See* Ex. 3 at 100:18–23. In turn, the more records that are available through WorldCat, the more beneficial WorldCat becomes to OCLC's customers because "the greater the value of the . . . WorldCat database." *Id.* at 100:9–17. The more valuable WorldCat is, the more valuable all the products and services that rely on WorldCat are, too. *Id.* at 101:7–10 (explaining that as WorldCat becomes more valuable, the "other downstream services[ ] become more valuable to the members").

Finally, Defendants argue that OCLC's request for an injunction prohibiting the transfer of files from collectionHQ to BTCat is moot because no records from collectionHQ, obtained through § 4.5, have been transferred to BTCat for almost two years. Opp. at 58–60. Courts generally do not dismiss claims on mootness grounds due to "voluntary cessation" of the alleged conduct to moot a claim unless (1) "there is 'no reasonable expectation that the alleged violation will recur'"; and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)); *Thomas v. City of Memphis*, 996 F.3d 318, 323 (6th Cir. 2021). Defendants make no effort to satisfy this test, despite the "heavy burden" of establishing mootness lies with Defendants. *Thomas*, 996 F.3d at 324 (citation omitted).

First, there is a reasonable expectation that the alleged violation will recur. Bridgeall's acquirer, Valsoft, has currently decided it will not transfer to Baker & Taylor the files that Bridgeall

collected pursuant to § 4.5 of the collectionHQ agreement for use in BTCat, but nothing prevents Valsoft from doing so in the future. The same is true for the records that Bridgeall already transferred to Baker & Taylor pursuant to § 4.5 but that Baker & Taylor has chosen not to upload into BTCat. Indeed, in Defendants' opposition brief, they maintain that they have a legal right to upload all these records into BTCat in the future. Opp. at 59 ("B&T believes it is entitled to add those records to BTCat."). This insistence that Defendants have a legal right to transfer and upload the files undercuts their mootness argument. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (concluding that voluntary cessation did not moot a claim where the defendant "vigorously defend[ed]" the legality of the challenged conduct); *Bethel v. Jenkins*, No. 2:15-CV-3016, 2018 WL 3215502, at *3 (S.D. Ohio July 2, 2018), *R&R adopted*, 2018 WL 3649599 (Aug. 1, 2018) (same). There is a reasonable expectation that the alleged wrongful conduct could recur.

Second, the interim relief or events have not completely and irrevocably eradicated the effects of the alleged violation. Since Bridgeall/Valsoft stopped transferring the files to BTCat, no interim events have "completely and irrevocably eradicated the effects of the violation." BTCat still has over 4 million bibliographic records made available to all BTCat subscribers that contain WorldCat indicators—and Defendants have many of those records because of their wrongful conduct. *See supra* Part I.A.3. And Defendants are still using those records to unfairly offer BTCat at a reduced cost subsidized by OCLC's significant hard work and investment. Thus, the effects of the violation have not been "completely and irrevocably eradicated."

## III. The Balance of Equities Weighs in Favor of Granting a Preliminary Injunction.

This Court should grant OCLC's Motion, as OCLC's harm far outweighs any potential harm to others. OCLC need not show that no harm will be suffered by others as a result of its requested preliminary injunction. *See Certified Restoration*, 511 F.3d at 550–51. Rather, OCLC

need only establish, and does establish, that its own harm outweighs the alleged potential harm to others. *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 568 (6th Cir. 1982).

Defendants allege that Baker & Taylor will be harmed as the preliminary injunction will "effectively shut down" Baker & Taylor. Opp. at 60. However, Baker & Taylor's corporate representatives designated to testify as to the potential harm to Baker & Taylor as a result of a preliminary injunction admitted that the harm to Baker & Taylor would be minimal. *See* Ex. 9 at 209:2–210:14; A. Kochar Dep. Tr. Vol. II (Ex. 38) at 360:19–364:20, 370:3–373:24. Specifically, Mr. Johnson testified that there could be harm to Baker & Taylor's "CLS services," but that such harm would be easily mitigated if Baker & Taylor and OCLC has entered into a third-party cataloging agreement, allowing Baker & Taylor to access the customer's holdings for the purpose of providing CLS services. Ex. 9 at 209:2–210:14.

Similarly, Mr. Kochar focused on harm to Baker & Taylor's other services, which could be mitigated by a third-party cataloging agreement, or a potential sequester of the WorldCat records that Baker & Taylor impermissibly obtained. Ex. 38 at 360:3–363:23; 370:3–372:3. Mr. Kochar did not testify that Baker & Taylor or BTCat would be shut down by the removal of OCLC's enhanced WorldCat records. In fact, Mr. Kochar testified that records with WorldCat identifiers are not important to BTCat's core functionality. *Id.* at 371:19–22. The only other potential harm Mr. Kochar truly identifies is speculative, reputational harm to Baker & Taylor. *Id.* at 373:25–374:17.

Moreover, any alleged "harm" to Baker & Taylor is purely of its own making. Defendants do not provide any case law to dispute that "[w]hen the harm to a defendant is self-inflicted, it is outweighed by the irreparable harm to the party seeking injunctive relief." *See* Mot. at 20 (citing *Concentrix CVG Customer Mgmt. Grp. Inc. v. Daoust,* No. 1:21-CV-131, 2021 WL 1734284, at

*16 (S.D. Ohio May 3, 2021)); *see also H.H Franchising Sys., Inc. v. CareSmart Sols., Inc.,* No. 1:21-CV-575, 2022 WL 4274278, at *6 (S.D. Ohio Sept. 15, 2022) (citing *Handel's Enter., Inc. v. Schulenburg*, 765 F. App'x. 117, 125 (6th Cir. 2019)). Defendants' assertion that BTCat will cease to exist if the preliminary injunction is granted precisely proves OCLC's point that the BTCat database was impermissibly built upon OCLC's enhanced WorldCat records. Nothing is preventing Defendants from removing WorldCat records and data and building the BTCat database by compiling, enriching, and improving its own bibliographic records. Defendant's alleged harm, if no longer allowed to support BTCat with enriched WorldCat records, is of its own doing and thus makes any alleged harm suffered a non-factor. *See H.H. Franchising Sys., Inc.,* at *6.

Defendants argue that libraries will be harmed if they are "deprived of access to BTCat" and point to *Cavalier Distrib. Co., Inc. v. Lime Ventures, Inc.,* No. 23-3283, 2023 WL 9052002, at *4 (6th Cir. Dec. 28, 2023). Opp. at 60. *Cavalier* is different from this case. In *Cavalier*, the Court concluded the harm to Defendant outweighed the harm to Plaintiff because Defendant was the sole manufacturer of "lambics beer" and the injunction could "deprive Ohioans of the breweries' beer altogether." *Cavalier*, 2023 WL 9052002, at *4.

Here, libraries will not be deprived of cataloging services or of bibliographic records if BTCat may no longer operate using OCLC's enhanced WorldCat records. Baker & Taylor has, itself, recognized that libraries can go elsewhere for such services. Ex. 13 at 132:3–20; 245:12–25. And specifically, libraries may obtain the same exact enhanced WorldCat records from the source itself—OCLC. *See Certified Restoration*, 511 F.3d at 551 (finding this factor did not "counsel[] against issuing the preliminary injunction" where "[t]he only third parties that might be affected by the injunction are Defendants'. . . customers" and "they would still be able to obtain . . .

services from Plaintiff"). Therefore, any "alleged" harm to BTCat users is mitigated and outweighed by the irreparable harm to OCLC. *See supra* Part II.

## IV.    The Preliminary Injunction Will Serve the Public Interest.

Given OCLC's likelihood of success on the merits, it is in the public interest to protect OCLC's contractual relations with its customers and prospective customers from the Defendants' unfair competition. *See Certified Restoration*, 511 F.3d at 551 (protecting contractual relations is in the public interest). This public interest factor primarily considers the impact of an injunction on non-parties, *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011), which here include OCLC's employees, WorldCat customers, and other OCLC customers. Without an injunction, these stakeholders will continue to suffer from the instability and unpredictability that stems from Defendants' interference with contractual obligations.

Further, Defendants have no basis for alleging that OCLC has a monopoly in library services. *See* Opp. at 61. Baker & Taylor's Senior Vice President of Global Supply Chain Systems, Daniel Johnson, testified that OCLC's WorldCat competes with several other services, including BTCat, Alma, SirsiDynix, Destiny, Koha, and more. Ex. 9 at 47:17–48:8; *see also* Ex. 13 at 245:4–22. OCLC and BTCat operate in a market with robust competition, and the public has a strong interest in ensuring that OCLC can continue to provide its services without the Defendants' improper interference.

Defendants also misconstrue OCLC's position on WorldCat records, claiming that OCLC purports to own "essentially every single library in the world, based on its equally unfounded claim to control the public's access to records that it admits it does not own." Opp. at 61. As explained above, that is not OCLC's position on this issue, nor is it consistent with the plain language of OCLC's Framework Agreement. *See supra* at Part I.A.1.

## V.       The Evidence Demonstrates a Minimal Bond is Appropriate.

Defendants only response to OCLC's request for a minimal bond is that the bond should be "in an amount sufficient to protect B&T" and that "B&T should be permitted to request a specific amount based on the scope and nature of the injunction." Opp. at 61–62. Defendants do not provide even an estimate of the appropriate amount of bond. And as set forth above, the harm to Defendants from any preliminary injunction will be minimal, justifying only a minimal bond.

## <u>CONCLUSION</u>

For these reasons, OCLC respectfully requests that the Court enter a preliminary injunction order as requested in OCLC's Motion.

Respectfully submitted,

*/s/ Jeffrey M. Walker*

Jeffrey M. Walker (0096567)
Kathryn M. Brown (0100426)
Traci L. Maritnez (0083989)
Brittany Silverman (0102263)
Erin Hassett (0099970)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: (614) 365-2700
Facsimile: (614) 365-2499
jeffrey.walker@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com
erin.hassett@squirepb.com

## CERTIFICATE OF SERVICE

On September 12, 2025, this document was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties. As-filed copies of this document were also served via email upon all counsel of record.

*/s/ Jeffrey M. Walker*
One of the Attorneys for Plaintiff OCLC