# EXHIBIT 3

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE SOUTHERN DISTRICT OF OHIO
3                    EASTERN DIVISION
4                        * * *
5    OCLC, INC.,
6          Plaintiff,
7
           vs.                CASE NO. 2:25-CV-309
8
9    BAKER AND TAYLOR, LLC, et al.,
10         Defendants.
11
                             * * *
12
13
          * TRANSCRIPT DESIGNATED CONFIDENTIAL *
14
15
16         Deposition of BILL ROZEK, a 30(b)(6)
17   representative herein, called by the defendants for
18   examination pursuant to the Rules of Civil Procedure,
19   taken before me, Emma Jane Troyer, a Notary Public
20   within and for the State of Ohio, at the Offices of
21   Squire Patton Boggs, 41 South High Street, Suite 2000,
22   Columbus, Ohio, 43215, on August 12th, 2025, at 9:00
23   a.m.
24                           * * *
25

Page 22

1 Maybe not a few minutes, but soon. In that instance,
2 who took the lead in addressing that problem -- was it
3 you, or someone else?
4   A. Took the lead. There was a group discussion, and
5 after that discussion, sales has taken the lead in
6 communicating with the customer indicating a potential
7 violation of rights and responsibilities and the
8 framework agreement.
9   Q. Okay. So that particular instance has not been
10 resolved yet?
11   A. No. It's ongoing right now.
12   Q. Before I show you copies of these agreements that
13 we've already started talking about, what is your
14 understanding of the difference between an OCLC customer
15 and an OCLC member?
16   A. The terms are somewhat synonymous.
17   Q. What do you mean by somewhat synonymous?
18   A. They're synonymous. We use the term institution,
19 we use the term member, we use the term customer,
20 throughout our agreements, but they're all essentially
21 mean almost the same thing. They mean the same thing.
22   Q. Are there any customers who are not members?
23   A. We have separate agreements with third party
24 agents and publishers who are not members.
25   Q. Okay. So two different groups. So let me ask

Page 23

1 you, are there any third party agents who are customers
2 of OCLC?
3   A. Yes.
4   Q. And does that mean that there's an agreement with
5 the third party agent and that they pay OCLC?
6   A. Yes.
7   Q. Okay. And are those third party agents, is that
8 in connection with a library who is a customer who
9 utilizes the agent to help them do things?
10       MS. BROWN: Objection. Vague.
11   A. Can you define the question a little more
12 clearly?
13   Q. Okay. Are you familiar with the term third party
14 agreement?
15   A. Yes.
16   Q. Okay. And are there instances where there are
17 library members of OCLC that would like to use another
18 entity as their agent to help them in whatever they're
19 doing, and so the agent get access to OCLC?
20   A. Yes.
21   Q. Okay. Is that what you consider to be a third
22 party agent?
23   A. Yes.
24   Q. Okay. And does the library pay a fee when that
25 arrangement is made?

Page 24

1   A. The library doesn't pay us the fee directly. We
2 get an agreement from the library and that the agent
3 signs, for example, to do cataloguing on behalf of the
4 library, okay.
5   Q. Okay. So as between the library and the third
6 party agent, it's the agent who pays the fee?
7   A. It's my understanding. I don't know all of the
8 arrangements between the agent and the library who's
9 paying, okay.
10   Q. But there's a written agreement in those
11 instances, correct?
12   A. There's a written agreement that both the library
13 agrees to and the agent agrees to to act on behalf of
14 the library.
15   Q. And OCLC also agrees to that?
16   A. With those terms and conditions in the agreement.
17   Q. And all three of those parties sign an agreement?
18   A. Yes.
19   Q. You mentioned publishers. Are there publishers
20 that are customers of OCLC?
21   A. Yes.
22   Q. And they pay a fee to OCLC?
23   A. Yes.
24   Q. Okay. And do they -- we heard some testimony
25 yesterday about that. Let me digress for a second.

Page 25

1 You're aware that yesterday we took testimony from Mary
2 Sauer-Games?
3   A. Yes.
4   Q. And you know who that is, correct?
5   A. Yes.
6   Q. Was she one of the people you met with in
7 preparing?
8   A. No.
9   Q. Okay. Did you speak to anyone about her
10 testimony?
11   A. Yesterday's testimony, no.
12   Q. Okay. So publishers, when they're customers of
13 OCLC, are they -- is that an arrangement that they use
14 to get access to the WorldCat or extract records out of
15 WorldCat?
16   A. Yes.
17   Q. Don't publishers send records to WorldCat?
18   A. Yes. We actually in some cases purchase those
19 records and place them into WorldCat.
20   Q. Okay. And so there are instances where the
21 publisher, you have an agreement for an electronic fee,
22 for example, for the publisher's records to get imported
23 into WorldCat?
24   A. Yes.
25   Q. And is that a separate arrangement from

CONFIDENTIAL

Page 26

1 publishers who are customers of WorldCat?
2   A. Separate arrangements. We have written
3 agreements with publishers who provide us records, and
4 we pay for those records.
5   Q. Right.
6   A. We also have separate agreements with some
7 publishers that permit them on a limited basis to be --
8 to have access to WorldCat. Those are two separate type
9 of arrangements.
10   Q. And there are publishers who are in one of those
11 categories or the other. Are there any that are in both
12 categories?
13   A. I'm not sure.
14   Q. Okay. So when you referred to publishers as
15 customers or when you refer to some customers are
16 publishers, you were referring to the group of
17 publishers who pay a fee, not the publishers who are
18 paid to contribute records, correct?
19   A. Primarily, yes. Yes.
20   Q. Do you consider a publisher who is paid a fee by
21 OCLC to be a customer?
22   A. It's really more of a vendor, okay, at that
23 point.
24   Q. Right. Okay.
25

Page 27

1   (Defendant's Exhibit N marked for identification.)
2
3   Q. The court reporter has handed you a document
4 that's been marked Exhibit N. Do you recognize that?
5   A. Yes.
6   Q. And the first page has a big Exhibit A on it,
7 because this was an exhibit to the complaint. Were you
8 aware of that?
9   A. Yes.
10   Q. Okay. The date of this on the bottom of the
11 first page, the date of this agreement is July, 2024; do
12 you see that?
13   A. Yes.
14   Q. Do you know whether this agreement existed before
15 July, 2024?
16   A. Yes.
17   Q. Okay. And did it exist before July, 2024?
18   A. Yes.
19   Q. And has there been more than one version of this
20 agreement over time?
21   A. Yes.
22   Q. And are you involved or have you been involved in
23 any changes that may have been made to this agreement
24 over time?
25   A. Only as it relates to payment terms, making sure

Page 28

1 the payment terms were in here.
2   Q. So if there are revisions or changes that don't
3 involve payment terms, you may not be involved?
4   A. No.
5   Q. To your knowledge, was this drafted by someone at
6 OCLC?
7   A. I know our legal department was heavily involved
8 with drafting this agreement and the previous versions.
9   Q. Do you know when the first version of this
10 framework agreement was promulgated?
11   A. I don't know when the first date was, but there
12 was something called the master services agreement, and
13 prior to this it was a name convention.
14   Q. In your understanding, does this essentially
15 serve as a master services agreement?
16   A. That was a previous term that was used for this
17 framework agreement.
18   Q. Right. And did the master services agreement
19 also govern services to customers?
20   A. To customers or institutions or members who
21 subscribe to our services.
22   Q. Okay. So is there any difference in your mind
23 between an OCLC subscriber and an OCLC member?
24   A. A subscriber being a member, someone who
25 subscribes to one of our services.

Page 29

1   Q. Okay.
2   A. Clarify the question?
3   Q. You want me to clarify the question?
4   A. Yes.
5   Q. So as you use the word subscriber and you use the
6 word customer, which you've already -- sorry. You used
7 the word member. In your mind, when you use those two
8 terms, are they synonymous, or is there a difference
9 between who is a subscriber and who is a member?
10   A. A member is someone who subscribes to our
11 services and also is referred to as an institution.
12   Q. Okay. And an institution is a defined term, and
13 that's actually what's used in this agreement, correct?
14   A. It's used in this agreement along with a member.
15   Q. Okay. So on the second page of the actual
16 agreement, if -- you can just disregard the cover sheet.
17 The second page, first page is like a form that's where
18 you fill in information for a particular customer,
19 correct?
20   A. Correct.
21   Q. And the second page has an introductory, or has a
22 statement and signatures, and it refers to institution
23 with a capital I, correct?
24   A. Yes.
25   Q. So in this -- as this agreement is drafted and as

CONFIDENTIAL

Page 34

1   MS. BROWN: Objection. Vague.
2   A. It is a separate document that is incorporated
3   into the framework agreement when you check that box and
4   subscribe to that service.
5   Q. Okay. And so it's the act of checking the box
6   that indicates whether a particular schedule becomes
7   incorporated with the framework agreement?
8   A. Yes.
9   Q. Okay. If a box, if the box next to a schedule is
10  not checked, that schedule is not part of the framework
11  agreement, correct?
12  A. Yes.
13  Q. Now, you mentioned many times already the
14  WorldCat rights and responsibilities document, which I'm
15  referring to as the policy, and if I refer to it as the
16  policy, you understand what I'm talking about, right?
17  A. Yes, I do.
18  Q. Okay. Can we agree that the framework agreement
19  itself does not incorporate the WorldCat policy?
20     MS. BROWN: Objection. Asked and answered.
21  A. No. I do not agree with that.
22  Q. Okay. Can you please point to where in the
23  framework agreement the rights and responsibilities is
24  incorporated?
25  A. Specifically, when you check box number 1, 2, 3,

Page 35

1   WorldShare meta data and OCLC cataloguing, it references
2   schedule two, and schedule two is specifically
3   incorporates the rights and responsibilities in that
4   schedule.
5   Q. So the only way that the WorldCat policy gets
6   incorporated is if you check the box and schedule two
7   applies?
8     MS. BROWN: Objection. Calls for a legal
9   conclusion.
10  A. I'm not a lawyer, okay, so I can't give you a
11  legal opinion, but there are sections in the framework
12  agreement that I believe also reference the fact that
13  you shouldn't be doing anything that might be
14  detrimental to OCLC's products and services.
15  Q. Okay. And for example, Section 5.1?
16  A. Mm-hm.
17  Q. Correct, and you're familiar with 5.1?
18  A. I am.
19  Q. Okay. But 5.1 doesn't mention or incorporate the
20  WorldCat rights and responsibilities, correct?
21  A. Schedule 5.1 by itself does not incorporate the
22  rights and responsibilities to my understanding.
23  Q. Okay. And just so we're clear, you said schedule
24  5.1. Did you mean Section 5.1?
25  A. Section 5.1. And specifically, if you read it,

Page 36

1   it says OCLC and its licensers and suppliers are the
2   exclusive owners and retain all right, title, and
3   interest copyrights and other proprietary rights to the
4   products, services, WorldCat, and other materials
5   produced by OCLC, all right.
6   Q. And you were reading from Section 5.1(a)?
7   A. I was, correct. That's correct.
8   Q. Since I'm turning the page on my outline, let me
9   just digress for a second. How many customers slash
10  members does OCLC have, approximately?
11  A. Approximately 29,000, I think, in that general
12  range.
13  Q. And how many of the 29,000 subscribe to the
14  WorldCat database?
15  A. Subscribe to the cataloguing services as opposed
16  to the database?
17  Q. That wasn't my question, but why don't you tell
18  me how many are subscribed to the cataloguing services?
19  A. Approximately 10,000.
20  Q. And if a customer subscribes to the cataloguing
21  services, is there a particular schedule that they would
22  use?
23  A. Yes.
24  Q. Which schedule?
25  A. Schedule two.

Page 37

1   Q. Okay. So if a customer wants to take advantage
2   of the cataloguing services, schedule two is checked and
3   becomes incorporated into the framework agreement?
4   A. Yes.
5   Q. And if in that instance then anything that is
6   mentioned in schedule two becomes connected to the
7   framework agreement?
8   A. Yes.
9   Q. If -- so that's 10,000. So there are another
10  19,000 OCLC customers or members who do not choose that
11  service?
12  A. There also is WorldShare Management Services,
13  WMS, and that service also includes cataloguing services
14  as well.
15  Q. Okay. So those are customers who also use the
16  cataloguing service?
17  A. Yes.
18  Q. And they get something else as well?
19  A. Yes. They get other services as part of that
20  package.
21  Q. Okay. So if a customer is in that category, are
22  they among the 10,000 that you mentioned?
23  A. I would need to double check that. I believe
24  they are, but I would need to double check that.
25  Q. Okay. So when you include the customers who use

CONFIDENTIAL

Page 38

1 cataloguing services and the customers who use the
2 WorldShare services that includes cataloguing, your
3 estimate is about 10,000 of the customers?
4   A. I would have to double --
5       MS. BROWN: Objection.
6   A. I would have to double check.
7       MS. BROWN: Remember to let me get the
8 objection in when I start.
9   A. Okay.
10   Q. So you don't know whether both of those
11 categories are included in the 10,000?
12   A. I know for sure that those that subscribe
13 specifically to just cataloguing services are in the
14 10,000. I would need to double check to make sure that
15 the WMS subscribers are part of that 10,000.
16   Q. Okay. That might be an additional number on top
17 of the ten?
18   A. It could be an additional number.
19   Q. So whatever that number is plus the estimated
20 10,000 subscribers, there are still a lot of OCLC
21 customers who are not subscribers; is that correct?
22       MS. BROWN: Objection. You can answer.
23   A. There are some who are not subscribers; yes.
24   Q. Do you have any sense of how many that is out of
25 the 29,000?

Page 39

1   A. I would say that that is -- I don't know the
2 exact answer of that, but I would say that it's probably
3 a good portion of that remaining 29,000.
4   Q. Okay. How does the customer -- let me withdraw
5 that. The framework agreement has a term, and then it
6 gets renewed at the end of the term if the customer
7 wants; is that right?
8   A. Yes.
9   Q. Okay. So when a customer is a new customer or is
10 a renewing customer, how does that customer decide which
11 schedule they would -- they need to check?
12   A. Okay. There's two questions there, new and
13 renewing customer. For a new customer, there is a
14 negotiation between the sales department and the
15 customer who explains our services, and as part of that
16 consultation process, it's determined which schedules
17 need to be checked and what services need to be
18 provided.
19   Q. Okay. And if the determination is that that
20 customer wants to use the cataloguing service, then
21 schedule two is checked?
22   A. Yes.
23   Q. Okay. And if the customer doesn't need the
24 cataloguing services, then you wouldn't check the box
25 for schedule two?

Page 40

1   A. Unless it was a WMS customer.
2   Q. Okay. Which box gets checked for WMS customer?
3   A. Box number one, WorldShare Management Services
4 schedule one.
5   Q. Okay. And so WorldShare Management Services
6 customer doesn't check the box for schedule two?
7   A. I believe they also check that box.
8   Q. Okay. Now, there are a variety of other services
9 that OCLC provides, which is reflected in this list of
10 schedules, correct?
11   A. Yes.
12   Q. Is there any other category of customers that
13 would check the box for schedule two?
14   A. I don't believe so, but I don't know for sure.
15   Q. Okay. So for those customers in the categories
16 for which schedule two applies, then the box is checked,
17 and schedule two then becomes attached to the framework
18 agreement, correct?
19   A. Yes.
20   Q. Okay. And if they don't -- if a customer doesn't
21 have schedule two checked on this agreement, then
22 schedule two doesn't apply to that customer, correct?
23   A. I believe that's correct.
24   Q. Okay. If I could ask you to turn to Section 13.7
25 of the framework agreement, which is the last page, it

Page 41

1 looks like, have you read that section before?
2   A. Yes.
3   Q. Okay. First sentence says, this agreement and
4 any schedules constitute the complete agreement between
5 the parties, and supersedes and replaces all prior
6 agreements, oral and written, between parties relating
7 to the subject matter of this agreement. What is your
8 understanding of that sentence, understanding you're not
9 a lawyer, but you're here on behalf of OCLC to discuss
10 this agreement?
11   A. I'm not a lawyer, as you've said, but the written
12 agreement and schedules that are incorporated in this
13 agreement, which then by reference includes the rights
14 and responsibilities, is the complete agreement and
15 supercedes any oral discussions between the parties.
16   Q. Okay. And actually, it supercedes oral and
17 written, prior oral and written agreements, correct?
18   A. Yep. Yes.
19   Q. And that sentence doesn't reference the WorldCat
20 policy, the rights and responsibilities, does it?
21   A. That specific sentence doesn't, but if they've
22 checked the schedule, and that schedule is incorporated
23 into the agreement, then the rights and responsibilities
24 is therefore incorporated into the agreement.
25   Q. If you look at the last sentence of that

11 (Pages 38 - 41)

CONFIDENTIAL

Page 66

1  A. To my understanding, when a new customer signs
2  up, they are -- the framework agreement is reviewed with
3  that new customer either by the sales team and/or our
4  legal department or both.
5  Q. Okay. And when would it be reviewed with the
6  sales team as opposed to be reviewed by the legal team?
7  A. My characterization of that would be that the
8  sales team would either give them to or direct them to a
9  place where they could get the framework agreement,
10 which is publicly available, and then they would also
11 then describe verbally the services that the library is
12 attempting, you know, is wanting to sign up for, and
13 then would direct any negotiations outside of the
14 framework agreement, if the customer wanted to or
15 library wanted to make adjustments to this, to the legal
16 department.
17 Q. Okay. So when you say the framework agreement is
18 publicly available, but the version that's publicly
19 available doesn't have check boxes for any of the
20 schedules, so looking at the publicly available copy
21 doesn't tell a prospective customer which schedule is
22 going to apply, does it?
23 A. I do not believe it has that in the publicly
24 available document, the schedules. But that is provided
25 as part of the final negotiations, depending upon what

Page 67

1  products or services they sign up for.
2  Q. So does OCLC provide a customer who wants to sign
3  up for services that involve schedule two with a copy of
4  schedule two?
5  A. Yes, and that's available through either a hot
6  link or a link, and or a hard copy, whichever is
7  requested.
8  Q. But how does that customer know that schedule two
9  is going to be part of the agreement?
10 A. Because they check which schedules for the
11 services on which they're going to be subscribing to.
12 Q. Who is they, the customer?
13 A. Yes. This includes when the final agreement is
14 negotiated, the services that they subscribe to are
15 checked, and the appropriate schedules are provided.
16 Q. Okay. So if a customer wants to sign up for
17 OCLC, but they don't check the box for schedule two,
18 then schedule two doesn't apply?
19    MS. BROWN: Objection. Form.
20 A. If they don't check, to my understanding, if they
21 don't check schedule two, they won't be provided the
22 actual product or services underneath schedule two,
23 because it's not -- they haven't agreed to the
24 contractual agreement.
25 Q. If that's -- if those are the services they want,

Page 68

1  how do they know that they have to check schedule two?
2  A. That's part of the contract negotiations that our
3  legal department works with them on in -- for new
4  customers.
5  Q. So if a customer wants to obtain services to
6  which schedule two applies, that would be something the
7  legal department handles?
8  A. They would be involved in that. If it's a brand
9  new customer, if it's a brand new customer, and working
10 with sales.
11 Q. And how does the -- how does the customer who
12 wants those services know that the WorldCat policy
13 applies?
14 A. They would be provided schedule two, which very
15 specifically references the WorldCat policy.
16 Q. And who would provide that?
17 A. It's my understanding that information is
18 provided either by the legal department and/or the sales
19 department or in conjunction with the both of them,
20 okay, usually is the way it works. Legal gets involved
21 with all new contracts.
22 Q. And does in that process, does someone at OCLC
23 also provide the product description document that's
24 referred to?
25 A. Under 3.6, I do not know if they specifically

Page 69

1  provide that document.
2  Q. Okay. But OCLC expects the customer to
3  understand what's in that policy, or in that document?
4  A. In which document?
5  Q. The product description?
6  A. Yes. In negotiations with the customers, sales
7  make -- the discussions are very clear as to what
8  services they're signing up for. They know.
9  Q. Is there sort of a cheat sheet or a guideline or
10 a written summary of what the salesperson is supposed to
11 convey to a customer so that they understand this
12 agreement?
13 A. I do know that the sales department has
14 collateral material that very clearly explains our
15 products, services that they use as part of the sales
16 process. I do not know specifically if that walks them
17 through the framework agreement.
18 Q. Okay. The term you just used, collateral
19 material, is that just a general reference to some other
20 material?
21 A. Sales aids, you know, that they use in
22 discussions with customers about explaining all of our
23 services and products and things like that.
24 Q. And do you know if one of those collateral
25 materials or sales aids walks a customer through the

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

CONFIDENTIAL

Page 98

1  A. I'm not a lawyer, but I think this is referring
2  to that there's rapidly changes that take place with
3  technology and other services that can't completely be
4  anticipated, is what they're referring to, and so it
5  recognizes that in the future there could be situations
6  that we don't even anticipate.
7  Q. Specifically regarding the use of data extracted
8  from WorldCat by a customer or member?
9  A. That's what that phrase refers to, uses of data
10 extracted from WorldCat.
11 Q. Okay. And that section continues, encouraging,
12 saying, it is impossible to anticipate all the
13 conceivable uses to which members might want to --
14 sorry, want or need to put WorldCat data?
15 A. That's what the line says, yes. That's what the
16 sentence says.
17 Q. And then it says, OCLC members are encouraged to
18 discuss with OCLC any uses that do not appear to be
19 covered by this policy. Has that ever happened?
20 A. Yes.
21 Q. Okay. And have you ever had discussions with a
22 member about what they want to do with data extracted
23 from WorldCat that wasn't clear from the policy?
24 A. We have had discussions on information that was
25 extracted from WorldCat that some of which would have

Page 99

1  violated the policy.
2  Q. All right. And when you refer to violating the
3  policy, part of the policy is the phrase I mentioned
4  before, encouraging widespread use of WorldCat
5  bibliographic data, correct?
6  A. Yes.
7  Q. Okay. So the policy isn't solely directed toward
8  restrictions on the use of WorldCat data, it also is
9  directed to encouraging use and sharing of the WorldCat
10 data?
11 A. It is, but it also refers to WorldCat as a club
12 good, which essentially means that it's intended to be
13 used for the benefits of the members of that club that
14 contribute to the financial benefit and creation of
15 WorldCat.
16 Q. Right.
17 A. And it further defines examples of widespread use
18 in Section 3, so it provides examples of what is meant.
19 It's not a public good. It's a club good.
20 Q. Okay. And to that point, the policy refers to
21 preserving and enhancing the value of WorldCat as a
22 community and as a database, correct?
23 A. As a club good database for the members of the
24 club.
25 Q. And OCLC contends that benefits are provided --

Page 100

1  sorry. Let me strike that. OCLC contends that members
2  benefit when WorldCat is expanded or preserved or
3  maintained?
4  A. Yes.
5  Q. Okay. So that the value in preserving WorldCat
6  is also a benefit to the members?
7  A. Yes.
8  Q. And what is the benefit to the members?
9  A. Well, there are several, but I'll define a few
10 off the top of my head. One of the most significant
11 ones is the more that -- the more members that
12 participate, the greater the value of the asset or
13 WorldCat database, because it enhances the ability of
14 the members to be able to utilize our services, because
15 more members are participating and more members are
16 contributing to the financial investment required to
17 maintain WorldCat.
18 Q. So that benefit to members that you've just
19 described is that by encouraging and expanding
20 membership, more records are ingested into the database?
21     MS. BROWN: Objection.
22 Q. Correct?
23 A. That's one of the things, yes.
24 Q. And it gets larger, and therefore it's a better
25 product?

Page 101

1  A. That is one of the benefits.
2  Q. And if you are a member and you can access that
3  product, and the product is larger, that's a benefit to
4  you?
5  A. It's a benefit to the members.
6  Q. To the members, yes?
7  A. And the investments, because the services that
8  utilize WorldCat, which are many, such as resource
9  sharing and many of our other downstream services,
10 become more valuable to the members.
11 Q. Right. Now, and all those services that also
12 benefit are all OCLC services, correct?
13 A. Some of those services could be not OCLC
14 services, specifically if a library wants to use some of
15 the information contained in WorldCat, internal to their
16 institution, for some of these other scholarly services
17 that are referenced in .3, and don't violate any of the
18 responsibilities in 3(b), some of those services aren't
19 necessarily OCLC's services, like they're using them for
20 scholarly research and they're putting them in their own
21 internal database to assist scholars, and they have
22 rights to do that.
23 Q. And what are the benefits to OCLC derived from
24 the WorldCat database?
25 A. Well, the benefits we receive are we receive

CONFIDENTIAL

Page 110
1   A. Yes.
2   Q. So it's just kind of restating, you have to
3 comply with this document, and that's a responsibility.
4 It's a pretty general responsibility?
5   A. Right. And it references the institution is
6 responsible to make, provide awareness to anybody like
7 their agents, anybody within their organizations that
8 utilize the information.
9   Q. Okay. That is their agents, their cooperatives,
10 and other organizations to which they make their data
11 available?
12   A. Yes.
13   Q. Okay. Which might include Collection HQ, for
14 example?
15   A. Yes.
16   Q. Or Baker and Taylor?
17   A. Yes.
18   Q. Okay. Second one is to contribute and maintain
19 bibliographic and holdings data consistent with the
20 guidelines. So that simply refers to how they maintain
21 it?
22   A. Yes. So I would not assert -- I'm sorry. I'm
23 going to correct my previous testimony that they
24 violated that policy. I don't believe they did, okay.
25   Q. Or at least, that's not relevant to this matter?

Page 111
1   A. Right. I mean, I think that refers to more of
2 formatting issues and things like that.
3   Q. Okay. Okay. Three, make reasonable efforts to
4 ensure that their contributions to WorldCat do not
5 violate the rights of any third party.
6     And we talked a little bit about in Section 5.1
7 of the framework agreement that when the customer is
8 uploading or ingesting material into WorldCat, they have
9 an obligation to make sure that they're allowed to do
10 that, correct?
11   A. Yes.
12   Q. And that's what this refers to as well, isn't it?
13   A. I believe so, yes.
14   Q. Four is make reasonable efforts to attribute the
15 OCLC cooperative as a contributor in works and services
16 based substantially on WorldCat data. So doesn't that
17 basically mean to give credit to the OCLC?
18   A. Yeah.
19   Q. When they're relying on information they get out
20 of WorldCat?
21   A. I believe that's an accurate representation of
22 that sentence; yes.
23   Q. Okay. Five is make reasonable efforts to ensure
24 that the subsequent reuse and transfer of their WorldCat
25 data by non-members is consistent with this policy, and

Page 112
1 with OCLC's public purposes, and supports the long term
2 viability and utility of WorldCat. And you believe
3 that's applicable to this case?
4   A. Absolutely.
5   Q. So what -- the responsibility as written here
6 isn't to simply not transfer, but to take reasonable
7 efforts to ensure that the reuse and transfer of their
8 data is consistent, and how do you determine whether a
9 library has taken reasonable efforts to ensure that?
10   A. Well, specifically it says that libraries are
11 not, under 6(c), cannot engage in mass distribution of
12 data directly from WorldCat to non-members without our
13 written consent.
14   Q. Right. I'll get to 6 in a minute.
15   A. But that specifically relates to -- that's a
16 specific responsibility that they have, which directly
17 contradicts them providing information of WorldCat data
18 to non-members, particularly one that's creating a
19 competitive service with WorldCat records.
20   Q. But even 6, which has (a), (b), (c), and (d)
21 under it, starts out with that the responsibility is to
22 encourage and practice responsible use of the OCLC
23 systems and services, including these steps, correct?
24   A. Yes.
25   Q. Okay.

Page 113
1   A. That's what the sentence says.
2   Q. And you mentioned (b). I'll read it, 6(b). It
3 says not engaging in mass downloading from WorldCat
4 without OCLC's prior written consent. WorldCat there
5 refers to the WorldCat database, doesn't it?
6   A. It does. WorldCat database and records contained
7 therein.
8   Q. Right. So if a library engages in mass
9 downloading from its own catalog, it doesn't implicate
10 that section, does it?
11   A. Unless it is provided to a non-member without
12 our -- OCLC's written consent, and mass downloading also
13 refers to records that aren't part of the member's
14 catalog.
15   Q. Okay. So if the member engages in mass
16 downloading of records out of WorldCat that are not part
17 of its own catalog, that section applies?
18   A. Yes. They would need to get written consent for
19 that.
20   Q. Okay. If the member instead engages in mass
21 downloading from its own catalog, how does this section
22 apply?
23   A. Under (c), it's provided mass distribution of
24 data directly from WorldCat to non-members, and so its
25 own catalog, which contains WorldCat records, we

Case 2:25-cv-00309-EAS-EPD Doc #: 44-10 *SEALED* Filed: 11/05/25 Page: 10 of 15 PAGEID #: 1623

CONFIDENTIAL

Page 114

1  consider to be mass distribution to a non-member.
2    Q. But is that mass distribution directly from
3  WorldCat?
4    A. Yes, because the records contain -- those records
5  are WorldCat records, and we consider providing a
6  complete distribution of a member's holdings that
7  contain WorldCat records as mass distribution to a
8  non-member.
9    Q. Is it OCLC's contention that a library reading
10 Section 6(c) and deciding whether it wants to engage in
11 mass downloading from its own catalog has to understand
12 that what -- that that somehow implicates this section?
13   A. Well, if they had any question, they could also
14 refer to later in the agreement here that defined what
15 WorldCat data is, which specifically says if the record
16 was ever in WorldCat at any point in time, it's a
17 WorldCat record, okay.
18   Q. Okay. And you're looking at the glossary?
19   A. Yes, I am.
20   Q. And it has a definition of -- are you referring
21 to WorldCat data, or WorldCat?
22   A. I'm referring to WorldCat data.
23   Q. Okay. There's a paragraph right after that, but
24 the WorldCat data definition is just that two lines,
25 correct?

Page 115

1    A. The WorldCat data that I'm referring to is that
2  two lines.
3    Q. Yeah. And it says for purposes of this policy,
4  WorldCat data is meta data for animation object
5  generally in the form of a record or records encoded in
6  Marc format whose source is or at one point in time was
7  the WorldCat bibliographic database?
8    A. Yes.
9    Q. Okay. And OCLC's contention is that a library
10 deciding whether, for example, to sign up to the
11 Collection HQ service would understand that downloading
12 records out of their own catalog violates the policy
13 because of this definition?
14   A. Downloading -- yes, libraries should know that.
15 In fact, many libraries, when they have questions on
16 these issues, they will contact us.
17   Q. The last part of 3(b)(6) is (d), okay, right.
18 The last little line in Section 3(b) of things that are
19 responsibility of WorldCat members, and that is not
20 engaging in other activities that diminish the value of
21 WorldCat to the OCLC cooperative. How is a library
22 supposed to know whether something diminishes the value
23 of the WorldCat?
24   A. Well, I think it's fairly clear that providing
25 their catalog to a competitor providing a cataloguing

Page 116

1  service and as an extra inducement, that competitor
2  agrees to provide that competitive service for free,
3  would clearly diminish the value of the WorldCat
4  database.
5    Q. So in the scenario you describe, you're not
6  contending that anything is removed from WorldCat?
7        MS. BROWN: Objection. Misstates testimony.
8    A. I'm contending that providing a mass distribution
9  of their holdings, which contain WorldCat records, is a
10 direct violation of the framework agreement to
11 non-members in (6)(c), and furthermore diminishes the
12 value of the WorldCat database, because they are now no
13 longer a contributing member, and as a result, many of
14 these libraries that would no longer have their records
15 in the WorldCat database, but I don't know that in every
16 situation.
17   Q. So if all that a library does is contribute a
18 mass download of records out of its catalog to somebody
19 else, OCLC believes that they would know that that
20 diminishes the WorldCat database?
21   A. They should know that it would diminish the
22 WorldCat's database because they're no longer
23 contributing members. Their holdings may or may not be
24 in the database, and it specifically violates 6(c),
25 which says they can't do it, because the person -- the

Page 117

1  member that the individual they're providing to is not a
2  contributing member supporting the investment in the
3  WorldCat database.
4    Q. Just a couple follow-ups. Where does it say that
5  a member is no longer contributing member here in
6  3(b)(6)?
7    A. Well, essentially what's happening here -- let me
8  think about this. They're cancelling their cataloguing
9  subscription, therefore they're no longer paying for the
10 cataloguing service, which supports the WorldCat
11 database, and then diminishes the value of WorldCat in
12 so doing.
13   Q. So that section, are you referring to (6)(d)?
14   A. (6)(c) and (6)(d), yes.
15   Q. Okay. So your understanding is that those apply
16 when a WorldCat member cancels their membership and
17 contributes their database to somebody else?
18   A. It includes that.
19   Q. Okay. Well, what about if it doesn't include
20 that, if it's just a member who maintains a membership
21 and engages in mass downloading?
22   A. It would also diminish the value because you're
23 providing WorldCat records to a non-contributing member
24 who is not paying for the support of those services and
25 is also providing services, competitive services, at

CONFIDENTIAL

Page 118

1 dramatically lower prices, which the library, we found
2 out the libraries have told us, and they're able to do
3 that because they haven't had to invest the enormous
4 amounts that we have had to invest in creating those --
5 the WorldCat database of records. And as a result, it's
6 damaging the goodwill with our membership as well as the
7 fact that that non-member is not contributing to
8 supporting the investment for WorldCat.
9    Q. Okay. So a lot of that is going to be in a topic
10 a little later. But I don't want to cut you off, but
11 I'm getting your understanding of this section. But let
12 me just propose this question. Isn't there an
13 assumption in what you just described that by
14 benefitting a company that is a lower price competitor
15 to WorldCat, that causes a diminishment of WorldCat --
16 isn't that an assumption in that scenario?
17       MS. BROWN: Objection.
18    A. It could diminish the goodwill and value that we
19 have in WorldCat because a competitor has
20 misappropriated records, in our contention, from
21 WorldCat, rather than making the investment, and
22 therefore been able to provide services at a much lower
23 value, and that diminishes the goodwill that we have
24 with the community.
25    Q. Okay. And again, I'm hoping not to jump ahead,

Page 119

1 but since you are a CPA and you've mentioned goodwill,
2 are you referring to goodwill as an intangible asset, or
3 are you referring to it more generically?
4    A. I'm referring to it more generically. And we can
5 cover the other topics now.
6    Q. Okay. Let's see how we're doing. How long has
7 it been?
8       MS. BROWN: Do you need a break?
9    A. Yeah, give me a five-minute break.
10
11       (Recess from 1:20 p.m. to 1:28 p.m.)
12
13       MR. ROZEK: I would like to clarify a
14 previous comment I made. When I was referring to
15 goodwill, I was really referring to reputational damage,
16 is really -- for a clarification.
17 BY MR. NOYES:
18    Q. That's fine. We're going to cover that.
19    A. You'll cover that later, but I thought I'd
20 clarify it now.
21    Q. Okay. You've used the term, and the policy --
22 and I think the framework agreement used the term en
23 masse, downloading en masse. How is that defined --
24 what makes a download an en masse download?
25    A. There isn't a specific definition to my

Page 120

1 knowledge, but I will tell you what we consider to be en
2 masse. It would include transferring a library's entire
3 catalog to a non-member, and en masse, I mean, clearly
4 something more than one or two records, but that's my
5 understanding. And once again, I'm not a lawyer, okay.
6    Q. Okay. To that point, are you familiar with the
7 term Z39.50?
8    A. I am familiar with it.
9    Q. And is that a utility that you can use to search
10 for records and then maybe download the records?
11    A. It is a protocol that you can use to search for
12 individual records.
13    Q. Yeah. So if -- and there's evidence in -- I'm
14 not sure if it's AEO only, but let's move to a
15 hypothetical. If it was possible to do a Z39.50 search,
16 one search, and download four, five, six records, you
17 don't consider that to be en masse downloading, do you?
18       MS. BROWN: Objection.
19    A. It calls for -- let me think about that for a
20 second. The purpose of a Z39.50 is not to download mass
21 records. It's to pull an individual record. But if you
22 end up not providing an exact search criteria, it could
23 pull down multiple records, like four versions of the
24 Harry Potter book. It's not designed, though, to pull
25 down thousands and thousands of records with an

Page 121

1 individual search.
2    Q. Would you agree that in referring to en masse
3 downloading, OCLC is not referring to searches run
4 through the Z39.50 protocol?
5       MS. BROWN: Objection. Misstates testimony.
6    A. The Z39.50 protocol is designed to pull down a
7 limited number of records, an individual record if they
8 do the proper search.
9    Q. So if I could recap our last period of testimony,
10 in terms of what an OCLC member would -- let me
11 rephrase. If an OCLC member who is subject to the
12 framework agreement, schedule two, and the WorldCat
13 policy, is considering whether they can transfer
14 documents to a non-member without violating the
15 framework agreement, schedule two, and the WorldCat
16 policy, do you agree that they need to consider those
17 three documents, plus the various references in those
18 documents to things like the -- okay. Read back what I
19 wrote so far, and I'll pick up from there. I know it's
20 going to be a long question.
21
22       (Question read back by court reporter.)
23
24    Q. Picking up from where she left off --
25    A. Things like, okay.

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

CONFIDENTIAL

Page 150

1  it says in any other products or services that could be
2  offered at any time. So we don't know what those future
3  services could be. Could it be a resource sharing
4  service, could they provide it to something else,
5  besides a non-cataloguing service. So we don't know.
6     Q. So the harm -- I'll restate it then. The harm
7  and the potential detrimental impact comes when those
8  records are either published and accessible through
9  BTCat or are published and accessible in some other
10 service from Baker and Taylor?
11       MS. BROWN: Objection. Misstates testimony.
12    A. The irreparable harm comes from what I've
13 previously stated, the loss of cataloguing
14 subscriptions, the potential deterioration of other
15 products and services that rely on WorldCat, the
16 reputational damage that could be generated by a
17 competitor offering a much lower price service,
18 utilizing OCLC records, which could then lead to more
19 libraries cancelling, right, and the valuation of
20 WorldCat itself would diminish.
21    Q. So the key to that scenario is Baker and Taylor
22 utilizing those records -- in other words, let me just
23 give you a hypothetical. If the San Rafael library
24 transferred records to Bridgeall and they stuck them in
25 a file somewhere and they never saw the light of day,

Page 151

1  there's no harm. There may be a violation, but there's
2  no harm. And if San Rafael transferred those records to
3  Bridgeall and Bridgeall transferred to Baker and Taylor,
4  and Baker and Taylor stuck them in a file, and they
5  never saw the light of day, there may be a breach, but
6  there's no harm. You following that?
7        MS. BROWN: Objection.
8     A. In that hypothetical, it appears there's no
9  immediate harm, but I can't say in the future.
10    Q. Because --
11    A. That's a hypothetical.
12    Q. Hypothetically, they could pull those records out
13 in ten years and use them?
14    A. Yeah.
15    Q. Okay. So you also are asserting irreparable
16 harm --
17    A. Can I go back and restate, though?
18    Q. Sure.
19    A. Assuming that that library doesn't cancel
20 cataloguing services as a result of this, with OCLC,
21 because then we get harmed.
22    Q. Okay. So in other words, if the San Rafael in
23 this instance entered into this agreement with Bridgeall
24 and then cancelled its OCLC subscription --
25    A. And got a Baker and Taylor cataloguing

Page 152

1  subscription, okay, as the quid pro quo, and they
2  cancelled, that would cause us financial harm.
3     Q. But what's missing from that scenario is that the
4  bake -- what they get through their Baker and Taylor
5  subscription is the records that came from WorldCat,
6  because a customer is allowed to cancel OCLC and go with
7  Baker and Taylor, right?
8     A. They are, as long as Baker and Taylor isn't
9  providing services that rely upon OCLC records.
10    Q. Right. Okay. I want to turn to the potential
11 irreparable harm based on lost customers and at risk
12 customers?
13    A. Okay.
14    Q. You reference this in a couple of paragraphs in
15 your declaration, and you're familiar with your
16 declaration?
17    A. Yes.
18    Q. Okay. There is a document that was produced as
19 an exhibit in this deposition yesterday that is a chart
20 listing a certain number of -- Exhibit L, and let me
21 just describe it to you to make sure you know what I'm
22 talking about. It's a chart listing customers cancelled
23 because of BTCat, and it also lists some customers at
24 risk. Are you familiar with that document?
25    A. Yes, I am.

Page 153

1     Q. Okay. So that's Exhibit L. I'm going to ask you
2  to look at that.
3
4        (Defendant's Exhibit L previously marked for
5             identification.)
6
7     Q. Did you assist in preparing this agreement, or
8  this document?
9     A. Yes.
10    Q. Okay. And how was it prepared?
11    A. The information was obtained through my
12 interactions with our sales operations group.
13 Specifically we were trying to ascertain the amount of
14 cataloguing subscriptions that we had that were
15 cancelled as a direct result of libraries cancelling and
16 moving to BTCat, based upon what the libraries told us.
17 So there could be more that we're not aware of. It was
18 based upon that communication.
19    Q. Okay. So then of that explanation, the part
20 about cancelling is clear. When a library cancels, they
21 cancel; there's no question about it, agreed?
22    A. Yep.
23    Q. The other part of that is the reason that they
24 cancelled, and the reason that they cancelled, the
25 reason that these libraries on this list is because OCLC

Veritext Legal Solutions
www.veritext.com                                                888-391-3376

Page 154

1 is contending that these libraries cancelled because of
2 BTCat?
3 A. Yes. They informed us they were moving to BTCat
4 because it was a much lower price and it had near the
5 same quality records that they could get from OCLC.
6 Q. Okay. And of that secondary explanation, the
7 fact that BTCat has a lower price is not an issue,
8 because BTCat is allowed to have a lower price, isn't
9 it?
10 A. They are allowed to have a lower price, as long
11 as they're not providing records in their service that
12 they obtained improperly with their service. Because
13 there are other services out there like Sky River who
14 provide cataloguing services, but they do not provide
15 OCLC records in their services.
16 Q. So -- and the basis for concluding -- I'm sorry.
17 Let me ask a different question. How do you know that
18 Sky River doesn't provide WorldCat records to its
19 subscribers?
20 A. We would know that based upon our previous
21 dealings with them, and the quality of the -- the
22 quality of the records that have been provided to
23 subscribing libraries that don't have the distinguishing
24 characteristics of an OCLC record.
25 Q. Okay. So you've looked at the records that Sky

Page 155

1 River offers, and they are missing indications that are
2 present in WorldCat records?
3 A. Yes, and that was done a long time ago.
4 Q. Okay. Has it been done since?
5 A. I haven't -- I don't know the last time it was
6 updated.
7 Q. Okay. And have you examined records in BTCat to
8 see whether they contain the -- some sort of indicator
9 that a record is a WorldCat record?
10 A. I am going to rely upon my testimony from Mary
11 Sauer-Games that she has seen YouTube videos which
12 outline the BTCat service, which appears to have
13 distinguishing characteristics of an OCLC record, all of
14 which I don't know every one of those. That's her
15 expertise, not mine.
16 Q. This list of customers on Exhibit L has a date,
17 and I guess that's the cancellation date?
18 A. Yes.
19 Q. And the dates go back to 2019. There's one, and
20 they're as recent as June 30th of 2025. Over that same
21 period of time, has any other OCLC customer cancelled
22 their contract?
23 A. Yes.
24 Q. How many OCLC customers have cancelled their
25 contracts over that period of time that are not on this

Page 156

1 list?
2 A. I don't know. I'd have to go back and look for
3 that. This list is ones who specifically cancelled who
4 specifically communicated that they were moving to
5 BTCat. Not every library tells us why they're
6 cancelling.
7 Q. Okay. And I think to get into that question
8 we're going to the other topic, so we won't go there.
9 So based on the data in this exhibit, the customers who
10 have been lost according to OCLC because of BTCat, it's
11 36, right, including a group of 13?
12 A. That looks to be about the right count. This is
13 an evolving list, though. I'm sure that if I went back
14 to work, I might find more.
15 Q. Okay. So assuming, just taking the number of 36,
16 and this is 36 out of a how many customers who use
17 WorldCat?
18 A. It's in the 10,000 range, in my previous
19 testimony.
20 Q. Okay. So how long -- how long will it take,
21 losing 36 customers over five-year period going forward,
22 before the cumulative impact is material to OCLC?
23      MS. BROWN: Objection.
24 A. Okay.
25      MS. BROWN: If you can do that math, you can

Page 157

1 answer.
2 A. Well, here's what I would say. The rate of
3 cancellations is increasing, and so it's starting -- in
4 fact, if you'll notice, the amount of cancellations that
5 have started to increase dramatically, and it's not just
6 the cancellations, it's the dollar amount. And in this
7 present environment where library budgets are under
8 extreme stress because of federal, changes in federal
9 legislation and funding and whatnot, it appears that the
10 cancellations are ramping up rather quickly in this
11 environment.
12      And it's not just the cancelling of the
13 cataloguing service. It's also the deterioration of the
14 WorldCat database when libraries or members leave, which
15 could lead to deterioration of other services that
16 they're reliant on, like resource sharing, or in this
17 case it says ILL in any schedule.
18 Q. And I'll get to that in just a minute. And
19 sticking with the number of cancellations, you mentioned
20 that the environment is changing, and would you agree
21 that libraries are under increasing financial pressure
22 these days?
23 A. Yes.
24 Q. Which would be a reason why they would cancel a
25 subscription with OCLC regardless of what BTCat is

CONFIDENTIAL

Page 162

1 BY MR. NOYES:
2   Q. Mr. Rozek, we were talking about the relative
3 size of the two databases. Isn't part of your
4 contention that Baker and Taylor is building BTCat, I
5 think the phrase was used as a back door, and building
6 BTCat using WorldCat records, isn't that based on the
7 assumption as to how many of the records in BTCat are
8 actually OCLC records?
9       MS. BROWN: Objection.
10   A. First off, the 70 million comes from statements
11 that they have made. We don't know for sure the size of
12 that database size, which could be wrong. Secondly, I
13 think it's a phrase that you're referring to back door,
14 is that we have asserted that the insertion of the
15 provision in the Bridgeall agreements was a way to
16 obtain OCLC records after the licensing agreement which
17 we had with them was cancelled due to our suspicion that
18 they were inappropriately taking records well in excess
19 of their licensing agreement, and using them to populate
20 Baker and Taylor's database. So the context of the back
21 door is directly in relation to the clause in the
22 Bridgeall contracts referred to in 84 under Exhibit B.
23   Q. And you mentioned the license agreement. You
24 agree that there are records containing OCLC identifiers
25 that you would consider WorldCat records that Baker and

Page 163

1 Taylor has properly obtained?
2   A. Baker and Taylor have rights to obtain up to
3 55,000 records that they could utilize, that they could
4 utilize. It's our contention that they obtained OCLC
5 records well in excess of that 55,000 records, and also
6 used these -- are using these provisions to obtain
7 records from OCLC records very specifically in violation
8 of their contractual rights to grant those records.
9       MS. BROWN: And just for clarity of the
10 record, that was a topic for Ms. Sauer-Games. Just
11 clarifying.
12   Q. Right. And I don't want to get into the license
13 agreement, because that was the other witness. But I
14 want to clarify that when you're talking about the
15 presence of WorldCat records in BTCat, don't you agree
16 that some WorldCat records -- let me rephrase it. Don't
17 you agree that Baker and Taylor are permitted to have
18 some WorldCat records, because they got them under the
19 license?
20   A. I do not agree, because the licensing agreement
21 did not permit them to use OCLC records in creating a
22 competitive service.
23   Q. Okay. Well, that's -- that was discussed as part
24 of the topic on the license agreement. But if that's
25 your understanding, that's your understanding. And do

Page 164

1 you know whether there are other sources by which Baker
2 and Taylor could obtain records with WorldCat
3 identifiers that are also properly obtained?
4       MS. BROWN: Same objection. Just not sure
5 this is covered by the topics he's noticed for. But to
6 the extent you personally know.
7   A. I want to make sure -- can you restate the
8 question, because it's very specific.
9   Q. Yeah. Let me do it this way. In terms of the
10 harm to OCLC resulting from the presence of WorldCat
11 records in the BTCat, which you've identified as part of
12 the harm, do you agree that the presence of a WorldCat
13 record in BTCat only constitutes harm if it was not
14 properly obtained by Baker and Taylor?
15   A. I would answer it this way. The only records
16 that would have been obtained by Baker and Taylor under
17 the licensing agreement were 55,000 records for two
18 consecutive years. So if I multiply 110,000 records, in
19 providing those records in a competitive service, if
20 that was only the records that they had in that service,
21 I don't believe that that service would be as valuable
22 to the libraries as it is today.
23   Q. Okay. I'm not sure your numbers about the
24 license agreement are correct, but that's not your
25 topic. The point simply is that if there's a record

Page 165

1 that you deem to be a WorldCat record sitting in the
2 BTCat and it was not improperly obtained but was
3 obtained properly, then that doesn't constitute harm to
4 OCLC, correct?
5   A. My contention is I don't know of any
6 circumstances where an OCLC record could be properly
7 obtained in order to be put in a competitive service for
8 a cataloguing subscription.
9   Q. Okay. Is it OCLC's position that the presence of
10 even one single record that is a WorldCat record in
11 BTCat is harm to OCLC?
12   A. If it was only one record, it would appear to be
13 diminimous.
14   Q. Okay. At what point does the presence of a
15 record, a WorldCat record in BTCat no longer become
16 diminimous?
17   A. I don't know the complete answer to that
18 question. That would be something I would probably
19 defer to Ms. Sauer-Games.
20   Q. Okay. And if you look at your declaration, which
21 is Exhibit M, I have a couple of questions.
22 Paragraph 41, referring to the loss of customers, you
23 use the word precipitously. Current membership in
24 WorldCat and other OCLC products and services would drop
25 precipitously. I'm reading just an excerpt of that

CONFIDENTIAL

Page 166

1 paragraph.
2  A. Yes, I'm there.
3  Q. Do you agree that the 36 names on that exhibit is
4 not enough to constitute a precipitous drop in
5 membership?
6     MS. BROWN: Objection.
7  A. I would answer it this way. The cancellation of
8 services is accelerating significantly. When we
9 originally calculated this list, the amount of lost
10 customers was 686,000. Since the time of my
11 declaration, it's now close to 900,000, and we have the
12 same level of risk, and it's accelerating. So look at
13 that. It's grown by 30 percent in just a few months.
14  Q. Are you familiar with -- have you reviewed the
15 complaint? I think you said you had, right?
16  A. Yes, I have.
17  Q. And Count 1 of the complaint -- the complaint is
18 Exhibit 2. I think it's in front of you -- B, sorry.
19  A. Okay. I got too many in front of me now. This
20 is L. Okay. Got it.
21  Q. Okay. Count 1, near the back, it starts in
22 paragraph 130?
23  A. Do you have a page?
24  Q. 24 to 25?
25  A. Okay. Got it.

Page 167

1     MS. BROWN: What paragraph, Frank?
2  Q. I'm going to ask him to look at 133.
3     MS. BROWN: Okay. And just to be clear,
4 that was not one paragraph that was designated.
5  Q. But it does relate to irreparable harm. Take a
6 look at paragraph 133?
7  A. Yes.
8  Q. Is there any reference in there to lost customers
9 as a form of harm?
10  A. Not in 133.
11  Q. Okay. And any other paragraph in Count 1?
12  A. Yes, in 134. It says including irreparable
13 injury to its business and loss of customer goodwill and
14 its business. To me I refer to lost revenue. That's my
15 interpretation.
16  Q. Okay.
17  A. And other assets and additional damages and
18 expenses that are not in that particular count. And I'm
19 not a lawyer, by the way, once again. That's my
20 interpretation.
21  Q. I should have asked you this before, because you
22 had the declaration open. Now I'm going to ask you to
23 look at the declaration again. Sorry about that.
24  A. This one here, M?
25  Q. M, and paragraph 42. Do you see that?

Page 168

1  A. Yes.
2  Q. In paragraph 42, you refer to potential to reduce
3 the workforce of OCLC, correct?
4  A. Correct.
5  Q. Is it correct that there's recently been layoffs
6 at OCLC?
7  A. Yes.
8  Q. Does OCLC contend that the recent layoffs are
9 attributable to BT, to Baker and Taylor?
10  A. No.
11  Q. If there is any reduction in workforce resulting
12 from the claims against Baker and Taylor, that hasn't
13 happened yet, correct?
14  A. Correct.
15  Q. In terms of damages, you've referred to Exhibit
16 L, which is the list of lost customers, and it has a
17 dollar figure attributable to the subscription fees that
18 those customers had been paying, correct?
19  A. Yes.
20  Q. Okay. Apart from revenue that OCLC contends was
21 lost because a customer decided not to renew or
22 terminated its agreement, are you aware of any other
23 existing monetary damages attributable to your claims in
24 this case?
25  A. Well, this only are the monetary damages for

Page 169

1 cancellations that customers have told us that they're
2 moving to BTCat, and the Salesforce has told us that the
3 accounts that are at risk the customer has told us. We
4 are not aware if the customer has canceled or is
5 contemplating cancelling. They haven't told us. That's
6 point one.
7     Point two, we're also contending that we incurred
8 contractual damages because we believe that Baker and
9 Taylor violated the licensing agreement and obtained
10 more records than they were entitled to under the
11 licensing agreement. Those are the monetary damages
12 we're claiming so far.
13  Q. Okay. And on that point, you've indicated in
14 paragraph 22 of your declaration -- yeah, that WorldCat
15 accounts for 83 percent of OCLC's total revenue?
16  A. That's incorrect. WorldCat cataloging services
17 accounts for about 39 percent of our revenue, and we
18 also have other products and services that are dependent
19 upon WorldCat that account for 83 percent of our total
20 revenue.
21  Q. And is that because WorldCat subscribers tend to
22 use other services too?
23  A. Absolutely, or these other services are dependant
24 upon WorldCat as a part of those services, like
25 interlibrary loan or resource sharing as an example.

Veritext Legal Solutions
www.veritext.com                                                  888-391-3376