# EXHIBIT 7

```
 1          IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3             ~~~~~~~~~~~~~~~~~~~~
 4   OCLC, INC,
 5
                 Plaintiff,
 6
 7        vs.          Case No. 2:25-cv-00309
 8
     BAKER & TAYLOR, LLC, et al.,
 9
10               Defendants.
11
               ~~~~~~~~~~~~~~~~~~~~
12
                   Deposition of
13                 TRAVIS KELLEY
14
                  August 8, 2025
15                   9:42 a.m.
16
       ****CONFIDENTIAL ATTORNEYS EYES ONLY****
17
18
                    Taken at:
19           Cavitch Familo & Durkin
             1300 East Ninth Street
20              Cleveland, Ohio
21
22            Tracy Morse, RPR
23
24
25
```

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 22

1    A.   The MLIS degree, master's of
2  library and information science.
3    Q.   Do you have any certifications?
4    A.   I have no certifications.
5    Q.   Okay.  Where do you currently work?
6    A.   Baker & Taylor.
7    Q.   And how long have you been there?
8    A.   January of 2018, so seven and a
9  half years.
10    Q.   Okay.  Do you know what entity
11  signs your paychecks?
12    A.   I don't think I've looked at a pay
13  stub in seven and a half years.
14    Q.   Fair enough.  I haven't either.
15    A.   May I make one correction?
16    Q.   Sure.
17    A.   Baker & Taylor once owned YBP
18  Library Services or at the time known as Yankee
19  Book Peddler, which was the first nine years of
20  my career --
21    Q.   Okay.
22    A.   -- the ninth year at YBP Library
23  Services, YBP was sold from Baker & Taylor to
24  EBSCO.  So if you'd like to call it sixteen
25  years instead of seven and a half, you may.

Page 23

1    Q.   And we'll put a pin in that.  We're
2  going to go sequentially, but I will ask you a
3  couple questions about that.  What's your
4  current role at Baker & Taylor?
5    A.   Manager of strategic partnerships
6  for BTCat.
7    Q.   Could you generally describe your
8  responsibilities in that role?
9    A.   It's quite a mouthful, but
10  generally it's the supervision of all sales and
11  customer success related activities;
12  onboarding, training, renewals, onboarding.
13    Q.   I have a brother in sales, so I
14  know you guys have a jargon all your own.  For
15  those of us who are not well versed in sales,
16  what is, Customer success?
17    A.   Essentially ensuring that the
18  client's needs are met.
19    Q.   So that involves interacting with
20  the clients quite a bit?
21    A.   Correct.
22    Q.   And when you say, "Onboarding,"
23  you're not talking about onboarding employees,
24  right?
25    A.   Onboarding the product and the

Page 24

1  library together.
2    Q.   Could you describe a little bit
3  more about what you mean by that?
4    A.   Essentially a needs assessment from
5  the library telling us how to build the
6  software.  And then as we start training, then
7  we can manipulate the system further to refine
8  it to meet their needs.
9    Q.   Okay.  And when you onboard the
10  customer, is that just getting their
11  information, getting them credentials and
12  things like that or what do you mean by that?
13    A.   Sure.  It is information like that,
14  but it could be other requirements related to
15  workflow specific activities.
16    Q.   Okay.  What products and services
17  are you specifically managing in your role?
18    A.   Primarily BTCat.  I still maintain
19  some field sales duties for certain key
20  accounts in New England like Boston Public
21  Library.
22    Q.   And what would that involve?  So it
23  would involve BTCat and then other products
24  potentially?
25    A.   It would include CLS, book leasing.

Page 25

1  Essentially you're acting as a consultant to
2  strategize with the library to meet their goals
3  and needs --
4    Q.   Okay.
5    A.   -- with Baker & Taylor's typical
6  book processing, collection development,
7  analytic services.
8    Q.   Could you list the services and
9  products?
10    A.   I think I would need to refer to a
11  marketing sheet.  They are so plentiful.
12    Q.   Okay.  Those other products and
13  services, does that include collectionHQ?
14    A.   That's more from a lead generation
15  perspective than a selling perspective.
16    Q.   What do you mean by that?
17    A.   So we would leverage a relationship
18  to ask the library to be curious and take a
19  demonstration of a product like collectionHQ.
20    Q.   When you say, "Take a
21  demonstration," what do you mean by that?
22    A.   So they can learn about it, so they
23  can see it.
24    Q.   And you're facilitating that or
25  you're making the overtures to the library for

Veritext Legal Solutions



Page 64

1 Q. -- what you call a, tag?

2 A.

3 Q. Okay. Got it.

8 Q. That's correct?

9 A. Yes, that's correct, to fulfill

10 their needs, not our needs. We are not

11 prescriptive.

12 Q. Understood. But you do help

13 facilitate them and you apply your expertise?

14 A. Yes.

15 Q. Okay. You can put that to the

16 side.

17 A. (Witness complies.)

18 MS. BROWN: Do you need a break

19 or are you good?

20 THE WITNESS: No. I wasn't sure

21 if there was another document.

22 MR. HARTMAN: Actually, do you mind

23 if we take five minutes just for restroom

24 purposes?

25 MS. BROWN: Tracy, has it been an

Page 65

1 hour?

2 THE NOTARY: We began at 9:41.

3 MS. BROWN: So let's go an hour

4 and then we'll break --

5 MR. HARTMAN: Yeah, go for it.

6 MS. BROWN: -- as long as

7 Mr. Kelley is good and doesn't need a break.

8 THE WITNESS: No.

9 BY MS. BROWN:

10 Q. Okay. One of the responsibilities,

11 I believe you mentioned in your current

12 position, I'm going to call it, marketing and

13 outreach, as a layperson. Is that fair? Fair

14 enough? Close enough?

15 A. I guess, sure, yes.

16 Q. Okay. What kinds of marketing and

17 outreach activities do you do?

18 A. Anything from cold calls to mass

19 emails to standing up at ALA or other library

20 conferences and presenting what we can do.

21 Q. And you may have said this earlier.

22 This is primarily BTCat driven, right?

23 A. Correct.

24 Q. Are there other products and

25 services, when you're doing this outreach, that

19 speak, what is the, 007?

20 A. Again, I know enough to be

21 dangerous and, you know, play one on TV but I

22 am not a cataloger.

23 Q. But it does correlate to one of

24 those fields, right --

25 A. Right --

17 (Pages 62 - 65)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 66

1 you discuss with customers?
2     A.   Again, it really depends on the
3 situation.  I would say, 99.5 percent of it is
4 BTCat.
5     Q.   Do you cross-sell, though?
6     A.   I would introduce our eBook
7 platform, for instance, Boundless, to libraries
8 that don't have it or do not know our digital
9 services team.
10     Q.   Do you ever cross-sell
11 collectionHQ?
12     A.   I think we covered this right at
13 the start.  And the answer is, yes.
14     Q.   Okay.  So you mentioned conferences
15 and the ALA.  Do you go to that conference
16 every year?
17     A.   Not every year in my career.  I
18 believe I've gone to every ALA since 2022.
19     Q.   And when you attend do you present?
20     A.   Often, not always.
21     Q.   And when you're presenting, are
22 there slides or other demonstratives that you
23 use?
24     A.   Usually I try to do a panel with
25 libraries.  My feeling is libraries want to

Page 67

1 hear from libraries.  They don't want to hear
2 from sales guys.
3     Q.   Fair enough.  But is there any sort
4 of PowerPoint or any sort of like take-home
5 material?
6     A.   Sometimes --
7     Q.   What --
8     A.   -- not really take home material.
9     Q.   What kinds of materials accompany
10 these presentations?
11     A.   It could be a simple agenda, our
12 history, our philosophy, what we do and then
13 we'd get into the panel.
14     Q.   And do you draft those materials?
15     A.   Yes.
16     Q.   Okay.  So if we wanted to see those
17 materials, you have them?
18     A.   Happily.
19     Q.   Okay.  Great.  What about
20 presentations outside of these conferences?
21     A.   Most of my presentations will
22 either take place on Microsoft Teams or they
23 will take place in person, and I'm usually
24 managing the call.  I try to be very casual.  I
25 typically do not do a PowerPoint presentation

Page 68

1 in those unless there's something very
2 pressing.
3     Q.   Okay.  Is that the same for
4 pitches, usually no materials?
5     A.   Usually no materials for pitches,
6 although I might follow up with case studies.
7     Q.   And if we were interested in those
8 documents, you would also have those?
9     A.   They are publicly available on our
10 website.
11     Q.   Got it.  Okay.  That's helpful.
12 Are there any other sorts of presentations that
13 you do in this role that we haven't discussed?
14     A.   I do a monthly financial report.
15 Usually my boss, Fred Harvey, takes that and
16 modifies it.  I have also created a
17 presentation internally, not yet presented,
18 where I'm talking -- you know, basically asking
19 for more developmental requests.
20     Q.   What do you mean by, "Developmental
21 requests"?
22     A.   To make the product better --
23     Q.   Got it.
24     A.   -- to meet library needs.
25     Q.   Understood.

Page 69

1             - - - - -
2             (Thereupon, Deposition Exhibit 5,
3             PowerPoint:  Perspectives in
4             Cataloging: A New Tool With BTCat,
5             Bates Nos. OCLC_00000267-00000277,
6             was marked for purposes of
7             identification.)
8             - - - - -
9     Q.   I'll hand you what I've marked as
10 Exhibit 5.  I'll represent to you that this is
11 not a Baker & Taylor document.  There are notes
12 on the front, but what I'm really interested in
13 talking to you about is the slides that follow
14 that page.
15     A.   Um-hum.
16     Q.   Feel free to look through.  I have
17 a couple questions.
18     A.   Okay.
19     Q.   So this is the kind of thing that
20 doesn't get captured but you're smiling.  Can
21 you tell me why you're smiling?
22     A.   I really remember this event quite
23 well.
24     Q.   Okay.  What event was this?
25     A.   This was an ALA approved

18 (Pages 66 - 69)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 142

1  understanding as well, so I appreciate the
2  clarification.  If a library has the OCLC
3  authority updates --
4      A.  Okay.
5      Q.  -- they're applying those to their
6  records or incorporating them somehow
7  presumably, right?
8      A.  Yes.
9      Q.  Can the library then contribute
10  those records that have had the benefit of the
11  updates to the BTCat community?
12      A.  The library can take bibliographic
13  records that they have edited with their own
14  protocols authority or bib tables on content
15  summaries and have those be pushed into BTCat.
16      Q.  Is your answer, yes?
17      MS. BROWN:  Can you read it back,
18  please.
19      (Record was read.)
20      Q.  I can restate the question.  So
21  "Yes," or, "No, a library can update or can
22  contribute their records to BTCat that have had
23  the benefit of the OCLC authority updates?
24      A.  Of any authority update from any
25  service provider, yes.

Page 143

1      Q.  Okay.  Thank you.  If you go to the
2  top again of this email, what is, NACO/PCC?
3      A.  Think of those as little committees
4  that reside in the industry that dictate who
5  can belong and who can contribute.  We're not
6  currently apart of those programs.  And at the
7  time of the email we were not part of those
8  programs.
9      Q.  And to confirm, is that still the
10  case?
11      A.  To confirm, that is still the case.
12      Q.  Okay.  You can put that to the
13  side.  Thank you.
14      A.  (Witness complies.)
15      Q.  Earlier you testified that every
16  installation that BTCat does is unique.  Is
17  that right?
18      A.  Yes.
19      Q.  And why is that?
20      A.  Well, each library is unique; each
21  library serves a different community; each
22  library generally has a different cataloging
23  policy, and each library has different goals
24  and objectives, from what I have personally
25  experienced in 18 years.

Page 144

1      Q.  Okay.  And how do you get to know a
2  library well enough to do a successful, unique
3  installation?
4      A.  Fair.  A lot of questions, a lot of
5  curiosity, which I don't believe exists in the
6  market as a whole.  I'm a pretty curious guy
7  about a great number of things relating to the
8  library.  So I ask them why; and then why is
9  that important; and what does that do for you,
10  how can we make that better.  So we take a lot
11  of time to learn.
12      Q.  So as part of that discussion, are
13  you talking about things that a library does
14  well?
15      A.  More specific.
16      Q.  I mean, just things that are
17  working and are not working for the library;
18  you're trying to problem solve?
19      A.  Oh, yeah, sure.
20      Q.  Okay.  And how many conversations
21  do you typically have with a library?
22      A.  With one library?
23      Q.  Yes, if you can give an estimate.
24      A.  Honestly it can vary pretty highly
25  based on library.  Many libraries have been

Page 145

1  curious about us for years and so I might chat
2  with them four or five times a year.  Other
3  libraries -- and this is more rare, but we
4  get 10 minutes into a demo and they'll stop us
5  and say, yes, this is for me.  And then we more
6  thoroughly go back and figure out why it's for
7  them and what they want it to do.
8      You know, sometimes you learn because of
9  your collective experience and other times, you
10  know, you just learn by asking, you know.  And
11  the more goal oriented the library is the more
12  successful they will be with a BTCat
13  implementation because we fully understand how
14  to support them.
15      Q.  So you know the libraries really
16  well by the time you're implementing?
17      A.  I wouldn't profess that I'm the
18  smartest person for that library as a whole,
19  you know, in knowing them inside and out, but
20  with my interactions I try really hard.  My
21  implementations team, they try really hard.
22  Our pro services department, they try really
23  hard, but there will always be gaps in
24  knowledge.
25      Q.  Fair.  Previously you testified

37 (Pages 142 - 145)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 146

1 that you often don't know if someone is coming
2 from OCLC to BTCat. It seems a little
3 inconsistent with this testimony if you're --
4      A.   At the tail-end of our process, it
5 is not part of our packaging to ensure that
6 they have, you know, kept their OCLC
7 subscription or not. That, you know, only in
8 the scenarios where we know they're migrating
9 because the budget lines are that thin that
10 they cannot maintain both would I know that.
11      Q.   So that's not quite my question. I
12 mean, you just testified that you spend a lot
13 of time with these libraries and it never comes
14 up what service they're using instead of BTCat
15 until you're looking at budgets?
16      A.   That can happen in the first
17 conversation.
18      Q.   So are you changing your testimony?
19      THE WITNESS:   Can you read back
20 two or three questions?
21      Q.   Actually, I get to do that. So I
22 can rephrase.
23      A.   My apologies.
24      Q.   So I guess my question is really
25 simply: Do you often know that a library is an

Page 147

1 OCLC customer?
2      A.   I would say 80 percent of the time
3 I probably know.
4      Q.   And when you're having these
5 conversations with libraries you're probably
6 talking about the things that they don't like
7 with their existing service, right?
8      A.   Not always.
9      Q.   Then why are they switching and
10 talking to you about switching?
11      A.   Because they're telling us what
12 they want changed.
13      Q.   And they've never said, The current
14 system I have, it has these shortcomings, I
15 don't like it?
16      A.   I definitely would -- yeah, some
17 have said that their incumbent provider whether
18 it's your client or Sky River or Bookware or
19 its MARC or Z targets, because they can't
20 afford anything else and they've been priced
21 out of the market, will often say, this is my
22 current pinpoint.
23      Q.   And previously you testified that
24 customer restrictions from OCLC's contract
25 never come up. You're telling me that in 80

Page 148

1 percent of customer relationships that you have
2 you don't know what their current contractual
3 limitations are, that never comes up?
4      MR. HARTMAN:   Objection.
5      MS. BROWN:   What's the basis for
6 the objection?
7      MR. HARTMAN:   That's asking what
8 his knowledge is of contractual restrictions.
9      MS. BROWN:   I asked what he
10 knew.
11      A.   I've never seen an OCLC contract.
12      Q.   I'm not asking if you've seen one.
13 I'm asking if you're aware of the restrictions.
14      A.   No, I'm not aware of them.
15      Q.   It's never come up in any of these
16 conversations?
17      A.   No.
18      Q.   And in 18 years it's never come up
19 that OCLC has certain restrictions that make
20 libraries frustrated?
21      MR. HARTMAN:   Objection.
22      A.   That's a different question.
23      Q.   How is it different?
24      A.   Knowing what the library market is
25 responding to is different than knowing if I

Page 149

1 know it exists. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄.
5      Q.   Right. And maybe I can make this
6 simpler. I'm not asking if you're aware of a
7 specific contract. I'm asking if you're aware
8 that OCLC places restrictions on its WorldCat
9 records.
10      A.   I don't know what those
11 restrictions are.
12      Q.   But you're aware of them?
13      MR. HARTMAN:   Objection. Asked and
14 answered.
15      THE WITNESS:   So still answer?
16      MR. HARTMAN:   You can answer.
17      Q.   I mean, you just said you looked at
18 the ▄▄▄▄▄▄▄▄ so.
19      A.   That's not a contract --
20      Q.   I'm not asking that.
21      A.   -- that's a public letter.
22      Q.   I'm asking if you're aware of the
23 restrictions that OCLC placed on --
24      MR. HARTMAN:   Objection.
25      THE WITNESS:   I'm still really

38 (Pages 146 - 149)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 150

1 confused if I still continue with objections.
2      MS. BROWN: Yeah.
3      And maybe it would be helpful if I can
4 get my question out before you object.
5 BY MS. BROWN:
6      Q. So my question to you is: Are you
7 aware that OCLC puts restrictions on WorldCat
8 records and WorldCat?
9      A. I am not aware of what those
10 specific restrictions are.
11      Q. That's not my question. Are you
12 aware of restrictions -- that restrictions in
13 fact exist that OCLC has put on its WorldCat
14 records --
15      MR. HARTMAN: I'm still objecting.
16      Q. -- "Yes," or, "No"?
17      A. It feels like you're bating me into
18 a, yes.
19      Q. I'm asking you. Are you aware that
20 OCLC puts restrictions on its records?
21      MR. HARTMAN: Objection.
22      MS. BROWN: I haven't gotten an
23 answer from the witness yet so I'm not sure
24 what the basis is.
25      A. I'm aware conceptually, sure.

Page 151

1      Q. So is the answer to my question,
2 are you aware that OCLC puts restrictions on
3 WorldCat records, is the answer to that
4 question, yes?
5      A. Oh, goodness. Yes.
6      Q. Thank you.
7      - - - - -
8      (Thereupon, Deposition Exhibit 13,
9      07/08/2022 Email Trail Between
10      Travis Kelley and
11      Support@collectionhq.com, cc:
12      Corrine Lagacy, Bates Numbers
13      BAKER00009363-00009364, was marked
14      for purposes of identification.)
15      - - - - -
16      Q. I'll hand you what is Exhibit 13.
17 Mr. Kelley, do you recognize that document?
18      A. Yes.
19      Q. What is it?
20
23      Q. Okay. So if we go back to the very
24 beginning of the email chain and that's on the
25 page that ends in 64 in the Bates stamp --

Page 152

1      It's only two pages. I apologize.
2      A. Okay.
3      Q. -- do you see where you reference,
4
6      A. Um-hum.
7      Q. What is that referring to?
8      A. These are our project services.
9      Q. And is this in connection with
10 collectionHQ?
11      A. Yes.
12      Q. And that's collectionHQ -- that's
13 an email at the collectionHQ domain at the top,
14 right?
15      A. Um-hum, yes.
16      Q. And that's different than the other
17 project we talked about earlier where they're
18 actually coding the records, right?
19      A. This is us taking the results of
20 the project we talked about with the CHQ
21 screenshot that you're alluding to and then
22 doing our work on the records.
23      Q. Okay. If you then go to the first
24 page, it looks like support@collectionHQ asks
25 you,

Page 153

1
5      What is that in reference to?
6
14      A. Correct.
15      Q. Okay. You can put that to the
16 side.
17      A. Can I state something for the
18 record on this email?
19      Q. You cannot. You can only answer my
20 questions.
21      MR. HARTMAN: She's not wrong.
22      MS. BROWN: Oh, I'm right.
23      Q. If your counsel wants to clean
24 anything up, you'll have a chance to do that
25 with him.

39 (Pages 150 - 153)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 190

1    A.   No.
2    Q.   Okay.
3    A.   -- I believe we got a null hit on
4 something that should have constituted a hit.
5    Q.   Okay.  When you say, "I'm getting
6 three hits," "two via OCLC," is that the Z39
7 protocol?
8    A.   Yes.
9    Q.   And then if you flip a few pages to
10 Bates stamp 7831 --
11    A.   Yes.
12    Q.   -- at the top -- or I guess it
13 looks like this is an OCLC connection snip.  Is
14 that right?
15    A.   To the best of my understanding of
16 what's shown to me on the page, yes.
17    Q.   Does that mean that ████████████
████████████████████████████████████████
████████████████████████
█████████████████████████████████████████
███████
22    Q.   I understand.  ████████████████████
████████████████████████
24    A.   The hits they got in us versus your
25 client.

Page 191

1    Q.   I understand.  Okay.  You can put
2 that to the side.
3    A.   (Witness complies.)
4    Q.   When you're selling BTCat, does
5 Baker & Taylor ever bundle products?
6    A.   Yes.
7    Q.   Can you describe some of those
8 instances?
9    A.   Sure.  So if a library is
10 contracting, especially our higher margin
11 products, we will often apply additional
12 discounts.
13    Q.   And what are some of the products
14 that you recall bundling with BTCat?
15    A.   So there would be all the product
16 specialists who would be involved.  You know,
17 so that could be somebody employed by
18 collectionHQ, if we wanted to use them as an
19 example, but we would bring in those
20 individuals.  We would all talk amongst each
21 other as a team and try to craft a creative
22 proposal for the library.
23    Q.   So in terms of the products and
24 services that get bundled with Baker & Taylor's
25 BTCat, it could be any offered service if

Page 192

1 that's the right proposal for that customer?
2    A.   If it's the right proposal for us
3 and the customer.  We're looking for a win,
4 win, win.
5    Q.   Okay.  And when you say, "Win," why
6 is it a win?
7    A.   Why is it a win to provide
8 libraries with a better service?
9    Q.   Well, I guess what makes the
10 bundling a win, win?  Like in your mind what
11 makes it a win, win?  That's what I'm trying to
12 understand.
13    A.   Okay.  In my heart of hearts, I
14 want library patrons to be happy.  I want them
15 to use the library more.  We know that
16 libraries, when given a dollar, they create $7
17 of economic impact.  I really believe in that
18 type of a statistic.
19    Q.   So is cost really important to
20 libraries?
21    A.   I think cost is really important to
22 libraries.
23    Q.   Is it the most important factor?
24    A.   I think different libraries would
25 say service is the most important thing to

Page 193

1 them.
2    Q.   But the cost is high up there?
3    A.   I would say cost is high.  Service
4 is high.  Efficiencies are high.  So when I
5 say, "Win, win, win," I want the community to
6 be delighted with the end goal --
7    Q.   Right.
8    A.   -- I want the library to be happy
9 with how they budget, not just today but in the
10 three years or five years or seven years.  And
11 I want us to be happy with it as well, too.
12    Q.   Understood.  In your experience,
13 all else being equal, if a product is cheaper
14 is a library more likely to go that route?
15    A.   No.
16    Q.   Why not?
17    A.   Sometimes they have workflows that
18 can't be broken.  Sometimes they belong to
19 resource sharing and that's a higher value
20 point for them than the cataloging record or
21 wherever they get the cataloging record, if
22 we're specifically speaking about cataloging
23 record.
24    Q.   If those kinds of obstacles aren't
25 present, cost, would that be a major factor?

49 (Pages 190 - 193)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 194

1 If they're getting the same thing as a current
2 product, no limitations, same performance,
3 would they go for the cheaper?
4    A.   Are we saying BTCat is the same?
5    Q.   I'm asking you.  I'm not
6 necessarily saying BTCat is the same.
7        MR. HARTMAN: I'm going to object.
8 Speculative.
9    A.   So do I answer?
10   Q.   Yes.
11   A.   Can you repeat it one more time?
12 I'm sorry.
13   Q.   I'll rephrase.  I'm not doing a
14 very good job making a clear question.
15      If a library is looking at two products
16 and they're largely the same --
17   A.   Okay.
18   Q.   -- is a library going to go for the
19 cheaper product?
20   A.   Not always.
21   Q.   A lot of the time if dollar -- if
22 money is so important and if libraries are
23 strapped as you suggested earlier?
24   A.   I don't think so --
25   Q.   Okay.

Page 195

1    A.   -- reputation, relationship,
2 history, other socioeconomic factors.  I mean,
3 I've seen different evaluation sheets from
4 different libraries that score all differently.
5 I wish it was as easy as that.
6    Q.   Okay.  Got it.  Going back a little
7 bit.  You have bundled BTCat with various --
8 Baker & Taylor has bundled BTCat with
9 collectionHQ for some customers?
10   A.   █████████████████████
   █████████████████████████████
   ███████████████████████
14   Q.   Is cross selling important because
15 it ensures that customers get the best product?
16   A.   Is cross selling what?
17   Q.   Any of the products that Baker &
18 Taylor and Bridgeall offer --
19   A.   Is it -- I'm sorry, Katie.
20   Q.   That's okay.  So why are customers
21 looking at more than one service?
22   A.   One -- at that time?
23   Q.   Yes.
24   A.   Because they might have concurrent
25 goals at the same time.  Or because they know

Page 196

1 that they can get a better deal if they do
2 multiple things at the same time.  Or because
3 of synergies between different products.
4    Q.   And Baker & Taylor and Bridgeall
5 are trying to deliver on that for them?
6    A.   ██████████████████████
   ████████████████████████████████
   ██████████
10   Q.   But it is an option?
11   A.   It's an option, but they could take
12 those results and give them to another firm.
13   Q.   Right.  So I think you testified
14 that every setup for a library is unique.  Does
15 that include what types of products might also
16 be bundled for them?
17   A.   More rarely but --
18   Q.   It can?
19   A.   Yeah.
20   Q.   Okay.  And when you're looking to
21 bundle, does it matter that one product is
22 technically housed under Bridgeall and the
23 other is under Baker & Taylor in terms of an
24 offering?
25   A.   From what perspective?

Page 197

1    Q.   So understanding they're different
2 corporate entities, that's not an obstacle to
3 offering these bundles to customers, right?
4    A.   Generally, no.
5    Q.   So when you're out in the community
6 doing outreach, you're looking for
7 opportunities, not only to give them great
8 access to BTCat and come up with the right
9 solution for them, you're also looking to
10 include products that make it better for
11 them including collectionHQ.
12   A.   Yes.
13   Q.   And you did that across the
14 country, correct?
15   A.   Well, it gets -- you know, in terms
16 of responsibilities, not always.
17   Q.   Okay.  What do you mean by that?
18   A.   So in New England, right, I have
19 these longer term relationships; and it might
20 be with those, I have a bigger, you know,
21 stake.  But if I'm at a library, I sell by
22 need.  Okay.  So let's say I'm in California
23 and I go to the meeting and the library
24 initially wanted BTCat and now they're saying
25 they want book lease or they have another

50 (Pages 194 - 197)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 198

1 pressing thing that's a higher priority, I
2 pivot to that, but I'm not responsible nor do I
3 get credit for said sale.
4    Q.   Understood.  Got it.  But there's
5 cooperation between you and those specialists,
6 right, to make sure the library is getting the
7 right combination of products for them?
8    A.   Yes.
9    Q.   Right.  Are you emailing pretty
10 regularly with Bridgeall and collectionHQ, you
11 know, in pursuit of that?
12    A.   Not a ton.
13    Q.   But it happens?
14    A.   It happens.
15    Q.   Would you say it's a regular
16 occurrence, if not a frequent occurrence?
17       MR. HARTMAN:  Objection.
18    You can answer.
19    A.   I would say it's irregular.
20    Q.   Okay.  You said that you informally
21 have geographic responsibilities for the
22 northeast.  Does someone have official
23 responsibility for that or is it ▮▮▮▮ and
24 she's responsible for the whole country?
25    A.   ▮▮▮▮ role is trainer and

Page 199

1 customer success for BTCat.  Today that is
2 currently it.  In New England, there's myself
3 with official responsibilities primarily to the
4 larger libraries in New England or the larger
5 prospects in New England that we do not do
6 business with.
7    Q.   Who would be your counterpart in
8 Ohio?
9    A.   As a field sales consultant?
10    Q.   I guess anyone that would be your
11 equivalent or lower.
12    A.   In a sales role?
13    Q.   I think, yes, unless -- what else
14 would it be besides sales?
15    A.   It could be customer success for
16 other product lines.
17    Q.   Other product lines would include
18 just not BTCat?
19    A.   CLS, Boundless, the eBook platform,
20 collectionHQ.  There could be somebody
21 responsible for that.
22    Q.   Who -- I apologize.
23    A.   I'm sorry, Katie.
24    Q.   I was wondering -- and if you want
25 to finish and then answer this question, I

Page 200

1 leave it to you, whatever makes the most
2 organizational sense, but who's responsible for
3 Ohio?
4    A.   For Ohio, as a field sales
5 consultant, is ▮▮▮▮▮▮ and I believe
6 her new last name is ▮▮▮ I think it's,
7 ▮▮▮ --
8    Q.   Okay.
9    A.   -- is the field sales consultant.
10    Q.   Who would be the customer success?
11    A.   For CLS, they've changed their
12 mappings recently.  I would default to the head
13 of that department as ▮▮▮▮▮, spelled
14 as you would expect it to be spelled, to tell
15 you that answer.
16    Q.   And would ▮▮▮ and ▮▮▮ both have
17 some sort of connection to collectionHQ either
18 from a sales or from a customer satisfaction or
19 success standpoint?
20    A.   If any customer throughout their
21 tenure, throughout their experience with
22 Baker & Taylor whether it's on the phone, in
23 email, in person, if they hear of a problem,
24 they're going to let their counterpart know,
25 and usually those notes are captured in

Page 201

1 SalesForce.  Some folks are good at note
2 taking.  Others are poor at note taking.
3    Q.   Right.  Is there anyone else in
4 Ohio that comes to mind?
5    A.   I think the collectionHQ customer
6 success manager is based in Michigan and I
7 think her name is ▮▮▮.  I don't know if
8 she has Ohio accounts, but she reports to J▮
9 ▮▮▮▮ on the collectionHQ side.
10    Q.   This collectionHQ person
11 ▮▮▮▮ Bridgeall employee or a Baker & Taylor
12 employee?
13    A.   She moved to Valsoft in the sale of
14 the product of collectionHQ.
15    Q.   What about prior?
16    A.   I don't know who wrote her
17 paycheck.
18    Q.   Okay.  What about ▮▮▮▮▮▮ if
19 you know?
20    A.   Bridgeall employee, now Valsoft
21 employee.
22    Q.   Do Baker & Taylor employees carry
23 out the work of Bridgeall occasionally?
24    A.   Can you be more specific?
25    Q.   Yes.  What's the relationship

51 (Pages 198 - 201)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 222

1    A.   For this specific product or in
2 general in the industry?
3    Q.   Just BTCat.
4    A.   So 50/50.
5    Q.   It seems like it would be a good
6 negotiating tactic so I was just curious.
7    A.   Oh.
8         - - - - -
9         (Thereupon, Deposition Exhibit 26,
10        03/08-12/13/2021 Email Trail Between
11        Jamie Wright, Susan Reynolds, Travis
12        Kelley, cc:  Fred Harvey, Bates
13        Numbers BAKER00035026-00035032, was
14        marked for purposes of
15        identification.)
16        - - - - -
17    Q.   I've marked this as Exhibit 26.
18 Please let me know when you've had a chance to
19 look at it.  It's a long one, so I will let you
20 know I'm only interested in the first page.
21    A.   Perfect.
22    Q.   You're smiling again.
23    A.   It's always fun to see your words
24 again.
25    Q.   Yes.  So what is this document?

Page 223

1    A.   ████████████
2    Q.   So it's an email between you and
3 Jamie?
4    A.   ██████████████████████
████████████████████████████
6
7    Q.   All right.  Looking at your
8 response, which is at the top of the page, if
9 you go to the second paragraph, you say,
10   ████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████
15 Did I read that correctly?
16    A.   You did.
17    Q.   Then if we go down two paragraphs,
18 there's a paragraph this starts with, "List,"
19 and then there's a semicolon, correct?
20    A.   Yes.
21    Q.   And underneath that you say,
22   ████████████████████████
████████████████████████████████
██████████
25 Can you explain to me what was going on

Page 224

1 there?
2    A.   I'm outlining pricing for Jamie.
3    Q.   And why is the ████████████
████████████?
5    A.   Because if they have an incumbent
6 budget at a very delicate time in BTCat's
7 tenure -- I don't know.  I think at this point
8 we have somewhere between 3 and 10 libraries --
9 sales management wanted us to get aggressive.
10    Q.   Understood.  And what was the goal
11 of this pricing?
12    A.   To hopefully be lucrative enough to
13 raise an eyebrow.
14    Q.   What do you mean by, "Raise an
15 eyebrow"?
16    A.   Be curious.
17    Q.   Do you mean --
18    A.   For the library to be curious about
19 BTCat.
20    Q.   So potentially switching over to
21 BTCat?
22    A.   Yes.
23    Q.   And why is it half of OCLC and not
24 a different competitor?
25    A.   Because to what we thought we knew

Page 225

1 about OCLC or ████████ at this time, they had
2 OCLC so they likely did not have its MARC, Sky
3 River, Bookware, et cetera --
4    Q.   Understood.
5    A.   -- so we're competing for the same
6 budgetary dollars.
7    Q.   And when you say, ████████ that's
8 this library?
9    A.   I believe that's the library
10 referenced.
11    Q.   Okay.  Did you offer pricing this
12 aggressive when a library was using a
13 cataloging tool from another competitor?
14    A.   I have before, yes.
15    Q.   Half?
16    A.   Yes.
17    Q.   So in situations like this, were
18 libraries taking you up on the half of OCLC?
19    A.   Not at this time, not in December
20 of 2021.
21    Q.   Did that change?
22    A.   I think -- I think the market has
23 shown that there's room for change.
24    Q.   So at least sometimes the cost is
25 the most important factor?

57 (Pages 222 - 225)

CONFIDENTIAL ATTORNEYS EYES ONLY

Page 266

1 exploitation in any manner now known or
2 hereafter devised, as well as all documentation
3 and all copies thereof."
4    Keep going?
5    Q.   You can skip the next sentence but
6 please read the second-to-last sentence.
7    A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17         MR. HARTMAN:  Objection.
18    You can answer.
19    A.   Yes.
20    Q.   So the contract is creating a
21 proprietary interest?
22         MR. HARTMAN:  Objection.
23    A.   Was that a question?
24    Q▮▮▮▮▮
25    A.   I think, yes, if I understand

Page 267

1 correctly.
2    Q.   Fair enough.  ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Is that right?
6    ▮▮▮▮▮▮▮▮
7    Q.   Okay.  Would it surprise you that
8 OCLC's contracts contain similar provisions?
9    A.   No.
10    Q.   So is Baker & Taylor aware that
11 OCLC puts restrictions on WorldCat records
12 similar to how it does for Baker & Taylor's
13 BTCat?
14         MR. HARTMAN:  Objection.  He's here
15 in an individual capacity.
16    Q.   To the extent you know.
17    A.   I don't know.  I don't regularly
18 speak with our legal team.
19    Q.   Fair enough.  You can put that to
20 the side.
21    A.   (Witness complies.)
22    Q.   The restrictions we just looked at,
23 would you say they're reasonable?
24    A.   By and large.
25    Q.   Why is that?

Page 268

1    A.   I think it goes back to the
2 software, in my mind's eye.
3    Q.   But this isn't a contract held
4 software, is it?
5    A.   It includes the software access.
6 It's talking about the functionality, is it
7 not?
8    Q.   Where is the -- I mean, it defines,
9 "BTCat," in the BTCat database.  Is that what
10 you mean by, "Software"?
11    A.   Yes.
12    Q.   So it's protecting the software?
13    A.   Yes.
14    Q.   Is it important to Baker & Taylor
15 to protect the BTCat software?
16    A.   I highly suspect so.
17    Q.   Why is that?
18    A.   Because it's unique.
19    Q.   Any other reasons?
20    A.   Again, it's Baker & Taylor's
21 skeletal system.  Without it Baker & Taylor
22 dies.
23    Q.   In your experience, are contractual
24 provisions like this standard, if you know?
25    A.   Generally, yes.

Page 269

1    Q.   Do you know if Sky River has
2 similar contractual restrictions?
3    A.   I have not seen their terms.
4    Q.   Has a customer ever mentioned
5 anything to you about it?
6    A.   Other than their cancelation
7 notice, no.
8    Q.   Okay.  Do you need a break?
9    A.   Let's keep going.
10         MS. BROWN:   All right.  Well,
11 let's take a break.
12         (Recess taken.)
13 BY MS. BROWN:
14    Q.   We're back on the record again
15 after a short break.  Mr. Kelley, I want to ask
16 you one question about the BTCat form terms and
17 conditions that we just looked at.  Is that the
18 same contract for all iterations of BTCat?
19    A.   The terms and conditions?
20    Q.   Yes.
21    A.   As a basis, yes, and then it gets
22 modified if the client wants it modified.
23    Q.   But at least as a starting point,
24 that contract is the same for utility as it is
25 for full?

68 (Pages 266 - 269)

CONFIDENTIAL ATTORNEYS EYES ONLY

| Page 286 | Page 288 |
|---|---|
| 1 by line item, but, yes. | 1     A.  I think libraries through public |
| 2     Q.  Assuming that this is the proposed | 2 channels and social media -- Reddit, Facebook, |
| 3 and then accepted language, do you understand | 3 the Boston Library Consortia letter that we |
| 4 that this language is permitting the library to | 4 roughly spoke about -- I think there's a level |
| 5 take ownership over records that are just | 5 of dissatisfaction about those terms but what |
| 6 accessed but not even downloaded? | 6 specifically, no. |
| 7     MR. HARTMAN:  Objection. | 7     Q.  But generally would you say it's |
| 8   You can answer. | 8 common industry knowledge that OCLC has |
| 9     A.  You know, I think when they cite, | 9 restrictions on WorldCat records? |
| 10 "Accessed," they're referring to Z39. | 10     A.  I don't know what the restrictions |
| 11     Q.  I understand.  Okay.  Do you know | 11 are, but, yes. |
| 12 how often the standard terms and conditions for | 12     Q.  Okay.  Do you know where those |
| 13 BTCat are negotiated?  I know we talked about | 13 restrictions would be from? |
| 14 how ███████ had that unique agreement and you | 14     A.  Can you be more specific? |
| 15 said that was rare, but in terms of negotiating | 15     Q.  So if you're generally aware that |
| 16 the actual standard terms and conditions, is | 16 OCLC has restrictions, where would those |
| 17 that common? | 17 restrictions come from? |
| 18     A.  Yeah, ███████ of the time. | 18     A.  I don't know. |
| 19     Q.  To the extent you know, why | 19     Q.  Would it be contracts that BTCat |
| 20 does Baker & Taylor accept those modifications? | 20 has? |
| 21     A.  I think we're ███████ | 21     A.  It could be similar, I suppose. |
| ███████ | 22     Q.  Have you ever worked with a library |
| 23     Q.  Okay.  These negotiations, do they | 23 to avoid triggering those sales restrictions? |
| 24 occur in writing? | 24     A.  I don't recall. |
| 25     A.  Not always. | 25     Q.  Have you ever helped design macros |

| Page 287 | Page 289 |
|---|---|
| 1     Q.  Where do they occur? | 1 that removed the OCLC control number? |
| 2     A.  We could do a Teams call between | 2     A.  You'd have to talk to the |
| 3 legal departments. | 3 professional services department who does that |
| 4     Q.  Okay.  I think we talked about this | 4 work. |
| 5 with collectionHQ, but with the BTCat standard | 5     Q.  Okay.  Do you recall? |
| 6 terms, does Baker & Taylor present the full | 6     A.  I do not recall. |
| 7 standard terms first and then see where | 7     Q.  Any other OCLC indicators that you |
| 8 negotiations go? | 8 know of? |
| 9     A.  I believe typically, ███ | 9     A.  No. |
| 10     Q.  Okay.  Do you have any input on | 10     Q.  Okay.  Have you ever modified |
| 11 drafting agreements connected to BTCat? | 11 cataloging records or assisted in modifying |
| 12     A.  No. | 12 cataloging records before they were uploaded to |
| 13     Q.  Besides Scott -- well, I guess he | 13 BTCat? |
| 14 was collectionHQ -- who does have input on | 14     A.  No.  Nobody trusts me with that |
| 15 drafting those agreements? | 15 stuff. |
| 16     A.  That upper part of my corporate | 16     Q.  All right.  When you are promoting |
| 17 administration sometimes remains a mystery to | 17 BTCat, do you treat WorldCat customers |
| 18 me.  I would say from at least Fred's level or | 18 differently than other customers in your pitch? |
| 19 maybe above. | 19     A.  To what extent? |
| 20     Q.  Okay.  You can put that to the | 20     Q.  You tell me. |
| 21 side. | 21     A.  When I research a library and they |
| 22     A.  (Witness complies.) | 22 tell me that they're OCLC, I try to figure out, |
| 23     Q.  Would you say that OCLC | 23 is it full access, do they have record bands, |
| 24 restrictions on WorldCat records are well known | 24 do they use CatExpress, and then I look at |
| 25 in your industry? | 25 their interlibrary loan figures that are |

73 (Pages 286 - 289)

CONFIDENTIAL ATTORNEYS EYES ONLY



Page 294

1 bibliographic editor and database.
2         - - - - -
3         (Thereupon, Deposition Exhibit 33,
4    01/22/2024 Email Trail Between Tom
5    Jacobson, Gregg Travis, Elyse
6    Profera, Travis Kelley and Laura
7    Nederhoff, Bates Number
8    BAKER00007203, was marked for
9    purposes of identification.)
10        - - - - -
11   Q.   I'm handing you what I've marked as
12 Exhibit 33.  Does this refresh your memory at
13 all?
14   A.   Thank you.  Yes.
15   Q.   What is this?
16   A.   This is an email from ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
19   Q.   And what is happening in this
20 discussion or what is this discussion about?
21   A.   The outcome or the discussion?
22   Q.   The discussion.  Or what do you
23 understand the discussion to be about?
24   A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 295

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
4    Q.   And you received this email in
5 January 2024, correct?
6    A.   It looks like it.
7    Q.   And the subject is, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9    A.   Yes.
10   Q.   So is it fair to say that when you
11 received this email, you were aware again of
12 OCLC's restrictions on its WorldCat records?
13   A.   Can you -- that -- I don't know.
14 Never mind.
15   Q.   Is there a clarification that would
16 be helpful?
17   A.   Not at this time.
18   Q.   Okay.  But you understand that OCLC
19 wrote an enforcement letter to FLVC, right?
20   A.   I don't know about enforcement but
21 letter, yes.
22   Q.   So you understood that OCLC took
23 issue with sharing WorldCat records in a
24 community widely accessible area of ▮▮▮▮▮
25 right?

Page 296

1        MR. HARTMAN:  Objection.
2    A.   I don't know how extent that
3 network zone is, Katie.
4    Q.   That's fair.  Do you see, I guess
5 it's the fourth paragraph down?
6    A.   I think.
7    Q.   Sorry.  I was reading as well.
8    A.   All right.  And it says,
9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ Did I read that correctly?
15   A.   Yes.
16   Q.   What do you understand that to
17 mean?
18   A.   That within ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ the work that one
21 library is doing or trying to do based on the
22 work of another library is doing is impeded.
23   Q.   Do you also understand that OCLC
24 has the view that because those libraries are
25 not all subscribers, they cannot share the

Page 297

1 records?
2        MR. HARTMAN:  Objection.
3    A.   I mean, I would have to speculate
4 based on not seeing the letter.
5    Q.   But do you understand that's the
6 position that OCLC has taken?
7        MR. HARTMAN:  Objection.
8    A.   Based on what ▮▮▮ is telling me.
9    Q.   So, yes?
10   A.   Yes, based on what Tom is regaling.
11   Q.   All right.  And in the next
12 paragraph, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ Is that right?
20   A.   You read that accurately.
21   Q.   What do you understand that
22 paragraph to mean?
23   A.   Similar to the ▮▮▮▮▮ scenario,
24 the entities want to be able to use their
25 records freely.

75 (Pages 294 - 297)