# EXHIBIT 13

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 1

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION
3              ~~~~~~~~~~~~~~~~~~~~
4    OCLC, INC.
5             Plaintiff,
6
7       vs.          Case No.  2:25-cv-0039
8
9    BAKER & TAYLOR, LLC; BRIDGEALL LIBRARIES, LTD.,
10            Defendants.
11
12             ~~~~~~~~~~~~~~~~~~~~
13             (ATTORNEYS' EYES ONLY
14         PURSUANT TO PROTECTIVE ORDER)
15             ~~~~~~~~~~~~~~~~~~~~
16
17               VOLUME I OF II
18            30(b)(6) Deposition of:
19               AMANDEEP KOCHAR
20
              August 14, 2025
21               9:55 a.m.
22              Taken at:
              Offit Kurman
23     227 West Trade Street, Suite 2600
           Charlotte, North Carolina
24
25         Joyce Lynn Shannon, RPR

Case 2:25-cv-00009-ASE-PD Doc # 141 *SEALED* Filed 09/12/25 Page 3 of 11 PageID #: 1682

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 50

1  A.  The division?
2  Q.  Yes.
3  A.  They deal with training for library
4  Trustees and the Library Board.
5  Q.  Okay.  And what kind of topics are
6  provided in those trainings?
7  A.  That would be a question for them.
8  But generally the topics would be -- I'm
9  guessing, I'm not deep into that -- but how to
10 run a library, how to be a good Trustee.
11 Q.  Who else is on the board with you;
12 do you know?
13 A.  Yeah, it's a large board, which is
14 primarily comprised of either current or former
15 librarians or librarians who run large Friends
16 of the Libraries groups.  And there are a few
17 corporate members, like myself.
18 Q.  And do you recall any of the other
19 corporate members?
20 A.  The one that I can recall clearly
21 is Skip Dye from Penguin Random House.
22 Q.  And that's a publishing company?
23 A.  That's correct.
24 Q.  And on that board you're
25 interacting with a lot of librarians and then a

Page 51

1  few corporate representatives?
2  A.  Yes.  I would say most of the
3  people on the board, whether they're librarians
4  or not, I'm not sure, but many of them have
5  served previously within the Friends or the
6  foundations that support libraries, but I'm not
7  sure if they actually have a library degree.
8  But they're in the library world, if you will.
9  Q.  Library land?
10 A.  Library land.
11 Q.  So it seems like you're pretty
12 tuned into library land; is that fair?
13 A.  Yes.  This is the world I live in.
14 Q.  Yeah, yeah.  I imagine living in
15 that world, you like to stay updated on what's
16 going on in the industry; is that fair?
17 A.  I try to.
18 Q.  Okay.  And how do you try to make
19 sure you're staying up to date?
20 A.  Mostly with information and news
21 that's published publicly.
22 Q.  Okay.  What are your favorite
23 public publications?
24 A.  I read the Wall Street Journal as
25 much as I can, but I don't get a lot of time

Page 52

1  often.  But my primary source of information
2  would be my interaction with customers and any
3  information that my team brings me.
4  Q.  Okay.  And do you ever read any
5  library-specific materials?
6  A.  When I have the chance, I will
7  sometimes read Library Journal, LJ.  I don't
8  know of any library-specific publications.
9  Q.  Any blogs?
10 A.  On occasion if somebody sends me
11 something, I would read it, but I don't believe
12 I'm a subscriber to a library-specific blog.
13 Q.  Do any of the librarians ever send
14 you new things?
15 A.  I'm sure they have in the past.
16 Q.  And do you often read those?
17 A.  Sometimes.
18 Q.  Okay.  I'd like to briefly talk
19 about what you did to prepare for today, if
20 that's all right.
21 A.  Are we done with the background?
22 Q.  Yes.  You can set it to the side,
23 for sure.
24     So what did you do, if anything, to
25 prepare for today's deposition?

Page 53

1  A.  Spent time with Counsel and read
2  through the documents as much as I could.  In
3  some cases, I was -- when I was reading some
4  documents, I was confused, and so I sought
5  clarification.  In some cases I remained
6  confused.  But I was able to glance at the
7  documents that I was provided with that would
8  be relevant to this deposition.
9  Q.  And I don't want to get into any of
10 your conversations with Counsel.
11 A.  Uh-huh.
12 Q.  How often did you meet with them,
13 or how many times?
14     Better question.
15 A.  Frequently virtually.  And in
16 person, yesterday and today.
17 Q.  Okay.  And if you had to ballpark
18 it, how much time did you spend preparing with
19 Counsel?
20 A.  In hours, I don't -- how many hours
21 I spent with Counsel?
22 Q.  Yes.
23 A.  I wouldn't know how to estimate it.
24 I'd have to do some math in my mind.  Thinking,
25 I had a 90-minute video call one day, and two

**Page 118**

 1  A.  My HR leader, Hannah Correll.
 2      MR. NOYES: What topic is that, or
 3  is that just inquiry?
 4      MR. WALKER: Yeah, just inquiry.
 5  Q.  Have you ever seen a WorldCat record?
 6  A.  Can you tell me what a WorldCat
 7  record is?
 8  Q.  It's a record from WorldCat.
 9  A.  A record from WorldCat?
10      I'm not sure I've ever -- I've been
11  maybe a part of a demonstration or a review
12  somewhere, but I haven't searched for it or
13  reached out for a record from WorldCat.
14  Q.  Okay.
15      MR. NOYES: And just so I'm clear,
16  Topic 5, Sub A, WorldCat records and data is
17  Dan Johnson.
18      MR. WALKER: Right. I understand.
19      MR. NOYES: Okay.
20  Q.  Are you aware that OCLC places
21  restrictions on customers and their use of
22  records from WorldCat?
23  A.  Not particularly. They may choose
24  to do it, but I'm not privy to any contracts
25  that OCLC may have with our customers.

**Page 119**

 1  Q.  Is Baker & Taylor aware of this?
 2  A.  That OCLC places restrictions?
 3      Only in assumptions, that it's a
 4  good business practice. They may or may not.
 5  We don't know.
 6  Q.  Why is it a good business practice?
 7  A.  Just contracts, you want to make
 8  sure that contractually you know what you're
 9  getting into it.
10  Q.  So what kind of restrictions would
11  you put on something like that?
12      MR. NOYES: Objection to the form.
13  A.  It's just conjecture. There could
14  be many, many different clauses. You can put
15  any kind of restrictions on the usage.
16  Q.  What are some of those that you
17  might place on the usage?
18      MR. NOYSE: Objection to the form.
19  A.  They could put restrictions on the
20  jurisdiction, different features, so on and so
21  forth.
22  Q.  Okay. And you've been doing
23  software product development and sales for a
24  long time, right?
25  A.  For a while.

**Page 120**

 1  Q.  Yeah. And for those products and
 2  sales, have you ever placed restrictions on a
 3  customer's use of those software products?
 4  A.  I'm sure we have.
 5  Q.  Okay. What kind of restrictions
 6  have you placed on them?
 7  A.  Different products have different
 8  restrictions.
 9  Q.  Okay. So maybe let's throw out BTCat.
10      What kind of restrictions have you
11  put on customers' use of BTCat?
12  A.  Depending on their engagement with
13  BTCat, the restrictions can vary.
14  Q.  So depending on the engagement,
15  what does that mean?
16  A.  They could be using BTCat just as a
17  utility. They could be using BTCat as a
18  utility in a database. They could be using
19  BTCat as part of their third-party subscription
20  services.
21  Q.  So let's talk about each of those.
22      For the utility, what do you mean
23  by that?
24  A.  They're accessing BTCat's utility
25  to create or enhance any records that they may

**Page 121**

 1  choose.
 2  Q.  So is that for cataloging?
 3  A.  Yeah.
 4  Q.  And what restrictions does Baker &
 5  Taylor place on customers that use the utility?
 6  A.  General restrictions, like the
 7  software will not be abused and that it will be
 8  used in the real form that the customer
 9  understands it should be used.
10  Q.  Okay. So software restrictions.
11      Any other restrictions?
12  A.  I'm sure there are plenty in the
13  contract. I don't have it in front of me.
14  Q.  Would they place any restrictions
15  on the use of data?
16  A.  That depends on the form. That
17  depends on the contract. Some data is
18  protected. Some isn't.
19  Q.  Okay. So for the contract that
20  applies to the utility, does it restrict
21  customers' use of BTCat data?
22  A.  If they're accessing BTCat data
23  perhaps, yes. If they're using it for their
24  own creation of their MARC records and they're
25  able to do it, they own it.

Page 122

1  Q. Are they able to share that data
2 with others?
3  A. If they create it and if they own
4 it, yes, they can.
5  Q. Okay. What do you mean by "if they
6 own it"?
7  A. If they create the record, if they
8 enhance the record and they have it in their
9 private institution files and they deem it not
10 to be shared with anyone, then they can choose
11 to do whatever they want.
12  Q. So if they download a BTCat record
13 and make improvements, they can --
14  A. We --
15  Q. Go ahead.
16  A. I was just saying, we're only
17 talking about the utility. So the utility
18 doesn't have access with the database.
19  Q. So you can't download with the
20 utility?
21  A. You can download, but you don't
22 have access to our database, meaning the BTCat
23 database. The utility is like a Microsoft word
24 processor, you can type things into it.
25  Q. So it's to make edits, changes,

Page 123

1 deletions, that kind of stuff?
2  A. If it's technical restrictions,
3 then I think Dan might be the right person to
4 give you the answer more technically.
5  Q. I'm talking more contracts.
6     So the utility and database, is
7 that like -- what do you refer to that as?
8     Does that have a name?
9  A. It's BTCat.
10  Q. Okay. So there's BTCat, BTCat
11 utility?
12  A. They can choose to only have access
13 to the BTCat utility.
14  Q. Okay. And then you can do an
15 add-on to have access to the database?
16  A. Correct.
17  Q. And what is the database?
18  A. The database is a collection of
19 MARC records within BTCat.
20  Q. Okay. And how many records are there?
21  A. Dan can give you the exact answer.
22  Q. Okay. Do you have an estimate?
23  A. Approximately ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮.
25     MR. NOYES: Let me just -- for

Page 124

1 orientation, I believe we're in Topic 8, which
2 doesn't really directly relate to BTCat
3 contracts, but I just want to make sure because
4 8 divides certain topics between Aman and Dan
5 Johnson. So if I'm misunderstanding and this
6 is not Topic 8, then if you could clarify.
7     MR. WALKER: I think this is
8 related to the contracts that we've talked about.
9     MR. NOYES: Because 4 is
10 subscription contracts, but that's for
11 collectionHQ.
12     MR. WALKER: No.
13     MR. NOYES: Okay. 4(B), agreements
14 between Defendants other than collectionHQ.
15 Okay. Okay.
16     MR. WALKER: Yeah.
17  Q. So utility and database.
18     So for those customers, does
19 Baker & Taylor place restrictions on the use of
20 records from the database?
21  A. It's situational. For third-party
22 contracts where we are creating records on
23 behalf of a customer, it's stored in a
24 customer's work file, which they have access
25 to, and they can do with it whatever they wish

Page 125

1 to do with it.
2  Q. So that's for third-party cataloging?
3  A. Correct.
4  Q. Okay. For those that are given
5 access to the utility and database for not
6 third-party cataloging, are there restrictions
7 on it?
8  A. There may be certain restrictions,
9 Jeff, depending on the situation. So a
10 customer can create their own records. They
11 can access our database and edit a record and
12 make it their own, and then they can choose to
13 do whatever they want with it. In many
14 situations, a record goes around to many
15 different institutions.
16  Q. So a record that's in BTCat's
17 database that is downloaded by a customer, they
18 can use it however they want?
19  A. They can choose to add or enhance
20 it the way that they want.
21  Q. Can they share it however they want?
22  A. Non-commercially.
23  Q. Okay. So if they shared it with a
24 competitor, you'd have a problem with that?
25     MR. NOYES: Objection to the form.

32 (Pages 122 - 125)

Page 126

1  A. Depending on the use of it.
2  Q. So if they shared it with someone,
3 and then someone sold that record, would you
4 have a problem with that?
5  A. Depending on their agreement with us.
6  Q. Okay. And do you ever have an
7 agreement where that's permitted?
8  A. Where commercial rights are permitted?
9  Q. Say that again.
10  A. Where commercial rights are permitted?
11  Q. Yes.
12  A. I'm not aware.
13  Q. Okay. So as you sit here right
14 now, you can't think of a situation where you
15 permit that by contract?
16  A. Situationally, Jeff, like I said,
17 if there were third-party arrangements in which
18 we are creating records on a customer's behalf,
19 if we are creating records at Baker & Taylor,
20 as we do, as the largest employers of
21 catalogers, then those records are part of our
22 database.
23  Q. I understand that. That's cataloging,
24 right?
25  A. Correct.

Page 127

1  Q. That's a separate service?
2  A. Yes.
3  Q. Okay. I'm talking about people
4 that are given access, and they download the
5 record, and they do the changes and manipulations.
6  A. Uh-huh.
7  Q. Are they permitted to then share
8 that for commercial purposes?
9  A. For commercial purposes, no.
10  Q. Okay. Why is that?
11  A. The effort to create a record
12 within our database, so the commercial rights
13 are reserved by Baker & Taylor and BTCat.
14  Q. Okay. And so it's because of the
15 effort and investment that Baker & Taylor has
16 put into those records?
17  A. The originality of it, the novelty of
18 it.
19  Q. That you're adding -- what is
20 original about it?
21  A. Either creation or material
22 enhancement.
23  Q. Okay. Is it also kind of the sweat
24 equity?
25  A. I don't know what that means.

Page 128

1  Q. Like the work that you're putting
2 in to improving or enhancing that record.
3  A. I think it's hypothetical and
4 conjecture at this point, Jeff, because the
5 work put in by an original cataloger that has
6 book in hand in creating a record is very
7 different than somebody adding a field amongst
8 400 fields.
9  Q. So I'm talking about Baker & Taylor.
10  A. Yes.
11  Q. Do you put in work to make your
12 records original in your database?
13  A. Yes.
14  Q. Is that one of the reasons why you
15 protect those records --
16     MR. NOYES: Objection to the form.
17  Q. -- from commercial use?
18  A. In some cases, yes.
19  Q. Not in all cases?
20  A. There could be cases in which we
21 may have a partnership in which those rights
22 can be waived.
23  Q. Okay. Can you think of any
24 situation where you've done that already?
25  A. Not yet.

Page 129

1  Q. You haven't done it yet?
2  A. Not yet. But we have other
3 providers and other customers who use it.
4  Q. Okay. And so in that situation
5 where you enter into a partnership, would you
6 expect compensation as part of that partnership?
7  A. Sometimes.
8     MR. NOYES: Objection to the form.
9  Q. Sometimes?
10  A. Yeah.
11  Q. So I think you testified you
12 understood that OCLC does place some
13 restrictions on customers' use of WorldCat
14 records; is that accurate?
15  A. I briefly read the rights and
16 reservations document that was in there, but it
17 was very confusing to me to understand the
18 rights and the restrictions that are placed.
19 And also, I'm not privy to any restrictions in
20 any contracts that OCLC may have with their
21 customers.
22  Q. Okay. So are you saying you
23 weren't aware that they placed restrictions on
24 the use of WorldCat records?
25  A. I'm saying there may or may not

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 130

1 have been, but I'm not privy to any contracts
2 between OCLC and its customers.
3    Q.  So you don't know whether or not
4 OCLC placed restrictions on customers' use of
5 WorldCat?
6    A.  I'm unsure, yeah.
7    Q.  Okay.  You've never heard any
8 customer say that there are restrictions and
9 ways in which they can't use WorldCat records?
10    A.  If they understood it and
11 communicated maybe to somebody at Baker &
12 Taylor, but, you know, not me.
13        Just as a quick check-in, which --
14        MR. NOYES:  We're on 4.
15    A.  We're on 4?
16    Q.  Yes, we are.  I'm sorry.  I may hop
17 around a bit.
18    A.  I'm sorry.  I'm just trying to
19 organize my notes.  Okay.
20    Q.  So putting the contract aside,
21 whether or not you've seen it, are you aware
22 generally that OCLC places restrictions on its
23 customers' use of WorldCat data?
24    A.  Only through brief knowledge of
25 publicly-available information on a past

Page 131

1 litigation.
2    Q.  Okay.  And what litigation is that?
3    A.  I believe that there was one where
4 Clarivate was a Defendant.  And more recently I
5 was made aware of a matter with something
6 called Anna's Archive.  I apologize if I'm
7 mispronouncing that.
8    Q.  So the Clarivate litigation, when
9 did you first become aware of that?
10    A.  I would say I may have read it in
11 the past, I can't recall, but more recently in
12 one visit to OCLC's office with their CEO, I
13 was made aware that there was a past
14 litigation.
15    Q.  Okay.  And when was that visit?
16    A.  It was early this year.  I may not
17 recall the exact date.  It was right at the
18 time when OCLC withdrew from the acquisition
19 process of collectionHQ, somewhere in that time.
20    Q.  We can come back to that later.
21    A.  Sure.
22    Q.  So prior to that time you had never
23 heard anything from library land about the
24 Clarivate litigation?
25    A.  I'm sure I may have seen it, read

Page 132

1 through it in passing, but I don't think that I
2 may have paid enough attention to it.
3    Q.  And what are BTCat's main competitors?
4    A.  There are several.
5    Q.  Could you name a few?
6    A.  I would think that we have
7 SkyRiver, which I'm not sure who owns it now,
8 but it was a product out there.  I would
9 imagine it would be a product from TLC, it used
10 to be called ITS MARC, but I'm not sure what
11 it's called today.  I would say any open
12 databases out there.  I would say Library of
13 Congress, as well.
14    Q.  Okay.  Would you say WorldCat?
15    A.  In certain cases, it could be
16 considered a customer, a competitor, I would
17 say.  But we actively do not compete with any
18 other products out there.  We believe that all
19 products suit the different needs of different
20 customers.
21    Q.  So you've never compared -- have
22 you ever compared your product --
23    A.  I'm sure my team has.
24        MR. NOYES:  Let him finish the
25 question, please.

Page 133

1    Q.  Have you ever compared BTCat to
2 WorldCat?
3    A.  I'm sure my team has in instances.
4    Q.  Have you?
5    A.  In hindsight, in passive thought,
6 yeah.
7    Q.  What does that mean?
8    A.  It means not paying active
9 attention to it, but if some data was provided
10 to me, I may have compared it.
11    Q.  When you're talking with customers
12 or other libraries, have you ever discussed or
13 compared BTCat to WorldCat?
14    A.  I can't recall exact communications
15 with customers, but perhaps as a matter of
16 sales, I guess.
17    Q.  Okay.  What about in any potential
18 acquisitions?
19    A.  Yes.  The incident I could
20 potentially remember would be when Baker &
21 Taylor was part of the disposition by Follett,
22 there may have been discussions with potential
23 acquirers on the merits of BTCat.
24    Q.  Versus WorldCat?
25    A.  Just the merits of BTCat.  And if

Veritext Legal Solutions
www.veritext.com                                                888-391-3376

Page 242

1  found out that someone was an OCLC customer,
2  would it change how you treated them when it
3  came to participating in the EAP?
4      A.  I don't believe so.
5          (Discussion had off record.)
6      A.  Are we still referring to these,
7  Jeff, or are we done with that? (Indicating)
8      Q.  We are done with that. Let's do
9  56827.
10          - - - - -
11         (Thereupon, Plaintiff's Exhibit 49,
12         08-12-2020 Teams Invitation from
13         Eric Throndson to Fred Harvey and
14         Others, was marked for purposes of
15         identification.)
16          - - - - -
17     Q.  All right. This has been marked
18  Exhibit 49.
19         All right. Have you seen this
20  document before?
21     A.  I don't think I have.
22     Q.  Okay. Do you see on the attachments
23  it included BTCat All Opportunities?
24         Is that similar to the document we
25  were looking at before?

Page 243

1      A.  The one which will give me cataracts
2  later in life?
3      Q.  That's correct. The one with Bates
4  Stamp Baker 56191.
5      A.  191.
6      Q.  You're not going to have to read it.
7      A.  I'm just looking at the columns to
8  compare. Yes, it appears to be a --
9          MR. NOYES: There's no question
10  pending.
11         THE WITNESS: Oh, I thought he
12  asked a question.
13         MR. NOYES: I think he just asked
14  you to -- well, restate your question.
15         THE WITNESS: Restate your question.
16     Q.  Is this a similar report to what we
17  were looking at before, a Sales Report, BTCat
18  All Opportunities?
19     A.  Yes, it appears to be.
20     Q.  Would it surprise you that there
21  are other references in here that note when a
22  customer is an OCLC customer?
23     A.  No. We capture information for all
24  leads, whether they're part of another product
25  or not.

Page 244

1      Q.  Okay. And your salespeople never
2  focus on -- or make comparisons to BTCat and
3  WorldCat with customers?
4      A.  If they're asked, they can
5  represent what we believe are Baker & Taylor's
6  strengths.
7      Q.  Okay. If you turn to the first
8  page, this e-mail, the subject is Intro to
9  BTCat For Inside Sales.
10         What would you understand this to be?
11     A.  So this is a training session for
12  our inside sales team.
13     Q.  So these are the people that have
14  interaction with customers?
15     A.  They would potentially, I'm
16  assuming. Since it's marked "Intro To BTCat,"
17  I'm assuming they would eventually interact
18  with prospects.
19     Q.  Okay. And then one of the -- or
20  two of the things that it identifies under
21  No. 1, Discussion of BTCat, our competitors and
22  strengths and weaknesses.
23     A.  Okay.
24     Q.  Who are the competitors of BTCat at
25  this time?

Page 245

1      A.  I'm not aware of what was said in
2  this presentation or this session or review
3  about the competitors at that time.
4      Q.  But who were the competitors of
5  BTCat at this time?
6      A.  We would assume that BTCat in the
7  market would compete with the likes of
8  SkyRiver, and I don't know who that owner is
9  now, ITS MARC from TLC, Library of Congress,
10  open databases and some customers maybe on
11  WorldCat.
12     Q.  And it would compete with WorldCat,
13  right?
14     A.  It may.
15     Q.  It may?
16     A.  Well, it would be a customer's
17  choice to see if it competes with it or not.
18  We don't pitch a customer our product to be
19  competing with anyone. We say, "These are the
20  merits of our product." If the customer
21  chooses to say that, "We are on WorldCat,"
22  that's their volition.
23     Q.  So would it surprise you if this
24  presentation listed WorldCat as a competitor?
25     A.  No, it wouldn't.

Case 2:25-cv-00609-EAS-EPD Doc #: 41-1 *SEALED* Filed 09/12/25 Page 2 of 10 PAGEID #: 1442
Case 2:25-cv-00609-EAS-EPD Doc #: 41-14 *SEALED* Filed 09/26/25 Page 2 of 10 PAGEID #: 1688

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 246

```
 1    Q.   Okay.  Would it surprise you if
 2  when it compares strengths and weaknesses, that
 3  it compares strengths and weaknesses between
 4  WorldCat and BTCat?
 5    A.   No, it wouldn't surprise me.
 6    Q.   So WorldCat was a competitor?
 7    A.   WorldCat was a product that existed
 8  in the marketplace that our customers may
 9  consider us to be a competitor, we don't.
10    Q.   So you don't consider it a competing
11  product?
12    A.   We don't compete with WorldCat.  We
13  compete on our own merits.
14    Q.   Do you consider WorldCat a competing
15  product?
16    A.   We compete with ourselves.
17    Q.   It's a yes or no question.
18         Do you consider WorldCat a
19  competing product to BTCat?
20    A.   I don't think it's a yes or no
21  question.  We compete with ourselves.
22    Q.   Would it surprise you that others
23  at Baker & Taylor consider it a competing
24  product?
25    A.   Potentially.
```

Page 247

```
 1    Q.   Okay.  So Baker & Taylor considers
 2  it a competing product?
 3    A.   In certain situations in front of a
 4  customer, if they're asking us to list the
 5  merits of BTCat to WorldCat or OCLC.
 6    Q.   So you had listed other products as
 7  competing products, correct?
 8    A.   No, I listed --
 9    Q.   SkyRiver?
10    A.   Yes.
11    Q.   And you listed a couple others that
12  I don't remember off the top of my head.
13    A.   Sure.
14    Q.   And then you were really hesitant
15  to admit, you have been fighting me on this,
16  that WorldCat a competing product.
17         Why?
18         MR. NOYES:  Objection to the form.
19    A.   The intent here is to list products
20  that compete in this space.  Whether it is a
21  competitor of ours or not rests on a customer's
22  perception of our product.
23    Q.   Is WorldCat a competing product in
24  the space in which BTCat operates?
25    A.   If a customer deems that it's
```

Page 248

```
 1  competition, it is.  If they don't, it isn't.
 2    Q.   Okay.  Why won't you answer?
 3         MR. NOYES:  Objection.  He's
 4  answered that question in various forms six
 5  times, so I'm objecting, asked and answered.
 6  And each time was an answer, so to ask, "Why
 7  won't you answer" is actually not a correct
 8  question.
 9         MR. WALKER:  But it's a yes or no
10  question, Frank.
11    Q.   The question is still out there.
12         Why won't you answer?
13    A.   I believe I've answered it, Jeff.
14    Q.   You've answered why you won't admit
15  it's a competing product?
16    A.   I believe I've answered your question.
17    Q.   We have a new document.
18         - - - - -
19         (Thereupon, Plaintiff's Exhibit 50,
20         Review of Sales Opportunities, was
21         marked for purposes of
22         identification.)
23         - - - - -
24         MR. HARTMAN:  Jeff, to confirm,
25  we're on Exhibit 50?
```

Page 249

```
 1         MR. NOYES:  Does that say "50"?
 2         THE WITNESS:  Yeah.
 3    Q.   So I've put before you what's been
 4  marked as Plaintiff's Exhibit 50.
 5    A.   Yes.
 6    Q.   I'll give you a chance to look at
 7  it.  And I can direct your attention, if it's
 8  helpful, to the page that at the top says
 9  "BTCat."
10    A.   Okay.  Is that the only page to
11  focus on, Jeff?
12    Q.   Feel free to look at the others if
13  you want.  I'm only going to ask questions
14  about this one.
15    A.   Can you also tell me which section
16  are we still on?
17         Are we still on No. 8 here?
18         MR. NOYES:  No.  We're on 9.
19         THE WITNESS:  Apologies.
20         MR. NOYES:  Can I just clarify,
21  this is a native document, so it has one Bates
22  number?
23         MR. WALKER:  That's correct,
24  unfortunately.
25         MS. BROWN:  We noticed that some of
```

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 250

1 the metadata in your production didn't have
2 families, so either that's not a child or an
3 attachment, but your client didn't provide the
4 data.
5     MR. WALKER:  We don't have a cover
6 e-mail.
7     Q.  Do you recognize this document?
8     A.  It appears to be a review of sales
9 opportunities across different products at
10 Baker & Taylor.
11     Q.  And the part that I pointed out to
12 you that has BTCat at the top, is this specific
13 to BTCat?
14     A.  It appears to be, yes.
15     Q.  And at this point, if you read that
16 first bullet under RF7 Assumptions, it says "We
17 think we will have ▆ to ▆▆▆▆▆▆▆▆▆ that
18 are likely candidates to purchase BTCat, but
19 there is still uncertainty around their
20 provider and dates and our cataloging coverage
21 levels."
22     A.  Yes.
23     Q.  So at this point, were all the
24 customers you have had EAP?
25     A.  It appears to be.  I don't have a

Page 251

1 year or a date on this.  It just seems like
2 it's 2021.
3     It says -- what does it say?
4     It says 2021.  I don't have a date
5 on this document, what date this is, to be able
6 to answer that accurately.
7     Q.  And when did you have your first
8 BTCat paying customer?
9     A.  Hmm.  Dan may be able to give you
10 the exact date.  I remember the name, but I
11 don't remember the exact date in 2020 or 2021.
12     Q.  Okay.  What's the name?
13     A.  It was York.
14     Q.  And you see it right here on the list?
15     A.  Yes, sir.
16     Q.  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
24     A.  Yeah, I see it.  Thank you.
25     Q.  So at this point ▆▆▆ wasn't a

Page 252

1 customer, to your knowledge?
2     A.  No.
3     Q.  Okay.  Do you see in the notes
4 sometimes it still notes who the competitive
5 service is that they're currently subscribed to?
6     A.  Yes, sir.
7     Q.  Okay.  And it also says for ▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆ to OCLC.
10     A.  Yes.
11     Q.  Is that something that you guys
12 would have asked the customer about or they
13 would have volunteered?
14     A.  They would have volunteered.
15     Q.  Okay.  Were you doing any
16 competitor research about WorldCat or SkyRiver,
17 either about their functionalities or about
18 their pricing at this time?
19     A.  Whatever was available publicly.
20     Q.  And why were you doing that research?
21     A.  To gain market knowledge --
22     Q.  Okay.
23     A.  -- I'm assuming.
24     Q.  So you wanted to understand your
25 competitors' products?

Page 253

1     A.  We wanted to understand what does
2 this market mean.
3     Q.  And you wanted to understand how
4 you could market it?
5     A.  We wanted to understand what was
6 out there.
7     Q.  Did you want to understand how to
8 market it?
9     A.  We would market it on the merits
10 that we thought we have.  We wanted to
11 understand publicly-available information.
12     Q.  Okay.  And also information that
13 customers would share with you about these
14 competing products?
15     A.  If they did.
16     Q.  Okay.  And during that competitive
17 research, you guys never looked for any of the
18 contracts that applied to WorldCat?
19     A.  What contracts would those be, Jeff?
20     Q.  The contracts that governed WorldCat.
21     A.  We would have no reason to look at
22 a contract between a customer and OCLC.
23     Q.  But you were doing public searches
24 for these competing products, correct?
25     A.  At some point, yeah.

Veritext Legal Solutions
www.veritext.com                                           888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 286

1 cataloging purposes.
2  Q.  And you don't want to allow them to
3 share those records with other libraries?
4  A.  The restriction is on the use of
5 BTCat and the database.
6  Q.  Say that again.
7  A.  The restriction is defining the use
8 of BTCat and the BTCat database for cataloging
9 purposes.
10  Q.  Okay.  But the customer is not
11 allowed to load them into a database where
12 others can access them?
13  A.  Correct, without permission.
14  Q.  And so in this situation you'd
15 expect them to come back to you and seek
16 written authorization if they were going to do
17 it?
18  A.  Yes.
19  Q.  And have you ever given written
20 authorization for that?
21  A.  Not to my recollection.
22  Q.  Okay.  And then 2.03 that we looked
23 at before, the last sentence says "Customer
24 shall not allow any access to BT Cat by other
25 libraries through consortia," again, "without

Page 287

1 Baker & Taylor's prior written consent"?
2  A.  Correct.
3  Q.  And so you understand that the
4 customer has to come to you in order to give
5 access to other libraries through these
6 methods, give them access to BTCat?
7  A.  Correct.
8  Q.  Okay.  Is one of the purposes of
9 this to protect the database?
10  A.  It's to protect BTCat and Baker &
11 Taylor.
12  Q.  And all the work and improvements
13 you made to the database?
14  A.  It's designed for a specific
15 purpose, a problem that libraries face, for
16 them to solve their cataloging inefficiencies.
17  Q.  But is it also meant to protect the
18 investment you've made into the database?
19  A.  It's meant to protect the purpose
20 of the product.
21  Q.  Is it also meant to protect the
22 investment you've made into it, the resources,
23 the individuals that have cataloged and added
24 Baker & Taylor original records, any
25 improvements you've made to records?

Page 288

1  A.  Like I said, Jeff, the intent is to
2 protect the purpose for which this product was
3 created, which was to drive cataloging
4 efficiencies.
5  Q.  Okay.  So it's not intended to
6 protect the investment and the time and all the
7 other records that you guys have created
8 originally?
9  A.  That's the indirect intention.
10  Q.  Okay.  But it is an intention?
11  A.  The intention is to protect the
12 product and the purpose of this agreement.  The
13 reason for putting restrictions on customers is
14 so that they know exactly what the purpose of
15 this is.  And if they choose to have a
16 different purpose than what is written here,
17 they can seek permission.
18  Q.  And have you ever granted that
19 permission?
20  A.  I don't believe we've been
21 approached or granted.
22  Q.  Let's look at Section 2.05.
23  A.  Yes.
24  Q.  Does BTCat have a copyright or
25 claim a copyright -- sorry.

Page 289

1     Does Baker & Taylor have a
2 copyright or claim a copyright on BTCat?
3  A.  We do not have a copyright or a
4 patent currently on BTCat.
5  Q.  And if it doesn't have a copyright
6 or a patent, is it still able to claim a right
7 to the records in BTCat?
8     MR. NOYES:  Objection to the extent
9 it calls for a legal conclusion.
10  A.  I'm not aware of the legal
11 framework that would protect any original work
12 that was created at Baker & Taylor.
13  Q.  Okay.  Do you understand that -- is
14 it your understanding that Baker & Taylor can
15 still enforce these restrictions on customers
16 absent a copyright or patent?
17  A.  Restrictions on the usage of the
18 product.
19  Q.  And the records?
20  A.  The product and the records.
21  Q.  Okay.  Let's look at 6.01.
22     And do you see 6.0 above it --
23  A.  Yes.
24  Q.  -- Propriety Protection?
25  A.  Yes.

73 (Pages 286 - 289)