# EXHIBIT 21

CONFIDENTIAL

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE SOUTHERN DISTRICT OF OHIO
3  EASTERN DIVISION
4  * * *
5  OCLC, INC.,
6  Plaintiff,
7
   vs.                    CASE NO. 2:25-CV-309
8
9  BAKER AND TAYLOR, LLC, et al.,
10  Defendants.
11
   * * *
12
13
   * TRANSCRIPT DESIGNATED CONFIDENTIAL *
14
15
16  Deposition of MARY SAUER-GAMES, a 30(b)(6)
17  representative herein, called by the defendants for
18  examination pursuant to the Rules of Civil Procedure,
19  taken before me, Emma Jane Troyer, a Notary Public
20  within and for the State of Ohio, at the Offices of
21  Squire Patton Boggs, 41 South High Street, Suite 2000,
22  Columbus, Ohio, 43215, on August 11th, 2025, at 10:00
23  a.m.
24  * * *
25

CONFIDENTIAL

Page 130

1 Q. Oh, you're right. Thank you.
2 A. I'm listed on here.
3 Q. Yep. Okay. So at least at some point you were
4 part of this e-mail chain?
5 A. Yes.
6 Q. But only for part of it. Okay. And in fact, you
7 said I wasn't aware that B and T was competing head to
8 head with us?
9    MR. WALKER: Objection.
10 Q. So you also learned this information --
11    MR. WALKER: Sorry.
12 Q. So you also learned on March 3rd, 2021, about
13 BTCat?
14 A. It appears that way.
15 Q. Okay. And what, in general terms -- I mean, the
16 e-mails here are discussing it, but what in general
17 terms aside from the e-mails did OCLC do, having learned
18 that Baker and Taylor was -- had a product called BTCat?
19 A. We cancelled the WorldCat data and licensing
20 agreement.
21 Q. Okay.
22 A. And that was a May date.
23 Q. Okay. But then it actually continued from one
24 year contractually, but the decision to terminate was in
25 May?

Page 131

1 A. Right, in May. The letters that were sent to
2 Baker and Taylor were in May.
3 Q. And other than cancelling the license agreement,
4 did OCLC do anything else to find out more about BTCat?
5 A. We would have done -- Janet that I mentioned
6 would have done desk research, her team, to understand
7 what the product was. Our sales team would have been
8 asking more questions. The product team would have been
9 seeking out information. We would have attended
10 conferences to understand more, or presentations.
11 Q. Did OCLC consider, having learned about BTCat,
12 whether it needed to change something about its
13 agreements with its customers?
14    MR. WALKER: Objection.
15 A. Not -- I don't know.
16 Q. Okay. Well, let me direct your attention to the
17 first page of this exhibit. In the middle, the e-mail
18 from Chip Nilges, where he says, as an aside -- do you
19 see that paragraph?
20 A. Mm-hm.
21 Q. [redacted]

Page 132

1 [redacted]
2    MR. WALKER: One caution. To the extent
3 there are any discussions with counsel, he doesn't want
4 that information, is my understanding.
5 Q. Correct. Business discussions?
6 A. I'm not recalling any.
7 Q. [redacted]
12 Q. Okay. And by the way, none of the names or
13 e-mail addresses that you see on this exhibit are
14 lawyers; am I right?
15 A. No.
16 Q. Okay. I think we would --
17 A. Oh, I take that back. Brianna Elsmore was on
18 staff as attorney at the very top.
19 Q. Okay.
20 A. But this exchange in here, no.
21 Q. Okay. Is this a privilege issue?
22    MR. WALKER: I don't think so.
23 Q. Okay.
24    MR. WALKER: Obviously any subsequent
25 conversations would be.

Page 133

1 Q. Oh, right. Because she just gets the last
2 e-mail. All right. Next exhibit, moving forward a
3 couple of months -- yeah. So just before you leave
4 that, there's a reference at the top of the e-mail about
5 the document. UCC minutes, 2020, 10/18; do you see?
6 A. Mm-hm.
7 Q. Do you know what that is?
8 A. No.
9 Q. Do you know if there's a board or group at OCLC
10 that has the initials UCC, like some sort of committee?
11 A. No. That's not familiar.
12 Q. Okay.
13 A. My guess would have been it would have been a --
14 actually a library consortia, meeting minutes, if I were
15 going to guess.
16 Q. All right.
17
18 (Defendant's Exhibit J marked for identification.)
19
20 Q. Exhibit J is another -- it's actually just one
21 e-mail dated June 8th, 2021. It's from someone named
22 Lisa Adams to someone named Andy Bush and David
23 Whitehair, whose name you mentioned. Have you seen this
24 before?
25 A. I have not received this one as well.

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

| | |
|---|---|
| Page 134<br>1  Q. What was Lisa Adams' job in 2021?<br>2  A. Well, she's regional sales director.<br>3  Q. And have you had a chance to look briefly at this<br>4 exhibit?<br>5  A. Let me just read this over a minute. Okay.<br>6  Q. Was part of Lisa Adams' job in 2021 to interact<br>7 with OCLC customers, to find out how things were going?<br>8  A. Yes.<br>9  Q. And was Ventura County Library a customer that<br>10 cancelled its subscription in 2021?<br>11  A. I know this cancelled their contract with OCLC.<br>12 I don't remember what year.<br>13  Q. Okay. And at the beginning -- in the beginning<br>14 of the e-mail, Lisa Adams reports that Ventura County,<br>15 they talked of Ventura County regarding their Cat sub<br>16 cancellation. Does that mean to you that they cancelled<br>17 their subscription?<br>18  A. Yes.<br>19  Q. And describe their subscription fee as ▮▮▮▮▮<br>20 and saying they will be using BTCat moving forward?<br>21  A. Correct.<br>22  Q. And in this e-mail, is she sort of debriefing the<br>23 situation or reporting it to Mr. Whitehair and Mr. Bush?<br>24  A. Yes.<br>25  Q. Okay. And is this part of the competitive | Page 136<br>1  A. Yes.<br>2  Q. Is it still using it?<br>3  A. Yes.<br>4  Q. Pardon?<br>5  A. Yes.<br>6  Q. Okay. All right. So having reviewed this<br>7 e-mail, is there anything different about the way Ms.<br>8 Adams is reporting this, like more information or<br>9 different tone, because this is involving a loss to<br>10 BTCat?<br>11  A. No.<br>12  Q. Does this appear to you pretty standard report of<br>13 what's going on?<br>14  A. It depends on the sales rep.<br>15  Q. Okay.<br>16  A. But yes.<br>17  Q. So if we wanted to find out the reasons that<br>18 subscribers or members cancelled their subscription to<br>19 OCLC, we could look at reports like this that would be<br>20 in Salesforce?<br>21        MR. WALKER: Objection.<br>22  A. Yes.<br>23  Q. Looking at the first bullet point of her report,<br>24 BT offers additional services, hyphen, they will set up<br>25 macros for easy cataloguing and preprocess print |
| Page 135<br>1 marketing research that OCLC was doing in response to<br>2 hearing about BTCat?<br>3  A. This would be normal information that the sales<br>4 team would provide up to the product team about what<br>5 they're hearing in the marketplace or to their sales<br>6 leadership team.<br>7  Q. And was it -- how many people do you have at OCLC<br>8 who do a job similar to what Lisa Adams was doing?<br>9  A. I don't know the exact numbers.<br>10  Q. Okay. So was it part of the practice for OCLC to<br>11 reach out to customers who cancelled and find out, is<br>12 there something we can do, what happened, et cetera?<br>13  A. Yes. It is part of our process.<br>14  Q. Okay. And is that memorialized somehow?<br>15  A. The outreach from the sales team can be added to<br>16 Salesforce.com.<br>17  Q. Okay. So let me just break that down.<br>18 Salesforce is like a website that you use to support<br>19 sales, not just you, but anybody who subscribes can use<br>20 it to help support their sales and marketing?<br>21  A. Yes.<br>22  Q. And you can put in reports and information and so<br>23 forth?<br>24  A. Yes.<br>25  Q. And OCLC was using Salesforce in 2021? | Page 137<br>1 materials. What is your understanding of what that<br>2 means?<br>3  A. I would not want to speculate on what that means.<br>4  Q. Do you know what a macro is?<br>5  A. I know what our definition of a macro is. It<br>6 varies from company to company.<br>7  Q. Okay. But is a macro for OCLC something that you<br>8 use to help with these algorithms that you use in<br>9 managing OCLC?<br>10  A. In OCLC, it is.<br>11  Q. It's not something unique to OCLC?<br>12  A. No. But how it's implemented, what it does, it's<br>13 completely different. I would not know what that means.<br>14  Q. Okay. Is easy cataloguing a significant term in<br>15 your industry?<br>16        MR. WALKER: Objection.<br>17  Q. Let me rephrase it. Is easy cataloguing<br>18 something that OCLC considers a positive feature for<br>19 people who are using a catalog like WorldCat?<br>20  A. Yes.<br>21  Q. Is that something you strive to provide?<br>22  A. Yes.<br>23  Q. Okay. So this would be competitively significant<br>24 if Baker and Taylor is providing easy cataloguing?<br>25  A. Yes. |

CONFIDENTIAL

Page 166

1 [redacted]

Page 167

1 [redacted]

Page 168

1 [redacted]

Page 169

1 [redacted]

5　　　MR. WALKER: Frank, I'm just going to repeat
6　my objection that she is not the one that's prepared to
7　speak on this topic.
8　　　MR. NOYES: Oh.
9　　　MR. WALKER: This is Bill.
10　　　MR. NOYES: Okay. So those questions I can
11　address to Mr. Rozek.
12　　　MR. WALKER: Sure.
13　BY MR. NOYES:
14　Q. We're up to the next exhibit, which has a chart
15　with listing lost customers and at risk customers.
16
17　(Defendant's Exhibit L marked for identification.)
18
19　Q. All right. This is Exhibit L. Are you familiar
20　with this?
21　A. Yes.
22　Q. Did you participate in preparing this?
23　A. No.
24　Q. Did you review it at some point before it was
25　turned over?

Veritext Legal Solutions
www.veritext.com　　　888-391-3376

CONFIDENTIAL

Page 170

1  A. No.
2  Q. Okay. When is the first time you saw this?
3  A. While I was preparing for this deposition.
4  Q. Okay. Do you know who did prepare the
5 information in this exhibit?
6  A. I believe Janet Hawk in combination with someone
7 on Bill's team.
8  Q. Okay. And what is Janet Hawk, is that H-A-W-K?
9  A. H-A-W-K.
10  Q. And what's her job?
11  A. She's the person that I mentioned at the
12 beginning who I spoke to who runs market research, sales
13 operations.
14  Q. Is she connected to the group or team at OCLC
15 that investigates circumstances when a customer leaves?
16  A. She does that in combination with some folks from
17 Bill's team too.
18  Q. Okay. Is she like an inside person, or does she
19 interact with customers?
20  A. More inside.
21  Q. What do you know about how these names were
22 determined, or included as cancelled customers?
23  A. They all have cancelled a cataloguing
24 subscription with us sometime during this time period.
25  Q. Okay. And the time period ranges from -- it's

Page 171

1 not a chronological order?
2  A. 2019, I believe, or -- yes, 2019 was the Roswell
3 Public Library.
4  Q. Roswell. Okay. And they range up to as recently
5 as June 30th, 2025?
6  A. Correct.
7  Q. Which was recently. So that's a period of five
8 and a half years?
9  A. Yes.
10  Q. Okay. And what was the basis to include these
11 names in a list that purports to be customers who
12 cancelled because of BTCat?
13  A. Because we have had conversations with all of
14 them, and they said they were moving to BTCat.
15  Q. Okay. And we talked about an example from an
16 e-mail where someone, Ms. Adams, I think, reported on
17 Ventura County?
18  A. Correct.
19  Q. So -- and you said that it's common that that
20 type of conversation is memorialized in some way?
21     MR. WALKER: Objection.
22  Q. I mean, that's not the words you used, but is
23 that fair, that when there's a customer leaving, someone
24 reaches out to them, and if they do reach out to them,
25 they memorialize what they learned?

Page 172

1     MR. WALKER: Objection.
2  A. So we have a process where we will reach out to
3 customers and ask them. They don't always tell us what
4 they're moving to, what system they're moving to, or why
5 they're moving.
6  Q. And what is the business reason for OCLC engaging
7 in that process?
8  A. To understand how we can continue to improve our
9 products and services.
10  Q. Do you also try and keep them from leaving?
11  A. We can, yes, if we're aware of it.
12  Q. Okay. So over the course of the time period from
13 late 2019 through June of 2025, does OCLC have records
14 indicating how many customers left or cancelled?
15  A. In total?
16  Q. Yes?
17  A. Yes.
18  Q. And where is that information kept?
19  A. They would be in our systems.
20  Q. Okay. And for -- do you know what that number
21 is?
22  A. No.
23  Q. Any ballpark?
24  A. No.
25  Q. Okay. And for those instances, is it your

Page 173

1 understanding that all or most would have some record,
2 because there was a contact of when they left to find
3 out why, or ways you can improve?
4  A. We reach out to many. As I said, many do not
5 necessarily respond. They don't want to say where they
6 went to or what they were doing.
7  Q. Okay. So when you reach out to them and they
8 don't respond, is there any record that you tried?
9  A. I don't know that.
10  Q. Okay. So based on the number of -- strike that.
11 The number of customers listed on this page is how many,
12 do you know?
13  A. 36.
14  Q. 36. And does that include the at risk customers
15 on the second page?
16  A. No.
17  Q. Okay. I'll take your word on it. So of the 36,
18 there are 36 customers on this report, and you have no
19 idea in terms of context or scale how many of the 20,000
20 OCLC customers have terminated or cancelled their
21 contracts in the last five and a half years?
22     MR. WALKER: Objection.
23  A. We have many products and services, and we have
24 customers who cancel one service and then pick it back
25 up later. I don't track that.

CONFIDENTIAL

Page 182

1 with Baker and Taylor, but you've marked it as
2 attorney's eyes only?
3    MR. WALKER: Objection. Argumentative.
4    A. I think I'd like to take a break. Are we ready
5 to move on, or are we still in this section?
6    Q. I have a few more questions, and I'm sure I can
7 use the break to come up with some more. No, I'm
8 kidding. That's fine. Let's take a break.
9
10    (Recess from 3:53 p.m. to 4:08 p.m.)
11
12 BY MR. NOYES:
13    Q. We're back on the record. And we were talking
14 about the list of cancelled customers, which is Exhibit
15 L; do you still have that in front of you?
16    A. Yes, still have it in front of me.
17    Q. And one of the reasons 36, is because there's a
18 13-library consortium listed there?
19    A. Correct.
20    Q. And that, as a group, they cancelled all 13 of
21 them?
22    A. Yes.
23    Q. And all 13 were members for the reasons we talked
24 about a few minutes ago?
25    A. Yes.

Page 183

1    Q. Okay. Then there's a list of -- I count, I don't
2 know, 15 or 10 libraries that -- how many libraries are
3 on this exhibit that are listed as at risk?
4    A. I believe it's 13.
5    Q. 13. Okay. And those are still currently
6 customers of OCLC, correct?
7    A. Some of them are prospective customers.
8    Q. Okay. Can you identify --
9    A. They don't have symbol numbers, so that's why I
10 was guessing they were not -- I should not be guessing.
11 I don't know.
12    Q. Do you know who prepared this?
13    A. Janet Hawk prepared this; yes.
14    Q. And so -- and I believe you saw this in
15 preparation for the deposition, but --
16    A. Yes.
17    Q. What information do you have about how the at
18 risk customers were identified?
19    A. They were identified by the sales representatives
20 as they're having conversations with them about in the
21 case if they're existing customers about the renewal, or
22 when they're going out and talking to them about
23 cataloguing services.
24    Q. Okay. And so your understanding is this list
25 includes both prospective customers and current

Page 184

1 customers?
2    A. Yes.
3    Q. And so while you don't know, would somebody at
4 OCLC be able to distinguish between those?
5    A. Yes, very quickly.
6    Q. And so taking the at risk current customer
7 population, there are -- this is based on conversations
8 that OCLC employees have had with a customer that for
9 some reason raises a flag that they may be leaving?
10    A. And have talked about going to BTCat
11 specifically.
12    Q. Okay. So it's both of those things?
13    A. Yes.
14    Q. Okay. And in terms of the libraries on this at
15 risk list that are prospective customers, what's the
16 basis for, in general terms, what's the basis for
17 concluding that that's due to BTCat?
18    A. Because they've told the sales reps that they're
19 considering BTCat either as a replacement or a new
20 system for them.
21    Q. Okay. So since BTCat and WorldCat are
22 competitors, there's also a situation where a
23 prospective customer will be choosing between one or the
24 other?
25    A. Correct.

Page 185

1    Q. And that could be for a variety of reasons?
2    A. Yes.
3    Q. Okay. Not every reason, from OCLC's perspective,
4 not every reason that a customer or prospective
5 customer, when they go to BTCat from WorldCat, is an
6 improper one -- they might just like the people at BTCat
7 better?
8    A. They might like the people better.
9    Q. They might like the price better?
10    A. Yes, they might like the price better.
11    Q. And so the mere fact that someone chooses BTCat
12 over WorldCat doesn't mean that there was some improper
13 conduct; do you agree?
14    A. In what aspect of improper conduct?
15    Q. Well, it doesn't mean -- let me rephrase. The
16 mere fact that a prospective customer chooses Baker and
17 Taylor and BTCat versus OCLC and WorldCat does not mean
18 that BTCat is selected based on improper conduct?
19    MR. WALKER: Objection.
20    A. What I would say is if BTCat is priced
21 significantly lower than WorldCat, while carrying
22 WorldCat records in it, that Baker and Taylor did not
23 have to invest in the creation, maintenance, all of the
24 work that goes into creating a WorldCat record, they're
25 basically riding on the work that OCLC has done and are

Veritext Legal Solutions
www.veritext.com                                                                                                       888-391-3376

Page 186

1 able to charge a lower price than us because they
2 haven't done that work. So that would be improper.
3  Q. Okay. So -- but in that summary, there are three
4 points. One is lower price, and lower price, Baker and
5 Taylor and BTCat could charge a lower price whether they
6 have any improper records or not; it's a smaller
7 database, correct?
8      MR. WALKER: Objection.
9  A. Possibly, yes.
10  Q. So what I hear you articulating is that Baker and
11 Taylor is able to enhance its database improperly while
12 maintaining a price that is lower. So it's the fact
13 that there are records in their database that shouldn't
14 be there that is the problem, correct?
15      MR. WALKER: Objection.
16  A. That's half the problem, because they obtained
17 those records through nefarious reasons. They are
18 getting a higher quality record that they did not have
19 to create from scratch, and they're marketing their
20 database as clean quality records. If it's made up of
21 WorldCat quality records, they haven't had to make the
22 investments in those records, and are able to charge a
23 lesser price.
24  Q. Okay. Is part of that construction the
25 assumption that a WorldCat record is higher quality than

Page 187

1 a BTCat record?
2  A. Yes.
3  Q. If a customer who views a BTCat record and a
4 WorldCat record were to decide that they think the BTCat
5 record is just fine, then the use of WorldCat records or
6 the quality, relative quality of WorldCat records would
7 not be a consideration for that customer?
8      MR. WALKER: Objection.
9  A. We have -- can you rephrase that one more time?
10  Q. Yeah. Let me break it down again. So assuming,
11 which I don't think Baker and Taylor agrees with,
12 assuming that a WorldCat record has higher quality than
13 a BTCat record, if a customer comparing the two decides
14 that the BTCat record is just fine, and has sufficient
15 quality for their purposes, then the presence of these
16 WorldCat records is not part of that calculus; don't you
17 agree?
18      MR. WALKER: Objection.
19  A. I do disagree.
20  Q. Okay. I want to ask you to turn to the complaint
21 for a couple more questions, and then I'm going to ask
22 you to turn to your declaration. So in the complaint,
23 please look at paragraph 18?
24  A. Paragraph 18. I went to Page 18.
25  Q. Now, we were just before the break talking about

Page 188

1 the number of lost customers, and after the break
2 talking about the number of at risk customers that
3 you've identified, okay. Keeping that testimony in
4 mind, do you agree with the first sentence of 18 that
5 defendant's attack on WorldCat is a fundamental threat
6 to OCLC and everything that it does?
7      MR. WALKER: Objection.
8  A. Yes.
9  Q. Okay. Why is it fundamental?
10  A. Because if Baker and Taylor is gaining customers
11 based on the work that OCLC has done and not properly
12 licensing the records, that eventually the value of
13 WorldCat as not only a cataloging tool but also a
14 resource sharing network, a discovery mechanism for
15 libraries worldwide is devalued. So it devalues
16 everything that we built the cooperative around.
17  Q. Okay. So when you use the word eventually, what
18 timeframe are we talking about here?
19  A. I don't know. I don't know how many customers
20 you have moved over. But it's increasing. You had one
21 or two the first couple years, six customers, now 13
22 this year. And I don't know how many more are in Baker
23 and Taylor's customer base.
24  Q. So even at 13 customers a year, out of a pool of
25 13,000, that's a thousand years?

Page 189

1      MR. WALKER: Objection.
2  Q. Right? At the current rate, it would be a
3 thousand years to take all the customers?
4  A. It's a pretty impressive number they've already
5 gained at this point in time for a new product in this
6 market.
7  Q. In paragraph 118 of the complaint, okay, it uses
8 the word fundamental. I don't have to ask you about the
9 same word twice. Now, while you have the complaint in
10 front of you, you've reviewed the complaint, correct?
11  A. Yes.
12  Q. Okay. Including the parts of the complaint at
13 the end that are referenced as Count 1, Count 2,
14 Count 3, and Count 4?
15  A. Yes.
16  Q. And Count 1 is titled tortious interference with
17 contractual relationships. With the understanding that
18 you're not a lawyer, what is your understanding of what
19 Count 1 is challenging?
20  A. Count 1 is challenging the use of the contract
21 terms in the Baker and Taylor contract for Collection
22 HQ, which is enticing libraries to authorize the use of
23 their WorldCat records in other Baker and Taylor
24 services.
25  Q. And does Count 1 include a claim that OCLC has

Page 190

1  lost any customers or is going to lose customers because
2  of Baker and Taylor's conduct?
3      MR. WALKER: Objection.
4   A. If that is the case, that WorldCat customers
5  are -- oh. Yes. It's helping build BTCat to be a
6  better product, and they're also getting free access to
7  BTCat in exchange. So that could also lower the number
8  of customers that subscribe to WorldCat.
9      MR. WALKER: So Frank, if I may, these are
10 also not paragraphs that were identified in the topic.
11 So this is based on her personal knowledge.
12  Q. Okay.
13     MR. WALKER: To the extent she knows.
14  Q. All right. All right. Now, I asked you to get
15 ready for your declaration, so let's look at your
16 declaration, which is Exhibit C.
17  A. Oh, which one?
18  Q. C.
19  A. Oh, not F.
20  Q. No. At the beginning of your declaration you say
21 that the information in there -- look at paragraph 5,
22 which is the first page and carries over.
23  A. Yes.
24  Q. Okay. So the carryover sentence says, I am
25 familiar with the facts set forth herein based on my

Page 191

1  work history and experience at OCLC, based on my review
2  of relevant OCLC records and publicly available
3  information. On this basis, I believe the facts set
4  forth herein to be true and correct. So -- okay. With
5  that, you understand that's what your assertion was?
6   A. Yes.
7   Q. So if you look back at the back tail end of the
8  declaration, there are some paragraphs in which you
9  refer to knowledge Baker and Taylor has or things that
10 Baker and Taylor is aware of, and I just want to ask you
11 about that.
12     Starting with paragraph 32, okay, the first
13 sentence of 32, given defendant's knowledge and
14 experience with OCLC, it is OCLC's belief that
15 defendants know that their contractual requirement to
16 allow Baker and Taylor access to and a license to use
17 WorldCat records is a breach of the WorldCat customer's
18 framework agreement and policy. Do you see that?
19  A. Yes.
20  Q. Okay. So to be clear, you are not saying in that
21 paragraph that you know that Baker and Taylor has that
22 information; you're saying you believe that Baker and
23 Taylor knows that this is a breach, correct?
24  A. Yes.
25  Q. Correct?

Page 192

1   A. Yes.
2   Q. And in that -- so that means that you don't know
3  if Baker and Taylor is aware of that or not?
4      MR. WALKER: Objection.
5   A. I don't know, but it's reasonable to assume based
6  on all the different contracts we have had with Baker
7  and Taylor over the last several years and the fact that
8  they're contracting -- they're creating contract
9  cataloguing records on behalf of libraries using OCLC
10 credentials which do not allow them to share those
11 credentials between libraries that can only catalog
12 their records for those customers.
13  Q. And the point of your statement in 32 is that --
14 whether you -- that you believe, but don't know, that
15 Baker and Taylor is aware that that provision is causing
16 a breach of contract?
17  A. Please repeat that question again?
18  Q. Yeah. So you don't have any first hand -- I'll
19 do it differently. You don't have any first hand
20 knowledge of Baker and Taylor's awareness that it is
21 doing something that is causing a WorldCat customer to
22 breach its contract?
23  A. That would be correct. I have not had personal
24 discussions with anyone from Baker and Taylor.
25  Q. And that's why you phrase it as a belief that

Page 193

1  they know that, correct?
2   A. Yes.
3   Q. Okay. Paragraph 33, defendants want WorldCat
4  customers to breach their framework agreement with OCLC
5  and WorldCat policy because BTCat has been designed to
6  be populated with WorldCat records and meta data.
7  What's the basis for your assertion that that's what the
8  defendants want?
9   A. The fact that they have been cataloguing library
10 records for decades on behalf of WorldCat customers, and
11 built their systems to be able to support WorldCat
12 records.
13  Q. The specific reference is that defendants want
14 WorldCat customers to breach their agreements with OCLC?
15  A. It's fairly clear from the clause in the
16 Collection HQ contract.
17  Q. So is there anything else -- what else is there
18 that supports your statement that that's what the
19 defendants want?
20  A. That is the only fact that I'm aware of.
21  Q. Okay. Paragraph 34, defendants are also aware
22 that OCLC has WorldCat customers in Ohio and are also
23 Collection HQ customers, making them aware that they are
24 encouraging OCLC's Ohio based customers to breach their
25 agreements. What is the basis for your statement that

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1  the defendants know there are WorldCat customers in
2  Ohio?
3     A. Because they have had several customers that
4  they've talked to in Ohio that are WorldCat customers,
5  and they've cataloged on their behalf.
6     Q. But the statement is that they know that there
7  are companies in Ohio that are both WorldCat customers
8  and Collection HQ customers?
9     A. I'm not recalling specific customers at this
10 moment.
11    Q. Okay. Then paragraph 36, there are two
12 sentences. I want to ask you about both of them. First
13 sentence, again, defendants know that by stealing
14 WorldCat records and offering those records for free or
15 at much reduced cost they are interfering with the
16 current and potential feature of WorldCat customers.
17 What is the basis for the statement that the defendants
18 know that their conduct is interfering with customers,
19 WorldCat customers?
20    A. Because those customers are leaving WorldCat and
21 going to Baker and Taylor, BTCat.
22    Q. Okay. So the fact that they know that a
23 customer, assuming they do know that a customer that
24 goes to BTCat is an OCLC customer, that's what you're
25 saying?

Page 195

1     A. Yeah. I mean, they would ask them, what
2  cataloguing service do you have today.
3     Q. Okay. And are you stating -- are you stating in
4  that paragraph that Baker and Taylor knows that in that
5  process the customer is breaching its OCLC agreement?
6         MR. WALKER: Objection.
7     A. So this is two part. Baker and Taylor knows that
8  if they get WorldCat records that are WorldCat records
9  in ways that are outside of contract or getting them for
10 free, that allows them to offer a cheaper price to these
11 other customers, and so they're taking WorldCat
12 customers then for a lower price and strictly priced
13 based on the fact that now their customers are getting
14 quote unquote free WorldCat records.
15    Q. Okay. So we've gone round and round, and I
16 appreciate your indulgence. Paragraph 36, current
17 WorldCat customers are unlikely to continue to pay, and
18 potential WorldCat customers are unlikely to pay for
19 access to WorldCat if the same high quality records are
20 available for a reduced fee on BTCat. What's the basis
21 for that statement?
22    A. I believe there's a principle in economics that's
23 called rational choice, and if I am a consumer and I'm
24 looking at two products that look exactly the same, my
25 coke can and his coke can, and his is half the price of

Page 196

1  this coke can, I'm going to buy that one.
2     Q. Well, using --
3     A. They're the same.
4     Q. Let's use that metaphor, and let's say that a
5  coke can equals, what is it, 60 million records that are
6  in BTCat. Then the coke cans that would be WorldCat
7  would be ten coke cans. So their choice is between one
8  coke can and ten coke cans, correct, to use your
9  hypothetical?
10        MR. WALKER: Objection.
11    A. To use my hypothetical, I don't care about the
12 quantity. I'm looking at the quality of what is in
13 here. And the quality of these two things is exactly
14 the same. And if I only need so many records and
15 they're the same quality, then I'm going to choose the
16 lower price can.
17    Q. That's assuming that the lower quantity choice is
18 sufficient?
19    A. Yes.
20    Q. And if that's the case, then the fact that OCLC
21 has way more records than anyone else in the industry is
22 irrelevant?
23        MR. WALKER: Objection.
24    A. No. We have more higher quality records, and the
25 fact that they can be guaranteed to find something the

Page 197

1  first time they look, an item, and be able to pull that
2  into their catalog and use that is a greater value. But
3  if it's going to be the same record that they're pulling
4  out of BTCat and paying a lesser price, then it's --
5     Q. Well, just explain to me how you can refer to the
6  records being the same records if there's 60 million
7  records in BTCat and 600 million in WorldCat?
8         MR. WALKER: Objection. Asked and answered.
9     Q. And I just want to -- I understand what you're
10 saying, but just to -- I would like you to elaborate on
11 why you think that it's accurate to say it's the same
12 records when you have a 60 million record database and a
13 600 million -- it's one tenth of the records?
14        MR. WALKER: Same objection.
15    A. If the library can accomplish their cataloguing
16 missions with 70 million records and they're the same
17 quality a database with 600 million, then the size --
18 they're going for the quality of the WorldCat records.
19 Because we have records from all over the world. So the
20 number that the U.S. population needs may or may not
21 include those, but they may need them for other
22 purposes, like resource sharing, et cetera.
23    Q. So just to wrap up on this sentence, your
24 explanation, which I think you said you referred to an
25 economic theory, rational choice, is that you don't --

Page 198

1 the basis for that statement is applying an economic
2 theory to the situation, not actual information from
3 OCLC customers?
4     MR. WALKER: Objection.
5  A. We are hearing from customers that moving to
6 BTCat they can get the access to WorldCat records for
7 half the price, and that has been a direct quote. So
8 the perception is they're getting WorldCat records at
9 half the price.
10  Q. And in those conversations, does what you hear
11 include any comment about the relative size of the
12 databases?
13  A. No.
14  Q. So seemingly the customers don't care about the
15 size, from what you're hearing?
16     MR. WALKER: Objection. Calls for
17 speculation.
18  A. I don't have to evaluate that.
19  Q. Okay. I'm going to look at my notes, but I think
20 I'm done.
21     MR. WALKER: Okay. Do you want to go off
22 the record?
23     MR. NOYES: Yeah. Let's go off the record.
24
25     (Recess from 4:35 p.m. to 4:54 p.m.)

Page 199

1     MR. WALKER: I have no redirect questions.
2 And she'll go ahead and review and sign the transcript.
3
4     (Deposition concluded at 4:54 p.m.)
5         * * *

Page 200

1 STATE OF OHIO)
2 COUNTY OF FRANKLIN)    SS: CERTIFICATE
3
4     I, Emma Jane Troyer, a Notary Public within and
5 for the State of Ohio, duly commissioned and qualified,
6     DO HEREBY CERTIFY that the above-named MARY
7 SAUER-GAMES was by me first duly sworn to testify the
8 truth, the whole truth, and nothing but the truth.
9     Said testimony was reduced to writing by me
10 stenographically in the presence of the witness and
11 thereafter reduced to typewriting.
12     I FURTHER CERTIFY that I am not a relative or
13 attorney of either party, in any manner interested in
14 the event of this action, nor am I, or the court
15 reporting firm with which I am affiliated, under a
16 contract as defined in Civil Rule 28(D).
17     IN WITNESS WHEREOF, I have hereunto set my hand
18 and seal of office at Columbus, Ohio, on this 11th day
19 of August, 2025.
20
21
22
23 EMMA JANE TROYER
24 NOTARY PUBLIC, STATE OF OHIO
25 My commission expires 01-09-2027

Page 201

1   Veritext Legal Solutions
    1100 Superior Ave
2     Suite 1820
    Cleveland, Ohio 44114
3   Phone: 216-523-1313
4
  August 25, 2025
5
  To: Mr. Walker
6
  Case Name: OCLC, Inc. v. Baker & Taylor, LLC, Et Al
7
  Veritext Reference Number: 7528877
8
  Witness: Mary Sauer-Games, 30(b)(6)    Deposition Date:
9 8/11/2025
10
  Dear Sir:
11
12 Enclosed please find a deposition transcript. Please have the witness
13 review the transcript and note any changes or corrections on the
14 included errata sheet, indicating the page, line number, change, and
15 the reason for the change. Have the witness' signature notarized and
16 forward the completed page(s) back to us at the Production address
   shown
17
   above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
24
25 NO NOTARY REQUIRED IN CA