# EXHIBIT 38

Case 2:25-cv-00039-EAS-EPD Doc #: 143 SEALED Filed: 11/04/25 Page: 2 of 25 PAGEID #: 1659
Case 2:25-cv-00039-EAS-EPD Doc #: 141-3 Filed: 11/04/25 Page: 2 of 25 PAGEID #: 1875

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

```
                                                        Page 312

 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3              ~~~~~~~~~~~~~~~~~~~~
 4   OCLC, INC.
 5            Plaintiff,
 6
 7      vs.            Case No.  2:25-cv-0039
 8
 9   BAKER & TAYLOR, LLC; BRIDGEALL LIBRARIES, LTD.,
10            Defendants.
11
12              ~~~~~~~~~~~~~~~~~~~~
13              (ATTORNEYS' EYES ONLY
14         PURSUANT TO PROTECTIVE ORDER)
15              ~~~~~~~~~~~~~~~~~~~~
16
17               VOLUME II OF II
18        Continued 30(b)(6) Deposition of:
19               AMANDEEP KOCHAR
20
             August 15, 2025
21               9:00 a.m.
22              Taken at:
              Offit Kurman
23      227 West Trade Street, Suite 2600
             Charlotte, North Carolina
24
25         Joyce Lynn Shannon, RPR
```

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 353

1  Q. And what did you communicate to --
2 and let's take a step back.
3     Who were those conversations with?
4  A. During that meeting?
5  Q. Yes.
6  A. It was with Skip Prichard, Chip
7 Nilges, and I believe Bill Rozek.
8  Q. Okay. And what did you tell them
9 during that meeting in response to their
10 request that you stop certain activities?
11  A. The summary of that was that we
12 believed that OCLC has a contract with their
13 customers, and if OCLC believes that their
14 customers have violated any contracts, that
15 OCLC should pursue them with their customers,
16 not with Baker & Taylor.
17     However, given the history between
18 Baker & Taylor and OCLC as large library
19 service providers on whom libraries depend, I
20 told them that I was open to an amicable
21 solution, and I offered several solutions in
22 that meeting.
23  Q. And what were those solutions?
24  A. The solutions were that we could
25 jointly approach and communicate to the

Page 354

1 customers that they could identify, and we
2 could go to them and say, "OCLC has come to
3 Baker & Taylor, it has been brought to our
4 attention, what would you like for us to do?"
5  Q. Were there any other solutions?
6  A. I had also broached the idea that
7 I'm open to having a third party audit Baker &
8 Taylor for its use and the database to confirm
9 that the suspicions of OCLC are untrue.
10  Q. Were there any other solutions that
11 you offered?
12  A. That was the summary of it.
13  Q. Okay. Did you discuss the MetaDoor
14 litigation?
15  A. It was brought up by the CEO at OCLC.
16  Q. From Mr. Prichard?
17  A. Yes.
18  Q. What did he tell you about it?
19  A. That there was a litigation, and
20 that he cannot talk much about it, other than
21 what's publicly available, and that I should
22 not go down the litigation path, that I will
23 lose if I do.
24  Q. Was there any other -- as part of
25 these conversations, was there anything else

Page 355

1 that you told them?
2     Strike that.
3     All right.
4     - - - - -
5     (Thereupon, Plaintiff's Exhibit 63,
6     Motion for Preliminary Injunction
7     Re: OCLC versus Baker & Taylor,
8     LLC, and Bridgeall Libraries, Ltd.,
9     was marked for purposes of
10    identification.)
11    - - - - -
12  Q. I think this might be the last Exhibit.
13  A. Okay.
14  Q. So we are on the last topic. So
15 I'm handing you what's Exhibit 63. We're on
16 the last topic, Topic 12 from Baker & Taylor,
17 and Bridgeall Topic 11. Let me know when
18 you're ready.
19  A. Okay.
20  Q. Okay. Have you seen that document
21 before?
22  A. As part of my review of documents, yes.
23  Q. Okay. And what is it?
24  A. Motion for Preliminary Injunction.
25  Q. And we understand from discussions

Page 356

1 with Counsel that you're prepared to testify on
2 behalf of Bridgeall as to any harm -- well,
3 first let's take a step back.
4     What do you understand -- so are
5 you aware that OCLC is asking the Court to
6 enter a Preliminary Injunction against Baker &
7 Taylor and Bridgeall in this case?
8  A. Yes.
9  Q. Okay. And what do you understand
10 that to mean?
11  A. That you're seeking a Preliminary
12 Injunction for the Court to grant you against
13 Baker & Taylor for the counts of the Complaint.
14  Q. And do you have an understanding of
15 what a Preliminary Injunction is?
16     MR. NOYSE: Just objection, that
17 you should not include in your answer
18 communications with Counsel. Just your
19 understanding.
20     THE WITNESS: Okay. As much as
21 Counsel has made me understand.
22  Q. So it's requesting a Court Order to
23 restrain or require certain acts by Defendants,
24 their officers, agents, servants and
25 employees --

Page 357

1  A. Yes.
2  Q. -- and Attorneys while the case is
3 pending. It also covers any other persons or
4 entities actively participating in those acts
5 while the order is in effect.
6      MR. NOYSE: Were you referring to
7 Exhibit 63?
8      MR. WALKER: That's the Federal
9 Rules, but yeah, I was just --
10     MR. NOYSE: Oh, okay.
11     MR. WALKER: -- I was just trying
12 to provide an explanation.
13     MR. NOYSE: I wasn't sure if you
14 were reading from the document.
15     MR. WALKER: No, no.
16  Q. So what actions or activities do
17 you understand that OCLC is asking the Court to
18 restrain or require here?
19     And it may be helpful to point you
20 to the first page.
21  A. Sure.
22  Q. Feel free to look at the whole
23 thing, but it summarizes it on the first page.
24  A. It's asking Baker & Taylor,
25 Bridgeall to refrain from all activities listed

Page 358

1 in Paragraphs 1 through 4.
2  Q. Our understanding is you're
3 testifying on behalf of Baker & Taylor for
4 specific components of the requested
5 injunction; is that right?
6  A. Would you tell me what those
7 specific components are, Jeff?
8  Q. I don't know.
9  A. Could you ask the question again?
10     I may not have registered it.
11  Q. Okay.
12     MR. NOYSE: We have designated Dan
13 as to the second request, because we assessed
14 that that's a technical injunction, it relates
15 to the kind of things that Dan Johnson is going
16 to be talking about.
17     MR. WALKER: Okay.
18     MR. NOYSE: So we have internally
19 designated him to respond to No. 2.
20  Q. Okay. So is it your understanding
21 that you're prepared to speak on, of the four
22 points, No. 1, No. 3 and No. 4 on behalf of
23 Baker & Taylor?
24     MR. NOYSE: We are designating him
25 as the Witness to respond to those three of the

Page 359

1 four points in the injunction. And if you want
2 to ask him his personal -- from his personal
3 perspective about No. 2, that's fine, too.
4      MR. WALKER: And then as to
5 Bridgeall, it's all 4?
6      MR. NOYSE: I'm not sure what
7 you're getting at.
8      MR. WALKER: He was designated as
9 the Bridgeall representative for all four?
10     MR. NOYSE: Yes. I'm sorry.
11  Q. Is that your understanding, as well?
12  A. Yes.
13  Q. So let's talk about the first one.
14  A. Okay.
15  Q. What restriction -- I'm sorry, I
16 guess, would this -- if the Court grants a
17 Preliminary Injunction requiring No. 1, would
18 this harm Baker & Taylor?
19     We'll talk about Baker & Taylor
20 first, and then we'll go to Bridgeall.
21  A. Yes.
22  Q. What harm would result to Baker &
23 Taylor?
24  A. Baker & Taylor would not be able to
25 provide the products and services that a

Page 360

1 majority of libraries depend on Baker & Taylor
2 for.
3  Q. Okay. So what do you understand
4 No. 1 to be asking for?
5  A. It says "Including in their
6 agreement any provisions that encourage and/or
7 require customers who are also OCLC WorldCat
8 customers to grant Defendants access to and a
9 license for the customers' cataloging records
10 that include OCLC WorldCat® records and data."
11  Q. So why would that prevent you from
12 providing your services to customers?
13  A. A large majority of our customers
14 with whom we have third-party agreements are
15 also OCLC third-party agreements.
16  Q. Okay. So are you referring to like
17 third-party cataloging?
18  A. That's right.
19  Q. Okay. So if we carve that out,
20 where you've already received written approval
21 from OCLC or have agreements with OCLC, how
22 would No. 1 harm Baker & Taylor?
23  A. It would harm Baker & Taylor in the
24 fact that our BTCat utility, which we use
25 internally for our users to support our

Page 361

1  products, sales and services, would also
2  substantially be limited by its ability to
3  serve customers.
4      Q.  So it's that you wouldn't be able
5  to sell BTCat?
6      A.  No.  We also use BTCat internally
7  for our internal cataloging needs, as well.
8      Q.  So you're using WorldCat data in
9  BTCat for your internal cataloging?
10         MR. NOYSE:  Objection.
11     A.  It's not WorldCat records, as
12 you've defined prior.  It's the ability for our
13 customers to be able to search any databases.
14 And that would inhibit them from searching the
15 WorldCat database if they had a subscription to
16 OCLC.
17     Q.  So your concern there is that it's
18 a WorldCat customer --
19     A.  Yes.
20     Q.  -- that is directly accessing
21 WorldCat --
22     A.  Yes.
23     Q.  -- for internal cataloging purposes?
24     A.  They would be unable to do it.
25     Q.  How?

Page 362

1      A.  They must access records -- they
2  must allow Baker & Taylor to produce a MARC
3  record for them in support of books that
4  they've purchased.
5      Q.  Sorry.  I meant how does granting
6  this, removing those provisions from your
7  agreements, interfere with that?
8      A.  Maybe I'm not understanding the
9  question, Jeff.  It says our customers, who may
10 or may not be WorldCat customers, if they have
11 access to WorldCat, that Baker & Taylor is
12 contractually required to work upon for their
13 purposes, we are unable to provide services to
14 them.
15     Q.  And so you need, in your
16 agreements, provisions that license the records
17 to Baker & Taylor in order to do that?
18     A.  I'm not distinguishing license or
19 access.  But today, the third-party agreement
20 that we have requires us to perform those
21 services on behalf of the customers so that we
22 can support Baker & Taylor's core products and
23 services.
24     Q.  Okay.  I'm going to ask my question
25 again.

Page 363

1      A.  Sure.
2      Q.  Do you need provisions in your
3  agreements that license the customers'
4  cataloging records -- and when I say
5  "customers," OCLC cataloging records -- to
6  Baker & Taylor in order to perform those services?
7      A.  The question is a little confusing.
8          What is the difference between the
9  customers' cataloging records and OCLC's
10 customers' records?
11     Q.  My question is, do you need a
12 license to all the records in their catalog in
13 order to provide the services that you've
14 mentioned?
15     A.  Yes.
16     Q.  You do, you need them to grant you
17 a license to all of the records?
18     A.  Not all of the records.  The records
19 that we are working on.
20     Q.  And they grant you a license to all
21 of the records in doing cataloging for them?
22     A.  As much as we need to provide our
23 services.
24     Q.  Is it a limited license?
25     A.  I don't know what a limited license

Page 364

1  is, but --
2      Q.  Is it only for the purpose of doing
3  the cataloging?
4      A.  That is what we use it for.
5      Q.  Okay.  But do they grant a license
6  or any ownership interest to you?
7          MR. NOYSE:  Objection.  Calls for a
8  legal conclusion.
9      A.  I'll have to review our processes
10 and our contracts to exactly interpret whether
11 it's limited or a full license, Jeff.
12     Q.  So as of today, you don't know?
13     A.  As of today, I'm unsure of the
14 license grants and the rights thereof.
15     Q.  Is there anything that Baker &
16 Taylor could do to mitigate the harm that
17 you've identified here?
18         MR. NOYSE:  Objection to the extent
19 it calls for a legal conclusion.
20     A.  I don't believe so.
21     Q.  Could it amend its contracts?
22     A.  Not without causing irrevocable harm.
23     Q.  Could it sequester documents that
24 it obtains from these BTCat logs?
25     A.  How?

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 365

```
 1       I wouldn't know.  I don't know
 2  if -- I don't know of a process how to.
 3       Q.   You don't know how to sequester
 4  documents?
 5       A.   I don't know how we would do it
 6  without a full license.
 7       Q.   Do you think it's possible?
 8       A.   We haven't explored it.  I wouldn't
 9  know if it's possible or not.
10       Q.   Okay.  Is that something that Dan
11  would know?
12       A.   He may.  He may have thought of it,
13  but I haven't.
14       Q.   Okay.  So there's nothing else that
15  Baker & Taylor or Bridgeall could do to
16  mitigate the harm you've identified for No. 1?
17       A.   No.  It's a critical requirement.
18       Q.   Granting a license to Baker &
19  Taylor to catalog records of OCLC customers is
20  a critical requirement?
21       A.   Granting access to a customer's
22  cataloging records for us to provide services
23  to customers.
24            MR. WALKER:  Can you read back my
25  question?
```

Page 366

```
 1            (Question read by Reporter.)
 2            THE WITNESS:  The answer is, it's a
 3  critical requirement that Baker & Taylor have
 4  access to Baker & Taylor's customers' cataloging
 5  records.
 6       Q.   That's not my question.
 7       A.   Okay.
 8       Q.   The question was, is granting a
 9  license to Baker & Taylor to the records a
10  requirement?
11       A.   Yes.
12       Q.   And it's a critical requirement?
13       A.   Yes.
14       Q.   And that includes the full catalog
15  of OCLC customers?
16       A.   I haven't explored if it's the full
17  catalog or a partial catalog.  We haven't
18  explored that avenue, if it would be feasible
19  or not.
20       Q.   So for third-party cataloging, you
21  enter into agreements with OCLC, and the
22  customer provides notice to OCLC, correct?
23       A.   Correct.
24       Q.   For your internal cataloging
25  purposes, do you do that?
```

Page 367

```
 1       A.   Do what, Jeff, provide notice to
 2  OCLC?
 3       Q.   Yes.
 4       A.   I don't believe so.  We don't see a
 5  purpose there.
 6       Q.   Okay.  Why the difference?
 7       A.   Because we utilize records that we
 8  have either created or acquired for us to work
 9  through our internal cataloging processes.
10       Q.   So in your internal cataloging
11  processes -- sorry.
12            In third-party cataloging, you're
13  accessing WorldCat records to do that for the
14  customer?
15       A.   Through third-party agreements.
16       Q.   Okay.  And in internal cataloging,
17  are you accessing records from WorldCat?
18       A.   I don't think so.  We don't have
19  access to WorldCat.
20       Q.   You aren't accessing them in any way?
21       A.   Other than the catalogers who work
22  on behalf of customers.  Our internal
23  cataloging team simply works on records
24  available to them.
25       Q.   But my question is, in this
```

Page 368

```
 1  instance, you are not accessing -- the internal
 2  cataloging that you say this will hurt, you
 3  aren't accessing WorldCat records in any way?
 4       A.   We're only accessing the records
 5  that are available outside of the third-party
 6  work.
 7       Q.   I don't think I understand that
 8  distinction.
 9            MR. NOYSE:  Let me just, if I may,
10  I know you're talking about the scope of this
11  part of the injunctive relief, but this
12  discussion is also responsive to one of Dan
13  Johnson's topics.
14            MR. WALKER:  Sure.  Sure.
15       Q.   Could you provide a better -- could
16  you help me understand what you just meant?
17            And if you need her to read it
18  back, I can ask her to.
19            THE WITNESS:  Sure, Joyce, if you
20  could read it back, please.
21            (Answer read by Reporter.)
22            THE WITNESS:  Yes.
23       Q.   What did you mean by that?
24       A.   The third-party work that they do
25  on behalf of our customers is stored in their
```

Page 369

```
 1  work file.  That is only available to those
 2  customers.
 3      Q.  So for third-party cataloging it's
 4  only available?
 5      A.  To those customers.
 6      Q.  But for internal cataloging, do you
 7  know if you have access to WorldCat data or
 8  WorldCat records?
 9      A.  They have access to records that
10  are available to us that have been acquired
11  legally.  And some of them may have an OCLC
12  identifier.
13      Q.  And maybe Dan is the one for this.
14          But do they access any feeds --
15      A.  No.
16      Q.  -- to WorldCat?
17      A.  Other than the third-party
18  agreements, we have no agreement with OCLC to
19  access WorldCat.
20      Q.  Okay.  I don't think that was my
21  question.
22      A.  Okay.
23      Q.  In those internal cataloging
24  processes, do they access records from WorldCat?
25      A.  I don't believe so.
```

Page 370

```
 1      Q.  Okay.  So let's talk about No. 3.
 2      A.  Okay.
 3      Q.  So would this harm Baker & Taylor?
 4      A.  Yes.
 5      Q.  How?
 6      A.  We have records in our database
 7  that we acquired legally, even outside of the
 8  OCLC Baker & Taylor Data Licensing Agreement
 9  that was available for a short time, and some
10  of those records may or may not have an OCLC
11  identifier.  And it's impossible for us to
12  continue to do what we do if we are prohibited
13  from integrating, distributing, retaining or
14  incorporating MARC records that may have an
15  OCLC identifier.
16      Q.  Okay.  When you say that you
17  acquired these other records legally, do you
18  know where you got them?
19      A.  Like I said, Dan will be able to
20  give you the full source of records.  One
21  example would be a Library of Congress
22  subscription.
23      Q.  Okay.  Have you gotten any of those
24  from libraries?
25      A.  We may have in the community pool.
```

Page 371

```
 1      Q.  Okay.  And so to the extent there
 2  are records that you have in community pool,
 3  are these records that could be sequestered or
 4  taken out?
 5      A.  There may be a technical way, which
 6  we haven't explored yet, but it would render
 7  our ability to serve our libraries very
 8  diminished.
 9      Q.  Is that because those records with
10  the OCLC identifiers are important to BTCat?
11      A.  Are we talking about BTCat or
12  Baker & Taylor, Jeff?
13      Q.  Well, we can do both.
14          Are they important to BTCat?
15      A.  If you're only talking about BTCat,
16  the community pool is relevant for the
17  community of libraries who deem that they want
18  to share and support their fellow libraries.
19      Q.  Okay.  But my question was, are the
20  records with WorldCat identifiers important to
21  BTCat?
22      A.  Not to BTCat's core functionality.
23      Q.  So why couldn't you sequester those
24  records?
25      A.  We haven't explored a technical way
```

Page 372

```
 1  to do it, if it is feasible, and to identify
 2  what exactly the definition of that record
 3  would mean.
 4      Q.  Okay.  So what would be the harm of
 5  sequestering the records?
 6          Let's assume you can do it, you can
 7  put them off, take them out of BTCat.
 8          What would be the harm?
 9      A.  The harm would be for our customers
10  who depend on BTCat for sharing their records
11  with other libraries, and depend on Baker &
12  Taylor and BTCat to collaborate with their
13  libraries.
14      Q.  And so those records with OCLC
15  identifiers are essential for BTCat and its
16  customers?
17          MR. NOYSE:  Objection to the form.
18      A.  They're essential to the customers
19  because they contribute to that record with
20  their willingness.
21      Q.  I think you testified that records
22  with WorldCat identifiers aren't essential --
23  aren't part of the core functions of BTCat; is
24  that right?
25      A.  Maybe ask it another way, Jeff.
```

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 373

```
 1  Maybe I'm not understanding.
 2     Q.  You had mentioned that the records
 3  with WorldCat identifiers weren't part of
 4  BTCat's core functions; is that right?
 5     A.  We've acquired records under
 6  agreements that are part of BTCat's core
 7  functionalities.
 8     Q.  Okay.
 9     A.  But the community pool that has
10  been contributed by customers with their
11  willingness is not core to BTCat providing its
12  cataloging service.
13     Q.  Okay.  So are you changing your
14  testimony on that?
15         MR. NOYSE:  Objection to the form.
16     A.  No.  Let me clarify so that there
17  is no misinterpretation.
18         Customers depend on BTCat to share
19  their records that they create, enhance,
20  however it is that they choose to contribute to
21  the community database.  Customers depend on
22  BTCat to be able to do that through the
23  community pool.  BTCat doesn't depend on the
24  community pool to provide its services.
25     Q.  Okay.  So the harm would be to the
```

Page 374

```
 1  customers?
 2     A.  The harm would be to the customers
 3  and Baker & Taylor from our reputation of not
 4  being able to provide that service that they've
 5  come to depend on.
 6     Q.  So reputational harm.
 7         Any other harm?
 8     A.  Contractual harm, reputational harm.
 9     Q.  So what is the contractual harm?
10     A.  The customer may interpret this as
11  a lack of ability of Baker & Taylor to provide
12  services to them, and that could cascade into
13  other products and services that we offer.
14     Q.  Okay.  And so how would that --
15  just that they might not buy your other
16  products and services?
17     A.  Correct.
18     Q.  Okay.  Let's look at No. 4.  Let me
19  know when you're ready.
20         So would this relief harm Baker &
21  Taylor?
22     A.  Let me just finish reading, Jeff.
23     Q.  Sure.
24     A.  Okay.
25     Q.  Would this harm Baker & Taylor?
```

Page 375

```
 1     A.  Jeff, could you help me identify
 2  the difference in 3 and 4?
 3         I'm perhaps a little confused as I
 4  read this.
 5     Q.  So you see them as the same?
 6     A.  I'm sure they're different.  I'm
 7  just asking for a clarification on the
 8  distinguishing element between 3 and 4.
 9     Q.  So I'm just asking you if you
10  understand the difference.
11     A.  Okay.  Okay.  I have some
12  understanding, but just for the record, I'm a
13  little confused about this without clarification.
14     Q.  Okay.  So would this cause harm to
15  Baker & Taylor?
16     A.  Yes.
17     Q.  What harm?
18     A.  As I've said before, it is likely
19  to cause irreparable contractual and
20  reputational harm to Baker & Taylor.
21     Q.  Okay.  Any other harm?
22     A.  Contractual harm and reputational
23  harm, which is not limited to current revenue
24  and future revenue.
25     Q.  Okay.  Any other harm?
```

Page 376

```
 1     A.  I think those two cover it.
 2     Q.  Is there anything that Baker &
 3  Taylor could do to mitigate that harm?
 4     A.  No.
 5     Q.  Okay.  Again, it couldn't just not
 6  make those WorldCat records available to people?
 7     A.  I don't know what people.
 8     Q.  To customers or the public.
 9     A.  We wouldn't have any way -- we
10  haven't explored any way to continue operating
11  without this.
12     Q.  Okay.  And to your understanding,
13  you don't know if there's a way you could do it?
14     A.  I don't know if there's a way.  And
15  even if there was, I see very less likelihood
16  of Baker & Taylor continuing with its operation
17  without it.
18     Q.  And that's because the WorldCat
19  data or WorldCat records are important to
20  Baker & Taylor?
21         MR. NOYSE:  Objection to the form.
22     A.  It's that it would be impossible to
23  separate and sequester, in other words, and to
24  continue operating.
25     Q.  And that's because it's important
```

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 377

1 for Baker & Taylor's operations to have
2 WorldCat records?
3  MR. NOYSE: Objection to the form.
4  A. It would be technically very
5 expensive and cost prohibitive if there was a
6 way that would allow us to continue working
7 with this.
8  Q. But you haven't explored that yet?
9  A. We have not yet explored it.
10  Q. Okay. Now let's talk about
11 Bridgeall, which is -- so I think we've talked
12 about Baker & Taylor.
13  A. Okay.
14  Q. You're to talk about Bridgeall as
15 to all of these.
16  MR. NOYSE: Maybe we should go off
17 the record for just a second.
18  MR. WALKER: Sure. We can go off
19 the record.
20  (Discussion had off record.)
21  Q. Okay. So, Mr. Kochar, let's go
22 ahead and just talk about the harm to
23 Bridgeall, the other Defendant in this case,
24 from the requested relief in the Preliminary
25 Injunction.

Page 378

1  A. Okay.
2  Q. For No. 1 -- I guess, let's take a
3 step back.
4  Bridgeall is no longer an operating
5 entity; is that right?
6  A. Correct.
7  Q. And it just exists for tax purposes?
8  A. Yes.
9  Q. Okay. Does it have any agreements
10 with provisions like what we've discussed in
11 No. 1?
12  A. Contracts that may have any of
13 those provisions were part of the Valsoft
14 transaction.
15  Q. So will Bridgeall suffer any harm
16 from No. 1?
17  A. No.
18  Q. Will Bridgeall suffer any harm from
19 No. 2?
20  A. Customers who depend on Bridgeall
21 to contribute records to BTCat's community pool
22 may think of this as a diminished service that
23 collectionHQ offers, and may cause them
24 contractual harm.
25  Q. Is Bridgeall contributing records

Page 379

1 to community pool?
2  A. No.
3  Q. So how does that one harm Bridgeall?
4  MR. NOYSE: Objection to the form.
5  A. A point of clarification.
6  Are we talking about Bridgeall
7 pre Valsoft transaction or after?
8  Q. Today.
9  A. Okay. No.
10  Q. Will Bridgeall suffer any harm from
11 No. 3, under No. 3?
12  A. In the present terms, no.
13  Q. What about No. 4?
14  A. No.
15  Q. Okay. So Bridgeall will not suffer
16 any harm from the requested Preliminary
17 Injunction?
18  A. The current form of Bridgeall, yes.
19  MR. WALKER: I think that's all.
20 So we can go off the record.
21  MR. NOYSE: We have no redirect.
22  (Recess taken.)
23  - - -
24  MR. WALKER: So OCLC would like to
25 put a statement on the record. OCLC has been

Page 380

1 prejudiced by Defendants' late and incomplete
2 document productions, which have been missing
3 materially responsive documents. And this has
4 hindered OCLC's ability to review and assess
5 completeness of Defendants' productions and to
6 prepare for the 30(b)(6) deposition of
7 Mr. Kochar that OCLC noticed.
8  Accordingly, OCLC is leaving open
9 this deposition, and reserves the right to
10 explore the 30(b)(6) topics noticed for today
11 during merits discovery.
12  MR. NOYSE: We acknowledge the
13 statement. Defendants don't agree that OCLC
14 was prejudiced in the sense of preliminary
15 discovery for the Preliminary Injunction
16 process.
17  We're willing to work with Counsel
18 both before the Preliminary Injunction hearing.
19 And in terms of discovery after that on merits,
20 we're willing to talk about that as long as the
21 same ground isn't covered.
22  We're going to give all the
23 Witnesses leeway -- or all the parties leeway
24 in how they examine Witnesses on merits.
25  But we don't agree that OCLC has

Veritext Legal Solutions
www.veritext.com 888-391-3376