# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

OCLC, INC.,

        PLAINTIFF,

V.

BAKER & TAYLOR, LLC, *ET AL.,*

        DEFENDANTS.

CASE NO. 2:25-CV-309

JUDGE: EDMUND A. SARGUS

MAGISTRATE: ELIZABETH PRESTON DEAVERS

---

## DEFENDANTS BAKER & TAYLOR, LLC AND BRIDGEALL LIBRARIES, LTD'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

/s/ *Derek P. Hartman*
Derek P. Hartman (0087869), Trial Attorney
Michael C. Cohan (0013542)
Jose Mendez Valdez (0105056)
CAVITCH FAMILO & DURKIN CO., L.P.A.
1300 East Ninth Street, Twentieth Floor
Cleveland, Ohio 44114
Telephone:    (216) 621-7860
Facsimile:    (216) 621-3415
Email:    mcohan@cavitch.com
        dhartman@cavitch.com
        jvaldez@cavitch.com

*Attorneys for Defendant Baker & Taylor, LLC and Bridgeall Libraries, Ltd.*

/s/ *Frank E. Noyes (admitted pro hac vice)*
Frank E. Noyes, II (PA Bar No. 48366)
OFFIT KURMAN, P.A.
222 Delaware Avenue, Suite 1105
Wilmington, Delaware 19801
Telephone:    302-351-0900
Facsimile:    302-351-0915
Email:    fnoyes@offitkurman.com

*Attorneys for Defendant Baker & Taylor, LLC and Bridgeall Libraries, Ltd.*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1
II.  FACTS RELEVANT TO PRELIMINARY INJUNCTION MOTION ............................ 3
  1.   B&T is a Leading Provider of Cataloging Records ........................................ 4
  2.   BTCat and B&T's Other Repositories ........................................................... 6
  3.   B&T Third Party Agreements and Compliance Protocols ............................... 8
  4.   Bridgeall's collectionHQ Software Application ............................................. 9
  5.   The Hard Search Data Establishes that Only a Small Fraction of Records in BTCat Repositories have OCLC Identifiers ...........................................................11
  6.   The 2019 License Agreement ........................................................................ 12
  7.   Bridgeall Has Sold All collectionHQ Assets to a Third Party ...................... 14
B.   OCLC AGREEMENTS AND THE OCLC COOPERATIVE .......................................... 15
  1.   The Framework Agreement Does Not Incorporate the WorldCat Policy and Affirms Libraries' Ownership of Their Own Records ............................................... 15
  2.   The WorldCat Policy ..................................................................................... 19
  3.   The Sources of Records Ingested into WorldCat .......................................... 21
  4.   B&T and Bridgeall Were Not Aware of the OCLC Contract Provisions ...................... 22
C.   THE ACTIONS LEADING UP TO OCLC FILING SUIT ............................................. 23
III. ARGUMENT ..................................................................................................... 27
A.   THE LEGAL STANDARD FOR ENTERING A PRELIMINARY INJUNCTION ................................ 27
B.   OCLC CANNOT SHOW A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS ................... 27
1.   OCLC's Intentional Interference with Contract Claim Will Not Succeed ...................... 28
  a) The Framework Agreement and WorldCat Policy Do Not Prohibit Sharing Records with Bridgeall or B&T ............................................................................. 29
  b) OCLC Cannot Establish that B&T Knew the Terms of the Framework Agreement, Schedule 2, or Policy OCLC Claims Were Breached ..................................... 35
  c) The collectionHQ Agreement Does Not Induce OCLC Customers to Breach Their Contractual Obligations to OCLC .............................................................. 37
  d) The BTCat Subscription Agreements Cannot be the Instrumentality by which OCLC Claims Interference ....................................................................................... 40
  e) The collectionHQ and BTCat Agreements are Justified as Permissible Competition . 41
  f) OCLC Cannot Establish Intentional Interference Based on Lost Customers .............. 43
  g) OCLC Cannot Establish Tortious Interference Based on "Diminishment" of WorldCat 46
  1.   OCLC's Claim of Tortious Interference with Prospective Business Relationships Will Not Succeed ............................................................................................. 47
  2.   OCLC's Breach of Contract Claim Will Not Succeed Because There Is No Evidence of a Breach ....................................................................................................... 51
  3.   OCLC's Unjust Enrichment Claim Is Barred by the Existence of the 2019 License Agreement and Because B&T Was Not Unjustly Enriched ................................ 52
C.   OCLC CANNOT SHOW THE REQUISITE IRREPARABLE HARM .............................................. 53
D.   A PRELIMINARY INJUNCTION WOULD CAUSE SUBSTANTIAL HARM TO B&T AND OTHERS 60
E.   THE PUBLIC INTEREST IS NOT SERVED BY GRANTING A PRELIMINARY INJUNCTION .......... 61

F.   If an Injunction is Granted, OCLC Should be Required to Post a Bond............... 61

IV. CONCLUSION ................................................................................................................62[1]

---

[1] Defendants acknowledge that Local Rule 7.2(a)(3) requires "a succinct, clear, and accurate summary, not to exceed five pages, indicating the main sections of the memorandum and the principal arguments and citations of primary authority made in each section." Counsel prepared such a summary; however, its inclusion generated error messages throughout the table of contents that could not be remedied despite several hours of diligent effort.

# TABLE OF AUTHORITIES

**Cases**

*715 Spencer Corp. v. City Environmental Services, Inc.*,
    80 F. Supp. 2d 755 (N.D. Ohio 1999) ...................................................................... 25

*Absolute Mach. Tools v. Sw. Indus. Sales, Inc.*,
    2005-Ohio-3946, ¶ 9, 2005 WL 1819518 (Ohio Ct. of Appeals 2005) .................................. 26

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
    46 F.4th 489 (6th Cir. 2022) .................................................................................. 53

*Allah v. Smith*,
    No. 2:22-CV-21, 2022 WL 16832626(S.D. Ohio Nov. 9, 2022) .............................................. 23

*Barens v. Parma City Sch. Dist.*,
    No. 1:22CV00103, 2025 WL 834412(N.D. Ohio Mar. 17, 2025) ...................................... 40,43

*Barteca Holdings LLC v. Coastal Taco LLC.*,
    No. 1:16CV1498, 2016 WL 4168018 (N.D. Ohio Aug. 8, 2016) ............................................ 24

*Becker v. Cardinal Health, Inc.*,
    2021-Ohio-3804, ¶ 28, 179 N.E.3d 769 (Ohio Ct. App. 10th Dist. 2021) ................................ 31

*Bertec Corp. v. Sparta Software Corp.*,
    No. 2:19-CV-04623, 2019 WL 7249259(S.D. Ohio Dec. 27, 2019) ......................... 48, 50, 52

*Bush Truck Leasing, Inc.*,
    2020 WL 3871322 (S.D. Ohio July 9, 2020). ........................................................... 48

*Cannon Grp., Inc. v. New York Packaging II, LLC*,
    No. 2:16-CV-515, 2018 WL 11374036 S.D. Ohio Sept. 30, 2018) ........................................ 55

*Cavalier Distrib. Co. v. Lime Ventures*,
    2023 WL 9052002 (6th Cir. Dc. 28, 2023) .................................................... 40,53,56

*Chrvala v. Borden, Inc.*,
    14 F. Supp. 2d 1013 (S.D. Ohio 1998).............................................................. 41,44

*Crown Equip. Corp. v. Toyota Material Handling, U.S.A., Inc.*,
    2005 WL 2849161 (N.D. Ohio Oct. 28, 2005) ........................................... 31,33,34,37

*Cunningham Prop. Mgmt. Tr. v. Ascent Res. - Utica, LLC*,
    351 F. Supp. 3d 1056 (S.D. Ohio 2018)................................................................. 48

*D.P. Dough Franchising, LLC v. Southworth,*
No. 2:15-CV-2635, 2017 WL 4315013 (S.D. Ohio Sept. 26, 2017)...................................49, 55

*Despres v. Moreno,*
No. 15 CV 410, 2017 WL 131572 (N.D. Ohio Jan. 13, 2017) .................................27

*Emanuel's LLC v. Restore Marietta, Inc.,*
2023-Ohio-147, ¶ 23 206 N.E.3d 116 (Ohio Ct. App. 4th Dist.)...................................43, 44, 52

*EOG Resources, Inc. v. Lucky Land Management, LLC,*
134 F.4th 868 (6th Cir. 2025). ........................................................23, 48

*Finsterwald-Maiden v. AAA S. Cent. Ohio,*
115 Ohio App. 3d 442, 685 N.E.2d 786 (1996) .........................................30

*FirstPower Grp. LLC v. WD-40 Co.,*
No. 5:17-CV-392, 2017 WL 3034499 (N.D. Ohio July 18, 2017)...................................50, 56

*Fred Siegel Co., L.P.A.,*
85 Ohio St.3d 171, 176, 707 N.E.2d 853 (Ohio 1999) ................................24, 37, 39

*General Power Products, LLC v. MTD Products, Inc.,*
No. 1:06CV00143, 2006 WL 3692953 (S.D. Ohio Dec. 13, 2006)........................................25

*Gentile v. Turkoly,*
86 N.E.3d 991 (7th Dist. 2017)..........................................................42

*Hambleton v. R.G. Barry Corp.,*
12 Ohio St.3d 179 N.E.2d 1298 (1984) ................................................47

*Hicks v. Clermont Cnty. Bd. of Commissioners,*
No. 1:17-CV-677, 2018 WL 6418895(S.D. Ohio Dec. 6, 2018); ...........................................49

*Hines v. Humana Ins. Co.,*
689 F. Supp. 3d 516, 538–39 (S.D. Ohio 2023).........................................29

*J.D. P'ship v. Berlin Twp. Bd. of Trs.,*
412 F. Supp. 2d 772 (S.D. Ohio 2005)..................................................47

*Kenty v. Transamerica Premium Ins. Co.*
72 Ohio St.3d 415, 418-19, 650 N.E.2d 863 (1995)......................................24

*Kentucky v. Biden,*
57 F.4th 545 (6th Cir. 2023) ………………………………………...………………….........49

*Krueger v. Swineford,*
  2015-Ohio-3518, ¶ 18, 41 N.E.3d 807 (Ohio Ct. Appeals 2015) ............................ 27

*Lamson & Sessions Co. v. Peters*,
  576 F. App'x 538, 542 (6th Cir. 2014) .................................................................... 32

*Mann v. Wilkinson*,
  No. C2-00-706, 2008 WL 4332520 (S.D. Ohio September 17, 2008) ...................... 55

*McCreight v. AuburnBank,*
  611 F.Supp.3d 1336 (M.D. Ala. 2020) .............................................................. 44, 52

*Milacron LLC v. Advanced Fluids, Inc.,*
  No. 1:13-CV-364, 2013 WL 5722795 (S.D. Ohio Oct. 21, 2013) ............................ 43

*Miller v. First Safety Bank,*
  No. 1:14-CV-368, 2014 WL 12586315 (S.D. Ohio Dec. 30, 2014) ..................... 39, 43

*NCR Corp. v. Korala Assocs.,*
  512 F.3d 807 (6th Cir. 2008) ............................................................................. 22, 24

*OCLC, Inc. v. Anna's Archive,*
  No. 2:24-CV-144, 2025 WL 1235238 (S.D. Ohio Mar. 21, 2025) ............................ 43

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't,*
  305 F.3d 566 (6th Cir. 2002) ........................................................................ 23, 55, 56

*Premier Farnell Corp. v. Wallace,*
  No. 3:10-CV-055, 2010 WL 1963443 (S.D. Ohio May 17, 2010) ....................... 32, 50

*PUI Audio, Inc. v. Van Den Broek,*
  No. 3:21-CV- 284, 2021 WL 5164935, (S.D. Ohio Nov. 4, 2021) ........................... 32

*Roth v. Bank of the Commonwealth,*
  583 F.2d 527, 538 (6th Cir. 1978) .......................................................................... 56

*Rulli v. Fan Co.,*
  79 Ohio St. 3d 374, 376, 683 N.E.2d 337 (Ohio 1997) .......................................... 27

*Russian Collections, Ltd. v. Melamid,*
  2009 WL 1928883 (S.D. Ohio July 1, 2009) .......................................................... 50

*Senter v. Hillside Acres Nursing Ctr. of Willard, Inc.,*
  335 F. Supp. 2d 836, 843 (N.D. Ohio 2004) .......................................................... 29

*Southern Milk Sales, Inc. v. Martin,*
    924 F.2d 98, 103 (6th Cir. 1991) ................................................................ 49

*Stilson & Assocs., Inc. v. Stilson Consulting Grp., LLC,*
    129 F. App'x 993 (6th Cir. 2005) ...................................................... 40, 44

*Ullmo v. Gilmour Acad.,*
    273 F.3d 671, 676 (6th Cir. 2001) ...................................................... 27, 29

*Yoga Six Franchise, LLC v. Core 6 Energy Yoga LLC,*
    No. 1:19-CV-02796 (N.D. Ohio Sept. 30, 2020) ............................... 39, 44

**Rules**

Fed. R. Civ. P. 65(c) ......................................................................................... 56

## I.   __INTRODUCTION__

The Complaint asserts, primarily, that Defendants Baker & Taylor, LLC ("**B&T**") and Bridgeall Libraries, Ltd. ("**Bridgeall**") have interfered with contracts between Plaintiff OCLC, Inc. ("**OCLC**") and its library customers by improperly obtaining MARC (Machine Readable Cataloging) records from the Plaintiff OCLC's WorldCat bibliographic database ("**WorldCat**"). The Complaint asserts that B&T has built BTCat, its bibliographic database, on the back of WorldCat. The Complaint asserts that B&T has, for the same reasons, interfered with prospective customers of OCLC. Finally, The Complaint asserts that B&T breached a license agreement between B&T and OCLC.

OCLC's Motion for a Preliminary Injunction (Dkt. No. 5) (the "**Motion**" or "**PI**") should be denied because it has not met the high standard to obtain such extraordinary relief — or any other relief in this action. Based on the undisputed facts elicited in preliminary discovery, OCLC cannot demonstrate that:

- It has a strong likelihood of success on the merits;

- It has suffered any irreparable harm;

- An injunction would not cause harm to others; and

- Public interest would be served by issuance of an injunction.

On the contrary, the evidence shows that the claims in the Complaint are not supported by any evidence (and should not survive dismissal), that there are no claims where money damages would be insufficient, that an injunction would cause substantial harm to not only B&T but also libraries across the country and to the general public who use those libraries.

OCLC's Motion asserts "facts" derived primarily from its Complaint, its own agreements, a YouTube video demonstrating the features of BTCat, and a sample agreement between Bridgeall

and a public library. It is this sample agreement that OCLC incorrectly claims is a means for B&T to grab WorldCat records from unwitting libraries. Compl. ¶¶12-14. Regarding the alleged interference with contracts, the factual allegations in the Complaint are based on supposition and inferences. OCLC does not allege that B&T knew of the contract provisions that it supposedly interfered with or that B&T and Bridgeall knew that OCLC customers were breaching any enforceable obligations.

OCLC's claim of interference with prospective customers is even thinner – the Complaint only claims that any Bridgeall or BTCat subscriber *must* have been a potential OCLC customer because OCLC is the dominant participant in the market. And its narrow breach of License Agreement claim is refuted by B&T's disclosure in 2021 (which is quoted in the Complaint) confirming that B&T did not come close to exceeding the limit of records it was permitted to import from WorldCat.

The harm OCLC claims is: (1) loss of about 26 out of its 20,000-plus customers, but it is not able to allege that those customers were lost as a result of the B&T conduct it alleges interfered with its customer contracts; and (2) that B&T's conduct diminishes the value of WorldCat and is a "fundamental threat to OCLC and everything it does" and will "cripple OCLC's ability to provide products and services" – even though OCLC does not claim that even one record in the 600 million WorldCat records repository was removed or degraded.

The supposition and inferences used to stitch its claims together in the Complaint have now been thoroughly refuted in the preliminary discovery.

The lawsuit is framed in terms of intentional interference because OCLC disclaims any ownership of the individual bibliographic records. OCLC creates very few records. Rather, it collects MARC records from its library customers, from cataloging vendors (including B&T),

from publishers, and from the Library of Congress and other national libraries. Therefore, there is no claim that B&T directly violated OCLC's IP or ownership rights. The Complaint is plead based on contract interference to pursue OCLC's true motivation and intent, which is to force B&T to stop competing against OCLC in the market, and to get the Court's imprimatur on OCLCs audacious claim that through its library "contracts" it can claim exclusive rights to any cataloging records that it ingests into the WorldCat repository.

## II.     FACTS RELEVANT TO PRELIMINARY INJUNCTION MOTION

The parties engaged in extensive preliminary discovery (even while B&T's Partial Motion to dismiss and Bridgeall's Motion to Dismiss for lack of Jurisdiction have been pending). Defendants produced approximately 60,000 pages of documents and submitted to a highly intrusive search of the BTCat repository for evidence that BTCat was "populated" with records from OCLC's WorldCat repository. In addition, OCLC conducted four full days of depositions. The broad discovery gave OCLC more than adequate opportunity to locate support for its claims of interference with contracts and breach of contract, but as set forth herein, no evidence was generated to support its claims or show any irreparable harm.

### A.     INTRODUCTION TO B&T

Amandeep Kochar, President and Group CEO of B&T, testified as B&T's corporate designee, providing background on the company's history, operations, and its leading role in serving libraries and schools. With more than 170 professionally trained catalogers, B&T is one of the largest cataloging operations in the world. Its catalogers perform true "book in hand" cataloging—often creating the first iteration of bibliographic records directly from new materials provided by publishers. This work ensures libraries receive accurate, authoritative records at the

earliest point of availability, demonstrating B&T's role as an innovator and leader in the bibliographic ecosystem.

B&T's business is broad and vital to the library community. It provides both physical and digital book distribution, publishing support, and advanced cataloging services. Its flagship cataloging platform, BTCat**,** offers a powerful and efficient cataloging utility software solution. *See* Dep. Tr. of Amandeep Kochar (Ex. A)*.* at 95:4–98:3. In addition, B&T develops and distributes software products that support the operational needs of libraries and publishers. *See id.* at 96:7-15, 97:9-10.

B&T also delivers value through its subsidiaries by creating operational efficiencies. For example, Bridgeall, a long-time B&T subsidiary until the "collectionHQ" (the Bridgeall software program) assets were sold in June 2025 (*Id.* at 172:1-173:22) received extensive support from B&T. B&T's sales representatives marketed Bridgeall's collectionHQ service in the United States, while B&T also provided critical administrative functions—including accounting, financial reporting, IT infrastructure, and legal support for contract drafting. *See id.* at 115:7-117:3.

### 1. B&T is a Leading Provider of Cataloging Records

B&T works directly with libraries and schools to create and enhance customized MARC catalog records. *See id.* at 104:16–18. Its cataloging services include "book in hand" cataloging, internal cataloging, and copy cataloging. *Id.* at 224:6–24. As Daniel Johnson, B&T's Senior Vice President of Global Supply Chain Systems, explained, internal cataloging is the process of creating new bibliographic records for books, while copy cataloging involves adding branch and member-specific information to those records. Dep. Tr. of Daniel Johnson (Ex. B) at 69:25-70:5.

With catalogers spread throughout the world, B&T is one of the largest employers of catalogers in the industry and one of the largest contributors of records to OCLC's WorldCat repository. *See* Dep. Tr. of Travis Kelley (Ex. C) at 60:2–8, 76:10-15 (at one point [B&T] had close

to 200 catalogers working on three continents); Dep. Tr. of Amandeep Kochar at 126:20–21; Dep. Tr. of Daniel Johnson at 81:2–4.

In 2018, B&T launched BTCat, a more powerful and modern cataloging utility designed first to support its own internal cataloging team. "BTCat is a software product that allows for efficient cataloging workflow" through tools such as macros[2] to streamline record modifications and enhanced use of industry-standard Z39.50 searches. *Id*. at 59:7–9, 119:12-17. BTCat streamlined the creation and improvement of bibliographic records, allowing B&T's catalogers— already among the world's largest—to work more efficiently and produce higher-quality records. *See* Dep. Tr. of Daniel Johnson at 72:12-18, 73:20-74:1.

Recognizing its broader potential, B&T expanded BTCat into a product available to customers. As Travis Kelley, B&T's Manager of Strategic Partnerships for BTCat, explained, BTCat is both a cataloging utility and a cataloging database— "a concierge service that happens to have a database and modern editor included." Dep. Tr. of Travis Kelley at 23:3–6, 102:6–12. Unlike "plug-and-play" systems, BTCat tailors its services to each customer's cataloging policies, ensuring records align with their needs. *Id.* at 118:24–119:12.

BTCat also improves significantly on WorldCat's approach to records management. Whereas WorldCat stores multiple iterations of the same record, BTCat consolidates them, merging and rolling up versions into a single "best record." Dep. Tr. of Daniel Johnson at 54:5–10. As Johnson testified, BTCat was "intentionally created [as a] repository of fewer records than WorldCat" to eliminate duplication and enhance usability. *Id.* at 54:8–10.

Importantly, B&T does not market BTCat based on whether a library already subscribes to

---

[2] Macros are programs that contain sets of instructions use in modifying a MARC record. *Id*. at 79:3-12.

OCLC. Its focus is on what BTCat delivers: efficiency, quality, and cost-effectiveness. As Kelley noted, "cost is really important to libraries," as are service and efficiency. Dep. Tr. of Travis Kelley at 86:24–87:11; 192:21–193:6. BTCat meets those needs—offering libraries a modern, efficient, and affordable cataloging alternative.

### 2.    BTCat and B&T's Other Repositories



**BTCat Main.** The █████████████████████████████████████████ ███████████████████████████████████████████████████████████ Dep. Tr. of Daniel Johnson at 82:13–83:2. ████████████████████████████ ███████████ *Id.* at 84:23–85:2. ████████████████ ███████████████████████████████████ *Id.* at 89:3–11 ██████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ *Id.* at 84:3–17. Importantly, subscribers do not upload their entire Integrated Library System ("**ILS**") catalogs into BTCat; they submit only individual records they want B&T to improve or customize. *Id.* at 88:4-11, 132:22-25. Customers remain free to use their MARC records however they choose subject only to a prohibition on commercial resale. Dep. Tr. of Amandeep Kochar at 121:23-122:11, 124:19–125:22, 127:7–9.

**BTCat Community Pool.** The Community Pool was created in response to what libraries themselves identified as a "critical need" for a shared repository where authorized users could access contributed records. Dep. Tr. of Daniel Johnson at 74:14–21, 75:8-9. █████████████

███████████████████████████████████████████████████ *Id.* at 30:16–20;

104:20–105:3. Beginning in 2025, BTCat subscribers were given the ability to contribute records into the Community Pool—*but only after affirmatively agreeing to Terms and Conditions confirming they are authorized to share those records. Id.* at 111:18–112:4, 114:2–6. Thus, the Community Pool is expressly limited to authorized contributions.

**Customer-Specific Repositories.** B&T also maintains numerous customer-specific repositories that are not shared externally. These repositories house a customer's records for copy cataloging improvements or customization. The improved records are then returned exclusively to that customer's own ILS system. *See id.* at 88:15–89:2.

**OCDB Repository.** 

*See id.* at 89:14-90:17. Unless the customer represents it is expressly authorized to contribute its records to the Community Pool, the only party to receive the improved OCDB record is the requesting customer. *See id.* at 89:14–90:17; 90:21–91:1.

**Specialized Repositories.** ████████████████████████

████████████████████████████████████████████████

███████████████ *Id.* at 86:17–20, 87:8–15. ████████████

████████████████████████████████████████████ Dep. Tr. of Amandeep Kochar at 140:18–141:10.

**Repository Scale.** ████████████████████████████████

██████ *Id.* at 123:22-24. ██████████████████████████

---

[3] BDS is a service in the UK that provides records. Dep. Tr. of Mary Sauer-Games (Ex. D) at 125:17-19.

█████████████████ Dep. Tr. of Daniel Johnson at 117:2-8. ██████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████. *Id.* at 117:24-118:8.

### 3.    B&T Third Party Agreements and Compliance Protocols

As part of its core cataloging services, B&T enters into Third Party Agreements with libraries to assist them in adding and updating records to their ILS. Because many of these libraries are also OCLC members, the agreements expressly include OCLC as a party and authorize B&T's catalogers to use the library's OCLC credentials to search WorldCat for records. This arrangement ensures that catalogers can efficiently identify and enhance records on behalf of the library.

Crucially, these agreements involve targeted, library-specific work. Customers do not upload their entire ILS catalogs to B&T, as occurs with collectionHQ customers. *Id.* at 132:22-133:4. Instead, the library identifies specific individual books and records it wants B&T to improve. *See id.* at 203:1-5. ███████████████████████████████

██████████████ *See id.* at 89:14–90:17. Those r██████████████████████████████

█████████████████████ As Daniel Johnson confirmed, ████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████ *Id.* at 202:15–24.

B&T's strict compliance with this protocol is underscored by how it responded to the only known error. ███████████████████████████████████████████████████████

██████████████████████████ *Id.* at 202:15–203:16. As soon as the mistake was discovered, B&T immediately removed the records and replaced them with either new records created from scratch or the unenhanced prior versions. *Id.* at 203:21–204:4. B&T also implemented corrective training and archived the erroneous records to ensure they could not be reintroduced. *Id.* at 203:14–

16, 205:2–7. This swift corrective action demonstrates B&T's robust oversight and commitment to compliance.

Far from harming OCLC, this process often benefits it. The improved records are saved not only in the customer's ILS but are frequently pushed back into WorldCat by the library itself—enhancing the very database OCLC seeks to protect.

### 4.      Bridgeall's collectionHQ Software Application

Steven Legowski, Bridgeall's Vice President of Technology and Software under B&T's ownership, testified as Bridgeall's corporate designee. Bridgeall, a B&T subsidiary, developed and managed collectionHQ, its flagship product. CollectionHQ is a "stock performance management software application" that helps public libraries analyze circulation patterns, evaluate the condition of materials, and make data-driven decisions to ensure their patrons have the titles they need. Dep. Tr. of Steven Legowski (Ex. E) at 33:19–34:11. CollectionHQ served approximately 500 customers worldwide, including more than 300 public libraries in the United States. *Id.* at 89:16–23.

#### a.      *Standard Agreements and Section 4.5*

CollectionHQ customers sign standard agreements, such as the San Rafael Public Library agreement attached to OCLC's Complaint. *See* Compl. Ex. D. Beginning with the introduction of BTCat, these agreements included an optional Section 4.5, which gave customers the opportunity to access the BTCat Community Pool at no additional cost by authorizing B&T to use their catalog records. The language is explicit:

> As a subscriber to the service, you have the opportunity to access Baker & Taylor's BTCat community pool of cataloging records at no charge if you authorize the use of your cataloguing records by B&T… [B]y signing this Agreement, you are authorizing B&T to utilize your cataloging records and are confirming that you have the right to make this authorization.

9


Compl. Ex. D, § 4.5; *see* Dep. Tr. of Steven Legowski at 60:11–61:3, Dep. Tr. of Amandeep Kochar at 275:11-22.

This provision placed control squarely with the customer. As Mr. Legowski confirmed, ██ ████████████████████████████████████████████████████████████████████████ ██████ Dep. Tr. of Steven Legowski at 61:3–62:19, 64:21–24, 70:9–13, 78:5–10.

B&T analyzed all collectionHQ agreements executed after BTCat's launch in 2022. Of ██ customers, ████████—chose to remove Section 4.5 entirely. *See* BAKER00058290 (Ex. F).[4] This fact underscores that access to the Community Pool was strictly voluntary, not mandated.

    **b.**    *How Records Were Handled*

CollectionHQ customers provided their ILS records—typically MARC records and circulation data—████████████. Dep. Tr. of Steven Lewgowski at 35:15-19, 133:11-19. ████████████████████████████████████████████████████████████████████████ ████████████ *Id.* at 142:6–21. ██████████████████████████████████████████ ██████████████████████████████ *Id.* at 35:15-19, 133:17–19. ████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Dep. Tr. of Daniel Johnson at 89:3–11. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

---

[4] Defendants have represented to OCLC that this report captures the versions of collectionHQ contracts that Bridgeall's customers have signed. Each tab of the report represents a version of the collectionHQ contract that customers have signed that remains active, including pre-2022, 2022-2023, 2024, and 2025 versions. The columns indicate the customer ("Library Name"), the date the contract was signed ("Date Signed"), whether the contract contained a provision similar to Section 4.5, as defined in Paragraph 84 of OCLC's Complaint ("Section 4.5?"), what collectionHQ services were the subject of the contract ("Version"), the existence and content of a choice of law clause "(Choice of Law?"), and whether Bridgeall or Baker & Taylor signed the contract ("Signatory?"). Further, OCLC relies upon this spreadsheet in support of its Memorandum in Opposition to Bridgeall's Motion to Dismiss filed on August 29, 2025.



██████ *Id.* at 114:21-25, 181:4-9; Dep. Tr. of Amandeep Kocher at 201:8–25. By February 2025 — shortly after OCLC's cease-and-desist letter—Bridgeall ceased transferring customer catalogs altogether. Dep. Tr. of Steven Lewgowski at 41:9–20.

████████████████████. *Id.* at 136:25–137:21.

████████████████████ *Id.* at 148:25–149:4.

### 5. The Hard Search Data Establishes that Only a Small Fraction of Records in BTCat Repositories have OCLC Identifiers

At OCLC's insistence, B&T conducted a burdensome, all-encompassing search across its repositories to identify any records containing OCLC control numbers or codes. The search required scanning for identifiers such as ████████████████████. Because OCLC automatically attaches identifiers to every record it ingests (Dep. Tr. of Mary Saurer-Games at 45:19-46:1) this search was necessarily broad and redundant. Nevertheless, B&T performed it to ensure a definitive answer.

The results, summarized in BAKER00058294 (Ex. G), are decisive. ████████████████████

These numbers are fatal to OCLC's narrative. They directly contradict OCLC's central contention that BTCat and the Community Pool were designed as a "contractual backdoor to obtain WorldCat records" (Compl. ¶14) or that they were "populated with high-quality WorldCat records

11

and data" to "bypass the need to invest the significant time and money necessary to develop similar quality records". Compl. ¶16. The evidence shows the opposite: BTCat is overwhelmingly composed of records outside of WorldCat, and only a small fraction of records bear any OCLC identifier.

Far from proving theft, the comprehensive search confirms that B&T's repositories were not "built on stolen WorldCat records" (Motion at 7) and that B&T did not "take a shortcut" by improperly collecting OCLC records. Compl. ¶117. The data instead demonstrates that OCLC's claims rest on exaggeration, not evidence.

### 6. The 2019 License Agreement

On November 5, 2019 (effective January 1, 2019), B&T entered into a WorldCat Data License Agreement with OCLC. The License expressly permitted B&T to extract up to 50,000 records per year using the Z39.50 protocol and to use those records "for any purpose." *See* License Agreement (attached to OCLC's Complaint as Exhibit B and authenticated through Decl. of Mary Sauer-Games attached to OCLC's Motion, ¶17) at § II.A.

The License was renewed for a third year beginning January 1, 2021. But in May 2021— shortly after OCLC learned of B&T's rollout of BTCat—OCLC abruptly cancelled it. Compl. ¶ 77; Decl. of Mary Sauer-Games, ¶¶ 17–24; Dep. Tr. of Mary Sauer-Games at 130:12–131:2. The cancellation was ineffective, however, because the License gave B&T the unilateral right to extend for an additional 12 months. *See* License Agreement at § V.E. B&T exercised that right, entitling it to extract up to 50,000 records for a fourth year, through September 16, 2022. Compl. ¶ 77.[5]

On July 28, 2021, B&T certified that it had extracted ███ records during the two-and-a-half years the License had been in effect. *See* OCLC_00001904–OCLC_000001907 (Ex. H)

---

[5] The Sauer-Games Declaration, ¶ 24, states that the extension allowed Baker & Taylor to extract records over the course of 2022. Dep. Tr. of Mary Sauer-Games, 109:2-8.

(authenticated through Dep. Tr. of Daniel Johnson at 158:6-161:14). That figure—well below the annual limit, and nowhere near the maximum permitted across the License term—was transmitted directly to OCLC, and Mary Sauer-Games admitted she received it. Dep. Tr. of Sauer-Games at 109:19–113:16. Daniel Johnson confirmed the same number in his testimony. Dep. Tr. of Daniel Johnson at 161:9–14.

Faced with this certification, OCLC could point to no contrary evidence. Instead, Ms. Sauer-Games speculated that because B&T had executed 1.5 million Z39.50 searches, it must have extracted far more records than reported. She claimed "industry practice" suggests three searches per extraction, which would imply over 500,000 records. Dep. Tr. of Sauer-Games at 114:19–25. But she conceded that OCLC cannot see the number of extractions from Z39.50—only the number of searches—and that OCLC therefore "does not actually know how many records were extracted by B&T under the license, other than what's presented in that certification." *Id.* at 115:15–116:1.

OCLC went further still, speculating—again with no evidence—that B&T "could have" viewed records and cut-and-pasted data without extracting them. *Id.* at 115:1–19. Yet Ms. Sauer-Games admitted the only basis for this claim is conjecture: the theory that B&T "cut and pasted the entire record" as an extraction workaround. *Id.* at 117:2–9. She also admitted that simply running searches without copying data is plainly permitted under the License. *Id.* at 116:22–117:1. This theory collapses under its own weight. There is no reason B&T would engage in cut-and-paste gamesmanship when it had extracted fewer than half the records permitted under its annual limit. The numbers speak for themselves: ▮▮▮▮ extractions out of an annual allowance of 50,000.

Daniel Johnson further explained why OCLC's speculation makes no sense. Z39.50 searches load results into a temporary "cache," from which a user may decide whether to save a record. Any unselected records are automatically deleted when the next search is run. Dep. Tr. of

Daniel Johnson at 119:1-8, 122:5, 123:6-11. As Johnson testified, "[t]hat's what libraries do all day, is search, so it just clears, clears, clears, clears." *Id.* at *Id.* at 124:10-13. The only record that remains is the last one viewed. Thus, there is no practical or technical mechanism by which searches alone could result in improper extraction. In short: B&T extracted far fewer records than permitted, reported its extractions transparently, and OCLC admits it has no evidence to the contrary. OCLC's breach theory is pure speculation.

### 7. Bridgeall Has Sold All collectionHQ Assets to a Third Party

Since the filing of this lawsuit, B&T and Bridgeall have sold all collectionHQ assets to affiliates of Valsoft Corporation Inc. The transaction closed on June 17, 2025. Dep. Tr. Amandeep Kochar at 172:5–20. The pending sale was disclosed to OCLC on an Attorneys'-Eyes-Only basis during discovery and was incorporated into preliminary discovery materials. Following the transaction, Bridgeall was renamed Baker & Taylor Scotland, Ltd., but exists only for tax purposes. *Id.* at 144:7–18. ███████████████████████████████████████

████████████ *Id.* at 174:11–175:8.

Importantly, the sale has resulted in material changes to collectionHQ's contracts and practices. Steven Legowski testified that Section 4.5— the provision allowing customers to contribute records to the BTCat Community Pool—has been removed entirely from collectionHQ's standard template agreement. Dep. Tr. of Steven Legowski. at 66:20–67:1. He confirmed that this was his own business decision, not prompted by counsel, and explained that because Bridgeall had already ceased sending records to B&T, removal of Section 4.5 was appropriate under the new ownership of collectionHQ. *Id.* at 67:2–15.

Since the sale, ████████████████████████████████████████

██████████████████. Dep. Tr. of Amandeep Kochar at 174:1–3. ████████████

████████████████████████████████████████████████████████

███████████████████████. The evidence therefore confirms: collectionHQ has been divested, Section 4.5 has been eliminated, and OCLC's claims of ongoing risk are moot.

### B. OCLC AGREEMENTS AND THE OCLC COOPERATIVE

OCLC's claims hinge on just three documents that it contends govern its relationship with some 20,000 libraries worldwide: the Framework Agreement,[6] Schedule 2 to that agreement,[7] and the WorldCat Policy.[8] Compl. ¶¶ 98–101. OCLC's interference theory depends entirely on treating these documents as if, together, they formed a single enforceable contract with each library.

That premise is unsustainable. The documents are not uniformly executed, do not bind all 20,000 libraries in identical form, and—most importantly—contain provisions that expressly disclaim ownership or control over individual bibliographic records. Yet OCLC asks this Court to treat them as a blanket contract that grants it unprecedented dominion over the entire bibliographic ecosystem. In reality, the documents reflect cooperative guidelines, not enforceable restrictions. OCLC cannot convert its aspirational policies into binding prohibitions, and it cannot bootstrap contractual rights where none exist.

### 1. The Framework Agreement Does Not Incorporate the WorldCat Policy and Affirms Libraries' Ownership of Their Own Records

The Framework Agreement is OCLC's standard set of terms and conditions, signed by customers, that includes 17 optional schedules. OCLC relies heavily on a single schedule — Schedule 2 — as the supposed mechanism by which the WorldCat Policy becomes part of the contract. But that is not what the documents say.[9] Schedule 2 does not incorporate the Policy into

---

[6] See Compl. at Ex. E (authenticated through the Decl. of William Rozek (ECF No. 5-1), ¶23.

[7] Schedule 2 (Ex. J) (authenticated in Dep. Tr. of William Rozek at 49:3-8).

[8] See Compl at Ex. A (authenticated through the Decl. of William Rozek (ECF No. 5-1), ¶25.

[9] The Complaint erroneous alleges that "all WorldCat customers" agree to the terms in section 3 of schedule 2. OCLC acknowledged in the deposition that customers select which schedules apply based on the services they are requesting. Rozel stated that of the 17 listed schedules, only schedules 1 and 2 contain references to the WorldCat Policy.

the Framework Agreement; it merely states that "use and transfer by the Institution of WorldCat Data is subject to the Policy." Schedule 2 § 3.3. The Framework Agreement itself never mentions the Policy at all. As OCLC's own designee, William Rozek, conceded, only when a customer selects Schedule 2 does its reference to the Policy even come into play. Dep. Tr. of William Rozek (Ex. I) at 32:4–35:22.

Even then, the integration clause of the Framework Agreement expressly limits the agreement to "this Agreement and any Schedules," which "constitute the complete agreement between the parties." Compl. at Ex. E, § 13.7. Mr. Rozek admitted that § 13.7 excludes the Policy and that the Policy is not part of the "complete agreement." Dep. Tr. of William Rozek at 40:24–41:24. He also conceded that only the Framework Agreement—not the Policy—is signed by customers. *Id.* at 30:4–6, 88:15–17, 89:5–11.

Within the Framework Agreement itself, § 5.1 confirms that libraries retain ownership of their own data. Section 5.1(a) addresses OCLC's intellectual property; § 5.1(b) addresses "Institution Data," which the agreement defines broadly as "all other data and content that is produced, sent or reproduced through the Services by the Institution or made available to OCLC in connection with the Services." Compl. at Ex. E, § 3.4 (emphasis added). For that data, the institution "retains all right, title and interest (including, without limitation, all proprietary rights), except for rights granted to OCLC" under the agreement.

Despite this clear reservation of ownership, Mr. Rozek advanced a sweeping interpretation: once Institution Data is incorporated into WorldCat, the record "becomes a WorldCat record" covered by OCLC's intellectual property rights:

> Mr. Rozek explained OCLC's interpretation of those relative rights as follows:
>
> The institution data is owned by the institution. However, once it's incorporated into OCLC's WorldCat, the record becomes a WorldCat record, which includes

enhancements, improvements, et cetera, and is part of WorldCat, and is therefore covered under 5.1(a). (Dep. Tr. of William Rozek at 62:22-63:1)

However, the institutional data that is provided to OCLC initially that then gets combined with OCLC enhancements, et cetera, and gets into WorldCat is an OCLC record that is included in the WorldCat database, and is therefore we have ownership rights on that record. (*Id.* at 64:1-6)

They cover *the entire record if at one point in time that record was part of the OCLC database*, and that is specifically called out in the rights and responsibilities document, which is part of schedule two. (*Id.* at 64:10-14) (emphasis added)

Mr. Rozek repeated this assertion and stated that any records that contains any "enhancement … is exclusively owned by OCLC and its licensors … And once that record has been in OCLC, WorldCat, at any time, as outlined in the rights and responsibilities, it's an OCLC record." *Id.* at 74:18-24. In fact, he confirmed that even after a OCLC customer terminates or does not renew, its use of its records remains just as restricted: "…it's been our practice and understanding" that "[t]hey no longer have the rights to use those records that have at one point had been part of WorldCat." *Id.* at 76:22-77:6.

That interpretation strips § 5.1(b) of meaning, converting libraries' expressly reserved ownership rights into nothing. It is also inconsistent with contract law: an integration clause that excludes the Policy cannot be read to smuggle the Policy into the Framework Agreement, and ownership expressly reserved to the institution cannot be nullified by OCLC's unilateral "practice and understanding." That is the interpretation of the Framework Agreement OCLC relies on to claim its customers breached their obligations to OCLC.[10] When a new customer is considering subscribing to WorldCat, the agreements are provided, but Mr. Rozek was unaware whether any OCLC representative verbally explained the documents and their interconnections. *Id.* at 79:1-16.

---

[10] Mr. Rozek also mentioned §11.1(e) and (g) as other provisions applicable to its customers' sharing of records Dep. Tr. of William Rozek at 79:25-81:15. However both those sections apply to OCLC "Products and Services," which ad defined in section 3 of the Framework Agreement, does not include records or data.

Mr. Rozek also conceded that § 5.1 requires only that customers represent they are authorized to provide Institution Data to OCLC. *Id.* at 83:10–15. He agreed that this means (1) customers will not provide records they are not entitled to share, and (2) OCLC can rely on the customer's representation of authorization. *Id.* at 84:1–10. This language is functionally equivalent to § 4.5 of the collectionHQ agreement—the very provision OCLC claims supports its interference theory. Mr. Rozek agreed that this provision means (1) that the customer agrees it won't provide OCLC records it is not permitted to provide, and (2) that the customer is telling OCLC it is authorized to provide the records it sends to OCLC. *Id.* at 84:1-6. He agreed that "the purpose of those provisions is so that OCLC can rely on what the customer is telling it." *Id.* at 84:8-10.

Schedule 2 itself confirms the limited scope of OCLC's position. Schedule 2 applies only to customers selecting certain WorldShare services, and it is integrated into the Framework Agreement only if the box next to Schedule 2 is checked. *Id.* at 33:20-34:12. Even then, the sole contractual hook is a single sentence in § 3.3 stating that "use and transfer by the Institution of WorldCat Data is subject to the Policy." This is the entire basis for OCLC's claim that the WorldCat Policy is enforceable—despite the Framework Agreement's integration clause to the contrary.

Finally, Mr. Rozek acknowledged that only about 10,000 of OCLC's 29,000 customers select Schedule 2 and use WorldCat. *Id.* at 36:17–19, 38:24–39:3. That means the majority of OCLC's members are not subject to Schedule 2 at all—further undermining OCLC's sweeping claim that the Framework Agreement, Schedule 2, and the Policy together bind its entire customer base.

In sum: the Framework Agreement affirms libraries' ownership of their data, excludes the WorldCat Policy from the integrated contract, and applies Schedule 2 only to a minority of customers. OCLC's interpretation erases express contractual language and rests on overreach, not

enforceable rights.

## 2. The WorldCat Policy

By its terms, the WorldCat Policy is not a contract. It does not purport to be one. Instead, it speaks in aspirational language, describing the purpose and intent of WorldCat, emphasizing the collective "stewardship" of the database, and promoting dual goals: (1) encouraging the widespread use of WorldCat data, and (2) ensuring the long-term viability of WorldCat and related services. Dep. Tr. of William Rozek at 92:15-10; 94:8-11; 97:15-17. Mr. Rozek acknowledged that "encouraging the widespread use of WorldCat records" was one of the Policy's express purposes. *Id.* at 94:3-18.

The Policy itself disclaims ownership of individual records. Section 2.C, "WorldCat, a Shared Resource," provides:

> The WorldCat database is more than a collection of OCLC member-contributed records. Its value is in the cooperation and outcomes it supports, *not in the ownership of the records themselves.* And while *on behalf of its members,* OCLC claims copyright rights in WorldCat as a compilation. *It does not claim copyright ownership of individual records.* .[11]

Yet Mr. Rozek testified that, despite this language, OCLC interprets the Policy as creating "contractual ownership" of individual records once they enter WorldCat. Dep. Tr. of William Rozek at 105:14–25. That interpretation directly contradicts the Policy's plain text.

Section 3 of the Policy is titled "OCLC Member Rights and Responsibilities." Subsection A lists rights, including the right to use WorldCat records in a member's ILS and to transfer data to scholars, library consortia, public agencies, and other institutions—whether OCLC members or not—for institutional or collaborative re-use. Compl. at Ex. A, §3.4(A). Mr. Rozek agreed that transfers to non-members are expressly permitted so long as they comply with Section 3.B

---

[11] Compl. at Ex. A.

responsibilities, and that Section 4 allows transfers to non-members for research purposes. Dep. Tr. of William Rozek at 106:20–107:11.

Subsection B, the "Responsibilities," is no more than a list of aspirational obligations, expressed in terms of "reasonable efforts" and OCLC's "public purposes." For example, § 3.B(5) requires only "reasonable efforts" to ensure re-use of WorldCat data by non-members is consistent with OCLC's purposes, which include widespread dissemination. § 3.B(6) prohibits "mass downloading from WorldCat" and "mass distribution of data directly from WorldCat to non-members without OCLC's prior consent." (emphasis added).

Despite this explicit reference to mass distribution "directly from WorldCat," Mr. Rozek testified that OCLC interprets the prohibition to apply even when a customer shares data from its own ILS catalog—records it owns and retains rights to. Dep. Tr. of William Rozek at 112:10–114:17. That reading rewrites the Policy's plain language. Mr. Rozek went further, suggesting that even if no records were removed from WorldCat, a library's "en masse" download could still "diminish" WorldCat by reputational harm. *Id.* at 117:22–119:16.

Section 5 of the Policy concedes its own limits:

> OCLC member use of data extracted from the WorldCat database is carried out in a diverse and rapidly-changing environment. It is, therefore, impossible to anticipate all of the conceivable uses to which members might want or need to put WorldCat data. OCLC members are encouraged to discuss with OCLC any uses that do not appear to be covered by this policy." Compl. at Ex. A § 5 *(emphasis added).*

This acknowledgment of uncertainty undermines OCLC's claim that the Policy imposes clear, enforceable contractual obligations. Indeed, the confusion is reflected in contemporaneous correspondence. In June 2021, a librarian considering collectionHQ confirmed after reviewing her OCLC agreements that "there was nothing about sharing records with third parties in the contract

per se," though the Policy included terms that "might be in conflict." She concluded that uploading her ILS into collectionHQ "is probably ok since it isn't direct from WorldCat." BAKER00032425 (Ex. K). Rather than showing intentional interference, this exchange underscores the uncertainty libraries themselves face. Defendants' approach—asking customers under § 4.5 of the collectionHQ agreement to confirm their authorization—was a prudent and reasonable way to address that ambiguity. The WorldCat Policy is not a contract, but an aspirational statement riddled with ambiguity. OCLC's effort to transform it into binding obligations is contrary to its text, inconsistent with its stated purpose, and undermined by its own admissions.

### 3. The Sources of Records Ingested into WorldCat

The vast majority of records in WorldCat were not created by OCLC, but rather are provided from OCLC member libraries, publishers, national libraries such as the Library of Congress or the Library and Archives of Canada, catalog vendors, and even in the past from B&T. Dep. Tr. of Mary Sauer-Games at 20:15-21:20. When records are ingested into WorldCat from any source, certain automated steps are taken: the format of the records is converted to the format that OCLC uses (*Id.* at 32:18-33:7), and the record is automatically compared to other records for the same book. *Id.* at 34:20-35:1. Notably for this case, every record is assigned an OCLC "identifier" whether any other data is added or not. *Id.* at 45:24-46:3. Once any data is added, even if it is only the OCLC identifier, OCLC contends that it owns the entire record. *Id.* at 67:6-10. In contrast, the library whose catalog is uploaded into WorldCat, owns only the specific fields (data) that it added to their records before uploading them. *Id.* at 66:2-4.

Mr. Johnson testified that it "makes no sense that a record could be a WorldCat record" (Dep. Tr. of Daniel Johnson at 55:23-24) merely by adding an OCLC identifier or "replac[ing] the identifier sometimes of the originating party" *Id.* at 55:17-20.

We have records that B&T is the originating creator of that record.

21

> We have records where we have upgraded the content of the record. We have records where we have -- where we have done quality control and authority work on that record. But the only identifier of a possible BTCat record is that it's significant in a BTCat repository. There is no other -- the record, itself, is not a BTCat record. (*Id.* at 56:2-11)

Further, defining the record based on the platform that the records is delivered to creates confusion.

*Id.* at 62:13-16.

> The Library of Congress creates a record. B&T loads the record into BTCat. OCLC loads the record into WorldCat. Is that a WorldCat record? Is that a B&T record? I believe it's a Library of Congress record. Just because it sits in – is it an Alma record, because it also sits in Alma and it sits in Cerci Dynex. Who owns the record or how would you define the record? Yes, I would agree that the record came from BTCat, so we could call that a BTCat record. But if we're talking ownership here or some type of control, the industry is off base with its definition of this arbitrary ownership. \*\*\* B&T can license it as an enriched record, but ownership is a collective ownership. The Library of Congress created it. B&T enhanced it. OCLC enhanced it. The customer enhances it through Alma. Who does that record belong to? I struggle with the ownership of the records. (*Id.* at 62:22-63:25).

Mr. Rozek testified that OCLC does not object to competition from B&T; and even welcomes it. Dep. Tr. of William Rozek at 145:22-146:4. Yet, at the same time, OCLC's claim to own every record ever ingested into WorldCat has the effect of preventing any competitor from working with any library that has ever used WorldCat or has some OCLC records in its ILS catalog.

### 4. B&T and Bridgeall Were Not Aware of the OCLC Contract Provisions

OCLC's interference claim requires proof that Defendants knew of enforceable contractual obligations and intentionally caused their breach. Yet OCLC concedes it cannot show actual knowledge. Instead, it argues that Defendants "are aware" of the Framework Agreement and WorldCat Policy because such contracts are "common industry knowledge," and because B&T had other, different agreements with OCLC—such as the 2019 License Agreement and various Third-Party Agreements—that contained their own provisions. Motion at 9, PageID#98 (citing

Decl. of William Rozek. ¶ 23).

This theory substitutes assumption for evidence. OCLC does not allege, and cannot show, that B&T or Bridgeall knew the contents of the Framework Agreement or WorldCat Policy. Rather, it speculates that because "most libraries are OCLC customers" and OCLC "supplies the majority of the world's bibliographic records," Defendants must have known the specific provisions OCLC now invokes. *Id.* at 11.

The testimony flatly contradicts that speculation. B&T's President and Group CEO, Amandeep Kochar, testified that he had no knowledge of the provisions OCLC cites—other than what he learned in connection with this lawsuit. Dep. Tr. of Amandeep Kochar at 319:16-320:14. Likewise, Bridgeall's corporate designee, Steven Legowski, testified that he was not aware of either the Framework Agreement or the WorldCat Policy. Dep. Tr. of Steven Legowski at 174:12–175:1.

In short: OCLC cannot establish the element of knowledge. Its claim rests not on evidence of Defendants' awareness, but on conjecture about what the industry supposedly "knows." That is not sufficient to support a claim for intentional interference.

## C. THE ACTIONS LEADING UP TO OCLC FILING SUIT

OCLC has been aware of BTCat since at least 2021. Internal OCLC emails at the time described BTCat as a competitor to be studied, and OCLC even prepared marketing "battle cards" for its sales personnel to use against it. *See* OCLC_00001544-OCLC_00001545 (Ex. L); *see also* OCLC_00001548-OCLC_00001549 (Ex. M). In communications with a library that terminated OCLC in favor of B&T, OCLC staff recorded the library's explanation:

> BT offers additional services – they will set up macros for easy cataloging and preprocess print materials. BTCat is well positioned for public libraries since the majority get their print materials from BT. … They couldn't pass up the opportunity to save money on their

cataloging subscription. Even with price increases over 5–10 years,
it doesn't come close to what they were paying for OCLC.
OCLC_000047 (Ex. N).

This testimony shows that libraries viewed BTCat not as a shortcut to OCLC, but as a
better, more affordable alternative.

In 2024, OCLC came across a publicly available YouTube demonstration of BTCat's user
interface. The video showed multiple versions of the same record in a single search, along with
advanced editor functions such as "stacking" macros, spell-checking, and authority validation.
Dep. Tr. of Travis Kelley at 47:16–48:8, 58:1–14. Mr. Kelley explained that BTCat's stacked
macros allow Z39.50 searches to run more efficiently, giving libraries "multiple target results at
the same time" and avoiding significant work. *Id.* at 60:20–61:2.

OCLC leadership immediately recognized BTCat's competitive edge. In an October 2024
email, Mary Sauer-Games acknowledged BTCat's ability to generate multiple results
simultaneously—an innovation WorldCat could not match—and wrote that OCLC was "searching
for ways to shut down this activity." OCLC_00000838 – OCLC_0000041 (Ex. 0) (authenticated
in Dep. Tr. of Mary Sauer-Games at 142:11-16.

OCLC's Complaint mischaracterized the demonstration. It claimed the video showed
WorldCat's record as "green" and superior to BTCat's "yellow" record. But as Kelley explained,
the purpose of the demo was not to compare which database had the "better" record. Instead, it
showed how BTCat applies each library's own cataloging policy and preferences to select the
"best" record for that institution—a significant feature OCLC does not offer. Dep. Tr. of Travis
Kelley at 49:14–50:23.

The Z39.50 search functionality further confirms BTCat's legitimacy. Z39.50 searches do
not download or import records. Search results remain in the interface; the library itself decides

whether to save a record into its ILS. *Id.* at 87:18–90:11. When libraries search WorldCat using BTCat, they do so only by providing their own credentials, just as they would with any other Z39.50 utility. *Id.* at 107:19–109:3. BTCat never bypasses WorldCat—indeed, Kelley testified that to his knowledge, BTCat has never accessed WorldCat directly. *Id.* at 121:20–123:3

In short: BTCat is not a backdoor to WorldCat. It is an innovative, independent utility that libraries adopt because it saves them money and provides unique cataloging features OCLC cannot match. OCLC's own documents show it has always viewed BTCat as a competitive threat—not as theft of WorldCat records.

### D.     OCLC'S CLAIMS OF IRREPARABLE HARM

OCLC claims two forms of irreparable harm – current and potential lost customers and diminishment to the value of WorldCat, which it contends could result from B&T obtaining OCLC records from Bridgeall through a collectionHQ agreement. Mr. Rozek acknowledged that in the scenario presented when an OCLC customer uploads records to Bridgeall, who then transfers them to B&T, who then makes those records available in the BTCat community pool, the harm only becomes manifest when the records are made available in the community pool (unless the OCLC customer decides to switch to BTCat). Dep. Tr. of William Rozek at 149:12-21. Further, he agreed that in that scenario, if the OCLC records never made it into the community pool, or never made it to B&T, there would be no immediate harm. *Id.* at 150:21-151:9.

The unrefuted testimony from Mr. Legowski and Mr. Johnson establishes that very scenario – that even assuming OCLC records were improperly sent to Bridgeall, there is no immediate harm since B&T stopped uploading them into BTCat in October 2023, and Bridgeall stopped sending records to B&T in February 2025.

As to the contention that OCLC is losing customers to B&T, Mr. Rozel agreed that merely

offering a competitive service at a lower price than OCLC is permissible. *Id.* 154:3-24 (noting the example of Skyriver, another cataloging company). Further, he acknowledged that libraries are facing increasing budget constraints, which would be a valid reason for them to switch from OCLC. *Id.* 157:24-158:6.

OCLC has identified a list of 36 customers over the past five years that have either cancelled their WorldCat subscription or are somehow deemed to be at risk for leaving. Dep. Tr. of William Rozek at 156:15-19; Dep. Tr. of Mary Sauer-Games at 171:2-14, 173:10-21. Mr. Rozek placed the estimated number of WorldCat subscribers at 10,000; Ms. Sauer-Games thought it was 20,000. Dep. Tr. of Mr. Rozek at 156:15-19; Dep. Tr. of Mary Sauer-Games at 174:15-16, Using Mr. Rozek's estimate, 36 lost or at-risk customers out of 10,000 is 0.36%; using the 20,000 figure would cut the percentage in half.

Ms. Sauer-Games was not able to hazard a guess as to how many customer OCLC lost over that period for other reasons, but she agreed there was no need to speculate because OCLC tracks that information. Dep. Tr. of Mary Sauer-Games at 174:18-24. She testified that OCLC tracks and investigates the reasons that customer leave through Sales Force and so OCLC would have such information. *Id.* at 135:10-136:20, 174:5-5. But she provided no evidence of any such statistics which would put the lost customers blamed on B&T in perspective. While Mr. Rozek and Ms. Sauer-Games both stated the rate is increasing, the average so far is 0.07% per year. Mr. Rozek acknowledged that in his Declaration attached to the Motion, he described the rate of the drop of customer is "precipitous" *Id*. at 165.:20-166:2. He explained that while the number may be small, the rate is increasing, and the lost subscription dollars is growing. *Id.* at 166:3-13.

In terms of any diminution of OCLC or WorldCat as a basis for a preliminary injunction, Ms. Sauer-Games explained, without citing evidence, that OCLC would be diminished if B&T is

able to compete against it using some of the same records, even though no records are removed from WorldCat. Dep. Tr. of Mary Sauer-Games at 74:16-75:14. Mr. Rozek equated diminishment more as loss of reputation and goodwill. Dep. Tr. of Wiliam Rozek at 117:19-119:16. Yet he acknowledged that OCLC's net revenue, which is largely attributable to its WorldCat service (*id.* at 169:13-170:3, has grown every year since BTCat appeared in 2021; it was ███████ in 2024 and ███████ in 2025. *Id.* at 171:14-173:2. In addition, OCLC's investment portfolio has grown in relation to stock market performance. *Id.* at 173:18-24.

## III. ARGUMENT

### A. THE LEGAL STANDARD FOR ENTERING A PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to issue a preliminary injunction, this Court must balance the following four factors: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id; see also EOG Resources, Inc. v. Lucky Land Management, LLC*, 134 F.4th 868 (6th Cir. 2025). Here, for the reasons that follow, OCLC cannot satisfy any of the elements that would entitle it to a preliminary injunction, and the balancing of factors clearly weighs in favor of denying OCLC's request for a preliminary injunction

### B. OCLC CANNOT SHOW A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

OCLC cannot show a strong likelihood of success on the merits of any of its claims. OCLC's failure to show a strong likelihood of success on the merits of its claims is, by itself, "fatal" to its request for preliminary injunctive relief. *Allah v. Smith*, No. 2:22-CV-21, 2022 WL

16832626, at *3 (S.D. Ohio Nov. 9, 2022) (Sargus, J.); *Barteca Holdings LLC v. Coastal Taco LLC.*, No. 1:16CV1498, 2016 WL 4168018, at *5 (N.D. Ohio Aug. 8, 2016).

### 1. OCLC's Intentional Interference with Contract Claim Will Not Succeed

OCLC's first and primary claim is Count I – Intentional Interference with Contracts. To be successful in this claim, OCLC must establish the following elements by a preponderance of the evidence: "(1) the existence of an enforceable contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *NCR Corp. v. Korala Assocs.*, 512 F.3d 807, 817 (6th Cir. 2008) (quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)).

> "One who *intentionally and improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by *inducing or otherwise causing the third person not to perform the contrac*t, is subject to liability to the other for the *pecuniary loss resulting to the other from the failure of the third person to perform the contrac*t."

*Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 418-19, 650 N.E.2d 863, 866 (quoting 4 Restatement of the Law 2d, Torts (1979), Section 766) (emphasis added). OCLC's interference claim, as alleged in the Complaint and described in its Motion, fails to establish each essential element of the tort.

Count I contends OCLC customers are subject to enforceable restrictions as to the use of the records they submit to WorldCat, that B&T generally knew of that contractual relationship, that B&T solicited OCLC customers to grant it access to their cataloging records that included WorldCat records, that such access interferes with the OCLC contract, and that the interference is causing irreparable harm. (Compl. ¶¶131-134, ECF No. 1 at PageID 24-25). The evidence and testimony in preliminary discovery strongly shows that OCLC cannot establish any of the elements of intentional interference.

a)      *The Framework Agreement and WorldCat Policy Do Not*
        *Prohibit Sharing Records with Bridgeall or B&T*

**First**, OCLC cannot establish the existence of a valid and enforceable contract. *See General Power Products, LLC v. MTD Products, Inc*., No. 1:06CV00143, 2006 WL 3692953, at *3 (S.D. Ohio Dec. 13, 2006) (plaintiff failed to demonstrate a likelihood of success on the merits of its claim of tortious interference with contract where there was doubt as to the existence of an enforceable contract)*; 715 Spencer Corp. v. City Environmental Services, Inc.,* 80 F. Supp. 2d 755, 763 (N.D. Ohio 1999) (plaintiff could not succeed on a tortious interference with contract claim where no enforceable contract existed). In its Preliminary Injunction opening memo, OCLC identifies the Framework Agreement and the WorldCat Policy as "two contracts between OCLC and WorldCat customers" that are the basis for its interference claims. Motion at 9 (citing Decl. of William Rozek, ¶23). However, as explained herein, those documents do not include identifiable or enforceable obligations on OCLC customers.

OCLC contends that its contract with customers consists of 3 separate documents: the Framework Agreement, Schedule 2 to the Framework Agreement, and the WorldCat Rights and Responsibilities for the OCLC Cooperative ("Policy"). As alleged, OCLC necessarily relies on all three documents being part of one contract in order to have a provision that prohibits sharing records with B&T and Bridgeall. Further OCLC makes it clear that it is the Policy that is the real source of the prohibitions that it claims its customers breached.[12] The Framework agreement by itself is not sufficient, because it does not specifically address restrictions from sharing records; the Policy is merely a policy, not a contract, so even if it were properly incorporated into the Framework Agreement, it does not clearly prohibit libraries from sharing their own ILS catalog or

---

[12] OCLC has not sued any of the customers it alleges that it lost to B&T because of the claims in the Complaint.

29

using BTCat. OCLC is not even consistent in how it describes the connection. The Complaint asserts that the Policy is incorporated into the Framework Agreement through schedule 2, but OCLC's Motion states that Framework Agreement and Policy are two contracts. Motion at 9.

**The Policy is Not Part of the Contract.** In the Mr. Rozek deposition, OCLC merely repeated on multiple occasions that the Policy was part of the agreement OCLC customers signed. But the Framework Agreement never mentions or incorporates the WorldCat Policy. The Framework Agreement is a standard set of terms and conditions, which includes a list of 17 different schedules that each customer can choose from. OCLC relies on one of those schedules, Schedule 2, to connect the Policy.[13] Schedule 2, however, does not incorporate the Policy into the Framework Agreement, but merely states that the customer agrees that its use and transfer of "WorldCat Data is subject to the Policy." Schedule 2 at §3.3.

The Framework Agreement itself makes it clear that the Policy is not a part of the contract in §13.7, which states "This *Agreement and any Schedules* constitute the complete agreement between the parties." (emphasis added). Obviously, for the Policy to be incorporated into the Agreement, this integration clause would need to mention the Policy. See *Absolute Mach. Tools v. Sw. Indus. Sales, Inc.*, 2005-Ohio-3946, ¶ 9, 2005 WL 1819518 (Ohio Ct. of Appeals 2005) ("Based upon the plain language of the integration clause, Appellant is barred by the parol evidence rule from introducing evidence that the contract contains conditions which are not set forth in the writing"); *Burton v. Elsea, Inc.*, No. 97CA2556, 1999 WL 1285874, at *6 (Ohio Ct. App. Dec. 27, 1999) (rejecting argument that limited warranty was part of contract, where plain language of

---

[13] The Complaint erroneously alleges that "all WorldCat customers" agree to the terms in section 3 of Schedule 2. As explained herein, Mr. Rozek acknowledged that customers select which schedules apply based on the services they are requesting, and only schedules 1 and 2 contain references to the WorldCat Policy. Dep. Tr. of William Rozek at 40:2-23.

integration clause did not include the warranty in the integration clause). Only the Framework Agreement is signed by customers.

**The WorldCat Policy itself is not a contract**. By its terms, the Policy is not a contract and does not purport to be. "[I]t is well established that a contract is not enforceable when the terms are not sufficiently definite." *Despres v. Moreno*, No. 15 CV 410, 2017 WL 131572, at *6 (N.D. Ohio Jan. 13, 2017) (quoting *Ta v. Chaundhry*, 2016 WL 3743366 (Ohio Ct. App. July 12, 2016)); *see Ullmo ex rel. Ullmo v. Gilmour Acad.,* 273 F.3d 671, 676 (6th Cir. 2001); *Rulli v. Fan Co.*, 1997-Ohio-380, 79 Ohio St. 3d 374, 376, 683 N.E.2d 337, 339 (Ohio 1997) ("[V]agueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.") (quoting 1 Corbin on Contracts (Rev. Ed.1993) 525, Section 4.1.); *Krueger v. Swineford*, 2015-Ohio-3518, ¶ 18, 41 N.E.3d 807, 812 (Ohio Ct. Appeals 2015) (finding that language used in contractual right of first refusal was "too vague or uncertain" to be enforceable).

The Policy speaks in terms of the purpose and intent of WorldCat, emphasizes the collective obligation of "stewardship" of the WorldCat database, and the dual intent to "encourage the widespread use of WorldCat bibliographic data" and supporting "the long-term viability of WorldCat and WorldCat services." While the Policy is what OCLC primarily relies on as the source of the obligations that it contends B&T induces OCLC customers to breach, its aspirational language and mixed messages are far from clear or unambiguous in defining customers' rights and obligations.

For example, Section 2.C, titled "WorldCat, a Shared Resource" specifically disclaims any rights in individual records:

> The WorldCat database is more than a collection of OCLC member-contributed records. Its value is in the cooperation and outcomes it supports, *not in the*

> ownership of the records themselves. While, *on behalf of its members,* OCLC
> claims copyright rights in WorldCat as a compilation, *it does not claim copyright
> ownership of individual records.*

A reasonable customer reading this provision, in light of the dual intent of encouraging widespread

use of WorldCat Data and maintaining its long-term viability, could easily conclude that sharing

individual records outside the Cooperative is consistent with the Policy. Even the claim of

copyright OCLC makes is on behalf of the customers, rather than as a claim to be asserted *against*

the customer.

Even section 3.B, the provision OCLC relies on, does not provide a clear or unambiguous

assertion that sharing records is prohibited. Section 3 of the Policy is titled

"OCLC Member rights and Responsibilities." In section A it list the member's rights, which

includes not only the right to use records in their own ILS, but to "[t]ransfer or make available

such data to individual scholars for their personal academic or scientific research or study, to

library consortia [citing a link to another document] or public agencies working on behalf of

libraries, or to other libraries and educational, cultural or scholarly institutions (e.g., museums,

archives, historical societies, research institutes), *whether these institutions are members or non-

members of OCLC, for these organizations' institutional or collaborative re-use."* The transfer or

making available of WorldCat data and its subsequent uses … should be carried out in keeping

with OCLC member community norms", citing another link to another document.

Section 3.B lists member responsibilities, but even these do not provide reasonable notice

that sharing records with B&T or Bridgeall is prohibited. Section 3.B(5) requires "reasonable

efforts to ensure that the subsequent re-use and transfer of their WorldCat data by non-members is

consistent with this policy and OCLC's public purposes ..." which encourages widespread use of

WorldCat data. Section 3.B(6) prohibits "mass downloading from WorldCat" and "mass

distribution of data <u>directly from WorldCat</u> to non-members without OCLC's prior consent." But

in the case of the collectionHQ agreement, the download is from the library's own ILS, so a library could reasonably conclude that the sharing called for in §4.5 of the collectionHQ agreement is acceptable. And section 3.B(6)(d) includes a vague prohibition against "other activities that diminish the value of WorldCat to the OCLC cooperative." Since nothing a customer downloads to either collectionHQ or BTCat removes any records or data from WorldCat, an OCLC customer could reasonably conclude that the collectionHQ and BTCat agreements are acceptable under that provision.[14] In sum, the Policy is too "general and aspirational" to constitute an enforceable agreement. *Ullmo,* 273 F.3d at 676 (holding that student and parent handbook was too indefinite and aspirational to create an enforceable contract, even though "enrollment agreement," signed by parents, obligated students and their parents to abide by the handbook's terms).

The Policy is not a binding contract for the additional reason that, even where referred to in other documents, OCLC retains the unilateral ability to revise the Policy. Ohio courts regularly hold that policies which may be changed by one party do not create binding obligations because there is no "meeting of the minds" as to their terms. *See Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538–39 (S.D. Ohio 2023) ("Humana's 'Associate Work-Life Policies & Processes' in place during the time at issue explicitly state, as related to internal complaint investigations, that it is 'subject to change or termination by Humana at any time.' Given the explicit language giving unilateral authority to Humana to alter the policy, Plaintiff's breach of contract claim must fail, as there is no evidence present indicating mutual assent."); *Senter v. Hillside Acres Nursing Ctr. of*

---

[14] As if to underscore the ambiguous and fact sensitive nature of the various rights and obligations, as informed by the policy and the dual intent of WorldCat, section 5 of the Policy states: "OCLC member use of data extracted from the WorldCat database is carried out in a diverse and rapidly-changing environment. It is, therefore, *impossible to anticipate all of the conceivable uses to which members might want or need to put WorldCat data*. OCLC members are encouraged to discuss with OCLC any uses that do not appear to be covered by this policy." (emphasis added)

aspirational policies and objectives, principals, member rights and obligations that do not create an enforceable agreement.

          **b)**    ***OCLC Cannot Establish that B&T Knew the Terms of the Framework Agreement, Schedule 2, or Policy OCLC Claims Were Breached***

*Second*, OCLC cannot establish Defendants' knowledge of the contract. OCLC must show more than Defendants' knowledge of the general existence of a contract; it must show knowledge of the provision or obligation that Defendants are allegedly interfering with. *See Crown Equip. Corp. v. Toyota Material Handling, U.S.A., Inc.*, 2005 WL 2849161, at *3 (N.D. Ohio Oct. 28, 2005), aff'd, 202 F. App'x 108 (6th Cir. 2006) ("Plaintiff has not proven that Toyota had any more than a general belief that there probably was a Dealer Agreement between Crown and Florida Lift. Therefore, plaintiff cannot establish the requisite knowledge element of a tortious interference claim."). OCLC contends that Defendants "are aware of" those two contracts because OCLC is widely known to have contracts with "most libraries," and the OCLC contracts are "common industry knowledge," and because B&T had other agreements with OCLC – the 2019 License Agreement and various third-party agreements – which contain different provisions seeking to protect WorldCat records. Motion at 9, 11. As established below, however, OCLC cannot show that Defendants knew what the contracts were, and which provisions were allegedly breached. "Actual knowledge" of the contractual relationship is required; constructive knowledge is not sufficient. *Becker v. Cardinal Health, Inc.,* 2021-Ohio-3804, ¶ 28, 179 N.E.3d 769, 779 (Ohio Ct. App. 10th Dist. 2021) (collecting cases).

      OCLC's Motion argues "it is common knowledge that OCLC protects WorldCat through contracts." Also, OCLC claims B&T's License Agreement and the third-party agreements somehow means that B&T knew of the Framework Agreement and Policy. Even if the collective

documents were a contract, Aman Kochar, Dan Johnson, Steven Legowski, and Travis Kelley all denied knowledge of the Framework Agreement, Schedule 2, and the Policy. Their testimony on this point is unrefuted.

OCLC argues that B&T must have known of at least the existence of a contract with OCLC customers, and that the court may infer knowledge from the circumstances. But under *Crown Equip. Corp.*, 2005 WL 2849161, at *3, general awareness that there is likely some contract is not sufficient; OCLC must show knowledge of the provision or obligation that Defendants are allegedly interfering with. ("general belief that there probably was" a contract is not sufficient). The mere assumption that there is a contract with OCLC customers does not provide notice of any specific terms restricting the sharing of records. Nor does the 2019 license agreement or the third party agreements provide sufficient notice, since the restriction OCLC claims are in the Framework Agreement and Policy are very different. OCLC's claim of interference is not based on provisions in the 2019 license or Third Party Agreements. OCLC cites *PUI Audio, Inc. v. Van Den Broek*, No. 3:21-CV- 284, 2021 WL 5164935, at *7-8 (S.D. Ohio Nov. 4, 2021), for the vague proposition that the circumstances can provide sufficient awareness, but in that case the awareness was in the form of defendant's actual discussions of the relevant contracts. There is no evidence here that B&T discussed or knew of the terms of the Framework Agreement or Policy. In fact, all the evidence is to the contrary. Kochar and Legowski both stated they had not seen OCLC's contract or Policy. Dep. Tr. of Amandeep Kochar at 12:50:30; Dep. Tr. of Steve Legowski at 174:8-25, 175:1-5.

Kelley as a salesman in the field testified that he has never seen an OCLC contract, is not aware of the specific restrictions OCLC places on its customers and would have no way of knowing what an OCLC contract would permit a library to do or not to do. Dep. Tr. of Travis Kelley at 109:17-24, 148:11-17.

c)    *The collectionHQ Agreement Does Not Induce OCLC Customers to Breach Their Contractual Obligations to OCLC*

*Third*, OCLC cannot show, as it must, an "actual breach of the contract" by OCLC's customer, and that Defendants intentionally procured and caused such breach. *Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 542 (6th Cir. 2014); *see Premier Farnell Corp. v. Wallace*, No. 3:10-CV-055, 2010 WL 1963443, at *5 (S.D. Ohio May 17, 2010) (Plaintiff failed to show likelihood of success on the merits of tortious interference with contract claim where plaintiff had not shown likelihood that agreements were breached).

OCLC contends that its customer agreements prohibit "mass downloading of records" from WorldCat, and "activities that diminish the value of WorldCat" such as sharing records and data with non-contributing users or competitors. Motion at 10. As discussed above, these indefinite and aspirational policies do not create binding obligations on OCLC's customers, and there is no evidence of an actual breach.

Further, OCLC does not allege that B&T "procured" the alleged breaches, it merely states that B&T "induced" or "encouraged" breach because section 4.5 of the collectionHQ subscription agreement requires the customer to confirm that they are authorized to provide any records provided to the community pool catalog. That is not sufficient. OCLC must prove BT's *purpose* was to cause breaches, or that BT knew with substantial certainty that breaches would occur.

> In *RFC Capital Corp. v. Earthlink, Inc.*, 2004 WL 2980402, at *17 (Ohio App. Dec. 23, 2004) (citing Restatement (Second) of Torts § 766 cmt. j), the court noted that there are two ways to satisfy the intent element of a tortious interference claim: "'(1) by proving that the defendant acted with the purpose or desire to interfere with the performance of the contract or (2) by proving that the defendant knew that interference was certain or substantially certain to occur as a result of its actions.'"

*Crown Equip. Corp. v. Toyota Material Handling, U.S.A., Inc.*, 2005 WL 2849161, at *3 (N.D.

Ohio Oct. 28, 2005), aff'd, 202 F. App'x 108 (6th Cir. 2006).

OCLC contends that B&T did that through the collectionHQ agreement §4.5, which OCLC contends "requires" OCLC customers to grant B&T a license to use OCLC customer catalog records, by requiring the customers to download WorldCat records *en masse* and causing the devaluation of WorldCat. *Id.* at 10-11.[15] Without alleging that B&T actually knew what the OCLC contractual obligations are, OCLC contends B&T intentionally caused OCLC customers to breach because it is common knowledge in the industry that most libraries are OCLC customers and OCLC "supplies the majority of the world's bibliographic records," and B&T is aware of agreements other than the Framework Agreement or WorldCat Policy that restrict the use of WorldCat records. *Id.* at 11. As established in sections (c) and (d) below, neither the collectionHQ subscription agreement or the BTCat agreement actually "require" customers to agree to share records if the customer is not authorized to do so.

OCLC contends that §4.5 of the collectionHQ agreement constitutes actionable interference. OCLC has been forced to backtrack from its contention that the provision requires anything, and OCLC does not claim that the interference is "intentional" but now asserts that it "encourages" OCLC customers to breach. As noted, to satisfy this element, OCLC must establish that Defendants acted with a purpose or desire to cause breach of the OCLC agreements, or with substantial certainty that it would cause a breach. *Crown Equip. Corp.*, 2005 WL 2849161, at *3. The facts as developed in preliminary discovery, and the plain language of the collectionHQ agreements, demonstrate that OCLC cannot establish, and at a minimum will be unlikely to establish, this essential element of the claim asserted in Count I.

---

[15] Of course, the plain language of Section 4.5 refutes OCLC's repeated frivolous and intentionally false allegations in the Complaint that Section 4.5 "requires" anything.

There is simply no evidence that §4.5 was added for the purpose or desire to cause OCLC customers to breach contract obligations. To the contrary, Bridgeall affirmatively explained that it serves the purpose of benefiting the development of the community pool. Dep. Tr. of Steve Legowski at 62:20-63:8. Section 4.5 is offered by collectionHQ and B&T to its customers as an option, which the customer can accept or not. Mr. Kochar and Mr. Legowski both testified that ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ Dep. Tr. of Steve Legowski at 62:9-14. Dep. Tr. of Amandeep Kochar at 151:23.

There is likewise no evidence that § 4.5 is substantially certain to cause OCLC customers to breach any enforceable obligations to OCLC. In total, █████████████ of collectionHQ customers since 2022 opted to have §4.5 removed. *See* BAKER00058290 (Ex. F). ████ ███████████████████████████████████████████████████████████████████████ ████████████████████████ Since §4.5 requires the customer to affirm that it is authorized to share its records into the community pool, the significant percentage opting to remove that section is conclusive evidence that a library would be able to opt not to share records into the community pool if it was an OCLC customer and decided that its agreement with OCLC prevented it from sharing records. While the reasons for opting out are not established, the statistical incidence of opting out, and B&T's unrebutted testimony ███████████████████████████s, means that the collectionHQ agreement does not function as an intentional inducement to OCLC customers.

***The reasonableness of the language of §4.5.*** The language of §4.5 is clear and understandable – if the library opts to sign the agreement with §4.5 included, it is confirming that it is authorized to share those records into the community pool. The fact that █████████████████████

39

███████████████████████████████████████. The plain meaning of section 4.5 affirmatively requires that collectionHQ customers not upload records if they are not entitled to do so. If a collectionHQ customer uploads records in violation of an obligation imposed by OCLC, then the customer is also breaching their obligation to collectionHQ and B&T as well. OCLC touts robust efforts at enforcement but is clearly more interested in pursuing its competitor B&T instead of its customers.

In addition, the testimony from both Dan Johnson and Steven Legowski was that Bridgeall did not reach into customers' ILS databases to extract any records for collectionHQ. To the contrary, the library uploads its records, or a portion of its records, into collectionHQ. The library controls what records are uploaded. The customer controls what they upload, and given the clear language in §4.5, Bridgeall and B&T are entitled to presume that the collectionHQ customer can and will exclude any restricted records, or else opt out of §4.5 entirely, if the customer believes it would be breaching contractual obligations to OCLC or to anyone else. The fact that ██████ of collectionHQ customers opt out of 4.5 is very strong corroboration that customers opt ou██████ ████████████████████████.

If Defendants were trying to use §4.5 as a "back door" as alleged in the Complaint, they would never agree to remove it, and surely would have designed the process to allow Bridgeall or B&T to reach into the library's ILS database to extract records, rather than leaving the process in the hands of the library, which presumably is in a position to know if it is prohibited from giving Bridgeall and B&T access to certain records. The restrictions in the Framework Agreement are not implicated by section 4.5.

d) ***The BTCat Subscription Agreements Cannot be the Instrumentality by which OCLC Claims Interference***

The BTCat subscription agreements contain a similar provision to that in the collectionHQ

agreement and OCLC's Framework Agreement. There is no evidence that the BTCat agreement has a purpose or desire to cause libraries to breach obligations to OCLC, or that any such breach is substantially certain to occur as a result of the BTCat subscription. To the contrary, the BTCat agreement, like §4.5 of the collectionHQ agreement, affirmatively requires the subscribing library to certify or affirm that it is not providing any records that it is contractually obligated not to share.

Additionally, the BTCat agreement cannot be an "inducement" to breach any more than the collectionHQ agreement, because the BTCat subscription process operates on a record-by-record level, and so is not a means for B&T to obtain entire ILS catalogs. The BTCat subscriber is put on notice not to upload records that are subject to restriction or contractual obligations, and since records are uploaded individually, the subscriber can confirm it is permitted to upload each record on a case-by-case basis.

### e) *The collectionHQ and BTCat Agreements are Justified as Permissible Competition*

**Fourth**, OCLC cannot establish that the Defendants' conduct is not justified as general market competition. "Establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper." *Fred Siegel Co., L.P.A.*, 85 Ohio St. 3d 171, 176, 707 N.E.2d 853, 858. The Court proposed a list of fact-intensive factors to address the extent to which a defendant's conduct is justified, *id*. at 860, but in this case it is fundamentally a matter of allowing fair competition in the marketplace. "Furthermore where, as here, the contract is terminable at will, the Restatement (2d) of Torts § 768 provides that a competitor is protected by privilege. Competition is privileged, and therefore proper, where: (a) the relation between the actor ... and his or her competitor ... concerns a matter involved in the competition between the actor and the other, and (b) the actor does not employ wrongful means, and (c) his action does not create or continue an

41

unlawful restraint of trade, and (d) his purpose is at least in part to advance his interest in competing with the other." *Crown Equip. Corp.*, 2005 WL 2849161, at *4 (quoting *Fred Siegel*, 707 N.E.2d at 86).

Further, OCLC itself includes the very same type of provision in the Framework Agreement. Section 5.1(b) includes a statement that by signing the Framework Agreement, the OCLC member is representing to OCLC that it is authorized to do so. Section 5.1(b) states that the OCLC customer "is responsible for obtaining all permission and other rights necessary to provide Institution Data to OCLC," and that the customer "will not provide OCLC with Institution Data [defined is §3.3 of the Framework Agreement] that Institution does not have the right to provide for use in connection with the Products or Services." Under this language, OCLC is taking the position that it is entitled to rely on what its customers provide. Yet OCLC claims that with equivalent language in §4.5, Bridgeall and B&T are improperly "requiring" customers to breach obligations owed to OCLC. In light of OCLC's use and reliance on equivalent language in the Framework Agreement, it should be precluded form claiming §4.5 is a basis for interference in OCLC customer agreements. Dep. Tr. of William Rozek at 85:14.

First, as set forth in detail above, there is no evidence to support that either §4.5 of the collectionHQ agreement or the similar provision BTCat subscription is improper or operates to induce a breach by OCLC's customers. Second, even leaving this aside, there is no evidence that BTCat was created in an effort to somehow "build BTCat on the back of OCLC" in an effort overtake OCLC's place in the market. Indeed, given the length of time of OCLC has been in the market as compared to BTCat and the relative size of WorldCat as compared to BTCat, both in terms of records and customers, it is not plausible for OCLC to suggest such potential harm (even without its hyperbole). Further reinforcing the absurdity of OCLC's complaints is that even

assuming B&T caused the loss of 26 customers, it would take a thousand years for B&T to take all WorldCat's customers, which timeline was not disputed by Sauer-Games. Dep. Tr. of Mary Sauer-Games at 174:20. While OCLC and B&T share a similar customer base, their product offerings are different. BTCat offers services that WorldCat does not, such as macros, to explain why a customer may switch from WorldCat to BTCat. These macros were developed by B&T with its own money and people and in close consultation and trials with B&T customers' needs in mind, not with any eye to replicate WorldCat. There are a myriad of reasons why customers may leave WorldCat. OCLC has presented no evidence from customers that they left OCLC because of anything improper done by B&T. This lack of evidence is patently obvious. Similarly, after discovery, OCLC has come forward with no evidence from a single customer to support an inference that B&T wanted to develop a database to compete with WorldCat. In short, BTCat's strength and success in the market is based on its hard work, and not any alleged tortious interference with OCLC's customers. The only evidence found by OCLC, which is why it is silent, is that customers of OCLC appear interested in a lower cost alternative.

**f)      *OCLC Cannot Establish Intentional Interference Based on Lost Customers***

Finally, OCLC alleges causal damages as part of its intentional interference claim, on two bases – lost customers and "diminishment" of the WorldCat database. But OCLC has failed to establish any evidence that either alleged harm can be connected to the alleged interference. *Fred Siegel* and subsequent cases require proof of "resulting damages" as an element of the tort. There are at least two reasons why OCLC cannot establish any evidence of intentional interference based on customers that it contends terminated contracts with OCLC and entered into agreements with B&T.

First, Count I simply does not allege lost customers as a basis for the tortious interference

claim. *Yoga Six Franchise, LLC v. Core 6 Energy Yoga LLC*, No. 1:19-CV-02796, 2020 WL 13890223, at *11 (N.D. Ohio Sept. 30, 2020) (dismissing tortious interference claim where plaintiff did not "identify any potential customers or franchisees lost"); *Miller v. First Safety Bank*, No. 1:14-CV-368, 2014 WL 12586315, at *11 (S.D. Ohio Dec. 30, 2014) (tortious interference claim dismissed where plaintiff alleged only that she had "lists of interested buyers and realtors that have vanished without explanation" but failed to allege "any specific contract or business relationship was thwarted or cut-off as a result of Defendants' conduct."). Paragraph 134 of the Complaint alleges "irreparable injury to its business and loss of customer good will, and other tangible assets, and additional damages and expenses that are not readily calculable." Mr. Rozek testified that the term good will means reputational harm. The Complaint, and Mr. Rozek Declaration in support of the Motion mention two forms of irreparable harm: lost customers and "diminishment" of the value of WorldCat, but only the second aspect of irreparable harm is mentioned in Count I. Dep. Tr. of William Rozek at 116:3, 21.

Even if properly included in Count I, OCLC cited no evidence of lost customers other than a list it generated purporting to identify lost customers. No specific evidence was cited for any of the customers included in the list. Notably, Mr. Rozek acknowledged that when customers leave or decide not to renew, OCLC asks them why. *Id*. at 153:11-18. Yet no such evidence was provided to corroborate the self-serving list.

Second, the list does not purport to identify or explain the reasons *why* any of the customers may have terminated their relationship with OCLC or why they contracted with B&T. OCLC thus fundamentally fails to show the requisite "but for" causation element for its intentional interference claim. *Barens v. Parma City Sch. Dist.*, No. 1:22CV00103, 2025 WL 834412, at *66 (N.D. Ohio Mar. 17, 2025) (plaintiff must show that "but for the interference," the contractual relationship

44

"would have been consummated."); *Stilson & Assocs., Inc. v. Stilson Consulting Grp., LLC*, 129 F. App'x 993, 999 (6th Cir. 2005) (affirming district court's judgment against plaintiff where evidence showed that third party, dissatisfied with plaintiffs' work, "would have gone elsewhere for its future projects, regardless," and defendants therefore "cannot be said to have caused the termination of the relationship."); *Cavalier Distrib. Co., Inc. v. Lime Ventures, Inc.,* 660 F. Supp. 3d 700, 710 (S.D. Ohio 2023) (preliminary injunction denied where it was not clear which factors caused the alleged termination of alleged business relationship). It is insufficient that Defendant's alleged conduct may have been a factor in a customer's decision not to do business with Plaintiff. *See Chrvala v. Borden, Inc.*, 14 F. Supp. 2d 1013, 1023 (S.D. Ohio 1998) (holding that plaintiff must show "something more" than that "a particular course of conduct may have played a role in bringing about the harmful outcome.")

OCLC does not even attempt to establish that any relationship with any customer was terminated or breached due to conduct by B&T. Such a showing could only be made by identifying specific potential customers. Moreover, OCLC's theory of causation is implausible, if not incoherent. OCLC claims that that B&T built BTCat by improperly taking "high-quality" WorldCat records, passing them off as BTCat's own, and then diverting OCLC"s customers away by promoting BTCat as substantially equivalent to WorldCat. But even if B&T had improperly taken records, no one could plausibly conclude that BTCat is an equivalent of WorldCat. The ██████████████████████████████ contain approximately ████████████, as compared WorldCat's 600 million records – a ratio of more than █████. Mr. Rozek conceded OCLC has no evidence of customers leaving because they were led to believe BTCat was of comparable size, only evidence that BTCat was substantially less expensive. Dep. Tr. of William Rozek at 154:4-10.

Discovery shows that BTCat is not marketed in comparison to WorldCat. Mr. Kelley does not discuss OCLC in his sales calls. He focuses on the strengths and weaknesses of BTCat. Dep. Tr. of Travis Kelley at 87:2-87-11. OCLC found no B&T marketing materials comparing BTCat to WorldCat. Interestingly, Mr. Kelley believes that the number of new customers that come to B&T from other competitors exceeds the number that come to B&T after leaving OCLC. Kelley at 240:2-240:13.

### g) *OCLC Cannot Establish Tortious Interference Based on "Diminishment" of WorldCat*

The other claim of harm allegedly caused by tortious interference is the nebulous and purely speculative contention that WorldCat is somehow diminished by the presence of "WorldCat records" (i.e., records containing an OCLC identifier) in BTCat. To begin with, this claim, even as articulated in the Complaint, is exceedingly fuzzy and amorphous. WorldCat undoubtedly has thousands of records with B&T identifiers in them. And that has no impact on B&T. The suggestion that WorldCat is diminished by the small percentage of records in BTCat that have OCLC identifiers is an attempt to mislead the Court. The presence of an OCLC identifier in a BTCat record is not even conclusive evidence that the record entered BTCat through any improper means.

OCLC's corporate representatives did nothing to support or clarify this claim in their depositions. Fundamentally, it is undisputed that regardless of what records are included in BTCat, nothing that Defendants are alleged to have done removes any records from OCLC's 600 million strong database or degrades the quality of those records.[16] If the number or quality of records in WorldCat is undisturbed by B&T, there can be no "diminishment" under the ordinary meaning of

---

[16] To the contrary, it was established that BTCat improvement to records find their way into the WorldCat database on an ongoing basis, through the third party agreements. Dep. Tr. of Daniel Johnson at 81.

the word.

In fact, the testimony of OCLC witnesses, and the language in the Complaint and Declarations, all clarify that what OCLC is really talking about is "diminishment" in the form of having a competitor in the marketplace. This became clear in, among other records and documents, in those relating to the OCLC reaction to the You Tube video referred to in the Kelley deposition. OCLC became alarmed at the cascading Z39.50 search capability. But, according to the Library of Congress, the Z39.50 became industry standard in 1988.[17] In the end, that is what this lawsuit is all about – OCLC's desire, as the dominant force in the online bibliographic records market, to stop a competitor like B&T from providing improving search capabilities and creating a potential alternative to WorldCat. OCLC's claim that WorldCat is diminished is based not on any improper action by B&T butt on the prospect of having a competitor – especially a lower priced one.

### 1. OCLC's Claim of Tortious Interference with Prospective Business Relationships Will Not Succeed

OCLC's claim for interference with prospective business relationships is even more unlikely to succeed on the merits. To sustain a claim for tortious interference with a prospective business relationship, OCLC must establish: (1) the existence of a prospective business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom. *Gentile v. Turkoly*, 86 N.E.3d 991, ¶ 24 (7th Dist. 2017). OCLC contends that by virtue of the fact that WorldCat is "the world's preeminent cataloguing record service," it has many prospective business relationships. (Compl. ¶ 137, ECF No. 1 at Page ID 25.).

---

[17] Z39.50 is a national and international (ISO 23950) standard defining a protocol for computer-to-computer information retrieval allowing a user in one system (with a Z39.50 client) to search and retrieve information from an other system (with a Z39.50 server) without knowing the search syntax of that system. Z39.50 was originally approved by the National Information Standards Organization (NISO) in 1988.

Without identifying any of these potential future customers, OCLC claims that B&T interfered with its future relationships with them by building BTCat on the back of WorldCat and offering it as a "lower cost" alternative to WorldCat. (Compl. ¶¶ 136–41, ECF No. 1 at PageID 25–26.) The vague and speculative assertions offered to support OCLC's claim of interference with prospective relationships are insufficient to show the existence of any such relationship and are wholly unsupported. See *OCLC, Inc. v. Anna's Archive*, No. 2:24-CV-144, 2025 WL 1235238, at \*6 (S.D. Ohio Mar. 21, 2025) ("[a] vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim."); *Haas v. TruPartner Credit Union, Inc.*, No. 1:22-CV-678, 2024 WL 3925724, at \*5 (S.D. Ohio Aug. 22, 2024) ("vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim for tortious interference with a business relationship.") (quoting *Emanuel's LLC*, 2023-Ohio-147, at ¶ 23); *Miller v. First Safety Bank*, No. 1:14-CV-368, 2014 WL 12586315, at \*11 (S.D. Ohio Dec. 30, 2014) (claim dismissed where plaintiff alleged only that she had "lists of interested buyers and realtors that have vanished without explanation" but failed to allege "any specific contract or business relationship was thwarted or cut-off as a result of Defendants' conduct."); *Milacron LLC v. Advanced Fluids, Inc.*, No. 1:13-CV-364, 2013 WL 5722795, at \*5 (S.D. Ohio Oct. 21, 2013) ("Plaintiffs also fail to identify any particular party with which Defendant allegedly interfered. Plaintiffs merely make conclusory allegations that Defendant interfered with their customers, representatives, and/or suppliers, without stating that they lost business from any particular customer, representative, or supplier.")

Further, OCLC fails to identify an actual prospective contractual relation, or show that "but for the interference," the contractual relationship "would have been consummated." *Barens v. Parma City Sch. Dist.*, No. 1:22CV00103, 2025 WL 834412, at \*66 (N.D. Ohio Mar. 17, 2025).

See *Weiler v. DLR Group*, 2023 WL 2926417 at * 4 (Ohio App. 8th Dist. April 13, 2023) (tortious interference claim dismissed where plaintiff failed to identify the "existence of any specific, prospective business relationships that would have been entered but for the alleged interference."); *Stilson & Assocs., Inc., supra,* 129 F. App'x 993, 999 (6th Cir. 2005) Further, it is insufficient that Defendant's alleged conduct may have been a factor in a customer's decision not to do business with Plaintiff. *See Chrvala*, 14 F. Supp. At 1023.

OCLC makes no attempt, as it must, to identify a single prospective customer that has declined to sign with OCLC and is instead going to sign with B&T on the basis of any alleged improper conduct by B&T. Rather, OCLC claims that every library "around the world" that is not already an OCLC customer, is a prospective customer with whom B&T may not interfere. Motion at 13. And OCLC further argues that, because OCLC is so well-known, B&T "must know that any institution they solicit or subscribe to BTCat is considering subscribing to WorldCat." *Id.* at 14 (Page ID 103). The law does not support such an audacious and obviously anti-competitive proposition. *See Emanuel's LLC v. Restore Marietta, Inc.*, 2023-Ohio-147, ¶ 23 206 N.E.3d 116, 126 (Ohio Ct. App. 4th Dist.) ("[N]obody has a legally protectable relationship with every potential participant in their local market.") (quoting *McCreight v. AuburnBank*, 611 F.Supp.3d 1336, 1342–44 (M.D. Ala. 2020));*Yoga Six Franchise, LLC,* 2020 WL 13890223, at *11 (dismissing tortious interference claim where plaintiff did not "identify any potential customers or franchisees lost" and allegations that defendant was aware of plaintiff's "national reputation and brand" were insufficient to allege defendant's knowledge of any prospective business relationships).

As with actual customers, OCLC does not even attempt to establish that any relationship with any potential customer was terminated or breached due to conduct by B&T. Such a showing could only be made by identifying specific potential customers. OCLC ignored the features offered

by BTCat, and implausibly claims that B&T has simply replicated the WorldCat database to offer at a lower price. S-G confirmed that WorldCat contains over 600 million records. in contrast, ██████ contains ██████ records, and the community pool (offered for free) includes another ██████ records. Johnson at 116-118. In other words, the community pool is less than ██ the size of WorldCat, and BTCat Main is approximately ██ the size of WorldCat. Any suggestion that prospective customers are lost because BTCat is a replica of WorldCat is frivolous.

Ms. Sauer-Games testified that OCLC's marketing program has utilized a software program called Sales Force since at least 2021, which OCLC uses to track the results of individual marketing contacts. Dep. Tr. of Mary Sauer-Games at 135:15-25. Sales Force memorializes marketing information gathered by OCLC sales staff. Sauer-Games identified one specific example in 2021 where a library terminated its WorldCat subscription and subscribed to BTCat. As explanted by the librarian, the decision was matter of price, and B&T's use of macros that allowed for "easy cataloging" which Sauer-Games acknowledges was a "positive feature" that is "competitively significant." Dep. Tr. of Mary Sauer-Games at 137:18-20. The librarian said nothing about the BTCat database being in any way comparable to WorldCat. Sauer-Games acknowledged that "OCLC wanted to find out why customers left OCLC, it could look at reports in Sales Force. *Id.* at 135:15-25. Despite its use of Sales Force, OCLC has not identified any specific instance that supports is hypothesis that customers believe BTCat is a comparable database.

The evidence establishes that BTCat is lower cost alternative consisting of that uses macros that provide positive features, which is sold on the merits of its operations and B&T service, and in no way markets BTCat or the community pool as in any way comparable to WorldCat. As such, the basic premise OCLC touts as the reason it needs injunctive relief simply does not hold water.

But OCLC has not identified any specific library it has been soliciting who has targeting that has declined to move forward with OCLC and instead is signing up with B&T for improper reasons. OCLC thus would presumably be able to cite examples to satisfy the first element if it could.

The uncontradicted testimony and evidence from B&T and Bridgeall, and B&T salesperson Travis Kelley, is that collectionHQ and BTCat are marketed on their merits, not as a repository of a similar scale to WorldCat, and at a price point that is much lower than WorldCat. Kelly testified that he does not comment on OCLC in his sales efforts; he focuses on the B&T products. B&T has presented its products on the merits of collectionHQ and BTCat, and offering a database of quality records that is obviously much smaller than WorldCat. Dep. Tr. of Travis Kelley at 23:17-25:4; 85:4-87:11; 119:6-7; 143:15-25.

## 2. OCLC's Breach of Contract Claim Will Not Succeed Because There Is No Evidence of a Breach

OCLC's breach of contract claim (Count 3) is very straightforward, and the evidence elicited in discovery clearly and unequivocally establishes that there is no likelihood of success. The claim is simply that B&T was limited under the 2019 License Agreement to extracting 50,000 records per year for each year of the license, which could be used "for any purpose," but exceeded that limit. The uncontradicted evidence establishes that B&T did not exceed the allotted number of extractions, and in fact extracted far fewer that the total it was permitted to extract.

Sauer-Games testified that the only basis OCLC had to suspect B&T exceeded its allotment is that "historically" libraries extract one out of three records searched, and that B&T searched over 1.5 million records. Dep. Tr. of Mary Sauer-Games at 114:14-.25. The testimony of Johnson was unequivocal and uncontracted in that B&T only ███. He explained that the searches yielded many records and B&T sifted through them to decide which to save. Dep. Tr. of Daniel Johnson

at 161:9-25, 162:1-20. The records collected in the searches that were not saved were in a temporary cache directory, and each time another search was run, its contents were deleted. OCLC has failed to offer any persuasive evidence to the contrary. Accordingly, and because OCLC has found no evidence to support the allegations in the Complaint, OCLC has no likelihood of success on Count 3 for breach of contract.

> ### 3. OCLC's Unjust Enrichment Claim Is Barred by the Existence of the 2019 License Agreement and Because B&T Was Not Unjustly Enriched

OCLC's claim for unjust enrichment is unlikely to succeed because its breach of contract claim fails. OCLC's Unjust Enrichment Claim is based on the same alleged breach of the 2019 License Agreement but is pleaded in the alternative and applies only if no legal remedy is available. The elements of an unjust enrichment claim are: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *J.D. P'ship v. Berlin Twp. Bd. of Trs.*, 412 F. Supp. 2d 772, 787 (S.D. Ohio 2005) (quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 465 N.E.2d 1298, 1302 (1984); *OCLC Inc.*, 2025 WL 1235238, at *5 ("To establish its unjust enrichment claim, OCLC must adequately plead that Defendants retained the benefit of WorldCat's data under circumstances in which it was unjust to do so without payment.") (internal quotation marks and citation omitted). However, "Ohio law precludes a party from maintaining a claim for unjust enrichment where an express contract covering the same subject matter applies…. " *Cunningham Prop. Mgmt. Tr. v. Ascent Res. - Utica, LLC*, 351 F. Supp. 3d 1056, 1066 (S.D. Ohio 2018) (Sargus, J.); *Bush Truck Leasing, Inc. v. Cummins, Inc.*, No. 1:18-CV-871, 2020 WL 3871322, at *8 (S.D. Ohio July 9, 2020).

OCLC is not likely to succeed on its unjust enrichment claim because the claim is expressly based on an alleged breach of the 2019 License Agreement between the parties, and the existence

of that contract bars the claim. *Bush Truck Leasing, Inc.*, 2020 WL 3871322, at *8. While OCLC pleads unjust enrichment in the alternative, in general, a plaintiff may do so only "when the existence of an express contract is in dispute." *Bush Truck Leasing, Inc. v. Cummins, Inc.*, No. 1:18-CV-871, 2020 WL 3871322, at *8 (S.D. Ohio July 9, 2020). Here, there is no dispute as to the existence or validity of the 2019 License Agreement. While this Court has permitted unjust enrichment claims to be pled in the alternative before discovery, *see Cunningham Prop. Mgmt. Tr.*, 351 F. Supp. 3d at 1066, it does not follow that OCLC is *likely to succeed* on the merits of its unjust enrichment claim in light of well-settled Ohio law. OCLC's unjust enrichment fails regardless because, as shown, Defendants did not exceed the allotted number of extractions that the parties agreed to.

### C.     OCLC CANNOT SHOW THE REQUISITE IRREPARABLE HARM

A showing of irreparable harm is the "core" of the preliminary injunction. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883 (6th Cir. 2025). Thus, while the court may balance the extent of an injury against the other factors, the movant must in all cases show irreparable injury to obtain preliminary injunctive relief. *Id.; See also Bertec Corp. v. Sparta Software Corp.*, No. 2:19-CV-04623, 2019 WL 7249259, at *8 (S.D. Ohio Dec. 27, 2019) ("Irreparable harm is an 'indispensable' and 'mandatory' factor.) (citing *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). To establish irreparable injury, the movant must show injury that is "actual and imminent." *D.P. Dough Franchising, LLC v. Southworth*, No. 2:15-CV-2635, 2017 WL 4315013, at *15 (S.D. Ohio Sept. 26, 2017) (Sargus, J.). The movant must not only show that harm resulting for defendant's conduct has occurred in the past but also provide evidence that irreparable harm "*is likely to occur again*." *Id.* (cleaned up; emphasis added).

The party seeking a preliminary injunction must also "necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Colvin*

*v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010). "Injunctive relief must be tailored to remedy the *specific harm alleged* and an overbroad preliminary injunction is an abuse of discretion." *Hicks v. Clermont Cnty. Bd. of Commissioners*, No. 1:17-CV-677, 2018 WL 6418895, at *5 (S.D. Ohio Dec. 6, 2018).

The proposed injunction should be denied as overbroad. *see Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (preliminary injunction should not "extend[] further than necessary to remedy the plaintiff's injury"). "An injunction is overly broad when there is a risk that it restrains legal conduct, or the injunction prohibits illegal conduct that is not the subject of the litigation or is not closely related to the conduct found to justify injunctive relief." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022) (vacating preliminary injunction where there was a "mismatch" between the specific terms of defendant's non-compete agreement which plaintiff sought to enforce, and the breadth of the preliminary injunction).

Accordingly, here, to show irreparable harm, OCLC must do more than recite vague incantations of "loss of goodwill" or "loss of customers," as it did in its Motion at 16. Instead, OCLC must demonstrate both (a) that it is likely to suffer these injuries as a result of the conduct alleged in the complaint, *Colvin*, 605 F.3d at 300, and (b) that any such injuries, in this case, are not compensable by damages. *See Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991) (finding that while plaintiff may lose customers for its milk as a result of defendant's alleged interference with its contracts, there was no showing that the market was so limited that the damage would be irreparable); *Bertec Corp. v. Sparta Software Corp.*, 2019 WL 7249259, at *6-7 (S.D. Ohio Dec. 27, 2019) (plaintiff failed to show irreparable injury where it alleged damages for loss of goodwill, loss of market share, and price erosion, but failed to show these injuries were not compensable); *FirstPower Grp. LLC v. WD-40 Co.*, No. 5:17-CV-392, 2017 WL 3034499, at *12

54

(N.D. Ohio July 18, 2017) (plaintiff failed to establish irreparable harm where plaintiff offered no substantive evidence of loss of market share or damage to reputation market other than testimony by plaintiff's principal that it feared that it would suffer such injuries).

In this case, OCLC propounds two forms of "irreparable harm" – the alleged loss of customers and prospective customers, and the amorphous concept that B&T's conduct has "diminished" WorldCat.[18] The proposed injunction lacks any evidentiary support to show irreparable harm and is overbroad, a defect that stems from OCLC's overreaching claim restricting use of any record containing an OCLC identifier.

### 1.    Lost Customers Do Not Establish Irreparable Harm

OCLC has made no evidentiary showing of irreparable harm based on the customers it claims to have lost to BTCat. As noted above, the claim is unlikely to succeed because OCLC has not provided evidence of the reasons the two dozen customers it has listed left OCLC for B&T even though Mr. Rozek acknowledged that OCLC maintains records about the circumstances for which customers leave. Dep. Tr. of William Rosak at, 153:11-18.

More fundamentally, the scale of the losses identified cannot be considered material or noticeable. While OCLC uses hyperbole to characterize the customers losses as "a precipitous drop in membership." and as a "fundamental threat to OCLC and everything that is does." Dep. Tr. of William Rosak at, 159:3-5, 166:3-13. The claim that B&T's conduct will "destroy OCLC's current and future customer base for WorldCat and fundamentally threaten OCLC's continued operation"

---

[18] OCLC does not attempt to show irreparable harm based on its cause of action for breach of contract. As established above, there was no breach, but, even if there was breach in the past, the contract is admittedly terminated, and there is thus no plausible risk of injury from a future breach of the contract. See *Russian Collections, Ltd. v. Melamid*, 2009 WL 1928883, at *9 (S.D. Ohio July 1, 2009) ("[a]n injunction is not justified just because there has been a prior breach of the contract"); *Premier Farnell Corp. v. Wallace*, No. 3:10-CV-055, 2010 WL 1963443, at *6 (S.D. Ohio May 17, 2010) (denying preliminary injunction where plaintiff "has shown no irreparable harm that could be addressed by the injunctive relief that they seek.")

(Compl. ¶118, Page ID 21-22), borders on hysterical. But the numbers establish the opposite – that B&T's alleged conduct will have virtually no effect on OCLC in terms of the number of customers, the loss of WorldCat records, or lost revenue.

OCLC has approximately 20,000 customers, of which around 10,000 utilize the WorldCat database. It claims (without any evidence) that is has identified 36 lost or at-risk customers over the last 5 years.[19] That amounts to a loss of 0.36% of the customer base. Even if the rate of loss could be presumed to increase, it would take generations before B&T could actualy pose a material threat to OCLC.

As noted above, OCLC has provided no indication that it reviewed is Sales Force records for evidence of customers it claims left to switch to BTCat for reasons relating to the conduct OCLC claims was improper. Nevertheless, Mr. Rozek is willing to aver in his Declaration that OCLC is losing customers to BTCat. He even describes OCLC's irreparable harm in terms of unknown customers for whom OCLC has no indication why they left, and prospective customers whose identities are unknown to OCLC. Dep. Tr. of William Rosak at 149:12-21, 166:3-13. *See also Motion* at 17). OCLC's attitude is if there is any customer in the library industry that has chosen to use BTCat, OCLC is entitled to an injunction covering all such libraries.

When asked how many customers OCLC loses in the normal course, neither of its witnesses could even hazard a guess -- even though OCLC tracks and documents why customer leave. Sauer-Games admitted there is a business reason to investigate the reasons why a customer leaves. Dep. Tr. of Mary Sauer-Games at 135:15-25. The reason OCLC could not even hazard such a guess, despite having an established practice of investigating the reasons customers leave and

---

[19] None of the 30 allegedly lost customer have collectionHQ agreements or third party agreements, they are described as BTCat customers.

entering the information on Saled Force is obvious – the number of customers leaving for other reasons likely dwarfs the 26 "lost" customers attributed to B&T. If OCLC admitted the number of customers lost for other reasons, it knows there is no way a court could conclude 26 lost customers out of 13,000 over 5 years is trivial and does not warrant injunctive relief. There is no conceivable basis on which this Court could conclude that the alleged loss of customers has any material or even noticeable impact on OCLC operations, let alone any impact on its long-term viability.[20]

OCLC's position is not supported by case law. "[N]obody has a legally protectable relationship with every potential participant in their local market." *Emanuel's LLC v. Restore Marietta, Inc.*, 2023-Ohio-147, ¶ 23 206 N.E.3d 116, 126 (Ohio Ct. App. 4th Dist.) (quoting *McCreight v. AuburnBank*, 611 F.Supp.3d 1336, 1342–44 (M.D. Ala. 2020)).

Irreparable harm cannot be established when money damages are a sufficient remedy. OCLC claims, at most, to have lost 26 customers, for unspecified reasons. And because the Defendants have not used §4.5 in two years, there is nothing to enjoin.

### 2.  Diminishment of WorldCat Is Not Irreparable Harm

OCLC characterized the diminishment of WorldCat value as a threat that will "cripple OCLC's ability to provide its other products and services." Compl. ¶128

The claim is that B&T's use of records OCLC claims the right to restrict "diminishes" the value of WorldCat, even though not a single record is removed form WorldCat as a result of the conduct they challenge. Given that the conduct is alleged to have begun in 2022, OCLC's numbers refute that claim. Net revenue continues to grow, OCLC assets continue to grow, and the losses

---

[20] The List of Lost Customers establishes that each customer has a specific subscription fee paid, which means that the value of lost customers, even connected to some wrongful conduct by Baker & Taylor, would be calculable and compensable by money damages. See *Bertec Corp. v. Sparta Software Corp.*, 2019 WL 7249259, at *6-7 (S.D. Ohio Dec. 27, 2019) (plaintiff failed to show irreparable injury where loss of market share was measurable and compensable).

they claim (for which causation is vigorously disputed) are barely a rounding error on OCLC"s financial reports. Mr. Rozek confirmed that OCLC's net revenue for FY 2025 was approximately ████, which means that the cumulative alleged losses over the past four years are ████ Since BTCat was rolled out in 2022, OCLC's net revenue has managed to grow every year, from ████ in 2022 to ████ in 2025. Dep. Tr. of William Rosak at 173:2. Also, as a non-profit entity, OCLC's tax returns are publicly available.

The cases OCLC cites do not support its argument because OCLC has not shown it is likely to suffer the type of injury that was found to be irreparable in the cases it cites. In *Cavalier Distrib. Co. v. Lime Ventures*, 2023 WL 9052002, at *4 (6th Cir. Dc. 28, 2023), the plaintiff, a beer distributor *demonstrated* the loss of goodwill by showing that, after 15 years of an exclusive distributorship, a new importer refused to continue to supply product to plaintiff and started supplying the product to the plaintiff's competitors. Here, OCLC has not demonstrated any loss of goodwill. Notably, in *Cavalier Distrib. Co.*, the court *denied* preliminary injunctive relief because plaintiff sought to prohibit the importer from selling to other distributors, and the harm to defendant and its other distributors outweighed any harm to plaintiff. Likewise, *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503 (6th Cir. 2022), involved claims of copyright infringement against plaintiff's competitor in the academic testing industry. The district court found that defendant had copied plaintiff's testing materials, and "used the infringing materials to bid on contracts with consumers and compete" with plaintiff. There is no claim of copyright infringement or misappropriation in this case of the sort that was shown in *Act, Inc.,* and OCLC has in fact disclaimed any copyright or proprietary interest in the so-called WorldCat Records.

### 3. An Injunction as to the Transfer of collectionHQ Records into BTCat is Moot

Finally, in terms of avoiding potentially irreparable harm, it is notable that the transfer of

records from collectionHQ to BTCat was halted by B&T in October 2023, for technical reasons. Johnson explained that for technical reasons, ███████████████████████████████ ████████████████████████████. They were not deleted because B&T believed and continues to believe that it is entitled to use those records in the community pool, but the status quo has been that no collectionHQ records have been added to BTCat community pool since October 2023. Dep. Tr. of Daniel Johnson at, 179:12-23, 181:9. Given that the decision was a year and a half before OCLC sent its cease-and-desist letter, the decision obviously has no relationship to the validity or merit of OCLC's claims.

Further, in February 2025 when Bridgeall heard about OCLC's objections to the transfer of records to BTCat, Bridgeall made an independent decision to pause any such transfers to B&T at all, as Legowski explained. Dep. Tr. of Steve Legowski at, 66-67. Those records remain in the collectionHQ database (now held by collectionHQ, Ltd,), ██████████████████████████ ███████████████████████████████████████████████. Again, B&T believes it is entitled to add those records to BTCat. Legowski also testified that since the acquisition of the collectionHQ assets by Valsoft, ███████████████████████████ ███████████████████████. Dep. Tr. of Steven Legowski at 66-67. █████████████ ███████████████████████████████████████████████ ██████████████████████████████████████. Each of these three developments means that there is no irreparable harm to be enjoined.

A defendant's voluntary cessation of conduct can moot a request for injunctive relief "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Cannon Grp., Inc. v. New York Packaging II, LLC*,

No. 2:16-CV-515, 2018 WL 11374036, at *1 (S.D. Ohio Sept. 30, 2018) (quoting *Mann v. Wilkinson*, No. C2-00-706, 2008 WL 4332520, at *5 (S.D. Ohio September 17, 2008); *see D.P. Dough Franchising, LLC v. Southworth*, No. 2:15-CV-2635, 2017 WL 4315013, at *15 (S.D. Ohio Sept. 26, 2017) (holding that plaintiff failed to show irreparable harm where defendants were no longer using plaintiff's menu in alleged violation of a franchise agreement).

### D. A PRELIMINARY INJUNCTION WOULD CAUSE SUBSTANTIAL HARM TO B&T AND OTHERS

As part of the required showing for issuance of a preliminary injunction, OCLC must demonstrate that the injunction does not cause harm to Baker and Taylor or others. *Overstreet*, 305 F.3d at 573. In this case, the proposed injunction would cause harm not only to B&T, but would also harm libraries and all those who use library services. Even though two of the aspects of OCLC's requested injunction are moot, the requested restrictions on the use of any record containing an OCLC identifier would effectively shut down B&T. It is common knowledge in the library industry that in the life of a MARC record it passes through many hands, all of which leave marks on it. Dep. Tr. of Travis Kelley at 171:12-173:17.

Kelley explained the impact that any restriction on the use of BTCat, 

. . ." *** ". . .without BTCat,

" Dep. Tr. of Travis Kelley at 219:9-16. In contrast, there is no harm to Bridgeall, because it no longer operates collectionHQ.

The requested injunction, if granted, will also harm libraries and all those who use library services because they will be deprived of access to BTCat, and will be effectively forced to purchase services from OCLC, even if they would prefer not to. *See Cavalier Distrib. Co. v. Lime Ventures*, 2023 WL 9052002, at *4 (preliminary injunction denied where harm to plaintiff-

distributor was outweighed by harm to other distributors and the Ohio consumers who would be deprived of the product altogether).

### E.    THE PUBLIC INTEREST IS NOT SERVED BY GRANTING A PRELIMINARY INJUNCTION

Finally, OCLC cannot establish that the injunction it seeks is in the public interest. *Overstreet*, 305 F.3d at 573. First, because OCLC cannot show a likelihood of success on the merits of its claims, a preliminary injunction limiting access to cataloging records used in public and academic libraries would not be in the public interest. *FirstPower Grp. LLC v. WD-40 Co.*, No. 5:17-CV-392, 2017 WL 3034499, at *14 (N.D. Ohio July 18, 2017). Second, as discussed above, the requested injunction serves only to enhance and protect OCLC's monopoly based on its overly broad and legally unfounded claim to a protectible business interest in essentially every single library in the world, based on its equally unfounded claim to control the public's access to records that it admits it does not own. As such, the requested injunction hurts consumers and is not in the public interest. *Cavalier Distrib. Co. v. Lime Ventures*, 2023 WL 9052002, at *4.

### F.    IF AN INJUNCTION IS GRANTED, OCLC SHOULD BE REQUIRED TO POST A BOND

Rule 65(c) of the Federal Rules of Civil Procedure provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538-39 (6th Cir. 1978) (noting the bond requirement is discretionary, but the district court must expressly consider the issue). Although no preliminary injunction is justified in this case, if the Court is inclined to order any such injunction, the Court should require OCLC to post a bond in an amount sufficient to protect B&T in the event the injunction was improvidently granted, and B&T should be permitted to request a specific amount

based on the scope and nature of injunction ordered by the Court.

## IV. <u>CONCLUSION</u>

For these reasons, Defendants respectfully request that this Court deny Plaintiff's Motion in its entirety. If this Court is inclined to order any preliminary injunction relief, it must be extremely narrow, and the Court should set a bond in an amount sufficient to protect Baker & Taylor.

Respectfully submitted,

<u>/s/ Derek P. Hartman</u>
Derek P. Hartman (0087869), Trial Attorney
Michael C. Cohan (0013542)
Jose Mendez Valdez (0105056)

CAVITCH FAMILO & DURKIN CO., L.P.A.
1300 East Ninth Street, Twentieth Floor
Cleveland, Ohio 44114
Telephone:     (216) 621-7860
Facsimile:     (216) 621-3415
Email:          mcohan@cavitch.com
                    dhartman@cavitch.com
         jvaldez@cavitch.com
*Attorneys for Defendant Baker & Taylor, LLC and Bridgeall Libraries, Ltd.*

<u>/s/ Frank E. Noyes (admitted pro hac vice)</u>
Frank E. Noyes, II (PA Bar No. 48366)
OFFIT KURMAN, P.A.
222 Delaware Avenue, Suite 1105
Wilmington, Delaware 19801
Telephone:     302-351-0900
Facsimile:     302-351-0915
Email:          fnoyes@offitkurman.com

*Attorneys for Defendant Baker & Taylor, LLC and Bridgeall Libraries, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

On August 30, 2025 at 3:00 a.m., this document was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties.

<u>/s/ Derek P. Hartman</u>
Derek P. Hartman (0087869), Trial Attorney
*One of the Attorneys for Defendant Baker & Taylor, LLC and Bridgeall Libraries Ltd.*