# EXHIBIT B

*OCLC, Inc. v. Baker & Taylor, LLC*, No. 2:25-cv-309

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3              ~~~~~~~~~~~~~~~~~~~~~
 4   OCLC, INC.
 5              Plaintiff,
 6
 7       vs.            Case No.  2:25-cv-0039
 8
 9   BAKER & TAYLOR, LLC; BRIDGEALL LIBRARIES, LTD.,
10              Defendants.
11
12              ~~~~~~~~~~~~~~~~~~~~~
13              (ATTORNEYS' EYES ONLY
14          PURSUANT TO PROTECTIVE ORDER)
15              ~~~~~~~~~~~~~~~~~~~~~
16
17            30(b)(6) Deposition of:
18             DANIEL R. JOHNSON
19
             August 15, 2025
20              11:04 a.m.
21               Taken at:
                Offit Kurman
22      227 West Trade Street, Suite 2600
              Charlotte, North Carolina
23
24          Joyce Lynn Shannon, RPR
25
```

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 2

1 APPEARANCES:
2
3  On behalf of the Plaintiff:
4   Squire Patton Boggs (US), LLP, by
5   JEFFREY M. WALKER, ESQ.
6   KATHRYN M. BROWN, ESQ.
7   2000 Huntington Center
8   41 South High Street
9   Columbus, Ohio  43215
10   (614) 365-2700
11   jeffrey.walker@squirepb.com
12   kathryn.brown@squirepb.com
13
14  On behalf of the Defendant:
15   Offit Kurman, by
16   FRANK NOYES, II, ESQ.
17   222 Delaware Avenue, Suite 1105
18   Wilmington, Delaware  19801
19   (267) 338-1381
20   fnoyes@offitkurman.com
21        AND
22
23
24
25

Page 3

1 APPEARANCES, Continued:
2
3  Cavitch, Familo & Durkin, by
4   DEREK P. HARTMAN, ESQ.
5   1300 E. 9th Street, 20th Floor
6   Cleveland, Ohio  44114
7   (216) 621-7860
8   dhartman@cavitch.com
9
10        ~ ~ ~ ~ ~
11
12 ALSO PRESENT:
13   Julie Presas
14
15        ~ ~ ~ ~ ~
16
17
18
19
20
21
22
23
24
25

Page 4

1        TRANSCRIPT INDEX
2
3 APPEARANCES................................  2
4
5 INDEX OF EXHIBITS ........................  5
6
7 EXAMINATION OF DANIEL R. JOHNSON
8 By Mr. Walker..............................  8
9
10 REPORTER'S CERTIFICATE...................  214
11
12 EXHIBIT CUSTODY:
13 EXHIBITS RETAINED BY COURT REPORTER
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        INDEX OF EXHIBITS
2 NUMBER    DESCRIPTION        MARKED
3 Exhibit 3  Complaint for Injunctive .....  45
     Relief and Damages
4
   Exhibit 9  September, 2022 E-mail Chain  125
5    Between Travis Kelley and
6    ████████████
   Exhibit 14  08-30-2023 E-mail Chain      181
7    Between Susan Love,
     Support@collectionhq.com and
8    Others
9 Exhibit 40  Notice of Deposition.........  37
10
   Exhibit 45  Follow-up Questions          199
11   Regarding OCLC Injunction
     and Litigation
12
   Exhibit 47  WinWire B&T Executive Review  65
13
14 Exhibit 63  Motion for Preliminary       207
     Injunction Re:  OCLC versus
15   Baker & Taylor, LLC, and
     Bridgeall Libraries, Ltd.
16
   Exhibit 64  LinkedIn Profile of Daniel ...  11
17   R. Johnson
18 Exhibit 65  Notice of Deposition         38
19
20 Exhibit 67  04-08-2019 E-mail Chain......  118
     Between Dan Johnson, James
21   Smith, Scott Schuster and
     Scott Crawford Re:  BTCAT
22   Subscription Models
23 Exhibit 68  09-09-2024 E-mail from ████ . 134
     ████ to Travis Kelley
24
25

2 (Pages 2 - 5)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 6

1  Exhibit   February and March, 2025 ..... 139
       69      E-mail Chain Between Dan
2              Fish, Steven Legowski, Brad
               Lucas and Others
3
4
5  Exhibit   WorldCat Data and Licensing .. 144
       70      Agreement with Baker &
6              Taylor, LLC
7
8
9  Exhibit 71   Request from OCLC Regarding .. 150
               Number of Documents
10             Extracted, With Attached
               Responses and Report
11
       Exhibit 72  Total Downloads from OCLC by . 158
12             BTCat Via 2019 License
13 Exhibit 73  02-12-2025 and 02-14-2025 .... 166
               E-mail Chain Between Travis
14             Kelley and BTCat Onboarding
15 Exhibit 74  06-01-2020 and 06-04-2020 .... 171
               E-mail Chain Between Scott
16             Schuster, Amandeep Kochar,
               Dan Johnson and Others
17
       Exhibit 75  List Regarding Customers of .. 175
18             collectionHQ
19 Exhibit 76  06-03-2025 E-mail from ....... 183
               Noreply@collectionhq.com to
20             Ollie Downs
21 Exhibit 77  May, 2021 E-mail Chain ....... 186
               Between James Smith, Trisha
22             Vreeman, Whitney Bretzman
               and Others
23
       Exhibit 78  05-10-2023 Teams Meeting ..... 191
24             Invitation List
25

Page 7

1  Exhibit 79  01-17-2021 and 01-18-2021 .... 193
               E-mail Chain Between Eric
2              Throndson, Mark Kendall,
               Kathryn Harnish, Whitney
3              Bretzman and Others
4  Exhibit 80  11-26-2024 Microsoft Copilot . 196
               Search by Dan Johnson
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1      DANIEL R. JOHNSON, of lawful age, called
2  for examination, as provided by the Federal
3  Rules of Civil Procedure, being by me first
4  duly sworn, as hereinafter certified, deposed
5  and said as follows:
6      EXAMINATION OF DANIEL R. JOHNSON
7  BY MR. WALKER:
8      Q.   So I'm Jeff Walker.  And I'm here
9  today representing OCLC, Inc.
10         Could you please state your full
11 name for the record?
12     A.   Daniel Roy Johnson.
13     Q.   And do you understand that you're
14 under oath?
15     A.   Yes.
16     Q.   And do you understand that the oath
17 has the same meaning and effect here as it
18 would if you were testifying in Court?
19     A.   Yes.
20     Q.   Okay.  Is there anything that might
21 affect your ability to answer the questions
22 we'll be asking you today?
23     A.   No.
24     Q.   Okay.  So no medical conditions
25 that might prevent you from answering?

Page 9

1      A.   No.
2      Q.   No medications or other substances?
3      A.   No.
4      Q.   What is your current address?
5      A.   ████████████████████████████
6  ████████████
7      Q.   And what is your date of birth?
8      A.   ████████████
9      Q.   So I'm sure Counsel has spoken with
10 you a little bit about this, but I wanted to
11 lay out some ground rules to help this go as
12 smoothly as possible.
13         So the Court Reporter, sitting next
14 to both of us, is taking down everything that
15 you say, so when you provide a response, you
16 must respond to my question audibly and with
17 words.  So when you shake your head, she won't
18 capture that, or say huh-uh, it's not clear.
19     A.   Okay.
20     Q.   And then please wait for me to
21 finish asking you a question, and then I will
22 do the same when you're providing a response.
23     A.   Okay.
24     Q.   If you don't hear or don't
25 understand a question, let me know, and I'll

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 54

1   A.   We treat records differently, and
2  so yes, I understand it's more.
3   Q.   And what do you mean you treat
4  records differently?
5   A.   We sometimes roll up a single
6  record into a best record, as opposed to
7  leaving all this -- all the children records
8  there, using some intelligence strategies.  And
9  so we have intentionally created a repository
10 of fewer records than WorldCat.
11  Q.   Okay.  And so you merge -- do you
12 merge like MARC fields into one record?
13      Is that what you do?
14  A.   Yeah.
15  Q.   And so do you keep those other
16 versions somewhere else?
17  A.   We do.  In a history.  But just in
18 a history.
19  Q.   Okay.  And so --
20  A.   And --
21  Q.   Go ahead.
22  A.   Let me just say one other
23 difference is I believe WorldCat -- WorldCat
24 transacts in a number of languages for records
25 that Baker & Taylor does not deal in, which

Page 55

1  results in a larger set of materials, also.
2   Q.   Okay.  So when you say that you --
3  is it fair to say that while WorldCat has lots
4  of different iterations of records, you merge
5  those all together into one record?
6   A.   Yes.
7      MR. NOYSE: Objection to the form.
8   Q.   So the number of records may not
9  always be the best comparator?
10  A.   That's right.
11  Q.   How can you tell something is a
12 WorldCat record?
13      MR. NOYSE: Objection to the form.
14  A.   I don't know the definition of a
15 WorldCat record.  There is no stated definition
16 in the MARC structure to say, "This is a
17 WorldCat record."  A MARC record can have an
18 OCLC identifier associated with it, where they
19 have added or replaced the identifier sometimes
20 of the originating party, and possibly that is
21 the description of a WorldCat record.  But I
22 don't understand a record being referred to as
23 a WorldCat record.  It makes no sense that a
24 record could be a WorldCat record.
25  Q.   For Baker & Taylor, do you have

Page 56

1  BTCat records?
2   A.   We have records that Baker & Taylor
3  is the originating creator of that record.  We
4  have records where we have upgraded the content
5  of the record.  We have records where we
6  have -- where we have done quality control and
7  authority work on that record.  But the only
8  identifier of a possible BTCat record is that
9  it's significant in a BTCat repository.  There
10 is no other -- the record, itself, is not a
11 BTCat record.
12  Q.   Okay.  So each of those categories
13 of records you would not consider a BTCat record?
14  A.   No.
15  Q.   Okay.  Do you agree with me on that
16 or no?
17  A.   I do agree with you on that.
18  Q.   Okay.  Are you aware that OCLC
19 places restrictions on customers' use of
20 records from WorldCat?
21  A.   I am.
22  Q.   And what do you understand those
23 restrictions to be?
24      MR. NOYSE: Can you identify which
25 topic we're on?

Page 57

1      MR. WALKER:  Baker & Taylor's
2  knowledge and understanding of WorldCat's
3  records and data.
4      MS. BROWN:  That's 5.
5      MR. NOYSE: But you're asking him
6  about restrictions placed on them.
7      MR. WALKER:  On a WorldCat record
8  and data.
9      MR. HARTMAN:  It's contractual.
10     MR. NOYSE:  Maybe you should
11 restate the question, because I thought you
12 were asking about -- you're asking about
13 restrictions placed by Baker & Taylor?
14     MR. HARTMAN:  WorldCat records.
15  Q.   Yeah, so it's your knowledge and
16 understanding of WorldCat records and data.
17 And that includes restrictions on that data.
18     MR. HARTMAN:  I would disagree with
19 that, Jeff.  That's covered under OCLC's
20 Framework Agreement and OCLC's WorldCat Rights
21 and Responsibilities, which he's not.
22     MR. WALKER:  So maybe in this
23 instance, he's testifying from his personal
24 knowledge.
25     MS. BROWN:  He's asking for his

15 (Pages 54 - 57)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Page 66

1 our -- it was created by our third-party
2 development firm, WinWire, to Baker & Taylor to
3 give an executive overview of the projects that
4 they are working -- were working on for us at
5 the time.
6 Q. And was one of those projects BTCat?
7 A. Yes.
8 Q. And when you say during the time,
9 it says down there "3/23/2020," so this is
10 March of 2020?
11 A. That's right.
12 Q. And during this time were you
13 overseeing the development of BTCat?
14 A. Yes.
15 Q. Okay. And did you work directly
16 with WinWire on that development?
17 A. Yes.
18 Q. Okay. And also at this time
19 Baker & Taylor was a division of Follett; is
20 that right?
21 A. I believe so.
22 Q. Okay. If you want to move to -- it
23 would be the slide that is titled "BT Cat -
24 Planned Release Plan"; do you see that?
25 A. Yes.

Page 67

1 Q. On the left it has Release 1
2 through 6, and then down the middle, the
3 Release Scope, and then the Release Dates. And
4 the first release says "[redacted]"
5 [redacted] Did you understand what that
6 release -- I guess, at this time had that
7 already been released?
8 Do you know?
9 A. I don't believe so. Oh, yes, yes,
10 it would have been released, yes.
11 Q. So what is that referring to when
12 it says "[redacted]"?
13 A. [redacted]
23 Q. Okay. And do you understand that
24 that release internally was in January, 2020?
25 A. Yes.

Page 68

1 Q. [redacted]
11 Q. And [redacted] was what you were using
12 before?
13 A. [redacted]

Page 69

1 [redacted]?
2 A. [redacted]
3 Q. Okay. And then do you see [redacted]
4 [redacted] is Release No. 2?
5 A. Yes.
6 Q. And is it your understanding that
7 was released around February of 2020?
8 A. The initial release was done around
9 February, 2020. However, i[redacted]
15 ended up with an extension of the [redacted]
16 We had to extend our license there because
17 these dates were not achieved fully here.
18 Q. Understood. Like what anyone would
19 have, we all have experiences with contractors
20 where they don't meet their deadlines.
21 A. Yeah.
22 Q. Okay. So what is the difference
23 between internal cataloguing and internal copy
24 cataloguing?
25 A. Copy cataloging refers to the

18 (Pages 66 - 69)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Page 70

1 adding customer line item data. So internal
2 cataloging would be cataloging of the book.
3 Copy cataloging is adding the member and branch
4 information associated with the copies of the
5 book.
6    Q.   Okay. So would that be like holdings?
7    A.   Yes.
8    Q.   And then other MARC fields that
9 they use?
10    A.   Yes.
11    Q.   And internal cataloging, you
12 essentially look at the book and identify
13 what's on the book and do that initial step?
14    A.   That's right.
15    Q.   Okay. So it sounds like the CARL
16 system shutdown did not occur in March.
17    A.   That's correct.
18    Q.   Do you remember when it did occur?
19    A.   We ended up getting a six-month
20 extension, but I don't remember exactly when it
21 ended. But this also -- they were saying, when
22 they presented the functionality, to do this.
23 But I know one of the topics we will be getting
24 into is the implementation. We had 400-plus
25 customers, large library systems, that we had

Page 71

1 to migrate over to this, and the
2 implementation -- it wasn't a big bang.
3    Q.   So what you're saying is, this was
4 being developed, but you weren't rolling it out
5 to be using with all of your catalog customers?
6    A.   That's correct.
7    Q.   This Release 3, this ▮▮▮▮▮
▮▮▮▮ how is that different
9 than the other two we've already discussed?
10    A.   This functionality, for the next
11 five years, we've continued to invest in the
12 BTCat platform to make it better, make the
13 workflow more efficient, and this -- these were
14 some initial refinements that were deemed
15 mission critical for the retirement of the CARL
16 system.
17    Q.   And these were focused on internal
18 cataloging efforts?
19    A.   Yes.
20    Q.   Okay.
21    A.   No, no. These were both.
22    Q.   Okay.
23    A.   Both internal cataloging and
24 internal copy cataloging requirements.
25    Q.   Understood. And then ▮▮▮▮▮

Page 72

24    I don't want to misstate your
25 testimony.

Page 73

19 (Pages 70 - 73)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



**Page 78**

1  in that. I can hand it to him if you'd like me
2  to.
3       MR. NOYSE: I guess I just want to
4  make clear that this Exhibit is a copy of this
5  PowerPoint without certain parts included.
6       MR. WALKER: Yeah, so it was
7  produced in native -- or .pdf, so we didn't
8  actually realize until this week that it had
9  notes.
10      MR. NOYSE: Okay. Just so we're
11  clear on what this is.
12      MR. WALKER: Of course. Thank you
13  for the clarification.
14      Q.

**Page 79**

1
2      Q.   So what are macros?
3      A.   A macro is a -- what's the --
6      Q.   So is it like an algorithm?
7      A.   I wouldn't call it an algorithm.
8  It's a program.
9      Q.   Okay. And you code that program,
10  and it can modify the record in some way?
11      A.   That's right.
12      Q.   Okay. Then the second bullet says
13  "
15      Do you understand what that means?
16      A.   Part of the -- yes.
17      Q.   Okay. What does that mean?
18      A.

**Page 80**

1
8      Q.   So this is what your Counsel was
9  referring to earlier, that some of these have
10  notes at the bottom that we discovered in the
11  native file. And this is the note version of
12  this page we were just reviewing. (Indicating)
13      A.   Yeah.
14      Q.   If you look down at the notes, it
15  says "
17      Do you see that?
18      A.   Where is that under?
19      Q.   The notes.
20      A.   Oh, the bullet header. Yes.
21      Q.   And then the second bullet is
22  "
                "
24      A.   Yes.
25      Q.   What do you understand that to

**Page 81**

1  mean?
2      A.

Veritext Legal Solutions
www.veritext.com                                   888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Page 82

3    Q.   Okay.  If you go back to the
4  original Exhibit, 47, and turn to the next page.
5    A.   This is 47?  (Indicating)
6    Q.   Yes.
7       The next page, it's talking
8  about --

www.veritext.com                    Veritext Legal Solutions                    888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



**Page 76**

1  ███████ and ███████ were very vocal
2  in those, too.
3      Q.   And they provided a lot of feedback
4  for the development?
5      A.   Yes.
6      Q.   Is that true of the whole
7  development process?
8      A.   ███████ was more, you go to them,
9  you ask them to evaluate, they would take a
10  look at it and say, "Here is what we would do."
11  ███████ was more continual
12  through the development, through the later
13  stages of the development process.
14      Q.   Okay.  So ███████ would look --
15      A.   Periodically.  Sorry.
16      Q.   So ███████ would periodically
17  review different updates you had made to it and
18  provide feedback?
19          And would you sometimes make
20  changes based on their feedback?
21      A.   Yes to those.  It's a compound
22  question, but yes to those three things.
23      Q.   All three?
24      A.   All three, yes.
25      Q.   And ███████ was more involved?

**Page 75**

1      A.   ███████
2      Q.   ███████
3  ███████
4          MR. NOYSE:  Objection to the form
5  of that, too.
6      A.   Yes. ███████
7  ███████
8  But the real work began out of -- that was a
9  critical need.
10      Q.   Do you know w███████
11  █ ███████
12      A.  ███████
13  ███████ --
14      Q.   Okay.
15      A.   -- know.
16      Q.   No one ever told you?
17      A.   No.  There was a -- I am aware
18  that -- ███████
19  ███████
20      Q.   And what are those libraries?
21          THE WITNESS:  Am I okay to share
22  those?
23      Q.   Yeah.  You're here to answer
24  questions unless he instructs you not to.
25      A.   I know we took -- ███████

**Page 77**

1      A.   ███████ had -- yes.
2      Q.   Are there any other libraries that
3  were being involved at this stage?
4      A.   ███████, also.
5      Q.   And was their involvement more
6  similar to ███████ or ███████?
7      A.   More similar to ███████
8      Q.   So they would evaluate different
9  features that you had added or different
10  releases, and provide some feedback?
11      A.   Yes.
12      Q.   Okay.  Let's go ahead and turn to
13  the next page.  It reads at the top "███████
14  ███████."
15      A.   Uh-huh.
16      Q.   Okay.
17          MR. NOYSE:  Can I just ask a question?
18          This was produced in native format?
19          MR. WALKER:  It was.
20          MR. NOYSE:  Okay.  We're looking at
21  a copy of this document in native format that
22  has additional notes.
23          MR. WALKER:  That's right.  That's
24  right.  We do have one note that -- we did
25  print out a version with one note, but it's not

20 (Pages 74 - 77)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Veritext Legal Solutions

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Page 106

1 [redacted]

24     Q.   Okay. Who would know that?
25     A.   Trisha Vreeman, the head of

Page 107

1 cataloging.
2     MR. WALKER: We've been going for a
3 little while.
4     Do you need a break?
5     MR. NOYES: We probably should take
6 one.
7     THE WITNESS: Maybe a short one.
8     MR. WALKER: That works.
9     Maybe a five-minute break?
10     THE WITNESS: Yeah.
11     (Recess taken.)
12     - - -
13     Q.   Are you familiar with the Early
14 Adopter Program?
15     A.   Yes.
16     Q.   Okay. What is the Early Adopter
17 Program?
18     A.   That's with BTCat, right?
19     Q.   Correct.
20     A.   We gave some incentives for special
21 input into the design process for customers who
22 might be early adopters of the product.
23     Q.   Okay. And that was before the
24 public release?
25     A.   No. It would have been after the

Page 108

1 public release.
2     Q.   Okay. And those early adopters,
3 did they provide records as part of that program?
4     A.   Not that I'm aware of.
5     Q.   Okay. So how did they contribute
6 to the development of BTCat?
7     A.   [redacted]

12 refine the product features and functions.
13     Q.   Okay. And so was there feedback
14 recorded in documents?
15     A.   There were some documents that
16 contained their feedback, yes.
17     Q.   Do you know if there were any video
18 recordings of sessions with the early adopters?
19     A.   I don't believe -- now we use Teams
20 and Condense, but I don't believe we had that
21 at the point of early adoption there, so I
22 don't think there were any video recordings.
23     Q.   And were these all libraries that
24 participated?
25     A.   Yes. Yes.

Page 109

1     Q.   And was it the same thing --
2     A.   I think so. It seems like we
3 had one ex-librarian maybe, who is now a
4 consultant, but for the most part it was
5 libraries.
6     Q.   And who was that person?
7     A.   I think we actually had an
8 ex-employee from [redacted]
9 who left at the point of early adoption. But
10 for all intents and purposes, member of a library.
11     Q.   And is it the same thing as the
12 free trials that were provided?
13     A.   I don't -- not the same thing, no.
14     Q.   Okay.
15     A.   Now, a free trial might have been
16 provided as part of the early adoption, but
17 it's not the same thing.
18     Q.   So we have the public launch in
19 March of 2022; is that right?
20     A.   You know, I don't know the exact
21 date of when they signed up their first customer.
22     Q.   So we have the ALA conference in
23 March of 2022.
24     A.   This is '20.
25     Q.   Sorry. I'm jumping ahead. I'm

28 (Pages 106 - 109)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Page 110

1 trying to make the process move more quickly.
2    A.    Yeah, yeah.
3    Q.    So let's jump ahead to March, 2022.
4    A.    Okay.
5    Q.    There's an ALA conference.  I'll
6 represent to you that in some of the internal
7 documents it refers to it as the public launch.
8    A.    Okay.
9    Q.    Do you understand that that is when
10 you began marketing it -- around that time is
11 when you began marketing it more broadly to
12 customers?
13    A.    That makes sense, yes.
14    Q.    Was the version of BTCat that was
15 made available at the time of the public launch
16 different from today's BTCat?
17    A.

Page 111

1

Page 113

1
2        MR. NOYSE:  Objection to the form.
3    Q.

21        MR. NOYSE:  Objection to the form.
22    Q.    Sorry.  I can clarify.
23    A.    Yeah.
24    Q.

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Page 122

1 public-facing library, and it downloads the
2 record through Z39.50, what does it do with
3 that download?
4        Sorry.

6    A.

Page 123

1    Q

17    A.   Let me go over one other thing with
18 you, one other base.  The way Z39.50 works is,
19 it gets the first number of X-records, and then
20 you page forward in those results, and it goes
21 with that.  So one search could be multiple
22 searches.  And that was a complexity that we
23 had with that, as well.
24

Page 124

1

Page 125

1        MR. NOYSE:  Let him finish the
2 question.
3    Q

16        MR. NOYSE:  Objection to the form.
17    A.
18
         - - - - -
19
20 (Thereupon, Plaintiff's Exhibit 9,
21 September, 2022 E-mail Chain Between
22 Travis Kelley and ____ ____,
23 was marked for purposes of
24 identification.)
         - - - - -
25    Q.   I'm going to hand you what's been

32 (Pages 122 - 125)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Veritext Legal Solutions

www.veritext.com                                            888-391-3376

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 158

1    MR. WALKER: And we will replace it
2 with this, which we understand is what you
3 provided to us before.
4    MR. NOYSE: Yes.
5    - - - - -
6    (Thereupon, Plaintiff's Exhibit 72,
7    Total Downloads from OCLC by BTCat
8    Via 2019 License, was marked for
9    purposes of identification.)
10    - - - - -
11    Q.   Mr. Johnson, now that we've cleared
12 that up, have you seen this document before?
13    A.   No.
14    Q.   Okay. If you can turn to the page
15 that starts -- I think it's four pages in, and
16 it has -- starts a list with Record Number,
17 Control Number, Created Date.
18    A.   Yeah.
19    Q.   Do you see that?
20    A.   Uh-huh.
21    Q.   Okay. So I'll represent to you
22 that your Counsel provided this as a list of
23 the total downloads made pursuant to the 2019
24 license.
25    A.   Okay.

Page 159

1    Q.   Okay. And do you understand what
2 the ███████████ is referring to?
3    A.   Yes.
4    Q.   What is that referring to?
5    A.   That's the ███████ in the
6 BTCat repository.
7    Q.   Okay. And is that an identifier
8 that Baker & Taylor assigns to the number --
9    A.   Yes.
10    Q.   -- or to the record?
11    A.   (Witness nodding.)
12    Q.   And is that included in the MARC
13 data -- the MARC fields?
14    Sorry.
15    A.   It's included in the repository
16 record.
17    Q.   Is it -- so --
18    A.   But I don't believe it's in the
19 MARC data.
20    Q.   Okay. And then ███████████, do
21 you know what that's referring to?
22    A.   Yes.
23    Q.   What is that referring to?
24    A.   That is the -- either the -- likely
25 the ███████████████████.

Page 160

1    Q.   Okay. So you think it's the ███████
2    A.   Yes.
3    Q.   And then do you see underneath there
4 a list with "███████ and a bunch of numbers?
5    A.   Uh-huh.
6    Q.   Do you understand what those are?
7    A.   Yes.
8    Q.   What are they?
9    A.   ███████ ████████████████
10    Q.   Okay. A little way down do you see
11 "███"?
12    A.   Yes.
13    Q.   What do you understand that to be?
14    A.   ███████ ██████████████.
15    Q.   Okay. And then do you see down
16 where it says "███"?
17    A.   Uh-huh.
18    Q.   What is that?
19    A.   I'm not clear, but -- I don't know.
20    Q.   Okay. And "███" is another ███████
21 ███████?
22    A.   Yes.
23    Q.   Okay. Do you know why the ███
24 identifier would be on a record that you are
25 identifying here as a record that was

Page 161

1 downloaded pursuant to the license?
2    A.   I do not.
3    Q.   Okay. Do you know why a CLS number
4 would be?
5    A.   I do not.
6    Q.   Okay. Do you see the count of
7 total records?
8    A.   Yes.
9    Q.   Okay. So according to this report,
10 you understand that there were ███████ records
11 downloaded pursuant to the license?
12    A.   Yes.
13    Q.   Is that how many records were
14 downloaded pursuant to the license?
15    A.   Yes.
16    Q.   And did these records get added to
17 BTCat?
18    A.   Yes.
19    Q.   And are they stored in one of the
20 repositories for BTCat?
21    A.   Yes.
22    Q.   Which repositories?
23    A.   They could be -- records could be
24 stored in all repositories potentially.
25    Q.   So records can move all around in

41 (Pages 158 - 161)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 162

1  different repositories?
2     A.  Not move around.  But different
3  repositories can utilize the records for
4  different purposes, but it's the same record.
5     Q.  Okay.  And so OCLC records might be
6  in one repository or another repository just
7  depending on how you're using it?
8        MR. NOYSE:  Objection to the form.
9     A.  Yes.
10    Q.  Do you know specifically where
11  these records are stored?
12    A.  I believe they pulled this extract
13  and then they de-duped across the repositories
14  to get all records from -- for these --
15    Q.  Okay.  So copies of -- sorry.  I
16  interrupted.
17    A.  -- yeah -- so that our single
18  record could have been in multiple
19  repositories, and I believe they de-duped this
20  to get to a single entry for each.
21    Q.  Okay.  So is it your understanding,
22  then, that -- you saw the report certified on
23  July 28 of 2021.
24    A.  Which was pulled out.
25    Q.  No.  This is the one from the

Page 163

1  time -- July of 2021, the letter.  It's
2  Exhibit --
3     A.  Right.  That's on 74 right there.
4  That's the first --
5        MR. NOYSE:  71.
6     Q.  71.
7     A.  It was on --
8     Q.  It's this one right here.  Right
9  here, this one.  (Indicating)
10    A.  Oh.
11    Q.  Exhibit 71.
12        And you understand that this one
13  reported that there were [redacted] records?
14        MR. HARTMAN:  This one?
15    Q.  This report from July 30, 2021.
16    A.  Do we know that that's the count in
17  the backup?
18        MR. NOYSE:  I guess I object to the
19  form of the question in terms of you directed
20  him to this letter, Exhibit 71.
21        MR. WALKER:  The attachment to the
22  Exhibit.
23        MR. NOYSE:  Okay.
24    Q.  Go ahead and look --
25        MR. NOYSE:  He's directing your

Page 164

1  attention to the attachment to the letter.
2     Q.  If you see, there's a header row at
3  the very beginning.
4     A.  Is this the wrong attachment?
5     Q.  So let me represent to you that
6  there are [redacted] records reported in this
7  July 30, 2021.
8     A.  Okay.
9     Q.  And then in the report that was
10  provided, that was run for purposes of this
11  litigation --
12    A.  Right.
13    Q.  -- it reports that there were
14  [redacted] records.
15    A.  (Witness nodding.)
16    Q.  So is it Baker & Taylor's
17  contention that they did not download any
18  records pursuant to the license between
19  July 12, 2021, and the end of the license term?
20    A.  No.
21    Q.  So there's more records than are
22  reported?
23    A.  There were some issues with the
24  create date.  The create date for a period of
25  time got updated with the update date, and so

Page 165

1  we lost the traceability of the actual date of
2  the download.  As you see, the create dates are
3  beyond July 12, 2021, and into 2022.
4        These were the total records that
5  currently sit in the repository with the
6  indicator that they were downloaded during this
7  license period.  So according to the data, the
8  answer is yes, the [redacted] were the total number
9  of records that were downloaded.  And the data
10  pulled this month -- or in May equates to that
11  number.  So the data is showing that that's the
12  last record that we pulled down.
13        The traceability back to those
14  dates are no longer able to trace back to those.
15    Q.  Because the data was overwritten?
16    A.  Yes.
17    Q.  Okay.
18    A.  So the data makes it -- it looks
19  like -- I said no, but the answer is yes.  The
20  data looks -- it looks like the number is
21  same, that we stopped downloading at that
22  point, but the create date may not reflect that.
23    Q.  Okay.  So as far as you know, this
24  is the total number of records that were
25  downloaded?  (Indicating)

42 (Pages 162 - 165)



ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 178

1  Q.  I'm sorry, ILS system of the library?
2  A.  Oh, yes, they're in the ILS system
3  of the library.
4  Q.  And do they send you a -- how do
5  they transfer them into BTCat?
6  MR. NOYSE:  Objection to the form.
7  A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10  Q.  And then Number of Bibs Added, what
11  does that mean?
12  A.  That's the number of new records
13  created in BTCat Community.
14  Q.  Okay.  And so these for ▮▮▮▮
15  ▮▮▮, this is the number of records that were
16  added for ▮▮▮▮▮▮▮▮ on October 16, 2021?
17  A.  Correct.
18  Q.  And then down at the bottom, the
19  Total, what does that represent?
20  A.  That's just the sum of these number
21  of Bibs added.
22  Q.  To BTCat by these customers?
23  A.  Yes.
24  Q.  Okay.  And then what is this Active
25  Records in BTCat?

Page 179

1  A.  This is the total record account --
2  record count across all repositories, not de-duped.
3  Q.  Not de-duped?
4  A.  That's right.
5  Q.  When it's de-duped, what's the total?
6  A.  I don't know.  I don't know that
7  we've done that.
8  Q.  And so this percentage is what?
9  A.  I think it's just a simple
10  calculation of the total records added, divided
11  by the total records in BTCat.
12  Q.  Okay.  And then this ▮▮▮▮
13  records, where are they currently stored?
14  A.  In the ▮▮▮▮▮▮
15  Q.  And that's the one that customers
16  can upload their records to?
17  A.  Yes.
18  Q.  Do any of these records make it
19  into ▮▮▮▮▮▮▮▮▮▮▮▮
20  A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  Q.  So you have the capability --
25  apologies.

Page 180

1  A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  Q.  Okay.  And I don't recall if we
20  actually -- if I actually asked this question:
21  When did Baker & Taylor decide to incorporate
22  data from CHQ into BTCat?
23  A.  I do not have that date.  I don't
24  know when it started.
25  Q.  Do you know what year?

Page 181

1  A.  Well, silly me.  That was when they
2  decided, but the first file went in on
3  October 16, 2021.  (Indicating)
4  Q.  And I think you testified before
5  that no records have been added through
6  collectionHQ in the last -- is it year?
7  When was the last time a record was
8  added?
9  A.  October 19, 2023.
10  Q.  Okay.  Were you part of the
11  discussions on whether to add collectionHQ
12  records into BTCat?
13  MR. NOYSE:  Objection to the form.
14  Q.  Were there discussions about
15  whether or not to add collectionHQ records into
16  BTCat?
17  A.  There were.  I was primarily
18  involved in the discussions on how, not the
19  discussion to add.
20  - - - - -
21  (Thereupon, Plaintiff's Exhibit 14,
22  08-30-2023 E-mail Chain Between
23  Susan Love, Support@collectionhq.com
24  and Others, which was previously
25  marked, was shown for purposes of

46 (Pages 178 - 181)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER



Page 210

9      MR. NOYES:  Objection to the form
10 of the question.
11      A.
15      MR. WALKER:  I don't think I have
16 any further questions.
17      MR. NOYSE:  Okay.  We don't have
18 any questions, but I do want to make a
19 statement on the record.
20      MR. WALKER:  Okay.
21      MR. NOYSE:  So let me just say what
22 it is.  So this Witness has provided detailed
23 testimony about information that is not nearly
24 highly confidential under the AEO or under the
25 stipulated PO, but includes critically

Page 211

1 important trade secret information of the
2 highest order for Baker & Taylor.
3      Baker & Taylor has allowed this
4 line of questioning because of the stipulated
5 Protective Order, which allows the presence of
6 OCLC in-house Counsel and in-house General
7 Counsel to listen to the information.  Baker &
8 Taylor already had concerns about potential
9 motivations from OCLC arising from the due
10 diligence process for the potential purchase of
11 Bridgeall, which immediately preceded this
12 litigation.
13      So we are simply underscoring that
14 this testimony is of the highest importance in
15 terms of protection.  And we expect that OCLC
16 will take appropriate and verifiable protocols
17 and steps sufficient to make sure that this
18 information is not leaked through this process
19 to other principals at OCLC.
20      MR. WALKER:  Okay.  Anything else?
21      MR. NOYSE:  No.
22      MR. WALKER:  We have a statement,
23 as well.
24      MR. NOYSE:  Okay.
25      MR. WALKER:  So OCLC has been

Page 212

1 prejudiced by Defendants' late and incomplete
2 document productions, which have been missing
3 materially responsive documents.  This has
4 hindered OCLC's ability to review and assess
5 completeness of Defendants' production, and to
6 prepare for this Rule 30(b)(6) deposition that
7 OCLC noticed.
8      Accordingly, OCLC leaves open this
9 deposition and reserves the right to explore
10 the 30(b)(6) topics noticed for today during
11 merits discovery.
12      MR. NOYSE:  And you made that
13 statement after Aman Kochar's testimony.  We
14 will incorporate our response.
15      I will ask one clarification.
16      By saying that the depositions
17 remain open, you are not suggesting that we
18 can't talk to the Witnesses in the normal
19 course of involving and management of
20 litigation as if we were in the middle of a
21 deposition?
22      MR. WALKER:  I think that's fine.
23      MR. NOYSE:  Okay.
24      MR. WALKER:  And that same
25 clarification applies to yesterday.

Page 213

1      Nothing further.  We're off the
2 record.    - - - - -
3
4      (Deposition adjourned at 6:22 p.m.)
5      - - - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

54 (Pages 210 - 213)

ATTORNEYS' EYES ONLY PURSUANT TO PROTECTIVE ORDER

Page 214

1    REPORTER'S CERTIFICATE
2
3  The State of North Carolina,   )
4              SS:
5  County of Lincoln.            )
6
7       I, Joyce L. Shannon, RPR, a Notary
8  Public within and for the State of North
9  Carolina, duly commissioned and qualified, do
10 hereby certify that the within named witness,
11 DANIEL R. JOHNSON, was by me first duly sworn
12 to testify the truth, the whole truth and
13 nothing but the truth in the cause aforesaid;
14 that the testimony then given by the
15 above-referenced witness was by me reduced to
16 stenotypy in the presence of said witness;
17 afterwards transcribed, and that the foregoing
18 is a true and correct transcription of the
19 testimony so given by the above-referenced
20 witness.
21      I do further certify that this
22 deposition was taken at the time and place in
23 the foregoing caption specified.
24
25

Page 215

1       I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5       IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Maiden, North Carolina, on this 20th day of
8  August, 2025.
9
10
11
12
13
14      Joyce L. Shannon, RPR, Notary
15      Public within and for the State of
16      North Carolina
17
18 My commission expires August 18, 2028.
19
20
21
22
23
24
25

Page 216

1              Veritext Legal Solutions
                 1100 Superior Ave
2                  Suite 1820
                Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
     August 20, 2025
5
     To: Mr. Noyse
6
     Case Name: Oclc Inc v. Baker & Taylor LLC Et Al
7
     Veritext Reference Number: 7526707
8
     Witness:  Daniel R. Johnson , 30(b)(6)        Deposition Date:
9    8/15/2025
10
     Dear Sir:
11
12   Enclosed please find a deposition transcript.  Please have the witness
13   review the transcript and note any changes or corrections on the
14   included errata sheet, indicating the page, line number, change, and
15   the reason for the change.  Have the witness' signature notarized and
16   forward the completed page(s) back to us at the Production address
     shown
17
     above, or email to production-midwest@veritext.com.
18
19   If the errata is not returned within thirty days of your receipt of
20   this letter, the reading and signing will be deemed waived.
21
     Sincerely,
22
     Production Department
23
24
25   NO NOTARY REQUIRED IN CA

Page 217

1              DEPOSITION REVIEW
               CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 7526707
3    CASE NAME: Oclc Inc v. Baker & Taylor LLC Et Al
     DATE OF DEPOSITION: 8/15/2025
4    WITNESS' NAME: Daniel R. Johnson , 30(b)(6)
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have made no changes to the testimony
     as transcribed by the court reporter.
8
     _____
9    Date          Daniel R. Johnson , 30(b)(6)
10   Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
          Statement; and
14   Their execution of this Statement is of
          their free act and deed.
15
     I have affixed my name and official seal
16
     this _____ day of _____, 20____.
17
18   _____
     Notary Public
19
     _____
     Commission Expiration Date
20
21
22
23
24
25

55 (Pages 214 - 217)