# EXHIBIT D

*OCLC, Inc. v. Baker & Taylor, LLC*, No. 2:25-cv-309

CONFIDENTIAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF OHIO

 3                       EASTERN DIVISION

 4                           * * *

 5    OCLC, INC.,

 6         Plaintiff,

 7

              vs.                  CASE NO. 2:25-CV-309

 8

 9    BAKER AND TAYLOR, LLC, et al.,

10         Defendants.

11

                                 * * *

12

13

14            * TRANSCRIPT DESIGNATED CONFIDENTIAL *

15

16        Deposition of MARY SAUER-GAMES, a 30(b)(6)

17    representative herein, called by the defendants for

18    examination pursuant to the Rules of Civil Procedure,

19    taken before me, Emma Jane Troyer, a Notary Public

20    within and for the State of Ohio, at the Offices of

21    Squire Patton Boggs, 41 South High Street, Suite 2000,

22    Columbus, Ohio, 43215, on August 11th, 2025, at 10:00

23    a.m.

24                           * * *

25
```

CONFIDENTIAL

Page 2

                         I N D E X

MARY SAUER-GAMES                                        PAGE
      Examination by Mr. Noyes.......................4




                         * * *


                    INDEX OF EXHIBITS
EXHIBIT                 DESCRIPTION              PAGE
Defendant's Exhibit A....Notice of Deposition.......6
Defendant's Exhibit B....Complaint..................36
Defendant's Exhibit C....3/26/25 Declaration........37
Defendant's Exhibit D....Offer For Subscription.....62
Defendant's Exhibit E....Definition of
                         WorldCat in Discovery......77

Defendant's Exhibit F....7/30/25 Declaration........103

Defendant's Exhibit G....2019 Licensing Agreement...108

Defendant's Exhibit H....E-mail Correspondence......110

Defendant's Exhibit I....E-mail Correspondence......128

Defendant's Exhibit J....E-mail Correspondence......133

Defendant's Exhibit K....E-mail Correspondence......142

Defendant's Exhibit L....List of
                         Customers Canceled.........169

                         * * *

CONFIDENTIAL

```
 1    APPEARANCES:
 2
 3            On behalf of the Plaintiffs:
 4
                  Squire Patton Boggs
 5
          By:  Jeffrey Walker
 6             Kathryn Brown
               41 South High Street, Suite 2000
 7             Columbus, Ohio 43215
               Jeffrey.walker@squirepb.com
 8             Kathryn.brown@squirepb.com
 9
10
               On behalf of the Defendants:
11
12                Offit Kurman, P.A.
13          By:  Frank Noyes, II
               222 Delaware Avenue, Suite 1105
14             Wilmington, Delaware 19801
               Fnoyes@offitkurman.com
15
16
                  Cavitch Familo & Durkin
17
          By:  Derek Hartman
18             Jose Mendez-Valdez (by phone)
               Michael Cohan (by phone)
19             1300 East 9th Street, 20th Floor
               Cleveland, Ohio 44114
20             Dhartman@cavitch.com
               Jvaldez@cavitch.com
21             Mcohan@cavitch.com
22
23          Also present:  Julie Presas,
                  General Counsel for OCLC
24
25                     *  *  *
```

CONFIDENTIAL

Page 4

1      MARY SAUER-GAMES,

2  a 30(b)(6) representative herein, having been first duly

3  sworn as hereinafter certified, was examined and deposed

4  as follows:

5      EXAMINATION

6  BY MR. NOYES:

7      Q.  Good morning, ma'am.  Please state your full name

8  on the record?

9      A.  Mary Sauer-Games.

10     Q.  My name is Frank Noyes.  I represent Baker and

11  Taylor, LLC and Bridgeall Libraries, LLC in this

12  lawsuit.  I'm going to be taking your deposition today.

13  I'm going to start with some general instructions, which

14  I will preface with the question, have you given

15  deposition testimony before?

16     A.  No.

17     Q.  Okay.  You may have gone through this with

18  counsel, but I'm going to give you some instructions

19  anyway.  As you know, the court reporter is taking down

20  everything we say, and so just it's a matter of keeping

21  a clean record.  We can't speak at the same time, so I

22  will ask you to wait till I finish my question before

23  you answer, and I will try not to cut you off when

24  you're answering.  Do you understand?

25     A.  Yes.

CONFIDENTIAL

1     A.  Yes.

2     Q.  When OCLC gets records from any source, do they

3 sometimes come in other formats?

4     A.  Yes.

5     Q.  And is -- does OCLC have the ability to change

6 that into the Marc format?

7     A.  Yes.

8     Q.  Okay.  What are the sources from which OCLC

9 obtains records -- and I'm going to refer to just, for

10 the most part, I'm going to refer to the word records,

11 and I'll be referring to primarily the OCLC, but a

12 record will be a record in one of these formats; is that

13 clear?

14     A.  Yes.

15     Q.  Okay.  So what are the sources of records that

16 OCLC gets?

17     A.  There are libraries.  There are publishers.

18 There are cataloguing team.

19     Q.  Cataloguing team, you say?

20     A.  Well, catalogers, OCLC catalogers.

21     Q.  Okay.  What else?

22     A.  National libraries.

23     Q.  Does OCLC get records from vendors?

24     A.  Yes.

25     Q.  Is that the same as OCLC catalogers?

Case 2:25-cv-00009-JES-PPD Doc #: 6-14 *SEALED* 01/09/26 Page 75 of 80 Page PAGE ID # 1096 #: 1096

Page 21

1      A.   No.

2      Q.   Okay.  So you've got libraries, publishers, OCLC

3  catalogers, vendors, and national libraries?

4      A.   Yes.

5      Q.   Okay.  Now, which libraries do you get records

6  from?

7      A.   Our OCLC members.

8      Q.   Are there any OCLC members that are not

9  libraries?

10     A.   You have to be a library to be a member.

11     Q.   Okay.  And what publishers do you get records

12  from?

13     A.   Hundreds of publishers.  So Elsevier, Wiley,

14  many, many more.

15     Q.   Is Baker and Taylor -- does Baker and Taylor have

16  a publishing business?

17     A.   Yes.

18     Q.   Do you get records from the Baker and Taylor

19  publishing business?

20     A.   We have in the past.

21     Q.   Okay.  And -- okay.  So let me start with

22  publishers.  I think you mentioned this in your

23  declaration.  If we need to, we can look there.  How is

24  it that you get records from publishers?

25     A.   The majority of the records that we get from

Page 32

1    that nothing with the file format has changed.

2       Q.  Okay.  So it's not a process that's done manually

3    by a person?

4       A.  Part of it is manual.  Part of it is automated.

5       Q.  Okay.  And you also in that answer said you

6    verify that nothing has changed.  What do you mean by

7    that?

8       A.  Often times publishers' systems will make a

9    change to the software, which changes the format or

10   something about the record, that when we put it through

11   an automated process would invalidate that run, and then

12   we would push the records back out.  It would reject the

13   records.

14      Q.  So that's something that you would do if you

15   already had a record for the same book?

16      A.  No.  This is a file format for the records.

17      Q.  Okay.

18      A.  So the records come to us, every publisher has

19   their own production system, and in those production

20   systems they may make -- their fields don't necessarily

21   align with ours.

22      Q.  Okay.  So in general, this first step is to

23   essentially convert it to Marc format?

24      A.  Or to how we store the data within WorldCat.

25      Q.  Okay.  And that's whether you already have a

Case 2:25-cv-00009-EAS-EPD Doc #: 41-1 SEALED Filed: 01/09/26 Page: 25 of 30 PAGEID #: 1098

Page 33

1   similar record for the book or not?

2       A.   That's regardless.

3       Q.   Okay.  And is that an automatic process?

4       A.   Yes.  It is an automatic process, with the

5   exception if there's something that comes out, it

6   becomes a manual process to investigate why the record

7   failed.

8       Q.   Okay.  So --

9       A.   Or why the file failed.

10      Q.   Okay.  So if it doesn't work automatically, it's

11  flagged and someone looks at it?

12      A.   Yes.

13      Q.   And what about libraries -- is it the same

14  initial step with libraries?

15      A.   Yes.

16      Q.   How about the records that you get from a

17  national library -- same initial step?

18      A.   Yes.

19      Q.   Okay.  So regardless where the record comes, the

20  first step is to check the formatting to make sure it

21  works?

22      A.   Correct.

23      Q.   Okay.  Then what do you do?

24      A.   If the file is accepted, we run it through our

25  automated process to begin to match those items to

CONFIDENTIAL

Page 34

1  WorldCat records.

2  Q. Okay. Which you only need to do if you already

3  have a record for the same book?

4  A. We need to validate that there is not a copy of

5  any record within that -- any record within that file

6  that duplicates something within WorldCat.

7  Q. Well, let me break that down. So each book would

8  have its own record?

9  A. Correct.

10  Q. And it might have more than one version of that

11  record?

12  A. Correct.

13  Q. Okay. And what is the code that you use to say,

14  okay, this record is for this book, and this record is

15  for the exact same book -- is that an ISBN number?

16  A. There's multiple things that we match on to

17  determine if that book is -- if it matches something.

18  ISBN could be one, but there is the editions, formats,

19  many fields.

20  Q. Okay. And isn't it very common that books that

21  get ingested match up to some -- with other records you

22  already have?

23  A. Yes.

24  Q. Okay. So is there an automated process that

25  compares records that seem to be for the same book?

Case 2:25-cv-00009-EAS-EPD Doc #: 64-11 SEALED Filed: 01/09/26 Page: 11 of 30 PAGEID #: 1100

1    Q.  It's 48.

2    A.  So that statistic means that OCLC has either

3    added subject headings, updated subject headings, merged

4    the record with other records where they matched.  It

5    could be adding Dewey classifications, it could be

6    cleansing records.

7    Q.  Okay.  What -- does the statement in paragraph 48

8    mean that there are seven percent of records in OCLC

9    that OCLC does nothing to at all?

10   A.  Outside of adding, like, an OCN number to it.

11   Q.  Okay.  All right.  So that's -- and so are

12   there -- the seven percent that aren't otherwise

13   modified as you just described, they still get the OCN

14   number added to them?

15   A.  Correct.

16   Q.  And are there other OCLC identifiers, I'll call

17   them, in the record?

18   A.  Yes.

19   Q.  Okay.  So the OCN is a number that's assigned to

20   each record?

21   A.  Correct.

22   Q.  And what field does that go in?

23   A.  That goes in the 001.

24   Q.  001.  Okay.  So every single record that is

25   imported into WorldCat gets an OCN number?

CONFIDENTIAL

Page 46

1    A.  Correct.

2    Q.  Whether you do anything else or not?

3    A.  Right.

4    Q.  If you would turn to your declaration,

5    paragraph 8, and this is a statement by you that --

6    regarding the bibliographic data that's in a WorldCat

7    record; do you see that?

8    A.  The bibliographic data?

9    Q.  Yes?

10   A.  Yes.

11   Q.  Okay.  When a record is received by OCLC, are

12   these things that are in there already?

13   A.  In some instances.

14   Q.  And are there occasions where this information is

15   changed?

16   A.  Changed when?

17   Q.  Well, let's just go through it.  It says,

18   including among other things the title.  The title of

19   the book is in there when you get the record?

20   A.  Correct.

21   Q.  The author of the book is in there when you get

22   the record?

23   A.  Yes.

24   Q.  Those two things never change, whatever other

25   modifications are made -- the author is the author,

CONFIDENTIAL

Page 66

1    Q.  Okay.  What about --

2    A.  And can I clarify that?  They own the fields that

3  they created as a part of those original records that

4  they cataloged.

5    Q.  Okay.  Well, the libraries don't necessarily

6  create a lot of records, right, it's the publishers that

7  do that?

8    A.  They create quite a few.

9    Q.  Okay.  So is that the same thing as saying that

10  the records, the data that is in the catalog before they

11  send it to WorldCat, they still own?

12    A.  If none of the records came from WorldCat, yes.

13    Q.  Okay.  And the record, so we're clear on

14  terminology, is the entire set of data for a particular

15  book or movie or whatever, but it's the entire set of

16  data, correct?

17    A.  Yes.

18    Q.  And it's filled with different kinds of data in

19  different fields?

20    A.  Yes.

21    Q.  So as a whole, does the library own the records

22  that are in its catalog?

23        MR. WALKER:  Objection.

24    A.  They own any of the records that have not been

25  contributed to WorldCat.

CONFIDENTIAL

1    Q.  Okay.  And you've already said that WorldCat

2    record means -- correct me if I'm wrong, but I think you

3    said WorldCat record means all the records that are in

4    the WorldCat database?

5              MR. WALKER:  Objection.

6    A.  A WorldCat record is any record that has been

7    contributed by a library or OCLC or a vendor, partner,

8    publisher, that has been enhanced by OCLC.

9    Q.  Okay.  And that includes records where the only

10   thing added is the OCN identifier?

11   A.  That is part of the combination of WorldCat, yes.

12   Q.  So you've already said that every record in the

13   database has at least the identifier?

14   A.  Correct.

15   Q.  So every single record in the OCLC WorldCat

16   database is owned by OCLC?

17   A.  We own the compilation of WorldCat, the entire

18   database.

19   Q.  Okay.  But -- okay.  So the compilation consists

20   of individual records, correct?

21   A.  Correct.

22   Q.  But OCLC does not claim ownership of every single

23   individual record in WorldCat?

24   A.  That is --

25             MR. WALKER:  Objection.

CONFIDENTIAL

Page 109

1    A.   Yes.

2    Q.   Okay.   What was the amount of records that Baker

3  and Taylor was allowed to extract?

4    A.   They were allowed to extract 50,000 records a

5  year for the years 2019, 2020, 2021, and then when they

6  extend the agreement for 2022.

7    Q.   So is that a total of 200,000 records?

8    A.   That's a total of 200,000.   But they also had to,

9  if they did not extract 20,000 -- or, excuse me, 50,000

10  in the first year, they had to give us a list of what

11  they'd extracted in order to extend that.   So we did not

12  receive that.   So if they didn't extract 50,000, it

13  should be some number even less than that.

14    Q.   Okay.   So as you're describing, then, it's 50,000

15  per year, and if they give you a list of what they

16  extracted and there's leftover capacity, it can roll

17  forward?

18    A.   It can roll forward.

19    Q.   Okay.   So -- and did you get a list in July of

20  2021 from Baker and Taylor?

21    A.   Yes.   We received -- yes.   We received a list in

22  2021.

23    Q.   Okay.

24    A.   We did not for the prior years.

25    Q.   Okay.   And is supervision of license agreements

Page 110

1    part of your job duties?

2        A.  No.

3        Q.  Okay.  Now we can go to the next document.  And

4    I'll say while we're pulling this out, there's two

5    versions of this.

6                    MR. HARTMAN:  Do we want to go off the

7    record for a second?

8                    MR. NOYES:  Yeah, okay.  Let's go off the

9    record.

10

11                (Remarks were made off the record.)

12

13   BY MR. NOYES:

14       Q.  Okay.  We're back on the record.

15

16    (Defendant's Exhibit H marked for identification.)

17

18       Q.  Okay.  You've been handed an exhibit marked as

19   Exhibit H?

20       A.  Yes.

21       Q.  And directing your attention to the first three,

22   four pages of this exhibit, first, can you identify on

23   the first page, that's an e-mail, correct, from someone

24   named Brad Murchison?

25       A.  Yes.

CONFIDENTIAL

Page 111

1    Q.  And do you know who that is?

2    A.  No.

3    Q.  Okay.  It's sent to Chip Nilges?

4    A.  Nilges.

5    Q.  And who is he?

6    A.  He was our head of business development.

7    Q.  Okay.  Was he that role in 2021?

8    A.  Yes.

9    Q.  It's also sent to Brianna Elsmore?

10   A.  Yes.

11   Q.  And to an e-mail called legal at OCLC.org.  Do

12   you know who gets those e-mails?

13   A.  The legal department.

14   Q.  Okay.  How many people are in the legal

15   department?

16   A.  Half a dozen.

17   Q.  Okay.  So this is not an e-mail that you

18   received, but it's an e-mail that OCLC received,

19   correct?

20   A.  Right; yes.

21   Q.  And it was received on July 30th, 2021.  And in

22   your declaration, you refer to -- well, strike that.

23   Never mind your declaration.  You're aware that in July

24   of 2021 Baker and Taylor sent you a certification and a

25   list relating to extractions, correct?

CONFIDENTIAL

Page 112

1    A.  Yes.

2    Q.  All right.  And so turning to the third page of

3    this exhibit, this is a letter addressed to OCLC, Inc.?

4    A.  Yes.

5    Q.  Okay.  And is that your headquarters?

6    A.  Yes.

7    Q.  Attention, William Nilges?

8    A.  Yes.

9    Q.  From Brad Murchison, who is identified as the

10   general counsel for Baker and Taylor?

11   A.  Yes.

12   Q.  And in this, he's enclosing a certification

13   relating to the extractions under the license, correct?

14   A.  Yes.

15   Q.  Looking back at the cover e-mail, the first page,

16   backwards, the e-mail has three attachments listed under

17   the attachments line; do you see that?

18   A.  Yes.

19   Q.  Letter, OCLC authorization, and extracted

20   records?

21   A.  Yes.

22   Q.  Okay.  So we just looked at the letter.  Now

23   let's look at this page.  It's the fourth page of the

24   exhibit.

25   A.  Right.

CONFIDENTIAL

Page 113

1    Q.  And this is also in the form of a letter.  Oh.

2  And this one has -- I'm sorry.  This one actually has a

3  Bates number, OCLC 1907.  Do you recognize this letter?

4    A.  Yes, I do.

5    Q.  Okay.  And is this a letter that you received

6  enclosing the list of extractions?

7    A.  Yes.

8    Q.  And then the rest of the pages of this exhibit

9  are a bunch of individual records?

10   A.  Yes.

11   Q.  And do you know what the total is?

12   A.  ██████    ██████.

13   Q.  Okay.  And the fourth page that is the sort of

14  tinted letter from Scott Schuster at Baker and Taylor,

15  it indicates that this is a list that covers from

16  January 1st, 2019 to July 12th, 2021?

17   A.  Correct.

18   Q.  So according to this letter, the list encompasses

19  the first, second, and half of the third year of the

20  license?

21   A.  Correct.

22   Q.  Okay.  And ██████ records is less than what the

23  one year permitted extractions, correct?

24   A.  Yes.

25   Q.  So whether they reported to you annually or not,

CONFIDENTIAL

1    ████████ is a perfectly acceptable number?

2              MR. WALKER:  Objection.

3         Q.  Let me rephrase that.  ██████ extractions over

4    that period of time is permitted under the license?

5         A.  That is correct.

6         Q.  Even if they didn't report annually?

7         A.  Even if they did not report annually.

8         Q.  Okay.  So -- and you were aware of this list and

9    the number ██████?

10        A.  Yes.

11        Q.  So in light of that list, what is the basis for

12   your claim that Baker and Taylor extracted more records

13   than they were permitted to extract?

14        A.  So in addition to this, Baker and Taylor also had

15   access to our Z39.50 service.  We looked at the number

16   of searches that was conducted over the period of 2019

17   through 2022 when they had access to the service.  That

18   would be September of 2022.

19             Over that period of time, they executed over

20   1.5 million searches through Z39.50 to the WorldCat

21   catalog.  We don't have the number of extractions, but

22   based on industry practice, we find that on average it's

23   three searches for every one record extracted.  That

24   information would lead us to believe that Baker and

25   Taylor extracted over a half a million records.

CONFIDENTIAL

Page 130

1   Q.   Oh, you're right.  Thank you.

2   A.   I'm listed on here.

3   Q.   Yep.  Okay.  So at least at some point you were

4   part of this e-mail chain?

5   A.   Yes.

6   Q.   But only for part of it.  Okay.  And in fact, you

7   said I wasn't aware that B and T was competing head to

8   head with us?

9        MR. WALKER:  Objection.

10  Q.   So you also learned this information --

11       MR. WALKER:  Sorry.

12  Q.   So you also learned on March 3rd, 2021, about

13  BTCat?

14  A.   It appears that way.

15  Q.   Okay.  And what, in general terms -- I mean, the

16  e-mails here are discussing it, but what in general

17  terms aside from the e-mails did OCLC do, having learned

18  that Baker and Taylor was -- had a product called BTCat?

19  A.   We cancelled the WorldCat data and licensing

20  agreement.

21  Q.   Okay.

22  A.   And that was a May date.

23  Q.   Okay.  But then it actually continued from one

24  year contractually, but the decision to terminate was in

25  May?

CONFIDENTIAL

Page 131

1    A.  Right, in May.  The letters that were sent to

2    Baker and Taylor were in May.

3    Q.  And other than cancelling the license agreement,

4    did OCLC do anything else to find out more about BTCat?

5    A.  We would have done -- Janet that I mentioned

6    would have done desk research, her team, to understand

7    what the product was.  Our sales team would have been

8    asking more questions.  The product team would have been

9    seeking out information.  We would have attended

10   conferences to understand more, or presentations.

11   Q.  Did OCLC consider, having learned about BTCat,

12   whether it needed to change something about its

13   agreements with its customers?

14            MR. WALKER:  Objection.

15   A.  Not -- I don't know.

16   Q.  Okay.  Well, let me direct your attention to the

17   first page of this exhibit.  In the middle, the e-mail

18   from Chip Nilges, where he says, as an aside -- do you

19   see that paragraph?

20   A.  Mm-hm.

21   Q.



CONFIDENTIAL

1 [REDACTED]

2 [REDACTED]

3 [REDACTED]

4 [REDACTED]

5 [REDACTED]

6 [REDACTED]

7      Q.  And was it -- how many people do you have at OCLC

8 who do a job similar to what Lisa Adams was doing?

9      A.  I don't know the exact numbers.

10     Q.  Okay.  So was it part of the practice for OCLC to

11 reach out to customers who cancelled and find out, is

12 there something we can do, what happened, et cetera?

13     A.  Yes.  It is part of our process.

14     Q.  Okay.  And is that memorialized somehow?

15     A.  The outreach from the sales team can be added to

16 Salesforce.com.

17     Q.  Okay.  So let me just break that down.

18 Salesforce is like a website that you use to support

19 sales, not just you, but anybody who subscribes can use

20 it to help support their sales and marketing?

21     A.  Yes.

22     Q.  And you can put in reports and information and so

23 forth?

24     A.  Yes.

25     Q.  And OCLC was using Salesforce in 2021?

CONFIDENTIAL

Page 136

1    A.  Yes.

2    Q.  Is it still using it?

3    A.  Yes.

4    Q.  Pardon?

5    A.  Yes.

6    Q.  Okay.  All right.  So having reviewed this

7   e-mail, is there anything different about the way Ms.

8   Adams is reporting this, like more information or

9   different tone, because this is involving a loss to

10  BTCat?

11   A.  No.

12   Q.  Does this appear to you pretty standard report of

13  what's going on?

14   A.  It depends on the sales rep.

15   Q.  Okay.

16   A.  But yes.

17   Q.  So if we wanted to find out the reasons that

18  subscribers or members cancelled their subscription to

19  OCLC, we could look at reports like this that would be

20  in Salesforce?

21        MR. WALKER:  Objection.

22   A.  Yes.

23   Q.  Looking at the first bullet point of her report,

24  BT offers additional services, hyphen, they will set up

25  macros for easy cataloguing and preprocess print

CONFIDENTIAL

Page 137

1    materials.  What is your understanding of what that

2    means?

3        A.  I would not want to speculate on what that means.

4        Q.  Do you know what a macro is?

5        A.  I know what our definition of a macro is.  It

6    varies from company to company.

7        Q.  Okay.  But is a macro for OCLC something that you

8    use to help with these algorithms that you use in

9    managing OCLC?

10       A.  In OCLC, it is.

11       Q.  It's not something unique to OCLC?

12       A.  No.  But how it's implemented, what it does, it's

13   completely different.  I would not know what that means.

14       Q.  Okay.  Is easy cataloguing a significant term in

15   your industry?

16            MR. WALKER:  Objection.

17       Q.  Let me rephrase it.  Is easy cataloguing

18   something that OCLC considers a positive feature for

19   people who are using a catalog like WorldCat?

20       A.  Yes.

21       Q.  Is that something you strive to provide?

22       A.  Yes.

23       Q.  Okay.  So this would be competitively significant

24   if Baker and Taylor is providing easy cataloguing?

25       A.  Yes.

Page 142

1   was given a perpetual license to use those records in

2   any manner that they wished in perpetuity for any

3   product and service.

4       Q.  And that's your recollection of what the

5   agreement contains in that section?

6       A.  There probably are some other things, but my

7   recollection at this second is that, yes.

8       Q.  Okay.  I'm going to have this marked.  And with

9   apologies; this is not stapled.

10

11      (Defendant's Exhibit K marked for identification.)

12

13              (Remarks were made off the record.)

14

15              (Recess from 2:46 p.m. to 2:51 p.m.)

16

17  BY MR. NOYES:

18      Q.  So this is Exhibit K.  You've reviewed Exhibit K

19  briefly?

20      A.  Yes.

21      Q.  Okay.  And is this an e-mail chain in October of

22  2024, starting in September of '24 and extending to

23  October of '24 that includes you?

24      A.  Yes.

25      Q.  And what prompted this chain of e-mails?

CONFIDENTIAL

Page 174

1      Q.  Okay.  So let me just ask you, do you have any

2   knowledge of how many customers for WorldCat have

3   cancelled their subscriptions to WorldCat in the last

4   five and a half years?

5      A.  I don't have access to that, no.

6      Q.  Okay.  But to your knowledge, OCLC maintains data

7   that would allow you to figure that out, correct?

8      A.  Yes.

9      Q.  It's more than 36, isn't it?

10     A.  Yes.

11     Q.  It's probably hundreds?

12     A.  Probably.

13     Q.  Maybe thousands?

14     A.  No.

15     Q.  Okay.  I mean, you said there are 20,000

16  customers, correct?

17     A.  Yes.

18     Q.  And in the last five and a half years, you think

19  you have lost less than a thousand?

20     A.  I would not want to speculate.

21     Q.  Okay.  Fortunately, we don't have to, because

22  there's information at OCLC that will help us figure

23  that out, correct?

24     A.  Yes.

25     Q.  Based on, let's say, your anecdotal understanding

CONFIDENTIAL

Page 198

1   the basis for that statement is applying an economic

2   theory to the situation, not actual information from

3   OCLC customers?

4           MR. WALKER:  Objection.

5       A.  We are hearing from customers that moving to

6   BTCat they can get the access to WorldCat records for

7   half the price, and that has been a direct quote.  So

8   the perception is they're getting WorldCat records at

9   half the price.

10      Q.  And in those conversations, does what you hear

11  include any comment about the relative size of the

12  databases?

13      A.  No.

14      Q.  So seemingly the customers don't care about the

15  size, from what you're hearing?

16          MR. WALKER:  Objection.  Calls for

17  speculation.

18      A.  I don't have to evaluate that.

19      Q.  Okay.  I'm going to look at my notes, but I think

20  I'm done.

21          MR. WALKER:  Okay.  Do you want to go off

22  the record?

23          MR. NOYES:  Yeah.  Let's go off the record.

24

25          (Recess from 4:35 p.m. to 4:54 p.m.)

CONFIDENTIAL

Page 199

1          MR. WALKER:  I have no redirect questions.

2     And she'll go ahead and review and sign the transcript.

3

4          (Deposition concluded at 4:54 p.m.)

5                        *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 200

```
1    STATE OF OHIO)
2    COUNTY OF FRANKLIN)        SS:   CERTIFICATE
3
4        I, Emma Jane Troyer, a Notary Public within and
5    for the State of Ohio, duly commissioned and qualified,
6        DO HEREBY CERTIFY that the above-named MARY
7    SAUER-GAMES was by me first duly sworn to testify the
8    truth, the whole truth, and nothing but the truth.
9        Said testimony was reduced to writing by me
10   stenographically in the presence of the witness and
11   thereafter reduced to typewriting.
12       I FURTHER CERTIFY that I am not a relative or
13   attorney of either party, in any manner interested in
14   the event of this action, nor am I, or the court
15   reporting firm with which I am affiliated, under a
16   contract as defined in Civil Rule 28(D).
17       IN WITNESS WHEREOF, I have hereunto set my hand
18   and seal of office at Columbus, Ohio, on this 11th day
19   of August, 2025.
20
21
22
23   EMMA JANE TROYER
24   NOTARY PUBLIC, STATE OF OHIO
25   My commission expires 01-09-2027
```