# EXHIBIT I

*OCLC, Inc. v. Baker & Taylor, LLC*, No. 2:25-cv-309

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

* * *

OCLC, INC.,

          Plaintiff,


          vs.                    CASE NO. 2:25-CV-309


BAKER AND TAYLOR, LLC, et al.,

          Defendants.


                              * * *



          * TRANSCRIPT DESIGNATED CONFIDENTIAL *



          Deposition of BILL ROZEK, a 30(b)(6)
representative herein, called by the defendants for
examination pursuant to the Rules of Civil Procedure,
taken before me, Emma Jane Troyer, a Notary Public
within and for the State of Ohio, at the Offices of
Squire Patton Boggs, 41 South High Street, Suite 2000,
Columbus, Ohio, 43215, on August 12th, 2025, at 9:00
a.m.

                              * * *

CONFIDENTIAL

Page 2

1                    I N D E X

2

3  BILL ROZEK                                    PAGE

4      Examination by Mr. Noyes.......................4

5

6

7

                         *  *  *

8

9              INDEX OF EXHIBITS

10  EXHIBIT                  DESCRIPTION            PAGE

11  Defendant's Exhibit M....3/26/25 Declaration of
                            Bill Rozek................15

12

    Defendant's Exhibit N....2024 Framework Agreement...27

13

    Defendant's Exhibit O....Schedules 2 & 11...........49

14

    Defendant's Exhibit P....WorldCat Rights and

15                          Responsibilities/Policy....86

16  Defendant's Exhibit A
    (previously marked)......Notice of Deposition.......6

17

    Defendant's Exhibit B

18  (previously marked)......Complaint.................140

19  Defendant's Exhibit L
    (previously marked)......List of

20                          Customers Cancelled........153

21

22                       *  *  *

23

24

25

CONFIDENTIAL

```
 1    APPEARANCES:
 2
 3            On behalf of the Plaintiffs:
 4
                  Squire Patton Boggs
 5
      By:   Jeffrey Walker
 6          Kathryn Brown
            41 South High Street, Suite 2000
 7          Columbus, Ohio 43215
            Jeffrey.walker@squirepb.com
 8          Kathryn.brown@squirepb.com
 9
10
            On behalf of the Defendants:
11
12                Offit Kurman, P.A.
13    By:   Frank Noyes, II
            222 Delaware Avenue, Suite 1105
14          Wilmington, Delaware 19801
            Fnoyes@offitkurman.com
15
16
            Cavitch Familo & Durkin
17
      By:   Derek Hartman
18          1300 East 9th Street, 20th Floor
            Cleveland, Ohio 44114
19          Dhartman@cavitch.com
20
21
            Also present:  Julie Presas,
22                         General Counsel for OCLC
23
                        *  *  *
24
25
```

CONFIDENTIAL

Page 4

1                    BILL ROZEK,

2   a 30(b)(6) representative herein, having been first duly

3   sworn as hereinafter certified, was examined and deposed

4   as follows:

5                    EXAMINATION

6   BY MR. NOYES:

7       Q.  Good morning.  My name is Frank Noyes.  I

8   represent Baker and Taylor, LLC, and Bridgeall Libraries

9   Limited.  Can you state your full name on the record?

10      A.  William Joseph Rozek.

11      Q.  And Mr. Rozek, are you here in response to a

12  notice of deposition that was issued in this case?

13      A.  Yes.

14      Q.  Have you given deposition testimony before?

15      A.  Yes.

16      Q.  Okay.  I'm going to remind you of the rules

17  anyway, because there are some normal rules, typical

18  rules, in order to make sure that the transcript is

19  clear and reliable.

20          First, because everything is being taken down,

21  you and I can't speak at the same time.  You have to let

22  me finish my question before you answer, and I will try

23  and let you finish your answer before I ask the next

24  question.  Understand?

25      A.  Yes.

CONFIDENTIAL

1  you understand it, the institution is the company that

2  is obtaining services from OCLC?

3      A.  It's obtaining services through this agreement.

4      Q.  Right.  So this agreement is signed by the

5  institution, and by OCLC, correct?

6      A.  Yes.

7      Q.  Okay.  And throughout this agreement, it refers

8  to the entity receiving services as an institution.  It

9  doesn't refer to them as members, correct?

10     A.  In the -- in the agreement, it also references

11 the rights and responsibilities as incorporated into the

12 agreement.  And in that agreement, it also refers to

13 member.

14     Q.  Right.  And so I'm talking about the framework

15 agreement.  It doesn't refer to the institution as

16 members, right?

17         MS. BROWN:  Objection.  Asked and answered.

18     Q.  Didn't hear you.

19         MS. BROWN:  Asked and answered.

20     Q.  Please answer the question?

21     A.  The member is also mentioned in this agreement

22 through the rights and responsibility, which is

23 incorporated into this agreement.

24     Q.  I'm not talking about what's in the rights and

25 responsibilities document.  I'm talking about the

Case 2:25-cv-00009-EAS-EPD Doc #: 62-19 *SEALED* Filed: 01/09/26 Page: 7 of 43 PAGEID #: 1451

1    framework agreement?

2        A.  The framework agreement incorporates.

3        Q.  No, it doesn't, sir.  And just please answer the

4    question?

5            MS. BROWN:  Objection.  Asked and answered.

6        Q.  Please answer the question.  Does this document

7    that's in front of you refer to institutions as members?

8        A.  I've answered the question.

9        Q.  I'm asking it again.  Does this document refer to

10   institutions as members?

11           MS. BROWN:  Objection.

12       A.  I've asked and answered the question.

13       Q.  Are you refusing to answer my question, sir?

14       A.  No.  I've answered the question.

15       Q.  I'm asking the question in a new form.  Please

16   answer the question?

17       A.  The framework agreement includes the definition,

18   or includes institution, and by incorporation of the

19   schedules in the framework agreement, also includes

20   members in the definition in the rights and

21   responsibilities.

22       Q.  Okay.  So setting aside what the rights and

23   responsibilities document may say, and what terms it

24   uses, does the word member appear in this document?

25       A.  Setting aside the incorporation of the framework

CONFIDENTIAL

1  agreement, which is included, incorporated into this

2  agreement, if you set that aside, I don't see member in

3  here.

4      Q.  Okay.  And where in this agreement does it say

5  that the rights and responsibilities document is

6  incorporated?

7      A.  It's in the schedules that are attached to the

8  framework agreement.

9      Q.  Is there a schedule attached to this document?

10     A.  It is -- when someone signs up for our services,

11  the schedules are incorporated into this agreement.

12     Q.  My question was is there any schedule attached to

13  the document in front of you?

14     A.  There's no schedule attached to the document in

15  front of me.

16     Q.  Okay.  So the schedule is a separate document,

17  correct?

18     A.  That schedule is incorporated when they sign up

19  for the respective services in the agreement.

20     Q.  The question I asked, sir, is whether the

21  schedules are a separate document from the document in

22  front of you?

23     A.  They are a separate attachment from the document

24  that you have in front of me, which is a paper copy.

25     Q.  Okay.  And the copy of what you have in front of

CONFIDENTIAL

Page 33

1    you doesn't have any schedules, right?

2        A.   No, but it references them on Page 3 of 9.

3        Q.   Right.  And so on Page 3 is a list of schedules,

4    and there are little boxes that you can check beside the

5    name of each schedule, correct?

6        A.   Yes.

7        Q.   And what's the purpose of the boxes and the list

8    of schedules?

9        A.   The purpose for those schedules is to reference

10   the products and services that the institution is

11   signing up for.

12       Q.   Okay.  And an OCLC customer or an institution

13   that's referred to in this agreement has a choice as to

14   a variety of different services that they can obtain

15   from OCLC, correct?

16       A.   Yes.

17       Q.   And it's not the same for every institution or

18   customer, correct?

19       A.   Yes.

20       Q.   So Page 3 is a list of the options that the

21   customer or institution has, and they can select from

22   among those, correct?

23       A.   Yes.

24       Q.   Okay.  And each of those documents is a separate

25   document from the framework agreement, correct?

Case 2:25-cv-00009-EASPDD Doc #621-1 *SEALED* 01/09/26 Page 10 of 43 PAGEID #: 1454

1          MS. BROWN:  Objection.  Vague.

2     A.  It is a separate document that is incorporated

3     into the framework agreement when you check that box and

4     subscribe to that service.

5     Q.  Okay.  And so it's the act of checking the box

6     that indicates whether a particular schedule becomes

7     incorporated with the framework agreement?

8     A.  Yes.

9     Q.  Okay.  If a box, if the box next to a schedule is

10    not checked, that schedule is not part of the framework

11    agreement, correct?

12    A.  Yes.

13    Q.  Now, you mentioned many times already the

14    WorldCat rights and responsibilities document, which I'm

15    referring to as the policy, and if I refer to it as the

16    policy, you understand what I'm talking about, right?

17    A.  Yes, I do.

18    Q.  Okay.  Can we agree that the framework agreement

19    itself does not incorporate the WorldCat policy?

20         MS. BROWN:  Objection.  Asked and answered.

21    A.  No.  I do not agree with that.

22    Q.  Okay.  Can you please point to where in the

23    framework agreement the rights and responsibilities is

24    incorporated?

25    A.  Specifically, when you check box number 1, 2, 3,

Case 2:25-cv-00009-ASEPPD Doc# 6-11 *SEALED* 11/09/25 Page 11 of 43 PAGEID #: 1455

1   WorldShare meta data and OCLC cataloguing, it references

2   schedule two, and schedule two is specifically

3   incorporates the rights and responsibilities in that

4   schedule.

5       Q.  So the only way that the WorldCat policy gets

6   incorporated is if you check the box and schedule two

7   applies?

8              MS. BROWN:  Objection.  Calls for a legal

9   conclusion.

10      A.  I'm not a lawyer, okay, so I can't give you a

11  legal opinion, but there are sections in the framework

12  agreement that I believe also reference the fact that

13  you shouldn't be doing anything that might be

14  detrimental to OCLC's products and services.

15      Q.  Okay.  And for example, Section 5.1?

16      A.  Mm-hm.

17      Q.  Correct, and you're familiar with 5.1?

18      A.  I am.

19      Q.  Okay.  But 5.1 doesn't mention or incorporate the

20  WorldCat rights and responsibilities, correct?

21      A.  Schedule 5.1 by itself does not incorporate the

22  rights and responsibilities to my understanding.

23      Q.  Okay.  And just so we're clear, you said schedule

24  5.1.  Did you mean Section 5.1?

25      A.  Section 5.1.  And specifically, if you read it,

CONFIDENTIAL

Page 36

1    it says OCLC and its licensers and suppliers are the

2    exclusive owners and retain all right, title, and

3    interest copyrights and other proprietary rights to the

4    products, services, WorldCat, and other materials

5    produced by OCLC, all right.

6        Q.  And you were reading from Section 5.1(a)?

7        A.  I was, correct.  That's correct.

8        Q.  Since I'm turning the page on my outline, let me

9    just digress for a second.  How many customers slash

10   members does OCLC have, approximately?

11       A.  Approximately 29,000, I think, in that general

12   range.

13       Q.  And how many of the 29,000 subscribe to the

14   WorldCat database?

15       A.  Subscribe to the cataloguing services as opposed

16   to the database?

17       Q.  That wasn't my question, but why don't you tell

18   me how many are subscribed to the cataloguing services?

19       A.  Approximately 10,000.

20       Q.  And if a customer subscribes to the cataloguing

21   services, is there a particular schedule that they would

22   use?

23       A.  Yes.

24       Q.  Which schedule?

25       A.  Schedule two.

CONFIDENTIAL

1      Q.   Okay.  So if a customer wants to take advantage

2   of the cataloguing services, schedule two is checked and

3   becomes incorporated into the framework agreement?

4      A.   Yes.

5      Q.   And if in that instance then anything that is

6   mentioned in schedule two becomes connected to the

7   framework agreement?

8      A.   Yes.

9      Q.   If -- so that's 10,000.  So there are another

10  19,000 OCLC customers or members who do not choose that

11  service?

12     A.   There also is WorldShare Management Services,

13  WMS, and that service also includes cataloguing services

14  as well.

15     Q.   Okay.  So those are customers who also use the

16  cataloguing service?

17     A.   Yes.

18     Q.   And they get something else as well?

19     A.   Yes.  They get other services as part of that

20  package.

21     Q.   Okay.  So if a customer is in that category, are

22  they among the 10,000 that you mentioned?

23     A.   I would need to double check that.  I believe

24  they are, but I would need to double check that.

25     Q.   Okay.  So when you include the customers who use

1  cataloguing services and the customers who use the
2  WorldShare services that includes cataloguing, your
3  estimate is about 10,000 of the customers?
4     A.  I would have to double --
5            MS. BROWN:  Objection.
6     A.  I would have to double check.
7            MS. BROWN:  Remember to let me get the
8  objection in when I start.
9     A.  Okay.
10    Q.  So you don't know whether both of those
11 categories are included in the 10,000?
12    A.  I know for sure that those that subscribe
13 specifically to just cataloguing services are in the
14 10,000.  I would need to double check to make sure that
15 the WMS subscribers are part of that 10,000.
16    Q.  Okay.  That might be an additional number on top
17 of the ten?
18    A.  It could be an additional number.
19    Q.  So whatever that number is plus the estimated
20 10,000 subscribers, there are still a lot of OCLC
21 customers who are not subscribers; is that correct?
22            MS. BROWN:  Objection.  You can answer.
23    A.  There are some who are not subscribers; yes.
24    Q.  Do you have any sense of how many that is out of
25 the 29,000?

CONFIDENTIAL

Page 40

1    A.  Unless it was a WMS customer.

2    Q.  Okay.  Which box gets checked for WMS customer?

3    A.  Box number one, WorldShare Management Services

4  schedule one.

5    Q.  Okay.  And so WorldShare Management Services

6  customer doesn't check the box for schedule two?

7    A.  I believe they also check that box.

8    Q.  Okay.  Now, there are a variety of other services

9  that OCLC provides, which is reflected in this list of

10  schedules, correct?

11    A.  Yes.

12    Q.  Is there any other category of customers that

13  would check the box for schedule two?

14    A.  I don't believe so, but I don't know for sure.

15    Q.  Okay.  So for those customers in the categories

16  for which schedule two applies, then the box is checked,

17  and schedule two then becomes attached to the framework

18  agreement, correct?

19    A.  Yes.

20    Q.  Okay.  And if they don't -- if a customer doesn't

21  have schedule two checked on this agreement, then

22  schedule two doesn't apply to that customer, correct?

23    A.  I believe that's correct.

24    Q.  Okay.  If I could ask you to turn to Section 13.7

25  of the framework agreement, which is the last page, it

CONFIDENTIAL

Page 41

1    looks like, have you read that section before?

2    A.  Yes.

3    Q.  Okay.  First sentence says, this agreement and

4    any schedules constitute the complete agreement between

5    the parties, and supersedes and replaces all prior

6    agreements, oral and written, between parties relating

7    to the subject matter of this agreement.  What is your

8    understanding of that sentence, understanding you're not

9    a lawyer, but you're here on behalf of OCLC to discuss

10   this agreement?

11   A.  I'm not a lawyer, as you've said, but the written

12   agreement and schedules that are incorporated in this

13   agreement, which then by reference includes the rights

14   and responsibilities, is the complete agreement and

15   supercedes any oral discussions between the parties.

16   Q.  Okay.  And actually, it supercedes oral and

17   written, prior oral and written agreements, correct?

18   A.  Yep.  Yes.

19   Q.  And that sentence doesn't reference the WorldCat

20   policy, the rights and responsibilities, does it?

21   A.  That specific sentence doesn't, but if they've

22   checked the schedule, and that schedule is incorporated

23   into the agreement, then the rights and responsibilities

24   is therefore incorporated into the agreement.

25   Q.  If you look at the last sentence of that

CONFIDENTIAL

Page 62

1       A.  Yes.

2       Q.  And Section 5.1(b) describes institution data is

3   described in Section 3.4 --

4

5            (Remarks were made off the record.)

6

7   BY MR. NOYES:

8       Q.  Okay.  I'm looking at Section 3.4, which defines

9   institution data; do you see that?

10      A.  Yes.

11      Q.  Okay.  And it has three subparts to it?

12      A.  Yes.

13      Q.  And I want to ask you to look at Section 3, which

14  is all other data and content that is produced, sent, or

15  reproduced through the services by the institution or

16  made available to OCLC in connection with the services.

17  Do you understand that that is what part of what

18  institution data is?

19      A.  That is the phraseology that's in 3.4.

20      Q.  And under 5.1(b), doesn't the institution or the

21  customer retain rights to the institution data?

22      A.  The institution data is owned by the institution.

23  However, once it's incorporated into OCLC's WorldCat,

24  the record becomes a WorldCat record, which includes

25  enhancements, improvements, et cetera, and is part of

Case 2:25-cv-00009-SEAE-PPD Doc # 62-11 *SEALED 01/09/26 Page 18 of 43 PageID #: 1462

1  WorldCat, and is therefore covered under 5.1(a).

2      Q.  Okay.  And specifically in 5.1(a) it refers to

3  products, a defined term, services, a defined term,

4  correct?

5      A.  Correct.

6      Q.  Okay.  So let's look at the definition of

7  product.  It means the OCLC software, hardware, and

8  other products licensed to institution pursuant to this

9  agreement, correct?

10      A.  What section are you referring to?

11      Q.  Products as defined in Section 3.7?

12      A.  It means the hardware, software, hardware, and

13  other products licensed to the institutions in this

14  agreement.

15      Q.  And it says, the products are described in detail

16  in the applicable product descriptions, which is not

17  part of the framework agreement, but do not include

18  products provided by third parties.  So that's what

19  product means, correct?

20      A.  That's the definition that's down here.

21      Q.  Okay.  And to your reading of that, does the

22  record, the record that the library provides to OCLC is

23  therefore not a product?

24          MS. BROWN:  Objection.  Calls for legal

25  conclusion.

CONFIDENTIAL

Page 64

1    A.   I am not an attorney.  However, the institutional

2    data that is provided to OCLC initially that then gets

3    combined with OCLC enhancements, et cetera, and gets

4    into WorldCat is an OCLC record that is included in the

5    WorldCat database, and is therefore we have ownership

6    rights on that record.

7    Q.   Okay.  And to your understanding, those ownership

8    rights covered not only whatever material or data was

9    added by OCLC, but covers the entire record?

10   A.   They cover the entire record if at one point in

11   time that record was part of the OCLC database, and that

12   is specifically called out in the rights and

13   responsibilities document, which is part of schedule

14   two.

15   Q.   Okay.  Is the rights and responsibilities

16   document something that's mentioned in schedule two?

17   A.   It's the policy that's mentioned in schedule two,

18   which then refers to the rights and responsibilities.

19   Q.   Okay.  So to understand what the product

20   description is, you need to go to the WorldCat policy,

21   and it refers to a separate document that's the product

22   description?

23        MS. BROWN:   Objection.  Document speaks for

24   itself.

25   A.   The rights and responsibilities document

CONFIDENTIAL

Page 74

1   records are then sent back to the library or customer?

2      A.  The library essentially -- you're talking about

3   their holdings data, okay.  Specifically their holdings

4   data, which has now been enhanced by OCLC, is copied

5   into their individual catalog, which has more than just

6   the institutional data.  It has all of the OCLC

7   enhancements, and that's their holdings data.

8           MS. BROWN:  And just for the sake of

9   clarity, this is beyond Mr. Rozek's topics.  So you can

10  answer far as you know personally.

11     A.  That's what I know personally.

12     Q.  So is it your understanding that the operation of

13  Section 5.1(a) and (b) of framework agreement means that

14  once OCLC ingests records that are provided by a library

15  and then sends those records back to the library, that

16  the library's online catalog now is owned by OCLC?

17          MS. BROWN:  Objection.  Misstates testimony.

18     A.  That record, which contains enhancement, is OCLC

19  record in WorldCat, and that record is exclusively owned

20  by OCLC and its licensors, people that subscribe to the

21  cataloguing service, is what it says here.  And once

22  that record has been in OCLC, WorldCat, at any time, as

23  outlined in the rights and responsibilities, it's an

24  OCLC record.

25     Q.  Okay.  And just so we're clear, the record

1  consists of a lot of points of data, a few of which or

2  some of which are changed, modified, or enhanced by

3  OCLC, correct?

4      A.  Although this is not my topic, yes.  It includes

5  fields that have been modified, enhanced by OCLC,

6  de-duplicated, other types services.

7      Q.  But it also includes a bunch of fields that OCLC

8  doesn't do anything to, correct?

9      A.  This is not my topic, but to the best of my

10  knowledge, it would also include some fields that may

11  not be modified by OCLC.  But this is not my topic.

12      Q.  I agree.  And this next question is not your

13  topic, but I'm asking this to inform your understanding

14  of your prior answers.  So do you understand that in

15  some instances when OCLC ingests a record, it might do

16  only -- the only thing it does could be add the OCN

17  number; it might not modify anything else?

18      A.  This is not my topic.  This is Ms. Sauer-Games'

19  topic.  To the best of my personal knowledge, it would

20  be -- it would be rare that all we did is add an OCN

21  number.  The records that we have, if the -- if we

22  already have that record, that record has already been

23  significantly enhanced by OCLC outside of the

24  institution's data.  And so in effect what they would be

25  doing would be copying that record down and indicating

CONFIDENTIAL

Page 76

1   to the community that we, this library also has that

2   record in our catalog.

3       Q.  So the reason I was asking that question is I

4   want to be clear that your testimony about the ownership

5   rights of OCLC.  Once a record has been received from a

6   library and then returned to the library does not depend

7   on how much work OCLC has done on that record -- a

8   little bit of work, a lot of work, something in

9   between -- none of that matters; it's all OCLC records?

10      A.  Once again, this is not my topic, but I think the

11  language is fairly clear that once it gets into OCLC,

12  it's an OCLC -- or WorldCat, it's an OCLC record.

13      Q.  So if the library now has a catalog that OCLC has

14  worked on and decides not to renew its OCLC agreement

15  and is now a former customer or member, does it lose the

16  rights to its own catalog?

17      A.  If the library continues to use an OCLC record

18  within their catalog, it is no longer a customer.

19  Again, I'm not a lawyer, but it's my understanding that

20  that library is still subject to the rights and

21  responsibilities in these documents.

22      Q.  Does that mean that if a customer decides not to

23  renew its agreement and its catalog consists of records

24  that OCLC has added an OCN number to or added some other

25  modifications to, that the former customer is just as

1   restricted in how they can use that data as an active

2   customer?

3       A.  Once again, I'm not a lawyer, but it's been our

4   practice and understanding is yes.  They no longer have

5   the rights to use those records that have at one point

6   had been part of WorldCat.

7       Q.  Okay.

8       A.  And that's specifically outlined in the rights

9   and responsibilities document, I think on one of the

10  last pages, from memory.  If I had the document in front

11  of me, I could point it out.

12      Q.  So a customer looking at the framework agreement

13  in Section 5.(b), where it says that the customer called

14  an institution in this agreement retains all right,

15  title, and interest, including without limitation all

16  proprietary rights to institution data, except for

17  rights granted to OCLC and its affiliates under this

18  agreement, is it OCLC's position that the customer would

19  understand that it has no rights to that data once it

20  becomes WorldCat records?

21      A.  Once again, in the framework, or in the rights

22  and responsibilities document referenced under schedule

23  two, it makes it very clear that once it's been an OC --

24  in WorldCat, it is an OCLC record at that point in time.

25      Q.  So the word WorldCat record, or actually it's

CONFIDENTIAL

1    WorldCat, is defined in this as a database, or several

2    databases, and that database consists of records,

3    correct?

4        A.  Yes, it does.

5        Q.  And the records that are in the WorldCat database

6    are WorldCat records; is that your understanding?

7        A.  Yes.

8        Q.  So a WorldCat record is a record that's in a

9    WorldCat database?

10                MS. BROWN:  Objection.  Form.

11       Q.  Is that your understanding?

12       A.  A WorldCat record is defined in here under 3.2.

13   It means the databases of bibliographic data, data

14   holdings and related files maintained by OCLC.  So it's

15   a record within WorldCat.

16       Q.  Okay.  That's not a definition of WorldCat

17   record, though; that's a definition of WorldCat,

18   correct?

19       A.  Okay.

20       Q.  So my question, though, is is it OCLC's

21   understanding that any record that's in the database as

22   defined in 3.2, 3.12, is a WorldCat record?

23       A.  Yes, as defined in rights and responsibilities.

24                MS. BROWN:  Really quickly, lunch is here,

25   and we've been going for about an hour.

CONFIDENTIAL

1  Q.  Okay.  Let me find a good spot to stop.  So just

2  a couple more questions on this topic before we break.

3  Does OCLC, through their sales or through the legal

4  department, when they're talking to a customer who is

5  considering, you know, joining and becoming a subscriber

6  to the WorldCat database, does the sales or legal

7  representatives of OCLC make all of what you just said

8  clear to the library?

9  A.  The relevant documents are provided, based upon

10  what services are selected.  If you're asking whether

11  there is verbal conversations that further amplify these

12  kind of situations, I do not know for sure.  I'm not

13  engaged in all the discussions that the legal department

14  has with prospective customers, and I am not engaged in

15  all the discussions that our sales group has with

16  prospective customers.

17  Q.  Okay.  In order to sort of find a good spot, is

18  there any other provision or section in the framework

19  agreement, understanding we'll get to the WorldCat

20  rights and responsibilities in a minute, or after the

21  break, is there any other section in the framework

22  agreement that OCLC contends is relevant to defining the

23  library and the customer's rights?

24  MS. BROWN:  Objection.  Form.

25  A.  There is Section 11.1, which defines what the

CONFIDENTIAL

Page 83

1     A.   It can be, yes.

2     Q.   Turning your attention back to 5.1(b) in the

3 framework agreement, we talked about the first part of

4 that section, which describes what an institution

5 retains, but I want to ask you about the last two

6 sentences of that section, starting on the third line at

7 the end. Institution is responsible for -- do you see

8 that?

9     A.   Yes.

10     Q.   Institution is responsible for obtaining all

11 permission and other rights necessary to provide

12 institution data to OCLC, and then the next sentence is,

13 institution will not provide OCLC with institution data

14 that institution does not have the right to provide for

15 use in connection with the products and services.

16 What's your understanding of the significance of those

17 two sentences?

18     A.   That when -- once again, I'm not a lawyer, but my

19 understanding of that refers to if a library provides

20 some of their institutional information to us, that

21 they're restricted by a previous agreement to providing

22 to other outside parties by third party agreement that

23 the institution will not provide that information as

24 part of their institutional data to OCLC, because

25 they're prohibited to do so.

CONFIDENTIAL

Page 84

1    Q.  Okay.  So part of it is that they won't provide
2  you records if they're not permitted to, correct?
3    A.  That's how it's worded.
4    Q.  And the other part of it is that the records that
5  they do provide to OCLC, they are telling OCLC that
6  we're allowed to do this, correct?
7    A.  That is the implication of that phraseology; yes.
8    Q.  And isn't the purpose of that so that OCLC can
9  rely on what the customer is telling it?
10    A.  Yes.
11    Q.  Okay.  And does OCLC take any particular steps at
12  the beginning of a relationship when the data -- before
13  the data is ingested or immediately when the data is
14  ingested, to determine whether in fact any of the
15  records are restricted or should not be provided?
16    A.  We provide mechanisms for an institution to tell
17  us if any of the information they have provided they're
18  not eligible to provide us for.  Those mechanisms,
19  include contacting customer support.  There is a -- in
20  our website, there are instructions on how to remove
21  an -- and I might not have the right term down, bib
22  data, deleting bib data from WorldCat, instructing an
23  institution if they've provided or will provide
24  information how to delete that information.
25    Q.  Okay.  And so the way that's handled is that OCLC

Case 2:25-cv-00009-EAS-EPD Doc #: 61-11 *SEALED* Filed: 01/09/26 Page: 28 of 43 PAGEID #: 1472

1  down the page.

2      A.  What page are you on?

3      Q.  2 of 7?

4      A.  Okay.  Thank you.

5      Q.  It's Section 1, which is scope, premise, and

6  policy objectives.

7      A.  Okay.

8      Q.  The first thing in that section is it talks about

9  the policy was created, okay --

10      A.  By the record use policy council, okay.

11      Q.  Right.  And then the next paragraph says the

12  policy is intended for the OCLC cooperative, which

13  refers to -- and it describes the cooperative, all

14  right.  The third paragraph talks about the purpose of

15  the policy is to define the rights and responsibilities

16  associated with the stewardship of WorldCat, correct?

17      A.  Yes.

18      Q.  Okay.  So there's an expectation that membership

19  has a stewardship obligation?

20      A.  Yes.

21      Q.  Okay.  Later in that paragraph it talks about the

22  policy is based on the premise that OCLC members value

23  WorldCat, correct?

24      A.  Yes.

25      Q.  And the next paragraph talks about the objectives

CONFIDENTIAL

Page 93

1   of the policy, to maximize the utility and viability of

2   WorldCat, to promote successful collection action, to

3   support a spirit of trust and reciprocity, and A, B, and

4   C, it goes down through L, all objectives of the policy,

5   correct?

6       A.  Yes.

7       Q.  And those are not specific obligations; those are

8   a description of the understanding that OCLC has about

9   the function of this policy, correct?

10      A.  Yes.  It's the premise of why the policy was

11  further defined and created.

12      Q.  Okay.  The sentence after the sentence that has

13  the word premise in it, see, it says the policy's

14  intent; do you see that?

15      A.  Where are you at, what paragraph?

16      Q.  Third paragraph on that page?

17      A.  Oh, the policy's intent is to encourage the

18  widespread use.

19      Q.  Yes.  Why don't you go ahead and read it?  It

20  speaks for itself.

21      A.  The policy's intent is to encourage the

22  widespread use of WorldCat bibliographic data, and then

23  there's a reference to a -- you know, a web reference

24  there, while also supporting the ongoing and long term

25  viability and utility of WorldCat and of WorldCat based

Page 94

1   services such as resource sharing, cataloguing, and

2   discovery.

3       Q.  So there really are two intents expressed in that

4   sentence, aren't there, an intent to encourage

5   widespread sharing and an intent to protect the

6   viability of WorldCat?

7           MS. BROWN:  Objection.

8       A.  While also supporting the ongoing and long term

9   viability and utility of WorldCat and WorldCat based

10  services, such as resource sharing, cataloguing, and

11  discovery.

12      Q.  Right.  So do you agree that this policy

13  expresses not only restrictions on the use of WorldCat

14  data, but it expresses an intent to encourage sharing of

15  data under the policy?

16          MS. BROWN:  Objection.

17      A.  It does, with restrictions related to the members

18  that subscribe to our services.

19      Q.  Is it your -- is it OCLC's view that any

20  provision in the policy constitutes an enforceable legal

21  obligation?

22          MS. BROWN:  Objection.  Calls for legal

23  conclusion.

24      A.  I'm not a lawyer, but there are sections in this

25  policy specifically that are prohibited and could be

Case 2:25-cv-00009-EAS-EPD Doc #: 21-1 *SEALED* Filed: 01/09/26 Page: 31 of 43 PAGEID #: 1475

Page 95

1   subject to litigation if violated.  Once again, I'm not

2   a lawyer.

3      Q.  Okay.  And the WorldCat policy only applies in a

4   situation where it is referenced in a schedule and

5   incorporated into the framework agreement?

6           MS. BROWN:  Objection.  Is that a question?

7      Q.  Yes?

8      A.  Only applies.  We also have third party

9   agreements that place restrictions on the abilities of

10  those third parties who have access to WorldCat.  I do

11  not know that those specifically reference the policy,

12  but they contain many of the same provisions that are in

13  the policy.

14     Q.  All right.  But the policy as a document, you

15  would agree, does not -- is not enforceable against

16  anyone unless it's connected to an agreement like the

17  framework agreement and the schedule two?

18          MS. BROWN:  Objection.

19     A.  I don't agree.

20     Q.  Okay.  So if there is a library that has not

21  signed any agreement with OCLC that incorporates the

22  policy through a schedule or otherwise, can OCLC enforce

23  the policy against that library?

24          MS. BROWN:  Objection.  Calls for

25  speculation.

CONFIDENTIAL

Page 96

1    A.   It would depend upon the facts and circumstances

2    that would have to be evaluated by our legal department.

3    Q.   So it might be the case that you could enforce

4    the policy, even though there's no agreement?

5    A.   Calls for a legal opinion, and I can't -- don't

6    know.

7    Q.   And the terms of the policy, when they are

8    applied to a customer, is the customer permitted to

9    negotiate the terms of the policy?

10   A.   Customers are permitted to negotiate the terms of

11   the policy, which is contained within the framework

12   agreement; yes.

13   Q.   So if a library said, I would like to join OCLC,

14   but I don't agree with everything in the policy, can we

15   amend it, would OCLC be willing to do that?

16   A.   They would be willing to engage in discussions as

17   to specifically what they want to amend, but that

18   doesn't mean that we would necessarily amend it.

19   Q.



CONFIDENTIAL

1    A.   █████ ███████ ███████ ████████████ ████████

2    ███████

3    Q.  Okay.  Can you think of an instance where OCLC

4  has agreed to any modifications in the policy?

5    A.  Not that would, to my knowledge, not that would

6  abrogate any specific responsibilities as it relates to

7  Section 3 that members are held accountable to.

8    Q.  Okay.  By the way, this particular version of the

9  policy is dated June 2nd, 2010.  And again, this was an

10  attachment to the complaint.

11    A.  Okay.

12    Q.  Has the policy been amended in any way since June

13  of 2010?

14    A.  Not to my knowledge.

15    Q.  Okay.  So one of the components of what the

16  policy provides is to encourage the widespread use of

17  WorldCat bibliographic data, correct?

18    A.  Yes.

19    Q.  If you look at Section 5, and then we'll come

20  back to Section 3, Section 5 is titled addressing

21  disputed use of WorldCat data by members, and in

22  Section 5 it says, OCLC member use of data extracted

23  from WorldCat database is carried out in a diverse and

24  rapidly changing environment.  What do you understand

25  that to mean?

CONFIDENTIAL

1    A.  Yes, I do.

2    Q.  And the individual record is what we've referred

3    to earlier as a WorldCat record, correct?

4    A.  Yes.

5    Q.  And that is a record, a bibliographic record,

6    that is ingested into the WorldCat database, and OCLC

7    does some modifications and enhancements and so forth

8    and sends it back to the library.  That's a WorldCat

9    record?

10          MS. BROWN:  Objection.  Misstates testimony.

11   Q.  Is that your understanding?

12   A.  My understanding is the way you've described it,

13   it's a WorldCat record.

14   Q.  Okay.  And doesn't this sentence say that OCLC

15   does not claim copyright ownership of such records?

16   A.  It does say that.

17   Q.  Okay.  And do you think that's true?

18   A.  It doesn't -- yes.  It says we don't claim

19   copyright ownership.  But our action is related to

20   contractual issues, but copyright.

21   Q.  Okay.  And in that regard, under what you've

22   discussed, and we'll get to the rest of Section 3 here

23   in a minute, what you've discussed about the framework

24   agreement, it's OCLC's position that it does have

25   contractual ownership of individual records?

CONFIDENTIAL

1    A.  I'm not a lawyer, but that is -- yes.  That's

2  what we're asserting.

3    Q.  Okay.  So Section 3 has part A, which is rights,

4  and part B, which is responsibilities, referring to

5  members' rights and responsibilities, correct?

6    A.  Yes.

7    Q.  There are three -- four items under the rights

8  section, section A, and looking at number three and

9  number four, which have some references to links, and

10  four has subparts, but 3 and 4 both refer to the right

11  to transfer or make available such data to individual

12  scholars -- this is 3 I'm reading -- for their personal

13  academic or scientific research or study to a consortia.

14  I guess I'll read the whole thing -- an educational,

15  cultural, or scholarly institutions, e.g., museums,

16  archives historical societies, research institutes.

17  Whether these institutions are members or non-members of

18  OCLC, for these organizations' institutional or

19  collaborative use.

20    I believe you mentioned something about

21  contributing to research and so forth a few minutes ago.

22  So a member reading this section would reasonably

23  understand that it's okay to transfer records to

24  non-members if they believe it falls within this

25  description?

Case 2:23-cv-00009-EASEPPD Doc #621-1 *SEALED* 01/09/26 Page 36 Page: PAGE43 PAGEID #: 1480

Page 112

1   with OCLC's public purposes, and supports the long term

2   viability and utility of WorldCat.  And you believe

3   that's applicable to this case?

4       A.  Absolutely.

5       Q.  So what -- the responsibility as written here

6   isn't to simply not transfer, but to take reasonable

7   efforts to ensure that the reuse and transfer of their

8   data is consistent, and how do you determine whether a

9   library has taken reasonable efforts to ensure that?

10      A.  Well, specifically it says that libraries are

11  not, under 6(c), cannot engage in mass distribution of

12  data directly from WorldCat to non-members without our

13  written consent.

14      Q.  Right.  I'll get to 6 in a minute.

15      A.  But that specifically relates to -- that's a

16  specific responsibility that they have, which directly

17  contradicts them providing information of WorldCat data

18  to non-members, particularly one that's creating a

19  competitive service with WorldCat records.

20      Q.  But even 6, which has (a), (b), (c), and (d)

21  under it, starts out with that the responsibility is to

22  encourage and practice responsible use of the OCLC

23  systems and services, including these steps, correct?

24      A.  Yes.

25      Q.  Okay.

CONFIDENTIAL

Page 113

1    A.   That's what the sentence says.

2    Q.   And you mentioned (b).  I'll read it, 6(b).  It

3  says not engaging in mass downloading from WorldCat

4  without OCLC's prior written consent.  WorldCat there

5  refers to the WorldCat database, doesn't it?

6    A.   It does.  WorldCat database and records contained

7  therein.

8    Q.   Right.  So if a library engages in mass

9  downloading from its own catalog, it doesn't implicate

10  that section, does it?

11    A.   Unless it is provided to a non-member without

12  our -- OCLC's written consent, and mass downloading also

13  refers to records that aren't part of the member's

14  catalog.

15    Q.   Okay.  So if the member engages in mass

16  downloading of records out of WorldCat that are not part

17  of its own catalog, that section applies?

18    A.   Yes.  They would need to get written consent for

19  that.

20    Q.   Okay.  If the member instead engages in mass

21  downloading from its own catalog, how does this section

22  apply?

23    A.   Under (c), it's provided mass distribution of

24  data directly from WorldCat to non-members, and so its

25  own catalog, which contains WorldCat records, we

CONFIDENTIAL

1  consider to be mass distribution to a non-member.

2    Q.  But is that mass distribution directly from

3  WorldCat?

4    A.  Yes, because the records contain -- those records

5  are WorldCat records, and we consider providing a

6  complete distribution of a member's holdings that

7  contain WorldCat records as mass distribution to a

8  non-member.

9    Q.  Is it OCLC's contention that a library reading

10  Section 6(c) and deciding whether it wants to engage in

11  mass downloading from its own catalog has to understand

12  that what -- that that somehow implicates this section?

13    A.  Well, if they had any question, they could also

14  refer to later in the agreement here that defined what

15  WorldCat data is, which specifically says if the record

16  was ever in WorldCat at any point in time, it's a

17  WorldCat record, okay.

18    Q.  Okay.  And you're looking at the glossary?

19    A.  Yes, I am.

20    Q.  And it has a definition of -- are you referring

21  to WorldCat data, or WorldCat?

22    A.  I'm referring to WorldCat data.

23    Q.  Okay.  There's a paragraph right after that, but

24  the WorldCat data definition is just that two lines,

25  correct?

CONFIDENTIAL

1  member that the individual they're providing to is not a

2  contributing member supporting the investment in the

3  WorldCat database.

4      Q.  Just a couple follow-ups.  Where does it say that

5  a member is no longer contributing member here in

6  3(b)(6)?

7      A.  Well, essentially what's happening here -- let me

8  think about this.  They're cancelling their cataloguing

9  subscription, therefore they're no longer paying for the

10  cataloguing service, which supports the WorldCat

11  database, and then diminishes the value of WorldCat in

12  so doing.

13      Q.  So that section, are you referring to (6)(d)?

14      A.  (6)(c) and (6)(d), yes.

15      Q.  Okay.  So your understanding is that those apply

16  when a WorldCat member cancels their membership and

17  contributes their database to somebody else?

18      A.  It includes that.

19      Q.  Okay.  Well, what about if it doesn't include

20  that, if it's just a member who maintains a membership

21  and engages in mass downloading?

22      A.  It would also diminish the value because you're

23  providing WorldCat records to a non-contributing member

24  who is not paying for the support of those services and

25  is also providing services, competitive services, at

Case 2:25-cv-00009-EAS-EPD Doc #: 6-11 *SEALED* Filed: 01/09/25 Page: 40 of 43 PAGEID #: 1484

1   dramatically lower prices, which the library, we found

2   out the libraries have told us, and they're able to do

3   that because they haven't had to invest the enormous

4   amounts that we have had to invest in creating those --

5   the WorldCat database of records. And as a result, it's

6   damaging the goodwill with our membership as well as the

7   fact that that non-member is not contributing to

8   supporting the investment for WorldCat.

9       Q. Okay. So a lot of that is going to be in a topic

10  a little later. But I don't want to cut you off, but

11  I'm getting your understanding of this section. But let

12  me just propose this question. Isn't there an

13  assumption in what you just described that by

14  benefitting a company that is a lower price competitor

15  to WorldCat, that causes a diminishment of WorldCat --

16  isn't that an assumption in that scenario?

17      MS. BROWN: Objection.

18      A. It could diminish the goodwill and value that we

19  have in WorldCat because a competitor has

20  misappropriated records, in our contention, from

21  WorldCat, rather than making the investment, and

22  therefore been able to provide services at a much lower

23  value, and that diminishes the goodwill that we have

24  with the community.

25      Q. Okay. And again, I'm hoping not to jump ahead,

CONFIDENTIAL

1    but since you are a CPA and you've mentioned goodwill,

2    are you referring to goodwill as an intangible asset, or

3    are you referring to it more generically?

4    A.  I'm referring to it more generically.  And we can

5    cover the other topics now.

6    Q.  Okay.  Let's see how we're doing.  How long has

7    it been?

8         MS. BROWN:  Do you need a break?

9    A.  Yeah, give me a five-minute break.

10

11         (Recess from 1:20 p.m. to 1:28 p.m.)

12

13         MR. ROZEK:  I would like to clarify a

14   previous comment I made.  When I was referring to

15   goodwill, I was really referring to reputational damage,

16   is really -- for a clarification.

17   BY MR. NOYES:

18   Q.  That's fine.  We're going to cover that.

19   A.  You'll cover that later, but I thought I'd

20   clarify it now.

21   Q.  Okay.  You've used the term, and the policy --

22   and I think the framework agreement used the term en

23   masse, downloading en masse.  How is that defined --

24   what makes a download an en masse download?

25   A.  There isn't a specific definition to my

CONFIDENTIAL

1 ████████████ ████ ████ ████ █████

2 ██████ ████ ██████ ███ ██████ ████ ████

3 ███ ███ █████

4      MS. BROWN:  Objection.  Misstates testimony.

5  A.  ████ ██████ ████ █████ █████

6 ██████ ███ ██████ ██████ ██

7 █████

8  Q.  And how do you know that?

9  A.  Because we had an ongoing investigation regarding

10 Baker and Taylor and the BTCat and the information that

11 we obtained led us to that conclusion.

12  Q.  Okay.  I think I'm done.

13      MS. BROWN:  Okay.

14      MR. WALKER:  Could we have a couple minutes?

15      MR. NOYES:  Yeah.

16

17  (Recess from 3:33 p.m. to 3:42 p.m.)

18

19      MS. BROWN:  Nothing further.  Nothing from

20 us.  But we will review and sign.

21

22  (Deposition concluded at 3:42 p.m.)

23      * * *

24

25

Page 188

*CONFIDENTIAL*

1  STATE OF OHIO)

2  COUNTY OF FRANKLIN)          SS:  CERTIFICATE

3

4      I, Emma Jane Troyer, a Notary Public within and

5  for the State of Ohio, duly commissioned and qualified,

6      DO HEREBY CERTIFY that the above-named BILL ROZEK

7  was by me first duly sworn to testify the truth, the

8  whole truth, and nothing but the truth.

9      Said testimony was reduced to writing by me

10  stenographically in the presence of the witness and

11  thereafter reduced to typewriting.

12      I FURTHER CERTIFY that I am not a relative or

13  attorney of either party, in any manner interested in

14  the event of this action, nor am I, or the court

15  reporting firm with which I am affiliated, under a

16  contract as defined in Civil Rule 28(D).

17      IN WITNESS WHEREOF, I have hereunto set my hand

18  and seal of office at Columbus, Ohio, on this 12th day

19  of August, 2025.

20

21

22

23  EMMA JANE TROYER

24  NOTARY PUBLIC, STATE OF OHIO

25  My commission expires 01-09-2027